UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NORRIS HOLDER,                  )

                      )

         Movant,          )

                      )     No. 4:03CV0923 ERW

   vs.               )

                      )     *This is a Capital Case.*

UNITED STATES OF AMERICA,    )

                      )

       Respondent.    )

**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE
OR CORRECT CONVICTIONS AND SENTENCES
<u>BY A PERSON IN FEDERAL CUSTODY</u>**

COMES NOW movant, Norris Holder, an inmate at the United States Penitentiary at Terre Haute, Indiana under a sentence of death, by and through court appointed counsel, Christopher E. McGraugh and Michael J. Gorla, and pursuant to 28 U.S.C. § 2255, files this motion challenging his convictions and sentences of death.  In support of this motion, movant states as follows:

**PROCEDURAL HISTORY**

*District Court Proceedings*

1.      The judgment and conviction under attack was issued on July 23, 1998 in the United States District Court, Eastern District of Missouri, Eastern Division, in Case #97CR141 ERW.

2.      Movant was charged in said cause with one count of bank robbery by force or violence in which a killing occurred in violation of 18 U.S.C. §§ 2, 2113(a) and (e) (1994), and one count of carrying or using a firearm during a crime of violence which resulted in a murder in violation of 18 U.S.C. §§ 2, 924(c)(1) and (j)(1) (1994 and Supp.II 1996).

3.      Movant entered pleas of not guilty, and the matter was tried to a jury in March of 1998 before the Honorable E. Richard Webber, United States District Court Judge. Movant testified during the guilt phase at his trial.

4.      On March 26, 1998, the jury returned its verdict finding movant guilty as charged on both counts, and on April 3, 1998, following penalty phase proceedings, recommended the death penalty.

5.      On July 23, 1998, Judge Webber formally sentenced movant to death on both counts pursuant to 18 U.S.C. § 3591(a)(2)(D) in accordance with the jury's verdict.

***Eighth Circuit Proceedings***

6.      Movant filed a timely notice of appeal to the United States Court of Appeals, Eighth Circuit, seeking review of the judgment of the district court.

7.      The Eighth Circuit affirmed movant's convictions and sentences of death on April 12, 2001.[1] Rehearing was denied on August 20, 2001.

***Petition for Writ of Certiorari***

8.      Movant filed a petition for certiorari in the United States Supreme Court seeking review of the decision of the Eighth Circuit.

9.      The petition for certiorari was denied on June 9, 2003.[2] A petition for rehearing of that ruling was filed, and denied on August 4, 2003.[3]

---

[1] *See United States v. Allen, et al.*, 247 F.3d 741 (8th Cir. 2001).

[2] *See Holder v. United States*, 539 U.S. 916 (2003).

[3] ___ U.S. ___, 124 S.Ct. 19 (2003).

*Prior Post-Conviction Applications*

10.    Movant has not filed any petitions, applications or motions with respect to this judgment in any federal court other than his direct appeal.

*Appointment of Post-Conviction Counsel*

11.    On July 30, 2003, the district court granted movant's request for appointment of counsel under *McFarland v. Scott,*[4] and appointed the undersigned counsel to represent movant in his post-conviction proceedings.

*Grounds for Relief & Supporting Facts*

12.    Movant has been convicted and sentenced to death in violation of the constitution or laws of the United States in the following respects:

**A.    Violation of the Fifth Amendment Indictment Clause:** The indictment charged movant and Billie Allen, his co-defendant, with Count I: bank robbery by force or violence in which a killing occurs,[5] and Count II: carrying or using a firearm during a crime of violence which results in a murder.[6] The indictment failed to allege at least one statutory aggravating factor from 18 U.S.C. § 3592(c), an element essential for the imposition of a sentence of death.[7] As a result, the indictment failed to charge a federal capital offense, and movant's sentence of death exceeded the maximum sentence authorized for the crimes with which he was charged. This "constructive amendment" of

[4]512 U.S. 849 (1994).

[5]18 U.S.C. §§ 2, 213(a) & (b) (1994).

[6]18 U.S.C. §§ 2, 924(c)(1) & (j)(1) (1994).

[7]*See Ring v. Arizona*, 536 U.S. 589, 609 (2002).

3

the indictment is a structural defect which requires that movant's sentence of death be vacated and set aside.[8]

**B.      Jury's Improper Consideration of the Pecuniary Gain Statutory Aggravator:**

Movant's sentence of death violates his Fifth and Eighth Amendment rights because the jury improperly considered and weighed the pecuniary gain statutory aggravator during the sentencing deliberations.

Under the federal death penalty scheme, the jury is instructed on the existence of statutory aggravating circumstances. If one or more statutory aggravators are found, the jury is then instructed on non-statutory aggravators. Next, the jury is instructed on mitigating factors. Finally, the jury is told to weigh the aggravators, both statutory and non-statutory, against the mitigating factors or, if the jury finds no mitigating factors, against each other, to determine whether to impose a sentence of death.

One of the statutory aggravators listed in 18 U.S.C. § 3592(c) is that the offense was committed in expectation of the receipt of anything of pecuniary value.[9]  Movant's jury was erroneously instructed to consider the statutory aggravator based on the government's position, adopted by the district court, that the "offense" referred to in the pecuniary gain aggravator was the underlying felony - here the bank robbery. Both the legislative history and current case law show that this interpretation of the statutory aggravator is incorrect. The correct interpretation is that the "offense" committed referred to in the pecuniary gain aggravator is the murder itself, not the

---

[8]*See Stirone v. United States*, 316 U.S. 212, 215-17 (1960); *see also, United States v. Johnson*, 934 F.2d 936, 941 (8th Cir. 1994).

[9]*See* 18 U.S.C. § 3592(c)(8).

underlying felony.[10]  Said aggravator only applies when the pecuniary gain is the consideration for the murder, *e.g.*, murder for hire or to collect insurance proceeds.  While the bank guard was killed during the perpetration of an armed robbery, the object of which was to obtain money, the murder itself was not committed as consideration for the receipt of money.  As a result, the evidence did not support the submission of the pecuniary gain aggravator, and the jury should not have been allowed to consider said aggravator during its sentencing deliberations.

The jury's improper consideration of the pecuniary gain aggravator prejudiced movant. Movant's jury specifically found the existence of said aggravator and weighed that aggravator in reaching its decision to impose a sentence of death.  The inclusion of the pecuniary gain aggravator in the weighing process, had the effect of placing "death's thumb on the side of the scale,"[11] and skewed the process.  Thus, movant is entitled to have his sentence of death vacated and set aside.

**C.**    **Ineffective Assistance of Counsel:**   Movant was denied his constitutional right to effective assistance of counsel both at trial and on appeal in violation of his Fifth, Sixth, and Eighth Amendment Rights in the following respects:

(a) Counsel unreasonably and prejudicially failed to challenge the indictment on the ground that it was insufficient to charge a capital offense, and failed to argue that movant's death sentence violated the Fifth Amendment Indictment Clause.  Movant and his co-defendant, Billie Allen, were indicted together but tried separately.  Prior to trial, and at sentencing, Billie Allen argued that a sentence of death in his case would violate the Fifth Amendment Indictment Clause

---

[10]*See United States v. Chanthadara*, 230 F.3d 1237, 1243 (10th Cir. 2000); *see also*, *United States v. Cuff*, 38 F.Supp.2d 282, 288 (S.D. NY 1999).

[11]*See Stringer v. Black*, 503 U.S. 222, 229-32 (1992).

because the indictment failed to contain at least one of the aggravating factors set out in 18 U.S.C. § 3592(c).

Movant was represented at trial by Charles M. Shaw and Jennifer M. Herndon, f/k/a Brewer. Movant's trial counsel were aware of Allen's challenge to the indictment. In fact, counsel Herndon prepared a motion joining in the motions filed by co-defendant Allen; however, counsel unreasonably and prejudicially failed to file said motion, or pursue the same arguments on behalf of movant. Further, counsel were privy to sample motions supplied by Federal Death Penalty Resource Counsel which included a motion attacking the indictment on the ground that it failed to charge a capital offense. But, counsel unreasonably failed to file a similar motion in movant's case.

Movant's case was consolidated with that of co-defendant Allen on direct appeal. The cases were argued together and submitted to the United States Court of Appeals on September 10, 2000. Prior to September 10, 2000, appellate counsel, Jennifer Herndon and Daniel Mohs, were aware of the fact that Allen's brief contained a claim that his sentence of death violated the Fifth Amendment Indictment Clause. Yet, counsel failed to include this claim in his brief. Counsel was also aware, or should have been aware, of the cases supporting that claim - *United States v. Jones*[12] and *Apprendi v. New Jersey*.[13] Appellate counsel was also aware, or should have been aware, that, under F.R.A.P. 28(i), they could have adopted the legal arguments asserted in Allen's brief by doing so in writing before submission of the case. However, appellate counsel unreasonably failed to do so as well. It was only after Circuit Judge Richard Arnold expressed his concern at oral argument that appellate counsel was not incorporating Allen's legal arguments that appellate counsel, on rebuttal, requested

[12]526 U.S. 227 (1999).

[13]530 U.S. 466 (2000).

that the Eighth Circuit adopt those portions of Allen's brief that the court found applicable to movant's case.  But, the Eighth Circuit neglected to do so, probably due to counsel's failure to comply with F.R.A.P. 28(i).

Counsel's failure to challenge the indictment and his resulting sentences of death as being in violation of the Fifth Amendment Indictment Clause constitutes deficient performance.  Movant was prejudiced by counsel's performance in this regard because, had counsel raised such a claim either at the trial or on appeal, there is a reasonable likelihood that his sentences of death would have been set aside and remanded to sentences of life imprisonment.

(b)  Trial counsel unreasonably and prejudicially advised movant to testify when, by his testimony, movant made himself eligible for the death penalty.  Count I of the indictment charged that movant committed the crime of bank robbery in which a killing occurs.  That crime has four essential elements:

> One, that defendant took money from the person in the presence of another while that money was in the care and custody of the Lindell Bank & Trust Company;
>
> Two, such taking was by force and violence or intimidation;
>
> Three, the deposits of Lindell Bank & Trust Company were then insured by the Federal Deposit Insurance Corporation; and
>
> Four, in committing this offense, the defendant, or a person aided and abetted by the defendant, killed Richard Heflin.

Count II of the indictment charged that movant committed the crime of using or carrying a firearm during and in relation to a crime of violence which results in a murder.  The essential elements of that offense are as follows:

One, the defendant willfully and intentionally committed the crime of bank robbery as charged in Count I;

Two, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm;

Three, that in the course of committing the crime of bank robbery as charged in Count I, while knowingly using or carrying a firearm, the defendant, or a person aided or abetted by the defendant, killed Richard Heflin by the use of a firearm; and

Four, the killing of Richard Heflin was murder in the perpetration of a robbery.

Lead trial counsel Shaw was unaware of the essential elements of the offense with which movant was charged. Counsel Shaw was acting under the mistaken belief that the law required the government to prove that petitioner specifically deliberated on the killing of the guard in order to be convicted of the charged offenses. Counsel Shaw did not realize otherwise until the instruction conference when he read the relevant jury instructions for the first time. Counsel Shaw inexplicably failed to realize that movant, by testifying that he participated in an armed bank robbery with Billie Allen in which a killing occurred, would be unknowingly pleading guilty to offenses charged in the indictment, and in process, make himself eligible for the death penalty. Because counsel Shaw did not understand the nature of the federal offense with which movant was charged, he convinced movant, over the objections of co-counsel Jennifer Herndon, to testify at the guilt phase of his trial.

Trial counsel's performance in this regard was constitutionally deficient. By putting movant on the witness stand to admit that he willingly and knowingly participated in an armed bank robbery during which a person was killed, trial counsel assured movant's convictions for the offenses charged and made movant eligible for the death penalty. Counsel's advice to movant to testify cannot be

justified as any conceivable trial strategy.  Said advice was an unthinkable blunder - the result of counsel being totally unaware of the elements of the offenses with which his client was charged.

Movant was unquestionably prejudiced by counsel's performance. By putting movant on the witness stand to admit the elements of the capital offenses with which he was charged, trial counsel failed to subject the government's case to meaningful adversarial testing and, in effect, deprived movant of effective counsel at a critical stage of his trial.  The government took full advantage of counsel's deficient performance by outlining the elements of each offense in closing argument, and adeptly pointing out that movant admitted each and every element during his testimony.  Given movant's testimony, his guilt was not even open for discussion.

Further compounding matters was the fact that movant's testimony did not go well.  Besides being totally unprepared as a witness, movant came across as combative, remorseless, indifferent, cold, and as someone looking to avoid responsibility by shifting the blame to the co-defendant.  The government characterized movant's testimony as aggravating evidence and used it to convince the jury to return sentences of death.  Movant's testimony most likely convinced the jury to sentence him to death.  But for counsel's erroneous advice urging him to testify, movant would not have testified, and had he not, there would have been a reasonable likelihood that he would have received sentences of life imprisonment.

(c)  Trial counsel unreasonably and prejudicially assured movant's convictions, and in the process made him eligible for the death penalty, by conceding in opening statement and in closing argument that movant participated in an armed robbery in which a killing occurred, and by placing movant on the witness stand where he admitted each and every element of the charged offenses.

Charles Shaw entered his appearance on movant's behalf in the district court on March 25, 1997. Sometime thereafter, Mr. Richard Burr of the Federal Death Penalty Resource Counsel, an organization which assists attorneys nationwide in the defense of federal capital cases, contacted counsel Shaw and offered his assistance. At Mr. Burr's recommendation, counsel Shaw retained Caryn Tatelli, a mitigation specialist, in December of 1997 to perform the mitigation investigation. Shortly thereafter, Ms. Tartelli met with counsel Shaw to discuss the penalty phase investigation. She determined that counsel Shaw was resistant to developing a mitigation case and ill-prepared to handle the case. Ms. Tatelli contacted Mr. Burr and asked him to intervene with counsel Shaw and convince him to accept her help. Mr. Burr then contacted counsel Shaw and was able to convince him to seek the appointment of a second lawyer to handle the penalty phase portion of the trial.

In February of 1998, approximately thirty days before trial, counsel Herndon, f/k/a Brewer, was appointed pursuant to the Criminal Justice Act. Shortly thereafter, counsel Herndon met with counsel Shaw to discuss trial strategy. At that time, counsel Herndon learned that counsel Shaw's planned trial strategy was to argue that movant was not guilty of the charged offenses because he neither fired his weapon nor intended for anyone to get hurt during the robbery. But, this belief was based on Missouri state law relating to capital murder where a defendant charged with acting with another has to personally deliberate on the homicide. The offenses with which movant was charged, Count I: bank robbery in which a killing occurs; and Count II: carrying a firearm during a crime of violence which results in a murder, neither required that movant fire his weapon nor specifically intended beforehand that anyone was to get hurt. All that was required to find defendant guilty under either count was to show that he intentionally took part in an armed bank robbery and that either he, or a person whom he aided or abetted, killed a person during the perpetration of the robbery.

Mr. Burr and counsel Herndon met with counsel Shaw prior to trial in an attempt to convince him that his trial strategy was flawed, and that what he perceived as a defense, was really no defense at all.  Mr. Burr and counsel Herndon were unable to get counsel Shaw to change his trial strategy.

As a result of his misunderstanding of the charges, Mr. Shaw assured movant's convictions for the offenses charged.  Beginning with his opening statement, he conceded the government's case and made movant's conviction a slam dunk for the government.  Portions of his opening statement reflecting his flawed understanding of the offenses are as follows:

> Now, jurors, the evidence is going to show, and with candor you will hear that the defendant robbed that bank.[14] . . .
>
> .    .    .
>
> The judge will explain to you later on what malice aforethought means, but you've got to find that he intended the death of Heflin. Now the evidence is going to show you that this Mr. Heflin was purposefully shot by this person known as Billy Allen.[15]
>
> .    .    .
>
> The evidence is going to be that when he entered the bank, he thought no guns would be fired, and they were not to be fired.  There will be no evidence that this defendant at any time fired the Russian-made weapon.[16]
>
> .    .    .
>
> Defendant fired no shots.  Defendant's back was to the shooting when the shooting started…. from then on, of course, the defendant was caught.  The defendant committed a robbery.[17]
>
> .    .    .
>
> We will at the end of this case ask that he be found not guilty of murder, as "murder" will be explained to you by the judge.  As for the

---

[14]Transcr. Vol. I, p. 64

[15]Transcr. Vol. I, p. 65.

[16]Transcr. Vol, I, p. 67.

[17]Transcr. Vol. I, p. 68.

robbery, with candor and forthrightness, you will hear that he committed that robbery.[18]

In keeping with his trial strategy, counsel Shaw cross-examined the government's witnesses in the guilt phase to infer and demonstrate that movant did not fire his weapon in the bank. Tragically, counsel Shaw's misunderstanding led him to convince movant to take the stand and unknowingly admit each and every element of the offenses with which he was charged, thus making himself eligible for the death penalty.[19]

Lastly, counsel Shaw's flawed trial strategy was summed up in his closing argument during the guilt phase:

> There is no doubt – we have never denied that since this trial started – that this defendant committed the extreme folly, the material act that seizes society by the throat, committing a bank robbery, armed, which he was, to get himself out of his problems which was utterly wrong and for which he will pay.[20]
>
> .   .   .
>
> You have to leap frog. In order to convict him of murder, you gave to leap frog over what these people have told us, the people in the bank, and just, convict him of murder because, tragically, manically and completely without justification, Billy Allen shot and killed Mr. Heflin.[21]
>
> .   .   .
>
> That is the reason he is here. He has admitted to robbery, but the murder, any intention, even knowledge that he was shot when Heflin was shot, he wasn't in the bank.[22]
>
> .   .   .

---

[18]Transcr. Vol. I, p. 169.

[19]*See supra* Claim C(b), p. 7-9.

[20]Transcr. Vol. VII, p. 77.

[21]Transcr. Vol. VII, p. 77.

[22]Transcr. Vol. VII, p. 80.

> We admitted and I told you at the beginning that defendant was involved in this robbery; and that what he did was, of course, punishable, and what he did is inexcusable. We offer no excuses for this part in this. We are not asking to be excused for it. But we reject totally the charge of murder. Now , you can say what you want, but murder takes an intention for somebody to be killed.[23]

There can be no question that movant was prejudiced by counsel's deficient performance. Not only did counsel concede movant's guilt during opening and closing statements, he convinced movant to take the stand to testify where he led movant to admit each and every element of the offenses charged. It wasn't until after the guilt phase that counsel Shaw realized that he had failed to understand the nature of the offenses with which movant was charged, and had in effect made the government's case. As a result, counsel absolutely failed to subject the government's case to meaningful adversarial testing, thus depriving movant of his Sixth Amendment right to counsel throughout the guilt phase portion of his trial.

(d) Trial counsel unreasonably and prejudicially failed to retain and present a ballistic expert to dispute the government's evidence that some of the rounds fired during the bank robbery could have come from the weapon carried by movant. At movant's trial, the government presented the testimony of Mr. Frank Stubits, a firearm's and toolmark examiner employed by the St. Louis Metropolitan Police Department. The government relied on Mr. Stubits' testimony to circumstantially establish that movant fired his weapon inside the bank. A total of sixteen spent shell casings were found in the bank. Mr. Stubits grouped said casings into three groups consisting of eleven, three, and two spent shell casings. Mr. Stubits test fired the weapons used in the bank robbery - a Chinese semi-automatic SKS rifle and a Russian SKS rifle - and compared the spent shells from

---

[23]Transcr. Vol. VII, p. 86-87.

the test firings to the spent shell casings that were found inside the bank.  Mr. Stubits concluded that eight of the eleven from the first group were fired from the Chinese rifle.  Said rifle was carried by co-defendant Allen during the course of the robbery and held eleven cartridges.  Three out of the eleven could have been fired by the Chinese gun but lacked sufficient markings to render a more definite conclusion.  These same three shells were ruled out as being fired from the Russian rifle allegedly carried by movant.  Mr. Stubits was of the opinion that the second group of three spent shells could not have been fired from the Chinese weapon but could have come from the Russian weapon; however, he could not make a definite conclusion because of the lack of sufficient impressions on the shell casings.  The third group, consisting of two spent shells, could have been fired from either weapon, but also lacked sufficient markings to yield a more definite conclusion.

Although he was able to point out on cross-examination that Mr. Stubits could not conclusively say that any of the spent shells definitely came from the Russian weapon, counsel Shaw could not shake Stubits' opinion that three of the shells definitely came from a weapon other than the Chinese gun and could have been fired from the Russian gun carried by movant.  The only way to break the government's chain of circumstances would have been to hire a ballistics expert to review Stubits' work and to challenge his findings that some of the spent shells could have come from the movant's weapon.  Had counsel Shaw properly consulted with and retained the ballistics expert, he could have established that none of the markings on the spent shells found inside the bank were consistent with having been fired from the Russian weapon.  Thus, he could have disproved the government's theory that movant fired his weapon during the course of the bank robbery.

Movant was prejudice by counsel's performance.  Although the government did not have to prove that movant fired his weapon in order to prove him guilty of the offenses charged, it still had

14

to prove that movant aided and abetted Billie Allen in the commission of the offense.  In order to have aided and abetted co-defendant Allen, movant had to have been aware of the serious risk of death attending his conduct.  Proof that movant did not fire his weapon would have supported his belief that no one was to be hurt and there was a serious risk of death attending his conduct.  Additionally, such proof would have been useful mitigating evidence in the penalty phase.

Trial counsel's failure to properly investigate, consult or offer testimony of a ballistic expert to contest the government's expert's opinion led the jury to believe that petitioner fired his weapon inside the bank based on opinions of the government's expert.  But for counsel's failure to investigate, consult and offer the testimony of a ballistic expert to support the defense theory that movant did not fire his weapon inside the bank, a reasonable likelihood exists that movant would not have been convicted as lesser included offenses, or alternatively, that he would have received a sentence of imprisonment rather tan death.

(e)  Trial counsel unreasonably and prejudicially failed to investigate, identify, and interview an unnamed witness mentioned in the discovery, and thereafter call said witness to testify as to movant's prior consistent statements and his remorse for the death of the bank guard.  The discovery provided to defense included various reports prepared by the St. Louis Metropolitan Police Department and the Federal Bureau of Investigation.  A report prepared by FBI Special Agent Jan Hartman referenced a July 15, 1997 interview of a person who was incarcerated with Billie Allen in the Franklin County Jail in Union, Missouri.  Said person and Billie Allen became friends and talked on almost a daily basis.  During the course of this conversation, Billie Allen related his version of the shooting: "Man, that cop reached for his gun, and I had to spray him."  The witness also informed

Agent Hartman that Billie Allen tried to recruit him to falsify a defense to the charges, and in the process, further incriminate movant.

Agent Hartman's report also indicates that the witness was placed in the same holdover cell as movant at the United States Marshal Services in the federal courthouse in St. Louis, Missouri. During that time, Holder told the witness about the robbery at the Lindell Bank & Trust Company. The pertinent portion of the report was as follows:

> He [movant] said that the robbery was Allen's idea. They were supposed to go in and out. No one was to get shot; no one was to get hurt. Holder told Allen "no bodies" no murders. Once in the bank Holder suddenly heard a shot. Holder panicked. He did not see the guard reach for his gun. He said that Allen shouldn't have shot the cop as a charge would have only been for bank robbery…Holder also told [the witness] that he could not watch the guard's funeral on television. Holder appeared remorseful.

The witness also told Agent Hartman of Billie Allen's reaction to the guard's death. Allen "laughed during the guard's funeral" and, according to the witness, has never shown a shred of remorse for the guard's death.

Although trial counsel was supplied with Agent Hartman's report detailing the witness's interview, they blindly dismissed its importance without attempting to identify or interview the witness. The witness's identity could have been easily discovered by defense counsel, either by checking the booking records at the Franklin County Jail, checking with movant, or filing a motion with the court seeking the witness's identity. Once identified, the witness could have been interviewed and eventually subpoenaed to testify on behalf of movant. The witness would have been able to provide helpful testimony at both phases of movant's trial.

Defense counsel's failure to identify, interview, and eventually call the person as a witness was deficient performance which prejudiced movant. The witness could have been called during the guilt phase to elicit movant's prior consistent statement that there were no plans to shoot anyone in the bank and that Allen's shooting of the guard was totally unexpected. This testimony would have supported movant's defense that he did not aid or abet the co-defendant in the shooting.

In addition, the witness could have been called at the penalty phase of the trial to convey movant's reaction upon viewing the guard's funeral on television and to show that he, unlike Allen, felt very remorseful about the guard's death. The government argued at the penalty phase that movant was cold, indifferent, and remorseless for the death of the guard. The witness's testimony to the effect that movant cried when he saw the guard's funeral on television and expressed his remorse for the guard's death, would have directly contradicted the government's evidence and placed movant in a different light. Had that evidence been presented, there is a reasonable likelihood that the jury would have returned a sentence other than death.

(f) Counsel unreasonably and prejudicially failed to adequately investigate movant's mental condition and present evidence which would have demonstrated that movant suffered from brain damage at the time of the offense, and as a result, was unable to form the requisite intent required to commit the offenses. Co-counsel Herndon was appointed pursuant to the Criminal Justice Act on February 4, 1998, approximately thirty days before trial, to assist counsel Shaw. Prior to counsel Herndon's appointment, no mental examination of any kind was performed on movant. On February 6, 1998, counsel Herndon made an *ex-parte* request for authorization to hire Dr. Thomas Reidy for the purpose of conducting a future dangerousness examination. Dr. Reidy performed this examination on February 19, 1998. Additionally, trial counsel Herndon obtained the assistance of

17

Dr. Stephen Rothke, a clinical neuropsychologist; however, Dr. Rothke was neither requested to nor performed a full neuropsychological examination of movant.  Movant had previously been involved in a train accident which resulted in the amputation of his leg, and Dr. Rothke was retained to testify to how that incident impacted movant.

Trial counsel was aware that movant suffered numerous incidents of seizures at the time of his birth.  Trial counsel was also aware that movant had a history of head injuries - one resulting in a fractured skull and hospitalization in 1992, and another occurring at the time of the train accident in 1991.  Trial counsel was aware, or should have been aware,  that a neuropsychological evaluation of movant was essential for the proper representation of movant.  Although defense counsel did request authorization from the district court to hire an expert to perform a neuropsychological examination, counsel failed to have such a pretrial evaluation performed.

During movant's trial, the government obtained a court order to obtain a neuropsychological evaluation of movant by their expert, Dr. Richard Wetzel.  Despite the fact that  Dr. Wetzel found that movant had a detectable brain dysfunction resulting from a skull fracture caused by being struck by a brick, Dr. Wetzel opined that movant's brain dysfunction was not a mental disease or defect that absolved him of responsibility for his actions.

On or before March 12, 1998, trial counsel Herndon contacted Dr. Anthony Semone to review Dr. Wetzel's findings, and determine the necessity of further neurological testing.  Had Dr. Semone been provided with Dr. Wetzel's report, he would have advised counsel that Dr. Wetzel's findings were questionable due to the way the tests were administered, the inconsistent results obtained, and his failure to follow the appropriate protocol.  Although counsel obtained an order for Dr. Semone

to visit the jail and evaluate movant, counsel neither provided Dr. Semone with Dr. Wetzel's report nor moved forward with the examination.

At the request of undersigned post-conviction counsel, Dr. Semone recently reviewed Dr. Wetzel's report and findings, and conducted a neuropsychological evaluation of movant. Dr. Semone suspected the possibility of brain damage to the right hemisphere of movant's brain.  Such an injury would cause a manifestation in petitioner's judgment.  Based on his recent neuropsychological evaluation, Dr. Semone believes that there was a reasonable likelihood that movant had objective brain damage affecting the right hemisphere of his brain at the time of the offense.  According to Dr. Semone, this brain damage could affect movant's judgment and ability to assess danger such that movant would plan and participate in a bank robbery with the use of weapons and totally expect that no one would be harmed or that he would place anyone at great risk of injury or death.  Dr. Semone's opinion would have been useful evidence at both the guilt and penalty phases of movant's trial.  Said evidence would have been readily available to movant, had counsel followed through with Dr. Semone's scheduled evaluation of movant.

Movant was prejudiced by counsel's failure to investigate petitioner's mental condition and discover that he was brain damaged at the time of the offense.  Movant was charged with aiding and abetting the co-defendant, Billie Allen, in the killing of the bank guard.  In order to aid and abet in the commission of the crime, movant "must have been aware of the serious risk of death attending his conduct."  Dr. Semone would have been able to provide evidence that due to movant's brain impairment, he likely believed that no one would be harmed and that his conduct in participating in the bank robbery would not put anyone at risk of death.  He would have naively believed that, since both he and Billie Allen had previously discussed that no one would be hurt, that no one, in fact,

19

would be hurt. Additionally, evidence that movant was suffering from brain damage at the time of the offense would certainly constitute mitigating evidence that would have given a jury a reason to impose a sentence of life rather than a sentence of death. But for counsel's errors in failing to adequately investigate movant's medical condition and discover that he had brain damage, there is a reasonable likelihood that the result at both his guilt phase and at his penalty phase would have been different.

(g) Trial counsel unreasonably and prejudicially exposed the jury to graphic portrayals of violence set out in the movies *Set it Off* and *Heat*. The government's theory was that certain aspects of the Lindell Bank and Trust robbery were based on the events portrayed in the movies *Set it Off* and *Heat*. The government presented testimony that movant and co-defendant Allen watched said movies shortly before the robbery. As it did at co-defendant Allen's trial, the government planned to have FBI Agent Jan Hartman testify to a number of similarities between the holdups depicted in the movies, and the Lindell Bank and Trust robbery. There were no plans to show the movies, which contained numerous graphic depictions of violence and killings to the jury.

Counsel objected to Agent Hartman's testimony on the ground that the movies themselves would be the best evidence. This prompted a lengthy bench conference between counsel and the court in which the propriety of showing the movies was discussed. During the conference, government lawyers warned counsel Shaw that the movies were a lot worse than Agent Hartman's testimony. At that point, counsel Shaw was allowed to *voir dire* Agent Hartman outside of the presence of the jury to preview her testimony. Thereafter, the court took a ten minute recess during which counsel Shaw conferred with movant on this issue. Counsel Shaw told movant that it was in his best interest to have

the jury see the movies in their entirety. Movant followed counsel Shaw's advice and the movies were then shown to the jury.

Counsel's performance in insisting that the jury watch the movies was deficient performance. As a result, the jury was exposed to multiple graphic depictions of violence, most of which were not in any way similar to anything that occurred during the Lindell Bank and Trust robbery. A reasonably competent attorney would have preferred Agent Hartman's oral testimony about the similarities between the movies and the instant bank robbery. Had counsel Shaw done so, Agent Hartman could have been effectively cross-examined about the multiple differences between the movies and the Lindell Bank and Trust robbery, all without exposing the jury to the prejudicial and harmful violent scenes depicted in the movies. But for counsel's performance in insisting that the movies be shown to the jury, the jury, like that in co-defendant Allen's case, would not have seen the movies. Had they not been poisoned by the violence depicted in the movies, there is a reasonable likelihood that the jury would have returned a sentence other than death.

(h) Movant was deprived of the assistance of counsel at critical stages of the proceedings when counsel irresponsibly and prejudicially slept during parts of his trial. Lead trial counsel Charles Shaw slept during parts of movant's trial. On multiple occasions, movant, co-counsel Herndon, and mitigation investigator Caryn Tatelli, witnessed counsel Shaw nodding his head with his eyes closed, and noted that he was asleep. These incidents occurred during voir dire, during the government's presentation of its case-in-chief, and again during the penalty phase of movant's trial.

A trial is presumptively unfair where the accused is denied the presence of counsel at critical stages of the proceedings. Jury selection, especially in a capital case, the government's presentation

21

of its case-in-chief, and penalty phase are critical stages of a trial.  A sleeping lawyer is akin to no lawyer at all, and such a lawyer fails to subject the prosecution's case to meaningful adversarial testing.  Counsel Shaw's performance in this regard was deficient and presumptively prejudicial.

(i) Trial counsel unreasonably and prejudicially failed to object and move to strike the second statutory aggravator alleged by the government - that movant committed the offense in the expectation of the receipt of anything of pecuniary value - because the evidence failed to support said aggravator.  The government alleged two statutory aggravating circumstances - one:  that movant knowingly created a grave risk of death to one or more persons in addition to Richard Heflin; and two: that movant committed the offenses in the expectation of the receipt of anything of pecuniary value.  With regard to the second statutory aggravator, both the trial court and the government were of the opinion that "the committed offenses" referenced in the aggravator referred to the underlying felony, in this case bank robbery, rather than the murder of the bank guard.  However, the statutory and legislative history suggests the opposite - that the committed offense language in the pecuniary gain aggravator refers to murder, not the underlying felony, and that application of the pecuniary gain aggravator is limited to situations where the murder itself was committed as consideration for, or in expectation of, anything of pecuniary value.  This position is consistent with the statutory scheme given that bank robbery is not among the crimes which warrant automatic death qualification.[24]  A contrary holding would have the effect of converting every felony murder, where the underlying felony had a pecuniary object, to a federal capital offense.

A reasonably competent attorney in a death penalty case would have reviewed the legislative history and, thereafter, objected to the pecuniary gain aggravator on the basis that there was no

---

[24]*See* 18 U.S.C. § 3592(c)(1).

evidence to support it. Had counsel imposed such an objection and cited the court to the legislative history in support thereof, the district court would have sustained the objection. Accordingly, the pecuniary gain aggravator would not have been submitted to the jury.

Counsel's failure to object to the pecuniary gain aggravator prejudiced the movant in that, had counsel objected, there is a reasonable likelihood that he would have received a sentence other than death. The jury was instructed to weigh the aggravating and mitigating factors against each other, or, if no mitigating factors were found, to weigh the aggravating factors alone. The inclusion in the weighing process of an invalid aggravator had the effect of placing a thumb on death's side of the scale, and skewed the process. The removal of the invalid pecuniary gain aggravator would have left the jury with only one statutory aggravator, and created a reasonable likelihood of a different result.

The United States Court of Appeals for the Eighth Circuit issued its opinion in movant's case on April 12, 2001. Prior to that date, a number of federal cases interpreted the pecuniary gain aggravator and concluded that said aggravator only applies when the murder itself was committed as consideration for, or in expectation of, anything of pecuniary value, *e.g.*, a murder for hire or a murder to collect insurance proceeds.[25] Like trial counsel, appellate counsel should have been familiar with the legislative history relating to the pecuniary gain aggravator in that there was a reasonable likelihood that said aggravator only applied to situations where pecuniary gain directly resulted from the murder. Even though trial counsel failed to object to the pecuniary gain aggravator, appellate counsel should have raised that claim as plain error on appeal. An appellate court may grant relief even where a defendant does not object at trial if the defendant can show that the error effected his

---

[25]*See United States v. Chanthadara*, 230 F.3d 1237, 1263 (10th Cir. 2000); *see also, United States v. Cuff*, 38 F.Supp.2d 282, 288 (S.D. NY 1999).

substantial rights and seriously effected the fairness or integrity of his trial.  The jury's consideration

of an invalid aggravating factor in the weighing process which resulted in the imposition of a sentence

of death clearly constitutes plain error.  Appellate counsel's failure to challenge the pecuniary gain

statutory aggravator on appeal constitutes deficient performance and, given the law in the

*Chanthadara* case, had said issue been included on appeal, there is a reasonable likelihood that

movant's sentence of death would have been set aside.

(j) Counsel unreasonably and prejudicially failed to object to the victim impact

evidence introduced during the penalty phase at movant's trial because said evidence exceeded that

allowed under *Payne vs. Tennessee*.[26]  At the government's request, the Court instructed the jury on

four non-statutory aggravating circumstances.  One of said non-statutory aggravators was that

"Richard Heflin's personal characteristics as individual human being and the impact of the death of

Richard Heflin upon his family make this crime more worthy of the death penalty than other

murders."  The government solicited testimony from Kelly Davis, Janice Walton, Ron Tamburello,

Evelyn Heflin, Sherry Holmes, Michael Heflin, Sue Heflin, Jason Heflin, Richard Heflin III, Justin

Heflin, Dana Heflin as victim impact witnesses.  These witnesses testified regarding Mr. Heflin's

work ethic, his work as a police officer in Caseyville, his status as a Vietnam War veteran, that he was

awarded accommodations in battle, and his positive actions as a brother, father, son, and husband.

Additionally, the government made the following argument:

> And you also consider the fourth non-statutory aggravating factor
> when making our decision, and that is the personal characteristics of
> Richard Heflin as a human being, and the impact of his death on his

---

[26]501 U.S. 808 (1991).

family, how great they are that makes this murder worthy of the death penalty.[27]

Trial counsel knew or should have known the limitations on victim impact evidence set out by the United States Supreme Court in *Payne vs. Tennessee*. Trial counsel knew or should have known that victim impact evidence cannot be offered to encourage comparative judgments - that a defendant whose victim was an asset to the community is more deserving of death than a defendant who murdered someone perceived to be less worthy. Trial counsel knew or should have known that portions of the victim impact evidence introduced by the government were objectionable and that said evidence fell outside of that allowed in *Payne vs. Tennessee*; however, trial counsel failed to lodge the appropriate objection.

Trial counsel's failure to object and limit the victim impact evidence exposed the jury to testimony which, if objected to, would not have been allowed. While the jury did not find the existence of the victim impact aggravating factor, it still was exposed to highly prejudicial testimony, and subjected to the government's argument that movant deserved the death penalty because of Richard Heflin's status in the community. Said testimony and argument was so prejudicial that it violated movant's Fifth Amendment Due Process rights. Had counsel imposed a proper objection, said evidence would have been limited before the jury, and there is a reasonable likelihood that defendant would have received a sentence other than death.

(k) Trial counsel Shaw unreasonably and prejudicially gave the penalty phase summation in lieu of co-counsel Herndon, the attorney responsible for the development and presentation of mitigating evidence. Trial counsel Shaw entered his appearance on behalf of movant

---

[27]Tr. Vol. 12, p. 179.

on March 25, 1997. Richard Burr of the Federal Death Penalty Resource Counsel, an organization which assists attorneys nationwide in their defense of federal capital cases, contacted counsel Shaw and offered his assistance. Mr. Burr recommended to counsel Shaw that he retain a mitigation specialist and suggested that he call Ms. Caryn Tatelli to assist in the mitigation investigation. Ms. Tatelli was retained in December of 1997 to prepare the mitigation case. Shortly thereafter, Ms. Tatelli met with counsel Shaw and determined that counsel Shaw was resistant to any issues related to sentencing. Particularly, Ms. Tatelli requested that counsel Shaw retain experts to evaluate movant's mental status at the time of the offense for the purposes of discovering potential mitigating evidence; however, counsel Shaw refused to act on Ms. Tatelli's request.

At Ms. Tatelli's request, Mr. Burr contacted counsel Shaw and finally convinced him to petition the court for the appointment of another attorney to assist him in the case, particularly as to sentencing issues. Co-counsel Herndon was appointed for this purpose in February of 1998. At that time, no penalty phase motions of any had been filed in the case.

Co-counsel Herndon was solely responsible for the development and presentation of movant's penalty phase case. Although she had only three weeks to prepare, she worked closely and around the clock with Ms. Tatelli to develop a penalty phase strategy.

Ms. Herndon presented at trial 27 lay witnesses to testify regarding movant's upbringing, his desertion by his parents, his essential role as a parent to his siblings, action as a positive role model to friends and family, and the effects of the amputation of his leg. Three expert witnesses were called to testify that movant was not a danger to others while in custody, as well as to explain the psychological effects of the amputation of movant's leg resulting from the train accident.

Counsel Shaw did not believe or place any significance in mitigation evidence.  Ms. Tatelli witnessed him sleeping throughout much of the penalty phase testimony.  Regardless, counsel Shaw insisted that he give the penalty phase closing argument.  Both counsel Herndon and Ms. Tatelli strenuously objected to this.  They believed that counsel Shaw did not understood the mitigating evidence and the penalty phase strategy.

At co-counsel Herndon and Ms. Tatelli's urging, Mr. Burr flew in from Texas prior to the penalty phase and attempted to convince counsel Shaw that it would be in movant's best interest if co-counsel Herndon gave the penalty phase closing argument.  It was Mr. Burr, Ms. Tatelli, and co-counsel Herndon's belief that counsel Shaw did not understand the significance of the mitigating evidence, and more importantly, that he would not be able to convey the importance and significance of the evidence to the jury.  Also, there was a concern by Mr. Burr, Ms. Tatelli, and co-counsel Herndon that counsel Shaw would ignore the mitigation evidence and revert to his flawed trial strategy - that movant should neither be convicted nor sentenced to death because he did not fire any shots during the course of the armed robbery.

Despite these efforts, counsel Shaw stubbornly refused to budge and gave the penalty phase closing argument.  In doing so, he totally ignored the mitigation evidence so carefully developed and presented by co-counsel Herndon, and made the same argument that had been rejected by the jury in the guilt phase - that movant should not be sentenced to death because he did not shoot the guard. Counsel's performance in this regard was professionally deficient.

Counsel Shaw's argument in the penalty phase of movant's trial was severely prejudicial. Since he neither agreed with nor understood the penalty phase strategy, his insertion at the penalty phase closing argument in lieu of co-counsel Herndon, effectively destroyed Ms. Tatelli's and co-

counsel Herndon's mitigation strategy.  Since counsel Shaw neither understood nor believed in the mitigating evidence, he clearly was not in a position to explain its significance to the jury.  Counsel Shaw's ineptness in this regard is confirmed by the fact that the jury found no statutory mitigators to exist and only unanimously found three out of seventeen non-statutory mitigators.  In addition, counsel Shaw failed to provide the jury with any assistance during the penalty phase closing argument as to how to weigh the mitigating evidence against the aggravating evidence.

Counsel Herndon stood ready to give the penalty phase closing argument.  She understood the evidence because she was the one who coordinated and presented the same to the jury.  Counsel Herndon was in the best position to assist the jury in understanding and applying the facts to the law contained in the penalty phase instructions.  A reasonable probability exists that, had counsel Shaw given the closing argument in the penalty phase, the jury would have understood the mitigating evidence and returned a sentence other than death.

13.    The grounds for relief listed above have not previously been presented for the following reasons:

(a)    Claim A, that movant's sentence of death violated the Fifth Amendment Indictment Clause is based on *United States v. Jones*,[28] *Apprendi v. New Jersey*,[29] and *Ring v. Arizona*.[30]  These cases were part of the legal landscape prior to the submission of movant's direct appeal.  Further, counsel for co-defendant Allen raised this claim throughout his proceedings, providing movant's lawyers with copies of the relevant pleadings and legal briefs.  Movant's failure

---

[28]*Supra*.

[29]*Supra*.

[30]*Supra*.

to pursue this claim before the district and appellate courts was a direct result of ineffective assistance of trial and/or appellate counsel. Additionally, movant can appropriately raise this claim on collateral review because it involves a structural, jurisdictional defect, and because the *Ring* case is necessarily retroactive to cases on collateral review.[31]

(b)   Claim B, that the jury was improperly allowed to consider the pecuniary gain statutory aggravator, is based on the relevant legislative and statutory history behind the enactment of 18 U.S.C. § 3592. This information was available to trial counsel prior to movant's trial. In addition, the case of *United States v. Chanthadara*,[32] decided in 2000 prior to submission in movant's direct appeal, specifically held that the "committed offense" mentioned in the pecuniary gain aggravator referred to the murder itself, not the underlying felony. Movant's failure to pursue this claim before the district and/or appellate courts was a direct result of ineffective assistance of trial and/or appellate counsel.

(c)   The ineffective assistance of counsel claims set out in Claim C are appropriately presented for the first time in a § 2255 motion.[33]

14.   Movant does not have any petition or appeal now pending in any court as to the judgment under attack.

15.   Movant has been represented by the following attorneys:

(a)   At arraignment and plea by Mr. Charles M. Shaw, deceased, former address 222 South Meramec Avenue, Suite 200, Clayton, Missouri 63105;

---

[31]*See Stirone v. United States*, 316 U.S. at 215-17.

[32]*Supra*.

[33]*See Massaro v. United States*, 538 U.S. 500, 504 (2003).

(b) At trial by Mr. Charles M. Shaw, deceased, and Ms. Jennifer Herndon, f/k/a Brewer, 33 Flower Valley, #188, Florissant, Missouri 63033;

(c) At sentencing by Mr. Charles M. Shaw, deceased, and Jennifer Herndon;

(d) On appeal by Ms. Jennifer Herndon and Mr. Daniel Mohs, 4387 Laclede Avenue, St. Louis, Missouri 63108;

(e) Movant is represented in the instant post-conviction proceeding by Mr. Christopher E. McGraugh, One City Center, Suite 2001, St. Louis, Missouri 63101, and Mr. Michael J. Gorla, 720 Olive Street, Suite 1630, St. Louis, Missouri 63101.

16.    Movant was sentenced on more than one count of an indictment in the same court at approximately the same time.

17.    Movant has no other sentence to serve after the completion of the judgment under attack.

WHEREFORE, movant prays for the following belief:

1.    That a writ of habeas corpus be directed to respondent;

2.    That respondent be required to appear and answer the allegations contained in this motion;

3.    That movant be afforded reasonable discovery and an evidentiary hearing on the allegations contained in his motion;[34]

4.    That after a full hearing, movant be discharged from his unreasonable conviction and sentences of death; and

---

[34]Movant will file motions for discovery and an evidentiary hearing by July 9, 2004, the original deadline previously set by the court.

5.       For such other and further relief to which he may be entitled in this proceeding.

Respectfully submitted,

/s/ Christopher E. McGraugh
CHRISTOPHER E. MCGRAUGH, #25278
Leritz, Plunkert & Bruning, P.C.
One City Center, Suite 2001
St. Louis, Missouri 63101
(314) 231-9600
(314) 231-9480 - Facsimile
E-mail: cmcgraugh@leritzlaw.com

/s/ Michael J. Gorla
MICHAEL J. GORLA, #3251
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com

*Counsel for Norris Holder*

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to best of my knowledge and belief.

/s/ Christopher E. McGraugh
Christopher E. McGraugh

## **VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct to best of my

knowledge and belief.

 

 
                                                         

NORRIS HOLDER                          DATE

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2004, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:  Mr. Raymond Gruender, United States Attorney, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102, and Mr. Steven Holtshauser, Assistant United States Attorney, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102.

                       /s/ Michael J. Gorla
                       Michael J. Gorla, #3251
                       Attorney for Norris Holder
                       720 Olive Street, Suite 1630
                       St. Louis, Missouri 63101
                       (314) 621-1617
                       (314) 621-7448 - Facsimile
                       E-mail: mjgorla@msn.com