**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **NORRIS HOLDER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **No. 4:03CV0923 ERW** |
| | ) |
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **Respondent.** | ) |

**GOVERNMENT'S RESPONSE TO MOVANT'S MOTION UNDER 28 U.S.C. §2255**
**TO VACATE, SET ASIDE OR CORRECT CONVICTIONS AND SENTENCES**
**BY A PERSON IN FEDERAL CUSTODY**

**COMES NOW** the United States of America, by and through its attorneys, James G.

Martin, United States Attorney for the Eastern District of Missouri, and Joseph M. Landolt,

Steven E. Holtshouser, and Roger Keller, Assistant United States Attorneys for said District, and

responds to movant Norris G. Holder's Motion Under §2255 to Vacate, Set Aside or Correct

Convictions and Sentences by a Person in Federal Custody as follows:

**Procedural Requirements**

Section 2266(b)(1)(A) of Title 28, United States Code, provides as follows:

A district court shall render a final determination and enter a final judgment on any
application for a writ of habeas corpus brought under this chapter in a capital case not
later than 180 days after the date on which the application is filed.

The instant application was filed on June 8, 2004. Therefore, this Court must enter a final

judgment not later than December 4, 2004. The 180-day time period may be delayed for not

1

more than one additional 30-day period if this Court finds that "the ends of justice that would be served by allowing the delay outweigh the best interests of the public and the applicant in a speedy disposition of the application."  28 U.S.C. §2266(b)(1)(C)(i).

**History of the Proceedings**

In 1998, defendants Norris Holder and Billie Allen were convicted after separate trials of killing a security guard, Richard Heflin, during the commission of an armed bank robbery, in violation of 18 U.S.C. §2113(a) and (e) (Count I), and using and carrying a firearm during the commission of a crime of violence that resulted in the death of another person under circumstances constituting first-degree murder, in violation of 18 U.S.C. §924(j) (Count II).  In accordance with the jury's recommendation, defendant Holder was sentenced to death on both counts.

In a decision that predated the Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002), the Eighth Circuit affirmed the defendants' convictions and death sentences, expressly rejecting defendant Allen's claim that the indictment violated the Fifth Amendment because it failed to allege at least one aggravating factor and one mental intent factor that would make the defendant eligible for the death penalty.  United States v. Allen, 247 F.3d 741, 761-764 (8th Cir. 2001).

After deciding in Ring that the statutory aggravating factors that define eligibility for the death penalty are the functional equivalent of offense elements that need to be unanimously found by the petit jury under the reasonable doubt standard (and, presumably, alleged by indictment in federal prosecutions), the Supreme Court granted defendant Allen's certiorari petition, vacated the Eighth Circuit decision, and remanded the case for reconsideration in light

2

of Ring.  United States v. Allen, 536 U.S. 953 (2002).  On reconsideration, a divided panel of the

Eighth Circuit (R.S. Arnold & Melloy, JJ.; Hansen, J., dissenting in part) held that "the

indictment in Allen's case failed to charge a federal capital offense, and that given Allen's timely

objections this failure cannot be dismissed as harmless."  United States v. Allen, 357 F.3d 745

(8th Cir. 2004).  The majority therefore ordered that the death penalty be vacated.  On the

government's petition, the court vacated the opinion, and ordered rehearing en banc, set for

September 15, 2004.  Defendant Holder had not raised the Ring issue on appeal, and the

Supreme Court denied his petition for certiorari.  Holder v. United States, 539 U.S. 916 (2003).

**Statement of Facts**

Shortly after 10:30 a.m. on March 17, 1997, the Lindell Bank and Trust Company

(hereinafter "the Bank") was robbed in a violent, terrifying, "take-over" style robbery.   The

robbers, Billie Jerome Allen and Appellant Norris Holder, arrived in a stolen blue van; Holder,

who was driving, left the engine running, and both robbers left the doors to the van open when

they went into the Bank.

The surveillance cameras in the Bank were not activated until after the robbers had left.

Allen and Holder, dressed in dark clothes and wearing masks, entered the lobby of the Bank

heavily armed, with semi-automatic SKS assault rifles.  Shooting began immediately, and the

evidence reflected that both weapons were fired during the robbery.  There were at least ten

Bank employees in the lobby at the time; Richard Heflin, the security guard, who never fired a

shot, was riddled with bullets and died. Although shots were sprayed around the Bank, no one

else received serious physical injury.

Because of the robbers' disguises, no one inside the Bank was able to visually identify

either Holder or Allen.  The United States relied upon the physical evidence collected, the

testimony of bank employees and patrons, and Holder's post-arrest statements to establish the

actions of Holder and Allen within the Bank.  This evidence clearly demonstrated that both Allen

and Holder fired their weapons, that Allen remained near the east doors in the lobby and shot

Mr. Heflin with a Chinese SKS rifle numerous times, and that Holder went over the tellers'

counter and took the money.  The evidence also established that Holder played the lead role in

planning the robbery and amassing an arsenal of weapons and ammunition  and other equipment

for the robbery.  Holder also drove the getaway van.

It took only minutes for the  robbery; Holder and Allen then fled in the waiting blue van,

attempting their getaway.  Their plan was to burn the getaway van,  switch to a second stolen van

in nearby Forest Park, and then switch to a third car parked in a Barnes Hospital parking garage.

The second car contained a loaded weapon.  However, the getaway van burst into flames a short

distance from the second van.  Appellant, Norris Holder,  was captured as he fled the burning

van;  Billie Jerome Allen was arrested in the early morning hours of March 18.

Holder testified in his own defense.  He admitted committing the bank robbery, but

denied culpability in the murder of Richard Heflin.

**Physical Layout**

The Bank is located at 6900 Clayton Avenue in St. Louis, Missouri, near Highway 40

and McCausland Avenue. (Holder Tr.,  3-18-98, p. 77-78).  There are entrances to the lobby on

both the east and west sides of the Bank.  Each entrance has a double set of glass entry doors

from the outside of the Bank to a vestibule and another set from the vestibule to the bank lobby.

Along the south wall of the lobby, from east to west,  are the safe deposit area including the

Bank's vault and the tellers' line.  These areas are separated by a counter from the rest of the lobby.  Behind the tellers' line is a wall which separates the tellers' line from the drive up teller area and a series of rooms used by safe deposit customers.  (Gov. Ex. 22A).  The eastern entrance to the Bank is adjacent to Forest Avenue.  Directly across Forest Avenue to the east of the Bank is a bank parking lot.  The drive-up area is on the south side of the bank.  (Gov. Ex.'s 2A and 22A).

**The Robbery**

At approximately 10:35 a.m. on March 17, 1997, there were ten Bank employees within the bank lobby.  Kelley Davis, the customer service manager, was at her desk across the lobby from the tellers' line.  (Holder Tr.,  3-18-98, pp. 72, 88).  Amy Boehlje was behind the counter in the safe deposit area and  Sandy Foppe was in the work room portion of  the safe deposit area.  (Holder Tr.,  3-18-98, p. 88).  Four tellers were behind the tellers' counter:  Lisa Moore, on the east end of the counter; Mary Garvels, next to her; and Laura Riehmann and Virginia Michaels at the teller window immediately to the right of the break in the counter.   Michael West, a maintenance man, was transacting business at Lisa Moore's window.  (Holder Tr.,  3-18-98, pp. 87-89; Holder Tr.,  3-19-98, pp. 54-55).  Debbie Stoltz was in the reception area in the middle of the lobby.  Richard Heflin, a uniformed, armed security guard for the Bank[1]  (Holder Tr.,  3-18-98, p. 72; Holder Tr.,  3-19-98, p. 32), was on duty and in the general area of the snack table; he had been talking with Michael West.  (Holder Tr.,  3-18-98, p. 90).

---

[1]Mr. Heflin had been married for six months to Dana Heflin, an assistant vice-president at the Bank.  Although Dana Heflin normally worked in the lobby area of the Bank, on the morning of March 17 she was working at another Lindell Bank & Trust facility.  (Holder Tr.,  3-20-98, p. 11).

March 17, 1997, St. Patrick's Day, was also Customer Appreciation Day at the Bank. In the lobby bank employees had set up a snack table with punch and cookies next to the teller counter. (Holder Tr., 3-19-98, p. 83). A St. Patrick's Day parade was scheduled to begin at noon in the area, known as "Dogtown." (Holder Tr., 3-19-98, p121; Holder Tr., 3-20-98, p. 61). At approximately 10:15 - 10:30 a.m., members of the "Sterling Club," a senior citizens club, who had gathered in the lobby of the Bank, left on a bus for a trip to one of the area gambling boats. (Holder Tr., 3-18-98, p. 86; Holder Tr., 3-19-98, p. 83).

Meanwhile Thomas Dirnberger, who lived near the Bank, was out walking his dog sometime before 10:30 a.m. on that same morning. He noticed a blue van drive down the street in the direction of the Bank. (Holder Tr., 3-18-98, pp. 287, 290). Three or four minutes later he saw the same van heading toward the Bank from the opposite direction. He noticed that it contained two black males. (Holder Tr., 3-18-98, p. 291).

Betty Thompson, a bank customer, had parked in the east parking lot and was walking up to the east door of the bank when she saw the blue van drive up to the Bank at a fast rate of speed and screech to a halt in front of the Bank on the wrong side of the street. (Holder Tr., 3-18-98, p. 300). Two men with rifles got out of the van; she could not identify them because they were masked, but she noticed that the driver walked with a limp. (Holder Tr., 3-18-98, pp. 302-303). (Norris Holder lost the lower part of his right leg when he attempted to hop a train at the age of 15; however, he was fitted with a prosthesis and was able to play basketball and football. (Holder Tr., 3-18-98, pp. 175-176; 3-25-98, p. 70)) Ms. Thompson testified that the men left the doors to the van open. (Holder Tr., 3-18-98, p. 303). She saw the two men run into the bank, the man who limped going in first, and within a few seconds she heard about four or five

6

gunshots.   She returned to her car and called 911 on her cell phone.  (Holder Tr.,  3-18-98, pp. 304, 311) .

At approximately 10:35 a.m., Virginia Michael, the teller supervisor, was standing at her window and observed a person entering the bank.  She testified that he "came in shooting" at the area where Richard Heflin was.  (Holder Tr.,  3-20-98, pp. 17-18).   He moved toward the safe deposit area, and toward Richard Heflin, and as he did so she saw him continue to move his gun lower and lower.  (Holder Tr.,  3-20-98, p. 19).   Although none of the eyewitnesses inside the Bank ever saw the faces of the robbers,  the evidence clearly indicates that Billie Allen was the man seen repeatedly firing at Mr. Heflin.

Kelley Davis was standing at her desk, talking on the telephone.  She heard what sounded like firecrackers, and as she looked up and at the east doors of the lobby, she saw a man holding a gun.  (Holder Tr.,  3-18-98, pp. 91-92).  The gun, a long black gun with a wood handle, was pointed at Richard Heflin, and Ms. Davis observed fire coming out of the end of the barrel.  She observed Heflin being shot in the left leg; the leg blew back and blood flew out of it.  Mr. Heflin's eyes and mouth were wide open, and he looked shocked.  His hands were out to his side with his palms wide open.  (Holder Tr.,  3-18-98, pp. 92-93).

Ms. Davis glanced back at the assailant, and observed fire still coming out of the gun; she then looked back at Mr. Heflin, and observed that he had fallen on the floor on his back.  She observed that his holster was empty, but that his gun was not in his hands.  (Holder Tr.,  3-18-98, pp. 93-94).   Although she was unable to see the shooter, because she was now crouching down, she heard more gunfire, and observed Mr. Heflin's stomach explode and blood fly out of it.  Mr. Heflin was lying on the floor helpless and not moving at the time of the gunfire.  (Holder Tr.,  3-

7

18-98, p. 95).   Ms. Davis then got under her desk and called 911.  While on the telephone, she heard voices or a voice in the far corner of the lobby near the tellers and the safe deposit area, and also noticed a shadow in front of her desk.  (Holder Tr.,  3-18-98, p. 97).  The gunfire continued for what "seemed like forever."  (Holder Tr.,  3-18-98, p. 98).

Sandra Foppe, who was in the work room portion of the safe deposit area, testified that she heard a noise that sounded like firecrackers going off, looked up and saw Mr. Heflin fall. She then heard more shots, and observed blood and pieces of Mr. Heflin's uniform flying around. She also saw gunsmoke and pieces of carpeting in the air.  (Holder Tr.,  3-19-98, pp. 56-57). Michael West took off running and dove over the teller counter.  (Holder Tr.,  3-19-98, p. 57). She observed one of the bank robbers, dressed in dark clothes, swing his feet over the gate into the teller area.  (The gate was next to where Richard Heflin lay dying.)  She noticed that the soles of the robber's shoes were black, and identified the shoes Holder was wearing when he was arrested, Exhibit 35(e), as the shoes that she had seen.   (Holder Tr.,  3-19-98, p. 58; Holder Tr., 3-23-98, p. 96).  The robber, who was holding a gun with a banana clip, went over a second gate and behind the teller's area.  (Holder Tr.,  3-19-98, pp. 59-60).

Michael West corroborated Ms. Davis's and Ms. Foppe's descriptions of the attack on Richard Heflin.  West testified that he was standing at Lisa Moore's teller station when he heard a noise, turned around, and saw a masked man coming in carrying a rifle pointed up in the air. When the man saw Mr. Heflin, he pointed the gun at him and shot him.  After Mr. Heflin fell down, the man walked over on top of him and fired repeatedly.  (Holder Tr.,  3-19-98, pp. 72-75).  Meanwhile, West saw the second masked man, who was wearing a long coat and carrying a rifle, approach and go over the teller counter.  Virginia Michael also observed the man going

8

behind the teller counter with a gun in his hand. (Holder Tr., 3-20-98, pp. 21-22, 34). West testified that he turned and ran, and jumped over the counter and left by an exit door in the basement. (Holder Tr., 3-19-98, pp. 75-76). Lisa Moore observed the gunman who had shot Mr. Heflin walk toward Michael West, at which point West jumped over the table and ran away. (Holder Tr., 3-19-98, pp. 127-128). The gunman then turned toward Ms. Moore, who got down on the floor. Ms. Michael testified that as Mr. West jumped over the counter, she heard gunshots. (Holder Tr., 3-20-98, pp. 20-21).

Ms. Moore testified that she noticed the presence of the second gunman standing behind her; he said "Bitch, I say, 'Get down.'" (Holder Tr., 3-19-98, p. 128). He took money out of her drawer, dropping a pack of $20 bills on her in the process. She testified that at some point he fired his weapon, as if to tell her he meant business. (Holder Tr., 3-19-98, pp. 148, 150). He then said, "I am going to hit the back." A voice responded back to him, "Fuck the back. Get the bitch down now." (Holder Tr., 3-19-98, p. 129). At that time, the robber near her headed toward the other end of the tellers' counter, toward Ms. Michael; then he came back. After arguing between themselves, the robbers left the bank. Ms. Moore then stood up and set off the alarms and cameras, which were triggered to operate when one of the tellers pulled bait money from his or her drawer. (Holder Tr., 3-19-98, pp. 130-131).

After the robbers left, the employees began to survey the scene. Several testified that they noticed bullet holes sprayed all over the building, and that the lobby was filled with smoke. (Holder Tr., 3-19-98, pp. 63, 135). Sandra Foppe testified that after the robbers left, she got up, and saw Mr. Heflin lying on the floor, his hand on his stomach. He was grey. (Holder Tr., 3-18-98, p. 99). A short time later police and paramedics arrived; the paramedics worked on him

9

for a while, and then took him away.  She learned shortly thereafter that he was dead.  (Holder

Tr.,  3-18-98, pp. 102-103).  An audit reflected that approximately $51,949.00 had been taken.

(Holder Tr.,  3-20-98, p. 166).

Outside the Bank, Betty Thompson, the bank customer who had seen two men run into

the Bank, was still on the phone to 911 when she saw the men come out.  The man carrying a

bulky blue bag, the one who limped, got in on the driver's side of the van, and the van sped off.

(Holder Tr.,  3-18-98, pp. 305, 312).  She identified the same van in Forest Park later that day.

(Holder Tr.,  3-18-98, p. 307). Alma Gilliam, another bank customer, was approaching the Bank

when she saw the van parked in front with its doors open.  She heard what sounded like

gunshots, returned to her car, and attempted to call 911 on her cellular phone.  She was unable to

get through, and drove out of the parking lot.  She stopped her car at the corner, and observed

one of the robbers get into the passenger side of the van.  He took his mask off and she saw his

face.  After about thirty seconds to one minute, the other robber came out, got into the van and

drove away.  (Holder Tr.,  3-20-98, pp. 44-48, 56).  The van was being followed by a Jeep, and

as the van went by, she observed the license number.  She then proceeded to a gas station in the

area, and gave one of the attendants the license number.  (Holder Tr.,  3-20-98, p. 50).  Later in

the day she identified the van in Forest Park.  (Holder Tr.,  3-20-98, p. 51).  The next day she

identified Billie Allen as the person she saw get into the passenger seat of the van after the

robbery.  (Holder Tr.,  3-20-98, p. 53).

Thomas Dirnberger, who had seen the blue van driving toward the Bank 20-25 minutes

earlier, was riding in a car heading toward the Bank when he noticed the same blue van,

proceeding at a high rate of speed, run the stop sign and head east onto Highway 40.  (Holder

Tr., 3-18-98, p. 293). He later identified the van in Forest Park. (Holder Tr., 3-18-98, p. 294).

William Green, an attorney and former prosecuting attorney, was in the middle of the six drive-through lanes at the Bank and noticed the blue van parked outside the bank with its doors open and unoccupied. When the teller came over the intercom, he heard what he believed to be shots inside the bank, and he saw the teller duck down or step behind a wall. He then saw two individuals come from the Bank and get in the van. Each individual was carrying a rifle, and the driver was carrying a bag. (Holder Tr., 3-20-98, pp. 170-173). He followed the van as it left the Bank and entered the eastbound ramp to Highway 40. He continued to pursue it when it exited a short distance down the highway onto the Hampton-Forest Park exit. (Holder Tr., 3-20-98, pp. 175-176). He observed the van stop just before the intersection of Hampton and Wells Avenue in Forest Park. He heard some popping noises and saw the passenger exit the van. He also saw smoke. The van then began to roll forward onto Wells Avenue, about twenty or thirty yards. (Holder Tr., 3-20-98, p. 178). While he pulled up and continued to observe, the driver exited the van, and there appeared to be a struggle outside the van between the driver and two park workers. Meanwhile, a police car arrived. There was smoke coming from the van, and it became fully engulfed in flames. (Holder Tr., 3-20-98, pp.178-79). Mr Green testified that the van was in his sight during the entire series of events, and that he did not see anyone else get into the van. (Holder Tr., 3-20-98, p. 179).

Keith Smith, an employee of the City of St. Louis Parks Department, was driving with a co-worker westbound on Wells toward Hampton Avenue when he saw the van on fire. He saw the driver get out; the driver was on fire also. He and his coworker got out of their truck and went over to the driver. They assisted him to the ground to extinguish the fire. (Holder Tr., 3-

20-98, pp. 185-189). The driver immediately got back up and ran to the van, which at that point was approximately twenty-five (25) feet away. (<u>Holder</u> Tr.,  3-20-98, p. 190).  By that time the police had arrived and taken him into custody  (<u>Holder</u> Tr.,  3-20-98, p. 191).  The driver was Norris Holder.

Meanwhile, at approximately 10:35 a.m., Captain Robert Oldani of the St. Louis Metropolitan Police Department had just returned from roll call to a command van set up at the intersection of Clayton Avenue and Art Hill Place in the Dogtown area; he was in command of the Hibernians Parade for St. Patrick's Day. (<u>Holder</u> Tr.,  3-20-98, pp. 60-62).  He was advised that a citizen had reported persons armed with guns entering the Bank. (<u>Holder</u> Tr.,  3-20-98, p. 63).  He and two other officers were the first to respond to the scene.  The robbers had left. When he entered the lobby through the east doors, he noticed a revolver on the floor near the doors, about ten feet from Mr. Heflin.  (<u>Holder</u> Tr.,  3-20-98, p. 71).   The revolver was fully loaded and had not been fired.  (<u>Holder</u> Tr.,  3-20-98, pp. 85, 95).  To his left, he saw Mr. Heflin on his back, bleeding profusely.  The carpet where Mr. Heflin was lying had been ripped by gunfire.  (<u>Holder</u> Tr.,  3-20-98, pp. 72-73).  In front of him Captain Oldani saw the tellers; some were still behind the teller windows and others were huddled together on the other side of the bank crying and holding onto each other.  There were numerous spent shell casings and live rounds scattered around the floor.  There was haze in the air from the burned gunpowder, and he could smell the strong odor of it in the air.  (<u>Holder</u> Tr.,  3-20-98, pp. 64-65). He immediately ordered an urgent ambulance and the city EMS and fire department responded within ten minutes.  He also secured the scene.  (<u>Holder</u> Tr.,  3-20-98, pp. 67-68).

The police began processing the crime scene at the Bank.  From the area on Forest

Avenue in front of the Bank where the getaway van had been parked, they found a black stocking hat, an audio C.D.[2] and miscellaneous papers from the van.  (Holder Tr., 3-20-98, pp. 84, 121).  Also in the street outside of the east bank entrance they found two live cartridges.  (Holder Tr., 3-20-98, p. 149).  In the east vestibule between the sets of glass doors was a live cartridge, and another live round was nearby.  (Holder Tr., 3-20-98, pp. 84-85, 94).  Four more live rounds were recovered from behind the tellers' line and another by the gate which leads from the lobby to the safe deposit area.  (Holder Tr., 3-20-98, pp. 85, 87-89, 101, 138; Gov. Ex. 22A).  Nine bullet fragments were recovered from the floor in the area where Mr. Heflin fell.  (Holder Tr., 3-20-98, p. 126).  The carpet was damaged by bullets striking it in the area of Mr. Heflin's crotch.    (Holder Tr., 3-20-98, pp. 86-87). Other bullet fragments were found behind Lisa Moore's teller station, beneath a desk directly in front of the area where Amy Boehlje took cover, just inside the east bank doors and imbedded in the interior portion of the south outer wall to the Bank.  (Holder Tr., 3-20-98, pp. 141-142, 147, 153; Gov. Ex. 22A).  Sixteen (16) spent shell casings were recovered within the bank.[3]  Two were found by chairs just inside the east lobby doors and another just to the west of the doors.  Three were recovered near the location Mr. Heflin fell.  Three were found near the check desk in the lobby.  Two more were directly in front of the teller line and one was behind the line. Two were recovered from the safe deposit area near the vault.  Police recovered two casings from the area of the new accounts desk which

---

[2]In "Set It Off," a movie Holder and Allen watched before the robbery, a bank robber tosses C.D.'s from stolen getaway vehicles.

[3]Both the Russian and Chinese SKS rifles are semi-automatic weapons.  In a semi-automatic weapon, each time the trigger is pulled, a bullet is fired and a spent shell is thrown from the weapon.   The recovery of sixteen (16) spent shell casings means at least sixteen (16) shots were fired inside the Bank.

is across the lobby from the teller line. (Holder Tr., 3-20-98, pp. 88-91, 98-100, 102, 115, 131-133, 137, 144-146; Gov. Ex. 22A). Pieces of carpet were blown from the area where Mr. Heflin fell and landed across a counter in the safe deposit area. (Holder Tr., 3-20-98, p. 143; Gov. Ex. 22A).

There was a considerable amount of damage from the bullets fired within the bank. One bullet penetrated two chairs by the east door and then struck the floor in front of the safe deposit area. Another bullet passed through one of the chairs. A bullet ricocheted off of the floor close to the location of Mr. Heflin's left leg as he lay on the floor. Several bullets struck the floor in the area of his crotch. There was extensive damage to the carpet in that area. A bullet passed through the counter in the safe deposit area, struck a desk leg and fragmented. Had this bullet not hit the desk leg, it could have hit Ms. Boehlje. Higher on the wall above this spot was another bullet hole. A bullet went through the gate between the lobby and safe deposit area, passed through three interior walls and landed against the south exterior wall of the bank. Another bullet passed through the wall behind the tellers' counter and landed near the south exterior wall. Both this bullet and the one just previously described passed through the wall behind Lisa Moore's teller station. A bullet struck the tile floor immediately in front of the teller line near the spot Mr. West jumped the counter. Two bullets struck the wall behind Virginia Michael's teller station. (Holder Tr., 3-20-98, pp. 86-91, 94-107; Tr., 3-24-98, p. 80-90; Gov. Ex.'s 3B, 3C, 22, 22A).

Emergency rescue workers arrived at the Bank, treated Mr. Heflin, and took him to Barnes Hospital. When he arrived, he was moribund; he did not have a measurable blood pressure, was not breathing on his own, and had no obvious evidence of neurologic functioning.

14

(Holder Tr.,  3-19-98, p. 170).  The trauma surgeon who treated him stated that "the particular weapon used in this case was thoroughly destructive..." (Holder Tr.,  3-19-98, p. 171).  The gunshot wound to the left leg shattered the thigh bone and severed the major blood vessel going down the leg, and vital structures in the abdominal cavity had been hit.  (Holder Tr.,  3-19-98, p. 171; (Holder Tr.,  3-23-98, p. 22).   The trauma team was unable to revive him, and he was pronounced dead at 11:09 a.m.  (Holder Tr.,  3-19-98, p. 173).

An autopsy revealed Mr. Heflin suffered at least eight (8) discrete bullet entry wounds and numerous puncture wounds caused by bullet fragments.  (Holder Tr.,  3-23-98, pp. 48, 50). At least four of the bullet wounds were potentially deadly.  (Holder Tr.,  3-23-98, p. 53). Only a wound to the left leg, a wound to the right thigh and a wound to the left knee were consistent with Mr. Heflin having received them while he was standing.   (Holder Tr.,  3-23-98, pp. 24, 27). Three of the lethal wounds entered through the buttocks, shattered the pelvis and massively damaged the abdomen.  (Holder Tr.,  3-23-98, pp. 11, 15, 16, 17, 49).   The bullets which caused these wounds apparently ricocheted off of the floor and struck Mr. Heflin as he lay on his back on the floor.  (Holder Tr.,  3-23-98, pp. 12, 16, 17, 47).  7.62 by 39 millimeter bullets relating to these three wounds were recovered: one from the kidney, one from the liver and a third from the abdomen near the spinal column.  (Holder Tr.,  3-23-98, pp. 12, 15, 17).  The wound which nearly severed his left leg was also lethal.  (Holder Tr.,  3-23-98, p. 26).  The wound to the right thigh shattered his femur.  Bullets and bullet fragments were also recovered from Mr. Heflin's right thigh, left thigh and left knee.  (Holder Tr.,  3-23-98, pp. 23, 28, 34).  All of these bullets and fragments were taken to the police laboratory for comparison.  Mr. Heflin also received less serious wounds to his left hand and lower left leg as well as two clusters of puncture wounds

from fragments.  (<u>Holder</u> Tr.,  3-23-98, pp. 38, 41, 43). He was alive when he received all of these wounds. (<u>Holder</u> Tr.,  3-23-98, p. 49).  He was shot with "hollow point" ammunition, which is more destructive than non-hollow point.  (<u>Holder</u> Tr.,  3-23-98, p. 14).  Some of the wounds were consistent with the shooter moving toward Mr. Heflin's left as he shot.  (<u>Holder</u> Tr.,  3-23-98, pp. 18, 33, 35, 38).  Upon examination of Mr. Heflin's clothing, a criminalist found over twenty (20) holes and rips to his shirt, t-shirt and trousers and corresponding damaged areas to his jockey shorts.  (<u>Holder</u> Tr.,  3-23-98, p. 180).

Police rapidly arrived at the scene of the burning van in Forest Park.  John Ackermann, a St. Louis City police officer, received a call about the robbery at about 10:45 a.m. and arrived at the scene in Forest Park in time to see both the passenger and the driver exit the van.  He observed the passenger, Allen, run across a path and into a wooded area of the park; he also observed the driver, Holder, leaning into the van.  (<u>Holder</u> Tr.,  3-20-98, pp. 196-197, 205).  He ordered Holder to get down on the ground and crawl to him; he could hear rounds of ammunition going off inside the van and the van was in flames.  Holder repeatedly refused to do so, but finally went to the ground, whereupon Ackermann handcuffed him, after a struggle, and pulled him to safety.  (<u>Holder</u> Tr.,  3-20-98, pp. 197-199).  Holder was wearing a bulletproof vest. (<u>Holder</u> Tr.,  3-20-98, pp. 200, 203).

Billie Allen had run into a wooded area.  He encountered a City Forestry employee, Bobby Harris, who was working with another employee, Bruce Norman, in Forest Park hooking up a wood chipper to the back of a truck.  Harris testified that a man came running toward him; he was patting the top of his hair.  He stopped and asked if they were hiring; Harris noticed that there was smoke in the distance behind the man.  He and Norman gave the man a ride to the

Metrolink Station; he paid them $30 apiece.  (Holder Tr.,  3-20-98, pp. 225-228).  He attempted

to buy Norman's hat from him, but Norman refused.  (Holder Tr.,  3-20-98, p. 229).   Harris

identified Allen in a lineup the next day as the man he had seen in Forest Park.  (Holder Tr.,  3-

20-98, p. 231).[4]

The getaway van was "fully involved" in fire when the fire department arrived and put it

out. Two weapons were seized from the van after the fire was extinguished.   Holder's weapon,

the Russian-made SKS with a bayonet and an extended magazine known as a banana clip

attached to it, Exhibit 38,  was on the floor between the driver's and passenger's seats.  The

Russian SKS still had some cartridges in the extended magazine at the time of the fire.  (Holder

Tr.,  3-20-98, pp. 251-252).   Allen's weapon, the Chinese SKS, Exhibit 37, which did not have a

clip, was on the floor in front of the passenger's seat.  It was not loaded at the time of the fire.

(Holder Tr.,  3-20-98, pp. 250-251, 257).  Burned  money was attached to the remains of the

stock of the Russian SKS.  A large quantity of partially burned money was found strewn about

the front of the van.  Police also seized a burned magazine, Exhibit 53, attached to the Russian

SKS  (Holder Tr.,  3-20-98, pp. 253-54),  and four other banana clips (Exhibit 39) from the van,

(Holder Tr.,  3-20-98, p. 254).  The four magazines were of the extended type usable only in the

altered Russian SKS, (Holder Tr.,  3-24-98, p. 99), and had been consumed in the fire; they had

exploded areas within them, indicating that there had been a "cook-off" of live ammunition.

---

[4]Lakeshia Williams, who had seen Billie Allen the night before the bank robbery, saw
him the afternoon of the bank robbery.  She noticed that, unlike the night before, he now had a
burn on one of his ears.  (Holder Tr.,  3-18-98, p. 244). Marcella Chowning, who had been with
Lakeshia Williams and Billie and Norris the night before the robbery also noticed Allen's blister
the next day.  (Holder Tr.,  3-18-98, p. 253).  When Allen was arrested early in the morning after
the robbery, he reeked of smoke.  He had burn blisters on his right ear and right nostril, and his
hair was singed.  He also had a burn on his wrist.  (Holder Tr.,  3-23-98, p. 125).

(Holder Tr.,  3-24-98, p. 98).  Also seized from the van were 85 fire-damaged shells, caliber 7.62 by 39mm; 79 .30 caliber bullets; 8 burned 12 gauge shotgun shells, and one loaded round of 7.62 by 39mm ammunition.  (Holder Tr.,  3-20-98, p. 269).  A Radio Shack transceiver and yet another (the sixth) banana clip were recovered from the street by the burning van.  There were 18 live rounds of 7.62 by 39 millimeter ammunition in this banana clip.  (Holder Tr.,  3-20-98, p. 248).

Police also found Allen's leather jacket on a hill near the scene, and retrieved from it three shotgun shells, Exhibit 47,  and five stripper clips of ammunition for fast reloading, four of them fully loaded and holding ten rounds of 7.62 by 39 mm ammunition, and one of them partially loaded; in total, there were 44 rounds of ammunition loaded in the stripper clips and 6 loose live cartridges, Exhibit 46,  in the pockets of the jacket.  In the front pocket of the leather jacket were three Winchester 12 gauge shotgun shells loaded with triple aught buck.  (Holder Tr.,  3-20-98, pp. 241-243, 258;  Holder Tr.,  3-24-98, p. 104).

The Russian SKS, the Chinese SKS and all of the cartridges, shell casings and bullets recovered during the investigation were taken to the St. Louis Metropolitan Police Department Laboratory for analysis and comparison.  Firearms examiner Frank Stubits reached the following conclusions:

The Russian-made SKS was a 7.62 X 39 mm calibered semiautomatic rifle with a bayonet attached and a loaded extended magazine.  In the magazine were three spent shell casings, three "cooked-off" shell casings and one burnt bullet.  The "cooked-off" casings were a result of the fire; the live cartridges in the magazine exploded within it, erupting from the magazine and leaving remnants of ammunition.  (Holder Tr.,  3-24-98, pp.  91-95).  The

Russian SKS, which was designed to hold only eleven rounds of ammunition, had been modified to accept the extended magazine or "banana clip," which held 37 rounds of ammunition.  The Russian SKS was reloaded by exchanging an empty "banana clip" for a full one.

The Chinese-made SKS was also a 7.62 X 39 mm calibered semiautomatic rifle.  Unlike the Russian SKS, it had not been altered to accept banana clips.  It had a fixed magazine and held 11 rounds when fully loaded.  It was not loaded at the time of the fire; the magazine was still attached and was empty and undamaged.   (Holder Tr.,  3-24-98, p. 94).  The Chinese SKS was designed to be reloaded by means of a "stripper clip" of the type found in Allen's jacket pocket.   Each "stripper clip" held ten rounds of ammunition and was designed to reload the SKS quickly.  (Holder Tr.,  3-24-98, pp. 93-98, 100-102).

A total of one hundred eighty-four (184) 7.62 by 39 millimeter rounds were recovered during the course of the investigation.  (Holder Tr.,  3-24-98, pp. 107-108).   All of this ammunition was high powered, Russian made, military-style ammunition of the hollow point design.  Hollow point ammunition is designed to mushroom open  upon impact to create more damage. (Holder Tr.,  3-24-98, p. 112).   Twenty-one (21) 12 gauge shotgun cartridges were also recovered.

Of the sixteen shell casings recovered from within the Bank, eight were positively identified as having been fired by Allen's Chinese SKS.  Another three were consistent only with having been fired by the Chinese SKS.[5]  Of the remaining five rounds, three could only have been fired by Holder's Russian SKS, and two could have been fired by either of the weapons.

---

[5]This total of eleven rounds accounts for all of the rounds that the Chinese SKS could have held without reloading. It also explains why the Chinese SKS was not loaded at the time of the fire in the getaway van.  It had been fired in the bank until it was empty.

(Holder Tr.,  3-24-98, pp. 128, 134-37, 143).

The bullets recovered from Mr. Heflin's liver, right thigh, left thigh and bullet fragments from the knee could not be positively identified to either firearm due to mutilation of the bullets. These items could have been fired from either firearm.  (Holder Tr.,  3-24-98, pp. 118, 124). The bullets recovered from the lethal wounds to Mr. Heflin's abdomen[6] and kidney were positively fired by Allen's Chinese SKS. (Holder Tr.,  3-24-98, p. 119).

A bomb and arson expert testified that gasoline had been poured in a Z pattern in the van behind the two front seats and that vapors from the gasoline ignited, causing the van to burn. (Holder Tr.,  3-20-98, pp. 277-279).  Gasoline was on the clothes and black gloves Holder wore during the bank robbery.  (Holder Tr.,  3-23-98, p. 165).  A detective from the bomb and arson unit testified that the exploding weapons and ammunition could have harmed people in the vicinity of the burning van,  (Holder Tr.,  3-23-98, p. 145), and that six of the shells that exploded made it outside the van.  (Holder Tr.,  3-23-98, p. 154).

Near the corner of Clayton Avenue and Faulkner Drive in Forest Park, police found the second getaway vehicle, a Dodge van which had been stolen overnight.  Inside the Dodge van, the police recovered a 12 gauge shotgun with pistol grips, owned by Norris Holder.  It was fully loaded with eight (8) rounds of 12 gauge ammunition.  Some of this ammunition was also triple aught buckshot of the type found in the pocket of the jacket Allen discarded in Forest Park.   The route Allen and Holder took from the Bank would have led directly to the Dodge van had the getaway van not caught fire and burned.  (Holder Tr.,  3-20-98, pp. 283-285; Holder Tr.,  3-23-

---

[6]The bullet from the abdomen appeared to have ricocheted off of a hard object before entering Mr. Heflin's body.

98, pp. 79-82).

About 10:00 p.m. on the 17th, police discovered the third getaway vehicle, Holder's Mercury Topaz, in the Barnes Hospital parking garage.  The garage is only a short distance from the location where the second getaway van was recovered.  Allen's left thumb print was found on the window of the passenger's door of the Topaz.  Holder's palm print was found on the window of the driver's door.  Inside the Topaz was Holder's driver's license.  (Holder Tr.,  3-23-98, pp. 56-61, 87-89).

**Planning**

The government introduced detailed evidence of the substantial amount of planning that had preceded the bank robbery.

Norris Holder, who was born on December 16, 1975, (Holder Tr.,  3-23-98, p. 119), was a regular customer of the Bank.  (Holder Tr.,  3-19-98, p. 107).   Between January of 1996 and March of 1997 he made fifteen withdrawals of $500 from the Bank.  (Holder Tr.,  3-19-98, pp. 109-110).  The last withdrawal before the robbery was on March 13, 1997.  (Holder Tr.,  3-19-98, p. 111).  Holder admitted during questioning after his apprehension that he had committed the robbery because he needed money; he wanted to "start from scratch and live right," and  he needed money for a lawyer.   (Holder Tr.,  3-24-98, p. 22).  Holder admitted that he and Allen had chosen the Bank because he had an account there, and he knew the layout of the Bank and that it was near a highway.  (Holder Tr.,  3-24-98, p. 17).   He also admitted that they stole two vehicles; that they used one as the getaway vehicle and parked the second in Forest Park, where they planned to switch vehicles, set the first vehicle on fire,  and drive to Holder's car parked in the Barnes Hospital parking garage.  (Holder Tr.,  3-24-98, p. 19).   He admitted that prior to

going to the Bank, they had poured gasoline into the van.  (Holder Tr.,  3-24-98, p. 19).  He admitted that he had carried a loaded Russian SKS with a bayonet, and that Allen carried a Chinese SKS without a bayonet.   He stated that he was the second to enter the Bank, and heard shooting and was confused because there wasn't supposed to be any shooting.  He then leaped over the counter with the assault rifle and went through the teller drawers.  He put the money in a green laundry bag, jumped back over the counter, and ran out of the Bank.  He drove the van onto Highway 40, running the electric signals; when he flicked his lighter the inside of the van caught on fire and burst into flames as they were driving.  (Holder Tr.,  3-23-98, pp. 109-111, 117).  He  repeatedly professed surprise that there was any shooting and denied firing his weapon, but admitted that he wore a bullet proof vest, and that they had ammunition in five or six clips.  (Holder Tr.,  3-24-98, pp. 18, 20, 23, 56).

Other witnesses and physical evidence corroborated Holder's admissions.  The government introduced evidence that on the evening of March 16, 1997, sometime after 11:00 p.m., a blue 1987 Astrovan was stolen from in front of its owner's residence.  (Holder Tr.,  3-18-98, p. 267).   That vehicle was burned almost beyond recognition.  (Holder Tr.,  3-18-98, pp. 269-270).   Also on the evening of March 16, 1997, a blue Dodge Caravan was stolen from in front of its owner's residence, also after 10 or 11:00 p.m.  (Holder Tr.,  3-18-98, p. 279).  That vehicle was found in Forest Park on Faulkner Drive, near Barnes Hospital.  (Holder Tr.,  3-20-98, p. 283).  The third vehicle, a 1988 gray Mercury Topaz was found parked in the Barnes Hospital parking garage, near Forest Park.  (Holder Tr.,  3-23-98, p. 57).

The Russian SKS assault rifle, equipped with a bayonet and a curved clip was purchased on November 19, 1996 and later sold to Norris Holder.  (Holder Tr.,  3-18-98, pp. 125,135).

Holder, accompanied by Billie Allen, purchased the bulletproof vest from a kiosk at the St. Louis Center shopping center in downtown St. Louis on March 13, 1997.  The salesman testified that he informed Holder and Allen that the vest would stop bullets from the types of weapons carried by St. Louis police.  (Holder Tr.,  3-19-98, pp. 12-15).   Allen was unable to purchase a vest because he did not have enough money.  (Holder Tr.,  3-19-98, p. 16). A Winchester 12-gauge shotgun was purchased for Norris Holder by his cousin in 1995.  (Holder Tr.,  3-18-98, p. 114).  That weapon was placed in the second getaway vehicle.  (Holder Tr.,  3-23-98, p. 112).

Holder had been thinking about committing a bank robbery for some time.  Holder's acquaintance, Terry Gear, testified that, around New Year's Day of 1997, Holder asked him if he had ever thought about robbing a bank.  Gear asked Holder if he had thought about the consequences involved, to which Holder replied that he wouldn't get caught.  Gear also testified that Holder said that he needed some money.  Holder also asked him if he had seen the movies "Heat" and "Set It Off."  (Holder Tr.,  3-18-98, pp. 151-152).  Gear described the movie "Heat" as about high-class bank robbers and as involving guns and violence.  He described the movie "Set It Off" as involving female bank robbers engaging in shootouts.  (Holder Tr.,  3-18-98, pp. 152-153).  He observed to Holder that "the people in those movies died, and it really wasn't worth it." (Holder Tr.,  3-18-98, p. 153).

Holder again responded that he had a plan, and described it for Gear.  He stated that he had seen a bank on Grand and close by a highway.  He planned that one person would get all the people down while the other person would collect the money, and someone else would watch the door.  After they left, they would get on the highway, go down one exit, and change cars at an apartment complex.  (Holder Tr.,  3-18-98, pp. 153-154).  Again Gear responded that the risk

was too high, whereupon Holder responded that no one would be crazy enough to try to stop them with the firepower they had, indicating that he had an assault rifle that could go through bulletproof vests and police cars.  He also stated that if someone tried to stop him, he would just shoot at the cars and get rid of them, and that if someone got in his way, he would get rid of him. (Holder Tr.,  3-18-98, pp. 154-155, 172).

Wayne Ross, a childhood friend of Norris Holder's, (Holder Tr.,  3-18-98, p. 175), testified that he observed Norris and Billie Allen talking together at a nightclub named "Cloud Nine" on March 7th or 8th of 1997.  (Holder Tr.,  3-18-98, pp. 180-181; also Johnnie Grant, p. 224; Lakeshia Williams, p. 238).   During the following week, he watched the movie "Heat" at his uncle's house with some friends, including Norris.  (Holder Tr.,  3-18-98, p181-182)  All those present, including Norris, expressed admiration for the "hardness" of the bank robbers in the movie as they fought to the death in their gunfights with the police.  (Holder Tr.,  3-18-98, pp. 183-184).   On March 15, Ross and a group of friends, including Norris, went to a bowling alley.  As they were leaving, around midnight, Norris left the group, met up with Billie Allen, and he and Allen went back into the bowling alley.  Ross and the others also went back into the bowling alley, and saw Norris and Billie whispering.  He overheard them referring to knowing the "perfect place" along the highway, and that it had two doors.  (Holder Tr.,  3-18-98, pp. 187-188). He also overheard them say that they had to "do it quick" and "when did they want to do it."  (Holder Tr.,  3-18-98, p. 189).   On Sunday, March 16, 1997, Ross stopped by Norris' house to trade some clothing with him before he returned to college from spring break.  He observed two guns, some clips, and a bulletproof vest in Norris's closet.  One of the guns had a "knife" on it and the other had something like Chinese writing on it.  (Holder Tr.,  3-18-98, pp. 190-192).

24

Ross identified Plaintiff's Exhibits 37 and 38 as the guns he saw in Norris's closet,  (Holder Tr., 3-18-98, pp. 193-194) and he identified Exhibit 42 as similar to the clip he saw, and Exhibit 34(b) as the bulletproof vest.  (Holder Tr.,  3-18-98, pp. 196-197) He identified Exhibit 60 as a pump shotgun with a short handle that he had seen over the years in Norris's residence.  (Holder Tr.,  3-18-98, p. 205).  Finally, Ross testified that he saw a stun gun on the table next to Norris's bed.  (Holder Tr.,  3-18-98, p. 199).

Ross testified that he invited Norris to accompany him back to campus, but Norris declined, saying that he had to "pull a lick" because he needed money.  (Holder Tr.,  3-18-98, p. 200).  They discussed some of the details of the planned bank robbery, including Norris's plan that "nobody" would get hurt, (Holder Tr.,  3-18-98, p. 201), and his plan to wear a bulletproof vest.  (Holder Tr.,  3-18-98, p. 202).

Lisa Moore, the bank teller, testified that a man accompanied Holder on the March 13th visit; while she waited on Holder, the other man sat on the edge of a chair in the lobby looking around.  (Holder Tr.,  3-19-98, p. 114).   Ms. Moore later identified Billie Allen in a lineup as the man who accompanied Holder to the Bank that day.  (Holder Tr.,  3-19-98, pp. 119-120).  As Holder and Ms. Moore chatted during Holder's transaction, he asked her "Does this bank always be this empty?"  (Holder Tr.,  3-19-98, p. 117).

Kevin Liddell, an employee of Radio Shack, testified that he sold Norris Holder a set of walkie-talkies (Exhibit 41 and Exhibit 15(1)) on the day before the robbery.  (Holder Tr.,  3-18-98, pp. 227-228).  That same evening, Norris and Billie brought the movie "Set It Off" to the residence of Lakeshia Williams, set it up in the VCR, and instructed her not to watch it until they returned.  (Holder Tr.,  3-18-98, pp. 241-242; also Chowning, pp. 249-250).  Later that evening

Norris and Billie returned and watched the movie awhile, and then left the house with the tape still running.  (Holder Tr.,  3-18-98, p. 252).

Holder testified in his own defense.  He admitted to robbing the Bank, but repeatedly testified that, not only did he not know there was to be any shooting, he instructed Allen that there was to be no shooting at all. (Holder Tr., 3/25/98, pp. 70, 83-84, 104-105, 120) He portrayed Allen as the instigator of the crime, testifying that Allen suggested robbing the Bank as a way for Holder to obtain money to buy a better prosthesis,[7]  (Holder Tr., 3/25/98, p. 75), that Allen asked to accompany him to the Bank when he went to deposit his disability check (Holder Tr., 3/25/98, p. 76), and that Allen paged him repeatedly the morning of the robbery.  (Holder Tr., 3/25/98, p. 77).  However, Holder admitted to supplying the Russian and Chinese SKS weapons, (Holder Tr., 3/25/98, p. 79), the walkie talkies, (Holder Tr., 3/25/98, p. 80), and to purchasing a bulletproof vest.  (Holder Tr., 3/25/98, p. 78).  He denied shooting his gun, (Holder Tr., 3/25/98, pp. 85, 102), and denied that he drove the car after the robbery.  (Holder Tr., 3/25/98, p. 89).  He testified that he set the van on fire to get Allen to stop the vehicle, (Holder Tr., 3/25/98, p. 92), and that once the van was stopped, he jumped out on the passenger side. (Holder Tr., 3/25/98, p. 93).

Holder ended his direct testimony with the following explanation for his participation in the robbery:

> I was in there trying to get some money to – what I thought I was doing the right thing trying to change my life for the better, just take some money that was insured, nobody get hurt, everybody is fine.  To change my life for the better, not to take somebody's life. Not to hurt somebody, not to take somebody from their people, their family.

---

[7]In contrast, Allen, during the sentencing phase of his trial, was repeatedly characterized as a follower.  See Allen Tr. 17, pp. 23-85.

(Holder Tr., 3/25/98, p. 106).

On cross-examination, Holder admitted that he willfully and intentionally robbed the Bank, that Richard Heflin was killed, and that his actions were reckless and placed everyone in the bank at a grave risk of death.  (Holder Tr., 3/25/98, pp. 130, 132, 170-71).  He admitted that he loaded his gun the evening before the robbery, and that he went into the Bank with his weapon ready to be fired, with a bullet in the chamber so that it could be fired by squeezing the trigger, (Holder Tr., 3/25/98, p. 108), that he doused the van with gasoline before the robbery, (Holder Tr., 3/25/98, p. 108), and that he wore a bulletproof vest.  (Holder Tr., 3/25/98, p. 109) He admitted providing the Chinese SKS to Billie Allen, and to providing the ammunition and the shotgun, even though Allen had told him he was going to "go wild.".   (Holder Tr., 3/25/98, pp. 122-23).  He admitted to loading the five clips in the van.  (Holder Tr., 3/25/98, p. 124).   He denied firing the Russian SKS or dropping any live cartridges in the Bank.  (Holder Tr., 3/25/98, pp. 124-26, 167).   He also denied even seeing Richard Heflin until he was leaving the Bank, even though he passed within feet of him to get to the teller counter.  (Holder Tr., 3/25/98, pp. 143-45).  He admitted that, even though he considered Mr. Heflin his friend and didn't want him to get hurt, he did not stop and try to help him.  (Holder Tr., 3/25/98, p. 147).

He admitted to fully loading the pistol-gripped shotgun found hidden in the stolen Dodge van to be used as the second getaway van,  (Holder Tr., 3/25/98, p. 135), but denied that he intended it to use it on anyone attempting to prevent his escape.  (Holder Tr., 3/25/98, pp. 134-36).   He testified that his statement to F.B.I. agent Jan Hartman that he had accidentally set the van on fire was untrue, (Holder Tr., 3/25/98, pp. 110-111), and denied that he had told Detective Carroll that he had not been involved in the bank robbery.  (Holder Tr., 3/25/98, p. 111). He did

27

not recall attempting to enlist his friend Terry Gear in the robbery, (<u>Holder</u> Tr., 3/25/98, p. 112), nor in telling Gear that he would get rid of anybody who got in his way.  (<u>Holder</u> Tr.,  3/25/98, p. 113).  He repeatedly denied that he drove the van away from the Bank, in spite of all the eyewitness testimony to the contrary.  (<u>Holder</u> Tr., 3/25/98, pp. 114-117). He denied that when he returned to the van as the police were approaching, he was reaching for his Russian SKS. (<u>Holder</u> Tr., 3/25/98, pp. 153-54).  He denied that he had told Special Agent Hartman that he robbed the bank to get money to pay his lawyer.  (<u>Holder</u> Tr., 3/25/98, p. 119).

Holder  was charged by Indictment with the crimes of Count I, the robbery of Lindell Bank & Trust which resulted in a death, and Count II, using or carrying a firearm during and in relation to a crime of violence which results in a murder.  The jury returned verdicts of guilty as to each count. (<u>Holder</u> Tr., 3/25/98, p. 119).

**The Penalty Phase**

As to each of Count I and Count II, the United States submitted two statutory aggravating factors and four non-statutory aggravating factors to the jury.   The statutory aggravating factors were :

> 1.  That Norris G. Holder, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to one or more persons in addition to Richard Heflin;
> 2.  That Norris G. Holder committed the offense in the expectation of the receipt of anything of pecuniary value.

The Government relied on the evidence presented at the guilt phase of the trial to prove these statutory aggravating factors.

The non-statutory aggravating factors were:

> 1. That Norris G. Holder's conduct in committing the offenses was substantially greater in degree than that described in the definition of the crime, apart from the statutory

aggravating factors;

2. That Norris G. Holder has committed other criminal acts in addition to the capital offenses committed in this case;

3. That Norris G. Holder is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society; and

4. That Richard Heflin's personal characteristics as an individual human being and the impact of the death of Richard Heflin upon his family make this crime more worthy of the death penalty than other murders.

(Holder Appendix, pp 84-88).

As to the first non-statutory aggravating factor, that Holder's conduct was substantially greater in degree, the Government relied upon the evidence submitted at the guilt phase. As to the second non-statutory aggravating factor, that Holder had committed other criminal acts, the Government introduced evidence that Holder pleaded guilty in 1995 to the crimes of carrying a concealed weapon and possession of controlled substances. In connection with these offenses, the Government introduced evidence that Holder, while driving an autombile, refused to stop the vehicle for a period of time after being signaled by a police car to pull over, and when he finally did pull over, attempted to throw away a plastic bag containing 4-5 rocks of crack cocaine. (Holder Tr., 3/31/98, pp. 43-46). A passenger in Holder's vehicle told police that Holder had hidden a pistol inside the door panel on the passenger side of the car. (Holder Tr., 3/31/98, p. 48). The pistol was loaded. (Holder Tr., 3/31/98, p. 49). In addition, in May, 1995, Holder sold a stolen vehicle which had been altered to appear legitimate. (Holder Tr., 3/31/98, pp. 65-67, 70). The VIN on the dashboard had been replaced with the VIN from the vehicle Holder was driving when he was arrested for crack possession and carrying a concealed weapon. (Holder Tr., 3/31/98, pp. 77-85).

As to the future dangerousness non-statutory aggravating factor, the Government presented evidence that Holder was on probation for the crack possession and carrying a

29

concealed weapon charges when he robbed the Bank.  He did not fulfill three conditions of the probation:

1) He did not attend the Turnaround Program, a kind of "scared straight" program for youthful offenders (Holder Tr.,  3/31/98, p 101-02);

2) He did not maintain employment.  (Holder Tr.,  3/31/98, p. 103)  He also failed to attend scheduled employment counseling, (Holder Tr.,  3/31/98, p. 105-08, 113), and indicated to his probation officer that he should not have to work for the minimum wage (Holder Tr., 3/31/98, p. 109);

3) He failed to attend regularly scheduled meetings with his probation officer (Holder Tr.,  3/31/98, pp. 119-121).  He did so poorly that his probation was extended for an additional year (Holder Tr., 3/31/98, p. 121).

As further evidence of future dangerousness, the Government introduced evidence that Holder failed to exhibit remorse for the robbery and murder.  He showed no remorse when he was interviewed on the night of the crime by Detective Carol and by Special Agent Jan Hartman. Further, he failed to exhibit true remorse on the witness stand at trial.

As to the victim impact non-statutory aggravating factor, the United States presented testimony from Mr. Heflin's mother, his wife of six months, his three children, his ex-wife (the children's  mother), two of his siblings, two co-workers and a former co-worker.  This testimony established that Mr. Heflin, a decorated veteran who was forty-seven years old at the time of his death, was a hard working family man who was cheerful and well liked.  The witnesses testified about their last contacts with Mr. Heflin and the effect of his murder on their lives. (Holder Tr., 3/31/98, pp. 144-227).

Bank employees spoke of emotional difficulties resulting from the robbery.  Kelley Davis testified that Mr. Heflin was like a brother to her, and that a year after the robbery she still had nightmares every night and episodes of sleepwalking during which she attempted to climb out the window.  She also testified that she couldn't go anywhere by herself.  (Holder Tr.,  3/31/98, pp. 150-51).  Janice Walton, a bank employee for twenty-five years, testified that she was looking for other employment, because she could not face the possibility of another robbery.  (Holder Tr.,  3/31/98, pp. 158-59).   Heflin's wife, who worked at the Bank, testified that she had not gone back into the Bank since the robbery.  (Holder Tr., 3/31/98, p. 225).

**Mitigating Evidence**

Holder submitted two statutory mitigating factors and seventeen non-statutory mitigating factors for each count.  (Holder App. at 96-101).  His statutory mitigating factors were  "1) that Norris G. Holder did not have a significant prior history of other criminal conduct and 2) other factors in Norris G. Holder's background, record, or character or any other circumstances of the offenses that mitigate against imposition of the death sentence."  His non-statutory mitigating factors were as follows:

> 1.  That in the killing for which Norris G. Holder was convicted, he did not fire the shots which resulted in the victim's death.
> 2.  That Norris G. Holder did not intend for any person to be killed during the course of the offenses which he committed.
> 3.  That Norris G. Holder suffered a series of losses in his life which he failed to process, despite recommendations that he receive counseling.  These losses include the desertion of his father at a young age, the loss of his leg, and the death of his grandfather.
> 4.  That Norris G. Holder's childhood was characterized by inconsistent parenting.
> 5.  That despite growing up in a rough neighborhood with economic instability, Norris G. Holder was continuously striving to improve his situation and that of his family.
> 6.  That in the absence of his father, Norris G. Holder assumed the role of the man

31

of the house at a very young age.

7.  That Norris G. Holder lacked a positive male role model while growing up.

8.  That Norris G. Holder felt a sense of responsibility to provide emotional and financial support to his mother, brothers and sister.

9.  That Norris G. Holder's motive for these offenses grew out of his attempt to reduce the impact of his disability, improve his life, and provide care for his family.

10.  That Norris G. Holder provided a positive role model to Norrim Holder, Norrell Holder, Normeka Holder, Tony Sanders, and others.

11.  That Norris G. Holder has been a father figure to his brother Norrim.  Due to Norris' influences and efforts, Norrim has made many positive changes in his life.

12.  That Norris G. Holder is a likeable person who provides support and help to many of his extended family, friends, and associates.

13.  That Norris G. Holder does not have a history of violent behavior and the offenses for which he was convicted are inconsistent with his personality and usual behaviors.

14.  That Norris G. Holder has a large family who is very attentive to and supportive of him and will help him make an adequate adjustment to prison life.

15.  That Norris G. Holder has made an adequate adjustment to being confined in jail and is not a problem inmate.

16.  That Norris G. Holder does not present a substantial risk of being dangerous or violent if confined in prison for life without the possibility of release.

17.  That Norris G. Holder can continue to provide a positive influence in the lives of Norrim, Norrell, and Normeka Holder while incarcerated in prison.

Holder presented the testimony of thirty-one witnesses in the penalty phase, who testified in support of the two statutory and seventeen non-statutory mitigating factors.  Thirteen of the witnesses were family members, six were family friends or neighbors, two were teachers from the Rockwood School District, and two were from youth service groups Holder had attended. Generally, these witnesses testified that Holder came from a disadvantaged background, acted as a parent figure to his siblings and was likeable and  non-violent. Holder's mother, Kimberly Holder, testified <u>inter alia</u> that she and Norris's father split up when he was nine, that his grandfather with whom he was close died when Holder was ten, that after he lost his leg in the train accident he could no longer play sports as well as he had before, and that she worked two and sometimes three jobs to support herself and her family.   She testified that during part of

Holder's childhood she used crack cocaine, and that during that period she was not a good mother; that the family lived in the Blumeyer housing project, where Holder was exposed to a lot of crack users and drug dealers, and that he began dealing drugs; that Holder participated in the school desegregation program, attending schools in the Rockwood School District, but dropped out of high school; and that after Holder's train accident, there was a settlement with the insurance company, as a result of which she received $10,000, and Holder received $10,000, plus $500 a month until the year 2000. She also testified that Holder told her how sorry he was that Mr. Heflin had died. (Holder Tr., 4/1/98, pp. 11-67, 95-96).

On cross-examination, Kimberly Holder testified that under the insurance settlement, Holder would receive $500 a month until 2005, instead of 2000, and that in 2005 he would receive an additional $15,000. (Holder Tr., 4/1/98, p. 75). She testified that, after seventh grade, Holder's rate of absenteesim went up, from 25 days in eighth grade to 61 days in ninth grade. (Holder Tr., 4/1/98, pp. 84-86). She also testified that Holder was involved in three incidents of sexually assaulting female students, in May, 1990, in March, 1991, and in December, 1993, for which he was suspended. He never returned to school after the 1993 suspension. (Holder Tr., 4/1/98, pp. 89-90, 96-97).

Holder's friend, Cortez Harris, testified that Holder was a good friend and not a "trouble-starter." (Holder Tr., 4/2/98, p. 9). On re-direct examination, he testified that Holder had discussed the plans for the bank robbery before it occurred, and had made clear that part of the plan was that no one was going to get hurt. He testified that Holder had shown him a stun gun that was supposed to be used to stun the guard, but that Allen had shot the guard instead. (Holder Tr., 4/2/98, p. 28). On re-cross, he testified that Holder had told him that the stun gun

33

would stun the guard for a minute, and that all they needed was a minute or a minute-and-a-half to do the robbery.  (Holder Tr.,  4/2/98, pp.29-30).  Holder's friend, Wayne Ross, testified on cross-examination that he had seen the stun gun on the side of Holder's bed the day before the robbery.  (Holder Tr.,  4/3/98, p. 38) (No stun gun was found in Holder's arsenal the day of the robbery.)

In addition to the testimony of family and friends, four employees of the Ste. Genevieve County Sheriff's Department testified that Holder had made a good adjustment to confinement. (Holder Tr.,  4/1/98, pp. 119-121; 203-212; Holder Tr.,  4/3/98, pp. 2-11, 22-28).  One witness, a forensic psychologist offered as an expert on risk assessment and future dangerousness, testified that Holder was not a disproportionate risk to prison society.  (Holder Tr.,  4/1/98, . 146, 182-187).  Holder's attorney testified that Holder owed a substantial amount of money in attorney fees and fines to various municipalities, and that he was supposed to meet her at 1:00 p.m. the day of the robbery with the money he owed her.  (Holder Tr.,  4/2/98, pp.72-82).  An expert in the area of orthotics and prosthetics testified that the foot on Holder's prosthesis was broken, and probably was broken at the time of the robbery.  (Holder Tr.,  4/1/98, pp. 232, 235-237).  Finally, an expert in clinical neuropsychology and rehabilitation psychology testified that Holder did not suffer from any psychiatric or mental disorder.  However, Holder did not deal with the emotional impact of the amputation of his leg, and his psychological "denial" caused him to focus only on what he needed to do to return to being a whole individual.  It therefore caused him to get involved in the crime, because in his eyes, it was the only way he could get a better prosthesis. (Holder Tr.,  4/3/98, pp.  91- 93).

**The Jury's Findings**

The jury's findings regarding the aggravating and mitigating factors were identical for each count. (Holder App. at 94-101, 109-119). The jury unanimously found the existence of both statutory aggravating factors and the first three of the four non-statutory aggravating factors. The jury did not unanimously find the fourth non-statutory aggravating factor which involved victim impact. Id. No juror found either statutory mitigating factor submitted by Holder. No juror found non-statutory mitigating factors 1, 2, 5, 9, and 17. Nine jurors found statutory mitigating factor 3, that Holder suffered a series of losses in his life which he failed to process, despite recommendations that he receive counseling; twelve found factor 4, that Holder's childhood was characterized by inconsistent parenting; eleven found factor 6, that in the absence of his father, Holder assumed the role of the man of the house at a very young age; twelve found factor 7, that Holder lacked a positive male role model while growing up; eleven found factor 8, that Holder felt a sense of responsibility to provide emotional and financial support to his mother, brothers and sister; two found factor 10, that Holder provided a positive role model to his siblings and others; twelve found factor 11, that due to Holder's role as a father figure to his brother, Norrim Holder, Norrim has made many positive changes in his life; ten found factor twelve, that Holder is a likeable person who provides support and help to many of his extended family, friends, and associates; nine found factor 13, that Holder does not have a history of violent behavior and the offenses for which he was convicted are inconsistent with his personality and usual behaviors; six found factor 14, that Holder has a large family that is very attentive to and supportive of him and will help him make an adequate adjustment to prison life; six found factor 15, the Holder has made an adequate adjustment to being confined in jail and is

35

not a problem inmate; and ten found factor 16, that Holder does not present a substantial risk of being dangerous or violent if confined in prison for life without the possibility of release. The jury found no additional mitigating factors not submitted by Holder. Id. The jury returned a sentence of death as to Count I and death as to Count II. (Holder App. at 102, 120).

**An Evidentiary Hearing is Not Required**

The government submits that an evidentiary hearing is not required in order for the court to resolve the issues raised in Holder's Section 2255 motion.

Rule 8(a) of the Rules Governing Proceedings under Title 28, U.S.C., Section 2255, provides that the district court shall, upon a review of the files, records, and supporting evidence, determine whether an evidentiary hearing is required and/or dispose of defendant's motion as justice dictates.

It is well settled that the district court need not hold an evidentiary hearing for every allegation raised in a Section 2255 motion. As noted by the Eighth Circuit:

> A §2255 motion "can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." (citations omitted).

Sanders v. United States, 341 F.3d 720, 722 (8th Cir. 2003), cert. denied, 124 S.Ct. 1460 (2004), quoting Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995).

The government submits that the issues raised by Holder may be resolved against him without the necessity of the introduction of facts from outside the trial record. Accordingly, because the trial transcript, files, and records of the court are adequate to dispose of Holder's Section 2255 claims, no evidentiary hearing is required.

**Response to Grounds for Relief**

**12(A).  Ring Indictment Issue**

Holder contends that the indictment failed to allege at least one statutory aggravating factor in violation of Ring v. Arizona, 536 U.S. 589 (2002), and that therefore the death sentence exceeded the maximum sentence authorized for the crimes charged.  He further contends that the indictment defect was structural, and therefore requires automatic reversal, rather than plain error review.

Procedural Default.  Holder raises this contention for the first time in the proceedings against him.  Claims raised for the first time in a §2255 motion and not in a movant's direct appeal are procedurally barred.  In order to overcome this procedural bar, Holder must show both cause for his failure to raise the claim on direct appeal, and prejudice resulting therefrom.  United States v. Frady, 456 U.S. 152, 167-168 (1982); Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Ineffective assistance of counsel on the defective indictment ground, which Holder alleges in Section 12(C)(1) of his motion, may be cause excusing a procedural default.  Williams v. Kemna, 311 F.3d 895 (8th Cir. 2002); Boyd v. Minnesota, 274 F.3d 497 (8th Cir. 2001).  However, even were the government to concede that Holder has established cause, the analysis and result are the same.  Alaniz v. United States, 351 F.3d 365, 367 (8th Cir. 2003).  Holder cannot establish a basis for relief.

The Supreme Court has held that Ring, and therefore necessarily Apprendi, is a holding properly classified as procedural, is not a "watershed rule,"and therefore is inapplicable to cases on collateral review.  Schriro v. Summerlin, ___ S.Ct. ___, 2004 WL 1402732 (June 24, 2004).

37

Were it not for Holder's claim of ineffective assistance of counsel, the <u>Ring</u> issue would not be cognizable in this §2255 petition.

Even if the issue were directly cognizable, the Supreme Court stated in <u>Frady</u>, 456 U.S. at 168, that there is no need to address the "cause" component of the procedural default standard if the record does not show that the movant suffered "actual prejudice" based on the alleged defects in his criminal proceedings.  To satisfy the "actual prejudice" component of the <u>Frady</u> standard, the movant must show that an error was of a constitutional dimension and so infected the trial or appellate processes that the movant's due process rights were violated and, but for such an error, the movant would likely have been acquitted or his conviction reversed. See <u>United States v. Frady</u>, 456 U.S. at 169- 170; <u>United States v. Williams</u>, 98 F.3d 1052, 1055 (8th Cir.1996); <u>United States v. Apfel</u>, 97 F.3d 1074, 1076-1077 (8th Cir.1996).  Put another way, the movant is required to show that the alleged error created a fundamental defect which inherently resulted in a complete miscarriage of justice and that his claim presents exceptional circumstances. <u>Davis v. United States</u>, 417 U.S. 333, 346 (1974).  The actual prejudice standard is a "significantly higher hurdle than the showing required to establish plain error on direct appeal." <u>Swedzinski v. United States</u>, 160 F.3d 498, 501 (8th Cir. 1998), <u>cert</u>. <u>denied</u>, 528 U.S. 846 (1999).

As the government makes clear in its response to the Section 12(C)(1) allegation, <u>infra</u> at pp. 42-50, any <u>Ring</u>-<u>Apprendi</u> error, had it been alleged on direct appeal, would have been rejected as harmless error or not plain error.  Therefore, even if Holder has established cause, he has not established prejudice, and therefore his claim is procedurally defaulted.

**12(B) Jury's Consideration of the Pecuniary Gain Statutory Aggravating Factor.**

Holder asserts that the murder of Richard Heflin was not committed as consideration for the receipt of money, and that therefore the court improperly submitted the pecuniary gain statutory aggravating factor to the jury, to his prejudice. Again, this allegation is raised for the first time in this §2255 motion, and therefore Holder must establish cause for his failure to raise the issue previously, and prejudice.

Again, assuming Holder has established cause because of ineffective assistance of counsel, he cannot establish prejudice. The jury was only required to find one statutory aggravating factor in order to make Holder eligible to receive the death penalty. 18 U.S.C. §3593(d). The jury here found two: the pecuniary gain factor and the grave risk of death to others factor. Because there was overwhelming evidence to support the grave risk of death factor, the function of statutory aggravating factors under the FDPA - to determine a defendant's eligibility for the death penalty[8] - was properly fulfilled in this case.

Judge Hansen, in his dissent in United States v. Allen, 357 F.3d at 761, described the evidence presented to the grand jury, the same evidence presented at trial, establishing the grave risk of death statutory aggravating factor:

> Lisa Moore, a bank teller, told the grand jury that she was pregnant at the time the robbery occurred. That day, she was working at the bank along with five other tellers and Heflin. There was one customer present, Michael West, who worked as the bank's maintenance man. The first robber appeared in the bank, fired three shots in Heflin's direction, and shouted, "Everybody get the f* * * down." When West turned to run, the robber raised his gun and fired three shots at West, but missed. Moore then complied with the robber's demand by lying face-down in the teller area. When the robber entered the teller area, Moore looked up at him. He pointed his gun at her head and said, "B* * * *, I said, get the f* * * down." He then fired a shot into the wall. While the robber took money from the teller area, Moore could hear his accomplice firing shots in the lobby. When the robber left the teller area, Moore again looked up at him, and he said, "B* * **,

---

[8] Zant v. Stephens, 462 U.S. 862, 878 (1983).

I told you, stay down." The two robbers then exited the bank. Moore went to the lobby, where she observed that Heflin had been shot. Moore subsequently decided to quit her job at the bank for her safety and the safety of her unborn child. (Tr. Apr. 16, 1997, at 6-7, 26-46, 58-59.)

Terry Gear, a friend of Holder's, testified before the grand jury that Holder invited him to be part of the bank robbery. Holder said that he was not going to get caught because he had an SKS assault rifle that could shoot through "police cars and vests." Holder said that he and his associates "weren't going to let anything stop them," and if anyone tried to catch him, "he was going to X them out." Gear declined Holder's invitation to participate in the bank robbery. (Id. at 118-23.)

FBI Special Agent Ann Pancoast told the grand jury that she had investigated the bank robbery. Heflin died of multiple gunshot wounds, some from direct shots and some from ricochets. Each bank robber had discharged a semiautomatic assault rifle in the bank. Authorities recovered a total of sixteen spent shell casings and observed numerous bullet holes in the walls. The two bank robbers fled in a van that they had doused with gasoline. The van crashed in Forest Park and became totally engulfed by flames. Bystanders in the park heard explosions inside the van, later determined to be ammunition cooking off. (Tr. Apr. 17, 1997, at 14-19, 25.)

. . . . I am satisfied that if the prosecutor had asked the grand jury to charge the risk- of-death aggravator, it would have done so. The grand jury testimony showed that (1) both bank robbers fired multiple shots from semiautomatic assault rifles while they were in the bank, for a combined total of sixteen shots; (2) one bank robber pointed his gun at Moore's head and fired a shot into the nearby wall to intimidate her into following his instructions; (3) one bank robber fired three shots at West when West turned to run; (4) multiple shots ricocheted through the lobby; (5) when planning the robbery, Holder had indicated that he would kill anyone who tried to prevent him from robbing the bank or tried to catch him; and (6) in fleeing the scene of the crime, the two bank robbers crashed a flaming gasoline-saturated van which contained exploding ammunition into St. Louis's largest park on St. Patrick's Day.

From this grand jury testimony, the grand jury would have found probable cause to believe that Allen and Holder knowingly created a grave risk of death to persons other than Heflin while committing the bank robbery or in escaping apprehension.

This same overwhelming evidence of grave risk of death was presented to the petit jury, which found the grave risk of death statutory aggravator beyond a reasonable doubt.  Therefore, the fact that counsel did not attack the pecuniary gain statutory aggravating factor did not affect Holder's eligibility for the death penalty.

Nor did counsel's "failure" affect the death penalty <u>selection</u> process.  First, as is clear from the government's response to Holder's claim of ineffective assistance of counsel for failure to attack the pecuniary gain factor, <u>infra</u> at pp. 82-88, there was no error in counsel's decision not to do so.  Second, even if counsel erred, the jury's erroneous consideration of an aggravating factor does not mandate a finding of prejudice.  In <u>Jones v. United States</u>, 527 U.S. 373, 402 (1999), the Supreme Court noted that direct review of a capital sentence where an aggravating factor was improperly considered by the petit jury may be performed by considering whether "absent an invalid factor, the jury would have reached the same verdict."   Here the record amply supports the conclusion that the jury would have reached the same verdict.  A review of the government's closing argument at the penalty phase reveals that the prosecutor focused much more heavily on the grave risk of death aggravator than the pecuniary gain factor.  <u>Holder</u> Tr., 4/3/98, pp. 165-165-171; 184-186; 193; 225-227.  Moreover, once the jury made the requisite findings beyond a reasonable doubt that made Holder eligible for the death penalty, the facts underlying those findings became simply facts to be weighed along with all the others that were introduced at the guilt phase and the sentencing phase - the details of the crime, the nonstatutory aggravating factors and the mitigating factors.  Any juror could have chosen to ignore totally the fact that Holder acted for pecuniary gain in deciding whether to impose the death penalty.  Finally, even if pecuniary gain had not been submitted to a jury as a statutory aggravating factor, the prosecutor still would properly have argued the fact that Holder committed murder for pecuniary gain in making his case for imposition of the death penalty.

**12(C) Ineffective Assistance of Counsel**.  Holder makes eleven claims of ineffective assistance of counsel.  Each of those claims lacks merit.

Applicable Case Law.  "The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 124 S. Ct. 1, 4 (2003) (per curiam); Strickland v. Washington, 466 U.S. 668 (1984). However, as the court in Tunstall v. Hopkins, 306 F.3d 601, 606 (8th Cir. 2002), cert. denied, 538 U.S. 968 (2003), stated:

> "Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Every effort must be made to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [The] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." Id. Furthermore, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91, 104 S.Ct. 2052. The defendant must overcome the presumption that the challenged conduct "might be considered sound trial strategy." Id. at 689, 104 S.Ct. 2052 (citation omitted).

> To establish prejudice a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Williams, 529 U.S. at 391, 120 S.Ct. 1495 (citing Strickland, 466 U.S. at 694, 104 S.Ct. 2052). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. Thus, even if a petitioner could show deficiencies on counsel's part, the defendant must also satisfy the second prong of the test affirmatively proving prejudice. Id. at 693., 104 S.Ct. 2052.

### Ineffectiveness Issue # 1.  12(C)(1) Failure to challenge the indictment on Ring - Apprendi grounds.

Holder contends that counsel was ineffective for failing to object to submission of the pecuniary gain statutory aggravating factor to the jury, because that factor was not alleged in the indictment, in violation of Ring and Apprendi.  His contention is without merit.  Even if counsel

were ineffective, as Holder claims, Holder does not and cannot establish prejudice.

Failure to raise Apprendi issue.  Failure to raise an Apprendi claim is not per se ineffective assistance of counsel. See Brown v. United States, 311 F.3d 875, 878 (8th Cir. 2002), cert. denied, 124 S.Ct. 229 (2003).  Even had counsel raised the Ring - Apprendi issue on direct appeal, the Government submits that the court of appeals would have found that any error in the indictment was not plain error or, alternatively, was harmless beyond a reasonable doubt.[9] Holder had full notice of the charges against him and the facts upon which the Government would seek the death penalty.  The petit jury made all findings required for imposition of the death penalty beyond a reasonable doubt.  Finally, the evidence in support of those findings was overwhelming.

Applicability of harmless error review to constitutional claims.  Since Chapman v. California, 386 U.S. 18 (1967), the Supreme Court has recognized that constitutional error in a criminal case does not always mandate reversal. The harmless-error standard requires a court to "disregard errors that are harmless beyond a reasonable doubt," i.e., errors that "do [] not affect substantial rights." Neder v. United States, 527 U.S. 1, 7 (1999); Fed. R. Crim. P. 52(a).  Neder holds that harmless-error analysis applies to a failure to obtain a petit jury finding on an element of the offense. The same conclusion should apply to the failure to obtain a probable-cause finding from a grand jury.

The Court explained in Neder that, "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may

---

[9]The plain error/harmless error portion of this response is in large part a condensation of the Government's brief in United States v. Cotton, 2002 WL 264766.

have occurred are subject to harmless-error analysis." Ibid. (quoting Rose v. Clark, 478 U.S. 570, 579 (1986)). The omission from the indictment of a fact that makes defendant eligible for the death penalty does not implicate the defendant's right to counsel or the impartiality of the adjudicator. And there is no sound basis for overcoming the "strong presumption" that the error here is therefore subject to harmless-error review.

Structural error.  In Neder, the Court listed examples of "the very limited class of cases" that are exempt from harmless-error review: Gideon v. Wainwright, 372 U.S. 335 (1963) (complete denial of counsel); Tumey v. Ohio, 273 U.S. 510 (1927) (biased trial judge); Vasquez v. Hillery, 474 U.S. 254 (1986) (racial discrimination in selection of grand jury); McKaskle v. Wiggins, 465 U.S. 168 (1984) (denial of self- representation at trial); Waller v. Georgia, 467 U.S. 39 (1984) (denial of public trial); Sullivan v. Louisiana, 508 U.S. 275 (1993) (defective reasonable-doubt instruction).   Neder, 527 U.S. at 8. The Supreme Court explained that those "structural" errors "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and  no criminal punishment may be regarded as fundamentally fair.' " Neder, 527 U.S. at 8-9 (quoting Rose, 478 U.S. at 577-578). The errors in that small class "are so intrinsically harmful as to require automatic reversal (i.e., 'affect substantial rights') without regard to their effect on the outcome." Id. at 7.

The Court determined in Neder that the error at issue-- the district court's failure to submit the materiality element of the offense to the petit jury--did not fall within the narrow "structural error" category.  While the Court recognized that the constitutional guarantee of a trial by jury serves as a protection against "oppression and tyranny," it held that "where a

defendant did not, and apparently could not, bring forth facts contesting the omitted element, . . . the error [in failing to submit the element to the jury] does not fundamentally undermine the purposes of the jury trial guarantee." Id. at 18-19.

Comparison of petit jury and grand jury protections.  It follows from Neder's holding - that the failure to obtain a petit jury finding on an element of an offense is not a structural error - that the failure to obtain a grand jury finding on an element or sentencing-enhancing fact is not a structural error either. The omission of a grand jury finding does not render a criminal prosecution "fundamentally unfair or an unreliable vehicle for determining [the degree of punishment]." Neder, 527 U.S. at 9. If anything, the Fifth Amendment right to a grand jury indictment is lower on the hierarchy of constitutional rights applicable in a criminal case than the Sixth Amendment right to a trial before a petit jury, for the following reasons:

First, the right to indictment by a grand jury, unlike the right to trial before a petit jury in a criminal case, does not apply to the States through the Fourteenth Amendment. Compare Hurtado v. California, 110 U.S. 516, 538 (1884)(Fifth Amendment right to indictment not applicable to the States), with Duncan v. Louisiana, 391 U.S. 145 (1968) (Sixth Amendment right to jury trial applicable to the States). It is hard to see why a right that is not constitutionally required in a state prosecution becomes so "fundamental" as to "defy analysis by 'harmless error' standards," Neder, 527 U.S. at 7, whenever it is infringed in a federal prosecution.

Second, the grand jury's return of a charge is only the opening act in a criminal proceeding; the main event is the trial. See United States v. Williams, 504 U.S. 36, 51 (1992) (the grand jury's "finding of an indictment is only in the nature of an enquiry or accusation, which is afterwards to be tried and determined") (quoting 4 William Blackstone, Commentaries

45

on the Laws of England 300 (1769)); accord Respublica v. Shaffer, 1 Dall. 236, 237 (Pa. 1788). The grand jury is not the final arbiter of the facts. A grand jury indicts based solely on probable cause, and, absent a plea of guilty, the essential facts must be proved at trial, beyond a reasonable doubt.

The Supreme Court has held that errors at the charging stage may be rendered harmless by subsequent developments in the prosecution. In United States v. Mechanik, 475 U.S. 66 (1986), the Court concluded that "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt." Id.  Accordingly, the Court held that "any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." Id.  Mechanik illustrates that an error that impairs the grand jury's role does not inherently vitiate a later criminal conviction and sentence.

Third, although a function of both the grand jury and the petit jury is to protect against oppression and vindictiveness, see Neder, 527 U.S. at 19; Wood v. Georgia, 370 U.S. 375, 390 (1962), the petit jury provides stronger protection for the accused than the grand jury. The prosecutor has no obligation to present exculpatory evidence to the grand jury, and a target has no right to appear before the grand jury or to submit evidence on his own behalf. See Williams, 504 U.S. at 51-55. The grand jury sits only to find probable cause, while the petit jury must find guilt beyond a reasonable doubt. The grand jury decides by majority vote, while the petit jury in a federal case must be unanimous. Compare Fed. R. Crim. P. 6(a) and (f) with United States v. Gaudin, 515 U.S. 506, 510 (1995), and Fed. R. Crim. P. 31(a). And if a grand jury refuses to return an indictment, the prosecutor may try again, before the same grand jury or a different one;

if a petit jury acquits the defendant, however, the Double Jeopardy Clause bars any retrial. See generally Williams, 504 U.S. at 47-50; United States v. Calandra, 414 U.S. 338, 342-344 (1974).[10]

Application of harmless error review does not usurp the role of the grand jury in protecting against oppression and vindictiveness.  The model grand jury charge approved by the Judicial Conference of the United States does not contemplate that grand jurors exercise unfettered discretion in determining whether to indict.   Grand Jury Law § 4:5, at 4-14 to 4-15, 4-17.  Just as the role of the petit jury is to convict whenever there is proof beyond a reasonable doubt that the defendant committed a crime, the role of the grand jury is to indict whenever there is probable cause to believe that the defendant committed a crime.  The petit jury's verdict in this case establishes beyond question that probable cause existed.

Further, the Supreme Court's decisions have consistently described the role of the grand jury as protecting the "innocent" against improperly motivated accusations, not as protecting those persons who, although sympathetic personally or politically, are probably guilty. See, e.g., Williams, 504 U.S. at 51; United States v. Dionisio, 410 U.S. 1, 16 (1973); Wood, 370 U.S. at 384.

---

[10]Other structural protections for the defendant at the trial stage are not afforded at the grand jury stage. In contrast to the public trial right protected by the Sixth Amendment, which exists "for the benefit of the accused," Waller v. Georgia, 467 U.S. 39, 46 (1984) (internal quotation marks omitted), the grand jury hears evidence in secret. See Fed. R. Crim. P. 6(d) and (e). And the grand jury may consider categories of evidence that may not be considered by the petit jury, including evidence that has been obtained in violation of the Constitution. See United States v. R. Enters., Inc., 498 U.S. 292, 298 (1991); see also Calandra, 414 U.S. at 349- 355 (declining to extend Fourth Amendment exclusionary rule to grand jury proceedings); Costello v. United States, 350 U.S. 359, 361-364 (1956) (declining to extend rule against hearsay to grand jury).

It has, of course, long been understood that a grand jury occasionally will not indict even when probable cause is established, just as a petit jury occasionally will not convict where guilt beyond a reasonable doubt is conclusively shown. But that does not mean that such nullification is a right that courts must encourage, as distinguished from a power that courts must tolerate for reasons of public policy. See, e.g., United States v. Washington, 705 F.2d 489, 494 (D.C. Cir. 1983); United States v. Thomas, 116 F.3d 606, 615 (2d Cir. 1997).

These considerations compel the conclusion that the failure to submit an issue of fact to the grand jury does not stand on a higher plane than the failure to submit an issue of fact to the petit jury. The Court concluded in Neder that such errors at the petit jury stage of a prosecution are not "so intrinsically harmful as to require automatic reversal (i.e., 'affect substantial rights') without regard to their effect on the outcome." 527 U.S. at 7. The same conclusion should apply to similar errors at the grand jury stage of a prosecution.

Supreme Court cases distinguished.  Stirone v. United States, 361 U.S. 212 (1960), Silber v. United States, 370 U.S. 717 (1962) (per curiam), and Vasquez v. Hillery, 474 U.S. 254 (1986) do not require a contrary conclusion.  In Stirone,  the Court held that a defendant was deprived of his Fifth Amendment right to a grand jury indictment when the government proved an element at trial in a way that departed from the way that element was alleged in the indictment.  However, Stirone was decided before the Court's comprehensive adoption of harmless- error analysis in Chapman v. California, 386 U.S. 18 (1967).  As noted above, the Court recognized in Neder that most constitutional errors can be harmless, and it did not identify Stirone as belonging to the "very limited class of cases" that involve an exception to that rule. See 527 U.S. at 8.  Moreover, Stirone presented fair notice concerns that are not presented here.

In Silber v. United States, the Court reversed on an indictment error.  In doing so, however, it did not hold that all indictment errors in violation of the Fifth Amendment necessarily require reversal under that standard. In any event, Silber, like Stirone, predates Chapman's articulation of harmless-error analysis.

Finally, Hillery, 474 U.S. at 263 does not hold that a court can never conduct harmless-error review by asking whether a grand jury would have found a particular fact. Subsequent decisions of the Court make clear that, outside the unique context of invidious discrimination in its selection, ordinary principles of harmless-error analysis apply to the grand jury.  See e.g. Mechanik, 475 U.S. at 71 n.1; Bank of Nova Scotia v. United States, 487 U.S. 250, 256-257 (1988) (distinguishing Hillery's automatic reversal rule as necessitated by racial discrimination, and describing Hillery as one of the "isolated exceptions" to the harmless-error rule).

Application of harmless error review to indictment errors.  A reviewing court can readily apply harmless-error principles to the absence of a necessary fact in the indictment. The basic question is whether the omission caused prejudice to the defendant. United States v. Olano, 507 U.S. 725, 734 (1993) (In order to "affect substantial rights" for purposes of Federal Rule of Criminal Procedure 52 (a) and (b), "in most cases . . . the error must have been prejudicial:  It must have affected the outcome of the district court proceedings.").  If the reviewing court determines, beyond a reasonable doubt, that a grand jury would have found the omitted fact, if it had been asked to do so, and that the defendant had notice that the fact was at issue and could affect his sentence, the error did not affect the defendant's substantial rights. Such a defendant would have received the same sentence if the right to a grand jury finding on the enhancing fact

49

had been observed.

Moreover, where the petit jury has found the same facts at trial beyond a reasonable doubt, a reviewing court can confidently conclude that the grand jury would also have found that fact under a less rigorous standard of proof. See United States v. Patterson, 241 F.3d 912, 914 (7th Cir.) ("Once the petit jury finds beyond a reasonable doubt that a particular . . . [fact] was involved, we can be confident in retrospect that the grand jury (which acts under a lower burden of persuasion) would have reached the same conclusion."), cert. denied, 122 S. Ct. 124 (2001); cf. Mechanik, 475 U.S. at 67 ("[T]he petit jury's verdict of guilty beyond a reasonable doubt demonstrates a fortiori that there was probable cause to charge the defendants with the offenses for which they were convicted.").

Application of these principles to the instant case.  There is no question that Holder's "substantial rights" were not affected by any error in the indictment.  The petit jury found sufficient death-qualifying facts beyond a reasonable doubt, and the evidence presented at trial makes clear beyond any doubt that a rational grand jury would have found probable cause to indict any fact not properly included.  Further, Holder was on ample notice of any unindicted statutory aggravating factors submitted to the jury.  Accordingly, he cannot plausibly claim to have been misled by the omission of any fact from the indictment into believing that the government would not seek the death penalty.  Consequently, his substantial rights were not affected, and therefore he cannot satisfy Strickland's prejudice prong.

### Ineffectiveness Issue #2.  12 (C)(2)Advice to Holder to Testify

Holder urges that "[t]rial counsel unreasonably and prejudicially advised movant to testify when, by his testimony, movant made himself eligible for the death penalty."  Motion, p. 7.  Put