another way, he contends that a competent attorney would have prohibited him from testifying.

In order to prove trial counsel's decision to call Holder as a witness was ineffective, Holder must establish that counsel had no articulable theory for calling him to testify and that but for his testimony "the result of the proceeding would have been different." Clozza v. Murray, 913 F.2d 1092, 1100 - 1101 (4th Cir. 1990), cert. denied, 499 U.S. 913, 111 S.Ct. 1123 (1991). Put another way, an ineffective assistance of counsel claim fails if a reasonable legal theory or strategy existed for calling the defendant to testify or if the defendant would have been convicted despite his testimony. A defendant who testifies poorly does not render a reasonable strategy ineffective. Clozza, 913 F.2d at 1101. This means that a defendant cannot render an otherwise sound decision to call him as a witness ineffective by testifying poorly.

In this instance, trial counsel did not render ineffective assistance of counsel because he called Holder as a witness. As explained below, trial counsel called Holder as a witness to humanize him before the jury. This is a rational trial strategy. See Waters v. Thomas, 46 F.3d 1506, 1519 (11th Cir. 1995), cert. denied, 516 U.S. 856, 116 S.Ct. 160 (1995). Moreover, even if the trial strategy was faulty, the overwhelming evidence marshaled against Holder clearly caused the jury to find him guilty. Consequently, Holder's ineffective assistance of counsel argument must fail.

In Waters, the defendant claimed that his trial counsel rendered ineffective assistance because he allowed the defendant to testify and the defendant provided no additional information to the jury. However, the court found a reasonable trial strategy for calling the defendant to testify.

> Skilled defense counsel realizes, however, that putting the defendant on the stand sometimes can help "humanize" him in the eyes of the jury. It may be more difficult for a jury to condemn to death a man who has sat on the stand a few feet from them, looked them in the eyes, and talked to them.

51

Id. at 1519.  In other words, trial counsel called Holder to testify in the guilt phase in order to have the jury spare his life in the penalty phase.  This is a calculated strategic decision which is difficult to make and to which a court "cannot say that no reasonable attorney in this position would have put [the defendant] on the stand."  Id.

Similarly, trial counsel's decision to call Holder to testify was a reasonable effort to move the jury to spare his life in the penalty phase.  Trial counsel acknowledged in opening that the government could prove beyond a reasonable doubt that Holder participated in the bank robbery. Indeed, the evidence was overwhelming.  Further, he knew that another jury found Holder's partner, Billie Allen, guilty.  In other words, based on similar evidence already presented, a jury concluded that Holder's co-conspirator robbed the Lindell Bank & Trust.  The fact that Holder robbed the bank was a foregone conclusion.

Rather than belabor the argument that Holder robbed the bank with Allen, trial counsel was trying to cause the jury to spare Holder's life in the penalty phase by having him testify in the guilt phase.  He calculated that having Holder testify would humanize him to the jury.  Like the Waters attorney, trial counsel believed that if he called Holder to testify, a jury would be less likely to sentence him to death.  For example, a jury would hear Holder's voice, watch his demeanor, and, hopefully, empathize with him as a fellow human-being.  Calling Holder to testify in his own defense in order to humanize him was a strategic decision that courts have declined to find unreasonable.

### Ineffectiveness Issue # 3.  12(C)(3) Acknowledgment to the Jury of Holder's Guilt.

Holder contends that trial counsel "unreasonably and prejudicially assured movant's convictions, and in the process made him eligible for the death penalty, by conceding in opening

statement and in closing argument that" that Holder was guilty of the bank robbery in which a killing occurred.  Motion, p. 9.

Holder's contention is without merit.  Acknowledging a capital defendant's guilt in order to maintain credibility at sentencing is not per se ineffective assistance of counsel.  In view of the incontestable nature and overwhelming strength of the evidence against Holder, trial counsel made the eminently reasonable judgment not to contest Holder's guilt in an effort to bolster the credibility of the case for leniency in the sentencing phase.  Contrary to Holder's assertion that defense counsel Shaw did not understand the nature of the offense with which he was charged, Motion, p. 13, the transcript portions Holder himself cites show clearly that Defense Counsel Shaw's strategy was to admit guilt in the bank robbery, but deny any knowledge or intent in the murder.  His strategy was the only reasonable strategy given the evidence against Holder.

A Capital Defendant's Counsel Can Reasonably Pursue A Strategy Of Conceding Guilt In Order To Maintain Credibility At Sentencing

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 124 S. Ct. 1, 4 (2003) (per curiam); Strickland v. Washington, 466 U.S. 668 (1984). Counsel, however, enjoys "wide latitude . . . in making tactical decisions," and "strategic choices made" among "plausible options are virtually unchallengeable." Id. at 689-690. Contesting guilt may not be a "plausible option[]," id. at 690, when the evidence is overwhelming, and "the Sixth Amendment does not require that counsel do what is impossible . . . . If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." United States v. Cronic, 466 U.S. 648, 656-657 n.19 (1984).

53

Accordingly, counsel confronted with overwhelming evidence of guilt on a charge can reasonably adopt a strategy of acknowledging the defendant's guilt in an effort to avoid undermining the credibility of arguments on other charges or on sentencing issues. See Gentry, 124 S. Ct. at 6 ("By candidly acknowledging his client's shortcomings, counsel might . . . buil[d] credibility with the jury and persuade[] it to focus on the relevant issues in the case."). As a number of courts have held, when counsel concedes a defendant's guilt as a "tactical decision, designed to lead the jury towards leniency on the other charges and to provide a basis for a later argument . . . for a lighter sentence," such a "tactical retreat[]" is "deemed to be effective assistance." United States v. Tabares, 951 F.2d 405, 409 (1st Cir. 1991) (Breyer, J.) (citation and internal quotation marks omitted); accord United States v. Holman, 314 F.3d 837, 840 (7th Cir. 2002), cert. denied, 538 U.S. 1058 (2003); Haynes v. Cain, 298 F.3d 375, 380-382 (5th Cir.), cert. denied, 537 U.S. 1072 (2002); Parker v. Head, 244 F.3d 831, 840-841 (11th Cir.), cert. denied, 534 U.S. 1046 (2001); United States v. Gomes, 177 F.3d 76, 83-84 (1st Cir.), cert. denied, 528 U.S. 911 and 941 (1999); Lingar v. Bowersox, 176 F.3d 453, 459 (8th Cir. 1999), cert. denied, 529 U.S. 1039 (2000); Bell v. Evatt, 72 F.3d 421 (4th Cir. 1995), cert. denied, 518 U.S. 1009 (1996); Underwood v. Clark, 939 F.2d 473 (7th Cir. 1991).

The same considerations apply in a capital trial when counsel acknowledges guilt in order to enhance the case for sparing the defendant's life in the sentencing phase. See Parker, 244 F.3d at 840; Lingar, 176 F.3d at 459; see also Anderson v. Calderon, 232 F.3d 1053, 1087-1090 (9th Cir. 2000), cert. denied, 534 U.S. 1036 (2001); Bell, 72 F.3d at 427-430. From defense counsel's perspective, the gravity of the potential sentence in a capital case heightens the need to maintain strategic focus on the sentencing implications of counsel's actions: "Death is different because

avoiding execution is, in many capital cases, the best and only realistic result possible." American Bar Ass'n, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.9.1 cmt. (Feb. 2003) (ABA Death Penalty Guidelines) (internal quotation marks omitted) (reprinted in 31 Hofstra L. Rev. 913, 1040 (2003)).

The evidence of guilt against a capital defendant often is overwhelming. See, e.g., Victor L. Streib, *Would You Lie to Save Your Client's Life? Ethics and Effectiveness in Defending Against Death*, 42 Brandeis L.J. 405, 414 (2004); Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. Ill. L. Rev. 323, 368 (1993); Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 329, 331 (1983). That is in part because prosecutors are more likely to seek a sentence of death if the case for guilt is very strong. See White, supra, at 368 n.309. Because the guilt phase evidence may be overwhelming, and because prosecutors, once having decided to bring a capital charge, may be disinclined to exchange a life sentence for a guilty plea, see *ABA Death Penalty Guidelines* 10.9.1 cmt. (31 Hofstra L. Rev. at 1041), "attorneys familiar with capital cases view the penalty trial as the probable focal point of the capital case." White, supra, at 325; see Goodpaster, supra, at 331 ("[B]ecause of the strength of the evidence of guilt, the penalty phase trial is the only real trial the defendant will receive.").

In light of that focus, a basic rule of representation in capital cases is to avoid taking a position in the guilt phase that could compromise arguments for leniency in the sentencing phase. "Ideally, the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation. Consistency is crucial because *** counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then

55

attempting to show in the penalty phase why the client committed the crime." *ABA Death Penalty Guidelines* 10.11 cmt. (31 Hofstra L. Rev. at 1059) (internal quotation marks and footnote omitted); see id. at 10.10.1 cmt. (31 Hofstra L. Rev. at 1047-1048); Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 Cornell L. Rev. 1557, 1558-1559 (1998); Streib, supra, at 409; White, supra, at 356-358; Goodpaster, supra, at 329. In the words of one attorney, "[i]t is not good to put on a 'he didn't do it' defense and a 'he is sorry he did it' mitigation. This just does not work. The jury will give the death penalty to the client and, in essence, the attorney." Andrea D. Lyon, *Defending the Death Penalty Case: What Makes Death Different?*, 42 Mercer L. Rev. 695, 708 (1991); see Lingar, 176 F.3d at 459.

In some situations--such as if the evidence of guilt is largely circumstantial or if the defendant acted with others and his individual level of participation in the murder is unclear--counsel might contest the defendant's guilt and pursue a "residual doubt" strategy at sentencing. See Sundby, supra, at 1597- 1598; Lyon, supra, at 710-711. See also Lockhart v. McCree, 476 U.S. 162, 181 (1986). But when, as in this case, there is overwhelming evidence that a particular person is responsible for the crime charged, contesting the defendant's guilt "could so prejudice the sentencer that no persuasive case for a life sentence can be made at the sentencing phase." Goodpaster, supra, at 329; White, supra, at 357.

A "run-of-the-mill strategy of challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt" can have dire implications for the sentencing phase. Sundby, supra, at 1597; see *ABA Death Penalty Guidelines* 10.10.1 cmt. (31 Hofstra L. Rev. at 1047); White, supra, at 357; Goodpaster, supra, at 329. In short, a "capital case clearly is one situation in which blindly relying on the presumption of innocence and putting the prosecution's evidence 'to the test' may

prove to be fatal." <u>Sundby</u>, <u>supra</u>, at 1598.[11]

<u>An Otherwise Sound Strategy Of Acknowledging Guilt To Enhance Arguments For A Non-Capital Sentence Is Not Deficient Performance As A Matter Of Law When Pursued Without Explicit Client Consent</u>

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." <u>Strickland</u>, 466 U.S. at 688. The inquiry is "highly deferential," <u>id</u>. at 689, particularly with respect to informed tactical judgments, which are "virtually unchallengeable," <u>id</u>. at 690. Given the ample evidence of Holder's guilt, trial counsel reasonably elected not to contest Holder's guilt in an effort to maintain credibility in the sentencing proceedings that he presumed would follow.

While a criminal defendant has authority over certain "fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal," <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983), counsel bears principal responsibility for the conduct of the defense. See id. at 753 n.6; <u>New York v. Hill</u>, 528 U.S. 110, 114-115 (1999); *ABA Standards for Criminal Justice Prosecution Function and Defense Function* 4-5.2 (3d ed. 1993) (ABA Standards). Of particular salience, counsel has responsibility for determining "what arguments to pursue," <u>Hill</u>, 528 U.S. at 115 (citing <u>Jones</u>, 463 U.S. at 751), and "what defenses to develop," <u>Wainwright v. Sykes</u>, 433 U.S. 72, 93 & n.1 (1977) (Burger, C.J., concurring). In this case, counsel's strategy of

---

[11]See <u>Lingar</u>, 176 F.3d at 459 (By conceding guilt of second-degree murder, "counsel could retain some credibility and gain an advantage by winning the jury's trust. Even if the jury convicted Lingar of first-degree murder, the jury might then be more sympathetic to defense witnesses testifying in the penalty phase that Lingar deserved mercy. Given the overwhelming evidence, Lingar could not credibly deny involvement in Allen's killing, and denying all involvement could inflame the jury and incite it to render a death sentence.") (citations omitted).

acknowledging Holder's guilt in order to strengthen the case for leniency at sentencing was a judgment about what "arguments" and "defenses" to pursue. Cf. Gentry, 124 S. Ct. at 6 ("While confessing a client's shortcomings might remind the jury of facts they otherwise would have forgotten, it might also convince them to put aside facts they would have remembered in any event. This is precisely the sort of calculated risk that lies at the heart of an advocate's discretion.").

Although counsel bears principal responsibility for tactical judgments about the conduct of the defense, counsel also must "consult with the defendant on important decisions." Strickland, 466 U.S. at 688; see Government of the Virgin Islands v. Weatherwax, 77 F.3d 1425, 1436 (3d Cir.), cert. denied, 519 U.S. 1020 (1996); *ABA Model Rules of Professional Conduct* 1.4(b) (2004) (ABA Model Rules); *ABA Standards* 4-3.8(b), 4-5.2(b). The obligation of consultation serves several purposes. It gives the defendant an opportunity to provide information uniquely in his possession in support of his defense, it ensures counsel's awareness of the defendant's views, and it also generally promotes an effective attorney-client relationship. Weatherwax, 77 F.3d at 1436. Moreover, if the defendant disagrees with counsel's judgments and considers the matter to be sufficiently important, he might seek leave to obtain different representation or perhaps to represent himself. Id. at 1536- 1537; see Faretta v. California, 422 U.S. 806 (1975).

Counsel's strategy in this case to acknowledge Holder's guilt in the guilt phase was an "important decision[]" about which he was required to consult with Holder. Strickland, 466 U.S. at 688; see Holman, 314 F.3d at 840. Presumably he did so.  Unfortunately, counsel's death prevents us from developing the true facts of the matter.  In any event, Holder had the opportunity to express his displeasure to this court, but did not do so.

Counsel's Acknowledgment Of Guilt Without The Defendant's Explicit Consent Does Not Result In Prejudice Per Se

58

Even if trial counsel rendered deficient performance as a matter of law by pursuing his strategy without Holder's explicit consent, counsel's performance was not prejudicial per se. Cf. Strickland, 466 U.S. at 697 (explaining that courts need not address performance before prejudice and may dispose of claims on prejudice grounds when it is "easier" to do so). The general rule for establishing prejudice requires a defendant to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In certain narrow contexts, prejudice is presumed per se, id. at 692, including "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," United States v. Cronic, 466 U.S. 648, 659 (1984); United States v. White, 341 F.3d 673, 678 (8th Cir. 2003), cert. denied, 124 S.Ct. 1701 (2004).  That exception does not apply in this case.

The initial question in assessing whether that purported error was prejudicial, therefore, is whether the failure to obtain explicit consent triggers Cronic's per se presumption of prejudice. In view of the overwhelming evidence of Holder's guilt and the potential implications for the sentencing phase of mounting a futile or frivolous guilt-phase defense, there is no reason to assume that Holder would have withheld explicit consent.  Therefore counsel's failure to secure explicit consent could not have been prejudicial. See Roe v. Flores-Ortega, 528 U.S. 470, 477, 484 (2000) (addressing counsel's failure to file a notice of appeal where (as here) "the defendant has not clearly conveyed his wishes one way or the other," and holding that, if "the defendant cannot demonstrate that, but for counsel's deficient performance, he would have appealed, counsel's deficient performance has not deprived him of anything").

More fundamentally, there is no warrant for concluding that counsel's concession of guilt in order to bolster arguments against a capital sentence amounted to an "entire[] fail[ure] to subject to

59

the prosecution's case to meaningful adversarial testing." <u>Cronic</u>, 466 U.S. at 659; see <u>Bell v. Cone</u>, 535 U.S. 685, 696-697 (2002) ("When we spoke in Cronic of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete," rather than a "fail[ure] to do so at specific points."). The penalty phase of a capital trial "is in many respects a continuation of the trial on guilt or innocence of capital murder," <u>Monge v. California</u>, 524 U.S. 721, 732 (1998), and assessing the effect of representation must take into account the unique focus of the case on the possible imposition of the death sentence. A reasoned strategic judgment by counsel to concede guilt in order to bolster arguments against a capital sentence is the antithesis of a complete failure to "subject the prosecution's case to meaningful adversarial testing." <u>Cronic</u>, 466 U.S. at 659. Far from an outright failure to test the prosecution's case, the strategy reflects a determination that the best way to overcome the prosecution's case for death is to acknowledge guilt and thereby enhance the case for leniency at sentencing.

Counsel aimed to pursue a coherent and consistent strategy across both phases of the trial: to avoid undermining arguments for leniency in the penalty phase, counsel sought to refrain from contesting Holder's guilt in the guilt phase. See <u>Sundby</u>, <u>supra</u>, at 1588-1589 ("[I]f the defense does not approach a capital case, even though it is bifurcated, as a unified presentation, it greatly increases the risk that the guilt-phase presentation will doom the case in mitigation during the penalty phase.").

The Supreme Court has not suggested that reasoned, tactical judgments of the sort at issue here could trigger <u>Cronic</u>'s per se presumption of prejudice. The purpose of that presumption is to address situations in which "the adversary process [is] itself presumptively unreliable." <u>Cronic</u>, 466

U.S. at 659. There could be no basis for concluding that a conviction is "presumptively unreliable" when the decision to acknowledge guilt derives from a considered assessment by counsel that the evidence against the defendant is overwhelming. Insofar as counsel's assessment in that regard may be unreasonable in a particular case, it likely would result in a finding of prejudice under Strickland; but there is no warrant for applying Cronic's across-the-board presumption. See Smith v. Robbins, 528 U.S. 259, 286-287 (2000) (concluding that Cronic presumption of prejudice is inapplicable to claim that counsel was ineffective in concluding that there were no meritorious arguments to be raised on appeal, because there is no reason to presume that counsel's assessment was erroneous).

Nor does this case present a situation in which a presumption of prejudice applies because counsel's deficient performance resulted in the denial of an "entire judicial proceeding." Flores-Ortega, 528 U.S. at 483. When counsel's errors "cause[] the defendant to forfeit a judicial proceeding to which he was otherwise entitled," id. at 485, there is no requirement that the defendant establish that, had the forfeited proceeding taken place, it would have produced a result in his favor. See id. at 484 (defendant alleging ineffective assistance based on counsel's erroneous failure to file a notice of appeal need not demonstrate that appeal would have been successful); Hill v. Lockhart, 474 U.S. 52, 59 (1985) (defendant alleging ineffective assistance in connection with advice concerning consequences of pleading guilty need not demonstrate that he would have prevailed had he gone to trial). That rule has no application here. A strategy of conceding guilt in the guilt phase in order to bolster arguments in the sentencing phase does not entail the complete forfeiture of a judicial proceeding. Instead, it reflects a tactical judgment concerning how best to conduct the entire proceeding.

Because a per se presumption of prejudice does not apply in this case, Holder must show a

reasonable probability that, but for counsel's statements acknowledging his guilt, the result of his trial would have been different. See Holman, 314 F.3d at 844-845 (applying Strickland and finding no prejudice from counsel's strategic acknowledgment of guilt); Haynes, 298 F.3d at 380-382 (explaining that Strickland rather than Cronic applies and finding no prejudice from counsel's tactical concession of guilt).  He cannot do so, and his allegation is therefore without merit.

### Ineffectiveness Issue #4.  12(C)(4) Failure to Obtain a Ballistic Expert.

Holder's next argument is that trial counsel's failure to call a ballistic expert witness was professionally deficient.  He claims that trial counsel "unreasonably and prejudicially failed to retain and present a ballistic expert to dispute the government's evidence that some of the rounds fired during the bank robber could have come from the weapon carried by movant." Motion, p. 13.  Put another way, he contends that a reasonable attorney would have called his own ballistic expert to testify and if the expert would have testified, it is reasonable to believe that the jury would have found him not guilty.

In cases involving an expert witness, a trial counsel is obliged to "make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary." King v. Kemna, 266 F.3d 816, 823 (8th Cir. 2001), cert. denied, 535 U.S. 934, 122 S.Ct. 1311 (2002).  This means trial counsel must be able to articulate a reasonable rationale for his decision not to call an expert witness. Id. at 824.  If a defendant proves that counsel erred in failing to call an expert, he must also prove that the jury would have most likely found in his favor if the expert had testified.  See Wainwright v. Lockhart, 80 F.3d 1226, 1230 (8th Cir. 1996), cert. denied, 519 U.S. 968, 117 S.Ct. 395 (1996).  A court directly assesses a trial counsel's decision not to call an expert witness "for reasonableness in all the circumstances, applying a heavy measure of deference

62

to counsel's judgment." Kemna, 266 F.3d at 823.  Proof that defendant's ballistic expert would have testified consistent with the government's expert witness is prima facie evidence that trial counsel's decision not to call a ballistic expert witness was reasonable.  Hughes v. United States, 241 F.Supp.2d 148, 158 (D.R.I. 2003).

In Hughes, the government introduced evidence that the defendant purchased a Sig Sauer 9 mm pistol a few months prior to his boss's death.  Furthermore, it elicited testimony that defendant and his friend engaged in target shooting with an apparent Sig Sauer.  Finally, it introduced expert ballistic testimony "that the fragment and 9 mm casings found at the murder scene could have come from a Sig Sauer 9 mm pistol." Id. at 152.  However, on cross-examination, the government's expert admitted that the fragments and casings "also could have been fired by several other types of handguns." Id.  The defendant claimed that his counsel was ineffective because he failed to call an expert witness who would have testified that the bullet fragments could not be identified as being fired from a Sig Sauer 9 mmm "because other types of weapons were capable of firing such projectiles." Id. at 157.  The court denied the defendant's ineffective assistance of counsel claim because his ballistic expert's testimony "would have added nothing the concession that [his trial counsel] elicited from [the government's expert] on cross-examination." Id. at 158.  This means that his trial counsel was not ineffective for failing to call a ballistic expert because the government's expert witness provided the defendant with substantially the same testimony that his own expert would have provided.

Likewise, any ballistic testimony from Holder's expert would have added nothing to the case. Holder claims that a defense ballistic expert witness would have testified that various rounds did not come from Holder's firearm.  Trial counsel, however, elicited the concession from Frank Stubits,

63

the government's expert ballistic witness.

Mr. Stubits testified that the police recovered 16 shell casings from the bank. He testified that 11 of the 16 casings could only be fired from Billie Allen's firearm. He further testified that 2 of the 16 casing could have been fired from either weapon and only 3 casings could have been fired from Holder's weapon. Moreover, Mr. Stubits testified that he could not positively testify that bullets that struck Mr. Heflin - - his liver, right thigh, left thigh, or bullet fragments from his knee - - were fired by Holder. In fact, he testified that Allen fired the lethal bullets to Mr. Heflin's abdomen and kidney. In short, Mr. Stubits testified that Holder could have fired only 3 of the 16 rounds fired in the bank. Additionally, he could not testify that Holder fired any of the lethal rounds.

A defense expert would not have been able to add anything more to the defense. At most, he would have testified that Holder did not fire the 3 rounds Mr. Stubits identified. A defense expert could not testify that Holder was not present at the bank robbery or that he did not carry a semi-automatic rifle equipped with a banana clip capable of holding 37 rounds of ammunition. Furthermore, he could not testify that the very presence of the semi-automatic rifle with the menacing banana clip allowed Holder to aid and abet Allen in the robbery. For example, assuming that Holder did not fire his weapon, it was reasonable for the bank employees to assume that he might based upon the firearm's readiness to fire. Holder's concession that the government did not need to prove that he fired his weapon combined with the government expert witness's concessions rendered a defense ballistic witness unnecessary because it would not have changed the outcome. See, e.g., Wainwright, 80 F.3d at 1230 (trial counsel's failure to call an expert ballistic witness, although erroneous, was not fatal because it would not have changed the outcome).

64

**<u>Ineffectiveness Issue # 5.  12(C)(5) Failure to Interview a Mitigation Witness</u>**

Holder also argues that "[t]rial counsel unreasonably and prejudicially failed to investigate, identify, and interview an unnamed witness mentioned in the discovery, and thereafter call said witness to testify as to movant's prior consistent statements and his remorse for the death of the bank guard."  Motion, p. 15.  In other words, he claims that a reasonable trial counsel would have interviewed the unnamed witness and if the witness had testified it is reasonable to believe that the jury's decision would have been different.  See Amrine v. Bowersox, 238 F.3d 1023, 1031 (8th Cir. 2001), cert. denied, 534 U.S. 963, 122 S.Ct. 372 (2001).

In cases involving lay witnesses, trial counsel is duty bound "to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." Simmons v. Luebbers, 299 F.3d 929, 932 (8th Cir. 2002), cert. denied, 538 U.S. 938, 123 S.Ct. 1582 (2003).  In other words, while trial counsel is obligated to conduct a pretrial investigation, he "is not required to pursue every path until it bears fruit or until all available hope withers."  Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 940 (1985).  So long as his decision not to pursue certain lines of investigation is the result of a reasoned tactical decision rather than inadequate preparation, the decision will not support an ineffective assistance of counsel claim.  Id.  See also Laws v. Armontrout, 863 F.2d 1377, 1385 (8th Cir. 1988), cert. denied, 490 U.S. 1040, 109 S.Ct. 1944 (1989).  Even if an attorney's inadequate preparation - - rather than a tactical decision - - caused him not to pursue a line of investigation, a defendant's ineffective assistance of counsel claim will not prevail if the jury's decision would not have been different.  See Amrine, 238 F.3d at 1031.  Tactical reasons for not pursuing a line of investigation include: (1) inadmissability of evidence; (2) unreliability; (3) the defendant's failure to identify the

65

witness; and (4) the evidence is cumulative.  See Freeman v. Graves, 317 F.3d 898, 401 (8th Cir. 2003), cert. denied, - - - U.S. - - - , 124 S.Ct. 326 (2003) (unreliability); Sloan v. Delo, 54 F.3d 1371, 1383-84 (8th Cir. 1995), cert. denied, 516 U.S. 1056, 116 S.Ct. 728 (1996) (inadmissibility and failure to identify); Solomon, 735 F.2d at 404 ("[w]hile attorneys may disagree as to how many . . . witnesses to call, such is the stuff out of which trials are made").

Holder does not allege that, prior to trial he identified the unnamed witness as someone with whom his counsel should speak.  Furthermore, the testimony would have been inherently unreliable coming from another inmate.  Moreover, any testimony the unnamed witness would provide would be cumulative of any evidence that trial counsel presented to the jury.  Finally, assuming that trial counsel erred in failing to contact the unnamed witness, it is not reasonable to assume that the jury would have rendered a different decision.  Thus, Holder's argument that trial counsel was ineffective because he failed to interview an unnamed witness and call him at trial must fail.

First, Holder did not believe that the witness was necessary because he failed to identify him for trial counsel.  Holder identified for his counsel individuals he believed would assist his defense.  For example, he undoubtedly told counsel where to find his mother and which friends to call at trial. However, Holder never identified the unnamed jail cell companion.  Holder knew the individuals with whom he shared a cell; however, he never indicated that trial counsel should speak to him.  If Holder believed that the unnamed witness would have assisted in his defense, he would have identified the person for trial counsel.

Second, the witness's testimony was inherently unreliable and lacked the indicia of trustworthiness for several reasons.  See, e.g., United States v. Gossett, 877 F.2d 901, 907 (11th Cir. 1989), cert. denied, 493 U.S. 1082, 110 S.Ct. 1141 (1990); United States v. Bagley, 537 F.2d 162,

66

167 (5th Cir. 1976), cert. denied, 429 U.S. 1075, 97 S.Ct. 816 (1977).  First, the timing concerning the unnamed witness's receipt of the information renders it untrustworthy.  Holder claims that the unnamed witness would have testified that he told the unnamed witness that Allen planned the robbery, that Holder did not intend for anyone to be injured, and that he was remorseful. Motion, p. 16.  However, Holder's statements came after he was arrested for bank robbery and murdering Mr. Heflin.  In other words, after he and Allen robbed the bank and murdered Mr. Heflin, he purportedly expressed remorse for the murder and robbery.  Holder's after-the-fact expression of remorse to a fellow prisoner is inherently untrustworthy based upon the statement's timing.  Bagley, 537 F.2d at 167 (purported exculpatory statement's trustworthiness questioned when statement not mentioned until shortly before trial).  Second, trial counsel was allowed to consider that the "critical defense witness[] was a prison inmate who had been convicted of a crime." Bagley, 537 F.2d at 167. Put another way, in deciding not to interview the unnamed witness, trial counsel reasonably evaluated the fact that the government would attack the witness's credibility "in an attempt to show that [Holder] recently fabricated the story. . . ." Id. at 168.  This attack undoubtedly would have made any testimony from the unnamed witness less persuasive.  Indeed, testimony from an incarcerated person that Holder did not murder Mr. Heflin "does not assure an acquittal and is sometimes counter productive." Freeman, 317 F.3d at 901.

Third, the unnamed witness's testimony would have been cumulative.  Holder acknowledges that trial counsel knew the facts to which the unnamed witness would testify.  According to the FBI report available to trial counsel, the unnamed witness would have testified that: (1) Allen murdered Mr. Heflin; (2) Allen attempted to falsify a defense and further incriminate Holder; (3) Holder appeared remorseful; and (4) Allen did not appear remorseful.  Significantly, the witness would not

67

have testified that Holder did not participate in the robbery or that he was not armed when Mr. Heflin was murdered.   In other words, the unnamed witness would not have added any additional information.  Trial counsel presented evidence to the jury to support each of these propositions.  For example, Holder claims that the witness would have testified that Allen murdered Mr. Heflin. However, witnesses testified that Allen repeatedly fired at Mr. Heflin and Mr. Stubits - - the government's expert witness - - testified that only Allen fired the fatal shots to Mr. Heflin's abdomen and kidney.  Moreover, Holder claims that the unnamed witness would have testified that Allen attempted to further incriminate Holder.  In other words, he claims that the unnamed witness would have testified that he was less guilty.  However, he does not claims that the witness would have provided an alibi.  Indeed, based on the volume of evidence produced against Holder, the witness could not have removed Holder from the crime.  Finally, Holder claims that the witness would have testified that he understood that no one would be injured.  However, Holder also testified that he believed that no one was to be hurt - - and the jury chose not to believe him based on his demeanor on the stand and on all the other evidence presented to them.

Finally, assuming that trial counsel erred in failing to interview the unnamed witness, it is not reasonable to believe that the jury verdict would be different.  The government presented overwhelming evidence that Holder participated in the bank robbery and Mr. Heflin's murder. Witnesses testified based on corroborating evidence that he participated in robbing the bank and could not have reasonably believed that no one would be injured.  Based on this overwhelming evidence, it is not reasonable to believe testimony from an incarcerated person that Holder was less culpable - - though not innocent - - would have changed their verdict.  Consequently, assuming that trial counsel Shaw erred in failing to interview and call the unnamed witness, Holder cannot prove

that it is reasonable to believe that the witness's testimony would have caused the jury to render a different verdict.

**Ineffectiveness Issue # 6.  12(C)(6) Failure to Investigate Holder's Mental Condition**.

Holder argues that his counsel were ineffective in failing to "adequately investigate movant's mental condition and present evidence which would have demonstrated that movant suffered from brain damage at the time of the offense."  Both of Holder's attorneys were experienced criminal defenders with specialized experience in capital litigation.  Ms. Herndon, in particular, possessed unique expertise in investigating and preparing penalty phase mental health evidence.  Ms. Herndon also utilized the services of Caryn Tortelli, a Psycho-Social Investigator and mitigation specialist based out of Chicago, Illinois.  Counsel had Holder's complete medical and social history and were well aware of his febrile seizures, his head injury resulting from being hit with a brick and his train accident.  Ms. Herndon retained the services of  2 mental health experts of which the Government was aware:  Dr. Thomas Reidy (a nationally-recognized expert in future dangerousness) and Dr. Stephen Rothke (a clinical neuro-psychologist).  Both experts examined Holder and both testified in his mitigation case.

Holder states that Dr. Rothke "was neither requested to nor performed a full neuropsychological examination of movant." This argument is not supported by the record.  A copy of Dr. Rothke's report and curriculum vitae is attached as Exhibit A.  It states that the purpose for the referral was "to determine if injuries he sustained several years ago are relevant to the criminal actions for which he is charged and to his future dangerousness."  Dr. Rothke's report details the materials he reviewed and the testing he performed to reach his conclusions.  According to Dr. Rothke, "[m]ental status testing revealed intact performances on tasks involving mental sequencing,

69

attention and concentration, topographical orientation, visuospatial organization and perception, ability to follow spoken and written commands, right-left orientation, and naming." Rothke Report at page 3.  Based on these and other neurological tests, Dr. Rothke concluded that Holder was:

> a cognitively intact individual without any significant neurobehavioral signs of head injury or reduced capacity to control his actions and responses. . . . He does not display any psychiatric diagnosis nor is he in need of any psychological treatment relating to his injuries.

Rothke Report at page 4.

In addition, the Government retained the services of Dr. Richard Wetzel, a Professor of Medical Psychology in Psychiatry and a Professor of Neurology and Neurological Surgery at Washington University School of Medicine.  Dr. Wetzel performed extensive neuro-psychological testing of Holder over the course of 2 days and summarized his findings in a 28-page report.  This report is attached as Exhibit B.  Dr. Wetzel's curriculum vitae is attached as Exhibit C.  Dr. Wetzel rendered several opinions with respect to Holder's brain status:

> A. Mr. Holder has detectable brain dysfunction caused by his injury from a flying brick.  The brick caused a depressed skull fracture, slow leaking of venous blood from the skull into the epidural space over the brain and bleeding in capillaries under the dura.  The damage was repaired surgically.  The dysfunction is limited to motor speed in his left hand.
>
> B.  Mr. Holder has no detectable cognitive dysfunction caused by that injury or any other brain disease or injury.  He is average or above average in all areas of cognitive brain function. (See appendix for a full account of the neuropsychological examination.)
>
> C. His subtle loss of motor speed in his left hand does not constitute a mental disease or defect under the law. It does not affect his ability to know right from wrong or to control his behavior.  It does not and can not cause any emotional disturbance.

Wetzel Report at page 18 (appendix attached).  Dr. Wetzel further opined that "[t]here is no psychological or neuropsychological connection or causal relationship between the febrile seizure(s), traumatic amputation and the head injury and the crimes with which Mr. Holder is charged." Wetzel Report at page 19.

70

Dr. Rothke testified for the defense in the penalty phase and a copy of his testimony is attached as Exhibit D.  Dr. Rothke testified that he practiced in the areas of "rehabilitation psychology and clinical neuropsychology" and that he was "specially qualified" in those areas because he was "board certifi[ed] through the American Board of Professional Psychology" in both areas.  Rothke Testimony at 12-74.  With respect to clinical neuropsychology, he testified that he dealt with "the evaluation of individuals who have difficulties with thinking or memory or emotional control or behavior, due to an injury to the brain, such as a head injury."  Rothke Testimony at 12-75.  Dr. Rothke testified that his examination had 2 main purposes, one of which was to determine whether Holder had "any lasting brain injury from a head injury he suffered in 1992[12], and if so, [whether] that brain injury [had] a bearing on his ability to control his behavior or leave him more dangerous than he would have been without a brain injury."  Rothke Testimony at 12-77.  At the time of his testimony, Dr. Rothke had also evaluated and considered the results of Dr. Wetzel's examination.

Based on Dr. Rothke's testing, he concluded that "[t]here were no deficits of any type that I would typically see in my patients who had a brain injury."  Rothke Testimony at 12-80.  In fact, Dr. Rothke opined that Holder "had made a vey good recovery from that head injury, and that he is no more impulsive now than he would have been before that head injury."  *Id.*  Dr. Rothke concluded that there were no "lasting effects at all from that injury."  *Id.*  With respect to Dr. Wetzel's findings, Dr. Rothke noted that Dr. Wetzel's testing had been far more extensive than his but that the results of that testing "compliment my findings" and that the results on "all major tests" were within normal limits of brain functioning.  Rothke Testimony at 12-80 to 81.  The remainder

---

[12]This is the brick incident.

of Dr. Rothke's direct examination was devoted to the emotional effects of the amputation and Holder's alleged motive in robbing the bank to obtain a new prosthesis and a better quality of life. On cross-examination, Dr. Rothke reiterated his findings that Holder's mental functioning was normal at the time of the crime (12-93 to 94) and that he had good problem-solving skills (12-94). Much of the remaining cross-examination focused on Holder's lack of willingness to work to improve his financial situation. Following the conclusion of Holder's mitigation evidence, the Government chose not to present Dr. Wetzel or any other rebuttal evidence.

Holder now claims that Ms. Herndon had contacted another mental health expert, Dr. Anthony Semone but chose not to pursue an opinion or examination. Holder now claims that Dr. Semone "would have advised counsel that Dr. Wetzel's findings were questionable due to the way the tests were administered, the inconsistent results obtained, and his failure to follow appropriate protocol." Holder's Motion at 18. Based on a recent review, Dr. Semone would allegedly opine that Holder's brain damage "could affect movant's judgment and ability to assess danger such that movant would plan and participate in a bank robbery with the use of weapons and totally expect that no one would be harmed or that he would place anyone at great risk of injury or death." Holder's Motion at 19 (emphasis added). Holder argues that Dr. Semone would have supported a claim that Holder would have suffered from some naivete syndrome under which he would have believed that no one would be hurt. Finally, Holder argues that but for counsel's failure to more fully investigate this avenue of excuse, "there is a reasonable likelihood that the result at both his guilt phase and at his penalty would have been different." Holder's Motion at 20. There are several flaws in Holder's allegations.

First, Holder is not entitled to a hearing on these allegations where he has failed to support

his allegations with any information concerning Dr. Semone's qualifications or a report of his examination and findings.  In addition, Holder fails to allege sufficient facts that, even if true, would be entitle him to relief.  Holder fails to point to any fact which would have put Ms. Herndon on notice that had she obtained the services of Dr. Semone he would have rendered a useful opinion. She already had obtained the services of 2 mental health experts.  One of these experts specifically examined Holder for brain damage impact that was in any way relevant to Holder's conduct or beliefs at the time of the crime; neither expert would have supported a brain damage argument.  Had she obtained the alleged opinions of Dr. Semone, it would have placed her in the position of having to choose experts or present experts reaching conflicting opinions.  Clearly, there was a strategic choice to emphasize Holder's obvious disability, an amputated leg.  Holder cannot and has not established that such an emphasis was unreasonable, error or below any standard of legal competence.  This is particularly true when faced with the very thorough and credible opinion of Dr. Wetzel, a local expert of national repute.[13]

Even if Ms. Herndon would have become aware of Dr. Semone's alleged opinions, a decision to refrain from presenting said opinions would still have been prudent in the face of the Government's likely rebuttal.  Dr. Wetzel specifically questioned the credibility of Holder's statements that he was surprised by Billy Allen's actions and angry about them.  Wetzel Report at 22.  Ms. Herndon's strategy actually resulted in there being no Government rebuttal of Holder's experts and was thus effective.  Therefore, in the absence of any fact putting Ms. Herndon on notice

---

[13]Dr. Wetzel also received no personal benefit from being retained by the Government. The fee went directly to the Washington University School of Medicine.  Thus, Dr. Wetzel was not subject to impeachment for bias.  In addition, Dr. Wetzel normally was retained by defense counsel.

that further pursuit of Dr. Semone's opinions would have been fruitful, her decision not to pursue Dr. Semone was far from error and did not fall below a reasonable standard of competence for capital defense counsel.[14]   Everything of which Ms. Herndon was aware, which included an examination by 2 neuropsychologists, pointed in the direction that any brain injury was irrelevant to Holder's actions.

Second, even if Ms. Herndon had a crystal ball and somehow should have known what Dr. Semone would opine, Holder fails to establish that the outcome would have been different in either phase if the jury had been exposed to such an opinion.  The fact that Holder had a brain injury was known to the jury through Dr. Rothke's testimony.  At best, Dr. Semone would have opined that this injury "could" have made Holder naive enough to believe that Billie Allen was not going to hurt anyone.  But, Dr. Semone's opinion would have been seriously impeached by Holder's main expert, Dr. Rothke, and by the rebuttal testimony of Dr. Wetzel.  This Court observed the testimony and demeanor of Dr. Wetzel in the companion trial of Billie Allen and should recall that his credibility and manner of testifying was excellent.

With respect to any prejudice as a result of not having the benefit of Dr. Semone's alleged opinions, other more credible evidence strongly contradicted both the claim that Holder actually believed that no one was going to be hurt and that he was naive in any respect.  For example, the facts of the crime itself foreclose a claim of brain-damage-caused-naivete.  Holder and Allen came to the bank prepared for violence and to overwhelm any resistance.  Rather than .22 caliber

---

[14]Put another way, it is not enough for Holder to establish that Ms. Herndon might have found something useful had she pursued Dr. Semone.  If that were the case, a capital defendant could escape the jury's justice by shopping until he found an expert with a helpful opinion who was not consulted by defense counsel.  Holder must show that Ms. Herndon's choice was imprudent and erroneous in light of what she knew then.

revolvers, SKS military assault rifles chambered at the ready with hollow-point ammunition were chosen and the volume of ammunition that they carried demonstrates that they intended to "Set It Off." Further insight is demonstrated by the fact that the SKS rifles were carried into the bank, but a shotgun was ready in the second getaway vehicle - close range, accurate lethality was chosen for the bank but the less accurate deterrence of a wider pattern weapon was chosen for a potential getaway shootout with police.

Holder and Allen's actions inside the bank further impeach any claim that Holder really believed that Allen was not going to harm anyone. Holder unquestionably fired his weapon in at least a reckless manner. The promptness and viciousness with which Allen executed Richard Heflin demonstrates that his murder was planned and was not a reaction to any threat by Mr. Heflin; the murder was something that Holder had to be aware of as the planner of this crime. Nothing done or said by Holder inside the bank suggests that he was surprised or angry about anything Allen did. The only argument between them seems to have been about the appropriate time to leave. Despite allegedly having his naivete shocked into reality, Holder continued to carry out the robbery according to plan and stated to one of the tellers: "Bitch, I say 'Get Down.'" Thereafter, he left with the money and drove the van. There is no evidence of an argument in the van over what had just occurred. Holder even attempted to assist Allen get away from the burning van. Most telling of all was the fact that Holder was wearing a bullet proof vest - even if he did not know that Allen intended to kill the guard the moment they entered the bank, he clearly knew there was an armed guard in the bank and that there was a high probability, if not a certainty, of gunplay.

Following Holder's arrest, in his statement to police, it is telling that in the same statement in which Holder claims that he was surprised by Allen's actions (a clearly self-serving statement

75

given the circumstances), he also initially claimed to police that he had not participated in a robbery at all and then later claimed that he did not fire his weapon. Because the jury knew that the latter statements were lies, the first statement was entitled to little credibility. Similarly, at trial Holder denied firing his weapon and denied driving the getaway van. Holder's admissions during his testimony that a round was chambered in his SKS rifle before entering the bank and that previously Allen had said that he was going to "go wild" in the bank defeat any claim of naivete.

Holder's claims about his mental state, which claims Dr. Semone would apparently attempt to bolster, were also contradicted by the testimony of Terry Gear that Holder said he would not get caught, had been inspired by the violent bank takeover movies and that if anyone did get in their way they would "get rid of him" with their overwhelming firepower delivered behind a bullet proof vest. The testimony of witness Ross that Holder admired how the robbers in the movies fought to the death with police likewise contradicts Holder's claim about his mental state. Lastly, one of Holder's own mitigation witnesses, Harris, testified that Holder had contemplated what to do about the presence of the guard in the bank and that the early draft of the plan called for the guard to be stun-gunned. However, it is clear that such a plan was scrapped in favor of a more certain fate for Richard Heflin, as no stun gun was found anywhere in the arsenal carried by Holder and Allen. The significance of this stunning piece of evidence is that it showed that Holder was, in fact, not so naive as to believe that they could peacefully get in and out of the bank without effectively neutralizing the guard. A very effective method was chosen.

Finally, with respect to the impact on the outcome had Dr. Semone's alleged opinions been presented to the jury, no juror found mitigators 1 and 2: that no shots were fired by Holder and that Holder did not intend a person to be killed. In other words, no juror found the existence of these

76

claims credible.  The sole value of Dr. Semone's testimony would have been to explain how or why Holder had such a naive belief.  Dr. Semone's opinion would have added nothing to the issue of whether he in fact had such a belief.  If the evidence did not convince the jury that Holder did not intend that a person be killed, mental health evidence explaining why he might have held that state of mind would not in any way have had an impact on the outcome.

In sum, there is no basis in the record before this Court to conclude that Ms. Herndon's failure to obtain the opinion of a 4th mental health expert was deficient or that the introduction of Dr. Semone's alleged opinion would have had any impact on the outcome of this case.  Most importantly, Holder has failed to substantiate his claim that a hearing on this subject is warranted, because even if the facts alleged are taken as true, the record clearly shows that Holder is not entitled to relief.

### Ineffectiveness Issue # 7.  12 (C)(7) Showing the Movies

Holder further contends that trial counsel "unreasonably and prejudicially exposed the jury to graphic portrayals of violence set out in the movies Set It Off and Heat."  Motion, p. 20.  In essence, he argues that trial counsel's decision to play the films' in their entirety prejudiced him because the violence in the films was "not in any way similar to anything that occurred during the Lindell Bank and Trust robbery."  Motion, p. 21.  This is the precise reason for trial counsel's decision to play the films in their entirety.

The government argued that Holder's actions in robbing the bank mimicked the actions taken in the movies.  In other words, Holder used the films to plan the robbery.  The government intended to buttress this argument by having Agent Hartman testify as to snippets from the films that were consistent with Holder's actions.  Put another way, Agent Hartman only intended to identify those

77

portions of the movies that mirrored Holder's actions.  In order to defend against this argument, trial counsel chose to play the entire films in order to diffuse the similarities.  This is a recognized trial strategy.  See United States v. McGill, 11 F.3d 223, 227 (1st Cir. 1993).

In McGill, the government intended to show snippets of the film The Deerhunter to support its argument that the death of an inmate in the defendant's charge resulted from the defendant's decision to mimic scenes from the movies rather than an accidental discharge.  Defense counsel "obtained a stipulation from the prosecution that the entire three-hour move be shown, in the expectation that the impact of the critical scene would be dissipated." Id. at 227.  In other words, he believed that playing the entire film would lessen its impact on the jury.  The court found this decision to be "an unarguably reasonable choice." Id.  Since trial counsel's decision was reasonable it did not rise to the level of ineffective assistance of counsel.

Similarly, trial counsel's decision in this case to request that the films' entirety be shown to the jury rather than snippets selected by the government was also reasonable.  By requiring the jury to view the entire films, trial counsel was able to juxtapose Holder's actions with the movies and distinguish them.  By introducing the films and allowing the jury to see the purported greater violence trial counsel was able to counter the government's argument that Holder mimicked the actions.  Absent trial counsel's decision to play the entire film, the jury would have only heard the government's evidence which paralleled Holder's actions.  Thus, trial counsel's decision to counter the government's evidence with the entire films was reasonable because playing the films' entirety dissipated the films' effect on the jury.

### Ineffectiveness Issue # 8.  12 (C)(8)Sleeping Defense Counsel

Holder argues that trial counsel deprived him "of the assistance of counsel at critical stages

78

of the proceeding when counsel unreasonably and prejudicially slept during parts of his trial." Motion, p. 21.  In other words, he claims that a sleeping counsel equates to no counsel at all.

The Sixth Amendment guarantees effective assistance of counsel at every critical stage of the proceedings.  Burdine v. Johnson, 262 F.3d 336, 344 (5th Cir. 2001), cert. denied, 535 U.S. 1120, 122 S.Ct. 2347 (2002).  Proof that counsel slept "through not insubstantial portions of the critical guilt-innocence phase of [the defendant's] capital murder trial warrants a presumption of prejudice . . . ."  Id. at 349.  This means that ineffective assistance of counsel is presumed if trial counsel: (1) slept; (2) through substantial portions; (3) of a critical phase.  In other words, a defendant's challenge fails if he cannot prove that trial counsel either: (1)  slept or; (2) if he slept, he slept through insubstantial portions; or (3) the portions were non-critical phases.  If a defendant only proves that trial counsel slept through insubstantial portions of the critical phases, the Strickland standard is not met.  Id.  See also United States v. Muyet, 994 F.Supp. 550 (S.D.N.Y. 1998).  This means that Holder must prove that trial counsel slept, which he did not, and that there is a reasonable probability that the jury's decision would be different had trial counsel not slept.

Holder argues that trial counsel slept during: (1) voir dire; (2) government's case-in-chief; and (3) the penalty phase.  However, there is no evidence that Holder's trial counsel slept.  None of the government's counsel recalls trial counsel sleeping through any portion of the trial, including any of the portions that Holder cites.  Moreover, the record supports this recollection.  No where in the record is there any statement that trial counsel fell asleep.  Not once do the Court, Holder's other trial counsel or assistants, or the government's counsel state on the record that trial counsel fell asleep.  In fact, but for the assertion by Holder's new counsel - - who did not represent him at trial and who was not present in the courtroom - - there is no indication that trial counsel ever fell asleep.

79

Moreover, trial counsel's actions throughout the trial does not support the assertion that he fell asleep.  Holder cites several instances in his motion when he believes that trial counsel failed to take certain conduct.  For example, he claims that trial counsel failed to call a ballistic expert and failed to interview an unknown witness.  Both of these events occurred before the trial.  Significantly, Holder identifies no instance in voir dire in which trial counsel failed to pursue a line of questioning.  He cites no instance in which counsel would have pursued a panelist's answer or developed another line of investigation if he awoke midway through voir dire.  Clearly trial counsel did not sleep through voir dire.  He asked questions, examined panelists, and made appropriate strikes.  Assuming that trial counsel slept as Holder claims, Holder should be able to cite instances in which trial counsel's performance during voir dire fell below professional standards.  This means that he should be able to cite instances in which trial counsel awoke during the middle of jury selection and asked inappropriate questions or failed to ask necessary questions.  However, he identifies none.

Similarly, Holder claims that trial counsel slept during portions of the government's case-in-chief.  However, he only cites one particular instance during the government's case-in-chief when he claims that trial counsel's performance fell below professional standards.  He claims that trial counsel erred in permitting the films to be played in their entirety.  As previously explained, trial strategy reasons support trial counsel's decision to request the films be played in their entirety.  Moreover, while Holder argues that trial counsel should have called a ballistics expert witness, trial counsel's cross-examination of the government's expert during its case-in-chief eliminated the need for such an expert.  For example, trial counsel elicited from the government's expert that he could

only determine that Holder fired 3 of the 16 casings found at the bank.  Furthermore, the government's expert conceded that he could not state that Holder fired <u>any</u> of the fatal bullets found in Mr. Heflin's body.  In other words, the government's expert could not conclude that Holder murdered Mr. Heflin.

Finally, Holder suggests that trial counsel slept through key portions of the penalty phase. However, Holder admits that trial counsel's presence during the penalty phase was not of great importance because "[c]o-counsel Herndon was <u>solely</u> responsible for the development and presentation of movant's penalty phase case." Motion, p. 26 (emphasis added).  In other words, but for the summation - - for which trial counsel was clearly awake - - trial counsel's presence at the penalty phase is irrelevant because co-counsel Herndon - - not trial counsel - - presented Holder's penalty phase case.  Put another way, assuming that trial counsel slept - - which he did not - - it was not relevant because co-counsel Herndon represented Holder and she was present throughout the penalty phase.

Moreover, even if trial counsel's presence at the penalty phase was necessary - - which Holder admits it was not - - his sleeping, if any, was not harmful to the case.  First, he claims that trial counsel failed to object to certain testimony concerning the victim impact non-statutory aggravator relating to Mr. Heflin.  Second, he argued that trial counsel erred in giving the closing argument.  However, he concedes that "the jury did not find the existence of the victim impact aggravating factor. . . ." Motion, p. 25.  <u>See</u> <u>also</u> <u>Nave v. Delo</u>, 62 F.3d 1024, 1037 (8th Cir. 1995), <u>cert.</u> <u>denied</u>, 517 U.S. 1214, 116 S.Ct. 1837 (1996).  In other words, Holder argues that trial counsel should have objected to information that the jury found to be unpersuasive in reaching its decision. Moreover, it is axiomatic that if trial counsel Shaw gave the closing argument he was not asleep.

81

Moreover, trial counsel's closing argument fully reflected the evidence presented during the mitigation phase of the sentencing hearing.  Thus, Holder's ineffective assistance of counsel argument fails.

### Ineffectiveness Issue # 9.  12(C)(9) Failure to Move to Strike the Pecuniary Gain Statutory Aggravating Factor.

Holder contends that defense counsel unreasonably and prejudicially failed to object to the pecuniary gain aggravating factor because the evidence failed to support that aggravator.  His contention is without merit; the evidence was sufficient to support submitting the pecuniary gain aggravator to the jury, and any error in the wording of the aggravator as submitted to the jury did not prejudice Holder.

The jury found that the offenses alleged in Counts I and II of the indictment were committed "in the expectation of the receipt of anything of pecuniary value."  This aggravator has its source in 18 U.S.C. §3592(c)(8), which contains two separate prongs.  United States v. Wicklund, 114 F.3d 151, 154 (10th Cir. 1997); United States v. Cooper, 91 F.Supp.2d 90, 105 (D.D.C. 2000).  The first covers killings committed "as consideration for the receipt" of anything of pecuniary value.  It is clearly limited to murder-for-hire situations.  The phrase "as consideration for" derives from the language of contract, is almost identical to the language in 18 U.S.C. §1958(a), and "means consideration in the traditional sense of bargained for exchange."  Wicklund, 114 F.3d at 154.

The second prong, applicable here, covers killings committed "in the expectation of the receipt" of anything of pecuniary value.  It "identifies a separate ground."  Wicklund, 114 F.3d at 154.  The second prong "means something other than murder for hire."  Cooper, 91 F.Supp2d at 105.  See also, Wicklund, 114 F.3d at 154; United States v. Matthews, 246 F.Supp.2d 137, 148 (N.D.N.Y. 2002); United States v. Cuff, 38 F.Supp2d 282, 288 (S.D.N.Y. 1999); United States v. Spivey, 958

82

F.Supp. 1523, 1530 (D.N.M. 1997); United States v. Nguyen, 928 F.Supp. 1525, 1535-36 (D.Kan. 1996); United States v. Walker, 910 F.Supp. 837, 848-49 (N.D.N.Y. 1995). As the court stated in Nguyen, there is "no principled reason why the second prong" stops at murders for hire and "reaches no further." Nguyen, 928 F.Supp. at 1536.[15] To satisfy this prong, the government must show that Holder committed the murder in question in expectation of the receipt of pecuniary gain. Although Congress chose not to include bank robbery among the list of offenses which are automatically death eligible, there is no reason to suggest that the government can not show, in the context of a bank robbery, that the murder was committed in expectation of the receipt of anything of pecuniary gain.

Several cases have denied motions to strike the aggravator where the underlying criminal episode involved a robbery. Cooper, 91 F.Supp.2d at 105 (Starbuck's robbery); Nguyen, *id.* (robbery of a restaurant); Matthews, 246 F.Supp.2d at 148 (drug-related robbery). The Ninth Circuit, in the context of rejecting a collateral attack on an Arizona capital conviction based on a nearly identical aggravator and a botched robbery attempt[16], held that a "rational sentencer could have found the existence of the pecuniary gain aggravating factor." LaGrand v. Stewart, 133 F.3d 1253, 1260 (9th Cir.), cert. denied, 525 U.S. 971 (1998). Moreover, the government has not been able to find, and Holder fails to cite, any case which holds that the aggravator cannot be applied in

---

[15]However, Nguyen and United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000), cert. denied, 534 U.S. 992 (2001) discussed *infra,* arise from the same criminal episode.

[16]A robbery was attempted and the victim was murdered when he was unable to open a safe. The Arizona Supreme Court gave the following rationale for upholding application of the aggravator there: ". . . the murder was neither accidental nor unexpected. The reason defendant was there was his expectation of pecuniary gain and the reason he stabbed the victim was because the victim was unable to open the safe, frustrating defendant's continuing attempt for pecuniary gain. The defendant's goal of pecuniary gain caused the murder and murder was in furtherance of his goal." State v. LaGrand, 153 Ariz. 21, 36, 734 P.2d 563 (1987), cert. denied sub nom. LeGrand v. Arizona, 484 U.S. 872 (1987)..

83

the context of a bank robbery in which, as here, the defendants entered the bank and immediately killed the guard, so that they could be assured of a successful robbery.

Holder's arguments concerning the meaning to be given to the language in section 3592(c)(8) are based on three recent cases. In United States v. Bernard, 299 F.3d 467, 483 (5th Cir. 2002), cert. denied, 539 U.S. 928 (2003) murders were committed in connection with a carjacking and after an ATM had been robbed. The evidence at trial established that at the time of the murders, the vehicle had already been stolen and the ATM had already been robbed. The motive for the murders was to prevent the victims from identifying the defendant. The Court found that the pecuniary gain aggravator was improperly submitted to the jury because the instructions did not require the jury to find that the pecuniary gain was expected to follow as a direct result of the murder as opposed to the robbery. The court stated that "the application of the 'pecuniary gain' aggravating factor is limited to situations where 'pecuniary gain' is expected 'to follow as a direct result of the (murder),'" quoting United States v. Chanthadara, 230 F.3d 1237, 1263 (10th Cir. 2000), cert. denied, 534 U.S. 992 (2001). The court held that the aggravating factor, pecuniary gain, "is only applicable where the jury finds beyond a reasonable doubt that the murder itself was committed 'as consideration for, or in the expectation of' pecuniary gain.'" Bernard, 299 F.3d. at 483. Thus, Bernard is a jury instruction case and requires that a finding based on the second clause of Section 3592(c)(8) be supported by an instruction and evidence that requires the pecuniary gain to "flow directly from the homicide." *Id.* at 483. Moreover, the facts of Bernard could not meet that standard, because of the timing of the murders, namely after the receipt of anything of pecuniary value. Here, to the contrary, the murder was clearly committed so that the bank robbery could be successfully completed; the murder was a preplanned, necessary part of the bank robbery.

Chanthadara, a case relied upon by Holder, likewise involved unique facts, and is distinguishable from Holder's case.   There, a restaurant was robbed and the robbers attempted to get one of the owners to open a safe to obtain further money and when she was unable to open the safe she was shot and killed.  On direct appeal, the defendant argued that the jury instruction on the pecuniary gain aggravator was erroneous because the jury was permitted to find the expectation of gain from the underlying felony as opposed to the actual killing and, because all money had been taken before the killing, no "further monetary benefit [could] result [from] the homicide." Chanthadara, 230 F.3d at 1263.   The court agreed that the gain must be expected "as a result of the victim's death." *Id.*  It reasoned that "the offense" language of the aggravator, as applied to felony murder cases, had to refer to the homicide, rather than the robbery in which pecuniary gain is "implicit", because to rule otherwise would result in an automatic finding of the aggravator in robbery cases.  Thus, the error was the jury instruction's failure "to specify the 'offense' to which it referred was the homicide, not the underlying robbery".  *Id.* at 1264.  Nothing in Bernard or Chanthadara requires a determination that the 2d clause of the pecuniary gain aggravator cannot apply in a bank robbery case.

The third case is the Eighth Circuit's recent decision in the case of Holder's co-defendant, United States v. Allen, 357 F.3d 745 (8th Cir. 2004).   In that opinion, which has been vacated, the court's discussion of the pecuniary gain aggravator was in the context of rejecting the Government's contention that the indictment was sufficient to allege the pecuniary gain aggravator by alleging that a bank robbery occurred in which a killing resulted.  The Allen  Court rejected this argument, because there was "nothing in [the] indictment . . . from which we [could] conclude that the grand jury in this case considered, and found, the facts that would support the pecuniary gain aggravator."

357 F.3d at 750.  In so holding, the Eighth Circuit panel opinion agreed with the holdings of Bernard and Chanthadara that "the offense" language in section 3592(c)(8) "refers to murder, not the underlying felony." *Id.* at 8.  "To hold otherwise would convert every felony murder in which the underlying offense had a pecuniary object or benefit into a federal capital offense." *Id.*

Thus, Allen, like Bernard and Chanthadara, held that the pecuniary gain must motivate the murder, not the underlying robbery. However, the Eighth Circuit's opinion in Allen does not stand for the proposition that a killing during a bank robbery can never satisfy the pecuniary gain aggravator.  Under the facts of this case, the jury rationally found this aggravator because the bank guard was murdered to eliminate resistance to the bank robbery and that "'pecuniary gain' [was] expected 'to follow as a direct result of the [murder].'" Id. (quoting Bernard, 299 F.3d at 483). Temporally, this could not have been true in Bernard and Chanthadara.

Support for the Government's position can also be found in Allen's citation and quote from Woratzecki v. Stewart, 97 F.3d 329, 334-35 (9th Cir. 1996), cert. denied, 520 U.S. 1173 (1997).  In Allen, the Court quoted approvingly the following passage from Stewart: "[e]ven if it is true that under many circumstances a person who kills in the course of a robbery is motivated to do so for pecuniary reasons, that is not necessarily so . . . ." Allen, 357 F.3d at 750-751 (emphasis added). This is why the indictment in Allen, which did not contain a Notice of Special Findings section, was insufficient to allege the pecuniary gain factor, but it clearly indicates the Eighth Circuit's view that the aggravator may be applied in certain robbery cases.

It is true that the aggravator submitted in this case read, "Did Norris Holder commit the offense in the expectation of the receipt of anything of pecuniary value?" Thus, as in Chanthadara, the jury was not explicitly  required to find that "the offense" which Holder expected to receive

pecuniary gain from was the homicide.  However, the jury had before it evidence from which it could find beyond a reasonable doubt that the killing was committed in the expectation of the receipt of something of value, namely the bank's money.  Indeed, the prosecutor's closing argument closely tied the killing to the receipt of pecuniary gain.  See, e.g. Holder Tr., 4/3/98, p. 165 ("This violent bank takeover, with these incredible weapons, the plan to burn the van later, take out anybody who got in their way, and what happened in that bank, where they put so many people in danger for money . . ." (emphasis added); p. 166 ("It's an intention, on this defendant's part, to cause harm, to cause death."); p. 167 ("the whole plan, when they went in there, was to take Richard Heflin out . . . "); p. 170-71 ("You saw the bags of money, that's what it was all about, so he could pay his lawyer. . . . it is so immoral for someone to go into that bank, . . . and take Richard Heflin's life . . . ; to trade Richard Heflin's life so he can pay his lawyer and buy more gold and cars and whatever else he wanted to buy."); p. 170 ("The fact that they took this man's life and took him away from his family for money, that alone outweighs all of those mitigators."); p. 185 ("Weigh them against the fact that this murder was for money."); p. 227 ("the fact that it is done for the most reprehensible reason of all, for money, so this guy can have money." Again, the critical fact, which distinguishes this case from the cases relied upon by Holder is the fact that Richard Heflin, the bank guard, was killed prior to and in order to obtain money.  Therefore, failure of counsel to object to the applicability of the pecuniary gain factor, or to the wording of the instruction submitting the pecuniary gain factor to the jury, even if in error, was not prejudicial.

**Ineffectiveness Issue # 10.  12(C)(10) Failure to Object to Victim Impact Evidence**

Holder contends that "[c]ounsel unreasonably and prejudicially failed to object to the victim impact evidence introduced during the penalty phase at movant's trial because said evidence

87

exceeded that allowed under Payne v. Tennessee." Motion, p. 24. He also asserts that counsel prejudicially failed to object to the government's closing argument concerning the victim impact testimony. Id., p. 25. Holder's contention is without merit.

The victim impact testimony was brief, straightforward, and devoid of dramatic displays of emotion. Tr. 3/31/98, pp. 144-231. The government's opening argument at the sentencing phase, id., pp. 37-39, and closing argument, Tr. 4/3/98, pp. 179-184, likewise were primarily factual and appropriate. More importantly, the jury did not find the victim impact evidence to be aggravating. Id., pp. 244, 251.

The Eighth Circuit rejected a similar attack on the victim impact testimony on the appeal of Holder's co-defendant, Billie Allen, in United States v. Allen, 247 F.3d 741, 778-79 (8th Cir. 2001). The court found no prejudice, stating:

> Due to Allen's failure to raise any objections during the sentencing phase to the victim impact testimony, we review Allen's claim for plain error. Thus, Allen
>
> > must therefore show that the error was plain, meaning clear or obvious; and [that] the error affected [his] substantial rights, which requires a showing that the error was prejudicial and affected the trial's outcome. Even clear errors will only matter if a miscarriage of justice would otherwise result that might seriously affect the fairness, integrity or public reputation of the judicial proceedings.
>
> United States v. Tulk, 171 F.3d 596, 599 (8th Cir.1999) (citing United States v. Olano, 507 U.S. 725, 733-35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)) (alterations in original) (internal quotations and citations omitted).
>
> First, it is clear from both the FDPA and Supreme Court precedent that the government is allowed to present and a jury is allowed to consider victim impact evidence in reaching its sentencing decision in a capital case. The FDPA provides for the submission of aggravating factors that may concern "the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement" identifying the victim and the loss suffered by the victim and the victim's family, "and any other relevant information." 18 U.S.C. § 3593(a)(2). Likewise, the Supreme Court has ruled that the Eighth Amendment "permits capital sentencing juries to consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family in

88

deciding whether an eligible defendant should receive a death sentence." Jones v. United States, 527 U.S. 373, 395, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (citing Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). See Payne, 501 U.S. at 830-31, 111 S.Ct. 2597 (explaining that the Eighth Amendment does not bar a jury from considering "the full extent of the harm caused by the crime, including its impact on the victim's family and community" or from seeing "a quick glimpse of the life petitioner chose to extinguish to remind the jury that the person whose life was taken was a unique human being," and further explaining that a defendant may still seek relief under the Due Process Clause of the Fourteenth Amendment "[i]f, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair")(internal quotations and citations omitted)(O'Connor, J., concurring).

Second, there is little, if any, danger of undue prejudice due to victim impact evidence under the FDPA if a jury, as in this case, fails to even find the existence of the victim-impact aggravating factor. (See Trial Tr., Vol. XIX at 123, 132.) This is because the FDPA prohibits a jury from considering, in the final weighing of aggravating and mitigating circumstances, any aggravating factor which the jury did not find unanimously beyond a reasonable doubt. See 18 U.S.C. § 3593(d), (e). The instructions to the jury were clear on this point, and unless a jury disregards its instructions, which we do not and cannot presume, there can be no prejudice. See Francis v. Franklin, 471 U.S. 307, 325 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)("[a]bsent [ ] extraordinary situations, however, we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions"); United States v. Delpit, 94 F.3d 1134, 1144 (8th Cir.1996).

Third, although the jury did not find the existence of the victim-impact aggravating factor, which is strong evidence of and in most cases will be sufficient to make a ruling of no undue prejudice, we will nevertheless consider the possibility that the evidence may have been so prejudicial as to violate the Due Process Clause. Our review of the record, however, convinces us that no such violation occurred. The government's evidence of victim impact consisted of testimony from eleven witnesses, including Richard Heflin's mother, one sister, one brother, two bank coworkers, one former coworker, his former wife (and mother of his three sons), each of his three sons, and his widow (who had married Heflin approximately seven months prior to his death). The testimony from these witnesses lasted less than a day and took up only eighty-eight pages of transcript. In comparison, the entire penalty phase transcript takes up over seventeen hundred pages, and the testimony from Allen's penalty phase witnesses took up over nine hundred pages. Furthermore, Allen could have objected to any specific testimony that he thought was unduly prejudicial, and he could have raised an objection if he believed the amount of testimony had become unduly prejudicial. For tactical reasons, such objections could have been lodged at a side bar conference outside of the jury's hearing. No objections were raised, however, and on appeal Allen makes no allegations that any specific testimony was unduly prejudicial. Our own review of the record convinces us that neither the amount nor the scope and nature of the victim-impact testimony was unduly prejudicial.

89

For all of the above stated reasons, we find that the district court did not commit any error, much less plain error, in its decision to deny Allen's motion in limine at the outset of the sentencing hearing and later to permit all of the government's victim impact evidence to come into the record without objection.

The same analysis applies to the victim impact evidence in Holder's case. Holder does not in his §2255 motion point to any particular victim impact testimony that was unfairly prejudicial. The testimony in Holder's case was essentially identical to the evidence the 8th Circuit found not "unduly prejudicial" in Allen's appeal. Holder's allegation of ineffective assistance of counsel by reason of counsel's failure to object to the victim impact evidence and argument is without merit.

### Ineffectiveness Issue # 11.  12(C)(11) Failure to Allow Mitigation Counsel to Give the Penalty Phase Closing Argument

Finally, Holder contends that "[t]rial counsel Shaw unreasonably and prejudicially gave the penalty phase summation in lieu of co-counsel Herndon, the attorney responsible for the development and presentation of mitigating evidence." Motion, p. 25. He argues that trial counsel Shaw's failure to successfully move the jury to spare his life renders counsel's assistance in the penalty phase closing argument ineffective. However, Holder cannot claim that Shaw was ineffective simply because his argument failed.

An ineffective assistance of counsel claims at the penalty phase closing argument requires the defendant to prove that his counsel's closing argument was an unreasonable trial strategy. See, Griffin v. Delo, 33 F.3d 895, 900 (8th Cir. 1994), cert. denied, 514 U.S. 1119, 115 S.Ct. 1981 (1995); Kitchens v. Johnson, 190 F.3d 698, 704 (5th Cir. 1999); Thompson v. Cain, 161 F.3d 802, 803 (5th Cir. 1998); Devier v. Zant, 3 F.3d 1445, 1454 (11th Cir. 1993), cert. denied, 513 U.S. 1161, 115 S.Ct. 1125 (1995). In other words, if trial counsel's argument is a recognizable strategy, the defendant's ineffective assistance of counsel claim fails. Furthermore, he must also prove that but

for trial counsel's closing argument, it is reasonable to believe that a jury would have found in his favor. See Kitchens, 190 F.3d at 703.

An effective penalty phase closing argument may simply plead for mercy or primarily elicit sympathy from the jury without "thoroughly dissecting the evidence presented in the penalty phase . . . ." Devier, 3 F.3d at 1454; Kitchens, 190 F.3d at 704. Alternatively, an effective penalty phase closing argument may: (1) plea for a defendant's life; (2) reference mitigating evidence; and (3) remind the jury that they are the ultimate decision-makers. See Sloan, 54 F.3d at 1384; Thompson, 161 F.3d at 813. The decision to emphasize various aspects in a closing argument "is a uniquely tactical decision that a reviewing court must treat with deference." Devier, 3 F.3d at 1454. See also Kitchens, 190 F.3d at 704. In other words, so long as trial counsel's closing argument is reasonable based on the jury's makeup and the evidence presented to a jury, the closing argument will not be found ineffective even though it was unsuccessful. See, e.g., Kitchens, 190 F.3d at 704 (simple mercy plea based upon the Bible was effective based upon the jury's makeup); Sloan, 54 F.3d at 1384.

In this instance, trial counsel Shaw's penalty phase closing argument articulated all three penalty phase closing argument factors. First, his closing argument pled for Holder's life. Shaw argued that the jury could not sentence Holder to death "based upon the evidence that you have in this case." Vol. 12, p. 12-209. Furthermore, he beseeched them to "return a verdict that spares his life." Vol. 12, p. 12-214 - 215.

Second, he also referenced mitigating evidence. Mr. Shaw noted that co-counsel Herndon painted "an exemplary mosiac of the life of this defendant" for the jury. Vol. 12, 12-195. He noted that she "brought in his entire family to show you that this is not a beast . . . ." Vol. 12, 12-211. He

91

argued that Ms. Herndon "brought to you everybody she could find, because she is dedicated to seeing that you know something about him." Vol. 12, 12-211. Finally, Shaw explained the circumstances in which Holder was raised. He noted that the defendant was raised in a ghetto - - the "crucibles of corruption," the "brick monstrosities where crime is rampant" - - until he was between 10 to 12 years old. Vol. 12, 12-196, 12-206, 12-212. He described the ghetto for the jury. He stated that people "can't even get in the elevator, they are either drenched with urine, or human feces, or they are traps where people get raped, killed, mugged, and every other sort of thing." Vol. 12, 12-197. Finally, Shaw described for the jury the people who raised the defendant. He noted that the defendant's mother was on crack. Vol. 12, 12-212. Moreover, Shaw also noted that the defendant was raised in the projects where he received "instruction from the drug dealers and the bums and the hoodlums who terrorize, and who are predators on all the people . . . ." Vol. 12, p. 12-196, 12-206.

Third, Mr. Shaw advised the jury that they were the ultimate decision-makers. For example, he told the jury that, "you are here to determine whether or not this young may should die." Vol. 12, p. 195. Furthermore, prior to reviewing the expert witness testimony, he stated, "you decide what happened; not the experts." Vol. 12, 12-209 - 210. Finally, he asked the jury to "return a verdict that spares [Holder's] life." Vol. 12-214 - 215.

Moreover, Shaw also chose to interpret the evidence for the jury. Interpreting the evidence for a jury does not render the penalty phase closing argument unreasonable simply because it failed. Sloan, 54 F.3d at 1384 ("[a]lthough the closing apparently was not persuasive, a strategy need not be successful to be reasonable"). See also Nave, 62 F.3d at 1036 ("Generally, an ineffective assistance of counsel claim cannot be based on a decision relating to a reasoned choice

of trial strategy, even when proved improvident"). In this instance, Shaw interpreted the evidence to find that the defendant should not be sentenced to death. The evidence, Mr. Shaw argued, demonstrated that the defendant did not shoot and did not kill the defendant. Vol 12, 12-198. For example, he noted that "every witness for the Government testified that it was Billie Allen who did the shooting." Vol. 12, 12-199. He argued that this was consistent with Holder's testimony and that Holder could not have known what others were saying because he was incarcerated. Vol. 12-204. Furthermore, Mr. Shaw proceeded to recall for the jury all the witnesses who testified that Allen, not the Holder, fired his weapon. Furthermore, Shaw examined the objective evidence. He noted that one of the witnesses testified that the unspent cartridges on the floor came from Allen's attempt to reload his weapon, not from the cartridge clip in the Holder's firearm. Vol. 12, 12-201 - 202. Finally, Mr. Shaw noted Mr. Stubits testified that his findings were inconclusive. Vol. 12, 12-210.

Trial counsel Shaw marshaled several arguments in his closing to demonstrate that the evidence did not justify a death sentence. He pled for mercy, reviewed several mitigation factors, and reminded the jurors that they were the ultimate decision-makers. Furthermore, he interpreted the evidence for the jury in such a manner that he believed they would concluded that Holder should not be sentenced to death. Mr. Shaw's efforts were reasonable and should not be found ineffective simply because he was unsuccessful.

## CONCLUSION

For the foregoing reasons, the government moves that defendant Holder's §2255 be denied without a hearing.

Respectfully submitted,

JAMES G. MARTIN
United States Attorney

/s/ Joseph M. Landolt
JOSEPH M. LANDOLT, #6484
STEVEN E. HOLTSHOUSER, #24277
ROGER KELLER, #27182
Assistant United States Attorneys
111 S. 10TH Street
St. Louis, Missouri  63102
(314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2004, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Mr. Christopher E. McGraugh
Leritz, Plunkert & Bruning, P.C.
One City Center, Suite 2001
St. Louis, MO 63101

Mr. Michael J. Gorla
720 Olive Street, Suite 1630
St. Louis, MO 63101

/s/Joseph M. Landolt
ASSISTANT UNITED STATES ATTORNEY

94