# Washington

WASHINGTON·UNIVERSITY·IN·ST·LOUIS

## School of Medicine



GOVERNMENT EXHIBIT

_B_

DEPARTMENT OF PSYCHIATRY

Norris Geroy Holder, Jr. Report

March 23, 1998

Steven E. Holtshouser, Esquire
Assistant United States Attorney
U.S. Court & Custom House
1114 Market Street
St. Louis, MO 63101

      Re: USA v. Norris Geroy Holder, Jr.
      This is a preliminary report

Dear Mr. Holtshouser:

Mr. Holder is the defendant in a capital murder case relating to a bank robbery on 3/17/97 in which a security guard was killed. At your request, he was evaluated in preparation for the penalty phase of the trial. The first interview on Saturday, 3/21/98, began at 9:10 AM. The examination on that day was concluded at about 4:15 PM. The examination was resumed the next day, 3/22/98, at 8:30 AM and concluded at 2:15 PM. In total, I spent ten hours and fifteen minutes with Mr. Holder for the purpose of this evaluation.

Mr. Allen reported on each day that he was ready and able to proceed with the evaluation. He stated he was not on any medications of any kind. He stated there was no condition that prevented him from presenting himself appropriately.

## Statement of non-confidentiality

He was informed that this examination was being done for the purposes of an evaluation and that what he said and did might be disclosed in a report, deposition or testimony. He was informed he could refuse to answer any question he chose. When asked, he stated his lawyers had not suggested any area of inquiry should be avoided by us. On direct questioning by me, he stated that what he told me would not be secret.

Elsewhere in the interview, he inquired about my relationship to the prosecutor. I stated was retained by the U.S. Attorney, but was not an employee of that office.

1

Phone:

4940 Children's Place

St. Louis, Missouri 63110-1093

(Medical School Box 8134)

(Wetzel- Holder 001)

Norris Geroy Holder, Jr. Report

Special notes

The conditions were adequate for neuropsychological testing and the interviews. Adequate privacy was afforded. An adequate table with appropriate work space was provided. The environment was appropriately free of distractions 98% of the time. None of the occasional announcements on the loud speaking system spoiled any test or any component of a test.

Testing on Sunday was interrupted for about one half hour in order to allow Mr. Holder to visit with his mother. Lunch breaks were taken on both days at the times requested by the deputies to insure Mr. Holder was fed without inconvenience.

Qualifications of the examiner

The qualification of this examiner to perform this evaluation are disclosed in the attached curriculum vitae.

Documents reviewed

1. The medical records of St. Louis Children's Hospital.
2. The remaining records of The St. Louis County Juvenile Court.
3. Records of the Missouri Department of Corrections.
4. The school records of the Rockwood School District.
5. The school records of the St. Louis City School District.
6. Reports by the St. Louis Metropolitan Police Department
7. Reports by Federal Bureau of Information Special Agents
8. Interview reports with friends and family of Norris Holder
9. Interview reports with teachers of Norris Holder
10. Interview reports with jail officers.
11. The medical records of St. John's Mercy Center.
12. The medical records of Cardinal Glennon Hospital.
13. The medical records of St. Louis Children's Hospital.
14. The medical records of St. Louis University Hospital.
15. The report of and an article by Dr. Thomas J. Reidy.
16. The report of Dr. Steven Rothke.
17. Documents furnished by Orthotics and Prosthetics Lab, Inc.
18. Federal statutes related to the death penalty.
19. DSM-IV.

Past personal history
12/16/75

Norris Gerome Holder, Jr. was born to Norris G. Holder, Sr. and Kimberly Holder at Barnes Hospital.

2

(Wetzel-Holder 002)

Norris Geroy Holder, Jr. Report

## 12/30/77

Mr. Holder was seen at St. Louis Children's Hospital for an apparent febrile seizure with tonic-clonic movements. The neurologic workup was normal. (Author's note: Mr. Holder denied to me he ever had a seizure and reported his mother said his brother, Norrim, was the one with a history of seizures. This record has the correct birth date for Norris Holder and his correct middle name.) A skull series of X-rays (identified with the wrong name and birth date) was normal. An EEG (identified with the wrong birth date) showed no epileptiform activity and was read as normal. He returned on 1/5/78 for a neurological evaluation. His mother denied any prior neurologic symptoms, but reported he was slightly uncoordinated. The neurologic workup was again normal. He was seen again on 4/7/78 with no seizures in the interval. His examination was normal. It was concluded he was doing well.

His family moved to California for one year while his father was in the service. The exact dates are unknown to me. They returned to St. Louis before he started kindergarten.

## 9/2/81

Mr. Holder began kindergarten at the Marshall Elementary School. He completed first grade (1982-83) at that school as well.

## 9/7/83

Mr. Holder began second grade (1983-84) at the Carver Elementary School. He completed third grade (1984-85) there as well. He received aptitude testing in third grade (Cogat '78). He scored at the 38th percentile in verbal, 35th percentile in quantitative and the 27th in non-verbal skills, using the norms for his age. He took achievement tests (CAT '77) twice in 1982, in 84 and 85.

**National percentiles**

|       | Reading Total | Math Total | Language Total | Total |
|-------|---------------|------------|----------------|-------|
| '82-1 | 49            | 57         | -              |       |
| '82-2 | 62            | 0          | 5              | 52    |
| '84   | 46            | 25         | 57             | 39    |
| '85   | 29            | 32         | 36             | 30    |

## 8/28/85

Mr. Holder began fourth grade at the Bowles Elementary School. He completed sixth grade there (1985-1989). He

3

(Wetzel-Holder 003)

Norris Geroy Holder, Jr. Report

completed achievement tests in all three years.

|  | **National percentiles** | | |
|---|---|---|---|
|  | Reading Total | Math Total | Language Total |
| '86 | 29 | 18 | 18 |
| '87 | 60 | 74 | 40 |
| '88 | 34 | 63 | 11 |

## August, 1988

Mr. Holder entered seventh grade at Rockwood South Junior High School.  In the first semester, he passed all eight classes. He missed 22 hours of class.

## January, 1988

Mr. Holder entered the second semester of seventh grade at Rockwood South Junior High School.  He passed all seven courses he attempted.  He missed 23 hours of class.

## August, 1989

Mr. Holder entered eighth grade at Rockwood South Junior High School.  In the first semester, he passed all seven classes. He missed 56 hours of class.

## January, 1989

Mr. Holder entered the second semester of eighth grade at Rockwood South Junior High School.  He passed four courses and failed three.  He missed 98 hours of class.

## August, 1990

Mr. Holder entered ninth grade at Rockwood South Junior High School.  In the first semester, he earned a "C" in one course and failed the other five.  He missed 101 hours of class.

## January, 1991

Mr. Holder entered the second semester of ninth grade at Rockwood South Junior High School.  He earned one "D" and failed eight other courses.  He missed 270 hours of class.

## June, 1991

Mr. Holder went to summer school at Vashon High School in the city.  He earned one "D" and one "C".

(Wetzel-Holder 004)

Norris Geroy Holder, Jr. Report

## August, 1991

Mr. Holder returned to ninth grade at Rockwood South Junior High School.  He earned a "C" in pre-algebra (home schooling) and was excused from all of his other courses (due to his injury in October).

## The railroad accident

The accident occurred during October, 1991 when Mr. Holder was 15 years old.  He tried to jump on a train.  He slipped or fell.  The train ran over his left leg and right foot.  He was taken to St. Louis University for his initial care and was admitted.

The injury to his right foot was described as a degloving of lateral right foot with amputation through the 4th and 5th toes. (The bone of the fourth toe was preserved by report.  The skin and muscle were pulled off like a glove revealing the bones and deeper tissues).

The left leg was so severely crushed that it could not be saved.  Surgeons completed the traumatic (by the train) amputation.

## 10/11/91

A Behavioral Medicine note at St. Louis University Hospital by Dr. Theresa DeShields, a psychologist, indicated that there was no loss of consciousness during accident.  She felt that at that time he was experiencing denial at the time.  She felt he was focusing on the drama of the accident, i.e., the attention from TV, the papers and the community, rather than his loss.

## 10/12/91

A Glascow Coma Scale indicated he had a perfect score of 15, probably on 10/12/91.  This would indicate that no cognitive impairment was noted.  For insurance reasons, his family asked that he be transferred to St. John's Mercy Medical Center.

The admitting record at St. John's recorded three diagnoses: Post traumatic amputation of the left leg, amputation of right fifth toe and multiple abrasions and contusions.

## 10/14/91

Mr. Holder had further surgeries at St. John's.  Skin grafts, large area (20 X 17 cm), (4 X 5 cm) not covered by skin, were placed by Dr. Carlos Pappalundo to cover the stump of the

5

*(Wetzel-Holder 005)*

Norris Geroy Holder, Jr. Report

left leg and the right foot.

10/15/91

Mr. Holder was noted to be very unhappy and angry. The cause was not stated. Mr. Holder, when interviewed, had no recollection about this.

10/17/91

An order was written for a psychologist, Dr. John Yunker, to see Mr. Holder if insurance would pay for it. No note indicates whether Dr. Yunker did or did not see him. Mr. Holder reports no memory related to this.

10/23/91

Mr. Holder was discharged home.

1/17/92

Mr. Holder withdrew from school because of his injury.

2/19/92

Mr. Holder apparently was involved in an argument between two groups of boys about who was allowed to talk to a group of girls at about 4 P.M. Mr. Holder and his companions started to leave the scene when someone, presumably in the other group, threw a brick. It flew through an open window and hit Mr. Holder who was seated in the right passenger seat on the convexity on the right side of his head about one inch anterior to the front of his right ear.

Mr. Holder was injured and was taken home by his friend. He was lethargic. He was obviously ill. He vomited once. His brothers called his father who took him to Cardinal Glennon Hospital. Examination there showed that he had a depressed, star shaped fracture of the skull. Blood from veins in the skull leaked through the crack into the epidural space. Bleeding also occurred inside the brain under the dura. The subdural hematoma was sufficient to produce a local increase in pressure (midline shift). Surgery was necessary. The dura was opened and the bleeding capillaries sealed electrically. The skull flap was repositioned. The neurosurgeon obviously was worried about the right motor strip primarily, since he stated that the prognosis was excellent after physical therapy demonstrated equal arm and hand strength bilaterally.

When asked about the effect of this head injury on him, Mr.

6

(Wetzel-Holder 006)

Norris Geroy Holder, Jr. Report

Holder replied he had to have surgery.  He can't really say about any other effect.  "I can't pinpoint any special effect."  "I am pretty sure I had some effect."  "I had to get my brain cells built up."  "I'm fine now".

Q:    Are you sure?
A:    "Yes".

He repeated several times that he had 60 staples placed in his head.  Staples "ain't no joke."  It hurt so much when they took them out, he almost cried.

Questions about the symptoms of post concussional disorder were asked.  He reported headaches, but he did not know for how long.  He complained of dizziness and lightheadedness.  His lightheadedness occurred when he stood up too quickly (orthostatic hypotension).  He said he probably had increased fatigue.  He denied any change in his sensitivity to noise, increased irritability, increased emotional reactivity or lability or insomnia.  He does not remember if he had problems with memory or concentration.  He did state he was sure he had problems with concentration.  He does not remember whether he felt less mentally acute.  He did not remember how long he was out of school.

(Author's note: Post concussional disorder is not currently accepted as a clinical diagnosis; it is a research diagnosis.)

He denied that this head injury had any effect on his personality.  He did report that he is more "paranoid"; he looks around more to see who is in the area.  He is on the lookout.  He is more watchful for danger.  He stated that this incident had no effect on how he presents himself to others.

(Author's note: Three neuropsychologists have failed to find any deficits on mental status examination.  Two neuropsychologists have failed to find any cognitive effects with appropriate and more sensitive neuropsychological testing.  Physical therapy and my examination failed to find any problems with motor strength.  Deficits are found only on the more sensitive motor speed tests.  This is trivial.)

August, 1992

Mr. Holder returned to ninth grade at Rockwood South Junior High School.  He failed English, but passed five other courses. Four of the grades ranged from D- to D+.  (Author's note: Note that this is a significant **improvement** from the semester before the train injury and head injury.)

7

(wetzel-Holder 007)

Norris Geroy Holder, Jr. Report

12/1/92

Mr. Holder came under the jurisdiction of the St. Louis City Juvenile court for possession of cocaine and was placed on probation.  The jurisdiction was transferred to St. Louis County Juvenile Court, apparently on 4/23/93.

Mr. Holder offered the following account of this arrest.  He was arrested as a juvenile for possession of cocaine.  He had just bought a new, really nice car, which attracted police attention.

January, 1993

Mr. Holder started tenth grade at Rockwood South Junior High School.  He obtained a "C" in physical education and failed five other courses.

Mr. Holder indicated that he was car jacked once by "two dudes" who took his car, an Oldsmobile Delta, from a filling station.  He was 17 or 18.  At the time, he was not "drawing attention to himself" by wearing gold, etc.  He ran from the scene and was not hurt.  Sometime after this incident, he obtained a gun.

(Author's note: Mr. Holder reported that he has owned a Monte Carlo SS, an Oldsmobile Cutlass Sierra, an Oldsmobile Cutlass Brougham, a "real classic" 77 Cutlass, and a Chevy Blazer at different times.)

4/14/93

Mr. Holder passed the Missouri mastery and achievement tests.

| National percentiles | | | |
|---|---|---|---|
| Reading Total | Math Total | Language Total | Total |
| 8 | 36 | 18 | 15 |

5/7/93

Mr. Holder was disciplined for disrupting a class.

5/10/93

Mr. Holder received a five day out of school suspension for profanity directed at a teacher.

8

(Wetzel-Holder 008

Norris Geroy Holder, Jr. Report

<u>5/25/93</u>

Mr. Holder received discipline for three days for "inappropriate language".

<u>9/16/93</u>

Mr. Holder was disciplined for disrupting a class.

<u>10/14/93</u>

Mr. Holder was disciplined for disrupting a class.

<u>10/21/93</u>

Mr. Holder was disciplined for insubordination to a teacher, Mrs. Hults.

<u>11/3/93</u>

Mr. Holder was admonished for wearing a miniature AK-47 on a necklace.

<u>12/15/93</u>

Mr. Holder was suspended from school for "immoral conduct".

Mr. Holder was dropped from the Rockwood School District when he and his mother failed to meet the requirements to return to school after his suspension.

Mr. Holder admitted that he had been suspended from school twice for fondling a girl's breast. He indicated both of these incidents were mutual and voluntary; he did touch their breasts. However, the young ladies had been frightened when they were detected and tried to escape the consequences by blaming him.

He indicated that the last incident (12/15) which led to his leaving school was a frame up. He was in class with the young lady. He did jump out on the bridge before the young woman with his face covered by a ski mask. After an instant, he raised the mask and identified himself. "It's me, Norris." However, while he did jump out at her, he did not touch her breasts. He does not recall whether he touched any other part of her body (hand, arm, etc.) Because of racism, much was made of this incident. He seriously considered calling the media to complain about this frame up.

<u>10/3/94</u>

9

(Wetzel-Holder 009)

Norris Geroy Holder, Jr. Report

Mr. Holder received his general education diploma (GED).

12/6/94

Mr. Holder was placed on probation for a period of two years on the charges of Possession of a controlled substance - cocaine base - felony and Unlawful use of a weapon - carry concealed weapon - felony by Judge Margaret Neill.  He offered the following account of this incident.

He was selling drugs for money for a period between six and eight years.  He was making "good money".  His was supporting himself and helping his family.  His mother, he said, had it hard.  She had to support four children.  He denied selling drugs to support his own habit.  "How can you make money if you smoke it up."

He carried the gun for two reasons - self-protection because of his amputation and to keep from getting ripped off.  When he got arrested for these charges, he had an inexperienced girl friend with him.  She didn't know how to conceal the gun. Usually he was with a more experienced male friend who could get it out of sight without being noticed by the police.  The police officer who arrested him "lied" about the situation.

3/17/97

Mr. Holder was arrested for participating in a bank robbery at the Lindell Bank in which a guard, Richard Heflin, was shot and killed.

Mr. Holder made a series of admissions and comments about this robbery and killing during my examination.

**The reported motive**

He began having problems with his prosthesis a few years later.  It was time for a change.  He was in a "trainer".  It was time for him to move on to a permanent prosthesis.  This occurred maybe less than two years after he received his first prosthesis.

He does not recall who first suggested he needed a new prosthesis or when.

He stated that the Flexifoot is a more state of the art prosthesis.  He was told about it by Dr. "Gill".  He did not remember when he was told about it.  With the Flexifoot, he could run and move more comfortably.  It would be less stressful [to his stump].  There would be less scar tissue breakdown.  It would let him get a decent job.  Now, he feels every little shock or

10

(Wetzel-Holder 010)

Norris Geroy Holder, Jr. Report

bump.

He found out that insurance would not pay for it.

Q:   Did you talk to anybody about how to get it any other way?
A:   "I don't remember."

He did not remember whether he had talked to Dr. "Gill" about other ways to get it.  He only talked about it at the lab [on Marshall Street].

Q:   Who told you insurance wouldn't pay for it?
A:   "Dr. Gill"

Q:   Did you talk about other prostheses?
A:   "I am sure we did.  I don't remember."

Q:   What does the Flexifoot have to do with the crime you are charged with?
A:   "Didn't have anyone else" [to pay for it.]

When asked about other ways to get it, he stated that he believed Shriner's Hospital did not have any programs for "older kids".

Q:   When did you think of the robbery?
A:   "Just wanted it.  At a point, wanted to make that positive change" "have that leg" "so I could leave all of that stuff alone" "drug selling" "help family".  [At this point, he cried]. "Turn things around."

"the way I went about it" [was wrong].

"Nobody was supposed to get hurt!" [pounds table gently] "Not worth nobody getting hurt."  "Let him [Billie Allen] be trying to scare me or something".

Mr. Holder reported that several months ago, he had decided to help his family, go to school, get away from drug selling and the whole fast life stuff.  "Always had it in my mind."  "Looked at all this stuff" "This ain't the way to go."  He was "Trying to do the right thing."  "Just the way I went about doing it" [was wrong].

"Nobody was supposed to get hurt.  The money was insured. Nobody gets hurt, not even a punch, not nothing."

**His associate**

He had met Billie a while ago.  He washed Mr. Holder's car

11

(Wetzel - Holder 011)

Norris Geroy Holder, Jr. Report

for him and did a good job.  He thought Billie Allen was an "OK guy".  He ran into him at a club or bar one night.  Mr. Holder does not remember when that was.  He admitted knowing Billie for several years.

## The planning

Billie Allen suggested the robbery to him a little before the robbery occurred; it was within a month.  It was Billie's idea.  Before that idea, Billie had talked to him about "home invasion" of a drug dealer.  Mr. Holder thought that was a "dumb" idea; he was trying to get away from drugs.  He also was aware that a drug dealer might be prepared to defend himself and might retaliate later if it were successful.

Mr. Holder, prior to the robbery, thought that once he got his life straightened out and got himself "situated", he could pay the money back to the bank.  He agreed he was thinking of this as a "loan" (my word).

Mr. Holder reported that the combination of the three vehicles to escape was his idea.

Q:   Did you talk to Yolanda Curry about the robbery before it
     happened?
H:   I don't want to talk about that.

Q:   Did you buy the SKS you used?
H:   Yes.

Q:   Did you buy the one Billie Allen used?
H:   No.

Q:   Where did he get it?
H:   He got his own weapon.

Q:   Where?
H:   I don't know; I don't want to talk about it.

Q:   Did you buy your bullet proof vest?
A:   Yes.

Q:   Why?
A:   "Because it's bullet proof"

Q:   Were you anticipating shooting?
A:   "No.  It was so I wouldn't get hurt."

Q:   "Did you spend a lot of time planning this so it would get
     done right and would be safe."

12

(Wetzel- Holder 012)

Norris Geroy Holder, Jr. Report

A:    "Yes".

Q:    "I want to be sure I quote this absolutely right.  Did you
      spend a lot of time planning this so it would be done right
      and be safe?"
A:    "Yes. Definitely, yes."

      Mr. Holder stated that he told Mr. Allen "not to shoot
nobody.", "not to hurt anybody", "don't shoot nowhere."

      "These people [the bank employees] are my friends."  "We got
to be sure nobody gets hurt."  "I care for them, - damn!"

Q:    Did you coach Billie on how to do the robbery?
A:    No.

Q:    Did you tell him not to shoot?
A:    "I told him over and over again "Be Cool!"  "No shooting".
      I was sick enough already that I'm getting involved" [in a
      bank robbery against his friends].

      He stated he does not know why Billie shot.

      After the robbery, he fled with Billie Allen in the van.
The van accidentally caught on fire prematurely.  He was arrested
next to the burning van.

Psychological history

      Mr. Holder denied a history of panic attacks, panic
disorder, generalized anxiety disorder, simple phobias, social
phobias and agoraphobia.  Even with probing, he denied phobias of
railroads.  He admitted he is more careful around railroad
tracks, but no more than that.  He specifically denied post
traumatic stress disorder.  He has had no nightmares or
flashbacks to either the traumatic amputation or the assault with
a brick.  He denies any intrusive memories about either occasion.
He denies any change in nervousness, physiological reaction or
startle response.  He reports that he is somewhat more alert
("paranoid") for people in the environment who might assault him.

      Mr. Holder denied that he has ever been depressed prior to
the robbery.  When the robbery and killing occurred, he got
pretty depressed.  He initially suffered from sad or depressed
mood, insomnia (primarily initial insomnia thinking about what
happened), loss of appetite with a five to ten pound weight loss,
increased fatigue and feelings of guilt (subjective).  He never
had death wishes, suicide thoughts, loss of libido (however no
opportunities), feelings of worthlessness or feelings of guilt.
These symptoms lasted for a few weeks to a month at most.

13

(wetzel-Holder 013

Norris Geroy Holder, Jr. Report

Currently, he has only low mood, occasional insomnia and subjective feelings of guilt.

He was never depressed before this.  He always "feels good - that is just my personality."

(Author's note: During the time, I was with him, interviewing or testing, I saw no signs of depression or low mood.  He was friendly and smiled easily.)

He denied any delusions.  He denied anyone was plotting against him.  Elsewhere, he reported Billie Allen had tried to sell him out.  He doesn't feel "too good" about Allen.

He denied auditory, olfactory or tactile hallucinations.  He initially reported he had has visions twice.  On questioning, it became clear these were dreams which he found meaningful.

The first "vision" occurred prior to the robbery.  In this vision, he was in a room at a table being questioned by a group of men who accused him of a crime.  "You did this."  He felt trapped in that situation.  He now sees this as a warning he failed to heed.

The second "vision", another dream, involved "Rich" (the decedent, Richard Heflin).  Rich was wearing a white shirt and talking to him.  He advised Mr. Holder "You have to get the truth out.  You can't let him [Billie Allen] get away with this."  "I know you didn't do this."  "I know you didn't want to do this."  Mr. Holder reported he felt comforted and reassured by this "vision".

When I asked whether he was scared by this dream, he said "I wasn't scared; I was encouraged."

Conduct disorder

The specific criteria for conduct disorder were reviewed with Mr. Holder.  He denied any aggression toward people and animals.  He was never a bully.  He never started any fights.  He has never used a weapon in a fight.  He has never been physically cruel to any person.  He has never been cruel to animals although he admitted throwing rocks at squirrels.  He has never robbed any one with physical confrontation.  He has never forced anyone to have any sexual activity with him.

He denied he had ever started any fires to destroy anything; he has lit barbecues.  He has never destroyed or vandalized others property.

14

(Wetzel-Holder 014