Norris Geroy Holder, Jr. Report

He has never broken into anyone's home or building. He has never shoplifted that he recalls. He did not know what he might have done as a very young child that he could not remember now. He has never conned other people although he felt quite uncomfortable when working as a telemarketer. He felt he was tricking people. He did not think it was illegal, just uncomfortable.

He denied staying out all night without parental permission. He never ran away from home. He never played hookey. He did miss school because of his injuries. He did miss the school bus which forced him to stay home. He never deceived his mother about whether he had gone to school.

(Author's note: The diagnosis of antisocial personality disorder can not be considered when the diagnosis of conduct disorder can not be made.)

Sexual history

He denied any history of physical, sexual or emotional abuse by anyone. He denies that he has ever been in a forced sexual situation or forced anyone else to have sex with him. He denies any and all sexual experiences with males.

Mr. Holder indicates that he had his first sexual experience when he was eleven or twelve with a young lady of the same age. The experience was mutually initiated. He recalls that he used protection (a condom) on that occasion and every subsequent occasion. (Author's note: He certainly understands everything that is being communicated to young people about the prevention of sexually transmitted diseases.)

Mr. Holder initially denied that he had any sexual problems of any kind. Under questioning, he admitted that he may have had rare problems with the timing of ejaculation. He also reported that after long period of catherization related to the loss of his leg, he had a short period of time when he had difficulty obtaining an erection.

Mr. Holder admitted that he had been suspended from school twice for fondling a girl breast. He indicated both of these incidents were mutual and voluntary; he did touch their breasts. However, the young ladies had been frightened when they were detected and tried to escape the consequences by blaming him.

He indicated that the last incident which led to his leaving school was a frame up. He was in class with the young lady. He did jump out on the bridge before the young woman with his face covered by a ski mask. After an instant, he raised the mask and

15

(Wetzel- Holder 015)

Norris Geroy Holder, Jr. Report

identified himself.  "It's me, Norris."  However, while he did jump out at her, he did not touch her breasts.  He does not recall whether he touched any other part of her body (hand, arm, etc.)  Because of racism, much was made of this incident.  He seriously considered calling the media to complain about this frame up.

He said it was a regular ski mask.  He denied it was the one he used in the robbery.  He appeared disgusted by the suggestion.

## Work history

His first job was for a man named Hassam who had a shop on Grand Avenue.  He apparently did part time odd jobs, including selling.

His second job was with S.L.A.T.E.  This was a program that helped thirteen or fourteen year olds to prepare to enter the job market.  His summer job was tutoring children in kindergarten through second grade.  He worked with two classes.  He liked being called Mr. Holder by the children when they saw him.

His third job, lasting two to three months, was with Winner's Circle, a telemarketing firm.  He worked on the phone identifying and qualifying people who had filled out a form.  When qualified, he would convince them to come in for a sales interview.  He felt the company was something of a "scam".  He did not know whether it was "totally legitimate".  He recreated the patter for me.  He was still quite good at it, showing a strong ability to sell himself.  He recalled an incident where he had called a woman and asked for her husband.  The husband had died and the widow called him names.  He could "feel her pain"; it made him "sick".  He repeated this several times.  He was paid $5.00 an hour.  He made $200.00 a week plus commissions; it was not a bad job.  He got paid on a weekly basis.

His fourth job lasted only one week.  He worked for Wholesale Direct.  They acquired large lots and then sold to retailers.  He had to dress up (with dress shoes) and make the rounds of retailers.  It was very hard on his amputated leg.  He had problems with his leg "breaking down".  He was "really trying" when he worked for them.

He also indicated that he worked for several temp services.

## Marital history

He has never been married.  He has never had any children; (he has always used protection).

16

(Wetzel-Holder 016)

Norris Geroy Holder, Jr. Report

## Alcohol and drug history

Mr. Holder had his first drink, away from his family, at age 20. He first became drunk at age 20. He took his first drink the day when a cast was removed from his broken foot; this was also the day before his birthday. He had one large drink of Tanqueray (? sp) which he thought was watered down. He was unable to stand up. He stopped when he turned 21. He has a "natural high" and doesn't need alcohol or drugs. He has had none of the sequelae of alcohol abuse (accidents, complaints from friends, family, doctors, AM drinking, fights and police trouble.)

He took one puff on one marijuana cigarette once. He denied all other use of illicit drugs. He denied any use of inhalants.

## Family history of psychiatric and neurological illness

A careful inquiry was made into psychiatric and neurologic disease in Mr. Holder's first (sharing 50% of genes - father, mother, full siblings, children) and second degree (sharing 25% of genes - aunts, uncles, grandparents) relatives. He reported that his brother, Norrim, had a history of febrile seizures. He stated he had never had such a seizure. He indicated that his mother confirmed his report that he had never had a seizure. He was unaware of anyone else in the family (first or second degree) who had any neurological disease. He denied knowing that his mother may have had a seizure.

He admitted only limited psychiatric problems in his family. His uncle, M.C. Curry, **may** have had police difficulties related to drug business. His mother used drugs in the past once, but no longer does. He emphasized she has no problems now. His aunt, Rhonda Curry, has seen a psychiatrist or psychologist for nervous problems. His cousin, Yolanda Curry, he said, has been in a psychiatric hospital for problems he characterized as involving depression, nervousness and "mental".

## Diagnostic impression:

Axis I     No diagnosis offered
Axis II    No diagnosis offered
Axis III   History of skull fracture and minor brain injury
           without cognitive sequelae
           History of traumatic amputation of left leg and right
           fifth toe
           History of broken bone in right foot
           History of Febrile seizure without sequelae
Axis IV    Arrest
Axis V     35

17

(Wetzel-Holder 017)

Norris Geroy Holder, Jr. Report

Opinions:

All of the opinions expressed below are held with a reasonable degree of psychological or neuropsychological certainty.

Opinion 1:

A.   Mr. Holder has detectable brain dysfunction caused by his injury from a flying brick.  The brick caused a depressed skull fracture, slow leaking of venous blood from the skull into the epidural space over the brain and bleeding in capillaries under the dura.  The damage was repaired surgically.  The dysfunction is limited to motor speed in his left hand.

B.   Mr. Holder has no detectable **cognitive** dysfunction caused by that injury or any other brain disease or injury.  He is average or above average in all areas of cognitive brain function.  (See the appendix for a full account of the neuropsychological examination.)

C.   His subtle loss of motor speed in his left hand does not constitute a mental disease or defect under the law.  It does not affect his ability to know right from wrong or to control his behavior.  It does not and can not cause any emotional disturbance.

Basis

1.   His IQ is average.

2.   All scores on the tests entered into the Halstead-Reitan Index (HRI) are in the normal range.

3.   His Goldstein Average Impairment Rating (based on more scores than the HRI) is above average.

Opinion 2:

A.   Mr. Holder does not have any psychiatric disorder that falls on Axis I in the *Diagnostic and Statistical Manual - IV* of the American Psychiatric Association.  He does not have any psychosis or disturbance of mood.  He does not have any Posttraumatic Stress Disorder related to the amputation of his left lower leg, to his head injury or any other incident or event.

B.   I am unable to make any Axis II diagnosis with a reasonable degree of psychological certainty.

18

(Wetzel-Holder 018)

Case: 4:03-cv-00923-ERW    Doc. #:  21-6    Filed: 08/31/04    Page: 5 of 14 PageID #: 180

Norris Geroy Holder, Jr. Report

C.   He has a medical history of febrile seizure without neurological or cognitive sequelae, traumatic amputation of his left lower leg below the knee and amputation of his fifth toe on his right foot.

D.   He does not have any mental disease or defect under the law.

Opinion 3.

There is no psychological or neuropsychological connection or causal relationship between the febrile seizure(s), traumatic amputation and the head injury and the crimes with which Mr. Holder is charged.

Opinion 4.

It is my opinion, with a reasonable degree of psychological certainty that Mr. Holder does not meet the federal statutory mitigator of impaired capacity (1).

Basis

1.   **Mr. Holder claims he knew it was wrong to kill before, during and after the crime.**

Q:   Is it wrong to shoot somebody or kill somebody?
A:   Yes.

Q:   When did you first know that?
A:   What do you mean?

Q:   Did you know it when you were in high school?
A:   Yes.

Q:   Did you know that before the crime?
A:   Yes.

Q:   Did you know it during the crime?
A:   Yes.

Q:   Did you know it after the crime?
A:   Yes.

Q:   You knew it was wrong to kill before, during and after the crime.
A:   Yes.

He volunteered "I know people who have been shot.  I know it is wrong."  "Nothing interfered with his ability to know it was wrong to kill someone", he said.

19

(Wetzel-Holder 019)

Norris Geroy Holder, Jr. Report

He added "Nobody was supposed to get hurt."

He continued "Money can be replaced. Nobody's life can be replaced. [You] can print more money."

2.   **Mr. Holder confirms his knowledge that killing is wrong by his statements after the crime, distancing himself as far as possible from the killing.**

Q:   Did you talk to Yolanda Curry about the robbery before it happened?
H:   **I don't want to talk about that.**

Q:   Did you buy the SKS you used?
H:   Yes.

Q:   Did you buy the one Billie Allen used?
H:   No.

Q:   Where did he get it?
H:   He got his own weapon.

Q:   Where?
H:   I don't know; **I don't want to talk about it.**

Q:   Did you buy your bullet proof vest?
A:   Yes.

Q:   Why?
A:   "Because it's bullet proof"

Q:   Were you anticipating shooting?
A:   "No.  It was so I wouldn't get hurt."

"I just know nobody's going to get hurt.  The money would be replaced.  They [people in the bank] may be upset, a little distraught [sic], then everything goes back to normal.  Everybody be fine."

"I absolutely did not fire a gun, at a wall, at nobody, at nothing.  I didn't accidentally pull the trigger, nothing."

"Nicely, easily, easily without incident.  That's how everything was discussed."

3.   **Mr. Holder reported that he knew it was wrong to rob a bank before, during and after the robbery.**

Q:   Is it a crime to rob a bank?

20

(Wetzel-Holder 020)

Norris Geroy Holder, Jr. Report

A:   Yes.

Q:   Did you know that before the crime?
A:   Yes.

Q:   Did you know it during the crime?
A:   Yes.

Q:   Did you know it after the crime?
A:   Yes.

Q:   You knew it was wrong to rob a bank before, during and after the crime.
A:   Yes.

Mr. Holder showed he knew bank robbery was criminally wrong by obtaining weapons, bringing masks, planning a get away with three vehicles and dousing the van with gasoline so that his finger prints could be concealed.

4.   **Mr. Holder claimed to me that he was so pressured or forced by his desire to straighten out his life, stop selling drugs, support his family and become a good citizen that he was less able to control his behavior and conform to the requirements of the law.**

"I knew robbing a bank was not necessarily the right thing to do.  My reasons for getting involved in this were right.  I was trying to change for the better. The way I went about this wasn't right."

"It wasn't the right way."  "I thought it was the right way at the time."

"It wasn't supposed to happen... Nobody gets hurt."

"It [the pressure he felt to change for the better and to leave the wrong way of life] did interfere...." [with his ability to control his behavior.]

"A desire to change for the better did not make my morals worse."

The pressure or duress was "the change I wanted to make".  Billie pressured him to an extent.  Billie had nobody.  His mother had put him out on the street. Billie was under a lot of pressure.  Mr. Holder indicated his position was much better.  He had a place, a supportive family.  Only his desire to improve himself pressured his actions.

21

(Wetzel-Holder 021)

Norris Geroy Holder, Jr. Report

I do not find this position plausible as something he really believed.  He intended to rob the bank, conceal his identity, and to escape with the money.

Opinion 5.

It is my opinion, with a reasonable degree of psychological certainty that Mr. Holder does not meet the federal statutory mitigator of emotional disturbance (6).

Basis

1.    Mr. Holder does not have any psychological, psychiatric or neurologic disease that can effect one's emotional condition.  He never has.

2.    Mr. Holder stated that he had no emotional disturbance during the time when the robbery was planned or when it was executed.  He claimed he only became upset after he heard shots fired.  He was not under any emotional disturbance, by his report, when he obtained his weapon, vest, arranged for the escape vehicles, discussed the robbery with Billie Allen, dressed for the robbery or entered the bank.

Q:    Were you upset before the time of the crime?
A:    He stated he was not upset before the crime.  He was "not upset, angry or anything."  "Cool, calm, the way you usually are."

He reported he started getting upset when he heard the shots.  "I didn't see no tellers or nobody." Internally, he reported he thought "What are you doing? What the hell are you doing."

3.    His behavior after the robbery, as described in police reports, does not show emotional distress of any kind. He attempted to shield Billie Allen from arrest initially.  This seems quite inconsistent with his current level of reported outrage at Mr. Allen for shooting Mr. Heflin.

22

(Wetzel-Holder 022)

Norris Geroy Holder, Jr. Report

Sincerely yours,

*Richard D. Wetzel Ph.D*

Richard D. Wetzel, Ph.D.
Professor of Medical Psychology in Psychiatry
Professor of Neurology and Neurological Surgery
Washington University School of Medicine

Enclosures

23

(Wetzel-Holder 023)

Norris Geroy Holder, Jr. Report

## APPENDIX

Mr. Holder received a mental status examination from Dr. Thomas J. Reidy, a board certified forensic psychologist, who practices neuropsychology. A mental status examination is able to detect moderate or severe brain dysfunction with high reliability and validity when expertly done. It may miss subtle or mild brain dysfunction that can be detected with neuropsychological testing. Dr. Reidy found no brain dysfunction. I agree with his conclusion. Mr. Holder has no brain dysfunction detectable with a mental status examination.

Mr. Holder also received a mental status examination and limited neuropsychological evaluation from Dr. Steven Rothke, a board certified neuropsychologist. Dr. Rothke found no abnormalities. His neuropsychological examination was focused on behaviors that might indicate impaired executive functioning that would be potentially quite relevant in a killing committed impulsively or in the heat of passion. Dr. Rothke found no brain dysfunction with his mental status examination and testing. I would agree with his findings as well. There is no brain dysfunction in the areas he tested.

I conducted a relatively exhaustive neuropsychological evaluation and a mental status examination. Guided by my review of his medical records, I was able to identify a focal, specific abnormality in the right motor strip. This abnormality is of little effect and no legal relevance. Mr. Holder is able to use his left hand and arm as well as the average person through compensatory techniques. By contrast, his right hand and arm can function at a superior level. While interesting, in the real world, this deficit means that Mr. Holder is slightly less likely to become a champion pin ball player or computer game player than he would have been before the injury to his head. He still can be above average.

## The neuropsychological evaluation

He was administered the Wechsler Adult Intelligence Scale-Revised, the mental status examination from the Cambridge Examination for the Elderly developed by Sir Martin Roth, M.D. (Camdex), the Benton Visual Retention Test, the Wechsler Memory Scale - Revised, and parts of the Halstead-Reitan neuropsychological battery. All testing was administered by my technician while I observed. He had previously received the Wisconsin Card Sorting Test, the Stroop Color Word Test, Trails A and B tests and a mental status examination from Dr. Steve Rothke, a neuropsychologist. Dr. Reidy, another neuropsychologist, had also given him a mental status examination. Their findings will be incorporated into this

24

(Wetzel-Holder 024)

Norris Geroy Holder, Jr. Report

report for purposes of comparison.

<u>Behavior During Testing</u>

The technician doing the testing reported that Mr. Holder cooperated with no prompting.  He showed variable concern and motivation for doing well.  Sometimes he appeared very competitive; at others, he was quite bored.  He focused his attention with no prompting.  His attention span was quite good. He persisted with little encouragement.  The technician concluded that he appeared to extend maximum effort.

He responded accurately to questions about person, place, and time.  He showed complete understanding of directions.  Normal vocabulary, phrasing and articulation were used.  Rate of performance was normal and dependent on instructions.  Mr. Holder held his pencil loosely with guidance of index finger and accurate production.  He had some problems with gait.  No irrelevant body movements were noted.  He sat quietly.

He was friendly immediately.  His behavior was appropriate for the setting.  He displayed no evidence of antisocial or sociopathic behavior.  Mr. Holder accepted failure with little observed effect on continued work.

<u>Test Results</u>
<u>Orientation</u>

Mr. Holder was fully oriented to person, place, date and time.

<u>Laterality</u>

He is right-handed, right-eyed and right-footed.

<u>Simple Calculations</u>

Mr. Holder was able to solve two simple arithmetic problems correctly.

<u>Attention and Concentration</u>

He was able to count backwards from 20 to 1 by 1s without error.  He did serial sevens without error.

Mr. Holder's ability to concentrate was normal on the WMS-R. He had normal scores on the tests on the Halstead-Reitan battery most sensitive to problems with attention and concentration.

(Wetzel - Holder 025)

Norris Geroy Holder, Jr. Report

## B. Cognitive Tests

The results of the Wechsler Adult Intelligence Scale-Revised indicated general ability in the average range (IQ= 92), with no significant discrepancy between verbal (IQ= 95) and non-verbal (IQ= 89) abilities.  Individual areas of the intelligence test were characterized by inconsistent performance on both verbal and performance sub-tests.  This suggests higher potential in these areas, now or in the past.

## Visual-spatial abilities

The Benton Visual Retention Test measures Mr. Holder's ability to perceive geometrical figures and to reproduce them.  His score is adjusted for IQ level.  He showed normal ability to perceive, reproduce and to remember these figures.

No evidence of construction dyspraxia was noted on the Halstead-Reitan.

## Motor

Strength of grip was average for the right (56.25 Kgs.) and left (58.25 Kgs.) hands.  Psychomotor speed was superior.  Simple manual dexterity of the upper extremities was normal on the right and left sides.

## Praxis

He was able to copy correctly all three of three figures shown to him.  He was able to draw a clock correctly and to make the hands show the requested time.  Mr. Holder's score for performance of requested behaviors was in the normal, non-demented range.

## Perception

He was able to identify two coins by touch alone.  Mr. Holder was able to recognize both of two famous person's pictures.  He was shown pictures of six common objects photographed from unusual angles.  He identified all of them.  Two by-standers were correctly identified by name or role.  His score on perceptual tasks was in the normal, non-demented range.

Simple auditory and tactile sensory perception were intact. Perception of speech sounds was normal.  Auditory discrimination for non-verbal elements was within normal limits.  No evidence of finger agnosia was noted.  He had no difficulty with finger tip number writing.  Mr. Holder's ability to recognize objects with only tactile and kinesthetic cues was normal.

26

(Wetzel - Holder 026)

Norris Geroy Holder, Jr. Report

## Reasoning and problem-solving

Mr. Holder was able to respond in an appropriate, abstract way to some items in a series of verbal reasoning questions. His performance on abstract thinking tasks was in the non-demented range.

Verbal abstract reasoning ability was in the average range. His ability in solving abstract visual spatial problems was average. Mr. Holder's ability to grasp the essential nature of novel problem situations and postulate solutions to problems based on feedback was superior.

## Language Abilities

He understood and responded correctly to a series of verbal directions and questions. He correctly obeyed two directions he read. Mr. Holder was able to obey a two step and a three step oral command. He was able to name seven of eight objects. He was able to name more than ten animals in one minute. Verbal fluency was above average. He was able to define all of a series of simple terms in general or abstract ways. He was able to write a complete sentence of his own choice. Mr. Holder was able to address an envelope correctly when the name and address were dictated to him. Language comprehension and usage were in the normal, non-demented range.

The aphasia screening test on the Halstead-Reitan indicated language functions were excellent.

## Memory

Remote verbal memory (fund of information) was below average, indicating a poor education.

Mr. Holder was able to recall two of six pictures previously seen. He was able to recognize all six of the same pictures when they were among a series of pictures shown to him. He was able to answer only one of six easy questions about world history from 1914 to 1945. He did not complete high school which may have affected his performance. He was reasonably well acquainted with current events. Mr. Holder had no trouble registering the names of three items (apple, table, and penny). He was able to recall only two of the three objects at five minutes. However, he remembered all five of the five elements on the address of an envelope he had written five minutes earlier.

(Author's note: Mr. Holder was given parts of this test by Dr. Rothke two days before my evaluation. Some scores may therefore be inflated because of learning. Dr. Rothke's report

27

(Wetzel - Holder 027)

Norris Geroy Holder, Jr. Report

indicated he was normal on this test.)

Mr. Holder's verbal memory index was 133. Considering his verbal IQ score (95), this is a Normal range score. He was able to recall 42 of the elements in the verbal memory scale score immediately and to recall 34 elements after one half hour. This is average recall.

Immediate visual spatial memory was assessed with the Benton Form C. Registration was normal. The Form D administration of the Benton measures the same skills with memory as an additional factor. That test indicated figural memory was normal.

Mr. Holder's visual spatial memory index was 128. Considering his performance IQ score (89), this is a normal range score. He was able to recall 40 of the 41 elements in the visual reproduction scale score immediately and to recall 34 elements after one half hour. This is average recall.

Overall Indices

Mr. Holder's score on the Camdex was in the normal, non-demented range. In general, the Halstead-Reitan Index (0), the best possible, indicated neuropsychological functions to be in the normal range. The Goldstein average Impairment Rating was (0.53), a score in the superior range. This is a good score.

28

(Wetzel-Holder 028)