GOVERNMENT
EXHIBIT
∩

Rothke - Direct                    12-72

DIRECT EXAMINATION

BY MS. BREWER:

Q.    Sir, can you tell the jury your name, please?

A.    Yes.  Steven Elliott Rothke.

Q.    And where are you from, Dr. Rothke?

A.    Currently from Northbrook, Illinois, which is a suburb of Chicago.

Q.    And what is your profession?

A.    I am a licensed clinical psychologist.

Q.    And how long have you been a licensed clinical psychologist?

A.    15 years.

Q.    Can you describe for the jury what a clinical psychologist is?

A.    Yes.

      That's a specialist in the study of human behavior, and treatment of mental abnormalities, such as psychiatric conditions, or neurological conditions that produce behavioral abnormalities.

Q.    Can you tell the jury what your qualifications to be a licensed clinical psychologist are?

A.    Yes.

      I have a Bachelor's Degree in Psychology from the State University of New York at Buffalo.

      A Master's Degree in Clinical Psychology from

the University of Dayton.

A Ph.D. or doctoral degree in Clinical Psychology from the University of Kentucky.

And I completed an internship at the Westside Veterans Hospital in Chicago, which was approved by the American Psychological Association.

And then beyond that, in the State of Illinois, we are required to have one year of supervised experience beyond our degree, which -- and I obtained mine at the Rehabilitation Institute of Chicago.

Q.    And what is the Rehabilitation Institute of Chicago?

A.    It's a free-standing hospital that focuses on the treatment for patients who have sustained some type of injury, leaving them with a physical disability, such as an amputation, a spinal cord injury, or a head injury.

Q.    And after that experience, did you go on to have some further professional experience at the Rehabilitation Institute of Chicago?

A.    Yes.

I was at the Rehabilitation Institute for 14 years, where I was a staff psychologist, and a senior psychologist, which involves supervising the work of other staff.

I then directed the neuropsychology testing lab from 1988 through 1996.

And was the head of the psychology department from 1991 through 1996.

Q.    What is your present practice, Doctor?

A.    I am currently in private practice within the areas of rehabilitation psychology and clinical neuropsychology.

Q.    And are you in some way specially qualified in these two areas?

A.    Yes.

In both of those two areas, I have board certification through the American Board of Professional Psychology.

Q.    And what does board certification mean?

A.    That's an advanced level of certification.

In my case, it involved, for each area, submitting samples of my work, usually reports or therapy transcripts, taking a written examination, and sitting for oral exams.

Q.    Doctor, let's talk for just a minute about the two areas that you are board certified in.

Can you briefly tell the jury what clinical neuropsychology is?

A.    Yes.

That is a subspecialty of clinical psychology. That deals specifically with the evaluation of individuals who have difficulties with thinking or memory or emotional control or behavior, due to an injury to the brain, such as a head injury from a car accident, a stroke, a tumor, or Alzheimer's disease.

And it also -- my area of specialty would also involve treating those individuals.

Q.   And how about rehabilitation psychology, what does that area involve?

A.   Rehabilitation psychology is more of a treatment specialty.

It involves working with patients with physical disability, helping them cope or adjust to their illness, how to maximize the use of their abilities to make the most of their lives, working with family members of an injured individual, and helping other professionals who treat that patient work around that patient's difficulties.

MS. BREWER:  Your Honor, at this time, I would ask that Dr. Rothke be certified as an expert in the areas of clinical neuropsychology and rehabilitation psychology.

THE COURT:  You may continue to interrogate.

MS. BREWER: Thank you, your Honor.

BY MS. BREWER:

Q.   Doctor, in the course of your practice, were you asked to evaluate Norris Holder?

A.   Yes, I was.

Q.   And do you recognize Mr. Holder as the young man seated at the table behind me?

A.   Yes, I do.

Q.   And did you in fact do an evaluation of him?

A.   Yes.

Q.   And do your records show when you did that evaluation?

A.   Yes, they do.

It indicates March 19th of this year.

Q.   And what purposes were you asked to evaluate Mr. Holder for?

A.   There were two main purposes for this evaluation, relating back to my two areas of neuropsychology and rehabilitation psychology.

The first was to evaluate the impact of Mr. Holder's amputation injury in 1991, and to look at what if any relationship there was between that injury and the crime for which Mr. Holder is charged and being tried for today.

And the second question was:

Did he have any lasting brain injury from a head injury he suffered in 1992, and if so, does that brain injury have a bearing on his ability to control his behavior or leave him more dangerous than he would have been without a brain injury.

Q.    Where did you evaluate Norris?

A.    In a holding cell in this building.

Q.    And approximately how long did the evaluation last?

A.    Three hours.

Q.    And in addition to your clinical interview and evaluation of Norris, did you also review some other records in order to help form your impressions in this case?

A.    Yes, I did.

Q.    And can you give us just kind of a summary of the records that you reviewed?

A.    Yes.

There were extensive medical records, mostly relating to his amputation injury and head injury.

School records.

Disciplinary records.

Records of interviews of Norris's family and friends.

And an evaluation by another psychologist, Dr.

Wetzel.

Q.   And was it your understanding that Dr. Wetzel was a doctor who was hired by the U.S. Attorney's office that evaluated Mr. Holder?

A.   Yes.

Q.   And did you receive a report from his evaluation of Norris?

A.   Yes, I did.

Q.   Okay.

Doctor, let's first talk about the neuropsychological aspect of the evaluation that you did.

Did that consist of an interview with Mr. Holder, and testing?

A.   Yes.

Q.   And what tests did you administer in order to do the neuropsychological evaluation?

A.   The test, or parts of tests that I gave, were the Wechsler Memory Scale-Revised, which is the most widely used test of memory in neuropsychology.

A Stroop Color Word test, the Rey Complex Figure.  The Trail Making Test.  The Wisconsin Card Sorting Test.

And then specific tasks making up what is called a mental status examination.

Rothke - Direct                                12-79

That is tasks of attention, concentration, problem-solving, and speech and language abilities.

Q.   And what information did you have that indicated there was a possibility that there may be some neuropsychological deficit?

A.   Mr. Holder had a head injury in February of 1992, when he was hit in the head with a brick.

The wound required 60 stitches.

And at the time I saw him, I hadn't reviewed that record yet, but I did before today.

And his injury required hospitalization.  The neurodiagnostic tests, the CAT scans indicated a bleed.

And those types of injuries often result in meaningful changes in cognition or behavior or emotional function.

Q.   And can you tell the jury what the results of your testing as to the neuropsychological aspects were?

A.   In terms of my testing, Mr. Holder did not display any deficits of the type we might expect to see in an individual who has had a head injury, such as changes in attention and concentration; memory for new things, whether it is told to somebody, or whether it is shown to them; changes in speech and

language, such as the ability to name objects, or to find one's way around, such as on a map; to tell the difference between right and left.

There were no deficits of any type that I would typically see in my patients who had a brain injury.

Q. What would your conclusion be then as to Norris's tendencies to be impulsive?

Would they be increased since this brain injury or head injury occurred?

A. My opinion is that he had made a very good recovery from that head injury, and that he is no more impulsive now than he would have been before that head injury.

Q. Did you see any lasting effects at all from that injury?

A. No.

Q. Now, did you also review Dr. Wetzel's neuropsychological report to see if it was consistent what you had done?

A. Yes.

Q. And how did his findings compare with yours?

A. His findings map up very well -- match up very well with my findings.

He did a number of other tests that I did not do that compliment my findings.

Rothke - Direct                                    12-81

And he also found Mr. Holder to be well within normal limits on all major tests that he gave of brain functioning.

Q.   Doctor, now I want to move over and talk to you about the amputation of Mr. Holder's leg, and the injury to his leg.

How did you -- let me ask you:

You reviewed several medical records, you already told us, regarding the amputation, is that correct?

A.   Correct.

Q.   Did you also talk with Mr. Holder about what happened during the train accident?

A.   Right.

As part of my clinical interview with him, we reviewed the train accident.

Q.   And what was your understanding, in summary fashion, of what happened?

A.   That Mr. Holder was out with some friends and had, in the past, jumped on a moving train.

But this time, something went wrong, and his leg got caught, and as a result his lower left leg was severed.

MS. BREWER:   Your Honor, at this time, I would like to show the jury Exhibit GG, as an

Rothke - Direct                                    12-82

introduction to Dr. Rothke's testimony regarding the

train accident.

THE COURT:  You may.

(Video shown.)

BY MS. BREWER:

Q.    Doctor, I now want to talk to you about the

accident itself.

Did you talk with Norris about whether he lost

consciousness at the time of the accident?

A.    Yes.  That was one of the specific questions I

asked.

And at no time, according to him, did he lose

consciousness, and that is consistent with what is

noted in the medical record as well.

Q.    Now, following the accident, is it your

understanding that Norris was first taken to the St.

Louis University Medical Center?

A.    Yes.

Q.    And did you review records from that

hospitalization?

A.    Yes, I did.

Q.    Was a -- any kind of a psychological consult

conducted while Norris was hospitalized at St. Louis

University?

A.    Yes.

Rothke - Direct                                    12-83

I believe it was the day after admission that there was a psychological consultation.

Q.   And what was the results of that consultation?

A.   The psychologist find generally Mr. Holder relaxed, calm, and what the psychologist concluded was that Mr. Holder was using the psychological defense mechanism called denial, which was enabling him to cope at that time with what had just happened.

Q.   I am doing this backwards.  I am sorry.  I should have allowed you the use of the exhibit.

     May I approach?

          THE COURT:  You may.

BY MS. BREWER:

Q.   Doctor, I am going to hand you Exhibit FF, and ask you if that is in fact the record that you just referred to in your testimony?

A.   Yes, it is.

Q.   Now, following his hospitalization at St. Louis university, was Norris then transferred to St. John's Mercy Medical Center?

A.   Yes.

Q.   And do you recall how soon that was after the St. Louis University admission?

A.   I believe it was -- it was the day after admission to St. Louis University Hospital that he

was transferred.

Q. And did you look at the St. John's records to determine whether he had gotten any further psychological services at St. John's?

A. Yes.

That was one of the specific areas I was looking for, as I reviewed the records. And there were no indications of any additional services delivered to Mr. Holder, psychological services.

Q. I'm going to hand you what we have marked as Defendant's Exhibit AA --

If I may, Judge.

THE COURT: You may.

BY MS. BREWER:

Q. -- is that a portion of the records that you reviewed from St. John's?

A. Yes.

Q. And in Exhibit AA, is there an indication that anyone ever talked with Norris about the willingness to do a psychological consultation?

A. I believe -- I recall seeing an indication that Mr. Holder was willing to see a psychologist.

Q. Okay.

Were there further -- well, did he ever see a psychologist, I guess, while he was there?

A.   No.

There were many notations in the medical record that a consultation with a psychologist had been requested by the attending physician, or recommended; but there were no indications that he actually saw a psychologist.

Q.   And do you have, by referencing the records, do you have the number of times that a psychological consultation was recommended?

A.   It was either 17 or 18 times that I recall seeing a recommendation for a psychological consultation.

Q.   And was there any indication in the St. John's record that there were any outpatient therapies recommended or received upon discharge?

A.   There were no outpatient therapies received.

I don't recall seeing any recommendation for any outpatient psychological services.

Q.   In addition to reviewing the medical records, you have told us that you talked with Norris about what life was like for him at the time of the train injury, is that correct?

A.   Yes.

Q.   And what was the purpose in getting his life history and background at the time of that injury?

Rothke - Direct                                           12-86

A.     There are several reasons why we do that in a clinical interview.

One, we want to have a sense of what are somebody's coping skills at the time of an injury.

What life experiences have led them to, what skills do they have to deal with the trauma, have they had traumas before, which might make them even more vulnerable to the effects of an injury or significant stressful event.

I look at education, which gives me an indication of somebody's ability to cope, or deal with difficult situations.

Family resources.

And also look at what a person's recollection of the event is, and their immediate experience afterward.

Because the recollection of the event, the awareness of the event, can have a tremendous bearing on how somebody responds or copes in the long term, after a traumatic injury or loss.

Q.     And how would you characterize Norris's behavior after his loss?

A.     In general, Norris displayed very little outward signs of any type of emotional reaction to his injury.

Rothke - Direct                                    12-87

There was no crying noted, no outward anger, no screaming.

Based on my interview with him, in terms of what he told me, he reports feeling largely the same after that injury as before.

Some of the interviews that I reviewed with family members indicate that he was somewhat more withdrawn, he was not as out with people as before, maybe kept to himself more, was somewhat more irritable, which is not uncommon after a traumatic injury.

Some people, rather than displaying outward depression, will withdraw and keep to themselves more.

There was a minor indication of that going on with Norris.

But in general, there did not appear to be a significant change from his behavior before his injury.

Q.   What, if any, kind of effort did Norris make to return to normal life after the injury?

A.   He made a very active effort to return to normal life after his injury.

He used his prosthetic device, his prosthetic leg fairly immediately, attempts to get back into