athletics.

Although he was no longer able to be on a school team, apparently he was involved in sports with friends.

He reports maintaining a social life.  He continued to date.

It appears to me that he made a very active attempt to fit back in with his usual social network of friends and family after his injury.

Q.    Did you get some information about Norris learning, down the road, about a new prosthetic device that he described?

A.    Yes.

The first prosthetic device he had he eventually outgrew.

He had another one.

And then he later learned about a newer prosthetic device called a flexi-foot, which very much appealed to him in terms of given that it would give him increased mobility.

It would allow him to move around more easily, and give him better balance, if he were to have the prosthetic device placed.

Q.    And did he report to you some problems in getting that device?

Rothke - Direct                                    12-89

A.    Yes.

By the time he learned of the flexi-foot, apparently he no longer had insurance coverage for a device that was that expensive.

Q.    And did you talk with him about how that related to his decision to commit the robbery?

A.    Yes, we did.

What he explained to me was that given that there were no other means available for obtaining this expensive device;

And given that his efforts at working several jobs didn't pan out for him, because most of them involved standing for long periods of time;

He then decided to proceed with his involvement with the bank robbery.

Q.    Doctor, before we go on to some more of your conclusions, let me back up for a minute, and ask about this -- what you have already talked about in the initial report from the hospital, and some of the other interviews that you have read.

There are some references in those things to Norris having some denial.

A.    Yes.

Q.    In your experience as a rehabilitation psychologist, can you kind of explain what that is?

A.    Yes.

Denial refers to an attempt to avoid thinking about or dealing with a problem.

In order to deny, we have to at some level have an awareness of something, whether it's an amputation injury, or spinal cord injury, the individual has to know that they've had the injury.

What usually occurs is they try to minimize the emotional impact on them.  They might say to themselves, "Well, I've had this injury, but I will walk again," or "I've had this injury, but life isn't going to be very different."

So they attempt to reduce the emotional impact on themselves, avoid the severe depression, avoid thinking about the potential catastrophic consequences that that injury might have on them.

So that tends -- it's a way that some people cope and minimize their anxiety or depression after an injury.

In a minor -- in a minor form, it's okay.  It helps somebody get through a rehabilitation program, it allows them to maintain hope that they'll improve.

When denial is very significant, and a patient says, "Well, I'm going to be well again, I don't need any of these therapies," then it becomes a

pathological or a problem.

Q.   Doctor, after reviewing all these records, and the other sources of information you were provided, were you able to draw some conclusions about that other question that you were asked, as to what if any impact the injury had on the current offense?

A.   Yes.

Q.   And what were those conclusions?

A.   Any conclusions were, given my interview, and examination, and record review with Mr. Holder, is that his amputation injury, his attempts to cope with it, and his need, his psychological need for that flexi-foot, was one of the motivations, was a motivation for his involvement in this crime.

Q.   As far as Mr. Holder's use of this denial concept, were you able to draw any conclusions as to how that relates to him, and his specific case?

A.   Yes.

Q.   And what were those?

A.   Mr. Holder, following his injury, attempted very hard to identify himself as an able-bodied individual, and not a disabled individual.

He participated in sports, again with friends.

In fact, he even injured his other foot in a football game with friends.

Continued in many ways to maintain normal activities.

He worked.

It was very, very important for him to return to life as an able-bodied and whole individual, and whole, w-h-o-l-e, a full individual.

And that's a theme that runs through many people who use denial.

That is, they want to be seen as whole again, and they fear being seen as mutilated, as less than whole, perhaps even as being unlovable or unapproachable because of the bodily injury.

So he was very much wrapped up in returning to life has a whole individual.

He needed that foot.

And as a result of his use of denial, that is not dealing with his emotional reaction, but only focusing on what he needed to do to return to being a whole individual, he eventually got involved in this crime, because that was the only way, in his eyes, he would be able to obtain the flexi-foot.

MS. BREWER:  Thank you, sir.

I don't have any other questions.

Judge, at this time I would ask for the admission of AA and FF.

THE COURT:  What is that?

MS. BREWER:  FF is the consultation report from St. Louis University Hospital.

MR. HOLTSHOUSER:  No objection.

THE COURT:  AA and FF are received.

(Defendant's Exhibits AA and FF received.)

CROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q.   Dr. Rothke, my name is Steve Holtshouser.

I have a few questions for you.  Okay?

A.   Good morning, sir.

Q.   First of all, Dr. Rothke, you are being paid for your testimony here today, are you not?

A.   I am being paid for my time.

Q.   Okay.

And when all is said and done here, how much will you be owed?

A.   Approximately $4,000.

Q.   Okay.

After you were done with all of your examinations, you basically concluded he does not suffer from any psychiatric or mental disorder?

A.   That's correct.

Q.   He was not mentally -- he is not mentally ill now; he was not mentally ill at the time of the bank

robbery?

A.   That is correct.

Q.   He knows right from wrong, and he knew it was wrong to rob the bank?

A.   Yes, he did.

Q.   And you found him to be normal in a wide variety of neuropsychological tests?

A.   Correct.

Q.   And in particular, do some of these tests test his problem-solving abilities?

A.   Yes.

Q.   Is the Wisconsin Card Sort Test a good test of problem-solving ability?

A.   Yes, it is.  It's one of the most widely used tests for that purpose.

Q.   Is that because the cards are constantly changing the problems, and changing the principles that he has to apply?

A.   Yes.

     What the test measures is what is called mental flexibility, the ability to take a different approach to a problem when the approach we are taking is no longer correct.

Q.   Does he have good problem-solving skills?

A.   Yes.

Q.   You also concluded that he had no reduced capacity to control his actions and responses?

A.   That's correct.

Q.   And your findings were consistent with those of Dr. Wetzel?

A.   In most almost every case, yes.

Q.   And he is a professor of neuropsychology at Washington University School of Medicine?

A.   Yes.

Q.   In interviewing Mr. Holder, did you credit anything that he said, did you give credibility to anything that he told you?

A.   Yes.

Q.   Did you look at a document from SLATE, St. Louis Agency on Training and Employment?

A.   Yes, I did.

Q.   And is there a document in there which indicated that prior to this leg injury, that Mr. Holder had a very poor willingness to work?

A.   I don't recall seeing that reference specifically, but I know that before his injury, I don't believe he was employed.

Q.   The injury occurred in October of '91, correct?

A.   Correct.  He was around 14 --

          MR. HOLTSHOUSER:  May I approach, your

Honor?

THE COURT: Yes.

BY MR. HOLTSHOUSER:

Q.   I am going to show you what's been marked as 107, and direct your attention to two evaluations of his willingness to work in August of '91, which would be prior to the leg injury, correct?

A.   Yes.

Q.   I direct your attention to the highlighted portion at the bottom.

A.   Yes.

Q.   Does that indicate that prior to the leg injury, Mr. Holder had a poor willingness to work?

A.   Yes.

Q.   And in fact there had been a decrease in his willingness to work throughout the course of his summer employment with that job?

A.   I believe that's correct.

Q.   And are you familiar with the job that he had for approximately two months, about the same time he received probation for the drug crime, at a place called Winner's Circle or New Horizons?

It was a telemarketing job.

A.   I remember him telling me about a telemarketing job.

Q.    That would be a sedentary type of employment, where he was sitting down, and didn't have to stand up?

A.    Correct.

Q.    Did he tell you why he left that job?

A.    Yes.

He said he felt bad because he felt what he was being asked to do was scam people.

That is, the telemarketing company was basically trying to sell a bill of goods to people that either wasn't honest, or not up to what was being advertised.

Q.    And did you review any of his probation officer records?

A.    Yes.

Q.    And in that, it indicated that he had told his probation officer that he was actually laid off of that job for calling in sick too much, without a valid excuse?

A.    Okay.  I don't recall seeing that specifically. I apologize.

Q.    I am going to show you what has been marked as Exhibit 98.

Does that appear to be a job application by Mr. Holder for a company called Food Team?

Roehke - Cross                                    12-98

A.   Yes.

Q.   And does it indicate there the reason that Mr. Holder put down on the application as to why he left the job at Winner's Circle or New Horizons?

A.   Yes.

Q.   What was the reason that Mr. Holder gave, before any of this happened?

A.   That he lost interest in the job.

Q.   Are you aware of any gainful employment that Mr. Holder had, other than the two-month job at Winner's Circle, and the one day at Food Team, between the time of the accident, and the time of the bank robbery?

A.   I don't know the names of employers, but I understand that he held several jobs that involved standing for long periods.

Q.   Who gave you that understanding?

A.   Mr. Holder himself, and I believe some of the interviews that were conducted.

Q.   Did you see any documentation of those jobs?

A.   No, I did not.

Q.   Are you aware of any other documentations of efforts to get employment in that period?

A.   No.

Q.   Are you aware of any person that he told, prior

to the bank robbery, and prior to being on trial here, that he wanted the a new leg so that he could get a job?

A.   I don't recall seeing documentation of that. That's something he did tell me in my interview.

Q.   Are you aware of any effort made by him, prior to the bank robbery, to get a new leg legitimately?

A.   From what I understand, he believed he no longer had insurance coverage for that.

Q.   Are you aware of any effort made by him to get the leg legitimately?

A.   I don't know how he went about that, or he found out that he had no insurance coverage.

Q.   I understand that he was told he didn't have insurance coverage.

Are you aware of any effort, on his part, to obtain the leg legitimately, other than seeing if he had insurance?

A.   No.

Q.   No effort that you are aware of to try to get either of his parents to use their financial resources to purchase it?

A.   I have no awareness of that.

Q.   Any effort to use his own financial resources, such as the $500 a month he was receiving, to

purchase it?

A.   No.

Q.   Any effort to try and use the present value of the $15,000 he is going to receive in the year 2005 to purchase the leg legitimately?

A.   No, I have no awareness of that.

Q.   Did you look at some documents from a person named Gil Christley, who is the prosthesis orthotic expert who saw Mr. Holder in February of '96?

A.   If it was part of one of the hospital records, I probably would have seen that, but I don't remember seeing a separate evaluation.

     I apologize.  There were a lot of records I reviewed.

Q.   I direct your attention to 102a, which have already, I believe, been identified.

     There is a paragraph there at the end, a visit by Mr. Holder in February of 1996 to Mr. Christley?

A.   Okay.

Q.   And does it indicate there that Mr. Christley advised Mr. Holder that he didn't have insurance for a flexi-foot, but that he should go to something called vocational rehabilitation?

A.   Yes.

Q.   And as a rehabilitation psychologist, are you

Roanke - Cross                                    12-101

familiar with what vocational rehab is?

A.   Yes.

Q.   And it is basically a state-funded agency that uses state funds to help people with handicaps become employed?

A.   Yes.  The title of the agency may vary from state to state, but that's one of the purposes of those agencies.

Q.   And even though you are from Illinois, you know that we have one in Missouri that would have covered Mr. Holder that, if he was interested in getting employment, might have helped use state funds to buy this new leg?

A.   I am not specifically familiar with what is available in Missouri, but I know that most states have agencies similar to that.

Q.   And you have worked with patients who are amputees who have their prothesises, is that correct?

A.   Right.

Q.   Prostheses bought with state funds?

A.   Yes.

     If it is determined that they have potential to work, then equipment and therapies are usually paid for.

Q.   Okay.

Rothke - Cross                                    12-102

And are you aware of any effort on Mr. Holder's part to take Mr. Christley's recommendation and go to vocational rehab?

A.     I didn't see any indications of that.

Q.     And you are aware that at the time he was arrested for this crime, he told the FBI that the reason that he did it -- and this is hours after the robbery -- the reason that he did it is because he needed money for a lawyer, and he wanted to start from scratch and live right?

A.     I was not familiar with that.

Q.     So you were not able to question him why he is now telling you a different story, if you were not familiar with it?

A.     Correct.

Q.     Did you notice in the probation records that Mr. Holder had failed to comply with the direction to attend employment counseling, to go to something called Opportunity Clearing House, to go to the Division of Employment Security?

A.     I believe I did.

Q.     Does that sound to you like someone with a strong willingness or desire to work?

A.     It would suggest an individual does not have a strong desire to work.

Q.    This concept of denial, would it be consistent or inconsistent with emotional denial of the amputation, if Mr. Holder used the leg as an excuse why he was carrying a gun when arrested in June of '94?

A.    If one is using prosthetic leg as an excuse for carrying a gun, that really doesn't have anything to do with denial.

What we sometimes see with individuals with a physical disability is they are left feeling more vulnerable; that is, if someone is in a wheelchair or someone has a prosthetic leg, they might be more easily attacked or robbed or caught by somebody else, and so as a result, may feel less secure.

Q.    But if you feel less secure, it's because you are conscious of the fact that you have a problem, correct?

A.    Correct.

            MS. BREWER:    Judge, I would object.    That calls for speculation.

            THE COURT:    Overruled.

BY MR. HOLTSHOUSER:

Q.    And that that solution to that problem is to carry a gun?

A.    In some cases, it is.

Q.   And is that consistent or inconsistent with denying, being in denial that you have the handicap?

A.   Oh, I understand the question now.

Q.   The first part of the question was consistent or inconsistent?

A.   Well, I think the definition of denial that we have talked about is somewhat misleading.

Denial doesn't mean that you don't recognize that something has happened, or that you don't recognize that you have an amputation.

What it means is you are minimizing the implications of it; it's not that you are saying, "I didn't lose my leg, it's "Well, I'll still manage, I'll still be okay."

They don't face the grief in response to the loss.

It's not that they're saying "I didn't have an accident," other than in very, very severe cases of denial.

Q.   I guess I'm not sure I got an answer.

Is the -- is that consistent or inconsistent with the kind of emotional denial you are talking about?

A.   The fact that someone would say, "I'm carrying a gun because of my amputation injury," it doesn't have

anything to do with denial.

Q.    Okay.

And if he, at some point in a meeting with his probation officer, put his prosthesis up her desk, pulled his pants leg down, and said, "Miss Alexander, you forget that I have a prosthesis."

Is that an example of denial?

A.    No.  That's an example of recognizing one's limitations; or it could be.

Q.    What if any psychological conclusions do you draw from the fact that he has a seemingly high capacity for play, such is basketball, athletics, other things as that, after the amputation, but such a low capacity for work?

A.    From what I have reviewed of the evaluations, I would not say that Mr. Holder has a low capacity for work.

My testing, and Dr. Wetzel's testing, would suggest this is a man with a lot of abilities, who was capable of a lot more than what he did.

So I would not say he had a low capacity for work.

Q.    So would you say then that the lack of work was due to a lack of willingness to work?

A.    Either a lack of willingness or a lack of

opportunity.

MR. HOLTSHOUSER: Nothing else, Judge.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. BREWER:

Q.   Doctor, just briefly, let me clarify:

You, as far as the records you have reviewed, those have been things that I have provided to you, is that correct?

A.   Correct.

Q.   And you are not aware of any of Mr. Holder's efforts with Mr. Christley to obtain a leg that aren't recorded?

A.   Correct.  I had not seen that report.

MS. BREWER: Thank you.  I don't have any other questions.

THE COURT: You may step down, sir.  You are excused.

(Witness excused.)