UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NORRIS HOLDER,                          )
                                        )
                    Movant,             )
                                        )        No. 4:03CV0923 ERW
        vs.                             )
                                        )        *This is a Capital Case*
UNITED STATES OF AMERICA,               )
                                        )
                    Respondent.         )

### MOVANT'S REPLY IN SUPPORT OF HIS MOTION UNDER 28 U.S.C. § 2255 MOTION TO VACATE, SET ASIDE OR CORRECT CONVICTIONS AND SENTENCES

Movant, Norris Holder, by and through counsel, Christopher E. McGraugh and Michael J. Gorla, submits this Reply in response to the Government's Response in opposition to movant's § 2255 motion.  Holder re-asserts all factual and legal allegations contained in his § 2255 motion.  In every instance in which he does not reply specifically to arguments made by the government in its response, he relies on the factual and legal allegations in his § 2255 motion.

### Chapter 154 - Special Habeas Corpus Procedures in Capital Cases - Does Not Apply to § 2255 Motions

The government asserts that, under 28 U.S.C. § 2266(b)(1)(A), this Court is required to enter a final judgment on movant's § 2255 motion not later than 180 days after the date on which the application is filed.  Since movant filed his motion on June 8, 2004, the government asserts that this Court must enter a final judgment no later than December 4, 2004.  The government's assertion is clearly incorrect.

The time limits set out in § 2266(b)(1)(A) are contained in Chapter 154 of the United States Code titled *Special Habeas Corpus Proceeding in Capital Cases*.[1]  Chapter 154 governs prisoners in state custody subject to a capital sentence who have filed habeas petitions under Title 28 U.S.C. § 2254 in a state which has complied with the opt-in requirements set out in § 2261.  Section 2261(a) unequivocally states that "[t]his chapter shall apply to cases arising under § 2254 brought by prisoners in state custody who are subject to a capital sentence."  While § 2266(a) does direct that § 2255 motions by a person under a sentence of death be "given priority by the district court . . . over all non-capital matters", the statute specifically states that the time limitations set forth in § 2266(b) apply only to "a writ of habeas corpus brought under this chapter in a capital case. "  The reference to § 2255 in § 2266(a) is solely to provide that such motions involving capital cases be given priority on the district court docket.  Had Congress wanted to include capital motions under § 2255 within the confines of Chapter 154, it would have specifically done so by including a provision to that effect in § 2261(a).

Given the plain language contained in § 2261(a), the special procedures set out in Chapter 154 do not apply to capital cases arising under 28 U.S.C. § 2255.  Accordingly, this Court need not resolve movant's § 2255 motion within 180 days of the filing date.

**Movant is Entitled to an Evidentiary Hearing**

Movant is entitled to an evidentiary hearing on the claims raised in his § 2255 motion "unless the motion, files and record conclusively show that he is not entitled to relief."[2]  Movant submits that

---

[1] 28 U.S.C. §§ 2261-2266.

[2] *See Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001); 28 U.S.C. § 2255, ¶ 2.

his ineffective assistance of counsel claims set out in ¶¶ 12.C(a) - (k) of his § 2255 motion allege specific facts, not conclusions, which if true would entitle him to relief. These allegations are neither contradicted by the record nor inherently incredible. Thus, movant is entitled to an evidentiary hearing to prove these claims.[3]

Further, the government alleges that claims 12(A) and (B) have been procedurally defaulted. The determination of whether a procedural default occurred, and if so, whether cause and prejudice exists to excuse the alleged procedural default involves factual questions. In this case, these questions revolve around the competence of trial counsel and include whether the basis of a decision not to object was tactical; whether movant's attorney was aware of the relevant facts when the alleged default occurred; whether movant's attorney should have anticipated the since recognized claim that he failed to raise; and the degree of prejudice resulting from the unobjected to error. Once the government raises a procedural default issue, a hearing must be held on the controverted facts surrounding the alleged default, and any excuses for it.[4] Accordingly with respect to Claims (A) and (B), movant is entitled to an evidentiary hearing to prove the existence of cause and prejudice.

---

[3]*See, e.g., Fontaine v. United States*, 411 U.S. 213, 215 (1973) (reversing summary dismissal and remanding for a hearing because the motion, files and records of the case did not conclusively show that petitioner is entitled to no relief); *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994) (district court erred by denying evidentiary hearing on allegations of ineffective assistance that were neither inadequate on their face nor conclusively refuted by the record).

[4]*See United States v. Wright*, 43 F.3d 491, 497-500 (10th Cir. 1994) (remanding § 2255 motion to district court for hearing on factual allegations underlying movant's arguments of cause and prejudice); *see also Simmons v. Lockhart*, 856 F.2d 1144, 1145-46 (8th Cir. 1988) (recalling the mandate, and remanding to district court for an evidentiary hearing to determine, inter alia, why ineffectiveness claim was not raised before state court).

### 12(A).  Violation of Fifth Amendment Indictment Clause.

The government submits that this claim is procedurally defaulted because it was neither raised at trial nor on direct appeal.  Assuming for the sake of argument that the claim was procedurally defaulted, cause, in the form of ineffective assistance of counsel, and prejudice exist to excuse the claimed procedural default.

In ¶ 12(C)(a), movant sets out specific allegations supporting his position that counsel's failure to raise this issue at trial and on direct appeal was deficient performance - the failure to use the skill and care of a reasonably competent attorney in the same or similar circumstances.[5]  The government fails to address movant's facts supporting the existence of cause, instead stating that *Apprendi v. New Jersey*,[6] were issued prior to the time that movant's conviction became final.  Further, assuming cause, the government asserts that movant cannot show that he was prejudiced by the government's failure to include the aggravating circumstances in the indictment.  The government's position is suspect for a number of reasons.

First, there can be no question that movant would have received the benefit of *Apprendi* if trial and direct appellate counsel would have pursued the claim.  The *Apprendi* decision, as well as the decision in *Ring v. Arizona*,[7] were issued prior to the time that movant's conviction became final.  There is no retroactivity problem where a movant shows that his lawyer rendered deficient

---

[5]Movant's § 2255 motion, p. 5-7.

[6]530 U.S. 466 (2000).

[7]536 U.S. 589 (2002).

performance in not raising the claim based on case law that existed before his conviction became final.[8]

Second, the government misstates the prejudice analysis.  The government believes that movant can only establish prejudice by showing that "the error created a fundamental defect which inherently resulted in a complete miscarriage of justice and that its claim presents exceptional circumstances."[9]  But, the Supreme Court has not provided a precise definition of the prejudice half of the cause and prejudice exception to the procedural default doctrine.[10]  In the context of death penalty cases, a movant would clearly be prejudiced in situations where, but for counsel's error, he or she would not have been subject to the death penalty.[11]  Movant can surely meet this definition of prejudice.  But for counsel's failure to object that movant's sentence of death was not authorized by the crime for which he was indicted, movant would not now be under a sentence of death.

In Claim 12(C)(a), movant claims that trial counsel rendered ineffective assistance of counsel in failing to object to the indictment on the basis that it failed to charge a capital offense.  The analysis as to why counsel's performance in that regard was ineffective supports movant's position that cause and prejudice exist to excuse the alleged procedural default of this claim.  Rather than repeat that argument here, movant incorporates that portion of his reply herein.[12]

---

[8]*See Brown v. United States*, 311 F.3d 875, 877 (8th Cir. 2002).

[9]*See* Government's Response, p. 38.

[10]*Amadeo v. Zant*, 46 U.S. 214, 221 (1988); *United States v. Frady,* 456 U.S. 152, 168 (1982).

[11]*See Reed v. Ross*, 468 U.S. 1, 12 (1984).

[12]*Infra* p. 7-9.

**12(B).  Jury's Improper Consideration of the Pecuniary Gain Statutory Aggravator.**

The government alleges that this claim is procedurally defaulted, and that, even if movant can shown cause to excuse the procedural default, he is unable to prove prejudice.  The government's argument is based on two reasons.  Initially, the government opines that because there was overwhelming evidence to support the grave risk of death statutory aggravator, the jury did not need to find the pecuniary gain aggravator in order to find movant eligible for the death penalty.  Next, the government alleges that the jury's consideration of the pecuniary gain aggravator did not effect the selection process because, once the jury found that movant was eligible for the death penalty, the pecuniary gain statutory aggravator did not have any special meaning.  It was just one of the facts to be weighed by the jury in considering whether or not to return a sentence of death.

Claim 12(C)(i) is a claim that trial counsel was constitutionally ineffective for failing to object to the court's submission of the pecuniary gain statutory aggravator to the jury.  Movant addresses this issue later in this reply.[13]  The analysis as to why counsel's performance was ineffective in not objecting to the jury's consideration of pecuniary gain aggravator supports movant's position that cause and prejudice exist to excuse the alleged procedural default of this claim.  Rather than repeat that argument here, movant incorporates that portion of his reply herein, and submits that the cause and prejudice exception excuses the alleged procedural default of this claim.

---

[13]*Infra* p. 20-29.

### 12(C)(a).  Failure to Challenge the Indictment on the Ground that It Failed to Charge a Capital Offense.

The government's position is that counsel's failure to raise an *Apprendi*-like challenge to the indictment is not "per se ineffective assistance of counsel."  Alternatively, the government asserts that even if effective counsel would have raised this issue, the court of appeals would have found any error to be harmless beyond a reasonable doubt because the petit jury made all the findings required for the imposition of the death sentence, and movant had notice of the aggravating circumstances and the fact that the government was seeking the death penalty.  The government's reasoning is flawed for a number of reasons.

First, *Brown v. United States*,[14] the case relied on by the government to support its position that counsel's performance was not deficient, is clearly distinguishable from movant's case.  Brown argued that his counsel was ineffective for failing to challenge his sentence on the basis that the trial judge relied on facts - the amount of cocaine involved - to increase his punishment where said facts were not proven and found by a jury beyond a reasonable doubt.  The *Apprendi* decision was issued after Brown's main criminal proceedings had been completed.  The Eighth Circuit denied relief, declining to find counsel ineffective for failing to predict future developments in the law.

By contrast, the *Apprendi* decision was firmly established at the time that movant's case was in the district court.  Further, as set out in movant's § 2255 motion, counsel for co-defendant Billie Allen attacked the indictment on the ground that it failed to charge a capital offense.  Further, counsel was in possession of sample motions prepared by Federal Death Penalty Resource counsel

---

[14]311 F.3d 875, 878 (8th Cir. 2002), *cert. denied*, ___ U.S. ___, 124 S.Ct. 229 (2003).

which specifically included such a claim.  But, counsel unreasonably and inexplicably failed to file such a motion on movant's behalf.[15]

Second, the government relies on *Neder v. United States*[16] to support its position that the failure to submit the aggravating circumstances to the grand jury was harmless error.  *Neder* involved a situation where the district court failed to submit an element of the offense - materiality - to the jury in a tax fraud case.  The Supreme Court held that the trial court's error in refusing to submit the materiality issue to the jury was harmless, finding that no jury could reasonably have found that defendant's failure to report substantial amounts of income was not a material matter.  The government theorizes that if the petit jury's failure to find an element of the offense can be considered harmless error as in *Neder*, then certainly a grand jury's failure to find an element should also be analyzed under the harmless error doctrine.  The government argues that since the petit jury in movant's case made all the findings required for the imposition of the death sentence, then a grand jury, which operates under a lower standard of proof, would surely have found the aggravating circumstances as well.  But, the government's position overlooks a number of factors.

The viability of the *Neder* decision is called into question by the decisions in *Apprendi v. New Jersey*,[17] *Ring v. Arizona*,[18] and *Blakely v. Washington*.[19]  Said decisions clearly dictate that a

---

[15]*See* § 2255 motion, p. 5-7.

[16]527 U.S. 1, 7 (1999).

[17]*Supra*.

[18]536 U.S. 589 (2002).

[19]____ U.S. ____, 124 S.Ct. 2531 (2004).

criminal defendant has a right to have sentencing elements that increase one's punishment submitted to, and found by a jury beyond a reasonable doubt.

Further, the government's argument, if sustained, would render the Fifth Amendment Indictment Clause meaningless.  No defendant would ever have to be indicted by a grand jury.  The government could simply proceed by information, and as long as a petit jury finds the elements beyond a reasonable doubt, assert that any error in proceeding without an indictment was harmless because surely the grand jury would have found said elements as well.

The government characterizes this claim as one where movant claims that he was misled into believing that the government would not seek the death penalty and that he was surprised when they did.  That is not the issue.  The issue is whether movant had a right to be indicted and charged with the offense for which he was convicted.  Clearly, the Fifth Amendment gives him that right.[20]  Since the statutory aggravators were not included in the indictment, movant was charged with a non-capital offense, and thus, was not eligible for the death penalty.

### 12(C)(b).  Advising Movant to Testify When His Testimony Made Him Eligible for the Death Penalty.
### 12(C)(c).  Acknowledging Movant's Guilt in Opening Statement, Throughout the Trial, and in Closing Argument.

The government's submits that counsel Shaw's performance in advising movant to testify even though his testimony made him eligible for the death penalty, and acknowledging movant's guilt throughout the course of his trial did not constitute ineffective assistance of counsel.  Instead, the government asserts that counsel's performance was part of a reasonable trial strategy to gain

---

[20]*See Stirone v. United States*, 316 U.S. 212, 215-17 (1960); *see also, United States v. Johnson*, 934 F.2d 936, 941 (8th Cir. 1994).

credibility before the jury and obtain leniency in the second phase of the trial. The government's position is based on its misunderstandings of the law, and misinterpretation of the facts.

Under the Sixth Amendment, a criminal defendant is constitutionally entitled to receive the effective assistance of counsel.[21] To prevail on a claim of ineffective assistance of counsel, a claimant must show that counsel's performance was constitutionally deficient in light of the prevailing professional norms, and that he was prejudiced thereby.[22] Prejudice is established when a claimant can show that, but for counsel's errors, the result of the proceeding would have been different.[23]

In *United States v. Cronic*,[24] decided on the same date as *Strickland*, the Supreme Court created an exception to the *Strickland* prejudice standard, and recognized that certain circumstances are so egregious that prejudice will be presumed.[25] These circumstances are: one, "if the accused is denied counsel at a critical stage of the trial"; two, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and three, where "the surrounding circumstances make it so unlikely that any lawyer could provide effective assistance . . .."[26]

The Due Process Clause of the Fifth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with

---

[21]*Strickland v. Washington*, 466 U.S. 668 (1984).

[22]*Id*. at 687.

[23]*Id*. at 694.

[24]466 U.S. 648 (1984).

[25]*Id.* at 658; *see also Stano v. Dugger*, 921 F.2d 1125, 1152 (11th Cir. 1991).

[26]*Id*. at 659-61.

which he is charged.[27]  Due process also commands that no man shall lose his liberty unless the

government has born the burden of producing the evidence and convincing the fact finder of his

guilt.[28]  When a defense attorney concedes that there is no reasonable doubt concerning the only

factual issues in dispute, the government is relieved of its burden of persuasion, and the adversary

system breaks down.[29]

The *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death

Penalty Cases* require that counsel obtain copies of the charging documents and analyze them in the

context of the applicable law to identify the elements of the charges, including those which would

made the defendant death penalty eligible.[30]  Accordingly, the ABA Guidelines require that counsel

identify defenses ordinary and affirmative that may be available to the substantive charge and to the

applicability of the death penalty.[31]  The ABA Guidelines further require that counsel engage in an

interactive dialogue with his client concerning all matters that might reasonably be expected to have

---

[27]*In re Winship*, 397 U.S. 358 (1970).

[28]*Speiser v. Randall*, 357 U.S. 513, 526 (1958).

[29]*See, e.g., United States v. Swanson*, 943 F.2d 1070, 1073 (9th Cir. 1991) (defense counsel's
concession during closing argument that no reasonable doubt existed regarding the only
factual issues in dispute constitutes deprivation of right to due process and effective
assistance of counsel that was prejudicial per se).

[30]American Bar Association, *ABA Guidelines for the Appointment and Performance of
Defense Counsel in Death Penalty Cases* 10.7, 31 Hofstra Law Review 913, 1015 (2003).

[31]*Id*. at 1018.

a material impact on the case such as the progress of the factual investigation, current and potential legal issues and development of a defense theory and the presentation of the defenses.[32]

Lead trial counsel Shaw provided ineffective assistance of counsel to movant. His ineffectiveness stemmed from the fact that he was unaware of the essential elements of the offense with which movant was charged. Counsel Shaw acted under a mistaken belief that the law required the government to prove that movant specifically deliberated on the killing of the guard in order to be convicted of the offenses charged in the indictment. He was under the impression that the federal death penalty law mirrored Missouri state law as to a co-defendant's liability for the death penalty. Because counsel Shaw did not understand the nature of the federal offense with which movant was charged, he convinced movant to testify. By doing so, movant unknowingly acknowledged the elements of a federal capital crimes with which he was charged, and made himself eligible for the death penalty. Movant's testimony was the functional equivalent of an unknowing plea of guilty to the capital offenses with which he was charged.[33] Counsel's performance in this regarding was clearly ineffective. Further compounding matters, counsel Shaw unreasonably and unknowingly made statements in his opening and closing arguments which effectively conceded movant's guilt and his eligibility for the death penalty.[34] Following are excerpts from counsel Shaw's arguments:

[32]*Id*. at 10.5, *Relationship with Client*, p. 1005.

[33]*Cf. Cox v. Hutto*, 589 F.2d 384, 386 (8th Cir. 1979) (due process violation found where counsel stipulated to the existence of several prior offenses which were used for sentence enhancement without client's consent).

[34]*See Francis v. Spraggins*, 720 F.2d 1190, 1194-95 (11th Cir. 1983), *cert. denied*, 470 U.S. 1059 (1985) (counsel ineffective for stating in closing argument that defendant is guilty of crime charged); *see also Wiley v. Sowders*, 647 F.2d 642, 649-50 (6th Cir. 1981) (counsel ineffective for stating in closing argument that defendant was guilty beyond a reasonable doubt without client's consent).

The judge will explain to you later on what malice of forethought means, but you got to find that he intended the death of Heflin.  Now the evidence is going to show you that this Mr. Heflin was purposely shot by this person known as Billie Allen.[35]

. . .

We will at the end of this case ask that he be found not guilty of murder, as "murder" will be explained to you by the Judge.  As far as the robbery, with candor and with fore rightness you will hear that he committed that robbery.[36]

. . .

You have to leap frog.  In order to convict him of murder, you gave to leap frog over what these people have told you, the people in the bank and just, convict him of murder because tragically, manically and completely without justification, Billie Allen shot and killed Mr. Heflin.[37]

. . .

That is the reason is here.  He has admitted to robbery, but the murder, any intention, even knowledge that Mr. Heflin was shot, he wasn't in the bank.[38]

. . .

We admitted and I told you at the beginning that defendant was involved in this robbery; and that he did, was, of course, punishable, and what he did was inexcusable.  We offer no excuses for this part in this.  We are not asking to be excused for it.  But we reject totally the charge of murder.  Now, you can say what you want, but murder takes an intention for someone to be killed.[39]

The government concedes that movant made the following admissions during the course of

his testimony, which provided sufficient evidentiary support for both his conviction of the charged

---

[35]Transcr. Vol. I, p. 64.

[36]Transcr. Vol. I, p. 69.

[37]Transcr. Vol. XII, p. 77.

[38]Transcr. Vol. XII, p. 80.

[39]Transcr. Vol. VII, pp. 86, 87.

offenses and his eligibility for the death penalty: movant admitted to purchasing and/or providing the assault rifles used during the robbery and the bullet proof vests worn by he and his co-defendant during the course of the robbery; admitting that he loaded the guns the evening before the robbery and went into the bank with the weapons ready to be fired; admitted that he willfully and intentionally took part in the bank robbery; and that his actions in doing so were reckless and placed everyone at the bank at a grave risk of death. Further, the government used these concessions in its closing argument to support its quest for the death penalty:

> If he did everything he did in this case and stayed at home, knowing that Billie Allen was going to pop somebody, and that Billie Allen was going to go wild in there, if he still planned the whole thing like he did, casing it out, getting the vest, getting these weapons together, and then gave this weapon to Billie Allen, with all these bullets that you saw here, and the shotgun, and set up the getaway vehicles for him, and this defendant stayed at home, while Billie Allen went in and murdered Richard Heflin, he should still get the death penalty, because he made it happen.[40]

Counsel's performance in advising movant to testify where, through his testimony, movant admitted the elements of the federal capital offenses with which he was charged, thus making him eligible for the death penalty, and in acknowledging movant's guilt throughout the course of the trial, constituted a breakdown in the adversarial system. Under *Cronic*, prejudice is presumed, and movant is entitled to a new trial. At the very least, movant is entitled to an evidentiary hearing because his § 2255 motion alleges facts, not conclusions, which are not refuted by the record, and which, if true, would entitled him to relief.[41] Counsel Herndon, other members of the defense team, and other witnesses will testify that counsel Shaw's decision to advise movant to testify and to

---

[40]Transcr. Vol. XII, p. 219.

[41]*See* § 2255 motion, p. 7-13.

acknowledge movant's participation in the robbery was not based on reasonable trial strategy, but instead the result of counsel Shaw's unfamiliarity with federal death penalty law.

### 12(C)(e).   Failure to Investigate, Identify, Interview and Present a Favorable Defense Witness.

While acknowledging that defense counsel has an obligation to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary, the government claims that the record conclusively shows that movant is not entitled to relief on this claim.  The government relies upon a number of reasons for this position.  However, an examination of each of these reasons shows that the government's reasoning is flawed.

Initially, the government claims that movant is not entitled to relief because he did not allege that he specifically directed defense counsel to interview this particular witness.  This reasoning flies in the face of the *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*.  The Supreme Court of the United States has referred to these guidelines as "standards to which we long have referred to as guides to determining what is reasonable."[42]  The ABA guidelines provide that mitigation investigations "should comprise efforts to discover all reasonably available mitigating evidence, and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."[43]  Defense counsel was in possession of the police report which referenced the unnamed witness.  The facts contained in said report clearly indicated that said witness may be a source of mitigating evidence on behalf of the movant.  Defense counsel's duty to conduct the mitigation

---

[42] *Wiggins v. Smith*, 539 U.S. 510, _____ ,123 S.Ct. 2527, 2536-37 (2003).

[43] *See* ABA Guidelines, 10.7(A)(2), 31 Hofstra Law Review at 1015.

investigation does not dissipate because of the fact that the movant himself did not specifically request that said witness be interviewed.

The government next asserts that any testimony from the unnamed witness would have been inherently unreliable because movant's statement was "an after-the-fact expression of remorse." But, this ignores the fact that the government presented evidence and argued in the penalty phase closing argument that movant has shown no remorse for the death of the victim. The testimony from the witness would show, in fact, that unlike Billie Allen, movant expressed his remorse for the victim's death.

The government also claims that trial counsel determined that the inmate/witness's credibility would have been attacked by the government, and based his decision not to investigate on that reason. The government's reasoning in this regard is pure speculation. The government has no idea why this particular witness was not identified, interviewed, and thereafter presented in the penalty phase of the trial. Defense counsel's decision with regard to this particular witness can only be decided after an evidentiary hearing before this Court.

The government next claims that any testimony that would have been provided by this witness would have been cumulative of other evidence presented at the penalty phase. But, even if that were true, this fact would still not change the mitigating nature of the evidence. The government argued in its penalty phase summation that movant expressed no remorse for the death of Mr. Heflin.[44] Evidence that movant expressed his remorse to a fellow inmate at a time obviously when it would not benefit movant to do so, would clearly be evidence that would have rebutted part of the government's aggravating evidence.

---

[44]Transcr. Vol. 12, p. 226.

Finally, the government alleges that even if counsel were deficient in failing to identify, interview, and present the witness's testimony during the penalty phase, movant was not prejudiced by counsel's performance.  In order to establish prejudice, movant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.[45]  In determining prejudice at the penalty phase of a capital trial, the court should "reweigh the evidence in aggravation against the totality of the mitigating evidence."[46]  Again, it is hard to determine the prejudice that stemmed from counsel's failure to interview and present a particular witness until that witness appears and testifies before this Court.  After this Court hears what this witness would have testified to before the jury, it may very well conclude that his testimony may have persuaded at least a single juror to return a sentence other than a sentence of death.  This Court simply cannot rule on this claim without the benefit of an evidentiary hearing.

### Claim 12(C)(f).  Failure to Investigate and Present Evidence of Movant's Mental Condition.

The government submits that movant is not entitled to relief on this claim because all of the information available to counsel Jennifer Herndon, including the reports of two psychologists retained by her, and the government psychologist, concluded that movant had no history of any significant brain injury.  Additionally, the government opines that there is no prejudice since the facts of the crime foreclose a claim of brain-damaged-caused naivete.  But, the government's conclusion is not supported by the record.

---

[45] *Strickland v. Washington*, 466 U.S. at 694.

[46] *See Wiggins v. Smith*, 123 S.Ct. at 2542.

Movant expects that counsel Herndon will testify at an evidentiary hearing that she suspected movant had brain damage and other neurological deficiencies. The fact that she retained Dr. Semone prior to trial corroborates that counsel Herndon's harbored these suspicions. Apparently, counsel Herndon must have realized the lack of adequate investigation into movant's neurological condition and thus, retained Dr. Semone to do further testing. If counsel Herndon has been presented with Dr. Semone's finding that movant's brain damage would have cause him to form a belief that his actions would not have caused a grave risk of death to others at the bank, she would have presented his testimony. Said evidence would have negated the grave risk of death statutory aggravator submitted by the government.

In *Wiggins v. Smith*,[47] counsel failed to investigate beyond a pre-sentence report (PSR) and Department of Social Service (DSS) records. Said records alluded to Wiggins having an alcoholic mother, and suggested that he experienced problems in foster care. In deciding whether Wiggins received ineffective assistance of counsel, the Supreme Court focused on whether the investigation supporting counsel's decision not to introduce mitigation evidence of Wiggins' background was in itself reasonable.[48] The *Wiggins* court held that counsel's decision not to expand their investigation beyond the PSR and DSS records fell short of the prevailing professional standards. The Court defined these standards in death penalty cases as being the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*.[49] Applying the ABA standards, the Supreme Court found counsel ineffectively abandoned their investigation of movant's background

---

[47]539 U.S. 510 (2003).

[48]*Id*. at 523.

[49]*Id*. at 524.

after having acquired a rudimentary knowledge of *Wiggins*' history from a narrow set of sources.[50]

The *Wiggins* case stands for the proposition that the ABA standards for counsel on death penalty cases provide the guiding rules and standards to be used in defining prevailing professional norms.[51]   Under ABA Guideline 10.7,[52] counsel has an obligation to conduct a thorough and independent investigation relating to the issues at both the guilt and penalty phases of the trial.

Movant has pled sufficient facts in his § 2255 motion alleging that movant's counsel failed to conduct thorough investigation into movant's mental condition and, as a result, deprived movant of relevant mitigating evidence.   Since these facts are neither refuted by the record nor inherently incredible, movant is entitled to an evidentiary hearing to prove this claim.

### 12(C)(h).  Sleeping Trial Counsel.

In response to this claim, the government asserts that there is no evidence in the record that counsel Shaw was asleep during portions of the trial.  Alternatively, assuming that counsel Shaw did sleep through portions of the trial, the government asserts that he fell asleep during unsubstantiated portions of movant's trial, causing no harm.

The absence of counsel at critical stages of a defendant's trial is a structural defect which undermines the fairness of the proceeding and yields a presumption of prejudice.  A defendant's

---

[50]*Id.*

[51]*See Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003).

[52]ABA Guidelines, 10.7, *Investigation*, 31 Hofstra Law Review at 1015.

19

Sixth Amendment right to counsel is violated when the defendant's counsel repeatedly sleeps through critical stages of the proceeding.[53]

Movant has pled that counsel Shaw slept during critical stages of the guilt and penalty phases of his trial.  Said allegations are not refuted by the record, and an evidentiary hearing is required to give movant an opportunity to prove the facts supporting this claim.

### 12(C)(i).  Failure to Object and Move to Strike the Pecuniary Gain Aggravator.

Congress enacted a death sentencing scheme under which the jury cannot consider the death penalty for a capital crime unless (1) the jury finds the requisite intent, and (2) the jury finds the existence of at least one statutory aggravating factor.[54] The list of aggravating circumstances applicable to the charges facing Mr. Holder appear in § 3592 (c).  The first statutory aggravating circumstance contains a list of federal crimes, the commission of which renders a defendant eligible for the death penalty whenever someone dies in the course thereof.[55]  Neither robbery generally nor bank robbery specifically is designated among those crimes that are automatically "death penalty eligible."[56]

The statutory aggravators identified in § 3592 (c) include a pair of circumstances that systematically describe the two parties to a "murder for hire" scenario:  the payor and killer.

---

[53]*United States v. Burdine*, 262 F.3d 336, 348-49 (5th Cir. 2001).

[54]18 U.S.C. § 3591 (a)(2); 3593 (d).

[55]18 U.S.C. § 3592 (c)(1).

[56]*Id*.; *United States v. Chanthadara*, 230 F.3d 1237, 1263 (10th Cir. 2000).

**Procurement of offense by payment.** The defendant procured the commission of the offense by payment, or promise of payment or anything of pecuniary value.[57]

**Pecuniary gain.** The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.[58]

By its plain terms, the "pecuniary gain" aggravating circumstance refers to a killer hired by another person to commit a murder in exchange for payment either before or after the killing.[59] Said factor immediately follows and mirrors the aggravating circumstance applicable to the 'payer' who engages the killer to commit the crime.

The government asserts that the aggravator "Did Norris Holder commit the offense in expectation of anything of pecuniary value" is supported merely by the fact that jury could find that the bank guard was killed to eliminate his resistance to the bank robbery and, therefore, pecuniary gain was expected to follow as a direct result of murder. However, this was not the evidence and the government has essentially taken the pecuniary gain label as a license to apply the aggravating circumstance whenever a criminal incident involves "pecuniary gain", whether or not the murder was specifically committed in expectation of pecuniary gain.

---

[57] 18 U.S.C. § 3592(c)(7).

[58] 18 U.S.C. § 3592(c)(8)

[59] *See* United States v. Davis, 904 F. Supp. 554, 558 n.3 (E.D. La. 1995) (pecuniary gain factor in Section 3592 (c)(8) upheld against vagueness challenged because it refers to murder for hire); United States v. Cuff, 38 F. Supp.2d 282, 288 (S.D. N.Y. 1999) (pecuniary gain aggravator applies to circumstances where pecuniary gain flows directly from the killing).

21

The government's position differs from that of the Fifth and Tenth Circuit Courts of Appeals addressing the applicability of 18 U.S.C. § 3592 (c)(8).[60]  Both circuit courts of appeals have held that the "pecuniary gain" aggravating circumstance does not apply to murders committed during robberies without proof that the pecuniary gain was expected to flow directly for the commission of the murder itself.

In U*nited States v. Chanthadara*,[61] the defendant and four others planned to rob a restaurant owned by Mark and Barbara Sun.  Chanthadara dragged Barbara to a locked safe, which she could not open because – unbeknownst to the robbers – it was installed before the Suns bought the restaurant, and they were unaware of the safe's combination.[62] Chanthadara fatally shot Barbara Sun. He was later convicted of using a firearm in a crime of violence constituting first degree murder.[63] He was sentenced to death based, in part, on the jury's finding of the "pecuniary gain" aggravating circumstance.  The Tenth Circuit ruled that the "pecuniary gain" circumstance did not apply to *Chanthadara*.  The court observed that "pecuniary gain" is implicit in the offense of robbery, and so it would automatically be present for felony murder where the underlying felony is robbery.  The court recognized that Congress had clearly expressed a list of 20 felony offenses which "automatically aggravated the death penalty" whenever a death occurs during their commission.  18 U.S.C. § 3592 (c)(1) .  The exclusion from the robbery from the list supported the conclusion that

---

[60]*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002); *United States v.  Chanthadara*, 230 F.3d 1237 (10th Cir. 2000).

[61]230 F.3d 1237 (10th Cir. 2000).

[62]*Id*. at 1245.

[63]*Id*. at 1244-45.

"pecuniary gain" circumstance did not relate to murders from which "pecuniary gain" did not directly result. The Court held that this aggravating factor was limited to the instance where the expectation of "pecuniary gain" flows from the actual killing rather than the underlying felony of robbery.[64]

The Fifth Circuit joined the Tenth Circuit's position in *United States v. Bernard*,[65] a case in which the defendants carjacked a married couple, forced them to withdraw money using their ATM card and later killed them. The government argued that the defendants killed the victims in order to get away with their money. The Fifth Circuit held that the "pecuniary gain" factor was wrongly submitted because the "pecuniary gain" did not flow directly from the victims' murder.[66]

The Eighth Circuit has not squarely addressed this issue. Said court declined to decide a similar claim that the "pecuniary gain" circumstances failed to narrow the class of homicide subject to the death penalty in the context of robbery charged since every robbery involves a pecuniary motive.[67] The court side stepped the issue by ruling that any errors made in the "pecuniary gain" aggravating factor was harmless because *Paul's* jury found two other statutory aggravating circumstances.[68]

The government submits that the jury could rationally find this aggravator because the bank guard was murdered to eliminate resistance to the bank robbery, and that "pecuniary gain" was

---

[64]*Id*. at 1263-64.

[65]299 F.3d 467 (5th Cir. 2002).

[66]*Id*. at 483-484.

[67]*United States v. Paul*, 217 F.3d 989, 1001 (8th Cir. 2001).

[68]*Id*.

expected to follow as a direct result.[69] The governments reasoning simply transfers the expectation

of pecuniary gain from the underlying robbery to anything the would be robber did.  This reasoning

mirrors the government's argument which the Fifth Circuit rejected in *Bernard* - that the victims

were killed to enable the robbers to get away with their money.[70]

Movant maintains that both trial and appellate counsel should have been familiar with the

legislative history related to the pecuniary gain aggravator, and been aware that there was a

reasonable likelihood that said aggravator only applied to situations where "pecuniary gain" directly

resulted from the murder.  Even though trial counsel failed to object to the pecuniary gain aggravator,

appellate counsel should have raised the claim as plain error on appeal.  An appellate court may grant

relief even where defendant does not object to trial if the defendant can show that the error affected

substantial rights and seriously affected the fairness of the integrity of the trial.  Appellant's counsel

failure to challenge the pecuniary gain aggravator on appeal constitutes deficient performance and,

given the *Bernard* and *Chanthadara* decisions, had said issue been included on appeal, there's a

reasonable likelihood that movant's death sentence would have been set aside.

The ABA standards recognizes both a trial counsel's duty to preserve a legal claim in a death

penalty case as well as a duty of appellant counsel to preserve and raise issues which have yet to be

resolved by the Supreme Court or anticipate a change of existing precedent.  The guidelines state:

> Appellate counsel must be intimately familiar with technical rules at issue preservation and presentation, As well as substantive state, federal and international

---

[69]Response, p. 86.

[70]299 F.3d at 483-484.

law governing death penalty cases, including issues which are "percolating" in the lower Courts but have not yet been authoritatively resolved by Supreme Court.[71]

Additionally, under ABA Guideline 10.8, *Duty to Assert Legal Claims*, counsel is required to consider all legal claims potentially available, and evaluate potential claims in the light of the importance of protecting the client's rights against later contentions by the government that the claim had been waived, defaulted, not exhausted or otherwise forfeited.[72]  The commentary to this guideline contains the following:

> One of the most fundamental duties of an attorney/defending capital cases at trial is a preservation of any and all conceivable errors for each stage of the appellate and post-conviction review.  Failure to preserve an issue may result in the client being executed even though reversible errors occur at trial.  For this reason, trial counsel in a death penalty case must be especially aware not only of strategies for winning at trial, but also heighten the need to fully preserve all potential issues for later review.[73]

> .  .  .

> Because of the possibility that client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential claims at all levels in a capital case than in any other case.  As subscribed in commentary to guide 1.1, counsel also has a duty pursuant to Subsection (A) (3) (a) – (c) of this Guidelines, to preserve issues calling for a change in existing precedence; the client's life may well depend on how zealously counsel discharges this duty.  Counsel should object to anything that appears unfair or unjust even it involves challenging well accepted practice.[74]

---

[71]ABA Guidelines 1.1, *Objective and Scope of Guidelines*, commentary, 31 Hofstra Law Review at 931.

[72]ABA Guidelines 10.8, *Duty to Assert Legal Claims*, 31 Hofstra Law Review at 1028.

[73]*Id*. at 1030.

[74]*Id*. at 1032.

Failure to investigate any and all claims regarding the constitutionality of the aggravating circumstances under which one's client is to be put in jeopardy of the death penalty falls well below the standard of representation required for capital defendants.[75]

In its response, the government claims that even if counsel was deficient in failing to object to the submission of the"pecuniary gain" aggravator, movant cannot show prejudice. The government asserts that since the jury found another statutory aggravator – that movant's actions created a grave risk of death to other people - movant was eligible for the death penalty. Further, once the jury found movant eligible for the death penalty, the pecuniary gain aggravator became just one of the factors to be weighed by the jury during its sentencing decision. The government suggests that the selection process was not effected since any juror could have chosen to ignore the government's assertion that the murder was committed for a pecuniary gain. The government's position is incorrect for a number of reasons.

The statutory scheme as developed by Congress, as it relates to consideration of aggravating circumstances in the second phase of trial, is a weighing process. In movant's case, the jury found and improperly weighed the improper aggravating circumstance of "pecuniary gain" in their decision to impose a death penalty. The Supreme Court has held that with regard to schemes, such as the federal death penalty scheme, which direct the jury to weigh aggravating and mitigating circumstances, the weighing of an invalid aggravating factor is fatal to the reliability of a death

---

[75]*Starr v. Lockart*, 23 F3d. 1280, 1285 (8th Cir. 1993).

sentence.[76] This is true even where the jury has found other valid aggravating circumstances because the invalid factor operates as an impermissible"thumb on the death's side of the scale".[77]

The government invites this Court to review its closing statement to demonstrate movant was not prejudiced by the submission of the pecuniary gain aggravating factor. Interestingly, the government not only emphasized the weight to be given the aggravating factor but compounded the error by its inflammatory rhetoric.

> Was there pecuniary gain? Once again, there is no question. The first four questions you have here are also clear: that he was 18; that he knew there was a grave risk of death; that other people were at grave risk of harm; and it was for money. You saw the bags of money, that's what it was all about, so he could pay his lawyer. And the reason that Congress made that a statutory mitigator—aggravator, rather, a factor for you to consider, is because it is so immoral for someone to go into a bank, with these kinds of weapons and a vest on to protect themselves, and take Richard Heflin's life, with his partner, Billie Allen, and take his life; to trade Richard Heflin's life so he could pay his lawyer and buy more gold and cars and whatever else he wanted to buy.[78]

.   .   .

> When you are listening to the defendant's mitigating factors, weigh those, as you are required to by law. Weigh them against the danger to all the people in the bank. Weigh them against the fact that this murder was for money.[79]

.   .   .

> If you find - - if you look at those aggravators that the government presented, and compare them to all the mitigators you just heard from the defendant, you can take

---

[76]*Id*. at 1286.

[77]*Stringer v. Black*, 503 U.S. 222, 229-32 (1992).

[78]Transcr. Vol. XII, pp. 170-71.

[79]*Id*. at 184-85.

either one of those aggravators, and say the fact that this was for money outweighs all 17 of defendant's mitigators.[80]

When you weigh the government's six aggravating factors against all those that I just went through, it is very apparent that the government's aggravating factors that all these people are in tremendous danger, the extreme nature of this crime, the fact that it is done for the most reprehensible reason of all, for money, so this guy can have money.[81]

. . .

He chose to kill for money, for the high life, for his lawyer.[82]

Additionally, the government's articulation of the standard to be applied in deciding whether the submission of the pecuniary gain aggravator prejudiced movant is incorrect. The government believes the proper test is whether the jury would have imposed a sentence of death had the pecuniary gain circumstance not been submitted as an aggravating factor. But, the ultimate questions is whether, given counsel's unprofessional error in failing to object to submission of the pecuniary gain aggravator, a reasonable probability exists that the result of the proceeding would have been different.[83] Given the facts of movant's case, a reasonable probability does exist that, had the pecuniary gain aggravator not been presented to the jury, at least one of the jurors would have voted against the imposition of the death penalty.

---

[80]*Id.* at 171.

[81]*Id.* at 227.

[82]*Id.* at 229.

[83]*See Simmons v. Luebbers*, 299 F.3d 929, 939 (8th Cir. 2002).

**12(C)(k). Failure to Allow Mitigation Counsel to
Give Penalty Phase Closing Argument**.

The government claims that counsel Shaw's decision to give the penalty phase closing argument rather than counsel Herndon, the lawyer who developed the mitigation case, was not deficient performance because counsel Shaw gave an effective closing. The government bases its decision on the fact that counsel Shaw pled for mercy, referenced some of the mitigating evidence, and told the jury that they were the ultimate decision makers. The government's position is incorrect for a variety of reasons.

Counsel Herndon and Caryn Tatelli, a mitigation specialist, worked day and night for three weeks to develop a mitigation strategy. Counsel Shaw neither understood nor believed in mitigating evidence. His closing penalty phase argument confirmed this. He neither explained the concepts of aggravating or mitigating evidence, nor gave the jury any guidance on how said evidence fit into the jury's decision to assess punishment. Although 30 witnesses were called during defendant's mitigation case, counsel Shaw only briefly referred to said evidence. Counsel Shaw had an obligation to make a logical argument that focused the jury's attention on the mitigating factors, and explained why said factors favored a sentence other than death.[84] Contrary to the government's suggestions, counsel Shaw made no attempt to tie the mitigating evidence together. Instead, he made a boilerplate plea for mercy, and reverted back to his failed guilt phase strategy - that movant should not be executed because he did not shoot Mr. Heflin.

---

[84]*See Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

29

Counsel Herndon was in the best position to assist the jury in understanding and applying the mitigating evidence. Had she been allowed to give the closing, counsel Herndon would have offered an explanation, based on the mitigating factors, as to why movant committed the offense, and why he should not be sentenced to death. Ms. Herndon would have emphasized that the underlying reason for the robbery was for movant to obtain money to buy a new prosthesis for his missing leg. He had outgrown the old one and needed a new one to walk without pain. Counsel Herndon would have explained that movant grew up with both of his parents on crack, and his father pretty much absent from the family. Because his parents were addicted to crack cocaine, movant had to become the father figure for the family at an early age. Movant's work skills and his education were very limited. Given that movant grew up in the Blumeyer Housing Projects, where drug use, robberies, and drive by shootings are a way of life, he saw bank robbery as a viable option in which to obtain money to buy a new prosthesis and help support his family. Although his actions in committing the bank robbery were obviously misguided and unjustified, he convinced himself otherwise because the bank's money was federally insured, and movant believed that no on would get hurt during the robbery.

In addition, counsel Herndon would have explained how the jail guards and Dr. Reidey's testimony supported movant's lack of future dangerousness, and how confining him to prison for the rest of his life would keep society safe. Unlike counsel Shaw, counsel Herndon would not have revisited the circumstances of the robbery and reiterated the flawed defense presented at the guilt phase of the trial.

Given counsel Shaw's penalty phase closing argument, the jury received a distorted picture of the balance between the aggravating and mitigating circumstances. Although the jury found a

30

number of non-statutory mitigating factors,[85] they were not provided with a logical argument as to how those circumstances justified a sentence other than death. Had counsel Herndon been allowed to give the penalty phase closing and tie these circumstances together, there is a reasonable likelihood that at least one juror would have voted for a life sentence.

As with all of the ineffective assistance claims, movant has proven facts which are not refuted by the record, and if true, would entitle him to relief. Thus, he is entitled to an evidentiary hearing.

WHEREFORE, for each and all of the reasons contained in his § 2255 motion and this reply, movant prays that he be afforded reasonable discovery and an evidentiary hearing on the ineffective assistance of counsel claims contained in his motion, and that after a full hearing, he be discharged from his unreasonable conviction and sentence of death.

Respectfully submitted,

/s/ Christopher E. McGraugh
CHRISTOPHER E. MCGRAUGH, #25278
Leritz, Plunkert & Bruning, P.C.
One City Center, Suite 2001
St. Louis, Missouri 63101
(314) 231-9600
(314) 231-9480 - Facsimile
E-mail: cmcgraugh@leritzlaw.com

/s/ Michael J. Gorla
MICHAEL J. GORLA, #3251
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com

*Counsel for Norris Holder*

---

[85]*See* Transcr. Vol. XII, p. 252-54.

31

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2004, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:  Mr. Joseph M. Landolt, Mr. Steven Holtshauser, and Mr. Roger Keller, Assistant United States Attorneys, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102.

/s/ Michael J. Gorla
Michael J. Gorla, #3251
Attorney for Norris Holder
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com