**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **NORRIS G. HOLDER,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | ) **No. 4:03-CV-923-ERW** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent.** | ) |

**EVIDENTIARY HEARING**

**BEFORE THE HONORABLE E. RICHARD WEBBER**
**UNITED STATES DISTRICT JUDGE**

**VOLUME I**
**JULY 18, 2005**

APPEARANCES:
For Petitioner:     Christopher E. McGraugh, Esq.
                    LERITZ AND PLUNKERT
                    One City Centre, Suite 2001
                    St. Louis, MO  63101

                    Michael J. Gorla, Esq.
                    720 Olive, Suite 1630
                    St. Louis, MO  63101

For Respondent:     Steven E. Holtshouser, AUSA
                    Joseph M. Landolt, AUSA
                    OFFICE OF U.S. ATTORNEY
                    111 South Tenth Street, 20th Floor
                    St. Louis, MO  63102

*REPORTED BY:*      *GAYLE D. BEILSMITH, CSR, RDR, CRR*
                    *Official Court Reporter*
                    *United States District Court*
                    *111 South Tenth Street, Third Floor*
                    *St. Louis, MO  63102*
                    *(314) 244-7987*

**VOLUME I**

2

# INDEX

*Witnesses:*

**CARYN PLATT TATELLI**

Direct Examination by Mr. McGraugh . . . . . . . . Page    5

Cross-examination by Mr. Holtshouser . . . . . . . Page   28

Redirect Examination by Mr. McGraugh . . . . . . . Page   76

Recross-examination by Mr. Holtshouser . . . . . . Page   92

Further Direct Examination by Mr. McGraugh . . . . Page   93

**JENNIFER HERNDON**

Direct Examination by Mr. McGraugh . . . . . . . . Page   95

Cross-examination by Mr. Holtshouser . . . . . . . Page  145

(PROCEEDINGS STARTED AT 1:06 P.M.)

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH THE PETITIONER PRESENT.)

THE COURT:  Norris Holder versus United States of America, 4:03-CV-00923-ERW.  The matter before the Court today is an evidentiary hearing ordered by the Court on December 2, 2004, regarding various grounds in Petitioner's motion to vacate his sentence pursuant to 28 United States Code § 2255.

The grounds include:

1.   12(A) Violation of the Fifth Amendment indictment clause.

2.   12(B) Jury's improper consideration of the pecuniary gain statutory aggravator.

3.   12(C)(a) Counsel's unreasonable and prejudicial failure to challenge the indictment.

4.   12(C)(b) Trial counsel's unreasonable and prejudicial advice to testify.

5.   12(C)(c) Trial counsel's unreasonable and prejudicial concession of guilt during opening statement and closing argument.

6.   12(C)(h) Trial counsel's prejudicial sleeping during critical stages of the proceedings.

Is Movant ready?

MR. GORLA:  Judge, we are.

MR. MCGRAUGH:  We are, Your Honor.

4

THE COURT:  Is the Government ready?

MR. HOLTSHOUSER:  Yes, Your Honor.

THE COURT:  All right.  Very well.  I have read your briefs.  I'll not indicate any further preliminary comments at this time, and I'll -- would hope to have an opening statement at this time, or if you prefer, you may go directly to the evidence.

MR. GORLA:  Judge, as far as a preliminary matter, I would just ask that you take judicial notice of the contents of the District Court file.

THE COURT:  All right.  The Court takes notice.  The file is on a cart over to your left.

MR. GORLA:  Okay, Judge.  And also, I'd ask that you take judicial notice of the Eighth Circuit file.

THE COURT:  Yes, the Court takes notice.

Any preliminary comments, Mr. Holtshouser?

MR. HOLTSHOUSER:  Judge, on preliminary matters, we have a complete copy of the Grand Jury testimony, the presentation to the Grand Jury, which is actually -- the originals are with the Eighth Circuit still.

THE COURT:  All right.

MR. HOLTSHOUSER:  We were told they're not actually in St. Louis right now.

THE COURT:  All right.

MR. HOLTSHOUSER:  But I would offer those in their

entirety, and it's a complete copy of what was submitted to the Eighth Circuit in connection with the Allen appeal.

THE COURT:  All right.  Those will be received.

MR. HOLTSHOUSER:  And we would mark that, Judge, as Government Exhibit O -- I'm sorry -- P as in Paul.

THE COURT:  P.  Okay.

MR. MCGRAUGH:  Judge, we'd like to proceed with our first witness.

THE COURT:  You may do so.

MR. MCGRAUGH:  We call Caryn Tatelli Platt to the witness stand.

**CARYN PLATT TATELLI**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. MCGRAUGH:

Q    Would you please state your name again for the record?

A    Caryn Platt Tatelli.

Q    And, Ms. Tatelli, are you employed?

A    Yes, I am.

Q    And how are you employed?

A    I have a private practice as a forensic social worker.

Q    Okay.  Can you describe to the Court; what's a forensic social worker?

A    I, in my practice, do detailed developmental life

histories for capital defendants.

Q     And how long have you done that?

A     I've been in private practice since October of '95.  I've done capital work since fall of '93.

Q     Okay.  Can you give a description of what a forensic social worker does in developing life histories in capital defense?

A     It's a multistep process.  It begins with a comprehensive interview of the client to understand who, in terms of source witnesses, is important in the client's life and then also what kinds of records might have been accumulated over the client's lifetime.  Then I -- based on my -- the interview I've done with my client, I go forth and conduct interviews with source witnesses and gather the developmental life history records, school records, medical records, social service agency records, those kinds of things, looking at the things that were relevant, things that were significant in my client's development.

Q     And to what ultimate purpose is this -- is this investigation done for?

A     In preparation for -- well, at the trial level, in preparation for a sentencing hearing.  I also do this work at the postconviction level and also clemency work sometimes.

Q     Okay.  In performing interviews, locating records, obtaining these records, do you -- how do you provide that

information to the attorneys that are working on the case?

A    Normally, I prepare several different documents that are shared with the attorneys.  Based on my interviews, I write interview summaries if the attorneys want them, and we'll do either summaries of records or a timeline of my client's life.  If I do a timeline, the timeline often includes both records and anecdotal information gathered from the source witnesses.

Q    As it relates to capital defendants at the trial level, approximately how many times have you performed this duty as a forensic social worker?

A    I've probably done this work on about 70 cases at the trial level, 65 or 70 cases at the trial level.

Q    Prior to your -- let me strike that.  You -- were you ultimately contacted to perform these duties in the case of U.S. versus Norris Holder?

A    Yes, I was.

Q    Can you tell the Court how you got involved in this case?

A    Initially, I was contacted by Dick Burr, who knew I had just finished working on a federal capital case in Chicago and wanted to know if I would be available to work on this case, the Holder case, but he was not the attorney who was actually working on the case, so he wasn't in a position to actually offer me the work.  He was more exploring my availability and expressed some concerns about the case to me at that time, too.

Q    Okay.  Prior to your -- prior to being hired in the U.S. versus Norris Holder case, approximately how many times did you perform this work as a forensic social worker in capital defense cases?

A    At the trial level?

Q    Yes, ma'am.

A    Probably four or five cases.  The bulk of my work at that time, prior to that time, had been postconviction work.

Q    And just so that we use the same terms, this forensic social work -- is this also known in the industry as mitigation specialist?

A    Yes.

Q    Now, you were contacted by Dick Burr.  Eventually, did you have -- were you contacted by Charles Shaw?

A    Not by Charles Shaw, but by his associate, Brad Dede, I think about 10 days later.

Q    Brad Dede, D-E-D-E?

A    Yes.

Q    Okay.  And approximately when did that occur?

A    The first contact with him was late November or early December of '97.  I have a bill that reflects it.

Q    Okay.  And what, if anything, was described at that or talked about at that first contact?

A    He didn't seem to know very much about what a mitigation specialist or forensic social worker would -- would do.  He

had been referred to me by Dick Burr and seemed to think that he should hire me because Dick Burr was encouraging him to do so.  I sort of outlined to him what I would do if I got involved, and I think I agreed to send him a package of materials.

Q   Did you, in fact, send him a package of materials?

A   Yes.

Q   Okay.  How does one go about hiring you as a forensic social worker?

A   It starts with a phone call, discussion of the case.  I look at my caseload to see whether or not I have time to take the case and then agree to work on it if that makes sense for me.

Q   Were you -- at this first phone call with Mr. Dede, were you retained to work as a mitigation specialist in this case?

A   I think I told him that I wanted to make a few phone calls about other cases and called him back later that afternoon to take the case.

Q   Okay.  And that was to determine your availability?

A   Yes.

Q   Okay.  Did you realize at that time when a trial date had been set in the case?

A   I knew that there was not a lot of time.  I don't know if I knew the exact trial date, but I knew we were talking about a four- to five-month period of time.

**VOLUME I**

10

Q    Okay.  After that first contact with Mr. Dede and then you returned his phone call and said you were available, were you retained then?

A    Yes.

Q    Okay.  And what were the first things that you did?

A    I made an appointment to visit with Norris Holder at the Ste. Genevieve County Jail.

Q    Okay.

A    And then I think I made that visit on December 9th and made arrangements to see Brad and Charlie Shaw at Charlie's law office that same day after my meeting with Norris.

Q    Okay.  Were you able to determine what the status of the case was at that point?

A    When I went to the Shaw Law Office after my meeting with Norris and tried to meet with Charlie and Brad, Charlie wasn't very available because he had other things going on.  He was meeting with clients and working on other cases and taking phone calls, but it became apparent that very little had been done.

Q    When you say very little had been done, can you describe what you mean by that?

A    I know that I was asking about 302's, witness summaries, and they didn't really know what I was talking about.  They didn't seem to know where they were, or they weren't sure whether or not they had them.  I don't remember exactly, but I

11

mean, the impression that I left with was that there was very little that had been done in terms of understanding what was -- what the Government's evidence was and -- and even what they had in terms of materials from the Government.

Q    What was -- were you able to determine what attorneys were actually working on the case?

A    I knew that it was Charlie's case, and I think I had the impression that Brad was also working on it, but I don't know whether or not Brad was really officially working on it.

Q    Had Ms. Herndon, who at the time her name was Ms. Brewer -- was Ms. Brewer/Herndon working on the case at that time?

A    No.

THE COURT:  I didn't -- what was your answer?

THE WITNESS:  No, she was not.

Q    (By Mr. McGraugh) Now, what was the status of the mitigation investigation?

A    At -- at that point?

Q    Yes, ma'am.

A    Nothing had been done.

Q    Okay.  Now, as to these concerns that you had, what, if anything, did you do?

A    I was in pretty close contact with Dick Burr and called him after my meeting with Norris and my meeting at the Shaw Law Office and talked to him about both what I perceived as

potential mitigation, the sort of themes that I thought I'd be able to develop, and also my impression that very little had been done in terms of preparing the rest of the case.

Q   Okay.  Did you make any recommendations to Mr. Burr -- to Mr. Burr or Mr. Shaw as to whether they should obtain additional help?

A   I don't remember specifically from that meeting, but I know that I was talking to them about needing to hire experts, and I know that I was talking to them about needing to spend -- I would need to spend a lot of time with them to prepare the mitigation, and I -- at some point, I knew that Dick Burr was working on finding another attorney to be involved.

Q   And that attorney was going to be more or less to assist in the mitigation?

A   I don't know if that was his -- his goal, but that was certainly part of what she would be doing.

Q   In the cases that you'd worked on prior to this and the cases you've worked on subsequently, is it common to have at least two lawyers involved?

A   Absolutely.

Q   Is -- was there any discussion with Mr. Shaw as to what the guilt phase strategy would be in the case?

A   I know that he didn't believe that Norris -- that this would be a capital case.  He didn't believe they would get to

a death penalty sentencing hearing because he didn't think that the facts supported it being a capital case.

Q   Okay.  Why do you say that?

A   Because he would say things like, "We're not going to get to a death penalty sentencing hearing.  This isn't a capital case.  Norris isn't guilty of murder, first degree murder."  I don't remember exactly, but that's the gist of the kinds of things he was saying.

Q   Did you convey those conversations to Mr. Burr?

A   Yes, I did.

Q   Now, was there ever a meeting in which it was discussed with Mr. Shaw and Dick Burr as to retaining a second attorney in the case?

A   I know that Dick was talking to Charlie Shaw about doing that, but I wasn't present at a meeting like that.

Q   How many opportunities did you have actually to meet with Mr. Shaw prior to Ms. Brewer getting in the case?

A   You know, I'd have to look at my bill to be sure, but I can only recall one meeting with him, which would have been that first meeting in early December.

Q   Okay.  Would you periodically report your status of what the mitigation investigation was doing to Mr. Shaw or Mr. Dede?

A   Yes.  More often to Brad Dede because he was more accessible.

14

Q    And was that prior to Ms. Brewer getting involved in the case?

A    Yes.

Q    Okay.  And what kind of feedback would you get from Mr. Dede when you would report your mitigation investigation?

A    Not -- not very much.  You know, he would, you know, sort of listen to what I had to say, and I know that I was interested in hiring experts, and there wasn't -- there was never any interest in doing that.

Q    Did you have an opportunity to meet with Mr. Burr and Mr. Shaw in February of 1998 with Ms. Brewer?

A    Yes.

Q    Okay.  What, if anything, was done at that meeting?

A    I know that in preparation for that meeting, I -- I put together a number of interview summaries and a sentencing hearing outline, and I remember that we spent some time talking about sort of the mitigation themes that I was developing.  I -- it was a long meeting, and I -- I think we talked about things other than mitigation, but I don't actually remember the other stuff.

Q    Okay.  Again, were you able to gauge the reaction that Mr. Dede or Mr. Shaw had as to the issues as to the mitigation themes that were being discussed?

A    I don't -- yes, I was, and I don't -- there wasn't much interest, mostly, I think, because they didn't seem to think

we were going to need it.

Q    Okay.  Now, after Ms. Brewer got involved in this case, did she work primarily with you on developing mitigation?

A    Yes.

Q    And was there a reason why Ms. Brewer was doing that instead of Mr. Shaw?

A    I think it's because she understood that we would probably get to a sentencing hearing.

MR. HOLTSHOUSER:  Judge, I'm going to object.  If she doesn't know, I think this is outside the scope of her knowledge.

THE COURT:  Yes.  If you know --

MR. HOLTSHOUSER:  Speculation.

THE COURT:  -- you may answer, but don't speculate as to what you believe she knew.  Sustained.

Q    (By Mr. McGraugh) Did you -- did you discuss -- I think you -- since Ms. Brewer got in the case, would you, again, report your mitigation investigation efforts to Mr. Shaw or Mr. Dede?

A    Yes.  Everything that I did, I communicated.  Yeah, I tried to communicate with the whole team of people, Mr. Shaw, Mr. Dede, and also with Jennifer Brewer.  Jennifer was the one who -- who responded, who had questions, who wanted to talk to me about the witnesses that I was interviewing, who, you know, was interested in making decisions about experts with me.

16

Q    Okay.  Did either Mr. Dede or Mr. Shaw participate at all in the mitigation investigation?

A    No.

Q    On top of preparing witness summaries, did you also prepare a sentencing outline?

A    Yes.

Q    Okay.  And when was that prepared?

A    It was sort of an ongoing process.  As I did more interviews and learned more things, I would input additional information into the sentencing hearing outline, but I know that I had at least an early draft of it, some form of draft of it, at the meeting with Dick Burr, Jennifer Brewer, and Charlie Shaw in February, on February 24th maybe of '97 -- of '98.  Sorry.

Q    Okay.  And was that presented to Mr. Shaw?

A    Yes.

Q    And what, if anything, was discussed after that was presented to Mr. Shaw?

A    Well, at that meeting, I remember talking about the interview summaries.  Those were individual summaries about each of the interviews that I had done, and he had -- he indicated that he'd had Brad Dede file them, but he hadn't looked at them.  And the sentencing hearing outline fell under the same sort of circumstances.  The sentencing hearing outline sort of incorporated -- included everything that the

interview summaries did.

Q     Okay.

A     Sort of a synopsis of them.

Q     Okay.  Was there ever -- in the meetings that you had that you met with Mr. Shaw or Mr. Burr or Ms. Brewer, was there ever a discussion of trying to integrate a guilt phase and penalty phase evidence presentation?

A     I -- you know, I can't remember exactly.  I can't -- what I remember is that we talked about there needing to be some cohesion, but I think that was more Dick Burr and I sort of theoretically saying that needed to happen, but I don't know that we ever sat down to do that strategically, no.

Q     Was there ever a meeting with Mr. Shaw as to say whatever your guilt phase strategy, it's going to have to work into what we're going to be doing in penalty phase?

A     No.

Q     Okay.  It sounds as though Mr. Shaw had no idea what was being prepared in penalty phase, is that correct?

        MR. HOLTSHOUSER:  Judge, I'm going to object.  It calls for speculation in terms of what Mr. Shaw knew or didn't know.

        THE COURT:  Sustained.

Q     (By Mr. McGraugh) As to Mr. Shaw's reaction when you would present him witness summaries and summary outlines and, you know, sentencing phase outlines, did Mr. Shaw give you any

indication that he was on board or aware as to what was being done in mitigation?

MR. HOLTSHOUSER:  Judge, I'm going to -- same objection.  If she has specific verbatim responses by Mr. Shaw, I have no objection to that, but anything beyond that, I think, is calling for speculation and conclusions.

MR. MCGRAUGH:  Well, Your Honor, I'm --

THE COURT:  Wait, wait, wait just a moment.  The question was, "When you would present him witness summaries and summary outlines, and, you know, sentencing phase outlines, did Mr. Shaw give you any indication that he was on board?"  So as to his responses, you may answer, but don't speculate as to what you thought he knew.

Now, did you have further objections?

MR. MCGRAUGH:  No.  That was it, Your Honor.

A    I think that in the memo that I wrote in April, I have quoted a response from him, if I -- could I look at that memo?

Q    (By Mr. McGraugh) Let me ask you some foundational questions.  After this trial, did you prepare a memorandum to preserve your -- your thoughts as to how this case proceeded?

A    Yes.

Q    Okay.  And that was prepared in April of '98?

A    Yes.

Q    Okay.  And why did you prepare it?

A    Because I had a lot of concerns about things that had

happened or not happened during the course of preparations.

Q    Okay.

MR. HOLTSHOUSER:  May we approach, Judge, regarding this particular document?

THE COURT:  Sure.

(A BENCH CONFERENCE WAS HELD ON THE RECORD AS FOLLOWS:)

MR. HOLTSHOUSER:  Judge, my purpose of approaching the bench is so that the witness doesn't hear the discussion. Judge, the memo, the file that we have here is written in April of '98 by Ms. Tatelli.  It is basically a two-page summary of complaints and negative comments Ms. Tatelli has about Mr. Shaw.  I think that there's been no -- there's been no testimony, at least, her failure of recollection that she can't recall what Mr. Shaw said in response to the last question.  So I'm not sure if there's an attempt to establish this as past recollection recorded, but this is a memo prepared long after the fact of any conversation that was the subject of the previous question.  So I'm -- I think that this -- this document is inadmissible and should not be referred to at this stage.

THE COURT:  Is the purpose to refresh her recollection?

MR. MCGRAUGH:  It is, Your Honor.  I believe she stated on direct testimony that she had memorialized this conversation and she -- in the memorandum -- and she couldn't

20

recall specifically what the statement was and that if she looked at the memorandum, I believe is what she said on direct examination, if she looked at the memorandum, it might refresh her memory.

MR. HOLTSHOUSER:  Well, Judge, the problem with --

MR. GORLA:  I think, Judge -- excuse me.  I think, Judge, what we can do is cut through all this and solve this if we just -- like she said she prepared a memo.  Is this the memo?  Did she prepare it?  Read the memo.  Does that refresh her recollection?  And then she can testify from what her recollection is and not from the actual document.  I think that's the objection, is that correct?

MR. HOLTSHOUSER:  I think it doesn't qualify as past recollection recorded, though, because the question had to do with a conversation that occurred, I believe, in, like, December or January of '98.  This is written in April of '98.  So she wrote this memo three months after the conversation in question.  I think it needs to be written a little bit closer in time to the event for it to be past recollection recorded.

THE COURT:  As I understand it, if it's past recollection recorded, the document actually comes into evidence, but what I understand --

MR. MCGRAUGH:  It will refresh her recollection.

THE COURT:  -- refresh her recollection.  If it doesn't, she then will be testifying as to what she --

MR. HOLTSHOUSER:  If it's used as Mr. Gorla suggested, I don't have any problem with it.

MR. MCGRAUGH:  That's how we'll proceed, Your Honor.

THE COURT:  Okay.

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.)

THE COURT:  You may proceed, Mr. McGraugh.

MR. MCGRAUGH:  Thank you, Your Honor.

Q    (By Mr. Mcgraugh) Would it refresh your memory to review your memorandum as to the conversation you had with Mr. Shaw and what his response was?

A    Yes.

MR. MCGRAUGH:  Okay.  May I approach the witness, Judge?

THE COURT:  You may approach.

THE WITNESS:  Thank you.

A    I had thought there may be a direct quote in here. There's not, but, you know, it certainly does refresh my memory.

MR. MCGRAUGH:  May I take back the exhibit?

THE COURT:  Yes, you may.

MR. MCGRAUGH:  That was Exhibit 1, Your Honor.

THE COURT:  All right.  Thank you.

Q    (By Mr. McGraugh) Does that refresh your recollection as to what the substance of the conversation between yourself and Mr. Shaw was after there was a discussion as to how the

mitigation phase would proceed?

A    Yes.   There were actually two different points in time that -- that there were specific conversations about the sentencing hearing.   One was at that February, I think, 24th, 1998 meeting, where Charlie said he had not -- Charlie Shaw said he had not read the interview summaries, and I strongly encouraged him to read them, and then after Norris was convicted, which was late March of 1998, the day of the conviction, I walked over to the courthouse, once I learned that Norris had been convicted, and had with me final versions of the sentencing hearing outline which I presented to Charlie and also to Jennifer, and Charlie's response to me was, "Well, you know, I'm not going to be needing this.   It's Jennifer's responsibility to put in the sentencing hearing," and I said --

THE COURT:   Wait a minute.   I didn't hear what you said.   I heard -- I didn't know what you said Jennifer said.

A    When I presented it to -- when I presented the document to Charlie, he said, "Well, I won't be needing this.   It will be Jennifer's responsibility to put the sentencing hearing in," and I said, "Well, I've given Jennifer a copy.   You know, this is your copy, so you know what we're doing."

THE COURT:   All right.   Okay.   I've got it now.

Q    (By Mr. McGraugh) What was your role during the sentencing hearing?

23

A     I was working with witnesses to prepare them, providing reassurance, making sure that we were able to call the witnesses in the order in which we had sort of planned to by keeping track of them.

Q     Did you have an understanding or an expectation as to who would do the closing argument in the penalty phase?

A     Yes.

Q     And what -- who was that?

A     Jennifer.

Q     And why was that?

A     Because Jennifer had done all of the work to prepare for the sentencing hearing and understood what the case was that we were putting in.

Q     Had she presented all the witnesses in the penalty phase?

A     Yes.

Q     Now, at some point, did that change, that Ms. Brewer was not going to do the closing argument in the second phase?

A     Yes.

Q     Okay.  And when did that occur?

A     I think it was the first day of the sentencing hearing Charlie made a comment about how he'd do the closing argument; he wasn't terribly impressed with what we were doing at the sentencing hearing, and Jennifer and I were alarmed by that. So I called Dick Burr from the courthouse, and he came in, I believe, very early the following morning and met with us at

24

the courthouse, at like 7:00 in the morning, to talk about closing arguments.

Q    Okay.  And did that, in fact, occur?  Did Mr. Burr come in town?

A    Yes, he did.

Q    And the purpose was?

A    To talk to us -- me, Jennifer, Charlie -- about the sentencing hearing and the closing arguments and who would be making the closing arguments.

Q    Okay.  And what happened at that meeting?

A    Umm, it was my understanding that there was an agreement that Jennifer and Charlie would split the closing arguments.

MR. HOLTSHOUSER:  Well, Judge, I'm going to object unless she has some firsthand knowledge of this agreement, and if not, we move to strike the last answer.

THE COURT:  All right.  Stricken until you can lay a foundation.

MR. MCGRAUGH:  I'll lay a foundation for it.

Q    (By Mr. Mcgraugh) You were present during this meeting, is that correct?

A    Yes, I was.

Q    And you heard the conversations both from Mr. Burr, Mr. Shaw, and Ms. Brewer?

A    Yes.

Q    And was there an agreement then that was ratified --

A    Yes.

Q    -- as to who would do the closing argument?

A    Yes, there was.

MR. HOLTSHOUSER:  Well, Judge, the question is premised on Mr. Burr, Mr. Shaw, Ms. Brewer, but Mr. Burr was not an attorney in the case, so I'm not sure if the agreement -- her knowledge of the so-called agreement comes from Mr. Burr, Mr. Shaw, Ms. Brewer.  So I think that, again, we have no specification as to how she knows this.  She has no firsthand knowledge of it.

THE COURT:  I understand, at this time, that the allegation is that there was an agreement that was made between all the parties present; is that --

MR. MCGRAUGH:  That's correct, Your Honor.

THE COURT:  All right.  Okay.  Overruled.

Q    (By Mr. McGraugh) And what was that agreement?

A    That the closing argument would be split between Jennifer and Charlie.

Q    Okay.  And did that come to pass?

A    No, they did not split the closing argument.

Q    Okay.  And who did the closing argument?

A    Charlie did.

Q    Okay.  Now, were you present during the closing argument?

A    Yes, I was.

Q    Okay.  Did Mr. Shaw argue the -- the sentencing outline

and strategy that you had outlined?

A   No, he did not.

Q   Did he argue the -- the --

MR. HOLTSHOUSER:  Judge, I think that his argument is in the record and will speak for itself.  Questions about the content of the argument, I think, are inappropriate.

THE COURT:  Okay.  Overruled insofar at least as it goes to whether he followed the outlines that she prepared.

Q   (By Mr. Mcgraugh) Did Mr. Shaw follow the witnesses that were presented in mitigation?

A   No, he did not.

Q   During that meeting, was it discussed with Mr. Shaw why it was important for Jennifer to do the closing argument?

A   Yes, it was.

Q   And what was said?

A   That Jennifer understood the mitigation case that we had put in.  Charlie made several comments about how having been raised in a housing project wasn't an excuse, and it was clear that he didn't understand the complexity of the --

MR. HOLTSHOUSER:  Judge, I'm going to object again.  This is all conclusion and speculation.  And also, Judge, the area or line of questioning we're on is not relevant to one of the six issues you've identified as being the subject of the hearing.  This has nothing to do with whether or not the strategy of conceding guilt in opening and closing constituted

ineffective assistance.

MR. MCGRAUGH:  Judge, may I respond to that?

THE COURT:  Well, I'll over -- I'll sustain it as to Mr. Shaw's state of mind as to what he understood, but I'm inclined to overrule it as to the balance of it.

MR. MCGRAUGH:  Thank you, Your Honor.

Q    (By Mr. McGraugh) Were there comments that Mr. Shaw said during this meeting that indicated to you what his impression of the mitigation case was?

A    Yes.

Q    Okay.  And what were those comments?

A    That he didn't think that Norris having been raised in a housing project was an excuse.

Q    Okay.  And was that a component of the mitigation?

A    A very small piece.

Q    Okay.  There were other components, larger components, to the sentencing evidence that you thought could be stressed and tied together?

A    Absolutely.

Q    Okay.  Were those many components that were tied together for the Jury?

A    No.

Q    Now, were you present during the sentencing phase while evidence was actually being presented to the Jury?

A    For part of it.

28

Q    Okay.  Was Ms. Brewer putting those witnesses on --

A    Yes.

Q    -- and conducting the direct examination?

A    Yes.

Q    Okay.  And what was Mr. Shaw doing at that point?

A    He was at counsel table.  Some of the time, he -- he was sleeping.

Q    Okay.  When you say he was sleeping, what -- why do you believe he was sleeping?

A    I saw that his eyes were closed.  I saw his head sort of bobbling back and forth the way a sleeping person -- somebody who is sort of fighting to stay awake -- the head forward/head back jerking movement kind of thing.

Q    And this was during the presentation of mitigation witnesses?

A    Yes.

Q    Was this also a concern that was one of your concerns with him doing the penalty phase closing argument?

A    Yes.

          MR. MCGRAUGH:  That's all I have at this time, Your Honor.

          THE COURT:  You may inquire, Mr. Holtshouser.

                    CROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q    Good afternoon, Ms. Tatelli.

29

A     Good afternoon.

Q     Let's start with the last topic, your belief that he was sleeping.  Can you tell us what time of the day it was that you observed Mr. Shaw sleeping?

A     I don't remember.

Q     How many times?

A     More than once, but I don't remember how many times in part because I was in and out of the courtroom.

Q     And how long of a duration did you observe -- when you say you saw his head bob, I mean, did his head bob back up awake or did his head bob down and hit the table?

A     No head on the table, but it was -- I truly believed he was sleeping, not just fighting sleep.

Q     And you don't know what time of the day it was?

A     I don't remember.

Q     All right.  And how long did this occur for during the period of your observation?

A     Again, I don't know because I was in and out of the courtroom.  It's not like I sat there for hours on end to observe him.

Q     Well, how long were you there on the first time you observed it?

A     I don't remember.

Q     How long a period of time did you observe him fighting off sleep?

A    I observed him to be -- I believed him to be sleeping, not fighting off sleep, and I don't know for how long, but long enough to cause concern.

Q    Can you give us any specification as to how much time?

A    Five minutes, 10 minutes, 15 minutes, maybe longer.  I really don't know.

Q    And this is something you observe regularly in the courtroom?

A    I -- I believe I saw it at least twice.

Q    Is it something that you regularly observe in the courtroom by attorneys defending defendants who are --

A    Oh, I'm sorry.  I misunderstood you.

Q    -- facing capital charges?

A    No.

Q    And so when you observed it, did it give you great concern?

A    Yes.

Q    And even though it gave you great concern, you can't tell us how long you observed it for or how long a period of time it went on?

A    That's correct.

Q    Can you tell us who was on the stand?

A    I know that we had mitigation witnesses on the stand.  I know that it was more when we were putting in the mitigation case.

31

Q    How long -- how many mitigation witnesses do you think the defense presented?  I don't -- I'm sure the record reflects how many, but do you have a ballpark figure as to how many were put on?

A    I don't actually know.  Maybe --

Q    Thirty?

A    Twenty-five to 30.

Q    Twenty-five to 30?

A    Twenty-eight maybe.

Q    Okay.  And you don't know which of those witnesses it was?

A    No, I don't.

Q    And you don't know whether it was morning or the afternoon?

A    That's correct.

Q    What did you do about it when you observed it?

A    I spoke with Jennifer about it and shared my --

Q    And what did you tell her?

A    I told her that I believed Charlie was sleeping.  I believe she already had that concern.

Q    And why do you believe that?

A    I think her response was along the lines of "I know."  I don't remember exactly, but I also shared my concern with Dick Burr.

Q    And in terms of the portion of the witnesses' testimony

32

that you -- this would have been direct testimony, I take it?

A    Yes, and possibly during cross, too.

Q    So -- and the evidence that was being presented through the mitigation witnesses was evidence concerning Norris Holder's life, correct?

A    What I know is that he was sleeping during the sentence -- during the mitigation portion of the sentencing hearing.  I can't tell you specifically at what points.

Q    And certainly, some parts -- some parts of the mitigation evidence would have been more significant than others and would have been more known to someone who knew Mr. Holder than others, correct?  I mean, it all wasn't the same, right?

A    Yes.

Q    And it particularly wasn't the same with respect to the strategy or the focus of the mitigation evidence?

A    That's correct.

Q    And so you can't -- since you don't remember what witness was on the stand, you can't give us any indication as to what impact it had on his awareness of what a particular mitigation witness was testifying to on direct or cross?

A    That's correct.

Q    And you are positive that you told Jennifer Brewer -- we'll call her Brewer for that's what she was on the record at the time.  You told her about this incident?

A    Yes.

Q    Immediately after, at the next break, or at what point in time did you tell her?

A    I don't remember.  It was a pretty busy time.

Q    But it would have been during a time period when she would have maybe been able to assess what witness was testifying at the time that he appeared to be nodding off?

A    I'm not sure.  You know, if it was at the end of the day, I don't know that she would have remembered it.  I don't know.

Q    Now, your past -- let's talk a little bit about your past experience.  You're in private practice now, and I think you started in private practice in what, approximately '95?

A    Yes.

Q    And prior to that, you worked for four years approximately with the Illinois -- is it the Illinois Capital Resource Project?

A    Capital Resource Project.

Q    All right.  And the focus of that center was postconviction relief for convicted capital defendants, correct?

A    Yes.

Q    So for the four years -- and that was immediately following your completion of your education as a social worker, correct?

A    Yes.

Q    So your first period of your professional focus in your

34

years was working on motions like this, correct?

A    I -- I didn't have any involvement in them, in the motions.  I was investigating what had or hadn't happened at the sentencing hearing, but I didn't write motions or --

Q    That part, I understood.  I think we're on the same wavelength as far as the question I'm asking.  Your role, though, was to conduct the investigation into either witnesses and evidence that had been overlooked by prior investigators -- is that one angle?

A    That's correct, yes.

Q    Looked at, investigated possible claims of errors committed by attorneys?

A    Yes.

Q    And those were leading, for the most part, to claims of ineffective assistance of counsel by failing to conduct adequate mitigation investigations or having made other blunders in the mitigation case, correct?

A    That's correct.

Q    And since -- in private practice, has the bulk of your experience, again, been focused in investigation of the mitigation part of capital cases?

A    I'm sorry.  Could you ask --

Q    Do you do work on noncapital cases?

A    Oh, very rarely.

Q    Most of your work is devoted to capital cases?

A    Yes.

Q    And is that by choice?

A    Yes.

Q    All right.  And you chose to go to the Illinois capital project that you described a moment ago as well, correct?

A    Yes.

Q    Okay.  So your entire professional career has been devoted to working against imposition of the death penalty; would that be a fair statement?

A    Umm, no.  I've also done other work.

Q    I didn't ask you if you had ever done other work, but the majority of your professional focus has been towards working against the imposition of the death penalty, whether it's in postconviction relief or an active mitigation investigation?

A    Umm, that's been a significant part of my work.  I also worked for a hospice for about four years.

Q    Okay.  So aside from that, when you were not in the criminal arena at all, all of the focus in your efforts in the criminal arena have been working against imposition of the death penalty in one way or another?

A    Yes.

Q    In your first four years, it was in an after-the-fact role.  Since in private practice, you're actively working to keep a death verdict from being imposed by conducting mitigation investigations?

36

A     That's correct, but just to verify, I wasn't at the Capital Resource Center for four years.  It was more like two and a half, I think.

Q     Okay.  You and Jennifer Brewer -- your first working experience with her was on this Norris Holder case, correct?

A     Yes.

Q     And since then, the two of you have become, as you have described, very close friends?

A     Yes.

Q     Is that a fair statement?

A     Yes.

Q     In fact, when she comes to St. Louis -- I mean, when you come to St. Louis, you stay with her?

A     That's correct.

Q     When she comes to Chicago, she stays with you, is that right?

A     Yes.

Q     And you've had occasion to work together on other cases since then?

A     Yes.

Q     Over the subsequent years -- and now it's been almost seven years since the Norris Holder trial -- have you had occasion -- the two of you -- to discuss the Norris Holder trial?

A     Yes.

37

Q    And have you shared your thoughts about what had transpired during the trial and the fact that you both were disappointed with the outcome?

A    Yes, although it's been a long time since we've talked about it.  I would say it was mostly more immediately after.

Q    Okay.  When you first came into the case, you were referred in by a man named Richard Burr, correct?

A    Yes.

Q    And he is with the Death Penalty Resource Center, is that right?

A    Yes.

Q    He was in Oklahoma; now he's in Texas?

A    I think he was in Texas and now he's in Oklahoma.

Q    But at the time, he was acting as a resource to refer someone in to assist Mr. Shaw and Mr. Dede in the preparation of this case, and that was your role?

A    Yes.

Q    And you were then -- you were then working for and with Mr. Dede and Mr. Shaw, correct?

A    Through his referral, yes.

Q    Okay.  But you were -- you were -- you were working -- the attorneys that you were working for, the actual lawyers on the case, were Mr. Dede and Mr. Shaw?

A    Yes.

Q    So as an -- as an agent of them, whatever Mr. Holder told

38

you would have been protected by the attorney/client privilege; you understood that?

A     Yes.

Q     And your work that you produced to them would have been protected by work product privilege as well?  Did you understand that or know that?

A     I'm not -- you know what?  I don't know what I knew or understood at the time, but I know that, for example, in preparation for our February meeting, I shared the interview summaries with him and everybody knew that.

Q     Him?

A     I'm sorry.  With Dick Burr.

Q     Okay.  Was it clear, though, that from the beginning, that you and Mr. Burr had sort of an understanding that you were going to report to him what Mr. Shaw and Mr. Dede were doing or not doing?

A     He wanted to be kept informed about what was happening, yes.

Q     He wanted you to make him aware of what was happening; more or less, you or one of your activities was to keep an eye on what they were doing and report to him?

A     I don't -- umm, I more think it was that he wanted to be sure that we had all of the resources that we needed, and -- and so if there were things that weren't happening that he could help with, I needed to be in touch with him.

Q    He wanted you to tell him, though, on a regular basis, what was going on in the case, keep him informed?

A    Yeah, I think so.

Q    Because he indicated to you he had some concerns of his own when he came into contact with the case, correct?

A    Yes.

Q    Did Mr. Shaw and Mr. Dede know that you were doing that?

A    They certainly knew that I was in touch with Dick Burr.

Q    Did they know that you were, you know, in effect, spying on them to report back to Mr. Burr?

MR. MCGRAUGH:  Your Honor, I'm going to object to the form of the question as argumentative as to the term "spying".

THE COURT:  Sustained.

MR. HOLTSHOUSER:  I'll rephrase the question, Your Honor.

Q    (By Mr. Holtshouser) Did they understand the level of feedback that you were giving to Mr. Burr about your perceptions of what they were doing or not doing?

A    You know, I really don't know what they understood because I didn't have very much contact with them.  It was very hard ever to reach them, but I do know that I --

Q    With respect to that question that I asked you, did you ever have any affirmative indication from them that they understood that you were having that level of communication with Mr. Burr about their performance?

A     Well, I submitted a bill originally, and I don't know when, but I could look and tell you.  Initially, I submitted a bill to their office.  My guess is, without looking, but I could do that if you wanted me to today, that it covered December and part of January, and in that bill, it reflected all of my contacts with Dick Burr.

Q    Did it reflect that those contacts included reporting to him about what Mr. Shaw or Mr. Dede were or were not doing?

A     That bill outlines all of my concerns about the case.  I mean, I was trying to use that bill as a log of what my concerns were.

Q    So did you -- are you saying that you gave a bill to Mr. Shaw and Mr. Dede that said, "Reporting to Burr on activity by Mr. Shaw and Mr. Dede"?

A     You know, we could look at that -- at that bill, and I could answer that better.  I don't --

Q    Do you think -- do you think it would contain that, just from your recollection at this point?

A     I know that I -- I included things in that bill like if I had a conversation.  For example, I think in the bill I had a conversation with Brad about hiring experts, and he said something like, "Well, I don't know that we need experts" or whatever, and that's included there.  I mean, I was documenting those kinds of things.

Q     Okay.  Now, Mr. Shaw, at the time that you, in '98, when

you were dealing with him, had been in practice for many years; would you say that's true?

A    I believe so, yes.

Q    And had been a -- were you aware that he had been a successful criminal defense attorney in the state of Missouri and elsewhere for much of his career?

A    I didn't know anything of his reputation.

Q    Nothing?

A    No.  I'm from Illinois, and I really -- and I was relatively new in the field.  I didn't know anything of him.

Q    Did you attempt to talk to anybody about, you know, what they knew or thought of this Charlie Shaw, whether he was new to this field or whether he was somebody that knew his way around a courtroom and a jury?

A    Well, it was clear to me that he'd been practicing law a long time, but I didn't -- I had a lot of other things to spend energy on other than -- no, I didn't do that.

Q    Was it clear to you also that he had, through his years of practice, come to certain judgments about the right way and the wrong way to do things and he had certain ways?

A    I think he was set in his ways, yes.

Q    Okay.  And in your conversations with him, among -- among the conversations that you had, did you -- did he ever talk disparagingly about the field of social work and social workers in general?

A    Yes.

Q    And that's you he's talking about when he says that, right?  You're a social worker; you're a social investigator, correct?

A    Yeah, but it wasn't directed at me when he said it.  It was much more sort of global.

Q    So it didn't bother you at all that he disparaged the field of your profession?

A    When you do the kind of work that I do and you go to the kind of places that I go, the things that you're subjected to are much, much worse than that.

Q    Well, that wasn't my question.  My question was whether it bothered you or not that the person you were working for and with who was receiving the product of your work actually disparaged your work as well?

A    I don't think he was disparaging my work.  It didn't bother me.  I don't think he understood what I was doing.

Q    So is your answer, no, that it didn't bother you that he was disparaging your work and your profession?

A    It did not bother me, and I did not believe that he was disparaging my work.  I didn't think he understood my work.

Q    Did he make comments that you would characterize as semidisparaging?

A    No.  Again, just I think it was that he didn't understand what I was doing, and I don't think he -- he could see the

43

value, the potential value.

Q    Do you remember giving a deposition in this case just May 9th, about two months ago?

A    Yes.

Q    And do you remember being asked this question, "And do you think in that respect you didn't see eye-to-eye with Charlie Shaw in terms of the significance and value at the penalty phase?"  And that amongst your answers to that question, "He would make references to -- in a semidisparaging way, he would talk about, you know, being a social worker, being touchy-feely."

Do you remember giving that answer?

A    Yes.

MR. MCGRAUGH:  Your Honor, let me object.  It's not the complete question nor is it the complete answer.

THE COURT:  I'll permit you to explore that further on redirect.

MR. MCGRAUGH:  Thank you.

Q    (By Mr. Holtshouser) I'm going to get to the other part of the complete answer here in a second.  So, in addition to making semi-disparaging remarks about your profession, did you also feel that he had a chauvinistic type of attitude towards you and Ms. Brewer in particular because you were women?

A    Yes.

Q    And did that not bother you also?

44

A    It didn't.  I think, again, he didn't see how we could add value to what he was doing.

Q    And did it seem to you that he thought you didn't know as much about what you were doing as he did as a man?

A    Yes.

Q    And that didn't bother you at all?

A    No.

Q    Because you deal with -- in a lot of rough areas and a lot of rough things, correct?  You're investigating the backgrounds of people charged with capital crimes?

A    That's correct.

Q    People aren't always happy to see you or welcome you into their homes to talk to you, do they?

A    Most of the time, I'm welcomed in the homes that I go to, but, you know, the neighborhoods that I'm in often leave something to be desired, yes, sir, and -- yeah, yeah.

Q    Now, you investigated, as best you could in a short period of time, what you considered a short period of time, working many long hours, in an intense period, the life of Norris Holder, is that correct?

A    Yes.

Q    And in that period, were you able to discover and develop a majority of Norris Holder's life?

A    I believe so.

Q    Anything significant that you think you missed because

you just didn't have time to find out about it that you've since found out about it?

A     There are a couple of things that we didn't get to investigate as thoroughly as we would have liked, yes.

Q     And was one of those what you referred to as the desegregation angle?

A     Yes.  Well, angle?  Issue, I think.

Q     Issue concerning whether or what effect or negative or positive it had on Norris Holder to be educated at Rockwood High School in the desegregation program?

A     Uh-huh.

Q     And what was the other thing?

A     We didn't get to explore the head injury issue and do a neurologic eval.

Q     And there's been some work done on that since then?

A     That's my understanding, yeah.

Q     But aside from those two things, you felt like that you were able to get to and investigate and explore, develop the witnesses that would tell most of the significant parts of Norris Holder's life, is that right?

A     That's correct.

Q     And I think you've referred to it that there was a great story to tell there about Norris Holder's life, correct?

A     Yes.

Q     And there was some disagreement between the value that

46

you placed on that -- the significance of that story to the ultimate outcome and the value that Charlie Shaw placed on it; would you agree with that?

A    I don't know about value.  I'm not sure that Charlie ever understood well enough what we were doing to make a determination.

Q    Can you be more specific what you mean by he didn't understand what you were doing?

A    Well, if you don't read the witness summaries and you don't read the sentencing hearing outline and you've never looked at the records, I don't see how you can know what the story would be.

Q    Okay.  And you're positive, you feel firmly convinced that he did not read those items, is that right?

A    He told me he wasn't going to.

Q    Okay.  But anything in his subsequent actions or conduct indicate that maybe he had a little bit better understanding of them than he led on?

A    No.

Q    Okay.  And you don't think he understood what you were doing, is that right?

A    I don't think he understood how it could come together in a way that would be helpful to Norris, and again, I don't think that he thought we would get to a sentencing hearing.

Q    Well, that isn't my question.  My question has to do with

what you perceived as the difference between you and Mr. Shaw in terms of your view of this mitigation evidence, and you've stated several times you just don't think he understood what you were doing.

A     That's correct.

Q     Try to relate to us what it was you were doing that was so complex that this lawyer of so many years couldn't understand.

A     Well, we had a story to tell about Norris Holder's life.

Q     Okay.

A     And I believed that if we presented that story to the Jury and we pulled that story together in the closing argument and showed how the different things that had happened in Norris' life came together to -- to come to the day of the offense, that the Jury might spare Norris' life.

Q     And --

A     And --

Q     -- is there any room in that belief for the possibility that maybe it might not have that effect on the Jury?

A     Well, sure.  I think it's impossible to know for sure what a jury will do.  What I know is that we put the evidence in, but then it never got pulled together.

Q     So is it safe to say, though, that you thought that this great story of Norris Holder's life, if told to the Jury and pulled together, as you said, might motivate the Jury to give

him a sentence of life rather than death; that's what you believed, correct?

A    Yes, yes.

Q    Did you get the sense that Mr. Shaw didn't agree with you, that he didn't think that the life story of Norris Holder was all that great or complicated or that, if told, the Jury would give a verdict of life versus death?

A    I don't believe he ever understood the story of Norris Holder's life.  He would make reference to, "Oh, well, you know, just because he was raised in a housing project, that that doesn't make it an excuse."  Well, there was so much more to his life than the fact that he was raised in a housing project that Charlie just didn't -- didn't understand.

Q    Okay.  With -- with respect to the Jury who was going to impose this sentence, what, if any, knowledge did you have of the audience that would receive this great story of Norris Holder's life?

A    I didn't know anything particularly about this Jury.

Q    Had you ever worked on any cases in the St. Louis, Missouri, area before?

A    No.

Q    So the housing projects that you were -- that were being referred to, the things that had gone on in Norris Holder's life, the train yard, for example, where Norris tried to jump a train and lost his leg as a teenager -- those were all

49

things and places that you were not previously familiar with, correct?

A    Correct.  Prior to this case, yes, that's correct.

Q    And so you had no idea how a jury of St. Louisans might perceive this evidence, is that right, because you didn't know this Jury, did you?

A    That's correct, but there are certain things that carry over, I think, from one jurisdiction to the next.

Q    Who do you think had a better sense of what a St. Louis jury -- how a St. Louis jury would react and evaluate the evidence -- you or Mr. Shaw?

MR. MCGRAUGH:  Your Honor, I'm going to object as it calls for a conclusion.

THE COURT:  Yeah, I think it does.  Sustained.

Q    (By Mr. Holtshouser) Let me direct your attention to the topic of Norris Holder's decision to testify, which is one of the issues that has been identified as being the focus of this hearing.  From your -- you had several contacts with Mr. Holder in the course of getting from him the leads you needed to conduct your investigation, is that right?

A    That's correct.

Q    And in the course of that, did Norris Holder tell you that he wanted to tell the Jury how it happened, meaning the bank robbery incident in question?

A    I don't remember verbatim what he said, but it was more

that he believed that if the Jury knew how it happened, that he'd go home.

Q    Did you -- did you take from that, though, a sense that Norris wanted to tell the Jury his story himself?

A    Oh, I don't know what his plan was in terms of testifying, but -- but he -- he seemed to believe that if the Jury knew what had happened, they would let him go home.

Q    Okay.  He felt that if he could just tell the Jury how it happened, that somehow they would let him go home?

A    Yes.

Q    Did you see any value in terms of a mitigation strategy, and the object of mitigation is to motivate a jury to impose life and not death or basically two choices, correct?

A    Yes.

Q    Did you see any value in a mitigation strategy to showing that Norris was less culpable than his Codefendant Billie Allen?

A    I'm not sure that Norris was less culpable than Billie Allen.  You know, I don't know.  I mean, I guess if we could have shown that absolutely, there'd have been value in that, but I don't know that I believed we could do that.

Q    Well, in the course of your discussions with Norris, he certainly maintained consistently to you, didn't he, that what Billie Allen did was not in his thinking, is that right?

A    Umm, I don't know that that's correct.

Q    In the course of your conversations with him, did Mr. Holder tell you that he intended for Billie Allen to walk into the bank and execute the guard?

A    We didn't discuss the offense like that.

Q    Okay.  Did he indicate to you, in fact, to the contrary, that he didn't want anyone to get hurt, that no one was to get hurt, and that he had not, in fact, fired his gun in the bank and had not fired the bullets that killed the guard?  Are those consistent things that he stated to you?

A    He absolutely told me that he hadn't intended for anybody to get hurt.

Q    Okay. Let's just stop right there.  Do you think that would have any value to a mitigation strategy to convince the Jury of that, in choosing between life and death, to convince them he did not intend to happen what actually happened?

A    I think it would, but I'm not sure that it would coming from a defendant.  I think if we'd been able to -- I mean, I'm not sure how believable defendants are.  I don't place a lot of value in what my clients can tell the jury because they, obviously, have a huge motivation.

Q    Well, if Norris could convince them that he was telling the truth and if other evidence that Mr. Shaw could muster could corroborate that, would that have any value in a mitigation strategy?

A    Yes.

52

Q    Would showing remorse for what had happened on the part of Norris Holder have value in a mitigation strategy?

A    Yes.

Q    And in this case, could you think of -- were you able to discover any way for Norris Holder to -- strike that.  In this case, were you able to discover any way to communicate remorse to the Jury without Mr. Holder testifying?

A    We didn't put a lot of effort into that.

Q    Did you have a witness who was going to come in and say that "I've spoken with Norris and he is just broken up over this and regrets it every day and feels bad about it"?

A    No.

Q    You had some alternative strategies that you thought might work, such as a letter, uncross-examined allocution, et cetera, but in terms of presenting evidence to the Jury, there was no other way than Norris testifying, was there, that he was sorry for what had happened?

A    Well, I had the other ideas that you had mentioned.

Q    But beyond those, there was no other way, was there?

A    Right.

Q    The decision to testify -- did you characterize that or was that -- did you -- was that Norris' decision?

A    Oh, I don't have any idea.  I wasn't there when that happened.

Q    Was he always talking about the fact that he was going to

53

testify in your communications with him?

A    No.   He would talk about, you know, if the Jury knew the truth, they would send him home.

Q    Do you remember giving -- again, you remember your deposition in this case, correct?  I'm going to ask you a question about that now.  Do you remember this question?

"In other words, in the days immediately preceding the actual decision for him to testify."  Let me back up so you understand the context.  "Did you have any conversations with Norris leading up to his decision to testify?"

Your response was, "I'm sorry?"

"During the trial.  In other words, in the days immediately preceding the actual decision for him to testify."

All right.  You said, "No, but I never thought it was a decision that he made, like, a day or two before he testified. He was always talking about he was going to testify."

Do you remember giving that answer?

A    I do, and I think that I need to clarify that.

Q    Okay.

A    He was talking about if he told the Jury what had happened, the Jury would let him go home, which I think I probably perceived as a decision to testify, but I don't actually know that that's what it was.

Q    But it was something, though, that didn't just come up at the last minute; it was something that he was talking about

consistently from the time of your first encounter with him?

A    I don't believe he talked about it in my very first visit with him.  In my very first visit, he expressed a great deal of remorse.  I think it was --

Q    In your next visit then?

A    I can't remember specifically, but I don't --

Q    Well, what do you mean by he was always talking about he was going to testify?  What does "always" mean then?

A    In my visits with him, he would talk about -- and I think this came from -- I think it was an impression he had from Charlie that if he told the Jury the truth, that he would be able to go home.

Q    What did you say when Norris said those things to you?

A    I don't remember specifically, but I generally don't believe it's a good idea for my clients to testify.

Q    That wasn't my question.  When Norris would say to you in your meetings with him about how he was going to testify and about how if he testified he might not get the death penalty or he would go home, what did you say in response?

A    Well, see, I don't think that Norris was saying to me that he was going to testify.  I think Norris would be talking about how if he told the Jury the truth, he could go home, and I -- you know, that wasn't the purpose in my visiting him.  I can't remember specifically, but I wouldn't have been having conversations with him about testifying, per se.

Q    To the extent that you had conversations where Mr. Shaw shared with you, the mitigation investigator, what his defense strategy was, did you get the sense that part of that strategy was to show that Norris Holder was less culpable than Billie Allen?

A    I don't think I ever understood what Charlie's strategy was.

Q    Did you ever have a discussion with him where he indicated that that would be his strategy?

A    I don't think I understood what Charlie's strategy was going to be.

Q    All right.  Again, back to the deposition, do you recall me asking you this question?  "Did you understand" --

         MR. MCGRAUGH:  What page, Counsel?

         MR. HOLTSHOUSER:  I'm on page 38, line 14.

Q    (By Mr. Holtshouser) "Did you understand that it was a major component of Charlie Shaw's defense strategy to portray Norris as not having been the one who fired, either fired his gun at all or fired his gun into the guard?

         Answer:  He talked about how Norris -- Charlie talked about how Norris was less culpable.

         And did you understand that to be a central feature of his defense strategy?"

         And your answer was, "Yes."

         Do you recall that question and answer?

A     I do.

Q     Okay.  Let's talk now about mitigation.  It was your belief that nothing had been done with respect to mitigation prior to your coming into the case, is that right?

A     Yes.

Q     Ms. Tatelli, I'm going to show you what's been marked as Exhibit Q.  I don't think you've seen this before, so take a chance to look at it.

          THE COURT:  Do you have water up there?  There should be some there to your left.

          THE WITNESS:  Thank you.

          Is there something I need to do?

Q     (By Mr. Holtshouser) Did you have a chance to look at that?

A     Yes.

Q     All right.  Does Exhibit -- does Exhibit Q purport to be a letter dated May 30, 1997, from Mr. Shaw to Joseph Landolt?

A     Yes, it does.

Q     And you know that Joseph Landolt, the attorney seated here at the table with me, is one of the prosecutors who handled the Norris Holder case?

A     Yes.

Q     And May of '97 would have been approximately six months before you got into the case, is that correct?

A     That's correct.

Q    And your impression when you came into the case was that nothing had been done with respect to mitigation, is that right?

A    That's correct.

Q    I'm going to direct your attention to the paragraph that begins on the bottom of page 1 and then over to the next page, the next two paragraphs.  Do those paragraphs purport to relate to Mr. Landolt certain information about Norris Holder's life in an effort to convince Mr. Landolt that mitigation outweighs aggravation and that the Government should not seek the death penalty in this case?

A    Certainly, it gives a sense of Norris' life history in broad strokes.  I don't know about mitigation outweighing aggravation.

Q    Okay.  In the first sentence, does it indicate that Norris Holder had significant events in this life which should be considered as mitigation requiring a sentence of life should a conviction or plea agreement be reached?

A    Yes.

Q    And among those, that Mr. Holder has come from a dysfunctional family, which resulted in his moving from various schools?

A    Yes.

Q    That was something that your investigation bore out, correct?

58

A     Yes.

Q     Mother and father had been separated for several years, and even before separating, the father would spend little time at home; that was something that your investigation bore out, correct?

A     Yes.

Q     And was the lack of a male role model in the home a significant feature of the mitigation evidence that you presented?

A     Yes.

Q     A variety of witnesses were brought in to testify to that, correct?

A     Yes.

Q     In the next paragraph, Mr. Holder has been adversely affected as a result of being run over by a Burlington Northern train when he was 14 years old.  He had to have one leg amputated at the knee and a toe amputated from the other leg.  As a result, he wears a prosthetic device.  He had to miss several days of school as a result of being late to the bus stop because of his prosthetic device.  Again, was that something your investigation bore out?

A     Yes.

Q     And was the issues associated with Mr. Holder's prosthesis a significant portion or a significant part of the mitigation evidence that you and Ms. Brewer presented?

A    Yes.

Q    And, in fact, was there some assertion that the desire for a better prosthetic device was a motivation for committing the bank robbery in question?

A    Yes.

Q    And did Mr. Holder -- in the next paragraph, Mr. Holder has no significant criminal history.  To our knowledge, Mr. Holder had a juvenile charge for possession of a controlled substance and successfully completed the probation period.  When he was 18, Mr. Holder received probation for possession with intent to sell a controlled substance and possession of a firearm.  He currently has pending in the city a charge of tampering, and that case has not been disposed of.  Was that lack of a significant criminal history also something that your investigation bore out?

A    Yes.

Q    And was that, likewise, a significant feature of your mitigation evidence that you helped to develop?

A    Yes.

Q    Would it be fair to say then that it is not correct that nothing had been done with respect to mitigation prior to your entering into this case?

A    Yes.  But I should say I have never seen this.

Q    Okay.  I understand.  The mitigation evidence that you did develop, though -- you felt that everything that you had

60

developed got admitted at trial and got used at trial?  In other words, the major features of Norris Holder's life story got told to the Jury, didn't it?

A    At sentencing, yes.

Q    In the penalty phase?

A    Yes.

Q    Was Mr. Shaw critical of the evidence that you -- that Ms. Brewer presented with your assistance?

A    Yes.

Q    And how did he criticize it?

A    He didn't see any -- any value in it.

Q    And did he -- well, did he, in fact -- did he, in fact, express the opinion that he didn't think the Jury, who would make this decision, would give value to it?

A    Yes.

Q    Were you aware of the actual contents of the verdict form that was returned by the Jury?

A    At the time when they vote on each of the mitigators, is that what you're asking about?

Q    Correct.

A    Yeah, I was in court, and I listened to that when they came back and it was read in.

Q    Okay.  And do you recall that?

A    Sort of.

Q    I mean, the Jury heard all of the mitigation evidence you

wanted it to hear, and then they were asked about each of those particular -- each of the mitigation points, and I think there was 18 or 20 of them.

A    Yes.

Q    And then they were asked to decide whether they thought those were mitigating or not, correct?

A    Yes.

Q    And in terms of the tally, not too many -- I mean, did you have an impression of whether or not the Jury had accepted all of your points or mostly had rejected them?  What was your impression of the outcome?

A    If I remember correctly, we heard how many jurors had voted which way on each of the proposed mitigators, and I remember thinking that the Jury had found -- not unanimously, but had found on many of our mitigators.

Q    Okay.  Let me show you Exhibit R, which I think has been referred to before, but this is your sentencing outline.  Is it important to have a consistent overall strategy between guilt phase and penalty phase to maintain credibility with the Jury?

A    Yes.

Q    And you've already -- you've already mentioned, I think we've established that a major component of Mr. Shaw's strategy was that Norris was less culpable, had not fired his gun in the bank, had not fired the fatal shots, is that right?

A      Yes.

Q      In your sentencing outline that you have there, is that anywhere a part of your sentencing outline -- those concepts of Norris being less culpable?

A      No, but the sentencing outline is based just on the developmental life history work that I was doing.  It's not meant to discount that.

Q      And this is one of the things that you would have given Mr. Shaw?

A      Yes.

Q      So you gave him the sentencing outline and -- of themes? I think it's called a themes outline?

A      Uh-huh.

Q      And nowhere in your themes is the concept of Norris Holder being less culpable than Billie Allen?

A      That's correct.

Q      In preparing the mitigation, did you -- did you investigate and develop it with an eye towards making sure that no evidence was developed or presented which would, for lack of a better word, backfire on the overall strategy?

A      This is -- this is subtle, but I don't --

Q      I'm sorry.  I didn't hear the first; this is what?

A      Subtle.

Q      Subtle.  Okay.

A      While I understood that Charlie intended to present as

part of his defense that Norris wasn't as culpable, I really never felt that I understood his overall strategy, and we certainly didn't have, you know, strategy meetings where we talked about how the whole case would come together and who would be responsible for what pieces and how the evidence would come in. We didn't do that kind of strategizing and that looking at how everything came together. So while I knew about various components, I -- I didn't even really understand what all of the evidence was against Norris.

Q    But you understood at least that a component of the case was to show that Norris was less culpable than Billie Allen, had not fired the fatal shots, had not fired his weapon, had no intent to harm anyone in the bank, correct?

A    Yes, but I -- I also believed that, at least if I understood correctly at the time what Dick Burr was saying to me, none of that would matter, that if Norris was present and participated and had participated in the --

Q    Well, none of it would matter in terms of -- perhaps, it would or wouldn't matter, but Mr. Burr is telling you that wouldn't matter legally, is that correct?

        MR. MCGRAUGH:  Your Honor, could the witness be allowed to finish her question?

        THE COURT:  Yes, so long as it's responsive.  The question was, "But you understood at least that a component of the case was to show that Norris was less culpable than Billie

Allen, had not fired the fatal shots, had not fired his weapon, had no intent to harm anyone in the bank, correct?"

And you said, "Yes, but I -- I also believed" -- and talking about Mr. Burr, so that part is unresponsive.  You may answer the question if you care to, which is, "But you understood at least that a component of the case was to show that Norris was less culpable than Billie Allen, had not fired the fatal shots, had not fired his weapon, had no intent to harm anyone in the bank, correct?"  You may answer that question.

A    I know that that's what Charlie's position was.  I never looked at the evidence myself.

Q    (By Mr. Holtshouser) Okay.  But you understood that was a component of both his guilt and his penalty phase strategy to convince this Jury that Norris was less culpable than Billie Allen in those respects?

A    I knew it was a part of his guilt phase strategy.  He never strategized with me about penalty phase.

Q    Okay.  Let's talk for a minute about Cortez Harris, one of your penalty phase witnesses.  Do you recall what value he added to telling the story of Norris Holder's life?

A    I think he talked about the way Norris grew up, some of the difficulties that he faced, and I also believe that he was the witness who provided the testimony that Norris had hoped to replace his prosthetic device, to be able to buy a better

prosthetic device with the proceeds from the robbery.

Q    And Cortez Harris was somebody who was a close friend or associate of Norris Holder?

A    A peer.

Q    A peer, same age group, correct?

A    Yes.

Q    And were you in -- were you in any of the guilt phase trial to see the extent to which Mr. Shaw had gone to create this image of Mr. Holder as less culpable than Billie Allen?

A    I was in the courtroom a few times, but I certainly wasn't there enough to know how the evidence had come in.

Q    And was Norris -- was Cortez Harris also the witness through whom it was established that Mr. Holder had discussed with Cortez the concept that the guard had to be taken out and that the way they thought they were going to do it was through a stun gun?

A    I've heard that, but I didn't know that, and I can't -- I don't know where I heard it, when I heard that.

Q    Can you see, though, how that might undermine his strategy of showing Norris to be less culpable?

A    Yes.

Q    And that if that -- and that when that evidence was presented, that that might give him less than confidence in you and Ms. Brewer and the consistency of what you're presenting with what he'd worked to establish?

A      I'm sorry.  Can you -- can you repeat your question?

Q      I'm not sure I can because it was kind of complicated. Let me try again.  Can you see, though, that that might have some impact on Mr. Shaw's confidence, a negative impact on his confidence in the evidence you were developing to present in the penalty phase, something that would, in effect, hurt that strategy of showing him less culpable than Billie Allen?

MR. MCGRAUGH:  Your Honor, I'm going to object because I'm not really quite sure what the -- I'm going to object on the basis of foundation and it calls for a conclusion as to what Mr. Shaw would have thought.

MR. HOLTSHOUSER:  I'll concede the objection and move on.  It does call for a conclusion, so --

THE COURT:  All right.

Q      (By Mr. Holtshouser) You wrote a memo to file that's been referred to after this case was over, correct?

A      Yes.

Q      And what was your purpose in doing that?

A      To record at the time the concerns that I had.

Q      And was -- was the primary topic of the memo criticisms of Mr. Shaw, Mr. Shaw's performance in your eyes?

A      Or concerns that I had about things he hadn't done, yes.

Q      Okay.  And given your past experience, you -- you understood the -- the value that your insights might have to some day being part of a 2255 claim like this claiming that

Mr. Shaw and/or Ms. Brewer were ineffective?

A    That's correct.

Q    So, in effect, following the imposition of a death verdict, you created a memo that you knew would some day be used in support of Norris Holder's 2255 and his efforts to attack that verdict, correct?

A    You know, I'd never been involved in a federal death penalty case where there'd been a death verdict before, so I didn't know how the appeals process worked, but I was hopeful that by recording what had happened at the time, I would preserve the information in a way that would be helpful in the future.

Q    Was -- you -- did you listen to the closing argument of Mr. Shaw?

A    Yes, I did.

Q    All right.  And in your -- in your memo -- let me -- well, forget the memo for a second, but were you critical of his closing argument to the extent that it, in essence, conceded Mr. Holder's involvement in the bank robbery?

A    I -- I think my criticism of the closing argument was that he --

Q    Well, my question wasn't what your criticism was, but was your criticism the fact that he had conceded, in effect, his guilt of the bank robbery?  Were you critical of that point at all?

68

A    I -- I was critical that he argued the facts of the case in the closing argument at sentencing.

Q    Were you critical of the strategy of conceding guilt?

MR. MCGRAUGH:   Excuse me, Your Honor.   Are we talking about the guilt phase or penalty phase?

THE COURT:   Penalty phase.

Q    (By Mr. Holtshouser) Penalty phase is the argument you heard, right?

A    Yes.

MR. MCGRAUGH:   I'm sorry.

A    I think it's broader than just the concession of guilt. I thought that given the short amount of time that the Jury had been out after the guilt/innocence portion of the trial, that to go back and argue the facts of the offense at the end of the sentencing hearing when we had put in what I believed was a rather complex amount of evidence -- that I didn't think that that was a good use of the closing argument.

Q    (By Mr. Holtshouser) In your memo that you prepared immediately afterwards -- have you reviewed it recently?

A    Yes.

Q    You reviewed it again today, I believe?

A    Yes.

Q    In there, do you anywhere criticize his strategy of conceding guilt?

A    I'd have to look at it again.  I --

69

Q    Do you have that with you that you can look at it again?

A    No.

MR. HOLTSHOUSER:  What'd you call this -- 1?

MR. MCGRAUGH:  1.

MR. HOLTSHOUSER:  I show you what's been marked as 1 for identification.

THE COURT:  Movant's 1?

MR. HOLTSHOUSER:  Defendant's 1.  I'm sorry. Plaintiff's 1.

THE COURT:  Plaintiff's 1.

MR. HOLTSHOUSER:  Plaintiff is Mr. Holder.

A    I think in my memo, what I say --

THE COURT:  Is this the same -- just a minute.  Is that the same as Government's Exhibit R?

MR. HOLTSHOUSER:  No.  Government's Exhibit R, which you -- is a copy -- R is a copy of a May 30, 1997 letter from Mr. Shaw to Mr. Landolt.

THE COURT:  Okay.  Well, I am all mixed up because I have Q -- I have Government's Exhibit Q as being the May 3rd letter.

THE WITNESS:  I have Q as the letter and R as the sentencing hearing outline.

MR. HOLTSHOUSER:  Okay.  My mistake.  Sentencing hearing outline is R.  The letter is Q.  This is actually Plaintiff's 1, the memo that was used to refresh her

recollection.

THE COURT:  Okay.

MR. HOLTSHOUSER:  So, Judge, just to review, P is the Grand Jury file.

THE COURT:  Yes, I have that.

MR. HOLTSHOUSER:  Q is the letter.  R is the sentencing outlining.

THE COURT:  Yes, I have that.  Thank you.

A    I say in here that he relied heavily upon the facts of the case.

Q    (By Mr. Holtshouser) Okay.  But in terms of the strategy of conceding his guilt of the involvement in the bank robbery, that was not a component of your criticism?  Your criticism was that he talked too much about the facts of the case, not enough about the mitigation that had been developed?

A    Correct.

Q    Okay.  Anything in your memo about the failure of Mr. Shaw or Ms. Brewer to file motions attacking either the statutory aggravator or pecuniary gain or the fact that the Grand Jury had not indicted him on the statutory aggravators?

A    No.  But this is only my second federal capital case.  I don't -- I was not sure I understood even really how aggravators and mitigators worked exactly.

MR. HOLTSHOUSER:  May I have just a second, Your Honor?

THE COURT:  Sure.

MR. HOLTSHOUSER:  I apologize.

Q   (By Mr. Holtshouser) I think you indicated you didn't really know anything about Mr. Shaw when you first came to St. Louis.  After you got here and during the course of your involvement in this case and sitting through this trial, sitting through the Allen trial, did you gain any more knowledge about Mr. Shaw's reputation in the St. Louis legal community during that process?

A   Well, I didn't sit through either of the trials, and somewhere along the line -- and I can't say if it was then or later, but I arrived at the impression that he had once been a very well-respected attorney but that that was a thing of the past.

Q   Okay.  And you, yourself, are not an attorney, correct?

A   That's correct.

Q   You have -- let me focus on the issue of who gave the closing in the penalty phase because I understand you are -- that is one thing that you are not happy about is the fact that Charlie Shaw gave the closing, is that correct, in the penalty phase?

A   I thought that it was a mistake for him to make the closing argument.

Q   And you thought that Jennifer Brewer should have made the closing, correct?

A    Yes.

Q    And why did you think that?

A    Because she had worked to develop the mitigation and understood how all of the different issues came together.

Q    To what extent did -- in her -- and is that based on your communication with her?

A    Yes.  We worked together very closely on this.

Q    And you're focusing on the features of Norris Holder's life, correct?

A    Yes.

Q    And to what extent did Ms. Brewer communicate to you the importance of stressing the theme of Norris Holder being less culpable than Billie Allen in causing the death of Richard Heflin?  Was it expressed by her at all as a priority or an issue?

A    You know, I don't remember.

Q    It must not have been then if you don't even remember her mentioning it.

A    Well, I know we talked about the idea that Norris wasn't as culpable as Billie Allen.  I mean, I know we talked about that, but I also know that we talked about how that probably didn't really matter given the law.

Q    Didn't matter in a legal sense?

A    Exactly.

Q    What about in the sense of the judgment that the Jury

would make in choosing between life and death for Norris Holder?  Do you think that that might -- do you think that that would make -- have any impact on their choice?

MR. MCGRAUGH:  Well, Your Honor, I'm going to object as to what -- it calls for a conclusion as to what she may think a jury --

MR. HOLTSHOUSER:  Well, Judge, I think it goes to inform the Court in terms of the basis of her criticism of the -- who gave the ultimate closing.

THE COURT:  I don't know -- I don't know precisely the extent of her qualifications in regard to juror selection or anything like that.  If -- if a foundation is laid so that she has some particular knowledge along that line, then I think it would be relevant, but if it's just asked based upon her expertise as a forensic sociologist and not as someone who has done work and study on juror behavior and things like that, then I think the -- the objection is probably valid.  So if you can lay a further foundation, I'll hear it again.

MR. HOLTSHOUSER:  Okay.  I'm actually going to just shift topics, Your Honor, and move away from that point.

THE COURT:  All right.

Q    (By Mr. Holtshouser) Among the reasons that you thought that Jennifer Brewer should give the closing was that you felt that she had the experience and could give a better closing than he could in the penalty phase, is that right?

A    It was more the latter, that she understood what we had developed better.  I don't know that I was weighing particularly experience.  I mean, Charlie was clearly an older and, therefore, more seasoned attorney, but Jennifer was the one who had met the witnesses and had prepared the witnesses and had been through the records and knew what it was that we were trying to accomplish in terms of the life history story we wanted to tell.

Q    And what was your understanding of Jennifer's experience?

A    Umm, I think that, at the time, I believed that she had more experience than I now know she did.

Q    And how do you now know her experience level?

A    Umm, something you asked me in the deposition caused me to go back and ask Jennifer something about her experience, and I don't remember exactly her response, but I remember thinking I believed she had more capital experience than she really did.  I know that, you know, Dick Burr had told me repeatedly that he was looking to try to find me an attorney who could work with me on the sentencing piece, who would know what to do with it, and so when he presented her and she was able to work with me, I think I probably assumed she had more experience than she did.

Q    Okay.  I'm not asking for you to set the record straight on what her experience actually is.  She can do that, but what was your understanding of her experience level in terms of

forming your judgment that she should have given the closing, not Mr. Shaw?

A    I don't know that I -- I mean, I didn't ask her, you know, "How many cases have you tried" or "How many closing arguments have you given in a capital case?"  So I can't quantify it, but I know that Dick Burr had -- had endorsed her involvement, and for me, that was good enough.

Q    Did you know whether she had ever given a closing argument in the penalty phase of a capital case prior to the Norris Holder trial?

A    I didn't know, I don't think.  I think I assumed that she had.

Q    And what was that assumption based on?

A    Probably the fact that Dick Burr endorsed her.

Q    And did you have some -- did you feel that you had some knowledge that she had actually tried capital cases within the Public Defender system in Kansas City, Missouri?

A    I think I thought she was more experienced than she was.

MR. HOLTSHOUSER:  Those are all the questions I have, Your Honor.

THE COURT:  Redirect, Mr. McGraugh?

MR. MCGRAUGH:  Yes, Your Honor.

MR. HOLTSHOUSER:  Judge, I'm going to offer Q and R.

MR. MCGRAUGH:  Judge, I have no objection to R, but Q, I'd like to reserve my objection to until I have had an

opportunity to redirect.

THE COURT: All right. At this time, R is received, but I'll reconsider the offer after the redirect. You may redirect at this time.

MR. HOLTSHOUSER: Thank you, Judge.

REDIRECT EXAMINATION

BY MR. MCGRAUGH:

Q    I might jump around a little bit, Ms. Tatelli, so bear with me. Let's just kind of start where Mr. Holtshouser left off as to your opinion as to why it was more prudent for Ms. Brewer to give the closing argument. I believe you stated that you felt it was better because she had actually presented the evidence and had done the investigation?

A    Yes.

Q    Okay. Why is that important? As far as your concern, your criticism here, what importance does that have in actually a presentation of a closing argument?

MR. HOLTSHOUSER: Judge, I think this is a -- that is the same objection Mr. McGraugh just made is that I think she lacks the foundation to be giving opinions about the propriety of closing argument. I thought he made that objection; it was sustained with respect to when I asked the question. I don't think any better foundation has been laid at this stage.

MR. MCGRAUGH: Your Honor, my question doesn't go as to how the -- how it's received, but it's been a matter of

discussion both on direct and cross-examination as to her criticism as to this, and I want to further explore as to what the basis of her criticism is as to why she thought that was important that -- I mean, we know that she thought it was important that she -- that Ms. Brewer do it and why, but what do those factors have to do with ultimately giving a closing argument?

THE COURT:  All right.  Yeah.  So long as the testimony goes to the inquiry about the fact that Ms. Brewer did the preparation and did the presentation of the witnesses, insofar as your testimony relates to why it's important for her to give the closing, I'll hear it, but not as to any impact it might have on the Jury.  You may answer the question.  Do you understand?

THE WITNESS:  Yes.

THE COURT:  Okay.

A    We spent two-and-a-half days putting evidence in and having witnesses testify, and -- and there was a story there, but I think the story was only clear if all of the different threads were pulled together, and if you look at what Charlie did in the closing argument, he barely touched on any of what we did in the two-and-a-half days that we put the mitigation in.  Had Jennifer done the closing argument, she would have pulled all of those pieces together in a cohesive story.

Q    (By Mr. McGraugh) So it was to tie these many witnesses

together as it relates to these mitigating circumstances?

A     Yes.

Q     And why those mitigating circumstances have some significance?

A     Yes.

Q     And that wasn't done in Mr. Shaw's closing argument?

A     That's correct.

Q     And your decision or your opinion or criticism that -- of Mr. Shaw doing the closing argument wasn't based on how much experience one lawyer had versus -- is it as to who could pull it all together or tie it together, as you say?

A     That's correct.

Q     You had -- Mr. Holtshouser asked you about a component of Mr. Shaw's defense strategy was the lack of culpability or the fact that Mr. Holder was less culpable than Mr. Allen, is that correct?

A     Yes.

Q     Do you remember that line of questioning?  Well, I guess we should first -- was there ever a strategy session or a meeting between yourself and Mr. Shaw or Mr. Dede as to what the defense strategy would be in the penalty phase?

A     No.

Q     All right.  Is that something, in your experience, is common?

A     Yes.

Q    And it's something that you do throughout your representation; one is to help develop defense strategies in the penalty phase?

A    Insomuch as it's important that the defense strategy and the -- what's done at sentencing relate, fit together.

Q    Did he ever communi -- did Mr. Shaw ever communicate to you what his defense strategy was in the penalty phase?

A    No.

Q    As to the lack or the fact that Mr. Holder was less culpable than Mr. Allen, was that a guilt phase strategy or a penalty phase strategy?

A    I perceived it to be a guilt phase strategy.

Q    And is it my -- and did Mr. Shaw ever believe you would get to a sentencing phase?

A    No.

MR. HOLTSHOUSER:  Well, Judge, I'm going to object as to what she thinks Mr. Shaw believed.

MR. MCGRAUGH:  I'll withdraw that, Your Honor.

THE COURT:  Okay.

Q    (By Mr. McGraugh) Did Mr. Shaw ever tell you or was there any discussion with Mr. Shaw as to whether there would be a need for a sentencing phase or a penalty phase?

A    Yes, we discussed it, and he said we wouldn't get to a sentencing hearing.

Q    And the reason was why?

A    Because Norris wasn't as guilty as -- as culpable as Billie Allen.

Q    You were asked about the witnesses that went on in the sentencing phase.  Did you interview each individual that testified in the sentencing phase as to the mitigation portion?

A    Yes.

Q    All right.  And you have a sentencing outline there, which is R, is that correct?

A    Yes.

Q    And you placed nonstatutory mitigating factors which would be included in the sentencing outline, is that right?

A    Yes.

Q    Okay.  And they would be at -- have to do with the loss of Norris' leg?

A    Yes.

Q    And how that affected him?

A    Yes.

Q    And the affect of Norris' inconsistent parenting?

A    Yes.

Q    That was a component of your sentencing, is that right?

A    Yes.

Q    And that was part of the witnesses that you put on?

A    That's correct.

Q    That Norris assumed a role of a father early on --

A     Yes.

Q     -- at a young age?  That he lacked a positive role model?

A     That's correct.

Q     That Norris felt a sense of responsibility to provide emotional financial support to his family?

A     Yes.

Q     That he had been a father figure to his brother Norm?

A     Yes.

Q     That Norris was a likeable person and provided support and help to his extended family and friends?

A     Yes.

Q     That Norris had a history of violent behavior and offenses which were inconsistent with his personality and unusual behavior?

A     Yes.

Q     Okay.  That --

          MR. HOLTSHOUSER:  Judge, I'm not sure what the question is here, but is Ms. Tatelli being asked to confirm what was in the --

          MR. MCGRAUGH:  I'm asking whether these themes were part of her sentencing outline or sentencing strategy.

          THE COURT:  I thought it was -- I thought it was whether these were part of the sentencing memo.  Let me back up and see.  Just a moment.  I guess it wouldn't matter.  It would be the same question.  Just a second.

Okay.  "And you placed nonstatutory mitigating factors which" -- oops -- just a second.  I need to outline all this down a minute.

"And you placed nonstatutory mitigating factors which might be included in the sentencing outline, is that right?

Yes.

And they would be at -- have to do with the loss of Norris' leg?"

Yeah, overruled.

Q    (By Mr. McGraugh) So those items that we just went through were part of your sentencing strategy or sentencing plan, is that correct?

A    That's correct, but that's not all of them.

Q    I understand.

A    Okay.

Q    And those were themes that you had tried to share with Mr. Shaw?

A    Yes.

Q    But he rejected those?

A    I don't know that he ever looked at them.

Q    And was part of your sentencing theme or sentencing strategy that -- that he didn't fire the shots in the bank?

A    No.

Q    And that -- was part of your sentencing strategy that he didn't intend for anyone to get killed?

83

A    No.

Q    And in your -- in your memorandum that you prepared in April of '98, your criticism of him arguing the facts in the case -- is that what you're talking about?

A    Yes.

Q    Okay.  And those facts were argued in the first phase, were they not?

A    Yes.

Q    And, obviously, the Jury rejected those?

A    Yes.

MR. HOLTSHOUSER:  Objection, Your Honor.  I think that's an incorrect conclusion to draw from the verdict, and this witness has no basis to draw that conclusion.

THE COURT:  Overruled to the extent that they concluded that he was guilty, but -- overruled.  Overruled if you -- if it's your -- if it's your testimony that he was found guilty based upon the argument in the first stage about that he did not intend that shots be fired or that anyone was killed, but just to that extent only.

A    That's correct.

Q    (By Mr. McGraugh) I'm sorry.  What was your answer?

A    That's correct.

Q    Okay.  Now, you were asked some questions as to the Government's Exhibit Q.  Do you recall that, the May '97 letter?

84

A    Yes.

Q    Do you know where this information comes from that's outlined in this letter?

A    You mean like how they got it?

Q    Yes, ma'am.

A    No.

Q    When you -- much of this -- I think you testified on cross-examination much of the information that was -- was brought out from this correspondence, you later were able to confirm through source witnesses, is that correct?

A    Yes, plus quite a bit more than what's in the letter.

Q    Okay.  Can you explain -- can you explain -- well, first, let me ask you.  You were -- you said that there was no mitigation done prior to you getting in there.  Was there any witnesses that were interviewed in relationship to those items which were brought out on Government's Exhibit Q?

A    None that I was aware of, and then when I was doing my interviews, I didn't encounter anybody who had already been interviewed.

Q    And had Mr. Shaw given you any reports or any statements of people that he interviewed related to locating mitigation witnesses?

A    No.

Q    Okay.  Was there a wealth of information that existed once you started your mitigation investigation?

A    Yes.

Q    Okay.  And it confirmed not only the things in Government's Exhibit Q but a number of other things, is that correct?

A    Yes.

Q    And, in fact, it provided you with a wealth of different mitigation strategies, is that correct?

A    Yes.

Q    And none of those were done prior to you beginning your investigation, is that correct?

A    Yes.

Q    And when you got into the case in December of 1997, did you have a certain expectation on what the status of the penalty phase would have been?

A    I'm not sure I understand your question when you say status.

Q    Well, did you form any type of belief as to what -- what kind of case you were getting into and what you believe was done in the case prior to you getting into the case?

MR. HOLTSHOUSER:  Judge, I'm going to object unless he can lay some foundation as to the basis for her knowledge and belief.

MR. MCGRAUGH:  I'll lay the foundation, Judge.

THE COURT:  All right.

Q    (By Mr. McGraugh) You stated that you were con -- there

was a number of phone calls that you received prior to you being retained in the case, is that right?

A     Yes.

Q     Once you were retained in the case, did you make any determination as to what the status of the mitigation investigation was?

A     Yes.

Q     Okay.  And what did you conclude as to what the status of the mitigation investigation was?

A     That nothing had been done in that no source witnesses had been interviewed and no records had been gathered.  In fact, when I had my meeting at the Shaw Law Office in early December after seeing Norris for the first time, I knew that some of the information that I presented was new, certainly, at least to Brad.

Q     Is -- and what is the significance of actually going out and finding these source witnesses and interviewing these source witnesses?

A     That's the only way you can put the evidence in at a sentencing hearing is if you've done the legwork to know who knows what.

Q     Okay.  And as to the 28 or 30 witnesses that you saw or that testified -- and I won't hold you to that number, but it was a significant number of witnesses that testified in penalty phase -- had any of those witnesses been interviewed

by anyone from Shaw's office or Mr. Shaw himself?

A    No.

Q    I want to talk with you now about your testimony as it relates to Norris testifying.  Okay.  Did you have conversations with either Mr. Shaw or Norris about him testifying in the guilt phase of the case?

A    What Norris would say was that he believed if he told the Jury the truth, he'd go home, and so that was the extent of the -- you know, did I specifically discuss, like, the wisdom of Norris testifying?  No.

Q    All right.  Did you ever learn or determine where the basis of Norris' belief that if he testified he'd go home came from?

A    From Charlie.

Q    And how was that -- how did you learn that?

A    Norris told me that.

Q    All right.  Did -- and you may have already testified to this, and if you have, I apologize.  Do you recall what exactly Norris told you in relationship to Charlie's advice that he was to testify in this case?

A    I don't know verbatim what was said to him, no.

Q    But the gist was that if he got up and told the Jury what had happened, that he'd go home?

A    Yes.

Q    Did -- did Norris communicate to you as to whether his

88

decision to testify was based on something that he wanted to do or was it Mr. Shaw's advice?

A    We didn't talk about the decision to testify.

Q    So you don't know one way or the other; would that be fair to say?

A    That's correct.

Q    Now, did you assess for yourself as to how Mr. Holder would be as a witness?

A    Yes.

Q    Okay.  As far as a penalty phase witness or a mitigation witness, did you conclude that he would make a bad witness?

A    Yes.

Q    Why is that?

A    Most of the time, my clients don't speak well in their own behalf, and while Norris was able to express remorse to me one-on-one, I didn't think that he'd be able to do it in a courtroom setting, and I was worried that he would become defensive.

Q    Okay.  Was there also -- you said that he expressed remorsefulness to you.  Did he also express responsibility to you?

A    Yes.

Q    Was there a concern that he wouldn't take as much responsibility as he should for this offense?

A    I think he perceived his level of responsibility

differently than you or I might perceive his level of responsibility, so, yes.

Q    And would that be a concern in assessing him as a witness -- whether he'd be remorseful and not fully appreciate his responsibility?

A    Yes.

Q    Okay.  And is that something you also took into consideration?

A    Yes.

Q    As to why he would make a bad witness for himself?

A    Yes.

Q    And would that also be a factor in that the remorsefulness might be lost or his attempts to be remorseful might be lost?

        MR. HOLTSHOUSER:  Judge, I'm going to object.  This is completely leading and argumentative.

        THE COURT:  It is leading.  Sustained.

Q    (By Mr. McGraugh) Was the -- in his determination or your determination as a witness and his ability to express remorse, what, if anything, did you take into consideration about his effectiveness to do that?

A    I didn't think that the remorse, if he was able to express it, would be very believable if he also excused himself by saying something like, "I didn't mean for anybody to get hurt."  That sort of negates the remorse.

Q     I want to talk to you now about your discussion with Mr. Holtshouser about the -- about --

THE COURT:  Could I see counsel for just a minute?

MR. MCGRAUGH:  Sure.

(A BENCH CONFERENCE WAS HELD ON THE RECORD AS FOLLOWS:)

THE COURT:  I was just wanting to take about a 15-minute break, and I didn't want to stop you if you were getting close.  If you're not close, then we'll take a break, and then there's always the perception if we take a break during someone's testimony there will be visiting going on during the break, and so if we take a break, I'd ask that there be no discussion between counsel and the witness.

MR. MCGRAUGH:  I don't know that I have all that much, Judge, but there might be recross.

MR. HOLTSHOUSER:  Briefly so far.

THE COURT:  I don't want to give the impression I'm hurrying you.  Why don't we take a 15-minute break.

MR. MCGRAUGH:  That would be fine, Judge.

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.)

THE COURT:  We're going to take a 15-minute recess at this time.  Court's in recess.  You may step down.

(COURT RECESSED FROM 3:06 P.M. UNTIL 3:25 P.M.)

THE COURT:  Okay.  The last question was, "I want to talk to you now about your discussion with Mr. Holtshouser about the -- about" -- and that's when I interrupted you.

Okay.  Would the witness take the stand, please?

You may inquire, Mr. McGraugh.

MR. MCGRAUGH:  Thank you, Your Honor.

Q    (By Mr. McGraugh) Just a few more questions for you, Ms. Tatelli.  I want to explore with you some of the areas in cross-examination that Mr. Holtshouser talked about as to whether -- how you could assess the impact or the influence that your mitigation strategies would have on this particular Jury.  Do you remember that line of questioning?

A    Yes.

Q    Okay.  I want to speak to you more globally.  Is this the type of evidence that you tend to seek out when doing a penalty phase?

A    Yes.

Q    Okay.  And part of your opinion as to the impact or influence it may have is the -- is the effect that it's had in other cases?

A    Yes.

Q    And has this been something that you've commonly done before this case as well as after this case?

A    Yes.

Q    And is that the basis of your opinion as to why you think it had impact and influence?

A    Yes.

MR. HOLTSHOUSER:  Judge, I'm going to object and move

to strike the last answer.  I don't think she testified it had impact or influence.  So I don't think it got that far.

MR. MCGRAUGH:  I'll rephrase the question, Your Honor.

THE COURT:  Okay.

Q    (By Mr. McGraugh) Is that your opinion why you thought it was important to stress it to Mr. Shaw and Ms. Brewer?

A    Yes.

Q    And why you put these themes in your sentencing outline and why you interviewed the source witnesses --

A    Yes.

Q    -- and obtained records?

A    Yes.

MR. MCGRAUGH:  That's all I have at this time.

THE COURT:  Mr. Holtshouser.

RECROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q    I think you've established that Mr. Shaw didn't really confer with you much about his strategy or at all, correct?

A    Yes.

Q    And it's your belief that certain witness interviews had not been conducted prior to your entry into the case?

A    Yes.

Q    Right?

A    Yes.

Q    But, in fact, those witnesses got interviewed?

A    Yeah.

Q    They got presented to the Jury, the Jury heard it, and they were given an option to vote on it in the verdict form, correct?

A    Yes.

Q    So all of the evidence that you developed, the Jury got to hear?

A    Yes.

          MR. HOLTSHOUSER:  Nothing else, Your Honor.

                    FURTHER DIRECT EXAMINATION

BY MR. MCGRAUGH:

Q    I believe you alluded to the fact there were some areas that you were not able to follow up, is that correct?

A    Yes.

Q    And that was as to the desegregation issues as well as potential neurological issues, is that right?

A    Yes.

Q    Had you got in the case at -- early on, say March or April of '97, do you believe that those issues -- that you may have been able to take care of those issues?

A    I'm sure I would have been able to take care of the desegregation issue.  The problem with the neurologic issue is that we -- between the time that Jennifer Brewer was -- became involved in the case and when we went to trial, there really

wasn't enough time to pursue that.  It would have depended.

You know, the hiring of experts, I wasn't able to do on my

own.  So it would have depended a little bit on when I had an

attorney who was able to help me with that and be involved.

Q    And Mr. Holtshouser said there were certain witnesses

that had not been interviewed.  All the witnesses that you

interviewed, contacted, and either put on the witness stand or

decided not to use, Mr. Shaw or no one from his office had

talked to, is that correct?

A    I didn't interview anybody who had already been

interviewed except for some teachers that were -- the same day

I did my interviews, the FBI was there interviewing them in

advance of me.

Q    But my question is to Mr. Shaw's office.  Is that

correct?

A    Yes.

        MR. MCGRAUGH:  Thank you.  That's all I have.

        MR. HOLTSHOUSER:  Nothing further, Judge.

        THE COURT:  You may step down.

        You may call your next witness.

        MR. MCGRAUGH:  Your Honor, we'll call Jennifer

Brewer, who has since gotten married.  Her name is now

Jennifer Herndon.

        THE WITNESS:  The exhibits that are here --

        THE COURT:  You may take those and give them to

Mr. McGraugh.

Are these part of your exhibits?

MR. HOLTSHOUSER:  Yeah, I think they are, Judge.

**JENNIFER HERNDON**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

FOLLOWS:

DIRECT EXAMINATION

BY MR. MCGRAUGH:

Q    Would you please state your name for the record?

A    Jennifer Herndon.

Q    Okay.  Were you formerly known as Jennifer Brewer?

A    Yes.

Q    And back in December of 1997 and January of 1998, is
that -- is "Jennifer Brewer" what you went by?

A    Yes, that's correct.

Q    All right.  Ms. Herndon, what is your occupation?

A    I'm an attorney.

Q    How long have you been an attorney?

A    Fifteen years.

Q    Okay.  And in the latter part of 1997 and in 1998, were
you an attorney?

A    Yes, I was.

Q    Okay.  Were you licensed in the state of Missouri?

A    Yes.

Q    Were you also licensed in the United States District

Court for the Eastern District of Missouri?

A    I actually, umm, was admitted in the middle of Mr. Holder's trial or right before the trial or right at the same time that happened, yes.

Q    During the course of your practice, have you handled death penalty cases?

A    Yes.

Q    Can you give the Court some idea as to your experience in the handling of death penalty cases?

A    I began handling death penalty cases in the state level in 1994, approximately late '93, '94, right around there, with the Public Defender's Office, and I was with the Capital Division of the Public Defender's Office for almost three years, and then after that, since 1997, I've been in private practice, and I handle death penalty cases now exclusively with the exception of a court appointment every once in a while in another case.

Q    Is your experience in the area of death penalty both at the trial level and the appellate level?

A    Yes.

Q    And is it both at state level and federal level?

A    Right.  I haven't done anything in state court since 1997, but yes.

Q    Well, I assume from -- do you have any practice in the area of 2254 petitions?

A     Yes.  I do quite a bit of that.

Q     And that's in relationship to state death penalty prosecutions that are being appealed in the -- by way of a federal habeas petition, is that correct?

A     That's right.

Q     So you have some experience in the state -- state area presently, is that right?

A     Right.  And I represented defendants charged in the state of Missouri for about three years in capital cases.

Q     Okay.  At the end of 1997 and the beginning part of 1998, January and February 1998, had you handled a -- a federal -- any type of federal defense at a trial level?

A     No.  Mr. Holder's case was my first federal case.

Q     Okay.  Prior to that, were you the attorney of record in any state death penalty case?

A     Yes, I was, yes.

Q     Okay.  And can you give some background or what your experience in that regard was?

A     Umm, I -- for the approximate three years that I was with the Missouri State Public Defender's Office, Capital Division, I was probably counsel on -- I'm going to say maybe 10 cases that I was actively participating as counsel on.  As far as trying cases, I never personally served as a participant in a trial in a capital case, but I probably -- I would say I worked on approximately 10 cases.

Q    Okay.  But prior to being a -- in the state capital office, had you tried criminal cases?

A    Oh, yes.

Q    And had you prepared direct examinations?

A    Yes.

Q    Had you prepared cross-examinations?

A    Yes.

Q    Have you conducted cross-examinations?

A    Yes.

Q    Had you done opening statements?

A    Sure.

Q    Had you done closing arguments?

A    Yes.

Q    Okay.  In relationship to your work in death penalty cases, had you undergone any training?

A    At the time of Mr. Holder's case?

Q    Prior to.

A    Prior to Mr. Holder's case, yes, I had.  Well, it would have been just what was offered by the Public Defender system. Let me think for a minute.  You know, it hadn't been much at that point.  I think it was just what was offered by the Public Defender system.  I don't think I'd even been to a "Life in the Balance" at that point, if I remember correctly.

Q    And had your experience in the state capital unit as well as whatever seminars that were offered or training offered

related to the gathering and presentation of mitigation evidence?

A   Yes.

Q   And -- okay.  Now, did you come to represent Norris Holder at the trial level and appeal?

A   Yes, I did.

Q   Can you tell us how you became involved in the representation of Mr. Holder?

A   Yes.  In late January of 1998, umm, I got a call from Dick Burr, who I did not know at the time, but Dick Burr, who told me that he was resource counsel and he had been given my name by Sean O'Brien.  Sean is an attorney that I know in Kansas City, and Dick wanted to know if I would be interested in getting involved in a federal death penalty case.  He said that Sean had given him my name as someone who might be available.

Q   Since your representation of Mr. Holder and, I guess, during your representation of Mr. Holder, have you come to learn what resource counsel or the Death Penalty Resource Center does?

A   Yes.  During my representation of Mr. Holder, I became very familiar with that and aware of that.

Q   Can you tell the Court what that -- what does the resource counsel do?

A   Sure.  I think it's called the Federal Death Penalty

Resource Counsel Project, and at the time of Mr. Holder's case, they had three attorneys that were assigned to basically assist federal death penalty counsel around the country because at that time, it was still -- you know, we'd just had the Death Penalty Act of '96, so federal death penalty prosecutions were still fairly new.  There was a lot of people handling them who hadn't done them before, and the purpose of the resource counsel was to provide resources, help arrange for counsel, and then help counsel who -- who was unexperienced or even experienced, just help counsel with things that needed to be done in federal death penalty cases.

Q    And Dick Burr was one of the attorneys that worked through the Federal Death Penalty Resource Counsel?

A    He is.

Q    Okay.  And was he acting as that in 1997 as it relates to the Holder case?

A    When he called me, yes, he was.

Q    What was the subject of your conversation with Mr. Burr at that time?

A    It was pretty brief.  You know, when he first called me, he said would I be interested, and I had really just come to St. Louis not that long ago.  I wasn't doing a lot.  I was just kind of getting my feet on the ground here, and I said, you know, sure, I'd be available.  I enjoyed doing death penalty work on the state level and thought it was probably a

good opportunity here.  So I told him that I would be available.

Q    Okay.  And do you recall approximately when that was?

A    Umm, I know it was late in January of 1998.

Q    Okay.  And did you come to learn who was the attorney representing Mr. Holder at that time?

A    Right.  Dick had told me that it was Charlie Shaw, who I didn't know who that was at the time, but, you know, I've since come to know who he is obviously.

Q    Okay.  And once you had this conversation, were you eventually appointed --

A    Yes, I was.

Q    -- or retained?  Either retained or appointed?

A    No.  Obviously, I was eventually appointed.  I think after I told Dick that I was available, then he made the arrangements with Charlie, and Charlie ultimately filed the motion requesting my appointment, I believe.

Q    Prior to that, do you know, through Mr. Burr, if there was any resistance to having you appointed in the case?

A    I don't think that there was any resistance.  I think there was some dragging of the feet, but if there was any resistance, then I wasn't told about it.

Q    When you were appointed in this matter, did you know when the case was set for trial?

A    Yes.

Q    Okay.  And when was that?

A    It was set for March 10th, I believe, 1998.

Q    Did you have any idea of what the status of the case was as far as investigation or what needed to be done or what was -- what your role would be?

A    At the time that I accepted the appointment, I had been told by Dick -- and then I think he also had Caryn Tatelli call me.  You know, I had been told that they were in need of a second lawyer to help on mitigation.  I didn't have any idea at the time I took the appointment what the state of the case was as far as what had or hadn't been done.

Q    Did you have or did you learn whether you had a specific role in this case once you were appointed?

A    Well, I mean, I knew going in -- it was explained to me by Dick Burr -- the specific help they needed was in mitigation because they only had one lawyer; they didn't have a second lawyer to handle mitigation.  So I knew going in that it would be my job to -- I presumed, based on my conversations with Dick Burr, it would be my job to work on the penalty phase of the case.

Q    Once you were appointed, did you attempt to learn what the status of the case was as far as investigation and mitigation work, what trial preparations had been done?

A    Yes.  Dick provided me with, initially, sort of the rundown.  Once he -- you know, I told him that I would be

available, he provided me the rundown of what police reports that he knew of were available. You know, he didn't give them to me actually, but he said, "I think a lot of 302's have been disclosed." You know, basically, what he had told me was that there was a lot of discovery that had been given, and then he had -- I'm almost certain I talked to Caryn right in the beginning, too. Well, I know I did, and she filled me in on what the status of the mitigation investigation was.

Q     Okay. And what was it?

A     The status of the mitigation investigation?

Q     Yes, ma'am.

A     Caryn had started. It was -- what Caryn told me in the beginning was she had been appointed not that long ago. She had begun to do some, oh, initial investigation, finding out who the players are, finding out where they are, contacting them, setting up interviews, really, you know, for the case to be about five or six weeks from trial at that point. As far as penalty phase goes, very little had been done, but it was clear that Caryn was working pretty diligently to change that.

Q     Once you were appointed, were you provided any type of resources from the Death Penalty Resource Center?

A     Yes. They sent me -- you know, now they send it all on disks, but at the time, they were sending it in these big binders, and I got, I think, three volumes of, you know, big binder notebooks that contained resources.

Q    Let me show you what's been marked Exhibit 2 and ask you if you received this.

A    Yes.  I remember that.  I remember receiving two separate packages.  So I must have gotten -- excuse me -- the mitigation workbook first and then Volume II and III later.  And the disks --

Q    Let me --

A    The disks, I think, were stuck in the notebooks.

Q    Okay.  Let me hand you what -- what's been marked Exhibit 2A.  Were these the disks that you received?

THE COURT:  What is #2?

MR. MCGRAUGH:  2 is the February 9th, '97 correspondence from the Resource Center to Ms. Brewer.

A    Umm, boy, if these were in my file, then I got them.  These don't look familiar to me at all, but, you know, the letter indicates that there were disks with the books, and I remember receiving disks with the books, but I don't -- these don't look familiar to me at all.

Q    (By Mr. McGraugh) Well, let me represent to you that these came from your file.

A    Okay.

Q    If these were the disks -- did you receive any other disks related to sample motions and legal briefs as it relates to -- to death penalty litigation?

A    No, no.  These would have been them.  I just don't

remember seeing them.

Q    Okay.  And what did those disks contain?

A    Well, they would contain sample motions, sample mitigation presentations that you could give to the local U.S. Attorney or the Department of Justice, mainly sample pleadings and briefs, maybe some good district court orders.  If the district court in a case did a good order that wasn't published, they would be on here.  I'm telling you that because I know it now.  I didn't know it then, but that's what I know now.

Q    Did you review the sample motions that are contained in those diskettes?

A    You know, I don't remember ever looking at these disks. I looked at the volumes.  If I looked at these disks, I don't remember it.  I looked at the printed materials, but I'm thinking that these, I did not get to.

Q    So if I asked you whether any motions related to the U.S. versus Kaczynski prosecution would have been on those disks, would you know?

A    I don't know whether they are or not.

Q    Because it would be fair to say that you don't recall whether you looked at those disks?

A    Right.  I -- I'm going to -- my best guess is that I did not look at those because I don't remember and I do have a specific memory of looking at the actual books that they sent

me.

Q    Do you ever remember reviewing a sample motion in United States versus Theodore Kaczynski, K-A-C-Z-Y-N-S-K-I, related to raising a claim as what's been come to known as the Ring issue, that the indictment failed to allege aggravating circumstances contained in the indictment which made it a capital offense?

A    I did not ever review a motion like that, no.

Q    Do you recall ever receiving any motions attacking the indictment on the basis it didn't contain aggravating circumstances?

A    I don't recall ever receiving any motions like that, no.

Q    Did you file any motions in this -- well, let me ask you this.  Did you prepare motions as it relates to attacking the death penalty in this case?

A    I did prepare some, yes.

Q    Did you file any motions attacking the death penalty based on the grounds that the indictment failed to include aggravating circumstances?

A    No.

Q    In Mr. Holder's prosecution, there was a Codefendant?

A    Yes, Billie Allen.

Q    Okay.  And do you recall who represented Billie Allen?

A    Rick Sindel and John Simon.

Q    Do you know whether Billie Allen's attorneys had filed

motions attacking the -- the indictment?

A    At that time, umm, I knew that Billie Allen's attorneys had filed a lot of motions, but did I know specifically that they had filed a motion attacking the indictment?  No, I didn't know that specifically.

Q    Did you have access to the Codefendant's motions that were filed on his behalf?

A    I had access to them in terms of the fact that they were, you know, public; they were in the file.  Now, you know, most of the motions were filed before I became appointed on the case.  I do remember going to Charlie Shaw's office one day to look through his Norris Holder file and seeing in the Norris Holder file there was a big file for Codefendant's motions.  So, yes, I did have access to them, but I didn't go through that entire file.

Q    Okay.  Were you aware that the Codefendants had challenged the indictment on the basis that it didn't contain aggravating circumstances?

A    No, I wasn't.

Q    When did you become aware of that challenge?

A    Well, when we filed the briefs in the Eighth Circuit Court of Appeals, they had included some issues in their briefs that I would term legal issues, which the Ring issue would fall under a legal issue, but even when they filed the brief, I wasn't -- I can't tell you that I was specifically

familiar with the fact that that was one of the issues.

Certainly, when we sat through oral argument -- huh, I just don't really know the answer to your question.  If they argued it, I would have known, but I don't even remember if they argued it.  I mean, I think when I really became aware of exactly what was going on was when -- when Ring was decided.

Q    Okay.

A    I think that's when I really became aware of, okay, here's an issue and who's raised it in what and who hasn't raised it.  Until then, may I have vaguely known that there was some legal indictment issue out there that John Simon had come up with?  Maybe I was vaguely aware of that, but John Simon operates way above what I operate on.  So I'm just telling you honestly I may not have even -- I didn't take the time to try to figure out what that was.

Q    Were you aware at the time that you began representing Mr. Holder that you could adopt a codefendant's motions?

A    Yes.

Q    Was it ever suggested to you that you should adopt a codefendant's motions?

A    Yes.  Dick Burr suggested that to me.

Q    Okay.  And did you do that?

A    I prepared a pleading to adopt the motions that I had, and I don't know how I ended up with copies of some of them and not others.  I'm not sure, but I prepared a pleading

asking to adopt the copies of the -- or asking to adopt the motions that I specifically could see and see the title of.

Q    And when did you do that?

A    On March 9th of 1998.

Q    Let me hand you what's been marked Exhibit 3.  Is this the motion to join that you had prepared?

A    Yes, it is.

Q    Was that ever filed?

A    No.

Q    Okay.  Why was it not filed?

A    I brought this motion to court with me the next day, March 10th, which would have been the first day of trial, and I presented it to Charlie and told him, you know, that I'd made a list of all these motions, I thought we should go ahead and join in Rick's motions, and Charlie indicated that he didn't think it was necessary to join in Rick's motions.

Q    Now, did you have an opportunity to review Exhibit 3?

A    You mean just now?

Q    Yes, ma'am.

A    Okay.  Let me look for just one second.

Q    I'm going to ask you as to what motions that you were asking the Court to adopt.

A    Okay.  In Exhibit 3, all of the motions that I've indicated on here that we wished to adopt are what would be termed discovery motions.  They're motions to discover, you

know, various things in both guilt and penalty phase.

Q    Okay.  And so in your motion to adopt, you didn't include the -- the -- any motion to preclude the death penalty based on a structural error in the indictment?

A    No.  The Ring motion wasn't included in here, no.

Q    Is there a reason why it was not?

A    I wasn't aware of the motion at the time.

Q    Okay.  If you had been aware of the motion, would you have included it in your motion to join?

A    I would have, yes.

Q    Is there any reason why you would not have included it in your motion to join?

A    Oh, no.  I would have.  I mean, this, the motion, this motion to join was sort of -- it was an attempt to try to mitigate the damage that had already been done in the case, for the lack of work that had been done in the case, and so to just sort of throw everything out there and say we want to join everything to make a record to protect everything that we could.  So I definitely -- you know, the purpose behind this was to just do anything.  I mean, I'm sure I hadn't even read some of these motions.  It was just that, you know, Rick Sindel appeared to me to be doing a good job and if he was doing it, we probably needed to be doing it, too.  So I would have adopted it.

Q    Was it also the recommendation of Mr. Burr that you adopt

all the Sindel motions?

A    It was, right.  It came from him.  It was his idea.

Q    I want to ask you some questions about the pecuniary gain aggravator.  Did you file any motions challenging the pecuniary gain aggravator?

A    No.  I think I filed -- I think I filed a general motion, which I got from Dick.  It would have been sort of a form motion maybe to strike the aggravators.  I might have done that, but specifically, to challenge the pecuniary gain aggravator, no, I didn't.

Q    Did you do any research as to what the legislative history behind the act was as it relates to the pecuniary gain aggravators?

A    No.

Q    Did you consider any challenge to the aggravator in a pretrial motion on the basis that it only applied to murder for hire as it relates to pecuniary gain aggravators?

A    No.

Q    Upon your appointment, did you eventually meet with Mr. Shaw?

A    Yes.

Q    How soon after you were appointed did you meet with Mr. Shaw?

A    I believe the first meeting I had with Mr. Shaw was on February 24th of 1998.

Q    And who else was present during that meeting?

A    Dick Burr and Caryn Tatelli.

Q    Okay.  Was Mr. Shaw there throughout the whole meeting?

A    Yes.  Yes.  It was at his office.  Yeah.

Q    I mean, did he come and go?

A    Oh, yeah, yeah.  A meeting with Charlie was always come and go at his office because, you know, he'd be called away for a phone call or this or that.

Q    So he would intermittently leave the meeting from time to time?

A    That's my -- you know, I have to say that that's my memory of meetings with Charlie.  Do I remember specifically in this meeting him coming and going?  You know, other than to say that's my general memory, I can't remember specifically.

Q    Okay.  Was there a defense strategy discussed at that meeting?

A    Yes.

Q    Okay.  And did Mr. Shaw have a defense strategy at that point?

A    Yes.  At that point, it was his strategy to argue that Norris wasn't guilty of the murder; he was only guilty of the robbery because he had not -- not only had he not fired the shot that killed the victim, but he had not even fired his weapon at all.

Q    Okay.  And did that give you any concern?

113

A    Well, it did, yes.  Once Dick got out the statute -- and, you know, I was still brand-new to this, but once Dick got out the statute and we all looked at it there at Charlie's office, then it was clear that that wasn't going to be a viable strategy.

Q    And why is that?

A    Well, because of the way the statute reads, it doesn't matter whether Norris pulled the trigger or whether he fired a shot or killed the victim.  You know, the fact that he participated in the robbery is sufficient to make him eligible for the death penalty, guilty of the crimes that were charged.

Q    Was this expressed to Mr. Shaw?

A    Yes.  At that time, Dick Burr, you know, pulled out the statute and showed him and expressed to him that that wasn't going to work as a strategy for Charlie.

Q    What was his reaction once he -- once that was discussed?

A    Well, what was Charlie's reaction?

Q    Yes, ma'am.

A    He -- he didn't seem to -- I mean, he didn't agree with it.  He didn't agree, and I'm not sure exactly how that was working because we were looking at the statute, but Charlie still seemed to think -- you know, it got -- it was sort of -- I remember it being sort of aggressive back and forth between Dick and Charlie because Charlie was pretty entrenched that his position was correct and Dick was equally entrenched that

it was not correct.

Q    What, if anything, did you do after that meeting?

A    As far as my preparation on the case?

Q    Yes.  I mean, after that meeting, was there -- let me just step back.  Was there a discussion as to what role you would have involved in the case or -- or how did it proceed after that meeting?

A    Well, after that meeting, you know, I'm assuming we're sort of all on the same page there because we've all read the statute, umm, but, you know, Charlie and I never sat down and talked about, "Well, here, you go do this, and I'm going to go do that."  I think it was really the pull from Dick and Caryn.  You know, Caryn was the mitigation specialist, and Dick was sort of directing things.  So I was going to do what they said to do and what they needed help on, which was all in mitigation, and Charlie never indicated to me that he needed any help on the guilt phase.  So, you know, it was sort of -- it was unspoken as far as I was going to go do mitigation because that's what I had been pulled in to do.

Q    All right.  Did Mr. Shaw ever communicate to you that there would not be a sentencing phase or penalty phase because of his guilt phase strategy?

A    Well, yeah.  I mean, that was his whole -- his whole deal was he thought that -- I mean, I think the evidence is pretty clear that Norris is not the one who killed the victim, and

115

because the evidence was that clear, Charlie felt like it was a defense and we'd have a real shot at "not guilty" and the focus of the case needs to be on "not guilty".

Q    Okay.  So did you believe there was a resolution then to the disagreement between Mr. Burr and Mr. Shaw as to what a viable defense could be?

A    Well, no.  I mean, you know, at the time, yes, in my mind, I did because we all looked at the statute and it was clear what the statute said.  I -- do I specifically remember there being an, "Okay, we're all on the same page now"?  I don't specifically remember that ever being said, but I think in my mind it was how could it be any different.  I mean, this is not -- there's nothing ambiguous about the statute.

Q    Okay.  So you -- you defined your role into assisting in mitigation because -- was that because you felt there was a need there, or was it -- was it because Mr. Burr directed you to do that?

A    Well, there was a need there because there was -- you know, Charlie was obviously -- what he was going to do was go in and try the guilt phase of the case, umm, and he obviously had not and was not doing any mitigation investigation or communicating with Caryn to enable her to do anything to help him prepare for trial.  So it was pretty clear that that's where the focus needed to be.

Q    Did Mr. Shaw participate at all in the penalty phase

investigation or theorizing as to penalty phase strategies?

A    No.

Q    Do you know why he didn't participate in it?

A    Well, you know, I was really just communicating with Caryn at that point.  Umm, you know, I know that she had expressed frustration because Charlie was not responding to her and wouldn't read her product and wouldn't talk to her basically about what she was doing.  So, you know, I don't -- at the point I got into the case, all I know is that -- that Charlie wasn't responding to her.

Q    Did you formulate a mitigation strategy --

A    Yes.

Q    -- based on your investigation?

A    Yes.

Q    Okay.  And what was that?

A    Well, our strategy was, you know, based on the investigation, we learned a lot about Norris' background, obviously, that he -- his father had left the home at a pretty early age, that his mother had had a drug problem, that Norris had really become very -- I think sort of the social work term for it is parentized, which basically means Norris became the parent of the family, and he had two younger brothers and a younger sister, and he took on a lot of responsibility, what he could, to the extent that he could, to parent those kids because just mom was trying to do the job by herself and was

not adequate at it due to probably a lot of factors, including her drug problem.

So, you know, we felt like because of this role that Norris had taken on in the family, when -- it made things very difficult for him. He felt like he needed to provide for himself and for the family. When he lost his leg, he felt like he couldn't provide as well, and that was because of his -- you know, his own limitations with his leg and growing up the way he did, living in the projects, just a lot of -- you know, there's a ton of stuff, environmental and family history and things, and we felt like we could use that to explain why Norris would feel like the only answer to getting the new leg was to rob a bank.

You know, we wanted to explain that this wasn't just a bad guy who was a criminal who wanted to go out and rob a bank, that he really -- because of the huge responsibility and the role he had had in his life, that he felt like he had to do whatever it took, and robbing the bank was his answer because the money was insured, no individual was going to get hurt, no individual would be out the money, and he needed to do that to get his leg, so that he could be more productive and sort of could continue to parent.

Q    Did you find witnesses that would support this theory?

A    Yes.

Q    And in part, Ms. Herndon, is this theory based on what

118

mitigating circumstances, both statutory and nonstatutory, that you could then put before the Jury?

A    Well, yes.  Now, at the time, I don't think I was probably very familiar with statutory or not, you know, in terms of federal.  You know, we sort of -- I took my direction from Caryn and we went out and did this, but, obviously, it came down to what can we submit to the Jury.

Q    These themes that you discussed as well as the themes that you developed during the penalty phase -- did they evolve into nonstatutory aggravators which were presented to the Jury?

A    Right.

Q    Now, did Mr. Shaw participate in -- in developing these mitigation themes that would be statutory, nonstatutory circumstances, mitigating circumstances?

A    No.  You know, pretty early on -- and I mean, I was only in the case -- what -- five weeks before trial, so this all happened very fast, but, you know, it was pretty clear early on that Charlie was not going to be any help to anything that I was doing, and I think that, you know, two things really made that crystal clear to me.  One, I'm sort of remembering as you and I talk, as you ask me questions, is I remember going to his office one time for a meeting and being there for like an hour or more when he -- and meeting with him for like 10 minutes, and he sat on the phone the rest of the time, and

nothing productive happened, and that was one clue to me that -- you know, I mean, I was using 24 hours of every day at that time, and that was one clue to me that Charlie was not going to be helpful to what I was doing.  The other indication of that was when he told Caryn, "Stop sending me all this stuff."  He didn't want her interview summaries.  He didn't want anything she was doing.  He said he wasn't going to read it.  So, you know, there was really no time to back up and try to figure out what was going on there.  We just moved forward without him.

Q   I believe you've answered this question, but was there any meeting with Mr. Shaw where you would strategize what was going to be presented in the guilt phase and what would be presented in the penalty phase?

A   No.  The only meetings that -- that I had with Charlie -- and there weren't very many, but the only meetings I had with him, the only things we talked about were guilt phase issues.

Q   And as it relates to guilt phase issues, what kind of discussions would you have with him?

A   Well, you know what I remember -- and, like I say, there weren't very many, and I mean like maybe two or three, and what I remember is the ballistics issue.  That was the biggest one that I was involved in and that I could recall.

Q   Let me ask you about that.  When first was there a discussion about ballistics, and what was the discussion?

A    During the meeting with Dick, we talked about the need for a ballistics expert, and that was -- it had to be Dick's idea because Charlie -- it wasn't Charlie's idea and it wouldn't have been mine at that point.  So it had to be Dick's idea.  He suggested a ballistics expert, and Charlie said that he knew someone.  You know, he had been a lawyer for a long time obviously.  He had a contact.  So we left that meeting with Charlie was going to make contact with that ballistics expert.

Q    What was the significance or the importance of obtaining a ballistics expert?

MR. HOLTSHOUSER:  Judge, I'm going to object to the relevance of this line of questioning to the issues that have been narrowed for this area.

MR. MCGRAUGH:  Well, Judge, it goes to the prejudice issue as to the case and particularly as to what prejudice -- again, we would -- we would -- we would take the position that this is a chronic issue as it applies to the testimony and the concession of guilt, but also, the Court could look at it on a Strickland issue and then would have to examine the prejudice of putting Mr. Holder on and conceding guilt and advising the Jury that his weapon had not been fired in the bank.  This line of testimony, which I think where it's going to go is this, Judge, is to -- is to discuss what Mr. Shaw knew about the ballistic expert or the ballistic issues in the case as to

whether it was advisable to put this -- put his client on the witness stand to say that he didn't fire his weapon in the bank as well as to state in both opening and closing argument that he did not shoot his weapon in the bank.  I believe what Mr. -- what Ms. Herndon is going to testify to is that Mr. Shaw was aware that this was an issue and it wasn't followed up on, and as a consequence, it goes to the prejudice issue, Judge, as to what effect, if any, would Mr. Holder's testimony have or what error in putting Mr. Holder on the stand would have as well as his concessions both in opening and closing statement.

THE COURT:  All right.

MR. HOLTSHOUSER:  Well, Judge, I think the problem with that is that it's -- we're lumping -- we're trying to paint with a broader brush here than is the focus of the Court's order.  The ballistics have nothing to do with Norris Holder's decision to testify or the prejudice from that without some evidence being brought forward that a ballistics expert should have or would have been found that would have changed the outcome of the case or somehow changed the evidence that came in.  The ballistics evidence came primarily from Officer Stubits.  The question that's being asked here has to do with Mr. Shaw's pursuit or nonpursuit of a ballistics expert, and somehow there has to be some linkage up with prejudice from the failure to get a ballistics expert.

There's been no evidence produced to us in the course of discovery in this civil matter regarding that there exists such a ballistics expert or that we're going to hear evidence that had a ballistics expert been pursued, he would have told Mr. Shaw this and then he would have known not to call Mr. Holder.  So I think this is bootstrapping somewhat into another area that's really not relevant to the issues that the Court has narrowed.

MR. MCGRAUGH:  Your Honor, could I just briefly respond to that, Judge?

THE COURT:  Sure.

MR. MCGRAUGH:  The Court may, if focused on a Strickland analysis, have to examine prejudice in this case. Judge, it's going to be our position that it's a "damned if you do and damned if you don't" proposition, that had he got an expert, an expert who would have agreed with Mr. Stubits, then the Court has to examine the merits of putting his client on the stand to say, "I didn't fire the gun" when there was no evidence to contradict that.

However, on the other hand, if he was to get an expert, an expert who could contradict that, then the question is why would he put his client on the stand and concede these things without putting this expert on.  So, you know, Judge, I don't -- it doesn't matter really what the expert would say. It's the recognition that there was an issue here, an issue

that had to be followed up on, and then that has to be examined in the totality of his decision to put his client on and to concede guilt in both the opening and closing arguments.

THE COURT:  Okay.  I'll overrule it and allow it.  Overruled.

MR. MCGRAUGH:  I don't have the slightest idea what my question was.

THE WITNESS:  Maybe the court reporter can go back and --

THE COURT:  I can get it for you.

"What was the significance or the importance of obtaining a ballistics expert?"

A    Well, the significance was that it has always been Norris' position that he did not fire his weapon in the bank at any time, and that was the theory, obviously, that Charlie wanted to pursue since that was what Norris was telling us was the truth.  The problem was the ballistics, as revealed by the Government, showed that more than one weapon was fired in the bank, and in particular, I have a memory of there being some inconclusive results on the ballistics.  So, you know, maybe a ballistics expert could have argued with Stubits' results and said, "Well, no, it's not inconclusive.  It goes one way or another."  You know, I don't know what was out there, but the point was, you know, that in our -- I thought in all of our

124

estimation that we had a duty to make a reasonable

investigation before we concluded to put an expert on or not

to put an expert on.

Q    (By Mr. McGraugh) Do you know whether a ballistic expert

was ever retained?

A    There was not one retained, no.

Q    I think you already answered this question.  I apologize

if you had.  As to -- and I believe your testimony was that

there was no strategy meeting to determine what evidence would

be going on in the guilt phase and penalty phase, is that

correct?

A    That's correct.  There was no meeting to determine that.

Q    In -- in your experience in capital cases, is it

important to have a consistent theory in guilt and penalty

phase?

A    Absolutely, yes.

Q    Was it your expectation that there'd be some type of

meeting as to this is what we're going to do in guilt phase

and this is what we can put on in penalty phase?

A    Well, that would have been my expectation when I was

first appointed to the case.  It clearly -- you know, very

early on, it became clear to me that that was not going to

happen.

Q    And do you know why that never happened?

A    From my perspective, it never happened because we had

five weeks and Charlie wasn't doing anything but slowing us down.  So we went forward with -- and he expressed -- you know, not only did he express no interest; he affirmatively told us he was disinterested.  "Stop tying up my fax machine with this stuff."  So, you know, that just -- that was why from my perspective.

Q   Did you present the evidence in the penalty phase?

A   Yes.

Q   Okay.  So was it your responsibility as the case evolved that Charlie did the guilt phase and you did the penalty phase?

A   Yes.

Q   Okay.  And you -- did you cross-examine the aggravation witnesses?

A   Yes.

Q   And you put in all the mitigation witnesses, is that correct?

A   Right.  I did all their direct examinations.

Q   Now, accordingly, did you do the opening statement as it relates to the -- to the penalty phase?

A   Either I did one or there wasn't one.  I remember some discussion about that.  If one -- if I did one, it was me.  It wasn't him, or there may have not been one.  I can't remember.

Q   Okay.  Was it your expectation to do the closing argument in the penalty phase?

A    Yes.

Q    Okay.  And what was that expectation based on?

A    Well, in my experience with not only a capital case but with any case, the person who puts on the evidence is the person who does the closing argument.

Q    Okay.  Did you learn sometime -- and was it your expectation that you were going to do the closing argument?

A    Yes.

Q    Okay.  And at some point, did you learn that Mr. Shaw had intended to do the closing argument?

A    Yes.  At some point near the end, he -- he had said to me, "Oh, you know, I've been thinking about it, and I think that I should do the closing argument."

Q    Okay.  And that happened during the penalty phase?

A    Yes.

Q    During you putting on the penalty phase witnesses?

A    Right.

Q    What, if anything, did you do once you learned that?

A    Well, I was rather alarmed.  I called Dick Burr, and, you know, that -- it was not just that.  It was a series of things.  It was just everything.  I called Dick and said, you know, "I don't know what to do; we're in big trouble here; and, you know, the latest problem is he wants to do the closing argument, and that's going to be a disaster," and Dick said, you know, "I'll be right there," and he came the next

morning.

Q    Okay.  And did you meet with Mr. Shaw and Mr. Burr?

A    Yes.

Q    And this was during trial?

A    Yes.  It was early in the morning before we started trial one day, the second to the last day of trial, I believe.

Q    And the purpose of the meeting was as to who was going to do the closing argument?

A    Well, that was -- yeah, that would have been the main purpose.  There was more discussion than just that, but that would have been the main purpose, yes.

Q    Okay.  And was there -- let me ask you; why were you so concerned about Mr. Shaw doing the closing argument as opposed to yourself?

A    Well, because I knew that Charlie didn't have any interest or grip on what was going on in the penalty phase. You know, from everything I just told you, you know, he was very uninvolved, and he -- his view, as he expressed it, on penalty phase evidence was that it just didn't matter, it didn't make a difference, and, you know, I could see from his guilt phase closing argument and some other things that he persisted in this, "The only thing that matters is that Norris is not the one that killed the victim," and, you know, we had managed to put together some pretty good penalty phase evidence in the short amount of time that we had, but I

thought that the way that the evidence went on, sort of the nature of the case -- and I mean, I guess that's why you have closing argument is it needed to be tied together.  The Jury needed to be told why all of these witnesses we called translated into a life sentence rather than a death sentence. There needed to be that link made for the Jury as to why this mattered, why this means under the law and under your own personal moral responsibility, you should vote for life instead of death.

Q    How did the meeting end up?

A    The meeting ended up with Charlie agreeing that I would do the closing argument, and I'm not sure if that -- that's how Charlie and I left it.  I don't know if that was at the end of the meeting with all of us or if Charlie and I conferred afterwards and he agreed.  I kind of think that -- you know, I don't remember the end of the meeting being, "Okay.  It's set.  We're done.  We're back to me doing closing."  But then, you know, that was in the morning. Throughout that day, maybe at a recess or end of the day or whatever, by some point at the end of that day, he had agreed that I was going to do the closing argument.

Q    Who ended up doing the closing argument?

A    Charlie did.

Q    Did you -- were you there when he gave the closing argument?

A    Yes.

Q    Did he incorporate your mitigation theories in the closing argument?

A    No.  The closing argument penalty phase was pretty much -- my recollection is it was pretty much the closing argument in guilt phase.  The same, you know, things were stressed that Norris didn't shoot his gun, you know, which was, obviously, no evidence of that, and that, you know, for that reason, he shouldn't be sentenced to death.

Q    Okay.  I'm going to talk to you now about whether you participated in any meetings with Mr. Shaw and Norris about whether he should testify in this case.  Okay?

A    Okay.

Q    Did you discuss with Mr. Shaw whether Norris should testify in this case?

A    Yes.

Q    And what was the substance of those conversations?

A    Well, this was all like right during trial when, you know, he had said -- it was either during trial or, you know, maybe -- no.  It had to be when we were like maybe voir dire. You know, he -- Charlie had indicated that he wanted Norris to testify, he thought Norris should testify, and I told him I thought that was a bad idea.  I mean, you know, we never -- it was never like sit down and talk about it.  It would have been in court during a break or --

Q    Do you know what Mr. -- I take it from what you're saying that Mr. Shaw's opinion was that Norris should testify in the case, is that correct?

A    Yes, yes.

Q    Do you know whether he communicated that advice to Norris?

A    He did, yes.

Q    Okay.  And I also gather from your answer you didn't agree with Mr. Shaw's advice?

A    No, I didn't agree with that at all.

Q    Okay.  Why didn't you agree with him?

A    Well, several reasons.  Norris was not prepared to testify, first of all, and at the time that it first came up that Charlie first mentioned it to me, there wasn't sufficient time to prepare him to testify.  I didn't think Norris would be a very sympathetic witness.  I think that as -- as terrible as Norris feels about what happened, I never felt like he took responsibility for it, and I think that was because it was difficult for him.  This was not supposed to happen.  No one was supposed to die, and so the responsibility that he was able to -- to live with was, "I didn't do this.  This isn't my fault," and that's a real problem, you know, when your client is on the witness stand because we know under the law it is his fault even though he didn't pull the trigger, and so I thought that he was going to be a bad witness on the stand.  I

thought he was unprepared.  I thought that it was a real problem that he was going to say he never fired his gun because the Jury -- you know, at that point, they were believing that he fired his gun.  I was believing it based on the Government's evidence, you know, because that's what the ballistics said.  So to put him up there to contradict uncontroverted Government evidence was a bad idea.  You know, the Jury was not going to give anything he said any credibility because of that one little piece of, "I didn't fire my weapon."

Q    Did you explain this position to Norris?

A    I did, yes.

Q    And did you try to talk him out of testifying?

A    Yes.

Q    Did he follow your advice?

A    No.

Q    Do you know why he didn't follow your advice?

A    Well, he -- I mean, you know, it made sense.  Charlie did represent --

MR. HOLTSHOUSER:  Judge, I would object.  It calls for speculation and conclusion.

THE COURT:  Sustained.

Q    (By Mr. McGraugh) I'll rephrase.  Did Norris tell you why he was not following your advice?

A    He did.

Q    And what did he tell you?

A    He -- obviously, Charlie had represented him for much longer than I had, and he just told me that he trusted Charlie, that he thought if Charlie told him he should do it, he should probably do it, and that, you know, he felt like even though he -- he saw -- you know, he understood my position, that when push came to shove, he was going to have to go with what Charlie advised him to do.

Q    Okay.  I believe you stated that you felt he wasn't prepared to testify.  Is that --

A    Right.

Q    What did you -- what would your expectations be as far as preparation to testify?

A    If I were going to call a client to testify, umm, there would be weeks and weeks of preparation.  There would be me and co-counsel going in, playing prosecutor and doing cross-examination.  There would -- I've even videotaped clients before, so they can see how they testify.  You know, it's -- it is the riskiest and most important thing that you do if you decide to do it, and, you know, there can't be too much preparation for that.

Q    Did Shaw advise Norris at all as to how he should testify?

A    Umm, I don't know the answer to that.  I wasn't -- I didn't participate in any discussion between Charlie and

Norris about what his testimony would be.

Q    Okay.  As far as you know, though, did he ever -- was there any discussion as to what would be solicited during direct examination or what would be expected on cross-examination?

A    Oh, I can tell you what Charlie told me.  I mean, Charlie -- when I expressed concerns about Norris being unprepared to testify, Charlie told me that he doesn't need to be prepared, that he needs to just get up there and tell his story.

Q    Did you actually witness Mr. Holder testify?

A    Yes.

Q    Okay.  In your opinion, how did his testimony go?

        MR. HOLTSHOUSER:  Well, Judge, I'm going to object.  It calls for a conclusion.  This Court can evaluate his testimony, in fact, saw him testify.

        MR. MCGRAUGH:  From a defense perspective.

        MR. HOLTSHOUSER:  I don't think Ms. Brewer's perspective on it adds anything to the motion.

        THE COURT:  If, you know, she can testify specifically as to issues that she had raised in him not testifying or something like that, but just a general overall view of what he said, I think the objection would be sustained.  So if you want to ask specific questions, you may.

        MR. MCGRAUGH:  Let me attempt to narrow it, Judge.

Q   (By Mr. McGraugh) As to Mr. Holder's expression of remorse, do you -- do you -- do you have an opinion as to how Mr. Holder testified?

MR. HOLTSHOUSER:  Judge, same objection.  I don't think Ms. Brewer's opinion of how he, in fact, testified has any bearing on whether or not the decision to call him to testify was appropriate or inappropriate.

MR. MCGRAUGH:  It goes to the --

THE COURT:  Wait, wait, wait, wait.

MR. HOLTSHOUSER:  It's not an after-the-fact hindsight test here.  So her opinion after it's done is not relevant.

THE COURT:  Yeah, I think, you know, you are correct. If it -- if it goes -- you know, she was the one who -- who did the mitigation preparation, and in terms of certain reactions she had, I would be interested in hearing that, but not as to her assessment of his -- of his testimony.  Do you understand the difference?

MR. MCGRAUGH:  I believe so, Your Honor.

Q   (By Mr. McGraugh) As to how Mr. Holder testified, since you did prepare the penalty phase evidence and put the penalty phase evidence, was Mr. Holder's testimony helpful in presenting a coherent penalty phase?

A   No, it was not.  I mean, I -- no.  In keeping with what the Court wants to hear about, in keeping within those

parameters, I think I can say, no, it was not.  I remember sitting there thinking, as he's testifying, they're going to kill this guy.

Q    And why is that?

A    Because I didn't see any remorse.

Q    And so would it be fair to say that that was not a penalty phase strategy that Mr. Shaw communicated to you or that you acquiesced to as to put Mr. Holder on the stand in order to show remorse in order to gain some sympathy with the Jury?

A    Oh, no.  No, that was not -- I'm sorry if I misunderstood your question before, but that wasn't his reason for putting Norris on the stand at all.  No.  He wanted -- no.  Charlie wanted to put Norris on the stand to tell his story and to tell that he didn't fire any shots in the bank.

Q    You represented Mr. Holder on appeal, is that correct?

A    Yes.

Q    Okay.  And was the case consolidated with Billie Allen's appeal?

A    Yes.

Q    Were you assisted by other counsel on the appeal?

A    Yes.  Dan Mohs, M-O-H-S, I believe.

Q    And what was your role in the appeal versus Mr. Mohs' role?

A    Well, we both worked -- you know, I think we both

considered ourself equal because Dan had taken over for Charlie, and so, you know, we never saw it as "You're the boss" or "I'm the boss", and we worked together very well.  So it was never an issue of, you know, what role anyone was going to play.

Q    Did -- did you handle a certain issue and Mr. Mohs handled certain issues?

A    Right.  We just divided it up, and I don't remember specifically how we divided it up.  I think we -- you know, he decided what issues he thought were important.  I decided what I thought was important.  We came together on that, and we agreed on what was important and sort of said, "I like this one, I like this one," just kind of, you know, divvied it up like that.

Q    Did anyone focus on the death penalty issues?  Was that --

A    I more focused on the death penalty issues.  Those were the ones I volunteered to take because I was -- you know, that was more -- I had somewhat more experience.  Dan Mohs is not really -- he's not a criminal defense lawyer, so he wouldn't have had as much familiarity with some of those as I did.

Q    Did -- and I believe you answered this earlier in your direct testimony.  Were you aware that Billie Allen's attorneys were challenging the indictment on the basis that aggravating circumstances were not presented to the Grand

Jury?

A    I wasn't specifically aware of that, no.

Q    Did you raise that issue in your brief?

A    No.

Q    Were you aware that you could adopt the codefendant's motions under the Federal Rules of Appellate Procedure?

A    A codefendant's brief, you mean?

Q    Yes, ma'am.

A    No, I wasn't aware of that, not at the time.

Q    Did you later learn that you could?

A    Yes.

Q    Can you tell the Judge when you learned that?

A    That would have been during oral argument when one of the judges in the oral argument asked -- expressed concern about, you know, "What if we give Billie Allen relief?  Are we compelled to give your client relief also?"  And expressed -- and then specifically asked me if we were adopting the arguments from Billie Allen's brief, and I said -- you know, I don't think I'd read Billie Allen's brief.  I said, "No, Judge.  We're pretty comfortable with the arguments that we've made."  And then when I sat down after my argument, Dan Mohs -- you know, I didn't know what to say to the judge.  Dan Mohs said to me, "There's an appellate rule that allows you to adopt the codefendant's brief.  So when you get back up in rebuttal, tell the judge that you want to adopt the

Codefendant's brief just because that will satisfy the judge's concern about giving one person relief and not another, and it will cover our bases that way."  So that's what I did when I got back up in rebuttal.  I, you know, asked the judge if we could adopt pursuant to that rule.

Q    So you did make that motion to adopt their issues?

A    In court.  Oral motion in court, right.

Q    And was it your intent to adopt the issue of the Ring issue?

A    Right.  It was just a blanket request, you know, a blanket request for adoption of all the issues contained in their brief.

Q    Do you know what the court's ruling was as far as permitting you to adopt?

A    Well, you know, I think I remember the judge maybe sort of shaking his head.  Nobody said, "No, you can't do that" or "I'm not going to let you do that."  It was certainly my feeling at that point that we were going to be allowed to do that.  If I had thought there was some issue on it, I would have filed a formal written motion afterwards, which I didn't do, so.

Q    You alluded to this.  So during your oral arguments, one of the jurists on the panel pointed out to you that you had not adopted or the peril of not adopting their argument as it relates to the Ring issue?

A    No, that's not how I remember it.  I don't even think we were talking about the Ring issue.  The way I remember it is that he, the judge, expressed just a theoretical, "What if we give Allen relief and we don't give your client relief?  Do you want to adopt his issues?"  And I think the reason that I said no is because I didn't know what issue he was talking about, and that's how I remember it today.

Q    As to -- did you do any -- prior to filing your brief, did you do any research regarding the challenging of the pecuniary gain aggravator?

A    No.

Q    Again, I asked you earlier.  Pretrial, was there any research as to the legislative history as to the pecuniary gain aggravator applied only to murder for hire cases?

A    No.

Q    Did you consider at all challenging the aggravator on the basis that the aggravator, the pecuniary gain aggravator, only applied to murder for hire situations?

A    No.  I wasn't -- I wasn't even aware of that, that that was an argument.

Q    Sometime after your -- your oral argument was sometime in January of 2000; does that sound right?

A    Yes.

Q    Were you aware of the case of United States versus Chanthadara?

140

A    Chanthadara?

Q    Chanthadara.

A    You were close.  Yes.

Q    C-H-A-N-T-H-A-D-A-R-A.

A    I have for quite some time been aware of the Chanthadara case.  I mean, that's -- there's probably more than one opinion on that case.  I was not aware of actually what it said about -- what that opinion that you're referring to said about the pecuniary gain aggravator until a few months ago.

Q    But you're aware of what that case says today?

A    I'm aware of that today, yes.

Q    And you're aware of the holding in that case?

A    Right.  Yes, I'm aware -- it's my understanding what it stands for is that the pecuniary gain has to come from the actual murder, cannot come from the underlying felony.

Q    Okay.  And that case came down before your opinion was issued?  Your opinion was issued sometime in 2001, is that correct?

A    I think April 2001 is when the court issued the opinion, and Chanthadara came down in 2000.

Q    Was there anything that you could do to augment the issues that you already raised on appeal to incorporate either the Ring or the pecuniary gain issue?

A    Yeah.  I mean, I -- I know what I would have done now. If that happened today, I would, you know, contact the court

with a 28J letter saying, you know, this new thing has just come to light.  If I missed it then or if they wouldn't let us reopen the briefing to bring that up, then I would have filed a motion to recall the mandate after they issued their opinion.

Q    Would this issue apply -- the pecuniary gain aggravator apply to the holding in Chanthadara?

MR. HOLTSHOUSER:  I'm sorry?

Q    (By Mr. McGraugh) The factual background in this case as well as the use of the pecuniary gain aggravator in the Holder case -- would that apply to the holding, in your opinion, in Chanthadara?

A    Yes.  I think we could have used the Chanthadara case to argue that the pecuniary gain was not -- was an invalid aggravator in this case because of the facts of Mr. Holder's case, yes.

Q    And was there any reason why you did not file the letter or a motion to recall, a mandate, or anything of that nature to raise either the Fifth Amendment Ring issue or the pecuniary gain aggravator?

A    Well, on the pecuniary gain aggravator, I wasn't aware of the holding of the case, and on the Ring issue, I wasn't even aware of the issue that it was an issue.  You know, I think I told you before I really became aware of it when Ring was decided.

Q    One last area I want to talk to you about is whether you witnessed Mr. Shaw sleeping during the trial.  Did you see Mr. Shaw what appeared to be sleeping during the trial?

A    Yes.

Q    Okay.  At what point during the trial did you see this?

A    It was early in the trial.  It was while -- my memory is it was like there was a series of bank tellers that testified during the early part of the trial, early part of the guilt phase of the trial, and it was while there was a series of the bank tellers testifying, sometime during that period.

Q    Approximately how many occasions did this occur?

A    Well, it was just that one day, maybe that one -- well, Norris initially pointed it out to me.

Q    How did he do that?

A    Just, you know, I was sitting next to him.  He just kind of, you know, elbowed me or tapped me or something and kind of, you know, put his head towards Charlie, and I saw that Charlie was -- you know, Charlie had his face in his hands and his face down, you know, and his eyes were closed, and I think after Norris pointed it out to me, I, you know, kind of tried to pay attention to it, and I can't say that it went on all day, but as I looked over, you know, there were more occasions that I looked over and Charlie was in that same position.

Q    And as to whether -- was there any actions that Mr. Shaw was doing that appeared to you that he was sleeping besides

having his head in his hands and his eyes closed?

A    Well, as I was trying, you know, to assess that, to see if maybe he was just sort of taking it all in, I did on one occasion notice him kind of do the like when you're asleep and you realize you're asleep and you kind of jerk your head up a little bit.  I noticed his head kind of bob up to attention a little bit, like you do when you're asleep when you don't want to be, and so that was what made me think, oh, yeah, this isn't just -- you know, the testimony was kind of dry and not particularly relevant to what we were trying to do, to what I would hope we were trying to do.  So that's why I really kept an eye on him, and it was that one sort of jerky kind of movement I would describe it as that made me think that he was doing more than just resting his eyes.

Q    During that period of time, did you -- you said the witnesses were dry.  Was there anything that Mr. Shaw -- was there anything that you felt was crucial and that he had missed due to the fact that he was sleeping --

A    Well, and I don't know --

Q    -- or appeared to be sleeping?

A    I don't know whether he was sleeping when this happened or not.  I know that there was something, and this was -- this was before Norris even pointed out to me that he had his eyes closed.  There was a -- one of the tellers was testifying, and I can't remember specifically what it was, but it was some --

some point that could be characterized as kind of minor, where she said something that was not particularly favorable to Norris, and I recalled from the discovery that she had actually said something kind of favorable to Norris on that issue, and so I expected, you know, Charlie's going to be able to impeach her on this, and, you know, it wasn't a huge deal, but, you know, we didn't have any huge deals in this guilt phase.  So I was like every little bit is going to matter here, at least to go towards punishment, and so I expected that she would be impeached to show that, you know, she had said something different, and he didn't.

He didn't even appear to have her statement, and so that was -- I can't say I looked over at him and saw him sleeping at that time, but that's what concerned me was that there was some -- I hadn't read all the discovery.  I didn't know what the bank tellers were saying, good, bad, or otherwise.  I just happened to have read this one statement of this teller that the incident happened on, so I thought that it could have been relevant, you know, to go -- any little thing to help affect the Jury's decision on punishment.

Q   And what, if anything, did you do once you saw that Mr. Shaw appeared to be sleeping during these -- during this testimony?

A   I didn't do anything.

MR. MCGRAUGH:  That's all I have at this point.

THE COURT:  You may inquire.

MR. HOLTSHOUSER:  Thank you, Judge.

CROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q    Ms. Herndon, good afternoon.

A    Thank you.

Q    On the last topic, let's pick up there.  Were any other instances of Mr. Shaw sleeping ever brought to your attention?

A    You know, the -- the next day, Norris expressed some concerns about it, but I don't think it was actually that he had thought he was sleeping.  I think he was concerned that it wouldn't happen again.  I -- and I know that there was some fear that he was sleeping during part of penalty phase, but, you know, I was -- I never witnessed that.

Q    Okay.  But other than the one instance that you observed that Norris brought to your attention, there were no other instances brought to your attention where you observed this?

A    There's two different things.  There was another instance brought to my attention.  There was no other instance where I observed it.

Q    Okay.  What was the other instance?

A    That he may have been sleeping during penalty phase.

Q    How was that brought to your attention?

A    Umm, either Caryn or one of our penalty phase witnesses who was in the courtroom.  It was my understanding -- and I

don't -- I just don't remember who told me this, but it was my understanding that Caryn had a fear that she saw his eyes closed or she thought, but I don't have much of a memory of it.

Q   Okay.  And it wasn't anything that you felt that he had missed a critical portion of the trial that you needed to bring to his attention yourself?

A   You know, to bring to Charlie's attention?

Q   Well, let's just start with the teller, for example.  Did you have some -- I wasn't clear.  Did you have some concern that he had actually missed a discrepancy between the teller's testimony and her statement?

A   Oh, he did.  He did.

Q   Did you bring that to his attention?

A   No, I did not.

Q   And why not?

A   Umm, well, let's see.  We were in the middle of trial, and, you know, when he was cross-examining her and then he sat down and he hadn't brought it up, you know, I just let it go. I guess --

Q   Why did you let it go?

A   I guess because we were in the middle of trial.  I didn't think it was critical, you know, and it's hard to say what's critical and not critical in a death penalty case, but I didn't think it was critical.  We were in the middle of

witnesses being called, and, you know, by that time, really, honestly, Charlie was -- I was not much more than a nuisance to him.  He was not rude or unfriendly to me, but he, obviously, knew what direction he was going in and expressed that he really didn't need my involvement in that.

Q    Would you say that you and he actually were somewhat in different directions; you had different ideas about how the case should be tried than he did?

A    Completely.

Q    Okay.  The other instance that you referred to involving sleeping that you thought that either Norris or that a witness or that Ms. Tatelli brought to your attention -- and then, of course, later, you learned that Mr. Shaw was going to do the closing, correct?

A    Right.

Q    Did you bring it to his attention -- anything about that particular witness' testimony that you had some indication that he may have missed?

A    Well, now, the penalty phase thing, that wasn't Norris. Norris and I had only talked about it during guilt phase.  The penalty phase thing, I don't even know what -- when that was, during what witness that was.  You know, it was just sort of all a blur by that point.  So, no, the answer is, no, I didn't do anything about it.

Q    All right.  And, again, with respect to that, whatever

sense you had of what he may have missed -- and, again, you don't know whether he was actually sleeping or not, correct?

A   Correct.  That's right.

Q   With respect to what he may have missed, what you surmised he had missed, did you feel any need to bring it to his attention since he was going to do closing, when it became clear he was going to do closing, "By the way, Mr. Shaw, you might want to know that this witness testified to this"?

A   Well, again, I wouldn't have known what he missed, but, you know, it really wouldn't have mattered because Charlie -- by that point, when he decided he was going to do closing, he knew what he was going to say, and the reason he was going to do closing is because only he could say it and he didn't need me.

Q   Okay.

A   So, no, I wouldn't -- even if I had known what I thought he missed, it wouldn't have done any good to bring it to his attention.

Q   All right.  Let's talk about your experience before you came to this case.  It's been seven years since you tried this case, correct?

A   Right.

Q   You've had a lot more experience since this case was tried; am I correct?

A   Yes.

149

Q    In the fall -- I'm sorry -- in, say, January -- was it February of '98 that you were first appointed?

A    Right.

Q    February of '98 -- let's focus on that time period.  As of February of '98, you had previously been with the Kansas City Public Defender's Office, correct?

A    Right.

Q    And had worked for a while in their general crime section but then were in -- was in their capital unit?

A    Right.

Q    In the capital unit, had you personally represented a capital defendant in a trial?

A    No.

Q    Had you personally presented a witness or testimony in a capital trial?

A    No.

Q    And from the Kansas City Public Defender's Office, you left that office and came to St. Louis and started a private practice?

A    Right.

Q    And what time period was that that you were here in St. Louis?

A    I came here in roughly August of '97.

Q    Okay.  So between August of '97 and February of '98, your private practice was at -- what did that involve?

A    Just, umm, running the little criminal stuff.

Q    Okay.  Were you retained or appointed?

A    Appointed.  Well, I did some work for -- I did some contract work for an attorney in the Central West End who he was retained and I would do some of his criminal stuff for him.

Q    Okay.  But no instance in which you had been personally retained by a defendant to represent him or her against a criminal charge?

A    No.  I've never done that kind of work, no.

Q    Okay.  Then this came along; this appointment came along, correct?

A    Right.

Q    And then that -- that was the background of your experience before you took this appointment?

A    Right.

Q    Okay.  Now, you don't know what -- his name is Sean, is that right, in Kansas City?

A    Sean O'Brien?

Q    Sean O'Brien.

A    Yes, uh-huh.

Q    You don't know what Sean O'Brien said to Dick Burr about your credentials or experience that made Dick Burr suggest your name to Mr. Shaw to seek appointment of a second counsel?

A    No.  You know, I don't really know Sean that well.  I

151

mean, I know him pretty well but not well enough that he would

be familiar with the level of my experience.  He would have

known that I had been with the Capital Division of the Public

Defender's Office for a few years and that I had previously

been, you know, in the regular trial division where we tried

all kinds of cases.  He knew that, but that's all he would

have known about me.

Q    The experience that you had in the capital unit of the

Kansas City Public Defender's Office -- what did you do there?

A    Prepared cases for trial with the hopes of pleading them,

so we wouldn't have to try them.

Q    And what does preparing them for trial entail?

A    It entails investigation, interviewing witness, reading

police reports, preparing motions, you know, going and looking

at the physical evidence, communications with the client,

making strategy decisions about who you should call at trial

and who you shouldn't call at trial.

Q    And you assisted others with those decisions?

A    Well, no.  I was -- I was actually responsible for -- you

know, we had two people on each case, and I was actually

responsible for several cases.  We just never had to go to

trial on any of the cases I was responsible for.

Q    And in the cases that you did work on there, motions --

you mentioned motions that were filed -- you were familiar

with the practice of filing motions attacking either the

charge or the death penalty procedure, correct?

A    Right, yes.

Q    And that was despite the fact that the law with respect to some of those issues was against you and that those motions were likely to be denied, correct?

A    Right.

Q    So why did you do that then in those cases?  Why did you file those motions?  What was the point?

A    Well, in a -- you know, in a capital case where your client is going to be killed, you have to do everything.  And, you know, as we later learned from Ring, things like this happen.  Even though we think something -- even though Supreme Court precedence says this issue isn't going anywhere, if we truly believe that we have an argument that says it should go somewhere, maybe some day the Supreme Court will change their mind, and when they do, I want to be on that bandwagon.  So that's the logic behind it.

Q    So part of the practice is to preserve issues in the event that the law changes, not so much that there is currently, you know, valid case law that makes this issue meritorious and should be ruled in your favor, but it's to partly preserve issues in case the law does change?

A    Right.  You want to preserve issues, and, you know, to some extent -- and this wouldn't apply in this case because of Judge Webber's experience, but a lot of times, we tried to

educate the judge on the death penalty and death penalty issues by filing motions.

Q    Okay.  And when you came into this case, what was the status of those motions?  Did you realize that no such motions had been filed?

A    At some point, I did because at some point, you know, Dick was sending me all this stuff, saying, "Here, you need to file these 1,000 motions in the next 24 hours."  So I think probably Dick pointed it out to me is how I became aware of it.

Q    So all of these -- all these issues that at least as of the time that the case was going to trial were not meritorious, all the motions concerning all these issues had not been filed to preserve the record in the event the law changed some day?

A    Uh-huh, that is correct.  At the -- you said at the time I came into the case?

Q    Correct.

A    That's true.

Q    And your experience, at least in the Kansas City Public Defender's Office, was that it was general practice that you filed such motions to preserve the record in the event the law did change?

A    Right.

Q    And Dick Burr sent you a ton of stuff, right?

154

A    Yes.

Q    I mean, it was an overwhelming amount of material to try and master, but some of these motions were not new to you, were they?

A    Well, as far as the motions that we talked about filing, they were all specifically related to the federal Death Penalty Act, and that would have all been new to me.  Now, you know, a motion to strike an aggravator -- that's something you can do in state court, too.

Q    And some of the constitutional issues, though, were the same as between the state death penalty system and the federal death penalty system?

A    Yeah, I'm sure they are.

Q    Eighth Amendment claims, things of that sort?

A    Yeah, yeah.  You know, they all apply through the Fourteenth Amendment, so I'm sure that they are.

Q    So -- and motions like that, at least, came to your attention through Mr. Burr, had not been filed in this case?

A    Right.

Q    And you filed -- you, in fact, prepared a motion to file or to adopt all the motions that Mr. Sindel had filed?

A    Well, I prepared a motion to adopt some specific motions that he had filed, yes.

Q    In fact, those specific motions actually went to discovery and disclosure?

A     Right.

Q     You wanted to make sure that you were on record making a request for specific kinds of disclosure?

A     Right.

Q     You were not attempting to preserve the record with respect to certain legal issues that you were familiar with. The general practice we've just discussed -- that was not your attempt in making that motion?

A     Well, that -- no, that wasn't -- it wasn't a conscious decision like you've worded that.  It was a -- and you have to sort of understand the atmosphere at the time.  It was, you know, we're sinking; let's try to put as many fingers in as many holes as we can.  At the time, we didn't have electronic case filing.  So my access to all the motions that Rick Sindel had filed was limited.  I didn't know what he'd filed, what I had, what I didn't have, what Charlie had, what Charlie didn't have.  There wasn't a conscious decision to protect the record with regards to discovery.  There was a conscious decision to adopt as many of Sindel's motions as I could possibly get my hands on.

Q     But the motion that you prepared that was previously shown to you by Mr. McGraugh went solely to the issue of disclosure or discovery?

A     Right.

Q     You did not file a similar motion to adopt any or all of

the motions that Mr. Sindel had filed preserving certain legal issues for down the road?

A     You mean just like a blanket motion or --

Q     Things like the Eighth Amendment claims we talked about, anything else that Mr. Sindel had filed attacking the indictment or attacking the imposition of the federal death penalty.

A     No.  I actually filed some individual motions, you know, in -- for Norris on those kinds of issues.

Q     Along those lines?

A     Right, right.

Q     Okay.  You filed some of those?

A     Right.

Q     And none of those, to your knowledge, contained any preservation of what we're later going to refer to as the Ring issue, right?

A     Right.  No, I wasn't aware of that issue at the time.

Q     And that one wasn't even on your radar screen, I think, in your words?

A     Right, that would be true.

Q     And the law as it existed at that time -- were you familiar with the case of Walton versus Arizona, the Supreme Court case?

A     Sure.  Well, yeah, sure.

Q     Okay.  And that was the then existing law with respect

157

to -- I think it held specifically that a judge could make findings with respect to statutory aggravators, correct?

A    Well, understand this.  At that time, Walton versus Arizona wouldn't -- was I aware that that's what that case said and that that was an issue?  No.  In Missouri, the law was if the jury hung, the judge could sentence you.  Did I know that consciously that was because of Walton versus Arizona?  No.  You know, what you have to understand is that I didn't even realize that was an issue.

Q    Okay, but if -- logically, if a judge could sentence you after a jury had hung, there was certainly no need for a grand jury to indict you on statutory aggravators?

A    If I would have thought about that, then the answer would have been --

Q    Okay, but it wasn't even on your radar screen?

A    Right.  I didn't even think about it.

Q    And it certainly wasn't anything that anyone else was discussing as a hot button issue in capital defense work, were they?

A    Well, obviously, they were since Ring was decided and since --

Q    We're talking about now February of '98.

A    Well, but in order for -- for Ring to be decided the way it was, people have to be filing motions to get there.

Q    Correct.

A    And, obviously, it was because -- my -- and my hunch is probably that John Simon was the mastermind behind the motion in Billie Allen's case.  And, you know, Dick Burr had told me, "In these materials that I sent you, there's a bunch of motions that you need to file," and there were several that I never got to filing.  Now, I don't remember specifically whether he said to me, "One of these several motions is the Ring motion," which, you know, wouldn't have been called the Ring motion at the time, but I don't know if he specifically directed to me that that's one of the things that needed to be filed, but if he did, I just didn't get to it.  You know, for example, I remember him specifically saying, "Here's a bunch of motions related to victim impact.  You need to file these to try to control the amount of victim impact evidence that comes in."

Q    And that was -- that was important enough that you did that?

A    I didn't, no.  No.  I mean, I wanted to.  I wanted to do everything that Dick told me to do, but I -- I had five weeks, and I had 24 hours in each day, and I had mitigation witnesses, and, you know, I mean, I could go on all day, but that was sort of the -- I was trying to do what I could.

Q    You're aware now that Billie Allen filed a motion specifically preserving what some years down the road would be known as the Ring issue, correct?

A    Right, yes.

Q    And you did not file any motion to join in that motion, correct?

A    Right, that's correct.

Q    Was it your effort in terms of filing the motions you did file to preserve what you viewed as credible issues?

A    No.  Not that I would ever file anything frivolous knowingly in court.  Like I think I already said, I'm pretty sure I didn't even read all these motions that I wanted to join in.  It was my effort to try to do something to somehow preserve this record because this thing was becoming -- you know, every hour it became a greater disaster.

Q    Do you recall giving a deposition in this case?  I'm on the top of 92.  Do you recall giving a deposition a few weeks ago?

A    Sure.  I have it right here if you want me to refer to something.

Q    Okay.  Yeah.  If you would, refer to the top of page 92.

A    Okay.

Q    And do you see at the top of the paragraph there your answer, "You have to preserve every issue that is a credible issue in case something like Ring happens."

A    I would agree with that.

Q    And based on what -- based on what was going on in February of '98, can you give this Court any -- any inkling of

why was <u>Ring</u> a credible issue in February of '98?

A    Well, because someone who is smarter than me said this is wrong and here is the argument and the case law that supports that it's wrong, so we're going to keep making this.  You know, it's like the reasonable doubt motion that everybody files.  You know, I mean --

Q    But can you point to anything that existed in February of '98 that, had you known about it, would have told you that, "Gee, this is a credible issue that I should preserve"?

A    The fact that other -- yes.  The fact that other capital attorneys were filing it.

Q    That makes it credible?

A    If I would have read it and could have gotten through it without laughing and said, "This is something that I believe is true," I would have filed it.

Q    Despite the existence of <u>Walton versus Arizona</u> as then the Supreme Court decision on the issue?

A    Yeah, absolutely.

Q    Now, I want to clear up one thing, and that concerns the appeal.  You had a strategy that you used in preparing the appeal that essentially was to focus the court's attention on what you considered to be certain big issues rather than to give the court a multitude of issues, some of which were big and some of which were less important, is that right?

A    That's right.

Q   And you did that primarily on the recommendation of Mr. Mohs who's an experienced appellate lawyer?

A   Right.

Q   And in terms of that balance, that strategy, if you knew now -- if you knew then what you know now about Ring, would Ring have been one of those big issues?

A   Well, I mean, that's hard to say because now, obviously, yeah.  You know, I can say --

Q   Well, actually, just so we're clear, now, actually, in terms of where Allen stands, it's not a successful issue, correct?

A   In terms of where he stands now, it's not.  That's true.

Q   Okay.  But in terms of knowing what -- knowing -- if you could have predicted somehow that Ring would have been decided, would -- would -- would this issue have been a big issue in terms of what -- of your appeal strategy?

A   Well, in -- the answer to that is, obviously, yes.  You know, I didn't -- again, I just didn't even know about the issue at the time that we were deciding what to include in the appeal.

Q   And is one of the criteria, though, that you relied on in choosing the issues that you were going to argue on appeal the extent to which there was strong case law to support your argument?

A   No, it's not.  And, I mean, if you look at -- I'm just

thinking about the next brief I did after a federal death penalty trial, and I included a ton of issues, and some of them, I just put a paragraph or two in because I wanted to make sure and preserve them.

Q   So you took a different strategy approach in a later appeal, correct?

A   Well, yeah, once I learned more of what I was doing, yeah.

Q   Okay.  So in terms of the strategy that you adopted for Mr. Holder, is there any reason to believe that the case law would have supported you then to make the Ring issue one of your key issues on appeal had you known about it?

A   It clearly would not -- the case law clearly would not have, but that doesn't -- that doesn't solve the problem.

Q   Now, during the oral argument -- and have you had the benefit of listening to the tapes of your oral argument recently?

A   No.

Q   Okay.  Your recollection actually is correct in terms of your oral argument, how it came up.  Judge Arnold was the one that asked you.  Do you recall Judge Arnold --

A   Sure.

Q   -- asking you the unusual circumstance of why you hadn't adopted any of your Codefendant's arguments on appeal?

A   Yes.

Q     And he pointed out to you the possibility that, well, perhaps, if Mr. Allen got relief and Mr. Holder didn't on one of those issues you had not adopted on, it would create a bit of a dichotomy there, correct?

A     Right, right.  And I think he specifically asked, you know, "Would we then be compelled to also give your client relief?"

Q     And that question was not specific with respect to the Ring issue, was it?

A     Not -- my recollection, no.

Q     Because there were many other issues that were raised in Mr. Allen's brief other than the Ring issue, and none of those issues were actually even argued by Mr. Allen's attorney during the appeal?

A     Right.  That's right.

Q     And the Ring issue wasn't even argued by Mr. Simon in course of his oral argument, was it?

A     That's my memory, that it wasn't argued.

Q     And then do you recall that you came back in oral argument in rebuttal, after conferring with Mr. Mohs while Mr. -- while Ms. Lyle was arguing, and, in fact, asserted the rule to adopt; you asked for permission to adopt any of Mr. Allen's arguments should he get relief from them?

A     Right.

Q     And you conditioned your motion on if he obtained relief,

correct?

A    Oh, I don't remember.  I don't remember because if I did I shouldn't have.  I remember the way Dan described it to me.  Dan Mohs described it to me, "You know, there's a rule that allows you to adopt it.  We don't know what he's talking about, so just get up there and ask if you can adopt it."

Q    And you could have done so even though you hadn't specifically preserved this issue at the trial level?

A    Sure.

Q    It would have just affected your standard of review, correct?

A    Right, right.

Q    So you were looking at plain error versus harmless error in terms of overcoming the impact of the error, correct?

A    Right, yes.

Q    Now, with respect to that request, as it turned out, when the Eighth Circuit's opinion came down, Mr. Allen did not get any relief with respect to any of those issues, correct?

A    That's true.

Q    They rejected his Ring argument, his -- what later would be known as his Ring argument?  Let's call it his Fifth Amendment indictment right issue.

A    Okay.

Q    He did not get relief, correct?

A    Right.

Q    He lost that.  So in terms of your request as it related to that issue, there was no reason for the court to act on that because Mr. Allen had not gotten any relief from the Eighth Circuit, had he?

A    Well, you mean, ultimately, when the en banc decision came down?

Q    Well, at least in terms of the first, Allen I, the first direct appeal opinion, Mr. Allen had not obtained any relief, had he?

A    Oh, okay, right.  You're right, yes.

Q    And then while his petition for cert. was pending, Ring came down and they remanded him?

A    Right.

Q    Okay.  Then at any point in -- then you were familiar with Ring, correct?

A    Right.

Q    Now, why, at that point, did you not go back to the Eighth Circuit and ask them for permission to obtain relief based on your previous request in rebuttal to adopt Mr. Allen's argument?

A    Well, I thought about that, and I think I even talked to some people about that, and I -- you know, I don't really --

Q    So you gave it some serious consideration?

A    That might be overstating it a little bit.

Q    Well, who did you talk to about it?  Who did you consult

with?

A    Umm, I might have -- oh, I don't know.  Gosh, it seems like I would have done something like called Dick or sent him an email or -- you know, obviously, it became important, but, you know, part of it was I never got around to doing anything. The other part of it was, you know, the reason really behind never getting around to doing anything is -- you know, and I don't -- okay.  I'm remembering a little bit more now.  I don't remember who I talked to, but it was my opinion based on discussions with others that if Billie Allen ultimately got relief on the issue, that Norris would receive relief, too. So that it wasn't crucial that I act right at that very moment and do something, and unfortunately, I'm a person that if I don't have a deadline, it gets put off and put off and put off.

Q    Where was Mr. Holder's case in the line of appeal at the time Ring was decided, if you remember?

A    Umm, well --

Q    Would his petition for cert. have been in the same place as Mr. Allen's?

A    Norris -- we filed Norris' cert. petition, and it was after all that -- I don't know -- anthrax stuff or whatever because Norris' cert. petition got lost for like a year. Nothing happened on it for like a year because the court lost it because of the mail difficulties.

Q    So it might have even been -- acting on it might have even been further behind Mr. Allen's?

A    Yeah.

Q    But no request was made to seek a remand for Mr. Holder to the Eighth Circuit and take advantage of your earlier request to the Eighth Circuit to adopt any issue of Allen's on which he obtained relief?

A    No.  And, again, I think even though --

Q    And what is the reason for not doing that?

A    Well, I think even though I thought I should probably do that and I'm going to do that and that's on my list of things to do, I -- the reason I kept pushing that back on the list was in talking to other people, I felt like if Billie Allen got relief, so would Norris on that issue ultimately.

Q    And that was because why?

A    Because they're in the same circumstance.  If -- they were indicted together.  If the indictment is --

Q    Was it because of your earlier request to the Eighth Circuit to adopt that issue?

A    No, no, no, no, just because if Billie Allen wins and that becomes the law, they're indicted together; how do you then execute Norris and you take Billie off of death row when they're indicted together and the indictment -- you know, if there's a fatal flaw in it to one person, there's a fatal flaw in it to both of them, and so I thought that it would be a

168

matter of, okay, Allen is decided favorably, maybe the court

without our motion or at very most a one-sentence motion

saying give him the same relief --

Q    Has that motion ever been filed?

A    Well, he didn't get relief.  You know that.

Q    He did in Allen II?

A    Well, he doesn't have relief now.

Q    But how about after Allen II came down and --

A    No.

Q    -- Mr. Allen's conviction was temporarily set aside?  Was

any motion filed then to seek relief?

A    No.  And it was the same thing.  I actually -- as I was

telling you before, that was the thought process that was

going on at that time was that he -- I could file something, I

should, I would, I will, but ultimately, if the Eighth Circuit

upholds this, which I never thought they would, if the Eighth

Circuit upholds this, then Norris is going to benefit.

Q    Okay.  Let's step back there.  You never thought that

they -- part of your reason for not doing anything was you

never thought that the Eighth Circuit would uphold this?

A    Oh, no, that wasn't part of my reason for not doing

anything, no.

Q    Okay.  What was your reason then for not doing anything?

A    There were two reasons.  One was procrastination.  Two

was I felt like, ultimately, if Billie got relief, so would

Norris because they were indicted jointly.

Q    While we're on this topic of these legal issues, let's talk briefly about pecuniary gain.

THE COURT:  Well, just a second.  Could I see counsel at the bench?

(A BENCH CONFERENCE WAS HELD ON THE RECORD AS FOLLOWS:)

THE COURT:  Just curious.  From a time perspective, can she return in the morning without any problems?

MR. MCGRAUGH:  I don't know, Judge.  I'll ask her. Can you give me a minute?  I know that we're on somewhat of a tight time frame.  I'd like to think that we can -- he's flying in late tonight and needs to fly back out in the afternoon.  So Jennifer is here.  If -- if we have to take him out of order and put her back on after he's done --

MR. GORLA:  She can come back.

THE COURT:  I'm just curious.  I mean, we're going to have quite a bit more?

MR. HOLTSHOUSER:  I think we have pretty much more. Don't you?

THE COURT:  Yeah, okay.  Let's wrap it up.

MR. HOLTSHOUSER:  If we're going to break, Judge, I would request that you give an oral instruction to the witness not to confer with -- she physically came here with the other witness, Caryn Tatelli, and I think Ms. Tatelli is actually staying overnight with Ms. Herndon -- and not have any further

communication about either the subject of Ms. Tatelli's testimony or with counsel.

MR. MCGRAUGH: I don't anticipate that to be a problem.

THE COURT: Would you tell her the same thing?

MR. MCGRAUGH: Sure.

THE COURT: All right.

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.)

MR. HOLTSHOUSER: Will you give that instruction as well, Your Honor?

THE COURT: Yes, I will.

MR. HOLTSHOUSER: Okay. Thank you.

THE COURT: I believe that, at this time, that Ms. Herndon will be giving substantially more testimony, and it is about five minutes after 5:00. So we're going to take the evening recess until 8:30 in the morning.

I do understand that it will be possible without grave consequences to you to return tomorrow; is that true?

THE WITNESS: That will be fine, Judge.

THE COURT: Okay. I must give an instruction that you not confer with Ms. Tatelli or that she confer with you -- I believe she's still in the courtroom -- and that -- and that the witness not confer with counsel on either side before she's recalled.

THE WITNESS: No problem, Judge.

THE COURT:  Thank you.  Court's in recess.

MR. HOLTSHOUSER:  Thank you, Judge.

(PROCEEDINGS CONCLUDED AT 5:12 P.M.)

CERTIFICATE

I, Gayle D. Beilsmith, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 171 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 29th day of August, 2005.

_____

/s/ Gayle D. Beilsmith

GAYLE D. BEILSMITH, CSR, RDR, CRR

Official Court Reporter