**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **NORRIS G. HOLDER,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | ) **No. 4:03-CV-923-ERW** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent.** | ) |

**EVIDENTIARY HEARING**

**BEFORE THE HONORABLE E. RICHARD WEBBER**
**UNITED STATES DISTRICT JUDGE**

**VOLUME II**
**JULY 19, 2005**

APPEARANCES:
For Petitioner:        Christopher E. McGraugh, Esq.
                       LERITZ AND PLUNKERT
                       One City Centre, Suite 2001
                       St. Louis, MO  63101

                       Michael J. Gorla, Esq.
                       720 Olive, Suite 1630
                       St. Louis, MO  63101

For Respondent:        Steven E. Holtshouser, AUSA
                       Joseph M. Landolt, AUSA
                       OFFICE OF U.S. ATTORNEY
                       111 South Tenth Street, 20th Floor
                       St. Louis, MO  63102

*REPORTED BY:*         *GAYLE D. BEILSMITH, CSR, RDR, CRR*
                       *Official Court Reporter*
                       *United States District Court*
                       *111 South Tenth Street, Third Floor*
                       *St. Louis, MO  63102*
                       *(314) 244-7987*

VOLUME II

2

## INDEX

*Witnesses:*

**JENNIFER HERNDON**
Cross-examination by Mr. Holtshouser . . . . . . . Page   3
    (continued from 7/18/2005)
Redirect Examination by Mr. McGraugh . . . . . . . Page  71
Recross-examination by Mr. Holtshouser . . . . . . Page 101
Further Direct Examination by Mr. McGraugh . . . . Page 122

**RICHARD BURR**
Direct Examination by Mr. McGraugh . . . . . . . . Page 129
Cross-examination by Mr. Holtshouser . . . . . . . Page 182
Redirect Examination by Mr. McGraugh . . . . . . . Page 211
Recross-examination by Mr. Holtshouser . . . . . . Page 217
Further Direct Examination by Mr. McGraugh . . . . Page 226

(PROCEEDINGS STARTED AT 8:45 A.M.)

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT AND WITH THE PETITIONER PRESENT.)

THE COURT:  Morning, Ms. Herndon.

Whenever you're ready.

MR. HOLTSHOUSER:  Judge, I failed to introduce to you yesterday the other person sitting at our table.  This is Melanie Ranken.  Melanie's a law student at St. Louis University who assisted us in preparation for this hearing.

THE COURT:  Very well.  We met briefly yesterday. Whenever you're ready, Mr. Holtshouser, you may proceed.

**JENNIFER HERNDON,**

HAVING BEEN PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

CROSS-EXAMINATION

(continued from 7/18/2005)

BY MR. HOLTSHOUSER:

Q    Good morning, Ms. Herndon.

A    Good morning.

Q    Over the break last evening, was Caryn Tatelli staying with you?

A    Yes.

Q    All right.  And did you have any discussions with her about the questions that she was asked during the testimony yesterday?

A   No, no.  We discussed very brief -- nothing about the testimony -- you know, that she had testified and she was done and I had to come back, and, you know, but nothing about the nature of our testimony.

Q   Okay.  Now, in the course of getting to know Mr. Shaw through this case, did you come to learn anything about his past experience?

A   I did very generally, yes.

Q   And can you tell us what that was?

A   Umm, I heard through the legal community that he had a reputation for being a very good lawyer, that he had tried a lot of cases.  I heard some stories from different lawyers about how he was good at trying sort of barroom brawl kind of cases.  Mr. Shaw told me, you know, gave me kind of some war stories and told me about how, you know, oh, when he was practicing law, you just walked into the courtroom with a folder and nowadays you've got all these boxes and, you know, just kind of general stuff like that.

Q   So did he share with you some of his experiences as a trial lawyer over a period of many years?

A   Right.

Q   And did that include many capital cases as well?

A   You know, we didn't -- the only comment I remember him making about capital cases was what I said about how, you know, he said, "It used to be you could just walk in with your

folder, and now you guys have all these boxes."  That was the only specific discussion we had about capital cases.

Q    Okay.  And his specialty, his area of expertise, seemed to be violent crimes, though?

A    Well, how, you know, some of the other lawyers in the community told me he was good if there was, you know, kind of a barroom fight or a "good old boy" kind of dispute, that he was good at coming in and being effective with witnesses who would -- who would have been eyewitnesses to those kind of events.

Q    Okay.  Did he share with you that he'd been a B52 pilot or a B17 pilot in World War II and had been a prisoner of war?

A    He did.  He did.  We talked a little bit about that, sure.

Q    Okay.  Now I want to direct your attention to one of the topics we were on before the end of yesterday.  We had talked about the Fifth Amendment indictment right issue and were beginning to talk about the pecuniary gain issue.

A    Okay.

Q    Do you remember the questions that Mr. McGraugh asked you yesterday about the pecuniary gain issue?

A    Yes.

Q    And he asked you several questions that seemed to be based on your knowledge of the legislative history of the pecuniary gain statutory aggravator.  Do you recall those

questions?

A    Yes.

Q    And is it your belief that there's something in the legislative history which suggests that that statutory aggravator applies only to murder for hire?

A    No.  The only thing that I know of now that leads me to believe that is Chanthadara and the other cases of that, which the name escapes me right now.

Q    Is the other one named Bernard?

A    Bernard, right.

Q    Okay.  And Chanthadara, I believe, was the first of those, and that wasn't decided until 2000, correct?

A    That's right.

Q    Some two years after the Holder case was tried?

A    Right.

Q    And this concept of the so-called pecuniary gain issue, that's an issue that, in fact, wasn't even raised or preserved by Mr. Sindel either, was it?

A    You know, I don't know whether it was or not.  If you say it wasn't, I'm sure it wasn't.

Q    Okay.  Have you read Chanthadara?  Are you familiar with it at all?

A    I am familiar.

          MR. HOLTSHOUSER:  May I approach the witness, Your Honor?

THE COURT: You may.

Q  (By Mr. Holtshouser) Let me show you what's been marked as Exhibit S, as in Sam. This is a copy of Chanthadara, and I've turned it to the page that deals with pecuniary gain instruction. Now, is it your statement to the Court that this case would have benefited Mr. Holder had you raised this issue?

A  Well, it could have benefited him potentially on appeal. You know, obviously, during the trial, it wasn't decided, but the issue was being raised. You know, I'm sure that this is contained in some of the motions that I received from -- from resource counsel because the issue was being raised by Mr. Chanthadara and, I assume, by other lawyers at the time. For the case to be decided by the Tenth Circuit in November of 2000, it was obviously being raised at the trial level well before then.

Q  Okay. And you believe that somehow your own performance was less than professional in failing to be aware of this issue percolating in the lower courts and not filing a challenge to it?

MR. MCGRAUGH: Your Honor, I'm going to object to this question as it calls for a conclusion and, actually, an ultimate conclusion as to whether her conduct rises to the level of below professional standard.

THE COURT: Yeah, I think so. Sustained.

Q    (By Mr. Holtshouser) With respect to the holding in Chanthadara, the essence of the holding is that the pecuniary gain needs to flow directly from the homicide as opposed to the underlying felony, such as robbery; is that your understanding?

A    That's correct.

Q    Okay.  And not that the pecuniary gain statutory aggravator cannot be applied in a robbery context?

A    Well, I'm not sure how it would be applied in a robbery con -- let me think about it.

Q    But doesn't Chanthadara itself indicate that it could be if the evidence was that the homicide -- the pecuniary gain would flow directly from the homicide?

A    Yeah, I think it's an issue.  I think that there's -- yeah, I think it's maybe somewhat unclear because Chanthadara doesn't deal with the exact set of facts that we have here. So I think it could probably go either way.

Q    And in terms of the facts in Chanthadara, did it not involve a robbery where the homicide had occurred after any property involved in the robbery had already been taken?

A    Right.

Q    Now, in the case of Mr. Holder and Mr. Allen, the guard was -- Mr. Heflin was a guard at the bank, correct?

A    Correct.

Q    In effect, he stood between them and the money that the

bank held?

A     Right.

Q     And so killing him, theoretically, would allow the pecuniary gain aggravator to apply because monetary gain would flow directly from killing him?

A     Well, I mean, that would be your response to our motion, but obviously, I would see it differently, and I think an honest reading of Chanthadara supports a different conclusion than that.

Q     Okay.  And Chanthadara, though, does not stand for the proposition that the pecuniary gain aggravator can only apply to murder for hire situations?

A     It does not say that, although I -- my interpretation of it -- and certainly, it's, I think, more than credible argument to make to the court that it would stand -- that it -- because of the rule in Chanthadara, it'd be hard to apply the pecuniary gain aggravator to any other situation other than a murder for hire situation.

Q     But Chanthadara, itself, dealt with the propriety of the instructions, the way in which the jury was instructed on how to find the pecuniary gain, correct?

A     Correct.

Q     Now, turning your attention to the theory of defense that Mr. Shaw employed, part of that involved conceding Mr. Holder's involvement in the bank robbery, correct?

A    Right.

Q    And do you see that, in your understanding of the facts of the case, as an inappropriate strategy to pursue?

A    Not at all.

Q    And is that because the evidence of his involvement in the bank robbery was essentially overwhelming?

A    Right.

Q    Was it also, in your -- in your estimation, an appropriate tactic to try and have a consistent strategy between guilt and penalty phase in order to maintain credibility with the Jury?

A    Sure.  Always.

Q    Was it also Mr. Shaw's strategy that even though he was involved in the bank robbery, Mr. Holder was guilty of noncapital bank robbery and not guilty of capital bank robbery, that he had a sense that there was two offenses here and that Mr. Holder was guilty of one but not guilty of the more severe offense?

A    Right.  The -- yes.  The way Charlie explained it to me or the way Charlie always referred to it is he's guilty of the bank robbery, but he's not guilty of the murder is how Charlie always phrased it.

Q    That was his way of rephrasing it and referring to it?

A    Oh, I don't know what -- all I know is what he said to me.  I don't know.

Q    I'm asking; is that the way he phrased it?

A    That's what he said, yeah.

Q    And that the missing element, in his mind, with respect to the facts of this case, on the more severe offense, was the lack of Mr. Holder's intent to kill?

A    Well, right, the fact that he -- that he didn't kill.

Q    And that he didn't kill and he didn't intend for anyone to be killed?

A    Right.

Q    That was critical to Mr. Shaw's defense strategy?

A    Well, yeah, because how could you be guilty of the murder if you didn't kill anyone or didn't intend to kill anyone; that was his reasoning.

Q    But his reasoning also was that he couldn't be guilty of the capital offense based purely upon a felony murder concept of bank robbery, that something more was needed in order to make him guilty of the capital offense?

A    Well, you're just making it more complicated than Charlie ever talked to me about it.  The way he always referred to me about it is, you know, optimistically, that he was going to be found not guilty of the murder.  And keep in mind, as I've told you several times, we didn't talk about it very often, but the times that we talked about it, there was no talk of, you know, felony murder not supporting a capital offense.  It was always he's guilty of robbery; he's not guilty of murder.

Q    All right.  And did you take from that some sense that you didn't perceive that he understood those concepts?

A    Absolutely.

Q    Okay.  Now, was it a consistent part of his theme and a consistent point that he stressed to the Jury that Mr. Holder did not intend to kill Mr. Heflin, did not, in fact, shoot Mr. Heflin, and further, that he didn't fire his weapon at all?

A    Right.

Q    There are three consistent themes there that he tried to stress throughout the case, correct?

A    Yes, he did.

Q    And that was true in his opening statement; it was true in his cross-examination, his guilt phase closing, and even as well in his penalty phase closing?

A    Right.  I mean, that was the whole case for Charlie.  He thought if he was convicted of the robbery, that was fine because it didn't -- you know, obviously, he was going to be convicted and that didn't expose him to the death penalty, so that was the best we could do.

Q    And did you feel that this strategy was inappropriate, to have that consistent theme throughout the case?

A    Yes.

Q    You thought it was inappropriate?

A    Yes.

Q    Okay.  And why was it inappropriate to stress to the Jury he didn't intend to kill the guard, didn't, in fact, shoot the guard, and hadn't fired his weapon?

A    Well, because that wasn't -- that wasn't going to ever, under any circumstance, lend the result that Charlie wanted. All that was going to do was make him eligible for the death penalty and, in my estimation, make it more likely that he receive the death penalty because I didn't think -- whether it's true or not, I didn't think that the Jury was going to believe that he didn't fire his weapon.

Q    And you felt that that strategy was legally flawed --

A    I felt that that --

Q    -- because it made him death eligible?

A    I -- I don't know.  I'm not sure what you mean by "legally flawed".  Maybe not that it was legally flawed.  I felt like it was missing big pieces and it wasn't the strategy that was going to obtain a life verdict, which in this case the best we could ever hope for was going to be a life verdict.

Q    And so to get a life verdict, though, you felt that it was -- it was inevitable that he was going to be found guilty of a capital offense?

A    I thought, you know, there was a 99 percent chance that that was going to happen, yes.

Q    So in terms of conceding Mr. Holder's -- if he, in fact,

14

did so, if he conceded his guilt of the capital offense, that really had no prejudice to Mr. Holder because he felt he was going to be found guilty of the capital offense anyway?

A    If it would have been -- if he would have decided to concede his guilt and plead him guilty and then just have a sentencing phase, umm, maybe you could have gone about it without any other thought, but if your -- if your strategy is going to be, basically, I'm going to concede his guilt in the guilt phase, but I'm still going to have a guilt phase trial, then you -- that's not an appropriate strategy unless you are integrating your penalty phase into your guilt phase.  I mean, what's the point in having a guilt phase trial and conceding guilt if you're not going to try to convince the jury to give your client life during the guilt phase?

Q    Okay.  Well, we'll get to that more in just a second, but with respect to his understanding of the law, was it your belief that Mr. Shaw was operating under a misunderstanding concerning the law that applied to the capital counts?

A    Well, he was.  Yeah, I mean, he --

Q    What was that?

A    He believed that --

Q    Well, let me try and --

A    Well, here, I can only tell you what he said.  I don't know if I want to go as far as "He believed".  I can tell you what he said.

Q    Well, let me see if I can phrase it for you this way. Did he believe that there was a -- in the bank robbery charge, there was a capital count there and a noncapital count?

A    What he told me was there was a bank robbery charge and a murder charge.  During the instruction conference or at some point when we were talking outside of the instruction conference, he said, "What happened to the murder charge?"

Q    And it's your belief based on that that he did not understand the law as it applied to the bank robbery count?

A    Yes.

Q    And that you felt that he was incorrect in believing that there was a capital count and a noncapital count there?

A    Well, he was incorrect.  I mean, as you know, both counts were capital counts and there wasn't a separate bank robbery and a separate murder count.

        MR. HOLTSHOUSER:  May I approach the witness, Your Honor?

        THE COURT:  I beg your pardon?

        MR. HOLTSHOUSER:  May I approach the witness?

        THE COURT:  Oh, yes.

Q    (By Mr. Holtshouser) I show you what's been marked as Exhibit T, as in Tom.  Is this a copy of a memo of law that was filed in support of the jury instructions in this case?

A    Yes.

Q    Is that signed by both you and Mr. Shaw?

A    Yes.

Q    And is the gist of that memo arguing that a certain mens rea beyond simple felony murder should be required in connection with a finding of guilt on Counts I and II?

A    Yes.

Q    And was that argument in part ultimately successful?

A    Oh, I think the Judge did make a small change to one of the instructions based on -- that's --

Q    I have here marked as Exhibit U a certified copy of the jury instructions given to the Jury in the guilt phase, and I've put a copy up here on the monitor.

            THE COURT:  Is that monitor on?

            MR. HOLTSHOUSER:  Pardon me, Your Honor?

            THE COURT:  I was checking to see if it was on.

            THE WITNESS:  Yes.  Thank you.

            MR. HOLTSHOUSER:  Is your monitor on?

            THE WITNESS:  Yes.  Thank you.

Q    (By Mr. Holtshouser) This is the essential elements of the crime charged in Count I, and there are four elements there, is that correct?

A    Right.  Yes.

Q    And would it be fair to say that in the course of his defense of Mr. Holder and in Mr. Holder's testimony, Mr. Holder admitted counts -- elements one, two, and three?

A    Yes.

Q    And then the fourth was that in committing this offense, the Defendant or a person aided and abetted by the Defendant killed Richard Heflin.  So the theory of liability for Mr. Holder was an aiding and abetting theory, correct?

A    Whose theory of liability?

Q    The instructions that the --

A    Oh, you mean that's what the instructions stated?  Right, yeah.

Q    Okay.  And then in Instruction 16 is where the Court defined what that means to aid and abet, and is one of the things that was required to find him guilty of aiding and abetting that he had been aware of a serious risk of death attending his conduct?

A    Yes.

Q    Now, in the course of Mr. Holder's testimony, in the course of defending Mr. Holder during the guilt phase, Mr. Shaw never conceded that element, did he?  And Mr. Holder never conceded it in his testimony?  Mr. Holder caused the bank robbery --

MR. MCGRAUGH:  Your Honor, I'm sorry.

Q    (By Mr. Holtshouser) Do you understand the question?

A    Yeah.  You want to know whether he ever conceded that by robbing the bank, he had been aware that there was a serious risk of death attending his conduct.  Right, he never testified to that.

Q    And Mr. Shaw never conceded that in his statements to the Jury or in his defense during the guilt phase?

A    Right.  Like you said, his theory was he didn't intend that anyone die.

Q    So would it be fair to say that Mr. Shaw did not, in fact, concede Mr. Holder's guilt of the capital offense of Count I in his defense of this case?

A    No, I don't think that's fair to say, no.

Q    Did he admit -- did he concede this element of aiding and abetting?

A    I think by -- yeah, I think by having Norris testify.  I mean, is there really any other --

Q    Did Norris acknowledge that he was aware of a serious risk of death attending his conduct?

A    The most I remember Norris ever testifying to was that he didn't intend for anyone to die.

Q    And that's exactly what Mr. Shaw told the Jury in his opening statement, wasn't it?

A    I'm sure he did.

Q    And that's the tactic that he maintained throughout his defense in the guilt phase?

A    Well, like you said, that he never fired his weapon, he never intended for anyone to be killed, yes.

Q    And that he wasn't aware of a serious risk of death attending his conduct?

19

A    Well, I don't think that there were any -- any words like that spoken.  I mean, you know, the problem, obviously, was the machinery that these guys went into the bank with.  You know, it was a very hard, if not impossible, sell that when you go in with body armor and assault rifles, that there's not some serious risk that someone's going to die.

Q    I'm not quarreling with you that it was a hard sell and that any defense would be a hard sell here in the facts of this case, but under these instructions and under the tactic that Mr. Shaw took, he did not, in fact, concede guilt of the capital charge, did he?

A    Well, no, I just don't agree with you on that.  If you want -- did he ever say -- he never said Norris Holder was not aware of a serious risk of death.  He never said that because he didn't understand.

Q    Did he ever say that he was?

A    No.

Q    Okay.  Did Norris Holder ever say that he was?

A    No, no.  Norris said the opposite.

Q    So by his words, he did not concede to the Jury this element of aiding and abetting, did he?

A    I just can't agree with you on that.  I can agree with you that he never said those words, but I think that's -- I mean, that's because he didn't understand that that was the instruction.

20

Q    He didn't understand that that was an instruction even though this is a memo of law that you have in front of you requesting instructions signed by him and you?

A    Oh, I prepared -- he never read this.  I prepared this, and I handed it to him that morning, and he signed it.  I handed the signature page to him, and he signed it.  He didn't read this.

Q    But the effect of the motion was to get these instructions adjusted the way you wanted them to and to have that element added and to put that burden on the Government, correct?

A    Right, and that was something that Dick and I worked on, and, you know, Charlie was never --

Q    Regardless of who worked on it and who is claiming credit for it, it was an act that benefited Mr. Holder and it put a burden on the Government to prove this element, didn't it?

A    Well, it did, but what you're trying to ask me about is what Mr. Shaw understood and argued, and that's an inaccurate accounting of what he understood.

Q    But in anything that Mr. Shaw did, did he concede that Mr. Holder was aware of a serious risk of death attending his conduct?

A    I mean, you can ask me a thousand times.  I just disagree with you on that.

Q    I'm asking you.  Did Mr. Shaw say anything to this Jury

in which he conceded that Mr. Holder was aware of a serious risk of death attending his conduct?

A    I believe the answer is yes.  The answer to your question --

Q    Can you cite us to those -- can you tell us where those words took place?

A    Although I believe the answer is yes, the answer to your question is did he ever say the words, "He was aware of a serious risk of death."  No, he didn't ever say those words.

Q    And, in fact, Mr. Shaw consistently and strenuously disputed this element, didn't he?

A    No.

Q    He didn't dispute it in his closing argument?

A    No.  What he disputed was that Norris had ever fired a gun.

Q    Did he dispute that Norris had any awareness that anyone was going to be hurt and that he intended for anyone to be hurt?

A    I'm -- well, let me answer you this way.  He -- that was part of the theory, that no one was ever intended to be hurt.

Q    So that theory went directly to this element, didn't it?

A    No.

Q    Okay.  Let me direct your attention to Instruction 17. Seventeen is the element -- it directs the Jury that if they find him not guilty of Count I under the instructions in 15,

that they are then to -- this is what's known as a lesser included instruction, correct?

A    Correct.

Q    So what is the difference between this count, this crime in 17, and the crime in 15?

A    Whether or not you're aware there's a serious risk of death.

Q    And what is the legal consequences between these two offenses?

A    Death eligibility and non death eligibility.

Q    Fifteen, the Count I Instruction 15, is the capital offense.  Instruction 17 is the noncapital offense, correct?

A    Correct.

Q    And the difference between these two is the fourth element?

A    Right.

Q    The aiding and abetting?

A    Right.

Q    So the difference between these two, again, comes back to this line, "aware of a serious risk of death attending his conduct"?

A    Correct.

Q    In the course of cross-examining the Government's witnesses in guilt phase, did Mr. Shaw attempt to establish that no witness had seen Mr. Holder fire his weapon at

Mr. Heflin?  Was that a focus of his cross-examination?

A    I mean, yeah, that was his theory.  I -- I honestly -- well, boy, I haven't read the transcript, and I can't remember specifically his cross-examinations.  I can tell you that was his theory, and I would think and hope that you're right about that.

Q    You don't recall, though?

A    Yeah.

Q    As well as the concept that Mr. Heflin did -- Mr. Holder, rather, did not fire his weapon in the bank?

A    You know, I remember that.  I remember, obviously, Charlie asking questions about that, you know, asking the different witnesses whether they ever saw him fire a weapon or that --

Q    Now, the report that you had from Mr. -- you and Mr. Shaw had from Mr. Stubits on the ballistics described the connection between -- well, let me back up, first of all, so -- do you recall that there were many shell casings in the bank as well as there were bullets recovered from the body of Mr. Heflin?

A    Right.

Q    And that some of those could be tied directly to Mr. Allen's firearm?

A    Yes.

Q    And that there were other shell casings and as well as

unidentified bullets in the body of Mr. Heflin that could not be specifically tied to that weapon or any weapon?

A    I recall there were other shell casings that couldn't be tied to any weapon.  I don't remember there being other bullets in the body that were inconclusive, but --

Q    Okay, but the result with respect to those others was "inconclusive" is the word that the report used?

A    Right, yes.

Q    Correct?

A    Yes.

Q    And during Mr. Stubits' testimony, did he explain "inconclusive", expand on that, explain further, and refer to the concept of things that were consistent and inconsistent?

A    Yes.

Q    And did Mr. Shaw attack that vigorously?

A    You know, I do remember Charlie's cross-examination of that witness.  So by the fact that I remember it, I'm going to say that it was one of his more -- because I don't remember most of them, I'm going to say that was probably an aggressive one just because I remember it.

Q    And Mr. -- Mr. Shaw vigorously attacked Mr. Stubits for the absence from his report of this concept of consistent and inconsistent, didn't he?

A    I remember that, right, because Charlie disagreed with Stubits.  Charlie -- and I can't remember --

Q    Well, his first avenue of cross-examination was to attack Mr. Stubits for not having that in his report -- that detail; do you recall that?

A    You know, not --

Q    Okay.  Well, the transcript --

A    It rings a bell.

Q    The transcript will speak for itself.

A    Okay.

Q    Would it be fair to say that Norris Holder attempted, through his testimony, to convince the Jury that he was not aware of a serious risk of death attending his conduct?

A    No, I don't -- I don't think that would be -- I mean, what your question is asking me is did Norris attempt to convince the Jury of that.  I don't believe Norris had probably ever heard those words before.  I -- it's my opinion that Norris was in his testimony telling the truth and by telling the truth attempting to make the Jury understand that he never fired his weapon and he never intended Mr. Heflin to be killed.

Q    And, in fact, Mr. Holder was stating that he, in fact, had warned or directed Mr. Allen that no one was to get hurt, correct?

A    Right, right.

Q    So that would go to or support the argument that he was not aware of a serious risk of death attending his conduct?

A    I -- sure.  Sure.

Q    And Mr. Holder was unsuccessful in doing that, though, wasn't he, apparently?

A    Well, did the Jury believe that?  No, obviously, they didn't believe that.

Q    Did Mr. Shaw argue in closing heavily and spend a lot of time addressing this ballistics testimony of Mr. Stubits, and was he highly critical of it in his guilt phase closing?

A    I don't remember, but I'm sure you've read it.  You know, if you say -- I just don't remember.

Q    And with respect to the Government's evidence upon that fact, you've already told us that the Government's evidence was pretty overwhelming that he was involved in this bank robbery, right?

A    Right.

Q    Would you have, likewise, considered it overwhelming -- the evidence that Mr. Holder had fired his weapon in the bank, had shot Mr. Heflin, or had intended to harm the guard?

A    Do I think the evidence of that was overwhelming?

Q    Yes.

A    No, I wouldn't characterize it --

Q    It, in fact, was debatable, triable, and reasonable minds could disagree about it?

A    I think that the way it was left, that the Jury couldn't have reached much of other conclusion because, you know,

Mr. Stubits is a pretty well-credentialed expert, and his testimony on the issue was uncontroverted. So I don't think that --

Q    That was -- it was not challenged, correct?

A    It was uncontroverted, yeah, correct.

Q    But it was severely questioned in cross-examination, and that alone could have led the Jury to disbelieve it, correct -- the fact those words about "consistent" and "inconsistent" were not in his report?

MR. MCGRAUGH:  Your Honor, I'm going to object as to what the Jury could or could not believe as it calls for speculation.

THE COURT:  Okay.  It may.  It's a little different in terms of if it's -- if the question goes to is it a debatable issue among the Jury, then it wouldn't be.  If it goes to what the Jury understood, then it would be.  So I'm not -- I guess I'll sustain it and ask you to rephrase the question just to be sure.

Q    (By Mr. Holtshouser) Okay.  My question really was that the evidence on that point could have been seen either way by the Jury based solely on the cross-examination?

A    Well, I -- no, I disagree with that because the cross-examination was just Charlie saying, you know, "Well, this isn't true, is it?"  And as a juror, you've got to think if Charlie's position was right, why wouldn't Charlie have put

someone up to say that. So the problem --

Q But jurors are instructed, aren't they, that they could find a witness' credibility lacking based solely on cross-examination?

A Well, yeah, but you didn't ask me about the jury instructions, though. I mean, you asked me about it being a debatable issue, and I don't see how it was the way it was left because of the credentials of Stubits and because we didn't do anything to counter that.

Q What did you -- what should you have done then?

A Well, we should have hired a ballistics expert.

Q What would that expert have told you?

A I don't know because we didn't hire one.

Q Because you haven't done it, right?

A Right.

Q So as you sit here now, you really have no way of knowing whether anything that anyone else would have done would have made any difference?

A No, we don't because we didn't investigate.

Q But still haven't?

A I'm sorry?

Q Still haven't?

A Well, I haven't, no.

Q Okay. Now, was there -- would it be fair to say that there actually was no evidence that Norris Holder had fired

any shots that killed Mr. Heflin?

A    Would it be fair to say there was no evidence of that?

Q    (Nods head up and down.)

A    Well, there were no casings or bullets matched up to his gun, but there were inconclusive casings that didn't come from Allen's gun.  So I -- I'm not sure I can answer your question yes or no.  I think there's -- based on the way the evidence came in at trial, I think there was a good inference, argument that either Norris fired his gun, or, you know, you could speculate Billie had another gun; Billie reloaded.  I don't know.

Q    Those are the possibilities, though --

A    Right.

Q    -- that Mr. Allen could have reloaded; there could have been a third gun?

A    Right.

Q    And part of the problem was that both of the firearms were severely damaged in the fire to the van afterwards?

A    Right.

Q    So that the analysis of those was -- was affected by that, correct?

A    I -- it's my understanding that that made it harder for Mr. Stubits to reach his conclusions.

Q    Do you see any value in pointing out to the Jury from a consistent guilt and penalty phase strategy -- in an effort to

obtain a sentence of life, do you see any value in pointing out to the Jury that Mr. Holder had not, in fact, fired the shots that killed Mr. Heflin?

A    Oh, absolutely.

Q    What about not having any intent that his Codefendant Billie Allen harm the guard?  Would that be beneficial to Mr. Holder in a bid for life versus death?

A    Sure, yeah.  I think that's huge.

Q    Now, Cortez Harris -- do you remember Cortez Harris, the witness?

A    Yes.

Q    And did you know, prior to putting Mr. Harris on, that he was going to give the testimony about this conversation with Mr. Holder and the stun gun?

A    Yes.

Q    Okay.  And was that contained anywhere in the statements that were prepared for Mr. Harris?

A    Statements that were prepared -- you mean just anything that he had said?

Q    The penalty summaries.

A    Oh, oh.  No, I don't know.  I don't know.  I don't know.

Q    And that was not something you brought out on direct, in direct examination of Mr. Harris, was it?

A    No.

Q    That was something that came out in cross?

A   Right.  I mean, it wasn't particularly helpful to us.

Q   And, in fact, it had the effect of undercutting the consistent theme of Mr. Holder not having any intent to harm the guard?

A   Oh, I don't -- no, I didn't feel that way when he testified because -- and, I mean, I guess it depends on your perspective.  Maybe we were trying to make the best of what we had, but, you know, if he -- if the guard is disabled with a stun gun, then there's no risk of the guard being killed; there's no risk of Billie Allen having to shoot the guard. You know, maybe we just tried to spin the best light on it as possible, but I didn't feel like it was, you know, devastating or absolutely inconsistent with what we were trying to do.

Q   Now, making the best of what you had, do you think that accurately describes what you were trying to do?

A   Sure.

Q   And making -- would it be fair to say that in terms of what you had to work with, it wasn't great?

A   Umm, I think in guilt phase, it wasn't great.  I think in penalty phase, it was really good.

Q   Are you familiar with the principle of residual doubt in capital defense work?

A   Yes.

Q   And what is that?

A   Well, residual doubt is -- you know, the experts sort of

32

say that it's one of the most powerful mitigators that's out there, and that is if the jury has some lingering doubt about a defendant's guilt, that they then won't sentence him to death because there's maybe that .1 percent chance that they're actually not guilty.

Q    And you really only need to get residual doubt with one juror in the penalty phase to achieve your objective, correct?

A    Right, yes.

Q    And residual doubt presumes that the Defendant has been found guilty --

A    Right.

Q    -- but that there's some residual doubt by just one juror that would keep them from imposing death?

A    Right.

Q    And in this case, would there have been value in creating residual doubt or trying to create residual doubt despite the evidence about Mr. Holder's intent to harm the guard, whether he fired his weapon in the bank, and whether he fired the shots that killed Mr. Heflin?

A    In this -- well, I mean, you know, this wasn't a residual doubt case because he was obviously guilty of the crime.

Q    Guilty of being involved in the bank robbery, but was he obviously guilty of the three things I just stated?

A    No, but when you talk about residual doubt, that's a mitigator that refers to "Maybe we should have found him not

guilty in the guilt phase."

Q    But residual doubt presumes that he's been found guilty, that the jury has rejected your arguments on guilt, but that some residual lingering doubt about any one of those elements may cause them to impose life versus death?

A    Residual doubt would refer to lingering doubt about his guilt of the crime.

Q    Correct.

A    Like I said, should we have --

Q    After he's already been found guilty?

A    Right, right.  Maybe like something in the back of one juror's mind that says, "Did I do the right thing?  Should I have found him not guilty?"

Q    And on this element of whether or not he was aware of a serious risk of death attending his conduct, would there have been any value from a residual doubt standpoint to creating some residual doubt in a juror's mind about whether he was aware of a serious risk of death attending his conduct?  If one juror believed that, would that have been helpful in obtaining a verdict of life versus death?

A    You've asked me two different questions.  The answer to your last question is, yes, if one juror believed that, it would have been helpful.  The answer to your first question is, no, I don't think there would have been value in that because it's -- we had a lot of good mitigators, and that's

not a good mitigator.  I think that it's unreasonable to say, under the circumstances and facts of the case, that you're not aware of the serious risk of death.  So I would not have wanted -- and, you know, I'm a pretty liberal person.  I would not have wanted to submit a mitigator that I, myself, couldn't have found.

Q     Was the grave risk of death, in fact, resubmitted to the Jury in the penalty phase, in Instruction 3?

A     Was it resubmitted --

Q     To the Jury in Instruction 3 in the penalty phase.

A     Well, the grave risk of death is one of the mental -- the gateway intent factors.  So they would have had to find that.

Q     So they would had to have addressed that again in the penalty phase?

A     Right.

        MR. HOLTSHOUSER:  Judge, we had this Exhibit Q yesterday that I believe an objection was reserved on, and I think we've resolved that at the breaks, and so at this time, I would offer Exhibit Q, which is the May 30, 1997 letter from Mr. Shaw to Mr. Landolt.

        MR. MCGRAUGH:  No objection, Your Honor.

        THE COURT:  Received.

Q     (By Mr. Holtshouser) Now, with respect to Mr. Shaw's theory, I think you stated before that he operated under a mistake of law regarding what was necessary to be convicted of

a capital offense in federal court, correct, that you got the statute out at one point and --

A    Right.

Q    And it's your belief that he simply just didn't understand the legal principles applicable there?

A    Well, it's not my belief.  He said -- he described the law in a way that was incorrect when you compared it to the statute.  So it wasn't my interpretation.  It was just what he said.

Q    Let me show you what's been received in evidence as Exhibit Q.  If you will, take a second to look at that.

A    Okay.

Q    Have you seen that before?

A    Yes.

Q    And when did you see it?

A    Umm, I saw this -- I have this.  Isn't this in my file?

Q    When did you last see it is my question.

A    I saw it yesterday.

Q    Well, yesterday when?

A    Yesterday, while I was here.

Q    Okay.

A    Before -- I mean before my testimony started.  I haven't -- if you're asking if I've done something improper and conferred with Mr. McGraugh or Mr. Gorla, I haven't done that, no.

Q    I wasn't asking that.  I'm asking -- I'm trying to ask you when you saw it.

A    I saw it yesterday before I testified.

Q    All right.  And at what point in the day did you see it? Did you see it after Ms. Tatelli testified?

A    Well, it would have been -- I think it was when you guys took a break, yeah, because it was in that room back there.

Q    And what caused you to look at it?

A    Umm, Chris and Mike asked me if I'd ever seen it before.

Q    Okay.  So you've had a chance to look at it?

A    Yes.

Q    All right.  And at least with respect to one point, you noticed in there there are several paragraphs that describe, in May of '97, which was over six months before you were involved in the case, that Mr. Shaw, apparently, has some knowledge of Mr. Norris' life and is arguing its mitigation aspects to Mr. Landolt in an effort to convince the Government not to seek the death penalty?

A    Right.

Q    Would you direct your attention to the third full paragraph on the second page?

A    Okay.

Q    And does it read, "It is significant to note that in the state court, Mr. Holder could not get the death penalty if he were convicted of killing a person while committing a felony,

i.e., robbery as felony murder, second degree murder, which does not demand the death penalty." Do you see that paragraph?

A    Yes, I do.

Q    Okay. Would that seem to indicate that Mr. Shaw is aware that in the federal system, the law is different than in the state and that felony murder is, in fact, a basis for a capital charge in federal court?

A    I don't know that this indicates anything about what Mr. Shaw believes or doesn't believe or -- I just don't -- I don't know because this, obviously, was prepared before --

Q    Well, let's read it again. Okay. It says, "It is significant to note that in the state court" -- so Mr. Shaw is drawing a distinction between state and federal court; would you agree with that much?

A    Right.

Q    "Mr. Holder could not get the death penalty if he were convicted of killing a person while committing a felony." So he's pointing out to Mr. Landolt an aspect of the state law, correct?

A    Right.

        MR. MCGRAUGH: Your Honor -- excuse me, Steve -- may I interject an objection as to the foundation of this letter. To the degree of asking what the thoughts are that Mr. Shaw had in preparing this letter, I think, first, we have to know

whether, in fact, Mr. Shaw did prepare this letter and whether she knew what he was thinking when he -- if, in fact, he did prepare it, what he was thinking when he made those statements in the letter.

THE COURT:  All right.  Your objection goes to the foundation then of the letter because I thought it had been received?

MR. MCGRAUGH:  As to this portion, yes, Your Honor.

THE COURT:  Okay.  I thought it had been received.

MR. HOLTSHOUSER:  It has been received.

THE COURT:  Okay.

MR. MCGRAUGH:  Well, I think he's asking -- he's asking Ms. Herndon what Mr. Shaw thought when he put these down, and my objection is that there's no foundation that he had actually prepared the letter and whether -- what he was thinking when he was writing it.

THE COURT:  What is known about the preparation of the memo?

MR. HOLTSHOUSER:  Judge, what we know about the letter is it is contained in the file that was provided to us by Mr. McGraugh that purports to be Mr. Shaw's trial file. You know, the problem, as you well are aware that we have, is the fact that Mr. Shaw is now deceased.  We don't have him available here to either defend himself or explain his thought process, but the letter has been received.  I don't think

there's any question that it's Mr. Shaw's signature.  I know it was sent to Mr. Landolt in the course of this case.  I think it goes to impeach the view by Ms. Herndon that Mr. Shaw was operating under a misunderstanding of the difference between state and federal law, and I think the letter clearly shows that that was not the case.

MR. MCGRAUGH:  The letter received in evidence speaks for itself.  To try to extrapolate what one person thought when preparing it, I think, is improper, Judge.

THE COURT:  All right.  Well, I'll -- I'll -- it is in evidence, and I'll consider the letter.  As to what Mr. Shaw thought, I think that may very well be a valid objection.  As to what appears, you may ask the witness her interpretation of -- of what the letter says, and then I'll draw my conclusions based upon all the evidence and the letter itself as having been written by Mr. Shaw.  You may proceed.

MR. HOLTSHOUSER:  Thank you, Judge.

Q    (By Mr. Holtshouser) Would the content of the letter seem to indicate that Mr. Shaw did not have that misunderstanding?

MR. MCGRAUGH:  Well, Your Honor, I'm going to -- I believe that's the same question.  Whether it indicates what he believed or not is, I think, asking what his thoughts were when he prepared it, and I think that's speculation, Judge.

THE COURT:  Sustained.

Q    (By Mr. Holtshouser) With respect to the ultimate

instructions that were imposed in the -- given to the Jury in the guilt phase, this third element of aiding and abetting that Mr. Holder had been aware of a serious risk of death attending his conduct was one of the elements that was given to the Jury, correct?

A    You're asking me if this instruction that you're referring to now was given to the Jury?

Q    Correct.

A    I believe it was, yes.

Q    And Mr. Shaw always challenged consistently throughout his defense of Mr. Holder this element; am I correct?

A    Well, it's the same question you've asked me several times, and you and I just aren't going to agree on it.  I -- Charlie challenged whether Norris fired his gun, whether Norris intended for anyone to be hurt.

Q    And would the factual significance of that argument and that position go to this element?

A    Yes.

          THE COURT:  Let me catch up on my notes here.  Just a minute, please.

          MR. HOLTSHOUSER:  Yes, Your Honor.

          THE COURT:  Okay.

Q    (By Mr. Holtshouser) Let's turn now, Ms. Herndon, to Mr. Holder's decision to testify.  You were present in court when a record was made on that decision to testify, is that

right?

A     Yes.

Q     And was it Mr. Holder's decision to testify?

A     He ultimately testified, yes.

Q     Okay.  And it was his decision to do so, correct?

A     It was -- I think he would have done -- well, he told me he would have done whatever Charlie said, but, yeah, it was -- you know, it's not like he fought Charlie about it.  Charlie thought he should testify, and he did.  He didn't disagree with it.

Q     That's not my question.  My question is, was it Mr. Holder's decision; did he make the decision to testify?  I'm not asking what influence, what input went into it, but was it his decision.

A     I don't know.

Q     Were you present in court when the record was made in front of Judge Webber concerning his decision to testify?

A     Yes.

Q     And were you present during the answers that were given by Mr. Holder?

A     Yes.

Q     And did you believe any of the answers that he gave to Judge Webber to be less than truthful?

A     I don't have any specific memory of that record being made, but I -- you know, I -- I -- if I would have thought he

42

was being untruthful with the Judge, I would have stopped him.

Q    And as you sit here, you don't have any recollection of having that perception?

A    No.

Q    In other words, "He's saying something that's not true, and I have to stop it"?

A    No.

Q    In terms of communicating to the Jury Mr. Holder's lack of intent to harm the guard in the guilt phase, was there any other way or method to communicate that to the Jury other than through his testimony?

A    Well, yeah.  He had already confessed, so that was already in evidence.

Q    Did his confession include the details of the fact of his conversations with Billie Allen and his lack of intent to harm the guard?

A    Yes.

Q    Could you see there being any difference between hearing what he said to an FBI agent and hearing him say it in person, looking the Jury in the eye?  Would there be any added value to that?

A    Well, we've already talked about that.  I think that had -- that would have and did have negative value.

Q    Well, I'm not asking you to evaluate it from a hindsight perspective but going forward.  When you're sitting there with

43

the only evidence being his statement to the agent, could you see a qualitative difference between hearing it from the person live?

A    Well, I think you have to evaluate that on a case-by-case basis, and I think 99 percent of the time, the answer is there is not a qualitative positive difference, and in this case, it's not hindsight.  I mean, you -- the testimony that I've given has been clear that I always was 100 percent certain that he should not testify.  I never thought that was a good idea.

Q    Okay.  Now, he had communicated remorse to you and Ms. Tatelli, is that correct?

A    He had communicated to me a great deal of remorse for the fact that the guard was dead.

Q    And was there -- was there any value in terms of your ultimate objective of obtaining a sentence of life versus death in convincing the Jury that he was remorseful?

A    Yes.

Q    And that remorse -- could that be communicated by him?  Was it possible for him to communicate it in person?  He had done so to you, correct?

A    Right, but I mean, I have to -- I have to preface that with even though it was a short period of time, I had gotten to know Norris pretty well.  We had spent a good deal of time together.  I felt like we had bonded pretty well together, and

he was comfortable enough with me to open up to me in that way.  I knew him well enough also to know that he was not going to be able to express remorse on the stand in this environment, in this very, you know, unsettling environment to someone who's on trial for their life, and his remorse was based on the fact that Mr. Heflin had died.  It was not based on his responsibility for Mr. Heflin's death, and that -- you know, that was a big problem.

Q    Now, did Mr. Holder want to testify in the course of your getting to know him and bonding with him?

A    We didn't talk about it.

Q    Do you remember giving a deposition in this case?

A    Yes.

Q    Okay.  I'm going to -- I'm at page 45, and I'll allow you to look at a copy of it as I read along.  Beginning at line 14, do you recall me asking you, "Did Norris have a personal opinion that he expressed to you?"

Your answer, "As of what?"

"Whether he would or should testify and, you know, how he thinks he would do."

And your answer is, "I don't know.  You know, I -- it seems like maybe he -- his personal opinion was -- I recall there being some in the discussion of 'I didn't shoot this guy, and I'm not responsible for his death, and I want the Jury to know that.'"

A    Right.

MR. MCGRAUGH:   And the answer --

Q    (By Mr. Holtshouser) "But really what I remember from our discussions is always coming back to 'If Charlie thinks I should, then I'm going to.'"

A    Right.  And maybe we have a misunderstanding.  This conversation that I'm telling you about here happened during the trial.  I thought you were asking me about when I met with Norris and we talked about the case pretrial.  This would have been -- the only time Norris and I ever discussed him testifying was during the trial when Charlie, you know, had made it clear that he was going to testify and I'm like -- you know, this was all happening while trial was going on, during breaks and whatnot.

Q    Okay.  So prior to trial, you're saying that Mr. Holder had never discussed with you his desire to testify?

A    He had not.

Q    Had Ms. Tatelli shared with you the fact that Mr. Holder was talking to her about it frequently?

A    You know, she and I were spending about 18 hours a day together.  I don't specifically remember that, but that doesn't mean it didn't happen.  If she told you it happened, I'm sure it did.

Q    So is that a yes or a no that you remember her telling you?

A    Oh, I do not specifically remember that, no.

Q    And the things that he wanted the Jury to know is he didn't shoot either the guard or his firearm, correct?

A    Right.

Q    And in terms of the ballistics evidence not being controverted, actually, Norris Holder directly controverted the conclusion of the ballistics expert that he had fired his firearm, correct?

A    Well, yes, technically, you're correct, but I mean, you know, you're a trial lawyer, too.  That certainly isn't -- wouldn't be considered, in my mind, controversial of Mr. Stubits' testimony.

Q    But Mr. Holder's direct testimony contradicted the conclusions of Mr. Stubits which were phrased in terms of consistent, inconsistent, and inconclusive, correct? Mr. Holder gave firsthand testimony; he said, "I did not shoot my firearm in that bank," correct?

A    Right.  And I mean, Mr. Stubits --

Q    And he also said, "I did not shoot Mr. Heflin"?  He said that, didn't he?

A    Right, but I mean, I guess the problem I'm having with your question is Mr. Stubits did not testify that Norris Holder had fired his weapon.

Q    Correct.  And might Mr. Holder's testimony have created that residual doubt in just one juror about whether or not he

had fired his firearm in the bank?

A    I don't believe that that's -- you know, I think that's -- that's kind of like asking me is there a chance that Mr. Holder could have been found not guilty.  Yeah, there's a .1 percent chance of that.  I think it's probably along those same lines.

Q    Now, do you recall when you gave your deposition that it was your statement that Mr. Holder had confessed to capital bank robbery in the course of his testimony?

A    Yes.

Q    And I think we established a few moments ago that one of the elements of capital bank robbery was that he was aware of a serious risk of death attending his conduct?

A    Right.

Q    Did Mr. Holder ever admit that element?

A    Well, no.  I mean --

Q    Did he ever confess to it?

A    Do I believe that he did?  Yes.  And, once again, we just see that differently.

Q    Mr. Holder, in his testimony --

        MR. MCGRAUGH:  Your Honor, could the witness finish her answer, please?

        THE COURT:  Yeah.  Sustained.

A    He testified that he put on body armor, that he went into that bank with that large gun that you had on the table, and I

believe by his testimony to that effect that there -- that, yes, he was confessing that there was a serious risk of death attending his conduct.  I don't -- you know, I don't see any other way to see that.

Q    (By Mr. Holtshouser) But did his testimony -- did he deny that he was aware of a serious risk of death attending his conduct?

A    He did not.  What he said was he never intended for anyone to be hurt.  He never intended Billie Allen to hurt anyone.  There's a big difference in intent and creating a serious risk.

Q    And he indicated that he did not -- and this -- this element here is a mens rea element, isn't it?

A    Yes.

Q    All right.  He has been aware of a serious risk of death attending his conduct?

A    Right.

Q    And was he not controverting that element by stating that he did not intend for anyone to get hurt?

A    No, I just don't believe so because I think we're talking about two different things.  I think intending for someone to get hurt and going in under circumstances where you're creating a risk are two different things.

Q    In the mitigation evidence, that's what you presented, correct?

A    What's that?

Q    Mitigation evidence.

A    Oh, yes.

Q    And yesterday, you were unsure whether you gave an opening at the beginning of that.  Do you recall that?

A    Right.  Do you know the answer to that?

Q    I'm going to show you your opening.

A    Okay.

Q    This is the transcript of Volume X, which is part of the court record, April 1, 1998, and do you see here where you begin your opening statement in the penalty phase?

A    Yes.

Q    Okay.  And over the course of the next 10 or so pages, did you outline for the Jury and give them an outline of all the evidence you were going to present and how it tied together?

A    I -- I mean, I think I'm just going to have to let it speak for itself because, like I told you yesterday, I don't even -- here's what I remember about it.  I -- it was like a really bad day.  I was having a really big problem with some witnesses, or something was really going wrong, and I said to Charlie, "I don't think I can give an opening statement.  I don't have together what we're going to do here.  I think I'm going to have to reserve it."  And he said, "No, no, no.  You really need to get up and give an opening."  And I think, you

know, that was maybe one of the few things he was right about. I did need to, but I was feeling really uncertain of myself and my evidence because of just the whole chaos of it all, and so, you know, I remember he and I going back and forth whispering, "You need to do it," and me saying, "I don't think I can do it," and then ultimately, I see from the record it was resolved, that I did do it, but I don't have any -- I haven't read it since then or, you know, since I did the appeal, and I don't -- I don't have any memory of what I said. So whatever is in there is what I said.

Q    All of the evidence that you wanted to present in the penalty phase came in and was heard by the Jury, correct?

A    Umm, yes, and the only reason I hesitate is there was that one doctor who I had wanted to bring down that I didn't bring down because of the timing issue, but I don't know whether we would have presented his testimony or not.  So, you know, as far as everything that we had investigated and wanted to put on, we did put on, yes.

Q    So evidence concerning each of the mitigators that you've given notice of was presented, and the Jury got to hear that?

A    Did we give notice of mitigators in the beginning?

Q    I show you Exhibit X.  Is that -- it's a certified copy of --

A    What's the service date on it?  Can you tell me when we did that?

Q    March 27th.  It would have been three or four days before you gave the opening statement.

A    Okay.  That was right before the penalty phase started --

Q    Yes.

A    -- three or four days before the penalty phase started; is that what you're saying?

Q    Yeah.

A    Okay.  Then --

Q    And you see, for example, the first two nonstatutory mitigating circumstances are that Norris Holder did not fire the shots that resulted in the victim's death; Norris Holder did not intend for any person to be injured or killed during the course of these offenses which he committed?

A    Right.

Q    Those were your first two stated mitigating circumstances?

A    Right.

Q    And then the remaining mitigators relate to Norris' childhood, his life, losses that he suffered, growing up in the absence of his father, lacking a positive male role model. Do all of these others look like mitigators that you presented evidence on?

A    Yes.

Q    Okay.  Was the existence of facts supporting each of these mitigators seriously controverted by the Government?  I

mean, there was no dispute of fact concerning his childhood, was there?

A    Oh, no, no, there wasn't.

Q    There was no dispute of fact about his parentage?

A    No, no, not at all.

Q    There was no dispute of fact about his loss of his leg in the train accident?

A    Not at all.

Q    So pretty much all that evidence came in not seriously controverted, correct?

A    Right, yeah.  It was just -- yeah, it was his background. There wasn't anything controversial about it.

Q    Okay.  And this evidence concerning his childhood and growing up, the lack of a male role model, the role that Norris plays in the lives of his relatives, et cetera -- you felt that that evidence was very complex?

A    I felt that how we got from all of that evidence, you know, including teachers, the people from the Blumeier's Projects, his relatives -- how we got from all of that evidence to "A life sentence is justified" was a complex leap, yes.

Q    And the opening statement that you gave -- that would have been the first time that you ever gave such an opening statement in an actual capital trial, correct?

A    In a capital case, yes.

Q    And would your presentation of mitigation evidence in this case have been the first time that you'd ever presented live mitigation evidence and testimony in a capital case?

A    Yes.

Q    Do you know from your conversations whether Mr. Shaw was aware of that?  Did you ever say to Mr. Shaw, "You know, I'm nervous.  This is the first time I've ever done this.  Do you have any suggestions?"  Any conversation you had?

A    Well, I wasn't -- you know, I mean, I had tried well over 50 jury trials.  So as far as presenting evidence to a jury, I wasn't nervous about that.  I was nervous because my client's life was on the line, but I think you're misunderstanding.

Q    I didn't ask if you were nervous.  Now, what I'm asking is in your conversations, was Mr. Shaw aware that this was your first time?

A    Well, you asked me if I ever said to Mr. Shaw, "I'm nervous," and so that's why I answered you the way that I did, and I'm trying -- you know, like I said, I think that you're misunderstanding the atmosphere, which was that Charlie did not expressly -- Charlie expressly indicated to Caryn and I that he did not wish to communicate about mitigation.  So he is not -- if I was --

Q    Ms. Herndon, my question really is, did you ever have a conversation with Mr. Shaw in which you communicated to him that this was the first time you'd ever done this?

54

A    I don't remember, but if I had to guess, I would say no.

Q    And the two of you sat next to each other for several weeks, correct?

A    Well, Norris sat in the middle.  He sat in between us.

Q    But you're at the same table for several weeks?

A    Sure.

Q    And after -- you felt that you were more qualified to give the closing argument in this case than Mr. Shaw, is that right?

A    I was without a doubt.

Q    But you had never given one before, had you?

A    Well, I'd given 75 closing arguments before.

Q    Did you ever give a closing argument in the penalty phase of a capital case before?

A    No, no.

Q    And your reaction when Mr. Shaw informed you that he was going to give the closing argument -- in your words, you were mortified, correct?

A    That would be one of the words I would use to describe it, yes.

Q    Had you had your closing argument prepared?

A    Yes.

Q    To what extent were you going to stress the theme of less culpability?

A    That would have been minor.

Q    Okay.  You intended to stress concepts like coping mechanisms and difficulties that he had had growing up and to show why Norris Holder thought he should rob a bank in order to obtain a new prosthetic device, is that correct?

A    Well, yeah.  What my intent would have -- what my intent was -- to show how the evidence --

Q    Is your answer to that yes?

A    No, but if --

Q    I thought you started off with "Yes."

A    You have not fairly summarized -- you have not fairly summarized what my intent was, no.

Q    Well, then the answer would be no, correct?

A    The answer would be you have -- you've given a small part of what my intent would be.  It's a very -- it's a far from full answer.  So it's not really a yes or no answer.

Q    Okay.  Okay.  The concepts that you were going to stress, you thought, though, would carry more weight with this Jury than the concepts of less culpability?

A    I don't mean to really minimize culpability.  It's just that culpability was a -- was just one part of it.

Q    Okay.  And -- but it was going to be a small or a lower part on the scale of importance of what you were going to address?

A    Well, I think the answer is yes, although I have to say this.  I don't know that I necessarily want to -- want to

say -- I think I want to say smaller part because what I thought was important was to translate for the Jury why our evidence equaled a life verdict, and culpability was a part of that, but, you know, we had the problem with whether or not Norris shot.  So I didn't think it was -- it wasn't the only thing that should have been said.

Q    But you had a limited amount of time in which you would have been allowed to argue, correct?

A    Right.

Q    And you had to choose amongst that time and prioritize "How much time am I going to spend on this topic," how much on this topic, right?  I mean, that's what you have to do in every closing argument, right?

A    Sure, but I mean, we weren't -- Judge Webber had given us enough time to argue the case.

Q    And in that time, though, how much time had you -- how much of a priority were you going to give the theme of that Norris Holder was less culpable than Billie Allen in the death of Richard Heflin?

A    Well, you know, somewhere, I have an outline of my argument, but I -- you know, I don't think that it's in the file.  Here's what I can say to you.  I think I would have -- and I hope this isn't hindsight, but I think I would have started out by saying, umm, "He didn't kill this guy.  He didn't fire the shots that killed him.  Because of that, he

shouldn't be sentenced to death," and then I would have -- you know, I would have spent a couple minutes upfront on that, and then I would have gone into everything else is what I think I would have done.

Q   Okay.  So in terms of the time that you would have used, you would have mentioned it in the beginning, but it would have been -- in terms of the overall time of what you devoted time to, it would have been a small part?

A   Right, because they already knew the guilt -- I mean, they were intimately familiar with the guilt phase.  They'd heard opening, closing, guilt phase evidence.  You know, they already knew all that.

Q   All right.  And it was your assessment that stressing these other concepts more so than less culpability would influence the Jury to render a life sentence for the death of a victim who was a decorated war hero, a policeman, and someone who was doing the job of protecting the bank?

A   Right.  And I mean, out of all of those things that you've said, you know, they're commendable things about Mr. Heflin, but they're really irrelevant to the closing argument in mitigation.  Guilt phase is much more straightforward than mitigation.  You always have the risk in the penalty phase of the jury thinking, "Oh, they're putting these witnesses up here to make excuses for why this guy did this," and so you really have to get past that "This is an

excuse" to make them understand complex, intimate, lifelong details, choices, influences in Norris' background and history, and that's a hard thing to do.

Q    And you, yourself, in your opening statement, needed to tell them that some of the things you were going to present weren't being presented as excuses, correct?

A    I probably did.

Q    And did Mr. Shaw, in fact, repeat that theme in his closing argument, that these were not being offered as excuses but were simply being offered so that you knew something about his life?

A    If that's in the transcript, I don't recall.

Q    And your objection, though, to Charlie Shaw doing the closing in place of you was that you felt he would not give enough weight to what you had worked hard to establish?

A    No.  My objection to him doing the closing was that he had actively and openly refused to be a part of the mitigation investigation.  He had possibly been asleep for part of the mitigation testimony.  He had indicated to me that he thought that mitigation was, basically, sort -- I can't remember his exact words, but --

Q    Touchy-feely?

A    Not where it's at.  You know, touchy-feely, fluffy stuff. Not where it's at.  So for us to have worked so hard to put on all this evidence that I thought really and truly justified a

life sentence and then not be able to explain to the Jury why,

I thought that it was all lost, that we might as well have not

put it on because while the Jury probably believed it, since

you didn't challenge it, they weren't going to understand why

that meant that life was the appropriate verdict.

Q    In terms of your objection to Mr. Shaw doing the closing

and the closing that he gave, to what extent did his, again,

concession of Mr. Holder's involvement in the bank robbery

play in that objection?  Did you feel that was an

inappropriate tactic for Mr. Shaw to take in the penalty phase

closing argument to, again, consistently and credibly admit to

the Jury that he'd been involved in the bank robbery?

A    Well, I didn't know -- let me make sure I understand.  I

didn't know before he gave the closing argument what he was

going to say, but during the closing argument, I felt that it

was very inappropriate that he continued to insist that Norris

had never fired his weapon because the Jury -- you know, I

thought that that was -- that was wrong.

Q    Okay.  That's not my question.  My question is, as you

sat there and listened to the closing argument, did you have a

problem with the fact that Mr. Shaw was, again, as he had in

the guilt phase, conceding Mr. Holder's involvement in the

bank robbery?

A    Oh, no.  I'm sorry.  No, I didn't have a problem with

that.

60

Q     And still don't?

A     No.

Q     Your assessment of what was going -- what you believed would be best suited to obtain a life verdict -- to what extent did that take into account the individual jurors that were seated in this case?

A     Well, I would say not a lot because I can't remember knowing a lot about the jurors.

Q     Okay.  As you sit here today, what do you remember about the jurors, themselves, who would make this ultimate decision?

A     I remember that I didn't think some of them were -- you know, we had -- I mean, that was another area where we had some disagreements on who the jurors should be.  I didn't think some of them were very good jurors for us.

Q     Do you recall their ages?

A     It's -- well, it seemed like they were -- I -- I don't know.  You know, every jury I look at seems to be middle-aged white people.  I know there was one --

Q     Do you recall the ages of these jurors, and I don't ask the question as a joke.

A     I don't know.

Q     Do you recall the ages of the jurors?

A     I don't know.

Q     Do you recall their background?

A     Not as I sit here today, no.

61

Q    Did you have -- did you have then or do you have now any information about the jurors that would lead you to believe that they would be more susceptible to or moved by what you would have said versus what Mr. Shaw was saying to them?

A    Sure.  There's been a lot of work done, you know, the National Jury Project.  There's been a lot of jury studies about what --

Q    I'm asking you; what do you know about these jurors that lead you to believe that they would have been more susceptible to what you would have had to say than what Mr. Shaw had to say?

A    Well, you make your decision on what you're going to say based on what you know to be true.  You know, I -- none of us went and talked personally with these jurors, so there's no way that --

Q    Well, Mr. Shaw did talk personally with these jurors in voir dire, right?

A    No.  I -- I mean, well, I did, too, but I mean, to really sit down and get to know what's going to influence them one way or another as far as that goes, and there was some restriction in voir dire on our ability to voir dire on specific mitigating circumstances, so --

Q    What, if anything, did you know about these jurors that lead you to believe they would be more susceptible to what you had to say than what Mr. Shaw had to say?

A    Well, I tried to answer your question, and you wouldn't let me.  So if you want to know my answer, here it is.  My answer is what I knew about these specific jurors is based on research that has been done about numerous jurors in capital trials.  So how I educated myself to come to that belief was by looking at the research that had been done that tells you what is the most effective way generally to get jurors to return a life sentence, what mitigators are most effective, what approaches are most effective.  That is what I knew about those jurors.  I had no -- they were a death-qualified jury, which every jury in a capital case is, so I had no information or no reason to believe that these jurors were any different than any of the jurors that have been studied by the different people who have done these studies.

Q    So you viewed these jurors as somewhat homogenous or generic with the jurors that have been studied and research done over the years, correct?

A    Right.

Q    And did not see them as individuals who might have their own particular vents towards things, contrary to what that research would show?

A    No, because they were death-qualified jurors.

Q    And that's all you really needed to know about them?

A    That's all I could know.

Q    And this, while it wasn't because you didn't give the

closing argument, would have been the first time that you would have given a closing argument in the penalty phase in a trial, correct?

A    Yes.

Q    Shortly after the verdict in this case, in approximately May of 1998, did you have a meeting with Ms. Tatelli and Richard Burr?

A    Yes.

Q    And you had been around capital litigation enough to know the role that 2255 motions and postconviction attacks play in the process, correct?

A    Yes.

Q    And the three of you got together and met, is that correct?

A    Yes.

Q    And the purpose of your meeting was to kind of do a rehashing of the trial, correct?

A    Well, the purpose of our meeting was to document all of the things that had gone wrong in the trial.

Q    All right.  And was the focus -- was Mr. Shaw invited to this meeting?

A    No.

Q    And the focus -- was the focus of much of your attention to criticisms of Mr. Shaw?

A    Yes.

Q    And were -- now, the three of you are talking, correct, and the three of you are experienced capital litigators, correct?

A    I would say Dick is a very experienced capital litigator, Caryn was a fairly experienced mitigation specialist, and I was an experienced capital lawyer in terms of preparing a case, but actually trying a case, obviously, as you've pointed out several times, that was my first one.

Q    But experienced enough to know that in the event of a postconviction motion, the three of you would be witnesses?

A    Sure.  Well, I mean, I --

Q    So this was an instance of three potential historic fact witnesses getting together and discussing their future testimony?

A    No.  What it was -- if you're -- if you're trying to insinuate that we had some devious plan to orchestrate our future testimony, we thought that it was important for Norris to receive his Sixth Amendment guarantee of effective assistance of counsel, and we thought that there had been a lot of problems, and we knew it would be a long time, and so we thought that it was important that the Court be as aware of the facts and that those facts be accurate when this day came.

Q    Can you tell me why the accuracy of the facts depended on the three of you getting together and talking with each other?

A    Because you practice a lot of law in seven years.

Q    And so did -- did you -- did some of the facts that you -- did you help each other remember facts?

A    No.

Q    Did you share with each other your own personal anecdotes and facts?

A    Yes.

Q    So you -- basically, one witness influenced the other with knowledge of their anecdotes and personal experiences, correct?

A    No.  I mean, there was nothing devious about this.  We were trying to do what we thought was right.

Q    I'm not asking you if there's anything devious.  I'm asking you that, in effect, that was what was going on in the room, though, correct?

A    No.  We were each remembering the experiences we had and making sure that we got them down.

Q    And you were sharing them with each other?

A    Yes.

Q    Can you imagine a similar scenario occurring with three law enforcement witnesses to an historic event?

A    It happens every day.

Q    And what is your approach to it?  How do you view it when you see it?

A    What do you mean?  That's what they do.  They sit down and write reports.

Q    Do you think that they sit down together and they each discuss what they mutually remembered about the events?

A    I really don't know the practice of law enforcement in writing reports.

Q    But you knew, at least at that time, that the three of you would some day likely be witnesses in a postconviction motion filed by Mr. Holder?

A    It was my -- it was my hope that I would be, yes.

Q    Because it was your hope to, at some day, vacate the death penalty sentence in this case?

A    Because --

Q    Is that true?

A    Yes.

Q    And was that -- did that -- the three of you shared that hope?

A    Yes, because we thought that it was wrong.

Q    Has there ever been a death verdict that you're aware of that you would think was correct or right?

A    Well, when I say we thought it was wrong, I mean -- and, well, let me answer your question.  No, because I'm opposed to the death penalty, but --

Q    Would that be true of Mr. Burr and Ms. Tatelli as well?

A    I don't know, but I -- although I have, a long time ago, had discussions with Ms. Tatelli where she has indicated that she believes there may be appropriate uses of the death

penalty.  I don't know if she still feels that way, but the problem here was -- are there cases where people have received the death penalty and I feel like their lawyers have done everything they can to make sure they don't?  Yes, there are, but this wasn't one of those cases.

Q    Do you recall, prior to the filing of the 2255 motion in this case, that you accompanied Mr. McGraugh and Mr. Gorla to visit Mr. Holder --

A    Yes.

Q    -- where he was imprisoned in Terre Haute, Indiana?

A    Yes.

Q    Okay.  And you knew at that time that there was a prospect of filing a 2255 motion?

A    I knew one would be filed, yes.

Q    In fact, it would be inevitable, correct?

A    Yes.

Q    And you knew that you would be a witness to that motion?

A    I believed that there were facts I could state that would be helpful to the motion, yes.

Q    Okay.  But you then accompanied the lawyers who would be representing Mr. Holder in filing that motion; you, as a fact witness, accompanied them to a meeting with Mr. Holder at Terre Haute to discuss it with him before filing the motion, correct?

A    Well, I accompanied them as Mr. Holder's attorney, not as

a fact witness.

Q    So you considered yourself to still be his attorney even though these new attorneys were about to present a 2255 motion attacking you on the grounds of ineffective assistance?

A    I will always consider me to be his attorney, yes.

Q    Okay.  And at that meeting, did you discuss with Mr. Holder the grounds that would be raised in this 2255 motion?

A    No, no, not at all.  I introduced Norris to Mike and Chris to make him feel comfortable with them and because I thought it was the right and professional thing to do so that he would see that I trusted them and he would, therefore, trust them, and then I left the room and went and visited with another client while they continued to talk to Mr. Holder.

        MR. HOLTSHOUSER:  I have nothing else, Your Honor.  I think these portions that I've marked as exhibits, Judge, of the -- that are in the court record -- I don't know if there's a need to offer them, but I'll be happy to since we've specifically marked sections of the record.

        THE COURT:  Yes, that would be --

        MR. HOLTSHOUSER:  That might just be easier for the Court.  So, in that respect, I would offer -- I referred to Exhibit S, which is the Chanthadara case.  Rather than offer that, I'll give you just the citation for the record.  It's 230 F.3d 1237.  The important discussion begins at page 1263.

That is a 2000 Tenth Circuit case.  So we're not offering that copy.

Exhibit T is the memorandum of law regarding the instructions filed in the guilt phase.

Exhibit U was the certified copy of the guilt phase instructions given to the Jury.

Exhibit U was a copy of the penalty phase opening statement by Ms. Herndon, then Ms. Brewer.

Exhibit W -- strike that.

Exhibit X was the notice of mitigation.

THE COURT:  X.  Okay.  Wait a minute.

MR. GORLA:  You've got two U's.

THE COURT:  Okay.  Just a minute.  What is X?

MR. HOLTSHOUSER:  Wait a minute.  Wait a minute. Penalty phase opening is Exhibit V, as in Victor.

THE COURT:  V.  Okay.  Wait a minute.

MR. HOLTSHOUSER:  Do you have any objection to those?

MR. MCGRAUGH:  I think they're all part of the court record.

MR. HOLTSHOUSER:  Nothing further.

THE COURT:  Okay.  V is received then.  And what was X?

MR. HOLTSHOUSER:  There was no X, Your Honor, I believe.

THE COURT:  Okay.

70

MR. HOLTSHOUSER:  No.  X is the notice of mitigation.  There was no W.

THE COURT:  Okay.  All right.

MR. HOLTSHOUSER:  That was filed March 27th, 1998, also part of the court file.

THE COURT:  All right.  So I show the following so far offered and received.  P, R.

MR. HOLTSHOUSER:  P?

THE COURT:  Yeah, P, R, S.

MR. HOLTSHOUSER:  S was Chanthadara, and that's not --

THE COURT:  Yes.

MR. HOLTSHOUSER:  We're not offering a copy.  We gave you the citation.

THE COURT:  Okay.  T, U, X, and V.  Are there any others?

MR. HOLTSHOUSER:  And Q was the letter that was received, identified yesterday and received today.

THE COURT:  Yeah, I have, Q, yes.

All right.  You want to break at this time?

MR. MCGRAUGH:  I think, Judge.

THE COURT:  All right.  We'll take about a 10-minute break.  You may step down.

THE WITNESS:  Thank you, Judge.

(COURT RECESSED FROM 10:08 A.M. UNTIL 10:24 A.M.)

THE COURT: Whenever you're ready.

MR. MCGRAUGH: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MCGRAUGH:

Q    Ms. Herndon, I want to go back to -- and in no particular order, I want to go back to some of the questions that Mr. Holtshouser asked you, as to the pecuniary gain aggravator --

A    Okay.

Q    -- and the effect of Chanthadara coming out in between the submission of this case and the final opinion. Okay?

A    Okay.

Q    Is it your testimony that had Chanthadara -- since Chanthadara had come out between the two, what actions would you have taken as you see it today?

A    Well, if I had been aware of the issue in the case, when the case came out, I first would have filed -- I think it's --

MR. HOLTSHOUSER: I'm going to object to the relevance because what she would do today is not relevant to what she would or should have done back then.

THE COURT: I think that's true. Sustained.

Q    (By Mr. McGraugh) The issues that are raised in Chanthadara -- it also discusses legislative history, is that --

A    Yes.

Q    And the legislative history of the death penalty statute?

A    Yes.

Q    And what it discusses is that -- that the -- the existence of a felony murder?

A    Yes.

Q    Which is a capital offense?

A    Yes.

Q    And it sets out that bank robbery is not one of those -- those that was --

MR. HOLTSHOUSER:  What page of the opinion are you on?

MR. MCGRAUGH:  I'm not.  I'm just --

MR. HOLTSHOUSER:  You're asking her about the opinion, right?

MR. MCGRAUGH:  I'm asking her if that's what she recalls from it.

MR. HOLTSHOUSER:  Well, Judge, I'm going to object because, I mean, in discussion of pecuniary gain in Chanthadara, I don't see anywhere where there's just discussion of legislative history.  So unless there can be some foundation laid to ask her about that passage from Chanthadara, I'd object.

THE COURT:  All right.  Sustained.

Q    (By Mr. McGraugh) Chanthadara and Bernard, the cases that discuss -- my recollection of Chanthadara, it does discuss the

legislative history of the death penalty statute. Is that what you recollect?

A   I thought it was in Chanthadara, too, but maybe -- maybe it's in Bernard. I mean, it's in one of those cases that I read about the legislative history. I certainly didn't research it myself.

Q   And both Chanthadara and Bernard follow the same reasoning as to why the murder for hire or the pecuniary gain is more applicable to a murder for hire situation?

A   Right, yes.

MR. HOLTSHOUSER: Well, Judge, I'm going to object again. I think it's a misrepresentation of what Chanthadara and Bernard --

MR. MCGRAUGH: Well, Judge, this Court can decide what Chanthadara and Bernard mean. It's what this witness interprets these cases to mean, I think, is seminal here, Judge.

THE COURT: Okay. Well, but I guess my problem -- the question is suggesting that they do, and she's admitting that they do, and what if they don't? That's my only issue.

MR. HOLTSHOUSER: Well, if the issue --

THE COURT: I think you're --

MR. HOLTSHOUSER: Judge, I'm sorry.

THE COURT: I think you're right. You know, I will eventually read them and make that decision.

MR. HOLTSHOUSER:  I think, Judge, if we have a dispute about what the case says, I think you should be the ultimate arbiter of that and not this witness.

MR. MCGRAUGH:  But, Judge, as to what she should do or what she should have done as to preserving this issue for appeal, it's seminal for her to understand -- what the understanding of the issue actually is as raised by these cases.

THE COURT:  That's true.  I agree.  Proceed.

Q    (By Mr. McGraugh) As to the discussion with Chanthadara and then Bernard, is it your recollection -- is there a discussion of legislative history as to the death penalty statute?

A    Yes, there is in one of those cases.

Q    And is the -- and you were aware of the death penalty statute back in 1997, 1998, is that correct?

A    When you say "the death penalty statute", you mean the Federal Death Penalty Act?

Q    Yes, ma'am.

A    Yes.

Q    Okay.  And that was the same one as -- that was -- was in effect when Chanthadara and Bernard were decided?

A    Right, yes.

Q    And as to the legislative history, would it be fair to say -- or strike that.  As to the statute, itself, it denotes

bank robbery as a -- or I'm sorry.  I'm sorry.  Strike that.

As to the death penalty statute, it denotes a capital offense

as some felony murder offense, is that correct?

A    Right.  Bank robbery in which a death results is a

capital offense.

Q    And my question is, did you do any legislative history to

determine whether a bank -- that Congress intended bank

robbery to be considered part of a felony murder?

A    No.  At the time, no.

Q    And did you do any research to determine whether Congress

intended under the pecuniary gain aggravators to relate to

offenses of bank robbery?

A    No.

        MR. HOLTSHOUSER:  Judge, I'm going to object to the

question.  There are two clauses in the so-called pecuniary

gain section, and there's a question going to -- which one is

the question going to?

        MR. MCGRAUGH:  I thought I said -- I thought I made

it plural as to both.

        THE COURT:  It says, "And did you do any research to

determine whether Congress intended under the pecuniary gain

aggravators to relate to offenses of bank robbery?"

        MR. MCGRAUGH:  Aggravators meaning plural.

        THE COURT:  Overruled.  Overruled.

A    I did not do any research into the legislative history at

all.  Was that your question?

Q    (By Mr. McGraugh) That was my question.  And is there a method that you can amend your -- your brief or amend your issues on appeal to include new issues that arise under law?

A    Yes.  You can always write a 28J letter to the court, and you can write it to the clerk, and the clerk forwards it on to the panel that has your case, and you bring it to the attention whatever the new point of law is that you want the court to know about.

Q    And did you do that as it relates to the pecuniary gain aggravators after Chanthadara was decided?

A    No.  I wasn't even aware of the rule at the time.

Q    Okay.  So there was no strategic reason as to why you did not include that?

A    No.

Q    There's been a considerable discussion during cross-examination as to whether consistent guilt phase and penalty theme was presented during trial.  Do you recall those questions and answers?

A    Yes.

Q    Okay.  First, was there -- did you and Mr. Shaw ever sit down in order to strategize that a guilt and penalty phase consistent theme would be presented?

A    No.  The only times that Charlie and I sat down -- and like I said before, there was only a couple of them, with

brief discussions, and they all revolved around guilt phase, and I didn't ever really make any attempts to talk to him about mitigation.  Caryn was rather persistent and made several attempts to do that, and like I said before, he, you know, eventually affirmatively indicated that he was not interested in that.

Q   Was there a consistent theme presented in the guilt phase and penalty phase in Mr. Holder's trial?

A   No.

Q   You were asked about --

MR. MCGRAUGH:  Do you have your exhibits, Steve?

MR. HOLTSHOUSER:  Sure.

Q   (By Mr. McGraugh) You were shown Government's Exhibit T. Is that showing up there?

A   I think you have it upside down.  I mean, like, flip it over.  Like, turn it over.  Like, pick it up, turn it over, set it down.

MR. HOLTSHOUSER:  You're upside down.

THE WITNESS:  You're upside down.

MR. MCGRAUGH:  Oh, there we go.

THE WITNESS:  There you go.

Q   (By Mr. McGraugh) You saw this during cross-examination -- Government's Exhibit T?

A   Right.

Q   The -- and was it your testimony that you actually

prepared this, this memorandum?

A    Right.  Well, Dick would have prepared it primarily and forwarded it on to me, and, you know, at the time, I think -- I'm trying to think whether I did any additional research or anything.  I think what happened is Dick prepared it and gave it to me and I got it in final form for this case, but it's my recollection that, you know, because of the timing, he did all the research and put all of the actual substance and law into the motion.

Q    Okay.  What was the reasoning behind trying to introduce a mens rea?  You know, what was your purpose behind filing this memorandum and suggesting these instructions to the Court?

A    Well, because under the jury instructions -- I think it was the Eighth Circuit Model Instructions at the time -- there was no mens rea requirements.  If you committed the bank robbery and someone was killed while you committed the bank robbery, then you were guilty of bank robbery in which a death results and eligible for the death penalty.  Based on the case law that is contained in this memorandum and our reading of the statute, Dick's reading of the statute, we felt like that jury instruction was incorrect, did not correctly state the law.  Dick pointed out to me this problem and forwarded that to me so that we could try to get the Court to change the model instruction so -- you know, because that was crucial to

our case, whether there was a mens rea or not.

Q   And did you -- I guess, did you put all your eggs in this basket that you could get the law changed, or was this a stretch?

A   Well, no.  I mean, we were purely preserving a record. We felt like it would -- the Court would give the Eighth Circuit Model Instructions, and I think, ultimately, the Government agreed to make a change in the instruction to modify it a little bit, which, you know, we were really surprised that they had even agreed to do that.

Q   Did you model either your guilt or penalty phase based on what you had hoped the outcome of this motion might be?

A   Well, I didn't have any modeling of the guilt phase at all, but as far as the penalty phase goes, this was irrelevant to the penalty phase, and -- and I didn't have any part of strategizing the guilt phase.

Q   Do you know whether Mr. Shaw had an expectation that this would actually be granted and a mens rea would be introduced into the instructions?

A   Well, he wasn't -- he wasn't aware of this issue.  I didn't ever talk to him about this, and like I said, he just --

        MR. HOLTSHOUSER:  Judge, I'm going to object.  If she never talked to him about it, I don't know if she can testify what he was or was not aware of.

THE COURT:  Sustained.  Sustained.

A    Well, I -- I'm sorry.  That -- yeah, that's -- he was not aware of what Dick and I were preparing in that motion, and like I said, he just signed the back page.  The only things he ever said to me were, as I stated before, in the meeting with Dick, you know, that he maintained that this was irrelevant because if he was found guilty of the bank robbery, that was a separate thing from the murder.

Q    (By Mr. McGraugh) So as far as the conversations you had with Mr. Shaw, did he contemplate at all what the final instructions would look like?

A    No.

Q    Okay.  You stated that he signed the back of this memorandum.  Did he actually read the memorandum?

A    No.  As I told you, I presented it to him like you have it now, with the signature line, and said that Dick had helped me prepare it, and it was an instruction issue, and by that time, I believe Charlie had had his revelation of, "Hey, where's the murder charge," and so it had hit him by that time that we were in trouble.

Q    Okay.  Did -- I want to discuss with you about that. How -- can you relate exactly what the conversation was and when that occurred -- the conversation when Mr. Shaw came to realize that -- that the murder would -- did not require specific intent?

81

A     It was -- you know, I can't say the exact moment.  I mean, I remember -- I can visualize in my mind the exact moment in time, but where it was in the sequence of things, I'm not sure of.  It was some point after we had received the Government's jury instructions, and, you know, whether it was before the conference, after the conference, during, you know, it took us a long time to get instructions together.  So I'm going to kind of think it was during the informal preparing of the instructions, and we were on a recess, and he and I were at the podium, you know, not for any reason.  That's just where we both ended up -- at the podium in the courtroom -- and he whispered to me, "Where's the murder charge?"  And I was like, "What are you talking about?" because I really thought at that time he had some understanding, you know, from looking at the statute.  I wasn't aware of his level of misunderstanding at that point.  And he's like, "There's no instruction on a murder in here."  And I was at a loss.

Q     Was this after Mr. Holder had testified?

A     Yes, because it was during -- at some point during the instructions.

Q     And was this statement consistent with his statements at the February '98 meeting with you and Burr?

A     Yes.

Q     Now, you recall you were present for Mr. Shaw's closing argument in the guilt phase?

A     Yes.

Q     Did he make affirmative statements that Norris was guilty of the bank robbery but did not intend to kill anyone and, therefore, could not be convicted of murder?

A     Umm, I'm sure that he did.  I haven't -- you know, that was his theory.  Once again, I'm going to have to let the closing argument transcript speak for itself because I can't specifically remember it and I haven't read the transcript.  All I can tell you is that was his theory.

          MR. MCGRAUGH:  Okay.  Judge, I believe I'm on Exhibit 4.

          THE COURT:  All right.

Q     (By Mr. McGraugh) Let me hand you what's been marked Exhibit 4 and Exhibit 5.  They are copies of motions which are in the court file.  I believe Exhibit 4 is a motion for acquittal at the close of the Government's case, and Exhibit 5 is a motion for acquittal at the close of all the evidence.

A     That's correct; that's what those two exhibits are.

Q     And the copies denote a ruling on both of those motions, do they not?

A     There's Judge Webber's notation and his handwriting on both of them that they're denied.

Q     As to paragraph two, paragraph two as to both motions are worded the same, are they not?

A     Exactly, word-for-word.

Q    Okay.  Would you read into the record the grounds for which Mr. Shaw sought the motion for acquittal at the close of the Government's case and all the evidence?

A    He states, "As to Count II, the Government failed to make a prima facie case as to Count II of the indictment in that there was no evidence to sustain the charge of malice aforethought, which is the essential element which elevates the killing of an individual to the intentional status of murder under Count II of the indictment."

Q    And that's as to both motions?

A    It's the same.  Paragraph two is the same on Exhibit 4 and Exhibit 5.

Q    And Count II of the indictment was the "use of a firearm" count?

A    Use of a firearm in the course of a crime of violence where a death results.

Q    And Count I was the bank robbery?

A    Bank robbery during which a death results.

Q    Okay.  And are those two motions consistent with the conversations you had with Mr. Shaw in February of 1998 and again right before the closing arguments or sometime after the instruction conference as to his belief that the Count II required a specific intent?

A    Yes.  That's -- yes.  And what he -- based on my conversations with him, paragraph two would be consistent with

84

what he expected to see Count II of a murder, and then he expected to see what ended up being Instruction 17 as Count I, a bank robbery.

Q    Again, you may not recall.  Do you recall Mr. Shaw ever arguing the Government was missing the specific element of a serious risk of death?

A    I don't recall the exact words, but I recall him making an argument.  Yes, I recall him making that argument, yes, because I think that was -- well, you know what?  No.  I have to say no.  I'm sorry.  I have to say no because it was during this instruction conference when he and I spoke privately and he said that to me about "Where's the murder?"  That's the first time since the February meeting when I was, like, "Oh, he does not -- this is huge.  He does not understand."  So I -- during his closing argument, I -- I don't know.  I don't recall that.

Q    You were asked some questions as to the instructions that were -- were --

        MR. MCGRAUGH:  Did you have an exhibit for those, Steve, for the instructions?

        MR. HOLTSHOUSER:  Guilt phase?

        MR. MCGRAUGH:  Guilt phase instructions.

        MR. HOLTSHOUSER:  U.

        MR. MCGRAUGH:  U?

        MR. HOLTSHOUSER:  U.

MR. MCGRAUGH:  Okay.  Do you mind if I just use my set?  They're the same, I think.

Q    (By Mr. McGraugh) Mr. Holtshouser showed you Instruction #16?

A    Yes.

Q    And that was the aiding and abetting instruction?

A    Right.

Q    Okay.  Is it your testimony, Ms. Herndon, that Mr. Holder's testimony admitted the essential elements of those facts?

A    Yes.

Q    Okay.  And as to the serious risk of death attending his conduct, those words may have not been directly spoken, but certainly, you could draw from his statements that his conduct leading up to the bank robbery, what was done inside the bank and thereafter, that he would have been aware of a serious risk of death?

MR. HOLTSHOUSER:  Judge, I'm going to object.  It's argumentative and leading.

THE COURT:  It is leading.  Sustained.

Q    (By Mr. McGraugh) I think what -- let me ask you this this way, Ms. Herndon.  Is there -- Mr. Shaw continued to argue and I think you've stated that Mr. Holder's position was that he never intended to hurt someone.  How does that conflict with this element three, there not being a serious

risk of death attending his conduct?

A    Well, the reason that it was my legal opinion that he had confessed to those crimes when he testified was that it was brought out during his testimony that -- you know, the conscious act of going and purchasing the body armor, the stockpiling of the rather high-powered weapons and just hundreds of rounds of ammunition.  And, you know, it was pretty skillfully brought out, I think.  Especially on cross-examination, I remember being like, oh, you know, wishing I could leave the room because, you know, that was really driven home, that amount of preparation and that amount of fire power that they went in there with, and, you know, there isn't -- there isn't anybody -- my legal opinion was that -- well, I guess it's not a legal issue at that point, but my professional opinion was that there was no way that any juror, especially any death-qualified juror, was going to see that evidence and conclude that he wasn't aware of a serious risk of death.

Q    I want to now direct your attention to Instruction 19, which is the instruction that relates to the crime of carrying a firearm in a crime of violence, Count II.

A    Right.

Q    Okay.  Now, as to the elements as to Count II, as set out in Instruction 19, did Mr. Holder, during his testimony, admit to all these essential elements?

A     Yes, he did.  And I'm trying to remember if this was -- I don't know if this was the instruction.  There was one instruction that Ed Dowd, who was the prosecutor -- he -- you know, they had prepared -- and this was during Norris' testimony, but they had either the instruction book or prepared them or whatever, and Mr. Dowd actually, you know, picked up the instruction and just read through the elements and asked Norris, you know, "Did this happen?  Did you do this," you know, which was especially painful, and I can't remember if it was this instruction or the other one, but even if this wasn't the one where he went one-by-one, you know, clearly Norris' testimony admitted to all of those four elements.

Q     The -- the paragraph where it describes malice aforethought --

A     Right.

Q     -- does not require intent, does it?

A     No.  That was part of our contention -- that malice aforethought -- that, you know, there should be a definitive intent factor in there, we wanted, you know, in the alternative instructions that we offered.

Q     At the time this case was tried, this was the law; this instruction was consistent with the law?

A     Well, it was consistent with the Eighth Circuit Model Jury Instructions.  You know, we -- I felt like -- that, you

know, based on what Dick had presented to me, that actually the law would have supported giving our instructions, but certainly, these were the Eighth Circuit Model Instructions, so these were -- even though the law may have been open to some interpretation, these were what the law was in this circuit.

Q    Did you anticipate that this instruction would be the one that would be given?

A    Yes.

Q    There was a discussion as to the decision not to retain a ballistic expert.  Is the -- is the criticism that a ballistic expert wasn't retained -- can you tell the Court what -- strike that.  Was it important to know what an independent or a defense forensic or ballistic expert would tell you in forming a defense in this case?

A    Well, here, this is what my -- my professional opinion on that issue was.  I am -- you know, I was very aware that it was our obligation as Norris' lawyers to make reasonable investigations before we made strategy decisions, and that is how I operate, not only because I think it's -- it's fair to the client, but because that's what the law is, that before you make a strategy decision --

        MR. HOLTSHOUSER:  Judge, I'm going to object to the answer as being nonresponsive.  The question had to do with a ballistics expert.

THE COURT: Sustained.

A    Okay.  I'm sorry.  Ask me the question again.  I'm sorry.

Q    (By Mr. McGraugh) My question is -- is that -- is that there was testimony both on direct and cross-examination of the failure to retain a ballistic expert and a ballistic expert wasn't -- wasn't ultimately obtained.  My question is -- is that -- why was it important to retain a ballistic expert?

A    Okay.  Well, without sort of going into my philosophy of it, the importance of obtaining a ballistics expert was to see if that expert reached conclusions that were different from Mr. Stubits' conclusions because, especially, in this case -- well, in any case, Mr. Stubits was employed by the -- the crime lab, which, you know, we, as the defense, really see as an arm of the police.  He was definitely, in my mind, a state's expert, an individual who would be working for the police, and so I -- it would have been important to get either what I would view as a more impartial or even a defense expert to see whether Mr. -- he agreed with Mr. Stubits, and especially in this case, since some of Mr. Stubits' conclusions were inconclusive, whether another expert could have moved those one way or another, whether it would have been good or bad.

Q    And, ultimately, what would that matter in your strategizing in the case?

A     Well, because --

MR. HOLTSHOUSER: Judge, I'm going to object to the relevance. No ballistic expert has been brought forward that would have made any difference in the outcome of the case. I think this is all purely hypothetical and has no bearing on the issues this Court has identified for this hearing.

MR. MCGRAUGH: Judge --

THE COURT: I understand what the question was -- why did you think -- why was it important to get one, and she explained because Mr. Stubits was associated with the prosecution side of the case and that the -- that he had testified that some of his conclusions were indeterminate, and then so I think it is relevant to show if she -- if they had gotten one, what they would have tried to produce. It -- it -- it is strictly hindsight. I'll sort it out, but based on the preliminary questions, I will overrule the objection.

MR. HOLTSHOUSER: Judge, could I just make a further record on that?

THE COURT: Yes.

MR. HOLTSHOUSER: And that is that we received an order from you specifying that there were going to be six issues that would be the subject of this hearing. We conducted discovery and exercised our discovery rights according to the parameters of those six issues. The failure to hire a ballistics expert or any issues relating to

ballistics, while raised in the 2255 petition, were not within the Court's order.  So we have not had an opportunity to fully explore this area or related areas like this.  So I think that it puts us at a disadvantage to be able to cross-examine on this issue now that we're getting afield from the six issues that the Court has identified and we were on notice would be the subject of the hearing.

MR. MCGRAUGH:  Well, we --

THE COURT:  All right.

MR. MCGRAUGH:  I'm sorry, Judge.  I didn't mean to interrupt.

Judge, we made available all the witnesses that -- that we expect to testify, and we -- outside from Mr. Holder, the testimony was unlimited and the questions were unlimited as to what could be asked and what could be answered.  As I stated yesterday, the questions along this line has to do with what prejudice existed if the Court examines this under a Strickland standard, and in essence, Judge, and I think what's been developed already through -- through what I have in my notes from what Ms. Herndon's testified to is that in determining what the appropriate strategy will be -- and these are questions that were the subject matter of the order and the subject matter of the questioning.  In determining what is the appropriate strategy to take in trial in both guilt and penalty phase, what type of things has to be done, and I think

what Ms. Herndon has said is investigation is one of those things. Ballistics is an element of the investigation to determine what the appropriate strategy -- not only the strategy as to forming guilt/innocence, but strategy in putting your client on the witness stand.

THE COURT: All right. For a limited purpose, I'll receive it. Overruled.

A     The importance of hiring a ballistics expert to our strategy in the case was that it was our contention that Norris never fired his weapon. That contention was refuted by the Government's ballistic expert, and Norris -- especially because Norris testified that he never fired his weapon, I think for him -- his testimony to be believable we would have needed a ballistics expert to support that there was at least some question about whether he fired his weapon.

Q     (By Mr. McGraugh) Evidence as to whether Norris had fired his weapon, whether Norris contended that he fired his weapon, or whether he had fired the fatal shots that killed Mr. Heflin -- had that evidence already been received in evidence prior to Mr. Holder testifying?

A     Yes.

Q     You were asked by Mr. --

MR. HOLTSHOUSER: Judge, I'm going to object unless there can be some specification as to where prior to Mr. Holder testifying that evidence came into the case.

THE COURT: Okay. I'll allow it on cross-examination.

Q    (By Mr. McGraugh) You were asked on cross-examination whether there was any -- the theories of residual doubt in this?

A    Yes.

Q    Did you rely in mitigation on a theory of residual doubt?

A    No.

Q    And why not?

A    Because there was no residual doubt. Well, because I did not believe that it was possible that any juror would have had residual doubt about their decision to convict Mr. Holder of these crimes.

Q    I want to ask you about some questions on Exhibit -- Exhibit Q.

A    Okay.

Q    This was the May '97 letter.

A    Right.

Q    Okay. First, let me ask you; do you know whether Mr. Shaw prepared this letter himself?

A    No, I don't.

Q    Do you know whether he knew of the contents of this letter?

A    No, I don't.

Q    As to -- as to the letter, itself, generic -- have you

seen similar letters as these, and when I say "similar letters", letters to the U.S. Attorney's Office to be forwarded to the Department of Justice during the authorization?

A    Yes, I have.  One of the things that the Resource Counsel Project provides is a workbook or a notebook that contains sample DOJ authorization letters in it, and they basically give you templates for when you're writing a letter to the local U.S. Attorney or you're writing a letter to the Capital Case Review Committee in Washington, D.C.  You can use these samples, and what I -- I just happened to be -- it's not I'm intimately familiar with that stuff.  I happened to be looking through it because I was looking for something the other day on a letter I'm preparing, and this -- I can't swear to this, but this third paragraph, I believe I've seen in one of those templates where it talks about Rule 11(e)(6) and Rule 410.

        MR. HOLTSHOUSER:  Well, Judge, I'm going to move to strike if the witness has no certainty in terms of where she's seen this before, and the fact that it's in a template is irrelevant.

        THE COURT:  Well, sustained as to the first part of the objection.

Q    (By Mr. McGraugh) As to letters such as Exhibit Q, is it common for the Capital Resource Center to provide capital defense lawyers templates of form letters?

A     Well, they do.  It's not only common.  It's their practice.  Every time you get appointed -- like, you know, I've been appointed on probably 10 federal death penalty cases.  I get their stuff every time I'm appointed.  They know me.  They know my name.  They still send me the same thing every time I'm appointed.  So it's a -- it's just a standard practice without considering who the attorneys are or anything like that.

Q     And does this Exhibit Q appear to be consistent with templates that you had received from the Capital Resource Center?

A     Yes.

Q     And as to the paragraph that you discussed with Mr. Holtshouser as to "Significant to note in state court" -- that paragraph beginning that way --

A     Yes.

Q     -- was that -- is that paragraph inconsistent with the motions he filed at the motions for acquittal at the close of the Government's case?

A     Yes.

Q     Is it inconsistent with the motion for acquittal at the close of all the evidence?

A     Yes.

Q     Is it inconsistent with his opening statement?

A     Yes.

Q    Is it inconsistent with his closing argument?

A    Yes.

Q    Is it inconsistent -- is it inconsistent with the meetings that you had with him in February of 1998?

A    It's inconsistent with every conversation I had with him on the issue. The conversations were few, but it's inconsistent with each of them.

Q    I jump back. I was talking to you about residual doubt. There was some discussion about the value of Mr. Holder showing remorse to the Jury.

A    Yes.

Q    Do you remember that? Was -- let me ask you; did Mr. Shaw communicate that that was the reason that he had advised Mr. Holder to take the witness stand?

A    No. In the course of my arguments with Mr. Shaw about why Norris should or should not testify, Charlie indicated to me that Norris needed to testify to, you know, get his story out and to tell the Jury that he did not shoot this guy, that he did not kill the victim.

Q    Did he effectively show remorse during his testimony?

A    No.

Q    And why is that?

A    I don't -- I don't -- he was -- I mean, he was never asked any questions that would -- I mean, you know, he could have spontaneously cried, I suppose, but he was never asked

any questions about that during his testimony, about whether he was remorseful or not.

Q    You were asked questions about whether you told Ms. Tatelli or that Ms. Tatelli told you about conversations that he had with Norris about always wanting to testify. Do you recall that?

A    Yes.

Q    Did Ms. Tatelli ever tell you that Mr. Shaw told him that if he testified, he could go home?

A    Did Ms. Tatelli ever tell me that?

Q    Yes.

A    I just don't remember. I just -- I mean, because, to me, before Charlie brought it up during trial, Norris wasn't going to testify. It wasn't an issue. If it was something Caryn was dealing with, then good for her for dealing with it and taking that on. You know, I just don't remember.

Q    Did Mr. Shaw ever tell you that, that if Norris took the witness stand, that he could go home?

A    Well, I can't imagine him telling me that because he knew he was going to get convicted of the robbery. I mean, I just -- I don't remember him ever telling me that, but it seems unlikely.

Q    You were asked some questions about what you stressed during the penalty phase and what you would have intended to argue; is that -- do you recall that line of questioning --

A    Yes.

Q    -- and what weight you would have or what time you would have denoted these things?

A    Yes.

Q    As to the effect of Mr. Shaw giving the closing argument as opposed to you, I think you've already stated what those -- strike that.  In your opinion, did Mr. Shaw link all those mitigating facts that you brought out in the mitigation portion as to -- to convince a jury why life was appropriate?

A    No.  And, I mean, you have to remember that I don't -- I don't remember specifically the entirety of the closing argument.  I can tell you what I remember thinking during the closing argument, and that was, you know, he kept stress -- he kept going back to the guilt phase issues, and I kept thinking, you know, boy, this is not where it's at.  I mean, I knew that's what he was going to do because he didn't -- he didn't understand or believe in the penalty phase stuff, but, you know, I remember him -- I remember him just talking about the fact that Norris didn't kill this guy and wasn't responsible because he didn't kill the victim, and I don't -- you know, when Steve said the thing about excuse, you know, we're not offering excuses, I don't even remember that.  So, you know, the only thing I remember is him talking about the guilt phase issues.

Q    Okay.  As to the issues which he argued, the issues about

the guilt phase, as to whether he shot his weapon and whether he intended for someone to be killed in the bank, you -- so that you wouldn't have offered a lot of time in arguing those issues, is that correct?

A    Right.

Q    Okay.  Do you recall what the Jury -- on the verdict form as to how the Jury returned on those mitigators?

A    They -- I recall that they -- I think zero found those mitigators.

Q    And as to the mitigating factors which you presented, the ones that were -- I think that Mr. Shaw characterized as touchy-feely, do you recall what they returned on those mitigating factors?

A    Well, I don't recall specific numbers.  I recall, as we're sitting there and the special verdict form was being read, I was encouraged by the number of people that had found the mitigators.  I thought -- you know, I thought it was going to be a death verdict, and then when they were reading the number of people that found the mitigators, I thought, well, you know, maybe there's some hope because more than half of the people have found that a lot of these, quote, "touchy-feely" mitigators exist.

Q    Now I want to talk to you about the -- the -- the meeting of May 1998.  Did you think there was anything inappropriate with you and Ms. Tatelli and Burr getting together and

100

discuss -- debriefing each other as to what happened during the case?

A    No.  I thought -- I mean, to the contrary, I thought we had an obligation to do that.

Q    Okay.  And why is that?

A    Because as the defense team -- and I considered Dick part of the team -- we have a Sixth Amendment obligation to ensure that Norris receives effective assistance of counsel.

Q    Did -- at any point, did what anyone said during that meeting influence you or change factually your recollection of something that happened during the trial?

A    It -- it certainly did not influence.  There were things and there are still things that we remember differently today.  I mean, you know, we've talked about our testimony in preparing.  We've talked about, you know, not our testimony, but we've talked about things we remember, and there's things we remember differently, and that's -- that's that.  I'm not going to lie about it because I don't feel like I have to lie about it.  I feel like the facts are good enough.  Did our discussions help me remember things?  Yeah.  Just like as we're sitting here and you guys ask me questions, sometimes still I'm like, "Oh, yeah."  You know, so I think the point of the discussion and the really helpful nature of the discussion was to get it all out and relive it and make sure that we weren't forgetting anything and that we got everything down.

MR. MCGRAUGH:   That's all I have at this point.

THE COURT:   Okay.   Recross.

RECROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q    Ms. Herndon, the May 1998 meeting -- Mr. Shaw was not included or invited to the meeting, correct?

A    That's correct.

Q    And do you know for -- do you know that Mr. Shaw is now deceased?

A    I do know that.

Q    And he's not here to respond to any of your claims of things he said and did, correct?

A    Obviously.

Q    Let me take you back to Chanthadara briefly.   A motion raising any issue based on an interpretation of the pecuniary gain statutory aggravator was not even included in the materials you were provided by Mr. Burr, was it?

A    I have no idea.   There were a lot of materials, and I didn't see them all.   I don't know.

Q    And you certainly haven't seen any material come forward here today from those materials that would have preserved that issue?

A    No, I haven't.

Q    So amongst -- you haven't seen, amongst the materials that you received from Dick Burr, a recommendation to you that

you preserve that issue?

A    Well, I haven't seen those materials.

Q    But you're not aware of anything in there which would have preserved the Chanthadara issue, are you?

A    Well, no.  You know what, though?  No, I don't know.  I just don't know if there is or not.  I have no idea.

Q    Okay.  You know you haven't seen any in this hearing, correct?

A    That is true.

Q    Okay.  What is it that you think you didn't know then that you should have known about the pecuniary gain argument?

A    Just the fact that it existed.

Q    Why should you have known about it?

A    Because, apparently, other death penalty lawyers were litigating the issue and, you know, it's still even --

Q    How do you know that now?

A    Because of Chanthadara.

Q    All right.  And Chanthadara came down in 2000.  This case was tried in March of '98.  As you sit here now, do you have any idea of who was raising this issue where or when?

A    Well, I know Chanthadara was because if the Tenth Circuit decided it in 2000, it was being raised in the district court in 19 -- I mean, I think the crime happened in Chanthadara in '94.  So it was being raised in the district court, I would probably bet money on it, during the time of Mr. Holder's

trial.

Q    But as you sit here now even, that's just a process of deduction on your part, correct, as to what the status of that issue was in March of 1998?

A    Well, there's no other way for it to get to the Tenth Circuit other than for the defense to bring it there, so I think it's --

Q    So it's a process of deduction as opposed to personal knowledge, correct?

A    Yes.

Q    And is it humanly possible to know, as a lawyer, every issue that is percolating in every circuit in every district of the country?

A    You know, in the death penalty community, yes, it is, and I feel like now I do because we have meetings.  You know, we have a meeting once a year where essentially --

Q    We're talking about now.  How about back then in March of 1998?  Did you feel like it was possible for you to know what issue was percolating everywhere at every moment in every district?

A    It was not for me because I had never handled a federal death penalty case and I had never been to a federal death penalty strategy session.  So under those circumstances, for me, no, it was not possible.

Q    And in this case at least, it's certain that you did not

VOLUME II

104

preserve -- you or Mr. Shaw did not preserve any claim attacking the propriety of the pecuniary gain statutory aggravator as applied to these facts; it wasn't preserved at the trial level, correct?

A    That's correct.  Now, I think.  I mean, I know I filed a motion to strike the aggravators, but, apparently, that wasn't in it.

Q    Okay.  And when it came down, when Chanthadara came down in 2000, even then, the best you could have done if you had raised it would have been to seek plain error review of the issue, correct?

A    Yes, right.

Q    And I think you testified that there was no consistent theme in the defense strategy utilized by Mr. Shaw.  Was that your testimony?

A    No.  I testified that there wasn't a consistent guilt and penalty phase strategy.  The strategy wasn't consistent throughout the two phases.

Q    Okay.  Was it correct that in the guilt phase, Mr. Shaw stressed to the Jury the concept that Mr. Holder did not fire his weapon in the bank, did not shoot Mr. Heflin, and did not intend for Mr. Heflin to be harmed?

A    Did he stress those things?

Q    Sure.

A    Yes, he did.

Q    And did he stress those in his closing argument in the guilt phase?

A    I'm going to say probably.

Q    Did you mention them in your opening statement in the penalty phase?

A    I don't know.  Is that what you showed me, the very first two lines earlier?

Q    Well, let me just --

A    Maybe I'm already forgetting.  If you show me again, I'll tell you.

Q    Near the end of your opening statement, "We're going to ask you to find that Norris Holder was not the kind of person who would have ever gone into a bank with the intent to kill someone."

     Do you see that?

A    Right.

Q    So at least and to the extent that -- to that extent, you were commenting on that theme, correct, that Mr. Holder did not intend to kill anyone?

A    Well, I mean, that wouldn't be --

Q    Did you say that?

A    No.  I mean that --

Q    Did you say that in your opening statement?

A    No.  What I said was, "We're going to show you he's not the kind of person who would do that," and the reference is to

he's not that kind of person because we're going to show you what kind of person he is.

Q   Okay.  So you're saying, though, that he's not the kind of person who would have ever gone into a bank with the intent to kill someone?

A   Right.

Q   Now, is that another way of saying that he did not have that intent?

A   No.  He's not the kind of person that would do that.  I mean, you know, it is what it is.  I don't really mean to argue with you about it, but honestly, I want to tell you what I -- what I'm thinking when I'm saying that.  He's not the kind of person that would intend to do that because that's not the kind of person he is.

Q   And was that at all consistent with the themes that Mr. Shaw had stressed in the guilt phase, that Mr. Holder was not a person -- did not intend to harm the guard and was not the kind of person who would do that?

A   It was consistent in that respect, yes.

Q   And then your notice of mitigating circumstances, the first two of those were that in killing Norris Holder, he did not fire the shots which resulted in the victim's death --

A   Right.

Q   -- did not intend for any person to be injured or killed during the course of the offenses which he committed.  Again,

is there consistency between a -- your notice of mitigating circumstances and the themes that Mr. Shaw had stressed in guilt phase?

A    On that little specific point, yes, there is.

Q    Okay.  And then, in the course of Mr. Holder's own testimony, he reinforced these concepts as well, correct?  He testified he did not intend to harm anyone --

A    Right.

Q    -- and did not fire the shots that killed Mr. Heflin --

A    Right.

Q    -- correct?  And then in Mr. Shaw's closing argument in the penalty phase, he again stressed those themes, didn't he?

A    Yeah.  I mean, you're missing the point, but yes.

Q    Okay.  And wouldn't you then say that there was consistency in Mr. Shaw's strategy between guilt phase and penalty phase, that those --

A    No.

Q    -- same themes were stressed over and over?

A    No, I wouldn't say that at all because what you are failing to understand and what was so crystal clear to me through my discussions with Charlie is that Charlie believed he could have Norris convicted of the robbery, found not guilty of the murder, and we would never have a penalty phase. That was Charlie's strategy.  That's what he intended to do throughout the trial.  That's what he argued in the guilt

phase closing argument.  That's what he argued in these motions for judgment of acquittal.  That's what he believed, intended, and strategized to do up until the moment of the jury instruction conference.

Q    Okay.  Now that you've answered your question --

A    And I think that's what you're missing.

Q    -- would you answer mine?

A    Well, that's what I tried to do.

Q    During the guilt phase and the penalty phase, did Mr. Shaw -- did he or did he not stress consistent themes of Norris Holder did not shoot Mr. Heflin, did not fire his gun in the bank, and did not intend to harm anyone?

MR. MCGRAUGH:  Your Honor, that's a different question than what he had asked before.

MR. HOLTSHOUSER:  I think it's the same question.

THE COURT:  Well, I was forced to shut down my computer.  It was some automation problem.

MR. HOLTSHOUSER:  Judge, whether it was the same or not, that is the question I'm asking.

THE COURT:  All right.  Very well.

A    Okay.  I can -- can -- did he not stress those themes is what your question is?

Q    (By Mr. Holtshouser) Yes.

A    He stated those facts at every occasion that he could because he believed --

Q    Consistently?

A    -- he believed that would -- yes, consistently, because he believed Norris would, therefore, be found not guilty of murder.

Q    And that is not the question I'm asking you.  Did he or did he not consistently stress those themes?

A    I already told you yes.

Q    Okay.  Now, you gave us some testimony referencing the Eighth Circuit Model Instructions.

A    Yes.

Q    Are you even sure that Eighth Circuit Model death penalty instructions existed at the time Holder and Allen were tried?

A    No.

Q    And weren't the Eighth Circuit Model Instructions, in fact, developed after these two trials, in large part based on the jury instructions given by Judge Webber in these trials?

A    Weren't -- I don't know the answer to that.  I was thinking these were proposed at that time.  I may be wrong.

Q    You're not sure, are you?

A    I may be wrong.  I was thinking these were the proposed Eighth Circuit Model Instructions.

Q    Now, you mentioned that it was always Mr. Shaw's misunderstanding or claim that there had to be intent to kill in order to be convicted of this crime, correct?

A    Right.

Q    And that that was one of the issues that he preserved in filing his motions for acquittal at the close of all the evidence, is that right?

A    That's what the -- that's what the motion says.

Q    Okay.  And in terms of something worth mentioning in the penalty phase, we just saw that in your opening statement, you thought it worth mentioning to the Jury that he was not the kind of person who had -- who intended to kill anyone, correct?

A    Yes.

Q    The memorandum of law that you submitted in support of the proposed jury instructions -- do you recall that?

A    Yes.

Q    I've got the original here.  Your testimony was that it was you and Mr. Burr who prepared this, even though it's you and Mr. Shaw who signed it and submitted it to the Court, correct?

A    That's the truth, yes.

Q    Okay.  And is the argument being presented by you and Mr. Burr, signed by Mr. Shaw, the question of whether -- what mens rea element there is with respect to the killing in addition to the mens rea with respect to the robbery?  Correct?

A    Right.

Q    All right.  And just so we're clear, the decision of what

to say in opening statement, the decision of what themes to stress during the guilt phase, the decision to call Norris Holder to testify as a witness -- all of those things took place before this memorandum was filed and before the Court had a jury instruction conference with you, correct?  It's a simple question about the order of things.  Did those things happen before Judge Webber determined what instruction would be given to the Jury?

A    If you just tell me the date of service -- I mean, you know, this could have been filed anytime.  I think the answer to your question is yes.

Q    March 26th, 1998, it was filed.

A    Yes.  Then the answer would be yes.

Q    And it may not have been actually ruled on by Judge Webber and considered by him until some days later as well, correct?

A    I think we were doing pretty much everything like the day it happened, but it would have been right around the same time.

Q    Okay.  So those decisions of what themes to stress in opening and what decisions to take during the guilt phase were -- had to be made prior to a final ruling by Judge Webber on -- on this issue, correct?

A    Well, the answer to your question is -- I have a problem. I really can't answer your question very well.

Q   Okay.

A   The answer to your question --

Q   I'm not going to make you answer it then, okay?

A   Okay.

Q   Turning your direction to the bottom on the second page, the argument put forward by you is that the Eighth Circuit treats a killing in the commission of a bank robbery as a murder.  "In the only Eighth Circuit decision we have found that reveals the court's view on this question, U.S. versus Delay" -- which is a '74 case, long before this case was tried -- "the court, without hesitation or question, characterized the offense as murder and discussed the need for the Government to show that the Defendant had a specific intent to kill."

A   Right.

Q   All right.  That is the argument being put forth by you, correct?

A   Correct.

Q   Now, you wouldn't put forth an argument to the Court in this motion that you didn't believe was accurate, correct?

A   Right.

Q   And you believed that this, in fact, was a correct statement of the law?

A   Well, I mean, the -- yes, I did.  I didn't think we were going to get the requested instruction, but I believed in our

argument, yes.

Q    And that there was a case, United States versus Delay, from the Eighth Circuit, the circuit in which the case was being tried, which supported that legal position?

A    Right, yes.

Q    And on the next page, you quoted passages from that case which referenced a specific intent to commit murder --

A    Right.

Q    -- in connection with a 2113(e) offense, which is a killing in the course of a bank robbery, correct?

A    Right, uh-huh.

Q    And then you also cited a Ninth Circuit case, U.S. versus Jones, which stated that the Defendant must have knowledge -- an aider and abetter must have knowledge that the principal intended acts that could result in killing as part of an attempt to avoid apprehension for the robbery or larceny, correct?

A    That's United States versus Lewis, but you're right about the language.

Q    You're correct.  And on the next page, did you also quote another passage from another case that argued that a deliberate attempt to inflict bodily harm or injury should be an element?

A    Could you highlight it real quick?  Oh, okay, okay.

Q    You have "deliberate" underlined in your quotation.

A    Okay.  Right.

Q    So would it be fair to say that in making this motion, you were taking a position before the Court that in order to be convicted of a capital offense of a killing in the course of a bank robbery, the Government must prove that a murder was committed?

A    That was the position I was taking, yes.

Q    Ultimately, in ruling on this, the Court, in effect, granted your motion in part and denied it in part, correct, because it modified and added the mens rea element that we saw earlier in the instructions?

A    You know, it's my recollection that the Government came in with a modified instruction and said, "Judge" -- that's my recollection, that you guys had come in and said, "This is how we're going to modify it," and it didn't go -- it didn't do what we wanted it to do, but it was a little bit better than the original instruction.  So I think instead of the Judge -- I think he overruled our instruction and approved your instruction as modified.  That's my recollection.

Q    And that's how we ended up in the instructions with this language right here, correct?

A    That's what I remember.

Q    That the Defendant had been aware of a serious risk of death attending his conduct?

A    I think so.

Q    Okay.  As based on the memorandum that you filed, which was at least supported by case law which you believed stood for the proposition that a murder had to be proved?

A    Right.  I mean, this -- this third element here that you're showing me does not comply with what we requested.

Q    Not completely, but it came in as a result of your memo?

A    I don't know why you changed it.  I hope so, that that's why.

Q    And Mr. Shaw's -- this memorandum -- strike that.  Mr. Shaw's motions for judgment of acquittal that Mr. McGraugh showed you a few moments ago were, in fact, consistent with the memorandum that you prepared in terms of the assertion that a murder had to be proved in order to be guilty of the capital offense in Count I?

A    That's right.  Well, you know, I guess I take that back because in Exhibits 4 and 5, he refers to Count II and not Count I.  So I'm not sure if I answered your question right or not.

Q    Doesn't one pertain to Count I and one pertain to Count II?

        MR. MCGRAUGH:  No.  They're both Count II.

        MR. HOLTSHOUSER:  Okay.

A    Yeah.

Q    (By Mr. Holtshouser) Clearly, within Count -- the language itself of the crime in Count II, the word "murder"

appears in the statute, correct?

A    Yes.

Q    As reflected in this element here that the killing of Richard Heflin was murder in the perpetration of a robbery?

A    You're right, right.

Q    And murder is further defined in the next paragraph?

A    Right.

Q    And was your testimony on redirect examination that Mr. Holder had admitted each of the elements of the capital offenses in Counts I and II during his testimony, is that right?

A    Yes.

Q    And is it your belief that Mr. Holder admitted that the killing of Mr. Heflin was done with malice because he was aware of the serious risk of death attending his conduct?  Did Mr. Holder admit that he was aware of a serious risk of death attending his conduct?

A    No.  I -- I think what I'm referring to is that he admitted four, the killing of Richard Heflin was murder in the perpetration of robbery.  I don't remember going any further than that.

Q    Did Mr. Holder admit that he was aware of a serious risk of death attending his conduct?

A    Umm, I can't answer it any other way than I've answered it the other six times you've asked me.  Yes, I believe he

did.

Q    And whether or not you're correct would, of course, be borne out by the transcript of Mr. Holder's testimony, correct?

A    Right.

Q    And was it not Mr. Holder's intention -- strike that. Was it not -- the content of Mr. Holder's testimony -- an attempt to convince the Jury that he did not know that Mr. Heflin was going to be harmed and that, in fact, his belief was exactly to the contrary, that he did not -- in fact, believed that Mr. Holder would not be harmed and that no one would be harmed?

A    The stated purpose by Charlie of Mr. Holder's testimony was -- was that, was that he --

Q    And did Mr. Holder, in fact, deviate from that?  Did he ever admit, "Yes, you know what, I did, in fact, know that Mr. Heflin was going to be shot and killed when we went in the bank.  I did, in fact, know that he was going to be shot at"?

A    No.  I mean, there's no question of intent here.  The question is was there a grave risk.

Q    But Mr. Holder consistently denied and maintained throughout the trial that he did not intend that result?

A    Absolutely.

Q    And was not aware that that result was going to happen?

A    Absolutely.

Q    The letter, the May '97 letter that you saw here --

directing your attention to the bottom of the first page --

A    Okay.

Q    -- it begins, "Mr. Holder has had significant events in

his life, in this life which should be considered as

mitigation requiring a sentence of life imprisonment should a

conviction or plea agreement be reached.  He comes from a

dysfunctional family, which resulted in his moving from

various schools.  Mother and father have been separated for

several years, and even before separating, the father would

spend little time at home."  That's not a template, is it?

A    No.  I mean, those things were true specific to

Mr. Holder.

Q    And that's not a template?

A    No.

Q    The next paragraph, "Mr. Holder has been adversely

affected as a result of being run over by a Burlington

Northern train when he was 14 years old" -- certainly, that's

not a template?

A    No.

Q    The next paragraph references his lack of a significant

criminal history, and then, "To our knowledge," it goes on to

specify details of knowledge that they have concerning the

extent of Mr. Holder's criminal conduct.  That is not a

template, is it?

A      You're right.  It's not.

Q      The discussion of the difference between the law in state court regarding capital offenses involving robbery, whether or not they can be based on felony murder -- that is not a template either, is it?

A      I wouldn't think so because every state would be different, so I wouldn't think so.

Q      And the suggestion here that -- first of all, regardless of whether Mr. Shaw wrote this -- I realize you don't know whether he did; you don't know whether he -- the content of this paragraph seems to acknowledge that federal law may be more liberal than state law in terms of permitting a capital offense based on felony murder; would you agree with that?

MR. MCGRAUGH:  Your Honor, I'm going to object as it speaks for itself.  As to what -- how she interprets it is not relevant.

MR. HOLTSHOUSER:  Judge, all I'm attempting to do here is lay a foundation for the next question to compare/contrast this with the instructions and the memos that were filed subsequently.

THE COURT:  Okay.  Overruled.

A      Well --

Q      (By Mr. Holtshouser) Do you want me to repeat the question, or do you remember it?

A      No.  I remember it.  That's fine.  You know, it said,

"It's significant to note that in state court he couldn't get the death penalty."  It doesn't go on to say or doesn't anywhere say "unlike in federal court".  I mean, maybe it's just saying --

Q    You are correct.

A    -- "Look, he couldn't get it in state court, so he shouldn't be able to get it in federal court either."  I don't know because I had no part in this.

Q    All right.  But the point being made here that there may be a difference, that state court law may be one thing and we are now in federal court -- at least as a point was -- in your memorandum of law that you filed in support of the jury instruction request, the point you were making in that motion, in that memorandum, was that the law for this offense should require more than simply felony murder circumstances, correct?

A    It's correct that that's the point I was making in my memorandum, yes.

Q    It should require proof of specific intent to kill, proof of a murder separate and apart from the intent to commit the robbery?

A    That was the point of the memorandum, yes.

Q    And you did not -- you did not recall seeing this letter before yesterday, is that correct?

A    You know, no.  I had that, and I'm sure that came from my file.  I think that came from my file because I think I've

seen that before yesterday.

Q    But it was specifically brought to your attention yesterday by Mr. McGraugh and Mr. Gorla?

A    They asked me if I'd seen it before.

Q    Okay.  And do you know whether that was before or after Ms. Tatelli had testified?

A    Like I told you before, it was in the -- it was during the break in her testimony.

Q    And in connection with preparing for either the deposition or preparing for your testimony yesterday and today, had it been shown to you before that instance?

A    No.  The only time either Chris or Mike showed it to me was the time I told you about in the attorney room at the recess in Caryn's testimony.

Q    And as a lawyer, what is your understanding of the purpose of having the exclusion of witnesses?

A    So that I don't model my testimony after what someone else says.

Q    Is it also so that a witness does not see what is presented for cross-examination of another witness before they are, in fact, cross-examined?

A    No.  I mean, that was something that was in my file.  I wouldn't think -- I don't think there was anything devious about that.  It was in my file.  They wanted to know if I'd seen it before.

Q    I didn't ask you if there was anything devious.  I'm asking you about the purpose of exclusion of witnesses.

A    I wouldn't think that that would go to the purpose of exclusion of witnesses.  If it was something that was in my file, I wouldn't think that that would have anything to do with it.

MR. HOLTSHOUSER:  That's all the questions I have, Your Honor.

MR. MCGRAUGH:  Just briefly, Your Honor.

THE COURT:  All right.

FURTHER DIRECT EXAMINATION

BY MR. MCGRAUGH:

Q    At the May 1998 meeting, Ms. Herndon, were you critical of yourself as well as of the actions of Mr. Shaw?

A    Yes.

Q    There was a lot of discussion here with your memorandum related to the proposed jury instructions.  Did you know what the status of the law was as to specific intent prior to filing that memorandum?

A    Yes.

Q    And what you were asking the Court to do was to change the law as it pertains to whether a specific intent was required?

A    Yes, because there was -- they -- the Government responded.  I mean, there's a lot of case law that is against

us in that area.  So I've been shown the memo we prepared, but there's a lot of case law against us.

Q    And you actually raised this on appeal --

A    Yes.

Q    -- this very issue?

A    Yes.

Q    And, actually, the Eighth Circuit affirmed these instructions?

A    Right.

Q    And I believe your earlier testimony was that Mr. Shaw had no idea that you were actually challenging these instructions?

A    That's correct.  He --

MR. HOLTSHOUSER:  Judge, I'm going to object to what he knew or didn't know.  His signature is on this document that was filed with the Court.

THE COURT:  Sustained.

Q    (By Mr. McGraugh) Did Mr. Shaw know prior to you actually filing the document that you were challenging the instructions?

A    I had never talked with him about it, and he had no involvement in preparing the memorandum.  He had never mentioned it to me.

Q    Okay.  And had he even read the memorandum before he signed it?

A    No.  As I said, I presented the last page to him, told him what it was.  By that time, he was in tune with it because he had realized his misunderstanding of the instructions.  So he was a little more in tune with what we were doing at that point.

Q    Okay.  And so as far as your proposed memorandum to change the status of the law as it applies to these instructions, did it inform your strategy or inform Mr. Shaw's strategy in the opening statement?

A    No.  It wasn't an issue at that -- I mean, I hadn't brought it to his attention.  I don't even know if Dick had brought it to my attention at that point.

Q    Okay.  Did it inform Mr. Shaw's decision in the closing argument?

A    No.

Q    Did it inform his decision in putting Mr. Holder on the witness stand?

A    No.

Q    When you were asked about the May '97 letter from Shaw to Mr. Landolt, you were asked whether portions of it were a template.  Can you explain to the Court what the template or these type of form letters generally do in relationship to helping a lawyer put together --

         MR. HOLTSHOUSER:  Judge, I would object to the characterization of "these type of form letters".  There's

been no testimony that this is, in fact, a form letter.

THE COURT: Sustained. Sustained. If the question assumes that this is a form letter, sustained.

MR. MCGRAUGH: Yeah. Okay.

Q   (By Mr. McGraugh) As to Exhibit Q here, you've had the opportunity to look at Q, is that right, which is the May 1997 letter?

A   Yes, yes.

Q   Okay. And after you reviewed it, does it appear consistent with other template or form letters that you saw at Capital Resource Center?

A   It is consistent. Again, I don't know whether it is or not. It's just consistent. What caught my eye was the citation to Rule 11(e)(6) and Rule 410, and then the citation to the U.S. Attorney manuals caught my attention because those rules are contained in some of the template letters that I've seen. I don't know whether there is a template or not. That's just -- the only reason I said that is because it was consistent with what I'd seen.

Q   Okay. And, generally, are those other letters people had filed so that you can kind of follow along and know what kind of substance to put in?

A   Right.

Q   And that's what you meant by template or form?

A   Right. Just to give an example, something you can model

after if you've never done it before or if you want some new ideas.

MR. MCGRAUGH:  That's all I have, Your Honor.

MR. HOLTSHOUSER:  Nothing further, Your Honor.

THE COURT:  You may step down, and thank you, Ms. Herndon, for your patience and for your time.

THE WITNESS:  Thank you, Judge.

THE COURT:  Maybe take an early break for lunch?  What do you think?  What's your view?  I mean, we'll do it however you want to do it.  Well, you had a witness that needed to be on.

MR. MCGRAUGH:  Could I check with him to see --

THE COURT:  Sure.

MR. MCGRAUGH:  He was going to have to make -- I think he's going to have to make different travel arrangements.

THE WITNESS:  He's changed it to 3:00.

THE COURT:  Well, why don't we go ahead and take a brief break.

MR. MCGRAUGH:  Take a break now and --

THE COURT:  No.  Maybe we better put him on.  What do you think?  Is there any objection to that?

MR. HOLTSHOUSER:  I think -- Judge, just, I think, if we got started and made some headway into him, at least we'd be that much farther along for the afternoon.

127

THE COURT:  Okay.  Well --

MR. HOLTSHOUSER:  That's up to you.  It's your courtroom.

THE COURT:  No.  It's --

MR. MCGRAUGH:  You want to take just a short break before we --

THE COURT:  Okay.  Okay.

MR. MCGRAUGH:  -- before we start with Mr. Burr, and then we can --

THE COURT:  You think like a 15 -- you're talking about a 15-minute break?

MR. MCGRAUGH:  Ten minutes or so?

THE COURT:  All right.  Yeah, we'll take a 15-minute break, do Burr, and then take lunch.  How's that?

MR. GORLA:  Sounds good, Judge.

THE COURT:  Is that all right with everybody?

MR. HOLTSHOUSER:  Yeah.

MR. MCGRAUGH:  Yes.

THE COURT:  Okay.  That's what we'll do.  Court's in recess for 15 minutes.

     (COURT RECESSED FROM 11:39 A.M. UNTIL 11:57 A.M.)

MR. MCGRAUGH:  I call Richard Burr.

THE COURT:  Come over, sir, and raise your right hand.

MR. MCGRAUGH:  Judge, just as a matter of

housecleaning, I'll offer Exhibits 4 and 5, which are part of the court file, the motions for acquittal at the close of the Government's case and the motion for acquittal at the close of all the evidence, and Exhibit 3, which is not part of the court file but was identified during Ms. Herndon's testimony as to Defendant Holder's motion for leave of court to join in the motion previously filed by Defendant Allen.

THE COURT:  Okay.  Now, it's a motion to join Defendant Allen in the Court of Appeals?

MR. MCGRAUGH:  No.  It's the -- it was a motion prepared by Ms. Herndon but not signed nor filed.

THE COURT:  Oh, okay.  Yeah, I remember now.  Okay.

MR. MCGRAUGH:  And I think she testified, identified it yesterday.

THE COURT:  Right.

MR. MCGRAUGH:  And it was entered or offered yesterday or at least testified to yesterday.  And then the motion for acquittal of both the --

THE COURT:  Right, I have those.  I have 4 and 5 received, and #3 will be received.

MR. MCGRAUGH:  And then Exhibit 2, which is the letter Ms. Herndon received, February 9th, '98, from Kevin McNally, that she identified.

MR. HOLTSHOUSER:  No objection.

THE COURT:  Received.  How is McNally spelled?

MR. MCGRAUGH:  M-C-N-A-L-L-Y.

THE COURT:  Thank you.  Received.  That's #2.

You may inquire.

MR. MCGRAUGH:  Thank you, Your Honor.

**RICHARD BURR**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

FOLLOWS:

DIRECT EXAMINATION

BY MR. MCGRAUGH:

Q    Would you please state your name for the Court?

A    Yes.  It's Richard Burr, B-U-R-R.

Q    Mr. Burr, how are you employed?

A    I'm an attorney.

Q    Okay.  And are you -- what are your job duties as an attorney?  What kind of law do you practice?

A    I'm in a private practice, have been since 1996 or, actually, '95.  I'm sorry.  And I -- for much longer than that, I've devoted all of my work to defending people in capital cases, both in the state and federal courts.

Q    Okay.  And how long have you done that?

A    I first became involved in death penalty defense work in 1979 when I worked with a group called Southern Prisoners Defense Committee.  I was based in Nashville, Tennessee, at the time.

Q    Okay.  And have you been involved in the defense of

130

capital crimes since 19 -- I'm sorry.  What?

A    '79.

Q    '79?

A    Yeah.  By 1981, that's all I did.  I had a mix between '79 and '81 of death penalty defense and prisoners' rights litigation, but after '81, I've done nothing but death penalty defense related work.

Q    Okay.  And have you handled cases at the trial level, capital cases at the trial level?

A    Yes, but although more of my work has been in habeas -- state and federal habeas cases, but I've handled some cases at the trial level in both state and federal court.

Q    Okay.  And, obviously, have handled some cases at the appellate level as well?

A    Yes.

Q    Okay.  Both in state and federal court?

A    Yes.

Q    Can you estimate about how many cases that you've represented capital defendants at the trial level?

A    Trial level, including cases in the federal system that were not authorized, eventually a dozen.

Q    Okay.  And approximately how -- how many cases have you handled at the appellate level both in state and federal court?

A    Well over a hundred, probably getting close to 200 by

now.

Q    Okay.  Are you associated with the Death Penalty Resource Center?

A    Actually, it's called Federal Death Penalty Resource Counsel.  It's a project funded through the Administrative Office of the U.S. Courts, the Defender Services Division, and, yes, I am a part of that project.

Q    How long have you been a part of that project?

A    Since September of 1997.

Q    And can you tell the Court what that project does?

A    Yes.  We are funded through the Defender Services now Office, Office of Defender Services, to provide consulting and assistance to defense counsel in federal capital prosecutions. We do a whole range of consulting from initially contacting federal defenders actually when cases arise, often become involved in the process of the federal defender recommending counsel to be appointed by the court, and then offer assistance to defense counsel from that point forward through the entire case in the trial court.  We do limited some work but less involvement in direct appeals and in 2255 proceedings.

Q    And what is actually the purpose of the Resource Counsel's involvement in cases, particularly at the trial level?

A    Our effort is to try to enhance the ability of trial

counsel to provide effective assistance.

Q    Is the -- are there resources offered to -- to permit lawyers in certain jurisdictions to know what's happening in other jurisdictions as to current legal issues that are being raised?

A    Yeah.  We do that in a number of ways that have evolved over the years.  We have, for a long time, including the time of this trial, developed manuals, in essence, manuals for litigating and defending federal capital cases.  They've gone through many evolutions, but we have had a, you know, basic fairly extensive manual that covered the entire trial process from a defense perspective, including pleadings and strategy and memos and briefs from cases that were on direct appeal and analyses of issues, a lot of effort about trying to help counsel find effective resources, investigators, mitigation specialists, and experts, and all of that has been available since before I was a part of this project.  The project started in 1991 or '2, and I joined it in 1997.

We now -- you know, over time, we have had, for a long time, an annual what we used to call strategy session.  It's moved to now being a two-and-a-half-day seminar, once a year, focused entirely on federal death penalty defense.  Since 1998 or '9, we have had a website focused on federal capital defense called capdefnet.org, part of which is public and part of which is not.  Those are -- you know, and then we do lots

of one-on-one, one-on-one consulting with counsel.

Q    Okay.  You yourself attend these strategy sessions or seminars?

A    Yes, I help.  I help put them on.

Q    Do you actually instruct at these seminars?

A    Yes.

Q    And have you instructed at other seminars related to death penalty litigation?

A    I have.  Since -- probably since, oh, the early to mid eighties, I have spoken regularly at a number of capital defense seminars across the country, some, you know, local or regional, some statewide, some with a more national perspective, but have probably taught at well over 100, maybe close to 200 of those over the last 20 odd years.

Q    Is there a recognized standard for the representation of capital defendants at trial and appellate level?

A    Yes, there is.

        MR. HOLTSHOUSER:  Judge, I'm going to object to the question unless we have some time frame specified.  This trial occurred in March of '98.

        THE COURT:  Okay.  Sustained.

Q    (By Mr. McGraugh) From March of 1998 to present, is there a recognized standard for the representation of capital defendants at trial and appellate level?

        MR. HOLTSHOUSER:  Judge, same objection.  Anything

134

after March of 1998 would be irrelevant.  The standard is evaluating what counsel knew or should have known in March of '98.

THE COURT:  Sustained.

Q    (By Mr. McGraugh) As of March of 1998, was there a standard as it relates to the representation of capital defendants at trial and appellate level?

A    Yes.

Q    And what is that standard?

A    It -- it involves several components.  The first is standards that were promulgated by the American Bar Association in 1989 related to the performance of the defense in capital cases.  Those were the closest thing there were to black letter standards in 1998.  In a U.S. Supreme Court case called Wiggins versus Smith in 2003, the court recognized that those standards had -- had set the standards for -- for practice and, in effect, were the standards for effective practice in death penalty defense from the time they were promulgated until the time the court decided Wiggins.  At about the same time the court decided Wiggins, the ABA updated the standards, again, in 2003, and in a case decided in either 2004 or early 2005 called Florida versus Nixon, the Supreme Court held that those standards were consistent with and seamless with the 1989 standards, and in fact, the standards were not materially different though amplified in 2003.  So

it's the black letter standards with the imprimatur of the U.S. Supreme Court.

Q    Okay.  I want to ask you questions as it relates to your involvement in the Norris Holder case.  Okay.  When did you become involved with this case, the Norris Holder -- U.S. versus Norris Holder?

A    In the first half of October of 1997.

Q    And how did you become involved?

A    I -- my initial involvement was to learn from one of my colleagues in the Federal Death Penalty Resource Counsel Project, David Bruck, who had had some limited contact with Charles Shaw.  David Bruck asked me to take on the consulting role in the case, briefed me on what he knew about the case, and then I contacted Mr. Shaw.  The initial contact was, as I recall, about helping Mr. Shaw move from having been retained by the family, when the money had run out, to becoming appointed counsel.

Q    And can you describe what your initial contacts with Mr. Shaw were?

A    I -- I think my initial contact was actually a fax to him.  I believe I had tried to call him and had not heard back from him.  Sometime in the first half of October of 1997, I faxed him a note introducing myself and offering to help make the transition, to help him make the transition to appointed counsel, and he thereafter responded, and we had some -- I

think some telephone conversations and fax or email or fax correspondence about it.

Q    Were any --

A    I should -- I should back up.  Before I became a part of the project, Kevin McNally had sent what we call an opening letter to Mr. Shaw when we -- the project first learned about the case.  I believe that letter went to Mr. Shaw in April of 1997.  That introduced the work of the project, the assistance we could provide, the resources that we could offer.

Q    Let me hand you what's been marked Exhibit 6 and ask you to identify it for me.

A    Yeah.  This is the letter I just mentioned from Kevin McNally.  Again, this predated my involvement in Federal Death Penalty Resource Counsel, but it's dated April 14th, 1997, a letter from Kevin McNally to Charles Shaw, doing exactly what I just said, explaining what our project did and what we offered in assistance.

Q    Did it provide anything at that time to Mr. Shaw?

A    I don't think it -- well, I think it simply said we have available a variety of materials.  I don't think it enclosed any materials, but I may be wrong about that.

    Oh, no.  It does.  It says, "Enclosed you will find the highly confidential packet of correspondence from previous federal death penalty cases as well as a mitigation workbook for your perusal."  The correspondence that was sent during

that time was a compendium of letters written to the Department of Justice or the U.S. Attorney in other cases arguing why the cases should not be authorized as death cases. That was a part of our initial material sent to people at that time.

Q   Now, was there any follow-up between that letter and your initial contact with Mr. Shaw in October of '97?

A   I believe that David Bruck had had some limited contact with Mr. Shaw or at least attempted to have that, but I don't think he had actually talked with Mr. Shaw.

Q   And did -- prior to you -- your direct involvement with Mr. Shaw, did you try to learn about the case and, you know, what the status was?

A   I did.  I talked to David Bruck and gleaned whatever he knew, and then I think, if I am recalling this correctly, most of his knowledge came from Rick Sindel, who was representing Billie Allen, and Rick has been a person that had worked readily in consultation with our project for a number -- on a number of cases before I ever became involved in it, and Rick really was more of a source of information about the Holder case than Charlie Shaw was up to that point.

Q   What kind of things did you learn before your initial contact with Mr. Shaw?

MR. HOLTSHOUSER:  Judge, I'm going to object.  The question calls, based on the preamble here, for hearsay upon

hearsay from Mr. Sindel to Mr. Bruck to Mr. Burr, and I think it's inappropriate.

MR. MCGRAUGH:  Judge, this would be not used to prove the truth of the matter asserted but only to explain the subsequent actions of Mr. Burr.

THE COURT:  Okay.  Okay.  Overruled.

A    There was a good deal of concern about the case in part because Mr. Shaw had never had much interaction with the project members before me.  I mean, that doesn't necessarily mean there's nothing appropriate going on, but that coupled with Rick Sindel's concern about the case.  Rick had, obviously, had some contact with Mr. Shaw, had seen the filings from Mr. Shaw on behalf of Mr. Holder, had, I think, at the point I became involved, litigated severance.  The Court had granted severance, and that had been without much help from Charlie Shaw.  I think Rick's -- Rick's perception was -- at least as it was passed on to me -- was that Norris Holder was in trouble because nothing seemed to be being done that was visible to defend this case as a death penalty case. It seemed to be being defended as a fairly routine criminal matter.

MR. HOLTSHOUSER:  Judge, I'm going to -- I think that this is clearly being offered for the truth of the matter asserted.  We've had a lengthy preamble here and not any reference to what was done afterwards, and if the Court is

going to accept it, it should be with the clear understanding

that it is not to be considered for the truth of the matters

asserted.

THE COURT: That is true. The only purpose for which

it's being considered is to explain this witness' actions

thereafter and not for the truth of it. That's correct. You

may proceed.

MR. MCGRAUGH: Thank you, Your Honor.

Q   (By Mr. McGraugh) Now, based on that information that you

received, you initiated some contact with Mr. Shaw in October

of '97, is that correct?

A   I did.

Q   And that was more so to get him appointed as a CJA

attorney?

A   Yeah. One of the things that David Bruck knew was that

while Mr. Shaw had been retained, that the retainer was

relatively modest in terms of the funds that are needed for a

capital defense, and there was at least concern that the funds

had been exhausted and maybe that's why not much work was

happening. So my initial entree was to try to be of help to,

you know, come up with a remedy for that problem. It did turn

out that that was a problem, and Mr. Shaw was quite grateful

for the assistance and the guidance I was able to offer in

helping him move from the status of retained counsel to

appointed counsel.

Q    Would the other items that you identified as concerns about the case -- what were -- what was your next action as far as your involvement with Mr. Shaw?

A    My next focus -- and, again, this -- this came from the inherited information about the case through David Bruck.  My next focus was to try to encourage Mr. Shaw to bring a mitigation specialist into the case.  There -- you know, there now would be funds as appointed counsel to pay a mitigation specialist to work.

Q    Did you make a recommendation as to a mitigation specialist?

A    I did.  My initial recommendation was of a woman named Beverly Marchbanks, M-A-R-C-H-B-A-N-K-S, who lived in Missouri and who had a good reputation as a mitigation specialist at that time.

Q    Did you attempt to contact Ms. Marchbanks on behalf of Mr. Shaw to determine her availability?

A    I did.  And initially, when I contacted her, she was quite interested.  On subsequent contact, after Mr. Shaw had indicated some interest in moving forward, I learned that she had taken a job with an agency that precluded her from working as a mitigation specialist anymore, at least in cases where she would be retained.

Q    Why was it important to you to recommend to Mr. Shaw that he retain a mitigation specialist?

A    Well, the core -- and by then, it was as true as it is today.  The core of a capital defense team is counsel, a mitigation specialist, and an investigator.  Those -- the three legs of that stool are essential.  The stool can't stand without it.  Each, you know, quality, learned, knowledgeable counsel, an effective and experienced mitigation specialist, a similar kind of investigator, are critical.  You simply can't -- you can't begin to provide effective representation without those members of the team.

Q    Okay.  And Ms. Marchbanks wasn't available, so what was your next --

A    I offered to Mr. Shaw to try to find somebody else.

Q    Was he open to that?

A    He was.  I don't recall how we communicated.  We must have had some phone calls.  There were some faxes between us, but I think we must have had some phone conversations.  There was no meeting in person, I know, during this period of time, but he seemed -- in some way, he indicated to me to please help him find somebody, and I then recommended two people.  I believe by now we were into November of 1997.  I don't remember exactly when in November, but I found two people that I recommended -- a woman from Chicago named Caryn Tatelli, who was a very well-regarded mitigation specialist there, who had just finished working in a federal death penalty case in Chicago, and a man in Austin, Texas, with whom I'd worked

extensively, named Neal Hartley, and he was also interested and available, and I gave Mr. Shaw the contact information for both of them.

Q    And did you contact both Ms. Tatelli and Mr. Hartley?

A    I did.  I had preliminary conversations with them to be sure they would be able to become involved in the case.  I explained what I knew about the circumstances of the offense and what had been done or not done up to that point and I believed there was a trial date at that point because I -- I didn't want offering them up to be an empty gesture at all.

Q    And that was my next question.  Did you know what the status of the case was as far as its --

A    I'm pretty sure I knew at that point that -- I don't know if the trial date was set.  I think it was.  I know that in later notes that I had about the case, I certainly knew about the trial date being set for early March, late February, early March, and I think I knew that at that time in November, but the reason I remember that is not because I ever saw a scheduling order but because what we were asking the mitigation specialist to do was to get a tremendous amount of work done in a very short period of time.

Q    I'm going to hand you a series of documents which I think coincide with what you've already testified to and ask if you can identify it for me.  First, let me hand you what's been marked Exhibit 7.

A       This is my fax to Charlie Shaw on October 15th, 1997. This was my introduction of myself to Mr. Shaw, mentioning about Beverly Marchbanks and offering assistance.

Q       And let me show you what's been marked Exhibit 8.   I'm sorry.

A       That's okay.  This is the first of a couple of follow-up memos after this initial contact with Mr. Shaw, offering -- providing the assistance and guidance for him in moving from retained to appointed counsel status.

Q       Okay.

A       And it's -- the memo is dated October 15th, 1997, from me to Mr. Shaw.

Q       And then Exhibit 9?

A       Exhibit 9 is a fax to Mr. Shaw on October 16th, including four pages, and it's -- it's -- again, it attaches a memo from me to Mr. Shaw entitled "More on the Crossover of Holder to CJA/848", and it's a two-and-a-half-page memo about, again, that subject of becoming appointed counsel.

Q       And then Exhibit 10?

A       Exhibit 10 is a memo or a fax from me to Mr. Shaw, dated November the 12th, and this was --

        THE COURT:  What was the date again, please?

        THE WITNESS:  November 12th, 1997.

        THE COURT:  Thank you.

A       I had contacted Ms. Marchbanks, the possible mitigation

144

specialist, had learned that she had taken another job, and was offering to help him find another mitigation specialist and also making an offer, I think for the first time, to help him find co-counsel to be appointed under the relevant federal statutes.

Q    (By Mr. McGraugh) And Exhibit 11?

A    This is a fax from me to Mr. Shaw, dated November the 25th, 1997, and this is the way in which I informed Mr. Shaw about the two possible mitigation specialists I had found who were willing to become involved, Caryn Tatelli and Neal Hartley.

Q    Okay.

A    And I think I'd attached their resumes to this as well.

Q    Now, were you later able to discern whether Mr. Shaw actually retained Ms. Tatelli?

A    I did.  I got a telephone call from Ms. Tatelli on -- I believe the date was December the 4th -- saying that she had been called by Mr. Shaw, she was going to be meeting with him the following week, and he wanted to hire her.

Q    Okay.  What was -- did you know Ms. Tatelli prior to this --

A    No, I did not.

Q    -- recommendation?

A    I -- I -- when we -- oftentimes, our members of our project will know of a mitigation specialist or specialists or

investigators or experts in a particular locale, and at this point, I -- I didn't know of anybody available in St. Louis, so I began a search in the Midwest and, through death penalty lawyers in Chicago, learned about -- about Ms. Tatelli.

Q    Now, Ms. Tatelli agreed to assist in this case.  Again, did you advise her with the trial -- with the possible trial date that was going to --

A    My recollection is that I did because I -- I distinctly remember telling her and Neal Hartley that they were going to have to do this case full-time because the amount of work that needed to be done was the amount of work that needs to be done in every case, but there was a very compressed period of time within which to do it.

Q    And was Caryn -- once she was retained, was she able to give you an assessment of what the status of the case was?

A    Yes.  I -- I know that I learned -- I don't know if I learned it all at once from her.  I think she met with Mr. Shaw around the 9th or 10th of December.  I think I heard back from her after that about her assessment of where things were.  I heard from her periodically over the next several weeks about the progress she was making in learning about the case, getting access to files, beginning to -- to develop a list of people to talk with and records that she needed to get.  So I talked with her more frequently than I ordinarily would a mitigation specialist because she needed somebody to

talk to who knew what she was doing and Mr. Shaw did not.

MR. HOLTSHOUSER:   Judge, I'm going to object to the last answer, ask it be stricken.   There's been no evidence to lay a foundation he knew what Mr. Shaw did or didn't know. All his information has come from Ms. Tatelli.   It's all hearsay.

THE COURT:   Okay.   Well, the fact that he talked to her, I'll receive that.   Sustained as to the balance.

Q   (By Mr. McGraugh) The -- you wanted to maintain a contact with Ms. Tatelli so that you could -- to determine what the status of the case was or to have an insight as to what was going on?

A   It was really Ms. Tatelli wanting to maintain a contact with me.   I mean, I -- I -- she knew I was resource counsel in the case, and as resource counsel, I'm available to anybody on the defense team who wants to talk to me.   Primarily, my contact is with counsel.

Q   Uh-huh.

A   Ms. Tatelli called me, initiated calls with me because she needed somebody to talk to about what she was learning.

Q   And did she tell you why she needed to talk to you?

A   She did.

Q   And what did she say?

A   She said that she needed to talk with me because she had had difficulty --

MR. HOLTSHOUSER:  Judge, I'm going to object.  I mean, this calls for hearsay.  Ms. Tatelli testified in this case already.  If he has no firsthand knowledge about his dealings with Mr. Shaw or his representation, I think it's inappropriate.

MR. MCGRAUGH:  Judge, again, this is not -- this is not hearsay because it's not being used to prove the truth of what Ms. Tatelli said to Mr. Burr, but what we're trying to get to is Mr. Burr's progression through this case and his involvement in this case, and without -- knowing what the status and learning what people are telling him, I think it allows the Court to understand how -- why his development grows in the case and why he makes the recommendations that he does in the case, and so, again, it's not being used for the proof of the matter asserted.  It's going to explain why Mr. Burr is doing what he's doing and why his involvement is as it is in the case.

MR. HOLTSHOUSER:  Well, Judge, I think this is merely a bootstrap argument because most of the focus here is on what other people are telling him, not so much on what he's doing in reaction to that.  So, I mean, I think this is simply an excuse and an attempt to try and get in volumes of hearsay where we've already had this witness testify, who is allegedly speaking to him.  You know, her firsthand knowledge is from dealing with Mr. Shaw.  At this point, Mr. Burr does not have

any.

THE COURT:  It's always difficult to separate these issues when that particular justification is made to receive hearsay evidence.  I will receive it, but keep in mind putting in material that seems to be particularly prejudicial will not be considered.  I'll only consider it for -- to explain his behavior and for no other purpose.

MR. MCGRAUGH:  That's fine, Judge.

Q    (By Mr. McGraugh) And so what did Ms. Tatelli tell you?

A    During this period of time -- and, again, it's -- it's in December and going into January of 1998.  She -- as I said, she's talking to me about what she's learning in substance about the case from talking with Mr. Holder, beginning to talk with his mom and other members of the family and acquaintances.  She's beginning to find records about him, and she's, you know, talking with me about that to help strategize how to -- you know, how to analyze it, how to make sense of the information, and where to go to get more information and so on and what resources might possibly be needed in addition to her, and so that -- that in -- that process is how I began to be acquainted with, you know, at least the mitigation-related facts of the case.

Q    Okay.  Now, once receiving that information, what steps did you take or what involvement did you try to proceed into with this case?

A    Well, from -- from relatively early in my involvement in the case, I felt like Mr. Shaw -- well, Mr. Holder was entitled to the appointment of learned counsel under 18 U.S.C. § 3005, and so part of my conversation with Mr. Shaw was -- in the course of moving to appointed status -- was that he not only could get resources for mitigation investigation and experts but could get an experienced death penalty defense lawyer appointed as co-counsel.  So we had been talking about or at least attempting to communicate about that from October through December.

        I had been searching for somebody who was willing to -- to jump into the case, again, in the circumstances that were presented, and as I learned from Caryn Tatelli that the work she was doing was the first work anyone had done in relation to mitigation, I became increasingly convinced that we needed to get somebody in, very experienced, who could essentially drop what they were doing and start working as the death penalty defense lawyer in the case because there wasn't -- my perception was that Mr. Shaw was not playing that role.

        MR. HOLTSHOUSER:  Judge, again, I'm going to move to strike that answer.  I mean, this is -- this is based purely on hearsay.  This is not a statement of what he did in response to information he received.  It's stating a conclusion based solely upon hearsay reports from Ms. Tatelli.

        MR. MCGRAUGH:  Judge, it's not being offered for

150

hearsay, and I think what Mr. Burr just testified to is, "Based on what I was learning, this is why I was acting the way I was acting."  That's exactly what it's being offered for.

MR. HOLTSHOUSER:  Well, Judge, the last answer was a statement of a conclusion of fact that he drew from his conversations with Ms. Tatelli.

THE COURT:  But he said his perception was that he was doing nothing.  So that, I think -- I'll sustain the objection to that.  The balance of what he testified to before, Mr. McGraugh is correct.  It does support the conclusion -- conclusions as to what the witness did.  You may proceed.

MR. MCGRAUGH:  Thank you.

Q   (By Mr. McGraugh) Mr. Burr, you -- so you were able to -- or you felt it was important to find a second counsel for Mr. Shaw?

A   Yes, a second person who met the statutory requirements of being learned counsel.

Q   And so what did you do to go about trying to locate a second counsel for Mr. Shaw?

A   I -- the person I've known the longest in Missouri who's done death penalty defense work and whose judgment I trust is Sean O'Brien in Kansas City.  I called Sean and, you know, talked with him at some length about possible other counsel

who were good death penalty defense lawyers, who might come into the case, and as it turned out, Jennifer Brewer, then Brewer, now Herndon, had just fairly recently left the state public defender office, had done a number of death penalty trials there.  Sean thought very highly of her, and so she became the person I focused on as the candidate for appointment with Mr. Shaw.

Q    So did you attempt to set up a meeting with Mr. Shaw in order to discuss these issues?

A    I did.

Q    Okay.  And -- and how did you go about doing that?

A    I -- I -- I think it was a combination of calling and trying to talk with him and sending faxes when he didn't call me back.

Q    And what did you -- so he did not return your phone calls or get back with you?

A    It was difficult to get a call returned by Mr. Shaw.

Q    Okay.  And so what did you do in light of him not returning your phone calls?

A    At some point -- and, again, I believe this was in December, mid December of 1997 -- I contacted Kevin Curran in the Federal Defender's Office because, as I think the Court is well aware, the Federal Defender, under 18 U.S.C. § 3005, has a formal role in recommending the appointment of learned counsel in a federal death penalty case.  So I contacted Kevin

Curran, who was somebody I knew and who was assistant in the Federal Defender's Office, talked with him a bit about it, and he facilitated my contact with Norm London.  I then wrote a long letter to Norm London outlining where things were on the basis of what I knew then and asking for Norm's help in talking with Charlie Shaw and seeing if he would be open to the appointment of Jennifer Brewer as co-counsel.

MR. HOLTSHOUSER:  May we approach?

THE COURT:  Sure.

(A BENCH CONFERENCE WAS HELD ON THE RECORD AS FOLLOWS:)

MR. HOLTSHOUSER:  I believe that the next exhibit that Mr. McGraugh wants to show the witness is a letter from him to Mr. London, dated December 12th, 1997.  It is our position that this letter is hearsay and is irrelevant to the case.  It contains -- it contains many of the same assertions of fact that are based, again, on hearsay.  He's communicating to Mr. London, all leading up to obtaining their assistance in arranging a meeting between Jennifer Brewer and Mr. Shaw.  I think this is entirely unnecessary to -- to bring that to -- to establish that fact that that meeting took place and that they played that role in facilitating it, and beyond that, again, it's just further repetition of the hearsay information that he'd been receiving.

MR. MCGRAUGH:  Judge, again, this is not hearsay, and he's going to testify as to a letter that -- that he -- that

he wrote.  He can be cross-examined as to the letter that he wrote.

As to whether the contents of the letter, in and of itself, constitute hearsay, again, Judge, this -- and I'm entitled to corroborate by way of the record what steps he took, and what the intention of the letter is is to corroborate his testimony that he contacted Curran and Norm London to solicit their assistance in trying to get a way in to talk to Mr. Shaw to solicit his advice.  Now, you know, Judge, I -- you know, it certainly corroborates his testimony. I'm entitled to put in demonstrative evidence that corroborates his testimony.

To the degree that the letter, in itself, has hearsay that is contained within it, I'm not offering it to prove that those statements are true.  It's for you to determine, Judge, what's true and what's not true.  If it were a jury here, potentially, I could see -- you know, I could see this, but, you know, the Court has the ability to discern from -- from -- you know, what's hearsay testimony and what's not hearsay testimony and give what weight, if any, you want to give to it, but it certainly corroborates what his actions are and why he's taken the steps that he has, and that's important for you to know, Judge, and again, it corroborates his testimony.  It establishes credibility.

MR. HOLTSHOUSER:  Well, Judge, there is no

corroboration exception to the hearsay rule that I'm aware of. This letter is hearsay. This is Mr. Burr's written communications to Mr. Norm London, which further contain representations in here about his conversations with Caryn Tatelli, certain conclusions and opinions that he has drawn about Mr. Shaw. There is a reference here to a strategy for shoehorning another attorney into the defense team. There's talk here about the fact that Mr. Shaw was originally retained is a counsel problem. There's some discussion of Ms. Brewer. There's paragraphs about some wrinkles in the case, about what Mr. Shaw allegedly knew or didn't know. I mean, all of this is hearsay. If we were challenging his communication that he asked Mr. London for help to arrange this as a recent fabrication, I think that then he might be able in rebuttal or in redirect to bring this letter out to prove that, in fact, there had been such a request. To simply corroborate the hearsay assertions in here that have already only been received for the purpose of showing what Mr. Burr subsequently did, I think, is inappropriate, and this letter is inadmissible.

MR. MCGRAUGH: Judge, I'm sorry. Can I just respond briefly, Judge?

THE COURT: Yeah.

MR. MCGRAUGH: Judge, it's not hearsay because it's not being used to prove that everything in the letter is true.

What it's being used to prove is -- is that this is what he knew or what he believed.  This is the actions that he took, and -- and -- and it -- it explains why and to what degree he is pressing for this meeting, and also, Judge, it's relevant as it corroborates his testimony, and so, you know --

MR. HOLTSHOUSER:  But there's been no challenge or contest as to why he did what he did.

THE COURT:  Wait, wait, wait, wait.  I've heard -- first of all, it is an out-of-court statement.  The issue is whether or not it's offered for the truth of it.  The -- clearly, parts of it would be hearsay.  The witness is on the stand.  He can testify as to what he did and his reasons for doing that, and so there's no need for the letter to -- to explain what he did.  There has been a long foundation laid as to why he has taken the actions he took.  I will receive it into the legal file, but I'll not consider it for the purposes of corroboration.  I don't think -- I agree with Mr. Holtshouser; I don't think that that's necessary.  There's been nothing to suggest that he's being untruthful.  The point is he contacted Mr. Curran.  As a result of that, he was in contact with Mr. London, and the reason is that he tried to get a mitigation lawyer into the case as soon as possible.  Is there anything else in the letter that I don't already know that you think is relevant other than statements about Ms. Tatelli or Ms. Brewer?

MR. MCGRAUGH:  I'd like to -- I'd like to examine the witness as to why -- the fact that he wrote it and that -- outlining his concerns.  It outlines his concerns and what his theories are and why he wants -- in here, Judge, is the strategies to have a second lawyer appointed, and I think -- you know, I want to discuss those things.

THE COURT:  I'll allow those questions.  I will receive it into the legal file, but I won't receive it as received in evidence.

MR. HOLTSHOUSER:  Can I just point out that what we're doing here is using hearsay upon hearsay to justify the inclusion.  He's saying that he wants to be able to put the letter in or ask him these questions about why he had these beliefs or opinions about certain things when those things in turn have only been received in evidence for purposes of showing what he subsequently did.  His only basis for those opinions is going to be hearsay information from Ms. Tatelli because, as he's indicated, he's not having much contact with Mr. Shaw.

THE COURT:  Well, let me hear the questions.

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.)

THE COURT:  That's #12?

MR. HOLTSHOUSER:  Did you mark it 12?

MR. MCGRAUGH:  12.

THE COURT:  And it is a letter from Mr. Burr to

Mr. London, correct?

MR. MCGRAUGH:  That's correct, Your Honor.

THE COURT:  And what's the date?

MR. MCGRAUGH:  December 12th, 1997.

THE COURT:  It will be received into the legal file.
You may inquire.

MR. MCGRAUGH:  Thank you, Your Honor.

Q    (By Mr. McGraugh) Can you just identify that letter for us?

A    Yes.  This is a letter from me to Norm London, the Federal Public Defender here in St. Louis, dated December 12th, 1997, asking for his assistance in facilitating with Mr. Shaw, talking with me about getting another lawyer into the case.

Q    Okay.  And without telling us what is said, does it outline your concerns about Mr. Shaw and the status of the case?

A    Yes.

Q    Okay.  And does it also discuss the strategy to have a second counsel hired?

A    It does.

Q    Okay.  And were -- were you concerned at the time, at the time that you wrote the letter, that Mr. Shaw might be resistant to a second counsel in the case?

A    I was.

Q    Okay.  And so does the letter outside -- outline strategies to Mr. London and Mr. Curran as to how a second lawyer could be appointed?

A    Yes.

Q    And that Mr. Shaw would accept?

A    Yes.  Well, hopefully, would accept.

Q    Okay.  What happened after --

A    If I could, I --

Q    Sure.

A    The reason Norm London was the person who -- there were two reasons for it.  He had known Mr. Shaw for a very long time.  I think they -- I don't know if they ever practiced together, but they respected each other, and of course, he was the Federal Public Defender with the statutory obligation to recommend the appointment of learned counsel.

Q    Okay.  And that was part of Mr. London's responsibility as the Federal Public Defender is to recommend learned counsel to the Court for appointment?

A    Yes, under 18 U.S.C. § 3005, which is the provision that requires the appointment of two counsel for indigent capital defendants in federal prosecutions.  It says that at least one of those shall be learned in the law of capital cases, and it requires that the Federal Defender or, in the absence of the Federal Defender, the Administrative Office of the Courts recommend someone for appointment by the federal district

court.

Q    And was -- the intention was to try to solicit Mr. London's help in trying to get a meeting between you -- in part between you and Mr. Shaw?

A    Yeah.  My frustration at this point was I couldn't get Mr. Shaw to communicate with me about it.  I -- my -- my view, based on everything I had learned from my contact with him and -- and with Ms. Tatelli and, indeed, what my project knew about this before I came into the project, was that he needed a learned counsel to work with, and so after we were able to -- to get Ms. -- you know, for him to bring Ms. Tatelli into the case, my next task was to work with -- with him in getting learned counsel in, and I simply wasn't able to communicate with him.  He did not return phone calls or respond in any other fashion.

Q    Okay.  Did that letter have the desired effect?

A    It did.

Q    And can you tell the Judge what happened then?

A    I don't know what Mr. London did because I don't think I ever talked directly to Mr. London about this, but between the time of this letter and the -- well, over the next month, between December the 12th and mid to late January, Mr. Shaw became open to having a learned counsel appointed with him, was ready to have Jennifer Brewer appointed, and I believe that I learned about all of this in a meeting that I had with

Mr. Shaw towards the end of January, which I think Norm London had facilitated.

Q    Okay.  But prior to Ms. Brewer or Herndon getting involved?

A    Yeah.  She was not appointed, my recollection is, until sometime in February, you know, shortly after this meeting.  I think I met with Mr. Shaw around the 25th or 26th of January, and that was the meeting that Norm London had encouraged him to have with me.

Q    Okay.  And at that meeting, can you describe the -- you know, what was discussed and what was the intent of that meeting?

A    My recollection is that the meeting included Ms. Tatelli and me with Mr. Shaw and an associate of his named Brad Dede, and we met in his office for -- off and on for several hours over the course of that day.

Q    All right.  And what, if anything, was discussed at that meeting?

A    Well, I know we talked about bringing Jennifer Brewer into the case.  He was amenable to doing that.  We talked a bit about how to do it, and I gave him all the contact information for Jennifer.  I don't think -- by the time we met, I don't think he had talked with Jennifer.

Q    Okay.  Sometime after that, did Jennifer become appointed in the case, Jennifer Herndon become appointed in the case?

A    Yes.

Q    And once she became appointed, is it customary for the Resource Center to send the materials that would -- the manuals and the other that you discussed?

A    Yes.  As you may remember from the opening letter that Kevin McNally sent, which is Exhibit 6, dated April 14th, 1997, in that letter, Kevin mentions -- he says -- if I can read from it.  Is the letter in evidence or --

MR. MCGRAUGH:  Yeah.  If I didn't offer it, I will.

MR. HOLTSHOUSER:  Yeah.

A    On the second page of the letter, Kevin says, "We have available a three-volume set of materials on defending federal capital prosecutions which we can make available for copying costs only should your case be approved for capital prosecution."  Then he goes on to say, "We have a federal capital motions/briefs file, which includes pleadings on critical issues, and they're available on diskette."  And those materials were never requested by Charles Shaw.  When Jennifer Brewer got in the case, the first thing she asked for was that we provide those materials to her.

Q    (By Mr. McGraugh) Let me show you what's been previously marked as Exhibit 2 and ask you if you can identify that.

A    It's a letter from Kevin McNally to Jennifer Brewer, dated February 9th, 1998, sending on the materials that I've just mentioned to Ms. Brewer.

Q    Okay.  Now, let me hand you what's been marked,
previously marked as 2A.  Can you identify that for the Court?

A    Yeah.  This is the set of diskettes that included mostly
pleadings but some other materials that accompanied the
hardbound volumes of materials that we routinely provided to
counsel --

Q    Are you familiar --

A    -- that Kevin McNally sent with the letter of February
9th, 1998.

Q    Are you familiar with the materials on the diskettes?

A    I was then.  We no longer use these anymore.  We use a
different format, but --

Q    Let me hand you what's been marked Exhibit 2B and ask you
to identify that.

          MR. HOLTSHOUSER:  2 what?

          MR. MCGRAUGH:  2B.

A    This is a motion from another federal death penalty case,
the case of Ted Kaczynski, K-A-C-Z-Y-N-S-K-I.  That has a
pleading from that case, and it was among materials that were
on these diskettes at that time.

Q    (By Mr. McGraugh) Are you familiar with that pleading?

A    I am.  I was -- I provided some resource assistance
during the course of the Kaczynski case as well, and I am
familiar with this pleading.

Q    Did the Kaczynski motion that's marked as 2B raise a

163

challenge against the indictment that it was structurally defective in that it did not include aggravating circumstances?

A    It did.  I don't know -- I'm not sure I can find the page within which it does it, but there was an argument made.  This was prior to -- obviously, prior to Ring versus Arizona, which solidified the issue you're talking about for federal death cases or for death cases, prior to Apprendi versus New Jersey which preceded that and prior to United States versus Jones. That trilogy of cases had not yet been decided by the time this motion was formulated, but the issue was in development as it were.

Q    Is the intention of the Resource Center in providing that documentation to inform attorneys as to legal issues which are percolating around the country?

A    Yeah.  Part of -- part of what we try to do is to stay abreast of evolving legal issues as well as established legal issues but, certainly, try to help people stay ahead of the curve, and if we see issues beginning to develop that seem to have some promise, we do our best to let people know about those because the worst thing that can happen in a death case -- well, one of the worst things that can happen is for an issue to evolve over the course of a case and not to have been preserved in that case, so that if it does evolve in a way that's favorable to capital defendants, that person

Case: 4:03-cv-00923-ERW   Doc. #: 54   Filed: 09/19/05   Page: 164 of 255 PageID #: 668

164

doesn't get the benefit of it.

Q   Okay.  Now, were you aware of motions that had been filed in the Billie Allen case which -- who was the Codefendant to Norris Holder?

A   I wasn't -- I didn't have a detailed awareness of what had been filed.  I knew from talking to David Bruck and Kevin McNally that Rick Sindel had filed a number of motions that we -- you know, that we knew about, we collectively knew about, and that made an effort to preserve all the issues that seemed to be promising in relation to the death penalty.

Q   Was one of those issues the -- what's been now known as the Ring issue?

A   I later learned that it was.  I don't know that at the time I knew that.  I mean, this was an issue -- you know, this was one among many issues then.  There had not been a Supreme Court decision that, you know, created the foundation for this issue at this point, in any -- in any direct way.  United States versus Jones is the first case that did that, and that was a noncapital case.  So I -- I was not focused on the so-called Ring issue, what would be known as the Ring issue, as a distinct issue among others then.  I -- what I did know is that what we -- what we -- the materials we gave to people that suggested challenges to the Federal Death Penalty Act were materials that people needed to pay serious attention to.

     Rick Sindel had done that, and so my role with Mr. Shaw

and later with Jennifer was to encourage them to join Rick Sindel's motions, not to have to worry about doing it independently themselves and reinventing that wheel but simply to join his motions.  That -- that was a critical thing that I thought they needed to do, that I think my recollection is that Rick Sindel suggested that they do that, but I -- I was not -- I did not distinguish that issue from among the other issues that they needed to do that with.

Q    Let me ask you.  As to that, was there a discussion you had with Mr. Shaw and Ms. Herndon as to whether they should join the Billie Allen motions attacking the death penalty?

A    I believe there was.  I -- I -- I think that we had -- after Ms. Herndon was appointed in early February, late January or early February, I was a part of a meeting with her, I believe, with Ms. Tatelli and Mr. Shaw towards the end of February, and I believe in that meeting, I encouraged that to happen.  I think I had done that before, before that meeting with Mr. Shaw and probably had done that with Jennifer Brewer -- I'm sorry -- Jennifer Herndon prior to that meeting as well, but I -- I do recall in that meeting making a point of -- of saying, "You all really need to do this."

Q    And what was the reaction by either Ms. Herndon or Mr. Shaw?

A    Ms. Herndon certainly appreciated the need to do that.  Mr. Shaw seemed sort of nonplussed about it.

166

Q    You just mentioned that there was a meeting in February of 1998 with Mr. Shaw, Ms. Herndon, and yourself, is that correct?

A    Yes, towards the end of that month.

Q    Okay.  What was the purpose of that meeting?

A    I -- Ms. -- Ms. Herndon had been in the case at that point about three weeks or so, two-and-a-half to three weeks. She had -- she had, you know, gotten the lay of the land, had begun working very heavily on the case.  I think that was all she was doing, and I don't remember whether -- in fact, she or Mr. Shaw invited me -- I suspect it was she, but I was invited to attend a meeting that had been -- you know, she and Mr. Shaw had arranged already to assess where they were on the case and, you know, try to start talking about what needed to be done before they could really formulate their -- their trial strategy.

Q    Was there any discussion as to what the guilt phase defense strategy would be?

A    Yes.

Q    Okay.  And who participated in the discussion of the guilt phase strategy?

A    Mr. Shaw, Ms. Herndon, and me.

Q    Okay.  Can you tell us what the substance of that conversation was?

A    The substance -- well, the thing that was the most

striking was that Mr. Shaw misunderstood the charges against Mr. Holder.

Q     How so?

A     This case, obviously, everybody knows, involved a bank robbery in which a security officer was killed.  Mr. Shaw believed that he could defend in the guilt phase of this case against the capital charge by proving that Mr. Holder did not intend to kill anyone.  In other words, he -- he thought that the capital aspect of the case required a specific intent murder, not simply a felony murder, and my reading of the statute and my understanding of the charge was to the contrary, as was Ms. Herndon's, that the Government did not have to prove -- prove a specific homicidal mens rea.  It was certainly a mens rea as to robbery but not a homicidal mens rea.

Q     And what was the response by Mr. Shaw in relationship --

A     I remember we got the statute out and read it together, and he still -- notwithstanding what I thought was the plain meaning of the statute, he continued to take the view that -- that he could defend against the capital charge by showing that there was no specific intent to kill.

Q     Okay.  Now, was there also discussion about whether to retain a ballistic expert?

A     Yes.

Q     Okay.  Can you tell us what the substance of that

Case: 4:03-cv-00923-ERW   Doc. #: 54   Filed: 09/19/05   Page: 168 of 255 PageID #: 672

conversation was?

THE COURT:  Could I have a conference with counsel for just a minute, just about a scheduling issue?

Your plane -- you're planning on leaving at 3:00? Your plane leaves at 3:00, is that right?

THE WITNESS:  A 3:30 flight.

(A BENCH CONFERENCE WAS HELD ON THE RECORD AS FOLLOWS:)

THE COURT:  The issue is, you know, the court reporter is going to need a break and my concern is even if we -- you finish and you're going to have some time, I don't know how he's going to make that 3:00 flight.

MR. HOLTSHOUSER:  I don't think he is.

THE COURT:  How are we going to work it?  You know, how are we going to work it?  What do you think?

MR. HOLTSHOUSER:  I don't think there's any way he can make that flight.

MR. MCGRAUGH:  Yeah.  Well, my -- my request would be that we take a lunch break now, give him time to make his -- rearrange his flight, and then resume after lunch, but it's unrealistic, I think, for him to make his flight.

THE COURT:  If he has to have -- you're supposed to be at the airport two hours early, and it's only 1:00.  Okay. Will you go and talk to him a little bit and then come back?

MR. MCGRAUGH:  Sure.

THE COURT:  And then we'll have another conference

before we break.

MR. MCGRAUGH:  Okay.

THE COURT:  Tell him what's going on.

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.)

MR. MCGRAUGH:  Judge, are we going to just take a short break right now, so Mr. Burr can determine the status of the flight?

THE COURT:  If you want, if he could call and see about that, then sure.

Would you take him into chambers and use the phone there in Betty's office?

We'll be in recess temporarily for about 10 minutes. We are, I think, going to soon pretty quickly have to have a little longer break one way or another, but let's get the information, and then we'll know for sure.

(COURT RECESSED FROM 1:02 P.M. UNTIL 1:11 P.M.)

(A BENCH CONFERENCE WAS HELD ON THE RECORD AS FOLLOWS:)

MR. GORLA:  Judge, he can move his flight to 7:20, which he did.  So we can take as long as you need for lunch.

MR. HOLTSHOUSER:  We've talked, and we think that -- you know, we'll wrap him up easily this afternoon, at an early hour, and then proceed to getting to other -- you know, driving home to a conclusion.

THE COURT:  Okay.

MR. MCGRAUGH:  I think reasonably, you know, we'll be

able to finish today.

MR. HOLTSHOUSER:  Yeah.  I think it depends what you guys decide to do at lunch, but I think, yeah, I think that's a reasonable hope right now.

THE COURT:  Okay.  Well, let's take 45 minutes.  Is that okay?  Is that enough time?

MR. HOLTSHOUSER:  That's fine.  Fifty minutes, 2:00 straight up?

THE COURT:  You tell me.  I mean --

MR. GORLA:  2:00 is enough.

THE COURT:  I want to do what you --

MR. HOLTSHOUSER:  You want more?  Is that what you're saying?  You need more than that?

MR. MCGRAUGH:  Yeah.  The only reason is because we might have to talk to Norris about things that we were talking about.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Right now there's discussion going on whether he'll testify or not and if not, whether we'll agree to just submit his deposition, things like that.

THE COURT:  Okay.  Let's take until 2:00 or 2:10.  How's that?

MR. MCGRAUGH:  2:10 is great.  Thank you, Judge.

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.)

THE COURT:  Court's in recess until 2:10.

Thanks a lot for your accommodation.

(COURT RECESSED FOR LUNCH FROM 1:13 P.M. UNTIL 2:14 P.M.)

THE COURT:  Whenever you're ready, Mr. McGraugh.

MR. MCGRAUGH:  Thank you, Your Honor.

Q    (By Mr. McGraugh) Mr. Burr, I think we left off -- before the lunch break, we were talking about the February '98 meeting between yourself, Mr. Shaw, and Ms. Herndon.  Do you recall that?

A    Yes, sir.

Q    Okay.  As to that -- to that meeting, was there any discussion regarding a ballistic expert?

A    There was.

Q    Okay.  Can you tell us what the substance of that conversation was about?

A    It was in the context of just talking about what the Government's case was against Mr. Holder, and there was a discussion about the forensic evidence and that there was, from, I think, the Government's firearms expert, some indication that there was -- there were bullets that may have been fired by a second weapon, that that created a problem for Mr. Shaw's theory, one piece of his theory, which was that Mr. Holder had not fired his weapon.

Q    We already discussed the Allen motions and your suggestion that the Holder defense team adopt the Holder -- I'm sorry -- the Allen motions.  Did you think -- after you'd

Case: 4:03-cv-00923-ERW    Doc. #: 54    Filed: 09/19/05    Page: 172 of 255 PageID #: 676

given that advice, did you understand that that was going to be done?

A    I -- I thought so.  I know that Ms. Herndon thought it should be done.  I don't recall Mr. Shaw ever reacting positively towards it or saying, "Yeah, we'll do that."  I don't think he said, "No, we're not going to," but I don't -- I never thought he was very -- he thought that was much of a priority.

Q    Did you leave that meeting under the impression that it would be done?

A    Yes.

Q    After that meeting, I want to talk with you about your involvement in the case.  After the February '98 meeting, did you -- were you actively involved in the case after that point?

A    By -- by telephone mostly, although I made one more visit to St. Louis.  I -- I know that I talked with Ms. Herndon and, on occasion, Ms. Tatelli pretty often between that meeting and when I returned to St. Louis about April the 1st.

Q    And what was the substance of those conversations between Ms. Tatelli and --

A    It may have been as simple as sort of a report about what happened that day, either in preparation for trial or once the trial started, what was going on.  Occasionally, it was to ask a question about an issue, a witness, to think about experts

that still might be needed.  You know, the -- the mitigation investigation was ongoing through the trial, as I recall, because there was so little time available that the case was literally being developed as the case was being tried -- the mitigation case was, which -- so there was a lot of consultation with me about that, occasionally with Ms. Herndon out -- you know, out of -- in the evenings or early morning and sometimes with Ms. Tatelli who was still out in the field, talking to witnesses and gathering records.

Q    Did you assist Ms. Herndon in preparation of any type of legal challenges to the instructions?

A    Umm, I helped with -- helped with research on and drafting instructions for the substantive elements of the crime in the guilt phase.  Prior to that, I had also helped with developing challenges to the death penalty notice, the notice of aggravating circumstances in the case.

Q    Okay.  And did you -- I want to -- I want to concentrate your attention on the -- on the preparation or your assistance with Ms. Herndon as to the challenges to the guilt phase jury instructions, okay?

A    Okay.

Q    What did you do in terms of assisting Ms. Herndon in that regard?

A    Well, I -- I had believed sometime before this case, from my involvement in other federal death cases, one of which I'd

been counsel in, that the array of federal crimes that did not require a specific homicidal intent were challengeable.  I knew from research I'd done before the Holder case that it was a very much uphill road, but I thought that there was a basis in -- you know, some seeds in a few federal cases here and there that you might put together and grow into a challenge to a charge that did not require a specific homicidal intent.

     And so with that in mind -- and Ms. Brewer was -- Ms. Herndon was -- was interested in the same thing, had the same instinct, I think, that I did.  So together, we worked on that.  I think I actually helped draft the -- the jury instructions that were proposed that would do that, that would require not a specific intent to kill but a -- you know, at least a kind of malice type intent with respect to the killing.

Q    Was Mr. Shaw involved at all with the discussions about these challenges to the instructions?

A    No.

Q    Can you tell us what the status of the law was in 1997, 1998 as it relates to whether specific intent was required and as to these charged offenses?

A    My recollection is that no federal court had held squarely in our favor.  Most had rejected similar kinds of arguments.  I don't think they were used in any capital cases but had rejected them.

Q    Did you anticipate getting relief as to -- as to these memorandums?

A    No.  No.  I thought -- I thought it was in the nature of developing an issue that might evolve, you know, much like the -- you know, what's come to be known as the Ring issue.  I was wrong about that.  The issue has not evolved, but I thought at the time that it might have some promise.

Q    Okay.  And did you communicate that to Ms. Brewer or Ms. Herndon as well --

A    Yeah.

Q    -- that this issue had no promise?

A    Yeah.  I don't think -- my recollection is that neither of us thought that it -- you know, we could persuade the Court to -- to grant the instruction.  We thought, you know, a modest degree of success would be if the Court found it interesting, you know, or not simply a stupid argument, and I don't know whether the Court did or not, but that was the status.  We did not expect that the proposed instruction would be granted.  We had hoped that it might catch a little bit of a foothold with the Court's attention and that he might -- if there was a conviction and a direct appeal, a necessary direct appeal, then by the time the Eighth Circuit heard the case, there might be some more law to support it.

Q    Did you believe it was going to be -- it was to be used as a guilt phase strategy?

A     No.  No.

Q     And was that also communicated with Ms. Brewer or Ms. Herndon or understood?

A     I'm sure that we understood that.  I mean, this -- this was an effort to try to stretch the law beyond where it had gone, and it certainly is not -- it's not something you'd base a strategy on.

Q     I want to talk to you now about issues that arose during trial, particularly as to the penalty phase closing argument. Were you in contact with Ms. Brewer and Ms. Tatelli after a guilty verdict had been returned in the guilt phase and the penalty phase was proceeding?

A     Yes.

Q     Okay.  And what was the substance of those phone calls?

A     I -- I, you know, got sort of not daily but pretty frequent reports about how the guilt phase was going, learned when the judgment, the guilt -- the verdict of guilty was returned.  I remember specifically getting a call from Ms. Tatelli on March the 31st, in the evening, I think it was. I had a note about this, and she -- I think that was the day that the penalty phase started.  There were opening statements, and perhaps, some of the Government's case came in that day in aggravation, and the report was troubling that I got from Ms. Tatelli.

Q     Before we get there, did you have any conversations with

Ms. Brewer or Ms. Tatelli about the reaction Mr. Shaw had as to how the penalty phase was going?

A    How the penalty phase was going?

Q    Yes, sir.

A    What I recall them telling me was that --

MR. HOLTSHOUSER:  I'm going to object to this as hearsay.

MR. MCGRAUGH:  You know, again, Judge, this is leading up to why eventually he comes here in April of 1998. I'm not using it to prove the truth of the matter asserted. I'm using it to provide the Court with a background as to why he eventually traveled here in April of 1998, prior to the penalty phase closing arguments.

MR. HOLTSHOUSER:  Well, Judge, he said that he received comments from them that were troubling.  I mean, I think that explains why he came here.  The details are purely hearsay, and these witnesses have already had a chance to testify.

THE COURT:  Okay.  What will be your next question?

MR. MCGRAUGH:  My next question was -- is as to what Mr. Shaw's -- what I want to concentrate on is what Mr. Shaw's reaction to the penalty phase evidence was.  Again, if we can do it at sidebar, just so that I don't want to try to queue the --

THE COURT:  That's all right.  Go ahead.  Go ahead

and ask the question.

Q    (By Mr. McGraugh) Was there any conversations about how Mr. Shaw was reacting or how -- what his participation in the penalty phase was going?

THE COURT:  Overruled.  I'll hear it.  You may answer it.

A    The description of his behavior was that he was fairly indifferent to the evidence.  He did not question any witnesses.  He -- going into the penalty phase, there was no plan for him to -- to examine witnesses.  Ms. Tatelli and Ms. Herndon had the perception that they communicated to me. I don't know if it was accurate or not, but they had the perception that they communicated to me that they believed Mr. Shaw had not even read any of the mitigation materials, records or statements of witnesses and that the mitigation -- the penalty phase was Ms. Herndon's part of the case.  That -- that -- what was -- that was troubling, but what was more troubling was that at times during the penalty phase, Mr. Shaw took it upon himself to interject himself into what was going on without being -- again, if their perception was accurate, without being informed and steeped in the evidence that the defense was trying to put forward.

Q    (By Mr. McGraugh) And how so?

A    And I should say it also happened -- the first indication I got was in the first day of March the 31st, when the

Government was putting on some witnesses in aggravation.

MR. HOLTSHOUSER: Judge, I'm going to object again. This is more about what he heard happened in this trial than what -- than it is what he did subsequent to this.

THE COURT: Yeah, I think so. Sustained.

Q   (By Mr. McGraugh) I'm interested in exploring what Mr. Shaw's reaction is during the -- during the penalty phase and what, if any, of those things led to your, you know, reasserting yourself in the case. So my question to you, Mr. Burr, is -- is that -- did either Ms. Tatelli or Ms. Herndon communicate to you what Mr. Shaw did or didn't do which -- which had an effect on the penalty phase?

MR. HOLTSHOUSER: Judge, again, I think I'm going to have to object. Mr. Burr wasn't here for this trial. He's testifying about a trial he never saw. We've already had establishment that he had some concerns, and we've already even gotten now what the subsequent conduct was, is that he reinjected himself into the case.

THE COURT: And also, the thing that concerns me most, it is hearsay, and I do believe that there's a reason for it, and that's been established, but my concern is Ms. Tatelli and Ms. Herndon have both testified. So I think that foundation has been laid for the witness' concerns. Sustained.

Q   (By Mr. McGraugh) Based on these phone calls you had with

both Ms. Tatelli and Ms. Herndon, what, if anything, did you do?

A    I came to St. Louis late in the evening of April the 1st.

Q    Okay.  And what was the purpose for your coming to St. Louis?

A    I was planning to meet with Mr. Shaw, Ms. Herndon, and Ms. Tatelli early the next morning.

Q    Was there something specific that you wanted to derive from this, from this meeting?

A    Yes.

Q    And what was it?

A    My effort was to try to persuade Mr. Shaw to let Ms. Herndon do the closing in the penalty phase for the defense rather than him taking it over.

Q    And why was that?

A    Because Mr. Shaw didn't know what the penalty phase evidence was, again, according to what I had been commun -- what they had communicated to me.

Q    And what happened then at that meeting?

A    We met early in -- I believe it was in the old courthouse before trial started that day, in the courtroom, I recall.  I was meeting with Ms. Herndon, Mr. Shaw, and I think Ms. Tatelli, but I'm not certain that she was there, and we discussed what the plan was for closing.  Mr. Shaw said he was planning to do the closing, and I tried to persuade him not to

do it, to let Ms. Herndon do it.

Q   And did -- did each indicate why the other was more qualified to do the closing or should do the closing?

A   I -- I think they did.

Q   Okay.  And based on this conversation, what happened?

A   My understanding is that Mr. Shaw rejected my suggestion and did the closing.

Q   Now, after the trial, you had an opportunity to meet with Ms. Tatelli and Ms. Herndon, is that correct?

A   Yes.

Q   And that was in May of 1998?

A   Yes.

Q   Okay.  What was the purpose of that meeting?

A   The purpose of that meeting was for the three of us to try to make notes and memorialize what we had just lived through, them far more than me, but me to some extent, to make a record before memories faded about what the concerns were related to the -- to the case of Mr. Holder in terms of counsel's conduct.

MR. MCGRAUGH:  Your Honor, I'll -- just as a matter of housekeeping, I think that's all I have of Mr. Burr at this time.  I'd like to move for introduction of Exhibits 7, 8 -- 6, 7, 8, 9, 10, 11, 2A, 2B, and then I think the Court's already ruled as to Exhibit 12.

THE COURT:  Correct.

182

MR. HOLTSHOUSER:  No objection, Your Honor.

THE COURT:  All right.  The following are received, and this is according to my order on the list.  2A.

MR. HOLTSHOUSER:  2A?

THE COURT:  Yes.  You moved for 2A, correct?  2A is the disks.

MR. MCGRAUGH:  2A is the disks, and 2B is the actual Kaczynski motion.

THE COURT:  And then the first one you asked for was 6, 7, 8, 9, 10, 11, and 2B.  All that have been requested have been received.

You may inquire, Mr. Holtshouser.

CROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q    Mr. Burr, we've met before, haven't we?

A    We've met by television, yes.

Q    Right.  Nice to meet you in person.  Good afternoon.

A    Same here.

Q    You -- do you have an attorney/client relationship with Mr. Holder?

A    No.

Q    You were not appointed by the Court to represent him as an attorney?

A    No.

Q    You were not -- initially, you and Kevin McNally more or

less volunteered yourself into the case, correct?

A    Well, we volunteered our services, but we can't make people take our services.

Q    And sometimes people take them; sometimes people don't take them, right?

A    Yes.

Q    And are all the -- are all the attorneys who -- who don't accept your services -- is it your view that they're ineffective?

A    No.

Q    And in this case, initially, you had some contact that led you to have contact with Mr. Shaw, correct?

A    That's correct.

Q    And you suggested that he needed a mitigation expert?

A    Yes, I did.

Q    And he agreed to that?

A    Yes.

Q    He was -- did not resent your offer of help?

A    I don't know whether he did or not.  It took awhile for him to do the things that were necessary to get the help.

Q    But he agreed to it?

A    He did.

Q    He was, I think -- and your words were he was amenable to it?

A    He eventually became amenable to it; that's correct.

184

Q    And likewise, when you suggested second counsel, Jennifer Brewer, he was amenable to that?

A    Eventually, that's correct.

Q    He never expressed opposition to it, though, correct? You just had some trouble communicating with him and setting up the meeting?

A    That's right.  It was a lack of communication and a slowness in the process given a need for speed.

Q    Subsequent to Ms. Tatelli's involvement in the case then, your contact with the case was mainly through Ms. Tatelli reporting to you what was going on in her experience?

A    Yeah.  It wasn't really reporting, but she occasionally called with questions or a need to discuss something about what she was doing.  We rarely, if ever, talked about her relationship with Mr. Shaw.

Q    Well, did you, in fact, ask her to keep you abreast of what -- of how the case was progressing and how her relationship with Mr. Shaw was going?

A    I don't think I did explicitly.  That may have been implicit, but, no, the -- my recollection is that the reason we had contact was that she needed somebody to talk to her about her work.

Q    All right.  And did you ever contact Mr. Shaw and, in any of your subsequent contacts, ask him, "Why aren't you doing -- why aren't you communicating with Ms. Tatelli after you hired

her at my suggestion?"

A    No, I don't think I did.

Q    And why didn't you do that?  In other words, why would you talk to Ms. Tatelli about your perceived problems and not to Mr. Shaw?

A    That's a good question.  I think that the reason is that in my conversations with Ms. Tatelli and in my own contact with Mr. Shaw previously, it seemed that Mr. Shaw was not interested in that part of the case.  He -- he certainly acquiesced to having a mitigation specialist or was amenable to it, but in the conversations I had with Ms. Tatelli, I learned from -- at least her perception was that he was not very available to talk with her.  That replicated my experience, and he wasn't very available to talk with me either.

Q    In your own experience as an attorney involved in criminal cases, do you often find that it's true that there are often two sides to every story?

A    Of course.

Q    And you, at that point, were receiving Ms. Tatelli's side of the story?

A    I was.

Q    And you didn't choose to get Mr. Shaw's side of the story as to why he wasn't communicating with her, if that was true, or why he wasn't taking interest in her after he had accepted

your suggestion to hire her?

A    I did not communicate with Mr. -- didn't try to communicate with Mr. Shaw about that.  You're correct.

Q    Now, you knew that -- did you not -- that Norris Holder had actually chosen Mr. Shaw to be his attorney?

A    Yes.

Q    He had hired him and retained him, correct?

A    I did know that.

Q    And it was later your suggestion, because of the limitation of funds involved in that retainer, that Mr. Shaw get appointed and be paid through CJA funds?

A    Yes.

Q    As was Ms. Tatelli and as was Ms. Brewer?

A    Yes.

Q    Now, Mr. Sindel -- did you view him as learned counsel in capital cases, as you phrased it?

A    Very much so, yes.

Q    And you're familiar with this pecuniary gain issue, correct, pecuniary gain statutory aggravator argument?

A    The one that the Tenth Circuit -- the Chanthadara decision?

Q    Chanthadara and Bernard.

A    Yes, I am.

Q    To your knowledge, did Mr. Sindel raise that issue in Mr. Allen's case?

A    I don't know.

Q    But you would certainly consider him learned counsel and qualified capital defense counsel?

A    Yes.  I mean, the Chanthadara decision had not been made at that point, and when it was made, it was a fairly novel decision, though most courts accepted it because it made such sense.

Q    And at least the facts in Chanthadara and Bernard, would you agree, are different than the facts of this case?

A    Yes.

Q    So in terms of whether it would apply to this case and how is something that actually remains to be seen, isn't it?

A    Yes.

Q    In terms of Mr. Sindel's status as learned capital counsel, though, would you consider his performance deficient because he had failed to raise this Chanthadara issue long before it had been decided?

       MR. MCGRAUGH:  Your Honor, I'll object as this calls for a conclusion.

       THE COURT:  I think so.  Sustained.

Q    (By Mr. Holtshouser) The mitigation workbook that you -- your -- Kevin McNally's letter first referred to and that you included in those disks -- do you know whether included within those materials was a motion to preserve the so-called pecuniary gain issue?

188

A    I don't know.

Q    And you would have viewed, at that time at least, the materials that you were providing as state-of-the-art in the knowledge of capital defense counsel at the time?

A    We tried to make them that.  I would never -- I recognize my own limits and the limits of other people to say that what we try to do may be state-of-the-art, but it may not be.

Q    Well, you would have considered it as such at the time, correct?

A    Well, we aspired to make it that.

Q    And are you aware of any other organization that does, for lack of a better term, better work than you but more comprehensive coverage in that area?

A    I don't think we have much competition.

Q    And you intend or try to cover the area as thoroughly and comprehensively as possible?

A    Absolutely.

Q    You mentioned in the beginning of your testimony the ABA standards, correct?  Do you remember that?

A    Yes.

Q    And they were standards that were enacted in 1989?

A    That was the first set, yes.

Q    And they were not revised again until 2003?

A    If I have the dates right, that's correct, yes.

Q    And the 2003 revisions, of course, would not have been in

existence in March of '98 when this case was tried?

A    No, they were not, although the practice -- you know, between 1989 and 2003, the practice evolved, and while there was no, you know, sort of regular revision of the standards between '89 and 2003, the 2003 standards were an articulation of how practice had evolved since 1989.  So by 1998, much of what is articulated in 2003 was standard practice in death penalty defense work.

Q    Well, without -- without getting into the details of the standards, the 2003 standards are much more voluminous in terms of their commentary and details and their actual content than the '89 standard?

A    Much more.  I'd agree with you.

Q    And I think you said that -- what did you say is the impact of Wiggins versus Smith on the 1989 Guidelines?

A    My recollection is that the Supreme Court referred to the 1989 standards as -- excuse me -- as the best indicia of the standard of practice in defending capital cases.  I mean, the court certainly didn't say that those control our discretion, but they did say that those standards deserved a good deal of consideration and deference in examining a claim of ineffective assistance of counsel.  I can't quote it, but I think that's what the court said in essence.

Q    And the facts of Wiggins dealt primarily with the failure to conduct a complete investigation into the background of the

case?

A     In mitigation --

Q     In mitigation, correct?

A     -- yes.

          MR. HOLTSHOUSER:  May I approach the witness, Your Honor?

          THE COURT:  Sure.

Q     (By Mr. Holtshouser) I'm going to hand you what's been marked as Exhibit Y, which is a copy of Wiggins versus Smith. The citation is 539 U.S. 510, 2003.  Does that look like a copy of the opinion?

A     Yes, it certainly is.

Q     And in terms of what the court had to say about the 1989 ABA standards -- and I think it's in the top right-hand side. It might be underlined.

A     Yes.

Q     It referred to them basically as guides, what might be considered as reasonable practice, correct?

A     Well, it quotes Strickland versus Washington, which was a 1984 Supreme Court decision, as saying they're "guides", but then a little below that, the court refers to them as "well-defined norms", which I take as a stronger phraseology than "guides".

Q     In connection then -- and then subsequently, you said that in Florida v. Nixon, in 2004 -- I think you might have

said 2005, but actually, it was 2004 that Florida versus Nixon was decided.

A    I couldn't remember which year it was between the two years.

Q    In that decision, the Supreme Court -- tell us again what you said was the impact of the 1989 and the 2003 --

A    My recollection is -- and I may be incorrect, but I haven't read it in a while, but my recollection is that is a case in which the defendant actually lost on his ineffectiveness claim, but the court said that the ABA standards, the 2003 standards then, articulated the well-defined norms for the practice of the defense in capital cases.

Q    And you think that that appears somewhere in Florida versus Nixon?

A    I think so, but if you asked me to find it, I could not do it quickly because I know the Wiggins decision far better than I know the Florida versus Nixon decision.  If you'd like me to take a few minutes to read it, I'll be happy to.

Q    If you think you know where it's at in here, I'd be glad to have you try and find it.

A    I don't know that I could find it quickly.

Q    I'm not sure it's there, but the opinion will speak for itself, no doubt.

A    Yeah, it will.  And I may be mistaken about it.

Q    Florida v. Nixon, though -- it's interesting that you raise that case because -- do you recall what the issue was in Florida versus Nixon in terms of the claim of ineffective assistance?

A    I think --

Q    Let me refresh your memory.  Did it deal directly with the claim that a concession of guilt in a capital trial was ineffective assistance?

A    Yes, yes.

Q    And directing your attention to a portion of the opinion -- and I've highlighted it in the bracket there, and in the opinion, did the court quote with favor from a law review article which said, "It is not good to put on a 'He didn't do it' defense and a 'He is sorry he did it' mitigation.  This just does not work.  The jury will give the death penalty to the client and, in essence, the attorney."

     The sentiment expressed there and quoted by the court -- does that appear to be a suggestion in terms of it makes sense sometimes to have a credible, consistent theory of guilt in mitigation for the jury in a death penalty case?

A    Oh, absolutely.

Q    And in terms of the holding in Florida v. Nixon, did the court hold that it was -- specifically, "The consent to a strategy of conceding guilt in the guilt phase of a capital trial did not automatically render counsel's performance

deficient"?

MR. MCGRAUGH: Your Honor, I'm going to object. The opinion speaks for itself.

THE COURT: Sustained.

Q   (By Mr. Holtshouser) Now, pretrial motions that preserve issues that challenge the death penalty are important in a capital case, correct?

A   Yes.

Q   And you indicated that you -- you thought that motions were going to be filed that -- that adopted Mr. Sindel's motions attacking the death penalty?

A   I encouraged that that happen, yes.

Q   And that you had that conversation specifically with Jennifer Brewer?

A   I believe that I had it with her and Mr. Shaw. I know that I talked with her about it. Well, in one of my notes of a phone call with her in February, the note said, you know, "Still hasn't had time to do that," to incorporate -- you know, to join those motions. So I know that I had some communication with her, and I'm confident that I did with Mr. Shaw as well.

Q   So you're confident, though, that you had a conversation with her in which you made it clear to her that what needed to be done was to adopt Mr. Sindel's pretrial motions that attacked the death penalty and its imposition in this case?

A    I -- I don't know that I differentiated motions.  I simply said, "I think you all need to look at his motions and join them."  I had not looked at his motions at that point.

Q    You did not simply recommend that she adopt motions that dealt with disclosure and discovery only?

A    No.

Q    And you had no specific discussion with either Ms. Brewer or Mr. Shaw as to the pecuniary gain issue?

A    No, not that I remember.

Q    It wasn't on your radar screen at the time?

A    I did talk with Ms. Herndon about the death notice, you know, notice of the aggravating factors, and if pecuniary gain was one of them -- I assume it was --

Q    It was.

A    -- since we're talking about it --

Q    Right.

A    -- I'm sure we talked about challenges to that because I did help craft the challenges or at least gave her a lot of suggestions for challenges to the aggravating factors.  I don't remember right now whether the Chanthadara perspective on that -- on pecuniary gain was one that I suggested.  I don't -- I don't think it was because I remember when Chanthadara was decided, I thought it was very insightful and I wished I'd thought of that before myself.

Q    All right.  And had not thought of it before yourself?

A     I don't think I had.

Q     About the Fifth Amendment indictment right issue, at the time, in March of '98, was that one you had thought of?

A     It was certainly one I was familiar with.  The first -- my first exposure to it was as co-counsel for Timothy McVeigh, and in the McVeigh and Nichols litigation, that issue was raised.

Q     And did you have any specific discussion with Ms. Brewer or Mr. Shaw that they needed to raise that specific issue?

A     I don't think I did about that specific issue, no.

Q     And why not?

A     It did not -- as I said on direct, there were a number of issues that -- that were among the materials that we provided that collectively we deemed issues that people ought to seriously consider and try to preserve.  There were -- I didn't distinguish any of those issues in suggesting that they adopt the motions that Rick Sindel had filed.  My focus as to particular issues was confined by the death penalty notice. That's my recollection about any specific death penalty related issues that we talked about.

Q     And the Fifth Amendment indictment right issue didn't rise to any greater level of importance than any other issue because at that time it wasn't supported by solid Supreme Court precedent?

A     Exactly.

Q    Walton versus Arizona was the then -- still had not been overruled by Ring, correct?

A    It was almost as inchoate as my aspirations for the mens rea on the bank robbery crime.

Q    Let me ask you some questions relating to defense strategy that you were asked about.  The -- there was a meeting you had in February of '98 where there was a discussion of those things, is that right, with Mr. Shaw and Ms. --

A    In February of '98?

Q    Yeah.

A    Yes.

Q    And that had been your second time to speak with Mr. Shaw in person?

A    Yes --

Q    You came in January; you came again in February?

A    -- because the first was in January, yes.

Q    And you indicated that Mr. Shaw misunderstood the charges because he wanted to defend Norris Holder by proving that he did not intend to kill and had -- was simply guilty of nothing more than felony murder, correct?

A    My understanding is that Mr. Shaw thought if he could show that he did not intend to kill and that he did not kill, that he could save him from a capital conviction.

Q    Now, at that time, that's the same as saying that there

is no homicidal mens rea or that a homicidal mens rea is required to be guilty of the capital offense of killing during a bank robbery, correct?

A    I'm not sure I understand your question.

Q    The essence of Mr. Shaw's position was that to be guilty of capital bank robbery as opposed to noncapital bank robbery, some homicidal mens rea was required?

A    That -- that was not his position.  His position --

Q    How did his position differ?

A    His position was that he believed that his client was charged with bank robbery and with murder and that if he could show that he did not commit a murder, you know, defined as a premeditated killing, that he could save his client.  It was a very different understanding of -- from what -- from the instruction that I tried to help Ms. Brewer craft.

Q    All right.  The Count II, the 924(c) count, certainly had the word "murder" in it, correct?

A    It did.

Q    And in your view, did it require a homicidal mens rea?

A    I don't remember how it was framed, but it certainly can -- a 924 count can require a premeditation.  I don't remember how it was framed here.

Q    And the argument made by you later and Ms. Brewer in the motion that was filed in connection with the jury instructions was that a homicidal mens rea was required for the bank

robbery and the -- the bank robbery capital offense and the 924(c) capital offense, correct?

A    That's -- that's how we tried to push the law, yes.

Q    And you actually had Eighth Circuit law to rely on?

A    Well, I had some Eighth Circuit dicta that we tried to -- I mean that we relied on, but that was certainly not controlling.

Q    Wasn't it some fairly clear and strong dicta in United States versus Delay to the effect that specific intent to kill is required to be guilty of the capital offense of 2113(e)?

A    I don't remember.  I -- you know, you've got probably what I did, but I don't remember it -- I'm sorry -- beyond what I've said.

Q    This is page 2 of the memo.  Do you see there where it stated that United States treats a killing in the commission of a bank robbery as a murder -- the Eighth Circuit rather -- in the Eighth Circuit decision of U.S. versus Delay?

A    Yeah.

Q    "The court, without hesitation or question, characterized the offense as murder and discussed the need for the Government to show that the Defendant had a specific intent to kill."

A    I see that.  And, in fact, I think I may have written that.

Q    And so that was -- you had -- not only -- it wasn't like

you were in the Eighth Circuit trying to cite a Ninth Circuit case.  You had Eighth Circuit precedent to rely on, and while it may have been dicta, it was fairly clear and directly to the point that was being asserted, correct?

A    If what I've written there is accurate, and I hope it is because I try to be accurate.

Q    And do you know, was there any clear contrary law at the time that -- for example, an Eighth Circuit case saying that homicidal mens rea was not required for the capital offense of bank robbery?

A    I don't remember.

Q    And if there was, you -- you would have cited it in your memo?

A    I probably would have put a "Cf." or tried to distinguish it or something, yes.

Q    Because, ethically, you would have noted or paid homage to the fact that there was opposing --

A    If I'd known about it, I certainly would have, yes.

Q    If this is correct, as asserted here in this memorandum of law, would Mr. Shaw's belief be correct that if he proved that he had not intended to kill and had no specific intent to kill, that he would be not guilty of the capital offense of bank robbery?

A    Yes.

Q    And the formulation of a defense strategy necessarily had

Q    to be made before a jury instruction conference would have occurred, before a decision on this memorandum took place in a trial?

A    No question, yes.

Q    So some judgment had to be made about what the law is and what the best way to defend Norris Holder was before you're entitled to a ruling by the Court on this motion, correct?

A    An informed judgment, yes.

Q    Do you know how the jury instructions in this case turned out?

A    I don't -- I have some recollection, but I don't know, you know, with great detail.  I know that the proffered instruction by the defense was rejected because an issue was raised on the direct appeal to the Eighth Circuit about it, but I don't know -- I don't remember how the instruction was framed.

Q    Let me show you what's been received in evidence as Exhibit U.  This is the elements instruction on the bank robbery, Count I, the capital offense of bank robbery, and as to Mr. Holder, element four, it was an aiding and abetting theory of liability.  Do you see that?

A    Yes.

Q    Okay.  And Instruction 16 went on to define that liability and that the third element of that was that Mr. Holder had been aware of a serious risk of death attending

his conduct.  Now, while that was not -- did not rise to the level of specific intent to kill, it went beyond simple felony murder mens rea; would you agree?

A    Yes.

Q    So that some aspect of your memorandum was successful?

MR. MCGRAUGH:  Your Honor, I'll object as to whether that caused it to be successful.  I think what Ms. Herndon testified was that the Government, on their own, had redrafted their instruction.

THE COURT:  Overruled.

MR. HOLTSHOUSER:  Well, Judge, I think that's a mischaracterization of her testimony.  She doesn't know what motivated the Government, whether it's in response to the memorandum.

THE COURT:  It's been overruled.  It's been overruled.

Q    (By Mr. Holtshouser) And directing your attention, this is the elements of the 924(c) capital crime of a crime of using a firearm during a crime of violence, that the killing was murder in the perpetration of a robbery.  Do you see also there that malice aforethought is required and that malice aforethought is defined as resulting from the perpetration of a robbery in which the defendant was aware of a serious risk of death attending his conduct?

A    Yes.

Q    Again, went somewhat beyond simple felony murder -- the mens rea requirement?

A    Yes.

Q    Based on what you knew about the facts of the case, was it your belief that it would -- it was not going to be possible to prevent -- it was not going to be likely, rather, to prevent Mr. Holder from being found guilty of a capital offense?

A    Yes.

Q    And that it was part -- it was important to have a consistent strategy between guilt and mitigation?

A    It's always important to have a strategy that is credible between the two phases of a trial for the defense.

Q    And if you're going to have a theory of residual doubt about whether or not he had fired the bullets that killed the guard or had intended the death of the guard, would you begin that in the guilt phase or would you begin it for the first time in mitigation?

A    If you're going to have such a strategy, which I think is a judgment that should rarely be made, then you certainly have to -- to talk about doubt consistently between the two phases of the trial.

Q    Okay.  And would the same be true with respect to relative culpability, that one person should not receive the death penalty because he or she is less culpable than another

perpetrator in the crime?

A    You can certainly lay the groundwork for that in the guilt phase of the trial, if that's what your question is.

Q    And if you're going to do that, though, you should, in fact, start it in the guilt phase, shouldn't you?

A    My view these days, based primarily on jury studies that have been done extensively in death penalty cases over the last 10 years or so, is that the more you can begin to develop your mitigation theory in the guilt phase, the better your client's going to be since jurors tend to start thinking about sentence during the guilt phase.

Q    You got a recommendation from Sean O'Brien to submit Jennifer Brewer's name, correct?

A    Yes.

Q    And I think your testimony on direct was that you knew that she had done a number of death penalty trials there and was what you considered to be learned counsel?

A    That's what Sean told me.  I did not know that firsthand, but I trusted what he told me.

Q    And when you came to the meeting in April of '98 to visit with Mr. Shaw to decide to recommend who should do the closing in the penalty phase, were you still under that same opinion that Ms. Brewer was what you had called learned counsel and had done a number of death penalty trials in Kansas City?

A    Yes.

Q   You had never been -- you had never, at least at that time, had any different information?

A   That's correct.

Q   And in terms of introducing Mr. Shaw to Ms. Brewer or trying to get Mr. Shaw to meet with you about bringing in second counsel, you wrote a letter to Norm London in December of '97, correct?

A   Yes.

Q   And discussed this case?

A   I did.

Q   Even though neither one of you represented Norris Holder in this case, did you?

A   That's correct.

Q   Back again to the February meeting -- and I don't mean to be jumping around -- the February meeting, the so-called strategy meeting where you were here.

A   Yes.

Q   Okay.  You mentioned ballistics and that it was your recollection that there was evidence at that time that two firearms had -- two weapons had been fired in the bank.

A   I -- I think there was at least the -- your expert, I think, said there was a possibility that more than one firearm was discharged.

Q   All right.  Did you actually see the firearm expert's report?

A     I probably did at the time, but I don't remember it.

Q     Well, do you know, did you talk to anyone who'd read it?

A     I talked to Mr. Shaw.

Q     Mr. Shaw seemed familiar with the contents of the ballistics report?

A     You know, I think so.  The information had to come from somebody.  It may have come from Ms. Herndon.  I don't know.

Q     And was he fairly confident at the time in that meeting in expressing to you that based on the report, there wouldn't be any evidence that Mr. Holder had fired his gun in the bank?

A     He seemed overconfident to me based on that report, or, you know, because of that report, I thought he was overconfident that he -- that the evidence would show or would support his theory that Mr. Holder had not fired a gun.

Q     Okay.  What was your recollection of the report then with respect to certain other shell casings found in the bank?

A     I don't remember specifically today.  I do remember that I recommended that the defense get their own firearms expert to examine the evidence, so that they would at least have a better sense of where the evidence stood.

Q     Are you aware of any evidence that, had they searched for another ballistics expert, such an expert would have said anything to contradict or controvert what Mr. Stubits had to say, as you sit here?

A     I have no idea.

Q    Did you watch any part of the actual trial?

A    No.

Q    Have you ever read any part of the actual transcript of the trial?

A    I don't think so, other than what may have been quoted in briefs in the Eighth Circuit or recounted in the Eighth Circuit opinion, but I've never looked at transcripts, themselves.

Q    And when you met in May of 1998, that was actually after the verdict, before sentencing had even occurred in this case, is that right?

A    I know it was after the verdict.  I don't -- I don't -- I'm not -- I don't know when the sentencing -- imposition of sentence occurred.

Q    But at that time, you had a meeting with Ms. Brewer and Ms. Tatelli to essentially debrief --

A    Yes.

Q    -- about what had happened in the case --

A    Yes.

Q    -- and to -- and I think you said you made some notes at the time?

A    I did.

Q    And so that was with an eye towards preparing for this particular litigation, correct?

A    Yes, it was.

Q    Mr. Shaw was not at that meeting, was he?

A    No.

Q    Did you ever talk with Mr. Shaw after the trial?

A    No.

Q    You received some information from Ms. Tatelli and Ms. Brewer at that meeting in May of '98 about Mr. Shaw, correct?

A    Yes, some of which I, you know, knew directly myself, some of which I'd heard about through them before, some of which I didn't know about before.

Q    Was most of what you knew, though, information that had come from them, aside from your one or two meetings and conversations with Mr. Shaw?

A    Yes, that's fair to say.

Q    You'd never had a meeting with Mr. Holder, correct?

A    No.  I didn't meet Mr. Holder until today.

Q    And following that May of '98 meeting, you didn't make any inquiry of Mr. Shaw as to ask him what his thoughts were about the strategy that had been pursued in the trial?

A    No, I did not.

Q    Now, you had some involvement in the appeals, I believe, of both of the Defendants in this case, Allen and Holder, right?

A    I actually a little -- I had very little involvement in the appeal of Mr. Holder's case.  I had more involvement in

208

the appeal of Billie Allen.

Q    And so in the appeal of Billie Allen, you worked with John Simon to formulate the issues and draft the brief?

A    Not to formulate the issues.  I -- I believe my first contact was that they asked me to help moot -- I don't remember if it was Michael Gross or John Simon who did the initial direct appeal argument, but we did a moot that I came to St. Louis to participate in.

Q    And going back to that May of '98 meeting, when you were at that meeting, did you determine at that time whether any motions had been filed adopting Mr. Sindel's substantive death penalty motions?

A    I learned that they -- that no such motion had been filed.

Q    Did you make any suggestion to file such motions at that time, perhaps, in support of a motion for a new trial?

A    I don't think I did.  I think -- I think, in my mind, I thought that the opportunity had been lost.

Q    So -- well, certainly, it hadn't been lost for plain error review, had it?

A    No, but I'm not sure.  It would have to have been preserved in a motion for a new trial for plain error review.

Q    Then you were familiar with the issues that were being raised by Mr. Allen by virtue of having done the moot court, correct?

A    I had read the briefs, and, yeah, I was familiar with the issues.

Q    Did you have any familiarity with the brief that Ms. Brewer was filing?

A    I did not see it until after it was filed.

Q    Even -- but was it before it was argued?

A    I imagine that it was, but I don't remember the sequence.

Q    So -- but looking at it, you would have noticed that it didn't contain some of the same issues as Mr. Allen's brief, did it?

A    I'm sure at the time I did notice that.

Q    And did you volunteer yourself to Ms. Brewer in that capacity, to assist with the appeal?

A    No.

Q    And did you make any suggestion to her to attempt to raise and incorporate any of the issues raised by Mr. Allen in the Holder brief, despite the fact they hadn't been preserved at trial?

A    Raised by Mr. Simon in the Allen brief?

Q    Yes.  Did I -- what did I say?

A    I think you said "raised by Mr. Allen in the Holder brief".

Q    Okay.  A lot of players here.  So did you make any -- you know, you understand what I'm getting at?

A    Yeah.

Q    Did you make any suggestion to raise those --

A    I --

Q    -- to Ms. Brewer?

A    We may have.  I don't remember for sure.  I have some -- some slight recollection that we talked about the Ring -- what -- what was -- would -- you know, was becoming known, I guess, as the Apprendi issue then.  I don't know if I talked with her while her case was still pending or after.

Q    At the time the appeal was argued, was Jones decided?

A    I don't remember when the appeal was argued.  My recollection is that Jones was decided in 19 --

Q    Apprendi was not?

A    I think Apprendi -- well, Apprendi, I think, was decided in 2000, and I think Jones was in 1999.

Q    Do you recall that Apprendi may have come down actually while -- subsequent to argument, before a decision in Allen I?

A    I don't know that.

Q    Okay.  But you never made any suggestion or volunteered yourself to Ms. Brewer to go ahead and raise that issue?

A    Like I said, I think we discussed it at some point and whether it was possible to revive the issue in the Eighth Circuit.  I don't remember exactly when that conversation happened in relation to the direct appeal process in Mr. Holder's case.

MR. HOLTSHOUSER:  May I have just a moment, Your

Honor?

THE COURT:  Yes.

MR. HOLTSHOUSER:  That's all the questions I have, Your Honor.

REDIRECT EXAMINATION

BY MR. MCGRAUGH:

Q    Mr. Burr, I believe you stated on cross-examination that you perceived this to be a penalty phase case?

A    Absolutely.

Q    Why was that?

A    Because the likelihood of a conviction even if your role was not shooting anybody -- if you walked into a bank with somebody else with a gun and you had a gun and somebody got killed, my view -- and that you had -- I believe he had a confession as to his involvement in that way -- the likelihood of being found not guilty of that charge was very, very remote.

Q    And as a consequence of that -- well, let me ask you. Did Mr. Shaw share this view with you?

A    Did he share that view?

Q    Yes.

A    No.

Q    How did his view of the case differ from yours?

A    His view was very distinctly that he conceptualized it as two different crimes, a bank robbery and a murder, and he

believed that if he could show that there was no premeditation as to murder, as to the murder, and, perhaps, that his client had not even fired the gun, then he could not be found guilty of murder, and if he was convicted of bank robbery -- and my recollection is that there was no connection between the two crimes in his mind, that he -- he would be happy for Mr. Holder to be convicted of bank robbery and acquitted of murder and be saved from the death penalty.

Q   As a consequence of understanding that that was his theory, was there any discussions either in the February '98 meeting or thereafter about trying to integrate a guilt and penalty phase strategy?

A   None whatsoever.  Not with him.

Q   And that was because why?

A   In the contact I had with Mr. Shaw, he did not seem to appreciate the need to present mitigation evidence in the penalty phase.  He didn't think there would be a penalty phase, and so he was indifferent to it.  He thought it was unnecessary.  I think he -- he agreed to have a mitigation person and to have Jennifer Herndon in the case simply because people were pushing him to do it.  He did not ever agree in his mind that it was necessary.  He never accepted that view.

Q   As to the issue as to the instruction and the law that you helped prepare for the memorandum to challenge the instructions in this case, is it my understanding that you

were aware that the law was contrary to the position that you were taking as to what was contained in your memorandum, proposed instructions?

MR. HOLTSHOUSER: Judge, I'm going to object. I think it's a misrepresentation of his testimony. He said that there was no contrary authority. He didn't cite any in the memo and did not indicate that he was aware of any contrary authority.

THE COURT: Well, there is, so could you rephrase the question?

MR. MCGRAUGH: Well, that's what I'm trying to get at, Judge.

Q   (By Mr. McGraugh) At the time that you helped draft these instructions and the memorandum, what was your mind or what did you believe the law was as it relates to the requirement for a homicidal intent as it relates to these instructions?

A   I -- my recollection is that the prevailing view of the courts was that you did not need a homicidal intent to be convicted of bank robbery murder.

Q   And what was your basis for that belief?

A   It was based on research I did then, most of which I have forgotten.

Q   And your preparation of the memorandum and the proposed instructions -- did -- did you intend on prevailing on those?

A   Did I intend on prevailing?

Q    Or had you hoped to prevail on those?

A    Well, you always hope to prevail, but I did not have a -- I did not expect that we would prevail.

Q    And do you know whether Ms. Brewer expected you to prevail on them?

MR. HOLTSHOUSER:  Objection, Your Honor, as to what Ms. Brewer expected.  It calls for speculation.

MR. MCGRAUGH:  I'll lay a foundation, Judge.

Q    (By Mr. McGraugh) You worked with Ms. Brewer on the preparation of these motions, is that right?

A    Closely, yes.

Q    And you shared information back and forth and legal authority, is that right?

A    Yes.

Q    And you discussed the merits of the motion?

A    Yes.

Q    Okay.  Did she communicate to you whether she thought that or that she had an expectation that the motion would be granted?

MR. HOLTSHOUSER:  Well, Judge, this is rank hearsay, and there's no assertion that it's going to be offered to explain something he did next.  So I'd object.

THE COURT:  Sustained, particularly since she has already testified.  Sustained.

Q    (By Mr. McGraugh) And -- and, Mr. Burr, your preparation

of the memorandum and the instructions were in no way to form a guilt phase strategy; would that be fair to say?

A    That's -- that's correct.  Yeah, we were -- at the point at which this was done, I don't remember exactly the date.  I believe that the case was already in trial or at least in jury selection, and, you know, the -- Ms. Brewer had very little to do with influencing how Mr. Shaw wanted to try the guilt phase of the case.  So we were simply trying to do as much as we could with the charges.  We thought that the closer we could get the law of the case towards requiring some mens rea that related to the homicide, the better off Norris Holder would be.

Q    (By Mr. McGraugh) Let me ask you this because this was discussed on cross-examination as to, you know, the concession of guilt to obtain some type of favoritism in the second phase or some leniency in the second phase.  Do you know whether that was the strategy in this case?

A    No, it was not.

Q    And the -- if that, in fact, is what you intend to do is to concede guilt, the anticipation is that you're not going to argue that your client's not guilty, are you?

A    Yes, that's correct.

Q    And that's what Mr. Shaw did, didn't he?

A    He did it --

        MR. HOLTSHOUSER:  Objection, Your Honor.  It calls

for a conclusion.

THE COURT:   Sustained.

Q    (By Mr. McGraugh) Let me jump over to the challenge of these -- these instructions.  I think you testified that this was contrary to what the prevailing law was.  Is it common for appellate lawyers or lawyers at the trial level to consistently challenge areas of law where they think there may be some hope that it will change?

A    It should be the practice, yes.

Q    And is that why the Resource Center supplies you with all these briefs and state-of-the-art legal arguments?

A    It is certainly one reason.  We are -- all of us who are in our Resource Counsel have been involved both in trial and habeas proceedings, and when you have that experience, you never want to have unpreserved issues because a lot of what you have to do in habeas is try to revive issues that were not properly preserved.  So that -- that has informed our zeal in trying to identify potential issues that might evolve into some -- something real for people and to encourage people to raise those issues.

Q    And that's by not only reviewing and researching the material that you provide them, but to keep an eye out as to whether these new issues take form?

A    Yes.

Q    For example, in Chanthadara?

A      Yes.

MR. MCGRAUGH:  That's all I have.

THE COURT:  Thank you, Mr. McGraugh.

Mr. Holtshouser.

MR. HOLTSHOUSER:  Just a couple questions, Your Honor.

RECROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q    You indicated it was your view that you perceived this as solely a penalty phase case, is that right?

A    Well, I think -- I think, based on what I know and what I knew during the time, it seemed to me that this was a primarily penalty phase case and that the -- the two phases of the trial needed to be put together with that in mind.

Q    All right.  And you weren't, though, the attorney of record in the case?

A    Of course not.

Q    And Mr. Shaw was?

A    He and Ms. Brewer were.

Q    He was the lead counsel?

A    He was.

Q    And I understand your view that it wasn't his strategy to -- I understand your view that his belief was that he could prove Mr. Holder not guilty of the capital offense of bank robbery and simply find him guilty of bank robbery, correct?

A    He -- he believed that he could have him found not guilty of the capital offense, which he conceived of as premeditated murder.

Q    And which would require a specific intent to kill --

A    That's correct.

Q    -- correct?  And the research that you did and the memorandum of law that you presented to the -- to the Court or that Ms. Brewer presented that you worked on provided legal authority to support his view that a specific intent to kill was a requirement of that offense, didn't it?

A    Well, it had the -- it had the serendipitous result of being consistent with part of his view, but it was not in any way -- it should not have been and was not intended to be the way of defining how the case should have been tried.

Q    But the case law that you presented and the argument you presented, in fact, provided legal authority, legal support for the propriety of the tactic that Mr. Shaw took, didn't it, to defend the case on the grounds that there was no specific intent to kill?

A    It moved in that direction.  I mean, I -- I don't think that we -- we did not think and I don't think we proposed in the instructions that bank robbery murder had to have a specific intent to kill.  I think we -- we were moving that direction, but my recollection is that we thought we might succeed in getting something more like what you showed me,

that there was at least a kind of malice aforethought element, mens rea element, which is certainly not premeditation, but, you know, a kind of reckless disregard for human life.

Q    But whether serendipitous or not, the memorandum that you prepared, in fact, supported Mr. Shaw's view?

A    It -- it supported it in the same -- in that it was somewhat consistent with it, but only that.

Q    Okay.  Let me show you what's been marked as Exhibit T. This is the memorandum that Ms. Brewer filed and testified that you assisted in preparing.  Can you find in there the -- where the contrary view is set forth?

A    You know, you're probably suggesting there is no contrary view set forth, and, you know, I'll read it if you'd like me to do so, but it will take me a few minutes to do it.  I don't -- I'm 56 years old.  This happened seven years ago, and a lot of water has gone under my dam since then, and I'm sorry I just don't remember it.

Q    If there was a contrary view and you were aware of it, would you have cited it in the memo?

A    I would like to think I would have.  I mean, I -- I try to be that kind of lawyer with integrity.

Q    And even though Mr. Shaw expressed to you or you interpreted that he did not think there was going to be a penalty phase, that his strategy of proving that there was no specific intent to kill would succeed, in fact, Ms. Tatelli

220

and Ms. Brewer conducted a mitigation investigation and presented a mitigation case?

A    They presented a cramped mitigation case in a -- in a trial that had no consistency between the guilt phase and the penalty phase, as I understand it.

Q    But they presented mitigation evidence; the Jury heard evidence about Norris Holder's life?

A    They presented some.  Had -- had they been involved months before, I think the case they would have presented would have been far better, far different, and might they well have informed the guilt phase as well.

Q    Now, you were asked the question just a moment ago about concession of guilt, and just so we're clear what we're talking about, there's two kinds of concession of guilt.  One involves concession of guilt of the capital offense, correct?

A    Yes.

Q    Okay.  And is it your understanding that Mr. Shaw did or did not concede Mr. Holder's guilt of the capital offense as defined by the Court's instructions?

A    I --

        MR. MCGRAUGH:  Well, let me object, Your Honor.  This will call for a conclusion unless there's some foundation laid as to what he conceded or he knows what he conceded.

        MR. HOLTSHOUSER:  Judge, at this point, I'm cross-examining him about the testimony he gave on redirect,

that the -- as far as the propriety of conceding involvement in the bank robbery.

THE COURT:  Okay.  Overruled.

A    My understanding is that -- I don't -- I don't know exactly what Mr. Shaw said in his opening statement, but I do believe he put Mr. Holder on the witness stand during the guilt phase to testify in part that he participated in the bank robbery and that he went in the bank with Mr. Allen, and -- and I believe that Mr. Holder testified that he did not fire the weapon or at least he didn't shoot anybody.

Q    (By Mr. Holtshouser) Okay.

A    And that that was consistent with what I understood Mr. Shaw to be -- to believe was a defense.

Q    And was it your understanding that he also testified that he didn't intend for anyone to get hurt and didn't have an awareness that anyone was going to get hurt?

A    That Mr. Holder testified to that?

Q    Yes.

A    I -- I don't know.

Q    Okay.  What I previously showed you, the "aware of a serious risk of death attending his conduct," was an essential element of the capital offense of bank robbery, correct, as instructed by the Court?

A    If that's what -- if you're showing me the instruction, that's what it says.

Case: 4:03-cv-00923-ERW   Doc. #: 54   Filed: 09/19/05   Page: 222 of 255 PageID #: 726

Q    I am showing you Instruction 16, which defined that part of the aiding and abetting.  Now, with respect to that, if Mr. Shaw did not -- did not admit or concede that Mr. Holder was aware of a serious risk of death attending his conduct and Mr. Holder didn't testify to it, that would not be a concession to the capital crime of bank robbery, would it?

MR. MCGRAUGH:  Your Honor, I object.  It calls for a conclusion in this case.

MR. HOLTSHOUSER:  Again, Your Honor, I think this is cross-examination about what was gone into on redirect.

THE COURT:  Yeah, I think it does, but I believe it does call for a conclusion.  Sustained.

Q    (By Mr. Holtshouser) The last thing I want to ask you about concerns this concept of making a record and preserving issues that currently are not supported by the law or are currently not supported by the leading Supreme Court cases. Are you familiar with what I'm talking about?

A    Yes.

Q    And it's your testimony that that is a -- a practice in capital litigation?

A    Well, the way you asked it makes it sound like we believe that we should preserve frivolous issues.  It's not that.  It is identifying issues that have some principles of law that can be drawn upon to support them that have, perhaps, not ever been favorably decided by other courts but that because of the

principles of law that support them, that may themselves be evolving in other contexts. You come to a judgment that these are issues that have the potential to become prevailing issues. I mean, it requires a -- you know, a pretty fine judgment about it.

Q    Let's apply that to the Ring issue. At the time this case was tried, Walton versus Arizona was the decision of the Supreme Court, is that correct?

A    Yes. Well, it was as to whether judges or juries were constitutionally required to decide the sentence.

Q    And that, in fact, was the -- the -- Ring reversed that ruling --

A    Yes.

Q    -- that judges could not make those determinations, that juries had to?

A    That's correct.

Q    And it only flowed from that logically that juries had to -- then grand juries had to indict those facts in federal court?

A    Well, it flowed from the whole analysis that really began with Jones, I think, that a sentencing factor which enhances a sentence beyond a certain level is like an element of the crime.

Q    Correct.

A    To me, that's the foundation. When you start thinking of

something as an element of the crime, then it necessarily requires the Jury to decide it.

Q    So Jones injected an issue, an argument, into the jurisprudence that wasn't there before, didn't it, that began the tumbling effect that Walton versus Arizona could no longer stand?

A    To answer that question, all of us would have to look at Jones and see how the court traces the history that led it to decide Jones the way it did.  There certainly were some precursors to Jones.  I don't remember what they were.

Q    But as a practitioner, a trial practitioner, sitting in March of '98, looking at Walton versus Arizona and being a rather clear statement by the Supreme Court of what is required with respect to what body, whether a judge or a jury has to find these facts, are you saying that it would -- that it is ineffective assistance for counsel to not challenge on a consistent basis that Supreme Court precedent?

MR. MCGRAUGH:  Your Honor, I'm going to object as, again, this calls for a conclusion, and actually, it calls for the ultimate conclusion.  This Court determines what's ineffective and what's not ineffective.

MR. HOLTSHOUSER:  Mr. McGraugh is right, and I'll rephrase the question.

THE COURT:  All right.

Q    (By Mr. Holtshouser) Your testimony that you gave in

225

redirect examination had to do with the practice of capital counsel preserving issues for appeal?

A    Yes.

Q    And nonfrivolous issues, correct?

A    Yes.

Q    What separates a frivolous from a nonfrivolous issue?

A    You know, there are -- there are -- certainly, it is an issue specific judgment, but one of the things that would separate them, I think, is whether an issue has been presented in the same way time and again and rejected for exceedingly sound reasons and there is simply no new perspective on the issue.  You know, frivolous issues are those.  Those are easily identified as frivolous issues.

Q    And so the standards that you referred to earlier that would have been in effect in 1989 wouldn't have required preserving the record as to frivolous issues?

A    I don't know of any standards of counsel's performance that require the preservation of frivolous issues.

Q    And, in fact, most bar ethical rules require you not to assert frivolous issues, correct?

A    That's my understanding of it.

Q    And do the ABA standards that you referred to -- do they expect counsel to anticipate future changes in the law?

A    None of us are fortune-tellers.  What we're expected to do is to be knowledgeable enough about court decisions on

issues that relate to the issues we're litigating, to be able to construct arguments using the principles of law from other cases, none of which squarely decide an issue in our favor, but to put them together in a way that builds a plausible ground of support for a new issue, and that is something that counsel in capital cases must do because the penalty for their clients of not doing that is being executed.

Q    Is the test for what separates frivolous from nonfrivolous the fact that some other counsel in some other case is asserting this argument?

A    No.

Q    Something else, something more is needed?

A    There's something about the issue itself that separates --

Q    And as you sit here now, with respect to either the Ring or the pecuniary gain issue, can -- do you know what that was with respect to those issues in March of '98?

A    I don't.  I'm sorry.  I could go back and refresh my recollection, but I can't say now.

        MR. HOLTSHOUSER:  That's all I have, Your Honor.

        MR. MCGRAUGH:  Just briefly, Your Honor.

                FURTHER DIRECT EXAMINATION

BY MR. MCGRAUGH:

Q    I have sort of two areas I want to ask you about.  As to this memorandum or motion and your proposed instructions which

227

you helped prepare with Ms. Herndon, do you know whether that motion was ultimately denied?

A    My understanding is that it was.

Q    And the instructions were rejected?

A    Yes.

Q    Okay.  And that was an issue which Ms. Herndon raised on appeal?

A    Yes.

Q    And it was -- the Court affirmed the Court's ruling?

A    That's correct.

Q    So there was, obviously, contrary law?

A    It certainly seems like there was.

        MR. HOLTSHOUSER:  Well, Judge, I'm going to object. That calls for a conclusion as well.

        THE COURT:  Sustained.

A    The Eighth Circuit opinion is certainly the authority.

        THE COURT:  It's sustained.

Q    (By Mr. McGraugh) Mr. Holtshouser asked you about ABA standards as it relates to asserting legal claims.

A    Yes.

Q    Was there an ABA standard back in -- what was the year they were amended?

A    1989 was the first.  Then 2003.

Q    Was there a standard in 1989 about asserting legal claims?

A    I don't remember if there was a specific standard.  I believe there was something at least to the effect that says counsel should be aware of evolving issues in the law and take care to preserve issues that -- that might later prevail --

Q    Is it my understanding --

A    -- but that's, obviously, paraphrasing, but I think there was something, some guidance like that.

Q    Is it my understanding that in 1989 the ABA standards came out and they were amended in 2003 or revised in 2003?

A    Revised in 2003.

Q    And in the revision in 2003, they didn't change any of the early 1989 standards?

    MR. HOLTSHOUSER:  Well, Judge, I'm going to object to whatever was done in 2003 as being irrelevant.

    THE COURT:  Yeah.  Sustained.

Q    (By Mr. McGraugh) Was the ABA standards in 1989 substantially the same as the ABA standards we have today?

    MR. HOLTSHOUSER:  Judge, whatever they were and today is irrelevant.  If he wants to testify about what they were in 1989, I don't object, but anything else beyond March of '98 is irrelevant.

    THE COURT:  Sustained.

Q    (By Mr. McGraugh) In 1989, did the ABA standards require counsel at every stage to exercise professional judgment and to consider all legal claims potentially available to them?

A    Yes.

Q    And to thoroughly investigate the basis of each potential claim before reaching a conclusion as to whether it should be asserted?

A    Yes.

Q    And elevate a potential claim in light of the unique characteristic of the death penalty law and practice?

A    Yes.

Q    And the near certainty that all available avenues of postconviction relief will be pursued in the event of conviction and imposition of death sentence?

A    Yes.

Q    And the importance of protecting the client's rights against later --

        MR. HOLTSHOUSER:  Judge, I'm going to object. Mr. McGraugh is reading from the 2003 Guidelines.  None of those words appear in the 1989 Guidelines, and we have the 1989 Guidelines if the Court wishes to see them.

        THE COURT:  Yeah, sustained.  '89 is all that would apply in this case.  Sustained.

Q    (By Mr. McGraugh) Were those elements embodied in the 1989 ABA standard?

A    I believe they were.  They were certainly embodied in the prevailing practice by 1997 or 1998.  As I mentioned earlier, practice evolved from '89 to 2003 and to the present.  It is

constantly evolving, and so the -- had standards been articulated in 1998, they would have looked different and more elaborate than the standards that were articulated in 1989.

Q    But those were the prevailing standards in 1998?

A    The ones that you phrased to me?

Q    Yes.

A    Absolutely.

Q    As well as in 1989, the prevailing standards were to present a claim as forcibly as possible, tailoring the presentation to particular facts and circumstances in the client's case and the applicable law in the particular jurisdiction?

A    Yes.

MR. HOLTSHOUSER:  Well, Judge, again, I'm going to object.  He's reading from the 2003.

THE COURT:  If you're reading from the 2003, I don't want to --

MR. HOLTSHOUSER:  Those words do not appear here.

THE COURT:  I don't want to hear 2003.

MR. MCGRAUGH:  Well, Judge, I'm asking whether the norm in 1998 was those norms.

MR. HOLTSHOUSER:  Well, Judge, my objection is that's a clear misstatement of what the 1989 regulations entail.

MR. MCGRAUGH:  But it's not -- I'm not asking what the ABA standards say.  What is the clear norms that were

available in 1998?

THE COURT:  But you're reading --

MR. HOLTSHOUSER:  Well, I think now --

THE COURT:  Wait, wait, wait.  But you're reading from the 2003 standards.  Now, if you're going to ask him was the 2003 ABA standard effective in 1989, you know, I don't think he can say it was.  How are we going to determine what the norms are?  Clearly, him testifying as to what the norms were in 1989 would be conclusory, and so, you know, my perception is you're trying to get the 2003 standards in by this route of asking what the norms were, and I -- you know, you can make an offer of proof on it, but I'm not going to permit it otherwise.

MR. MCGRAUGH:  Judge, my understanding from what -- if I just may respond briefly, Judge?

THE COURT:  Sure.

MR. MCGRAUGH:  My understanding from what Mr. Burr has testified to previously is that norms were established in 1989 and that during the practice of capital litigation, it broadened and -- and underlined certain aspects as to the standard of representation of capital defendants throughout the time of 1989 to 2003, and then 2003 just fully set forth what was really the established norms back in 1989 but just set them out more -- more broadly or -- and my question to Mr. Burr is, in 1998, were these the prevailing norms, whether

232

it be through the ABA standards or the prevailing norms in the representation of capital defendants.

THE COURT:   Just go ahead and ask it on an offer of proof, and it will be in the record.   Otherwise, I don't intend to allow it.   Go ahead and ask it.

MR. HOLTSHOUSER:   This is an offer of proof, Your Honor?

THE COURT:   Yes, this is an offer of proof.

MR. HOLTSHOUSER:   Okay.

Q    (By Mr. McGraugh) Mr. Burr, were the prevailing standards in representation of capital defendants for them to --

A    In -- in -- in what time frame are we talking about?

Q    Well, let me ask you this, you know, just so that, you know, I'm not operating under any confusion.  You said that the ABA standards were developed in 1989, is that correct?

A    The first standards were published in 1989.

Q    And they developed over time?

A    Over the time -- well, those standards reflected the evolution of practice prior to the time they were articulated. Every standard does -- every standard of practice.  Between 1989 and any year thereafter, the defense of capital cases, the standards in defending people in capital cases evolved. They don't become contradictory to what went before.  They evolve.  They build on what went on before and get improved, and the level of practice gradually goes up, and so between

1989 and any point thereafter up until the present, the level of practice is somewhat different from the way it was a year or two or three before.

Q    Okay.  And so that the norm in 1998 was for counsel to decide to assert a particular legal claim, should present the claim as forcibly as possible, tailoring the presentation to the particular facts and circumstances in the client's case and applicable law in a particular jurisdiction?

A    My view is that --

THE COURT:  Wait, wait, wait.  You know, up to this point, I probably would allow the offer of proof, but, you know, you're reading from a document, and so it's absolutely leading him into saying it.  If he can testify as to what the norm was without, you know, it being recited to him, I might very well -- I'm not saying I will or won't.  I might very well accept the offer, but I won't -- again, we're right back where we were with you telling him what the norm was and asking him to approve it, and I don't think we can do that.

Q    (By Mr. McGraugh) Do you -- did you know what the norm of the practice was in 1998?

A    I have -- I was doing nothing but capital defense work.  I have done nothing but capital defense work since 1981, and the -- the -- the standard of practice that you just articulated -- I don't know where you're -- what you're reading from.  I assume from the conversation that it comes

from the 2003 standards, but that standard of practice, in my mind, has been the prevailing standard for -- for much longer than 1998 to the 2003.  It's been the practice for a long time.  Now, there was a period of time between 1979 and the mid to late 1980's where issue preservation was not understood and practiced nearly as well as it became practiced thereafter for this reason.  Between the first --

MR. HOLTSHOUSER:  Could I interrupt just one second?  Just so we're clear, this is still being taken only as an offer of proof?

THE COURT:  It is.

MR. HOLTSHOUSER:  I have other objections to this entire line of questioning, just so the -- I don't want to waive those by not asserting them at this time, but --

THE COURT:  Yeah, it still is an offer of proof.  That's correct.

MR. HOLTSHOUSER:  Okay.  Thank you.

THE WITNESS:  May I continue?

MR. MCGRAUGH:  Sure.

A     The reason much greater care was taken by the late 1980's and from hence that point forward to preserve issues was that people started being executed who had issues not preserved, which was -- procedural default in death cases became a reality from 1979 to the mid 1980's.  There was a period of time where those of us who were litigating postconviction

cases in that era did not believe that courts would allow people to be executed who had meritorious issues that were unpreserved, and that bubble burst by the late 1980's.  There were people -- a number of people executed who had meritorious issues that were meritorious by the time they were executed, and yet those issues had not been preserved, and they were executed, and that reality fundamentally changed the way we taught people about issue preservation, the way we taught people about how to be extraordinarily conscientious about looking for issues that might evolve into prevailing issues, and so in my view, the standard you've articulated was a well-established standard long before 1998 because of what I've just described, that history.

John Spenkelink was the first person executed under an involuntary death warrant.  There had been people who consented to their executions before 1979, but in 1979, John Spenkelink was the first person executed involuntarily since Furman versus Georgia in Florida.  From then until the mid to late eighties was this bubble of time where I'm talking about, where those -- there was a relative handful of us litigating postconviction death cases during that time, and we didn't believe the courts would allow people with meritorious issues to be executed simply because the issues had not been preserved.  We were wrong, and there was a passion to teach people about that after that period of time, especially if

you'd had a lot of clients executed during that time, and I was one of them. So that's -- I know that from my life experience and my work experience.

Q   (By Mr. McGraugh) And as to what the professional norms were in 1998, it was a professional norm to preserve the record as to issues that were not only meritorious legal issues presently but to anticipate what might be a future meritorious issue?

A   Absolutely.

Q   And -- and to keep abreast and to assert legal claims that would only become recently known to you or available to you?

A   Yes. I mean, part of our mission as death penalty resource counsel was to try to identify those issues and to spread the word about them, and -- and that was why I was insistent several times that the Holder counsel adopt the Allen counsel's motions because I had some confidence that those motions preserved the issues that they ought to be preserving, too.

MR. MCGRAUGH: That's all I have.

MR. HOLTSHOUSER: Judge, was that the end of the offer of proof?

THE COURT: Yes, yes.

MR. HOLTSHOUSER: And I'm not sure the purpose for which the offer of proof was made, whether requesting a ruling

by the Court, but there are other objections to this line of questioning that I would have, whether you want to hear those now or --

THE COURT:  Yes.  Go ahead.

MR. HOLTSHOUSER:  Judge, the primary problem is that Mr. Burr is essentially now testifying as an expert.

THE COURT:  That's correct.

MR. HOLTSHOUSER:  He was never identified as such. We were never provided with a report of his credentials.  We were given an opportunity to depose him, but we were led to believe that he was a fact witness, that he had contact with Mr. Shaw.  The documents that we were supplied would have led us to do that, and we did -- were allowed an opportunity to take his deposition with respect to those facts, but we were never given notice that he was to be used as an expert or would be proffered to the Court as an expert.  I think that insufficient foundation has been laid with respect to at least some of the issues that he's testifying about, particularly the so-called evolution between 1989 and 2003 and particularly what exactly was the standard between these guidelines and March of '98, and we've not been given any sort of report that would set forth the bases for his opinions.  So those would be among our objections to that testimony.

MR. MCGRAUGH:  May I respond?

THE COURT:  Respond.  Yes, you may.

MR. MCGRAUGH:  Mr. Burr was presented for deposition. He testified for over two or three hours by way of video conference.  There was no restriction whatsoever given as to what questions he could be asked.  He was identified early on as the capital resource counsel that assisted in this case. Judge, I would have to say in response that, particularly, Mr. Burr's last line of questioning was after the door was opened by the Government.  The Government started asking him about the ABA Guidelines and the applicability of the ABA Guidelines.  I think once that door was opened, what's sauce for the goose is sauce for the gander.

MR. HOLTSHOUSER:  Judge, Mr. McGraugh got into this issue during the first several questions he asked of Mr. Burr when he asked him about the 1989 and 2003 Guidelines and made the assertion that Wiggins versus Smith said the 1989 Guidelines were the norm and that Florida versus Nixon said that there was a seamless break between 1989 and 2003 Guidelines, which is nowhere found in Florida versus Nixon. So this issue was entirely opened by Mr. McGraugh in his direct exam, not by us in cross.

MR. MCGRAUGH:  And, Judge, I would note there was no objection to that line of questioning.  There was no objection whatsoever to that line of questioning, and when the Government came back up and examined him specifically as to those issues, I think they opened the door to it.

THE COURT:  Well, the offer of proof will be rejected at this time.  The Court believes that this is expert testimony, and the point at which the Court indicated that there would be an offer of proof allowed -- from that point to this will be rejected.

Let's take a recess.  Are we now completed with Mr. Burr?  Is Mr. Burr's testimony concluded?

MR. MCGRAUGH:  I don't have any further questions, Judge.

MR. HOLTSHOUSER:  Well, Judge, I think the only thing that I -- at this point, since there is an issue, there seems to be an issue, I would offer -- perhaps, first have Mr. Burr identify but offer the guidelines that are in question here. While the last offer of proof was rejected, there was his earlier testimony about that these standards exist, and so I think it's Mr. McGraugh's view that they somehow represent the law.  There is discussion of them in Supreme Court cases.  I think the actual content of the guidelines would be useful to the court to have as an exhibit and most notably to see the distinction between the '89 and the 2003 versions.

MR. MCGRAUGH:  Judge, if he wants to introduce the '89 Guidelines, I'm all for it.

THE COURT:  All right.  What about the 2003?  Are you going to introduce those also?

MR. HOLTSHOUSER:  I think the only thing that I would

introduce those also, particularly the portion he was reading, is with respect to the difference between the two, that they are not one in the same or even close.

MR. MCGRAUGH:  Well, Judge, and by way of an inclusive offer of proof, then I'd like to offer specific guidelines as it relates to these claims from the 2003 as well as part of my offer of proof.

THE COURT:  Okay.  I didn't understand what you just said.  The ABA 2003?

MR. MCGRAUGH:  Right, Your Honor.

THE COURT:  And that's what Mr. Holtshouser also suggested be offered, correct?

MR. HOLTSHOUSER:  And I would offer the 1989 Guidelines, which were the ones in effect in March of '98.

THE COURT:  Well, all right.  All right.  Let's put them in -- let's put them in the record.  There may be -- I really believe there are parts of his testimony that -- you know, that would be beneficial to the court, and I'll try to sort it out.  That part, specifically where he is, I believe, testifying as an expert, should be excluded.  I'll receive the 2003 ABA Guidelines, the 1989 Guidelines and decide whether those should be included in the Court's findings.  What -- what exhibit numbers are assigned to those?

MR. HOLTSHOUSER:  Judge, I would assign AA to the ABA Guidelines for the Appointment and Performance of Counsel in

Death Penalty Cases, February 1989.

THE COURT: All right.

MR. HOLTSHOUSER: Do you have the entire set of 2003?

MR. MCGRAUGH: No.

MR. HOLTSHOUSER: I have marked as BB Guideline 10.8 of the 2003 Guidelines.

THE COURT: All right. Those are received.

You may step down, Mr. Burr. Thank you, sir.

MR. MCGRAUGH: Judge, this is -- could I -- I want to offer these.

THE COURT: Oh. All right. Go ahead.

MR. MCGRAUGH: Judge, if you wouldn't mind, I'd like to augment my record as to the issue of whether Mr. -- Mr. Burr was offered as an expert and whether disclosure was given and whether he had -- a proper foundation qualification was laid. There was -- I think the Court record should reflect there was no request, no discovery request made by the Government as to disclose experts and/or to disclose reports. Secondly, I would note that I think Mr. Burr had laid an ordinate foundation of his knowledge of capital litigation since 1979 and his knowledge as to the status of death penalty litigation throughout 1979 to the present.

THE COURT: All right.

MR. HOLTSHOUSER: Judge, just to respond, as you recall, we've been working informally in this case with

discovery and represented to the Court that we could work out these issues amongst counsel. We worked out a deposition schedule and other matters pertaining to the document production, including the testimony of Mr. Holder, without court intervention. That was not done by specific motion. We had requested in the course of those discussions for identification of who they would intend to call and who we would intend to call as well as a specific request for whether or not any of those would involve experts, and we were told that there would be none.

In a conversation that we had last Thursday afternoon, Mr. McGraugh called us back and, I believe out of an abundance of caution, indicated, "Well, there might be some reference to this 2003 Guideline, and we would ask about that," and I made it clear to him then that we had not been on notice about any direct expert, that we had not had discovery in terms of a written report or a statement of the bases for any opinions or even, in effect, what opinions that witness had.

It's true that we certainly had unlimited access to Mr. Burr when we deposed him, but we weren't on any notice that he would be offered in this hearing as an expert, and so we did not have any reason to question him. The 2003 Guidelines that he's used here were not produced prior to the deposition of Mr. Burr. So, again, we were on no notice, and

we received these by fax last Friday afternoon.

MR. MCGRAUGH: And, Judge, I would just respond. There was never any conversations with the Government as to whether -- until last week, Thursday of last week, whether we intended to offer expert testimony. And, you know, Judge, I -- again, Mr. Burr was made available. They could have asked him anything they wanted to ask him at that time. If there was any question as to whether expert testimony or whether that lent itself to expert testimony, you know, the Government was in a position to, even as of last Thursday, petition the Court for additional time to do the discovery once we advised them that -- that Mr. Burr may discuss standards of representation as it relates to the ABA Guidelines.

MR. HOLTSHOUSER: Judge, the only thing I'd add is if you're going to accept Mr. Burr as an expert, we clearly have not cross-examined him as an expert, have not gone into the bases for his opinions, have not cross-examined him because up until now you've accepted this only as an offer of proof.

THE COURT: No, I don't intend to receive his testimony as an expert.

MR. HOLTSHOUSER: Thanks, Judge.

MR. MCGRAUGH: Judge, just to finalize, we would offer Guideline 1.1 as Exhibit 13 of the 2003 Guidelines.

THE COURT: 1.1?

MR. MCGRAUGH:  Guideline 1.1 as Exhibit 13. Guideline 10.1 as Exhibit 14.  Guideline 10.2 as Exhibit 15. Guideline 10.5 as Exhibit 16.  Guideline 10.7 as Exhibit 18. Guideline 10.10.1 as Exhibit 19.  And Guideline 10.11 as Exhibit 20.

THE COURT:  All right.

MR. MCGRAUGH:  And I believe the Court's already -- if it hasn't -- Guideline 10.8 on the --

THE COURT:  Yes, I have that one.

MR. HOLTSHOUSER:  Judge, since Mr. McGraugh didn't offer it, I would offer as Exhibit CC the introduction to the 2003 Guidelines.

THE COURT:  All right.  Received into the file, legal file.  All of those are received into the legal file.

And Mr. Burr may now be excused?

MR. MCGRAUGH:  Yes, Your Honor.

MR. HOLTSHOUSER:  Yes, Your Honor.

THE COURT:  All right.  All right.  He is excused.

We'll take a 15-minute break and then we'll --

MR. HOLTSHOUSER:  I couldn't hear you.

THE COURT:  A 15-minute break and then we'll come back and start again.

MR. HOLTSHOUSER:  Thank you, Judge.

THE COURT:  Court's in recess.

(COURT RECESSED FROM 3:59 P.M. UNTIL 4:15 P.M.)

245

MR. GORLA:  Judge, may we approach the sidebar?

THE COURT:  Sure.

(A BENCH CONFERENCE WAS HELD ON THE RECORD AS FOLLOWS:)

MR. GORLA:  Judge, the only -- the only potential witness that we have left is Mr. Holder.

THE COURT:  Okay.

MR. GORLA:  We have some concerns about we want to put him on to testify to certain issues.

THE COURT:  Okay.

MR. GORLA:  We don't believe that by putting him up to testify to certain issues that that waives his Fifth Amendment rights on other issues that may be inquired into by the Government.  Obviously, he raised some Sixth Amendment issues.  Obviously, they can go into that, but he can't be forced to waive his Fifth Amendment at the expense of filing or enforcing his Sixth Amendment rights, and we have concerns about that as to basically how far the Government is going to be allowed to go.  We've been led to believe by Mr. Landolt and Mr. Holtshouser that they pretty much feel that once he gets up there, that he's open to anything that happened in the case, but we don't think that that's correct, and obviously what we're looking for is some indication as to what you think because we want to make sure before we go through this decision exactly what he's getting into.

MR. LANDOLT:  Judge, our position is Mr. Holder's a

246

party.  The scope of the cross-examination of a party are the issues in the case, and that in this case is, at a minimum, the six issues that you've identified which we're having a hearing on today, and I think, in the last two days, we've gone somewhat beyond that.  So I think our position would be it should be anything that there's been testimony on.  He would be open to cross-examination on those issues.

It's completely improper to allow a witness to pick and choose as to what questions he's going to answer.  Once a witness subjects himself to cross-examination, in the event he then takes the Fifth Amendment, his testimony is subject to being struck.  There's absolutely no way we can have an adequate opportunity to test his credibility and to represent the interests of the United States if we are not allowed to pursue full cross-examination of this Defendant.

THE COURT:  A couple of ways it could be done.  First of all, there -- if there are some limited issues to which parameters could be -- you know, to which you would agree, then it could be heard generally.  Anytime someone takes the stand and, you know, intends to rely upon their Fifth Amendment right, then my belief is -- and in saying this, what I want to do is ask both of you overnight to do some research on the subject, so we get it right.  My belief is that -- because you asked -- is that if he does intend to get on the stand and testify as to what he wants to and then would take

the Fifth Amendment as to issues raised by the Government, that his testimony would have to be stricken, but let's get it right. I mean, if there's law out there that says you can do it, then by all means, that's what I would want him to do.

MR. LANDOLT: Judge, I have one case to present to the Court. This is -- we actually broached this issue in Mr. Holder's deposition.

THE COURT: Okay.

MR. LANDOLT: We were able, by agreement, to get around the issue, quite frankly.

THE COURT: Okay.

MR. LANDOLT: We didn't know it was going to come up today, or we would have had more research done. The law clerk has found at least one Supreme Court case that indicates the law is just as you have said, which is also -- is my recollection of it also.

MR. GORLA: Judge, I haven't seen it. I would like the opportunity overnight to do some research. He's the last witness we have. We could bring him back in the morning and finish, and at least that way, I can see if there's anything there, and we can make a decision and go from there.

MR. MCGRAUGH: And just so that I'm clear, how we agreed to get around this issue at deposition is not acceptable as far as -- because I think we could move forward based on our agreement as to what we had at the deposition as

to how to deal with these issues.

THE COURT:  Well, if you come with some kind of an agreement, I'll approve anything that you all agree to. Whatever it is, I'll approve it.

MR. LANDOLT:  Just so you know, Judge, I mean, our position is and is going to be that if he testifies, our position is he's subject to cross-examination on the issues in the case without limitation.

THE COURT:  Okay.

MR. MCGRAUGH:  Beyond even the issues of the claims?

MR. LANDOLT:  The issues in the case, which are framed by the claims but, I think, actually now framed by the testimony that's come in.

MR. MCGRAUGH:  Just so I know, Joe, are you saying "the case" as being this case or the case that was tried back in '98?

MR. LANDOLT:  Well, I'm not sure that there is a meaningful distinction now that we've heard this testimony over these last couple of days and we have the issues as they've been framed.  Obviously, one depends on the other. They're one and inseparable at this point.

MR. HOLTSHOUSER:  And the problem is -- is that one of the issues has to do with his concession of guilt, and the claim is made that Mr. Holder, by his testimony, admitted each of the elements of capital bank robbery.  In the deposition,

we agreed to not cross-examine him or question him about the content of his testimony at trial. We simply limited it to, "Did you, in fact, tell Mr. Shaw the same things that you've testified to," and that's the way we got around it there. In the context of this hearing, I think that's going to be entirely inadequate. We need to question Mr. Holder both about the substance of his testimony at trial and the truthfulness of that testimony, particularly in terms of the effect it had on the so-called concession.

THE COURT: What -- some time earlier today -- and I don't remember when it was or whether it was on the record or not -- there was some discussion about one alternative may be to offer his deposition in lieu of him testifying. Is there any thought that that is a possibility?

MR. GORLA: I think we would be willing to do that.

MR. HOLTSHOUSER: The problem with that, Judge, is that we weren't allowed to ask him about the content of his testimony at the trial, and the thing of it is that he has testified about the crime in this case. He testified in this case and waived his Fifth Amendment right. So it appears that he's now trying to reassert his Fifth Amendment right as to the facts involving the bank robbery that he's previously waived to that, and we wanted to be able to question him about the content of his own testimony at trial.

THE COURT: Let me ask this question.

MR. HOLTSHOUSER:  The deposition didn't let us do that.

THE COURT:  He's under a sentence of death.  Subject to this proceeding and other appellate rights that he has -- of course, I'm not suggesting just because he's under a sentence of death that it's going to be carried out, but -- and the context of why I'm asking the question is this.  What right does he have to protect asserting his Fifth Amendment right at this stage, do you believe?

MR. GORLA:  It could be a perjury prosecution.  It could be a state prosecution for murder.

THE COURT:  Okay.  Okay.  Yeah, I hadn't thought of that.  I thought about the perjury, but I hadn't thought about the state prosecution.

MR. GORLA:  And, Judge, just so you know, it's not -- it's not our position that we can put him up there to testify and then when they get up on cross-exam, they shouldn't ask him a question that he can say, "I'm not going to answer on the basis that my answers may tend to incriminate me."  We're not saying that.  We're saying that what he testifies to, he can be cross-examined on what he testifies to, but it's not an open cross-examination, that by him testifying on certain areas, he doesn't waive his Fifth Amendment privilege as to other wide areas, and that's what our concern is, is that it's just going to be this wide-ranging, you know, foray into --

Case: 4:03-cv-00923-ERW    Doc. #: 54    Filed: 09/19/05    Page: 251 of 255 PageID #: 755

MR. HOLTSHOUSER:  What are the areas that you would like to protect, and maybe we can agree on those.

THE COURT:  You may be onto something here. Generally, the rule is -- and I try to enforce it in all cases, and that is the cross-examination does not go beyond the scope of direct examination, and with that -- if you can play with that rule, that may be another possibility that you all need to discuss.

MR. LANDOLT:  The only problem with that, Judge, is this is a party to the case.  So that means the rules are a little bit different here.

MR. HOLTSHOUSER:  He's going to put his credibility at issue when he testifies.

THE COURT:  Okay.  Right.  If you can give me some authority.  As much as you all do, I want to get it right.  So we'll do a little work on it ourselves and try to come up with something in the morning.

One other little complication -- do you suppose we could moot beginning at 8:30?  Judge Barta's mother died, and they're having the visitation.  It's about 20 minutes away from here, Kutis Funeral Home.  It's 9:00 to 9:30, and I'd like to run out there, and so I told Betty to start in the morning at 9:45 for that reason, but I'd kind of like to know kind of what you all come to agree on overnight, but I don't know how to do that.

252

MR. HOLTSHOUSER:  I think 9:45 would work best.

THE COURT:  Is that okay?

MR. MCGRAUGH:  That's fine, Judge.  It gives me a chance to get my kids wherever they've got to be in the morning.

THE COURT:  Okay.  All right.  Well, it is recessed until -- what about -- are you going to put on any evidence?

MR. LANDOLT:  I don't believe so, Judge.

MR. HOLTSHOUSER:  No.

THE COURT:  So we're talking --

MR. MCGRAUGH:  It should be done by the morning.

MR. HOLTSHOUSER:  And we had discussed, Judge -- now, I'm pretty sure you are thinking on the same lines -- that we were considering an extended period to brief, at least wait until the transcript is prepared, in our hands, and then have a schedule that begins after that.  Would -- I don't know what the general time frame is for the transcript, but --

THE COURT:  Well, she's really fast, and I don't know --

MR. HOLTSHOUSER:  Could we slow her down?

MR. MCGRAUGH:  It is vacation time, Judge.

THE COURT:  I promise you that we're not going to put this on some kind of a track that causes you any kind of hurry to finish it.  That won't happen.  So you come up with some recommendations.  Unless they're just completely out of

253

reason, it will be approved.

MR. LANDOLT:  Just so the Court knows, Judge, we have discussed the possibility of using the deposition with counsel, and we'll look into that again, but we have explored it.

THE COURT:  All right.  Okay.  Wait.  What we're going to do is we're going to talk about -- please research these issues.  If he takes the stand and testifies as to what he wants to testify to, can you cross-examine him beyond the scope of direct examination; that's the first issue.

The second issue is if he takes the stand and you cross-examine him beyond the scope of direct examination and he asserts his Fifth Amendment right, does all of his testimony have to be stricken?

Those really are the issues, aren't they?

MR. LANDOLT:  Yes.

THE COURT:  Okay.

(THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.)

THE COURT:  I know we've had some guests in the audience, and I appreciate your patience and your courtesies today in being present and certainly welcome you to be present.  We're going to recess.  Ordinarily, we start at 8:45, but Judge Barta, who is a bankruptcy judge in this court -- his mother has died, and there's a visitation for her in the morning, and I'd like to run out there to the funeral

home real quickly at 9:00.  So we're going to start at 9:45 tomorrow morning, and in the meantime, I'm going to be doing some legal research on a couple of issues, and I look forward to seeing you in the morning at 9:45.  Thank you all very much.

MR. MCGRAUGH:  Thank you, Judge.

(PROCEEDINGS CONCLUDED AT 4:27 P.M.)

CERTIFICATE

I, Gayle D. Beilsmith, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 254 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 16th day of September, 2005.

_____

/s/ Gayle D. Beilsmith

GAYLE D. BEILSMITH, CSR, RDR, CRR

Official Court Reporter