UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NORRIS HOLDER,                    )
                                 )
                    Movant,      )
                                 )       No. 4:03CV0923 ERW
          vs.                    )
                                 )       *This is a Capital Case*
UNITED STATES OF AMERICA,        )
                                 )
                    Respondent.  )

## MOVANT'S POST-HEARING BRIEF

COMES NOW Norris Holder, by and through counsel, Christopher E. McGraugh and Michael J. Gorla, and submits his post-hearing brief in support of his post-conviction motion filed under 28 U.S.C. § 2255.

## 12A.

**The Fifth Amendment provides, in part, that "[n]o person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury . . . ."  Norris Holder and Billie Allen were charged by indictment with Count I: bank robbery by force or violence in which a killing occurs,[1] and Count II: carrying or using a firearm during a crime of violence which results in a murder.[2]  The indictment is defective because it fails to allege at least one statutory aggravating factor from 18 U.S.C. § 3592(c), a factor which increased the punishment from a maximum sentence of life**

---

[1] 18 U.S.C. §§ 2, 213(a) & (b) (1994).

[2] 18 U.S.C. §§ 2, 924(c)(1) & (j)(1) (1994).

1

**imprisonment to death.[3]  Is the defective indictment a structural defect which entitles Holder to relief from his sentence of death?  Will the Court's failure to review the claim result in a miscarriage of justice?  Alternatively, does cause and prejudice exist to excuse Holder's alleged procedural default of this claim?**

The Fifth Amendment Indictment Clause requires the government to obtain an indictment prior to commencing prosecution "for a capital or other infamous crime."[4]  An indictment must contain all of the essential elements of the offense including an allegation of every fact "legally essential to the punishment to be inflicted."[5]  Any fact, other than a prior conviction, which increases the punishment is an essential element which must be included in the indictment.[6]

**The Holder/Allen indictment is defective - it does not include a**

**statutory aggravator, an essential element of a capital offense**

Norris Holder and Billie Allen were charged by indictment with Count I: bank robbery by force or violence in which a killing occurs, and Count II: carrying or using a firearm during a crime of violence which results in a murder.  The indictment does not include a statutory aggravator listed in 18 U.S.C. § 3592(c), a factor required to elevate the available statutory maximum sentence from

---

[3]*Ring v. Arizona*, 536 U.S. 589, 609 (2002).

[4]U.S. Const. amend. V.

[5]*United States v. Reese*, 92 U.S. 214, 232-33 (1975).

[6]*See Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).

2

life imprisonment to death.[7]   As specifically found by the Eighth Circuit, the Holder/Allen indictment is constitutionally defective.[8]

### Violation of the Fifth Amendment Indictment Clause is a structural defect

The purpose of the Indictment Clause is to have an independent body of people, not a judge or a prosecutor, find probable cause to support the charging of a federal offense.  The Supreme Court decision in *Stirone v. United States*[9] strongly suggests that the Indictment Clause is a structural defect warranting automatic relief.

Stirone was indicted for unlawfully interfering with interstate commerce by using his influential union position to obstruct and/or delay the delivery of sand and other materials to be used in the manufacture of ready mix concrete.  The government, over defendant's objection, offered evidence that the concrete was to be used to construct a steel mill, and used that as a basis to argue that the defendant also interfered with potential future interstate shipments of steel.  Stirone was convicted and thereafter appealed claiming that he was convicted of an offense not charged in the indictment.  The Supreme Court agreed, holding that while the indictment charged Stirone with unlawfully interfering with interstate commerce in respect to the importation of sand and other materials, it was error to admit evidence that he also interfered with possible future shipments of steel.

> The right to have the grand jury make the charge on it's own judgment is a substantial right which cannot be taken away with or without court amendment . . . [W]e cannot know whether the grand jury would have included in it's indictment a

---

[7]*See Ring v. Arizona*, 536 U.S. 584, 609 (2002) (statutory aggravating factors are the functional equivalent of elements of a capital offense).

[8]*United States v. Allen*, 406 F.3d 940, 943 (8th Cir. banc 2005).

[9]*Stirone v. United States*, 361 U.S. 212 (1960).

charge that commerce and steel from a non-existent steel mill had been interfered with. Yet, because of the court's admission of evidence and under it's charge, this might have been the basis upon which the trial jury convicted petitioner. If so, he was convicted on a charge the grand jury never made against him. This was a fatal error.[10]

As recognized by the Supreme Court in *Stirone*, "[t]he very purpose of the requirement that a man be indicted by the grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."[11] The function of the grand jury will be rendered meaningless if a violation which results in a person being convicted of an offense for which he was not indicted is treated as harmless error. But, as this Court is aware, the Eighth Circuit has concluded otherwise, holding, in co-defendant Allen's case, that a violation of the Fifth Amendment Indictment Clause is subject to harmless error analysis.[12] Further, the Eighth Circuit found that the specific Fifth Amendment violation alleged herein was harmless, finding "beyond a reasonable doubt that, if the grand jury had been asked to charge the grave risk to others statutory aggravating factor, it would have done so."[13]

Billie Allen has filed a petition for certiorari with the United States Supreme Court.[14] The question presented in the petition is whether the defective capital indictment herein is a structural defect warranting relief. The Supreme Court's disposition of Mr. Allen's petition for certiorari will resolve this issue with respect to the law in this circuit.

---

[10]*Id*. at 218-19.

[11]*Id*. at 218.

[12]*United States v. Allen*, 406 F.3d 943-45. .

[13]*Id*. at 947.

[14]*Billie Jerome Allen v. United States*, No. 05-6764.

Assuming that the Supreme Court does hold that a violation of the Indictment Clause is a structural defect not subject to harmless error review, then Mr. Holder is entitled to relief. This is so even though Holder raised this claim for the first time in this proceeding because Holder is actually innocent of the death penalty. Alternatively, cause, in the form of ineffective assistance of counsel, and resulting prejudice exist to excuse the procedural default of this claim.

**Holder is actually innocent of the death penalty**

This Court can review procedurally defaulted constitutional claims if the "failure to consider the claims will result in a fundamental miscarriage of justice."[15] The miscarriage of justice exception extends to cases in which a constitutional violation has probably resulted in the imposition of a death sentence upon one who is actually innocent of the death penalty.[16] Actual innocence of the death penalty is established by showing that, but for the constitutional violation, a petitioner would not have been eligible for the death penalty. This situation exists where a prerequisite for the imposition of the death penalty could not have been satisfied.[17]

Mr. Holder was charged with a non-capital offense because the indictment does not contain one of the statutory aggravating factors set out in 18 U.S.C. § 3592(c), an essential element for elevating the statutory maximum from life to death. As indicted, Holder was ineligible for the death penalty. But for the violation of the Fifth Amendment Indictment Clause, there would have been no possibility of Holder receiving the death penalty. Thus, Holder is excused from the procedural default, and can obtain federal review of this claim.

---

[15]*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

[16]*See Sawyer v. Whitley*, 503 U.S. 333, 340-47 (1992).

[17]*Id*. at 345.

**Alternatively, cause and prejudice exist to excuse the alleged procedural default**

The specific claim that Holder's trial and appellate counsel were ineffective in failing to challenge the indictment on the basis that it failed to charge a capital offense - Claim 12C(a) - is fully discussed later in this document.[18]  Rather than repeat that argument here, Holder incorporates said portion of his pleading and submits it in support of his alternative position that cause and prejudice exists to excuse the alleged procedural defect of this claim.

## 12B.

**Under the federal death penalty scheme, the jury is instructed to determine the existence of statutory aggravating circumstances, and thereafter, weigh the found aggravators against the mitigating circumstances in deciding whether to impose a sentence of life imprisonment or death.  In returning a sentence of death, Holder's jury considered, found and weighed the pecuniary gain statutory aggravator - that Holder committed the offense in expectation of anything of pecuniary value.  The application of the pecuniary gain aggravator is limited to situations where pecuniary gain is expected as a result of the victim's death and follows directly from the actual killing, and not just from the underlying felony, *i.e.*, a robbery.  Does Holder's sentence of death violate his Fifth and Eighth Amendment rights where the jury considered the pecuniary gain aggravator even though the murder of the bank guard was not commited as consideration for the receipt of pecuniary gain?**

---

[18]*See infra*, 16-21.

Congress enacted a death sentencing scheme under which the jury cannot consider the death penalty for a capital crime unless the jury finds (1) the requisite intent, and (2) the existence of at least one statutory aggravating factor.[19]  The complete list of aggravating factors appears in 18 U.S.C. § 3592 (c).

The jury considered and found the existence of two statutory aggravators in Holder's case: (1) that Holder knowingly created a grave risk of death to one or more persons in addition to Richard Helfin; and (2) that Holder committed the offense in expectation of the receipt of anything of pecuniary value.[20]  The jury's consideration of the pecuniary gain aggravating circumstance skewed the penalty phase because said aggravator was not applicable to Holder's situation.

The pecuniary gain statutory aggravator applies when the evidence shows that the "defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."[21]  The pecuniary gain aggravator is directly preceded in the defining statute by the procurement of offense by payment aggravator which, by definition, applies when the "defendant procured the commission of the offense by payment or promise of payment or anything of pecuniary value."[22]  Given it's placement in the statute directly following the procurement of offense by payment aggravator, and it's plain terms, the pecuniary gain aggravating circumstance refers to a killer hired by another person to commit a murder in exchange for payment either before or after the

---

[19]18 U.S.C. § 3591 (a)(2); 3593 (d).

[20]*See* Special Verdict Form, p. 3-4.

[21]18 U.S.C. § 3592(c)(7).

[22]18 U.S.C. § 3592(c)(8).

killing.[23]  The pecuniary gain aggravator does not apply when a defendant commits an offense other than murder, *i.e.*, robbery, to obtain money and, in the course thereof, commits a murder.

The application of the pecuniary gain aggravator to a robbery-murder case was thoroughly analyzed by the Tenth Circuit Court of Appeals in U*nited States v. Chanthadara*.[24]   In *Chanthandara*, the defendant and four others planned to rob a restaurant owned by Mark and Barbara Sun.  Chanthadara dragged Barbara to a locked safe, which she could not open because – unbeknownst to the robbers – it was installed before the Suns bought the restaurant, and they were unaware of the safe's combination.[25] Chanthadara fatally shot Barbara Sun.  He was later convicted of using a firearm during a crime of violence which resulted in a murder.[26]  He was sentenced to death based, in part, on the jury's finding of the "pecuniary gain" aggravating circumstance.

The Tenth Circuit ruled that the "pecuniary gain" aggravator did not apply to *Chanthadara*, limiting the application of said aggravator to "scenarios where the expectation of pecuniary gain is from the actual killing [*i.e.*, a murder for hire scenario] and not just the underlying felony [*i.e.*, a robbery]."[27]  The court observed that "pecuniary gain" is implicit in the offense of robbery, and so it would automatically be present for felony murder where the underlying felony is robbery.  The

---

[23]*See United States v. Cuff*, 38 F. Supp.2d 282, 288 (S.D. N.Y. 1999) (pecuniary gain aggravator applies to circumstances where pecuniary gain flows directly from the killing); *United States v. Davis*, 904 F. Supp. 554, 558 n.3 (E.D. La. 1995) (pecuniary gain  factor in Section 3592 (c)(8) upheld against vagueness challenged because it refers to murder for hire).

[24]230 F.3d 1237 (10th Cir. 2000).

[25]230 F.3d at 1245.

[26]*Id*. at 1244-45.

[27]*Id*. at 1263.

court recognized that Congress, in 18 U.S.C. § 3592(c)(1), listed twenty felony offenses which warranted automatic death qualification whenever a death occurred during their commission.  The exclusion from robbery from said list supports the conclusion that the "pecuniary gain" aggravator is limited to instances where the expectation of "pecuniary gain" flowed directly from the actual killing rather than the underlying felony of robbery.[28]

The Fifth Circuit joined the Tenth Circuit's position in *United States v. Bernard*,[29] a case in which the defendants carjacked a married couple, forced them to withdraw money using their ATM card, and later killed them.  The government argued that the defendants killed the victims in order to get away with their money.  The Fifth Circuit held that the "pecuniary gain" factor was wrongly submitted because the "pecuniary gain" did not flow directly from the victims' murder.[30]

In view of *Chanthandara* and *Bernard*, the submission of the pecuniary gain aggravator to Holder's jury violated his Eighth Amendment rights.  This was not a case where the pecuniary gain flowed directly from the murder of the bank guard.  The pecuniary gain involved in this case, the bank's money, was the result of the actual robbery - the taking of the money from the bank tellers.  No pecuniary gain resulted, in and of itself, directly from the killing of the bank guard.  While Holder's counsel concededly failed to challenge the pecuniary gain aggravator either at trial or on appeal, cause and prejudice exist to excuse the procedural default.

---

[28]*Id*. at 1263-64.

[29]299 F.3d 467 (5th Cir. 2002).

[30]*Id*. at 483-484.

**Cause and prejudice exist to excuse the procedural default**

Both trial and appellate counsel should have been familiar with the legislative history related to the pecuniary gain aggravator, and been aware that there was a reasonable likelihood that said aggravator only applied to situations where "pecuniary gain" directly resulted from the murder. Even though trial counsel failed to object to the pecuniary gain aggravator, appellate counsel should have raised the claim as plain error on appeal. An appellate court may grant relief even where defendant does not object to trial if the defendant can show that the error affected substantial rights and seriously affected the fairness of the integrity of the trial. Appellant's counsel failure to challenge the pecuniary gain aggravator on appeal constitutes deficient performance and, given the *Bernard* and *Chanthadara* decisions, had said issue been included on appeal, there's a reasonable likelihood that Holder's death sentence would have been set aside.

Ms. Herndon argued Holder's case before the Eighth Circuit in January of 2000. The *Chanthandara* decision was issued on November 1, 2000. The Eighth Circuit decision in Holder's case was not issued until April of 2001, well after the *Chanthandara* opinion was published. Although counsel Herndon was aware of the fact that she could have called the court's attention to *Chanthandara* via Fed. R. App. P. 28(j) and/or attempted to reopen the briefing schedule to bring the matter before the court, she failed to do so. She simply was unaware of the *Chanthandara* decision until recently.[31] Had she been aware of *Chanthandara*, counsel Herndon would have brought that matter to the court's attention and attempted to argue that the application of the pecuniary gain to Mr. Holder's case violated his Eighth Amendment rights.[32]

---

[31]*Id*. at 140-41.

[32]*Id*.

10

The Supreme Court has recognized the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, published in February of 1989, as the standards to be applied to counsel representing defendants charged in capital cases.[33] Guideline 11.4.1 mandates that counsel investigate the charging documents in the context of the applicable statutes and precedents to identify "the elements of the charged offenses, including the elements alleged to make the death penalty applicable as well as the defenses, ordinary and affirmative, that may be available to the subsequent charge and the application of the death penalty."[34]   Failure to investigate any and all claims regarding the constitutionality of the aggravating circumstances under which one's client is to be put in jeopardy of the death penalty falls well below the standard of representation required for capital defendants.[35]

Under the terms of the ABA Guidelines, Holder's trial and appellate counsel had an obligation to thoroughly examine the aggravating circumstances in order to discover any defense that may be brought as a challenge the application of the death penalty.  Holder's counsel's failure to do so constitutes deficient performance.

Holder was prejudiced by counsel's performance.  The jury found and improperly weighed the improper pecuniary gain aggravating circumstances in reaching it's decision to impose a sentence of death.  Under the federal death penalty scheme which directs the jury to weigh aggravating and mitigating circumstances, the weighing of an invalid aggravator skews the

---

[33]*See Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

[34]ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1, p. 93 (1989).

[35]*Starr v. Lockart*, 23 F3d. 1280, 1285 (8th Cir. 1993).

sentencing process and is fatal to the reliability of a death sentence.[36] This is true even where the jury has found other valid aggravators because the invalid factor operates as an impermissible "thumb on the death's side of the scale."[37]

The submission of the pecuniary gain aggravator was not harmless beyond a reasonable doubt. Elimination of the pecuniary gain aggravator leaves one statutory aggravator - that Holder knowingly created a grave risk of death to one or more persons in addition to Mr. Heflin.[38] The jury also found three non-statutory aggravators: (1) that Holder's conduct was substantially greater in degree than that described in the definition of the crime; (2) that Holder committed other crimes in addition to the capital offenses; and (3) that Holder is likely to commit future crimes.[39]

The jury found a number of mitigating circumstances. The jury unanimously found that Holder's childhood was characterized by inconsistent parenting; that Holder lacked a positive male role model while growing up; and that Holder has been a father figure to his brother, Norrim, and that due to his influence and efforts, Norrim has made many positive changes in his life.[40] Eleven of the jurors found that Holder assumed the role of the man of the house at a very young age and that he felt a sense of responsibility to provide emotional and financial support to his mother, brothers and sisters.[41] Ten jurors found that Holder is a likeable person who provides support and help to

---

[36]*Id*. at 1286.

[37]*See Stringer v. Black*, 503 U.S. 222, 229-32 (1992).

[38]*See* Special Verdict Form, 3.

[39]*Id*. at 4-6.

[40]*Id*. at 9, 10, 11.

[41]*Id*. at 10.

many of his extended family, friends and associates and that Holder does not present a substantial risk of being dangerous or violent if confined to prison for life without the possibility of relief.[42] Nine jurors found that Holder suffered a series of losses in his life which he failed to process, despite recommendations that he receive counseling; and that he does not have a history of violent behavior and the offenses for which he was convicted are inconsistent with his personality and usual behaviors.[43] Six jurors found that Holder has a large family who is very attentive to and support of him and will help him make an adequate adjustment to prison life and that Holder has made an adequate adjustment to being confined in jail and has not been a problem inmate.[44] Finally, two jurors found that Holder provided a positive role model to Norrim, Norrell and Noremka Holder, Tony Sanders, and others.[45]

The abundance of mitigating circumstances found by the jury as compared to the one statutory and three non-statutory aggravating factors, compel a conclusion that Holder was prejudiced by the erroneous submission of the pecuniary gain factor. Further, the government not only emphasized the weight to be given the aggravating factor but compounded the error by its inflammatory rhetoric.

> Was there pecuniary gain? Once again, there is no question. The first four questions you have here are also clear: that he was 18; that he knew there was a grave risk of death; that other people were at grave risk of harm; and it was for money. You saw the bags of money, that's what it was all about, so he could pay his lawyer. And the reason that Congress made that a statutory mitigator—aggravator, rather, a factor for you to consider, is because it is so immoral for someone to go into a bank, with these

---

[42]*Id*. at 11, 12.

[43]*Id*. at 9, 11.

[44]*Id*. at 12.

[45]*Id*. at 11.

kinds of weapons and a vest on to protect themselves, and take Richard Heflin's life, with his partner, Billie Allen, and take his life; to trade Richard Heflin's life so he could pay his lawyer and buy more gold and cars and whatever else he wanted to buy.[46]

.   .   .

When you are listening to the defendant's mitigating factors, weigh those, as you are required to by law.  Weigh them against the danger to all the people in the bank. Weigh them against the fact that this murder was for money.[47]

.   .   .

If you find - - if you look at those aggravators that the government presented, and compare them to all the mitigators you just heard from the defendant, you can take either one of those aggravators, and say the fact that this was for money outweighs all 17 of defendant's mitigators.[48]

When you weigh the government's six aggravating factors against all those that I just went through, it is very apparent that the government's aggravating factors that all these people are in tremendous danger, the extreme nature of this crime, the fact that it is done for the most reprehensible reason of all, for money, so this guy can have money.[49]

.   .   .

The ultimate question is whether, given counsel's unprofessional error in failing to object to submission of the pecuniary gain aggravator, a reasonable probability exists that the result of the proceeding would have been different.[50]  Given the abundance of the mitigating circumstances found by the jury, a reasonable probability does exist that, had the pecuniary gain aggravator not been

---

[46]Tr. Transcr. vol. XII, 170-71.

[47]*Id*. at 184-85.

[48]*Id*. at 171.

[49]*Id*. at 227.

[50]*See Simmons v. Luebbers*, 299 F.3d 929, 939 (8th Cir. 2002).

14

presented to the jury, at least one of the jurors would have voted against the imposition of the death penalty.

**12C(a), (b), (c) & (h)**

**Ineffective assistance of counsel claims - standard of review**

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel at critical stages of the proceedings. The general standard for analyzing ineffective assistance of counsel claims is set out in *Strickland v. Washington*.[51] Successful ineffective assistance of counsel claims require the establishment of two elements: one, that counsel's performance was deficient; and two, that the defendant was prejudiced thereby.[52] Counsel's performance is deficient if his or her representation fell below an objective standard of reasonableness.[53] To establish prejudice, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.[54] A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.[55] The application of the *Strickland* test necessarily requires a case by case examination of the evidence.[56]

---

[51]*Strickland v. Washington*, 466 U.S. 668 (1984).

[52]*Id*. at 687.

[53]*Id*. at 688.

[54]*Id*. at 694.

[55]*Id*.

[56]*See Wright v. West*, 505 U.S. 277, 308 (1992).

The *Strickland* analysis applies whenever a true adversarial criminal trial has been conducted.  But, a different rule applies where there is a complete breakdown in the adversarial process at trial.  In that case, prejudice is presumed.[57]

### 12C(a).

**The grand jury indictment did not charge a capital offense because it failed to allege at least one statutory aggravating circumstance from 18 U.S.C. § 3592(c), an essential element for a defendant's eligibility for a sentence of death.  Trial and appellate counsel failed to challenge Holder's eligibility for, and his resulting sentence of death, on the basis that it exceeded the maximum sentence authorized for the crimes on which he was indicted.  Was counsel constitutionally ineffective in failing to challenge defendant's sentence of death on the basis that the indictment failed to charge a federal capital offense?**

Holder and his co-defendant, Billie Allen, were indicated together but tried separately.  Prior to trial and at sentencing, Allen argued that a sentence of death would violate the Fifth Amendment Indictment Clause because the indictment failed to contain at least one of the aggravating factors set out in 18 U.S.C. § 3592(c).

Holder was represented at trial by Charles M. Shaw and Jennifer M. Herndon, f/k/a Brewer. Billie Allen was represented by Richard Sindel and John Simon.  Allen's attorneys filed a motion challenging the indictment on the basis that it failed to charge a capital offense.[58]  They provided a

---

[57]*See United States v. Cronic*, 466 U.S. 648, 656-59 (1984).

[58]*See* Allen's Mot. Preclude Death (Oct. 20, 1997), (Doc. 167).

16

copy of said motion to Holder's attorneys.[59]  Further, counsel Herndon was provided with sample motions supplied by the Federal Death Penalty Resource Counsel, which included a motion attacking the indictment on the ground that it failed to charge a capital offense.[60]  Counsel Herndon did not recall reviewing such a motion.[61]

Mr. Richard Burr, a consultant with the Federal Death Penalty Research Counsel, consulted with counsel Herndon throughout the course of this case.  Burr, on numerous occasions, urged counsel Herndon to file a motion adopting all of the motions filed by Mr. Sindel on behalf of Billie Allen.[62]  While counsel Herndon believed that that was good advice, and intended to file a motion, she failed to do so.[63]  As a result, Holder's counsel, unlike Allen's, failed to challenge the indictment on the basis that it did not charge a capital offense.

Holder's case was consolidated with that of Allen on direct appeal.  The cases were argued together and submitted to the United States Court of Appeals for the Eighth Circuit on September 10, 2000.  Since Holder and Allen's cases were consolidated, appellate counsel had access to Allen's brief.  Allen's brief included a claim that the indictment did not charge a capital offense because it failed to specifically contain one or more statutory aggravating circumstances, prerequisites for the imposition of a sentence of death.[64]  Said  claim was based upon the cases of *United States v.*

---

[59]*See Id.*, Certificate of Service.

[60]*See* Holder's Ex. 2B; Hrg. Transcr. vol I, 161-63.

[61]Hrg. Transcr. vol. I, 106.

[62]*Id.* at 108-11; vol. II, 164-65.

[63]Hrg. Transcr., vol. I, 106, 109, 155-56, 158-59.

[64]Br. of Billie Allen, *United States v. Allen, et al.*, 247 F.3d 741 (8th Cir. 2001).

17

*Jones*,[65] and *Apprendi v. New Jersey*.[66]  Counsel Herndon was neither aware that Allen's brief challenged the sentence of death on the basis that the indictment failed to charge a capital offense nor of the legal basis for said claim.[67]

Although Holder's appellate counsel could have adopted all of the applicable arguments contained in Allen's brief under Fed. R. App. P. 28(i), counsel Herndon was unaware of this rule and did not consider doing so.[68]  It was only after Judge Richard Arnold expressed his concerns that she was not adopting the legal arguments contained in Allen's brief that, after consultation with co-counsel, she attempted to do so during her rebuttal argument.[69]  Her attempt was apparently unsuccessful given how the Eighth Circuit opinion in Holder's case does not recognize that Allen's legal issues apply to Holder.[70]

Trial and appellate counsels' failure to challenge the indictment on the ground that it did not charge a capital offense was constitutionally deficient performance.  First, there is no strategic reason for trial counsel's failure to adopt co-defendant Allen's motions.  In fact, counsel Herndon testified that she intended to do so, but that she just dropped the ball.  Had she filed a simple two sentence motion adopting Allen's motions, Holder's case would be on par with that of Allen, primed for a favorable decision on a petition for certiorari.

---

[65]526 U.S. 227 (1999).

[66]530 U.S. 466 (2000).

[67]Hrg. Transcr. vol. I, 136-37.

[68]*Id*. at 137.

[69]*Id*. 137-38; Holder's Exs. 21, 22.

[70]*See United States v. Holder, et al.*, 247 F.3d at 782-95.

18

Appellate counsel's decision not to adopt the arguments contained in Allen's brief was just as deficient. Judge Richard Arnold's comments at oral argument expressing his incredulous disbelief that counsel did not adopt Allen's arguments is clear evidence that counsel's performance in this regard was objectively unreasonable.[71] Again, there was no strategic reason for not adopting the legal arguments asserted in Allen's brief on Holder's behalf. Holder's counsel had everything to gain and nothing to lose by doing so. As aptly stated by Judge Arnold, appellate counsel's failure to adopt Allen's issues could have a disastrous result - Holder could be executed while Allen will not.

Further, appellate counsel should have been aware of *Jones* and *Apprendi* during the course of their representation of Holder. Said cases hold that any fact, other than a prior conviction, which has the effect of increasing a defendant's punishment was, in effect, an element of the offense, and had to be submitted to and found beyond a reasonable doubt by a jury. Those cases support the premise that aggravating circumstances which make a defendant eligible for the death penalty are elements of a capital offense, and thus, need to be presented to and found by a grand jury before a defendant can be charged with a federal capital offense. Had counsel read the *Jones* decision, they would have found the specific statement that "under the Due Process Clause of the Fifth Amendment and the notice and trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury and proven beyond a reasonable doubt."[72]

---

[71]Holder's Ex. 21.

[72]*Jones v. United States*, 526 U.S. at 243 n. 6.

Although the *Jones* decision was not issued until March 24, 1999, Holder's appeal was not decided until April of 2001.  Counsel had ample time to learn of the *Jones* decision and make a challenge to the indictment based on it's failure to include at least one aggravating circumstance. Counsel Herndon testified that she was not aware that the case law supported such a claim.[73]

### Counsel's failure to challenge the indictment prejudiced Holder

Earlier in this document, counsel has articulated how Holder's sentence of death violates the Fifth Amendment Indictment Clause, and how such a violation is a structural defect.[74]  Rather than repeat that argument, Holder incorporates said portion of this pleading in this section in support of his position that, but for counsel's error in failing to challenge the indictment on the basis that it failed to charge a capital offense, he would not be under a sentence of death.

As stated earlier, Billie Allen has a petition for writ of certiorari currently pending before the United States Supreme Court.[75]  The question presented is whether the failure to include an aggravating circumstance in the indictment herein is a structural defect warranting relief, or whether said error is subject to harmless error analysis.  If the Supreme Court accepts certiorari, then the Court's decision in *Allen* will have in impact on whether counsel's failure to challenge the indictment prejudiced Holder.  In the event that the Supreme Court denies certiorari, Holder's position in that *Stirone v. United States*[76] controls, and supports his argument that counsel's failure

---

[73]Hrg. Transcr. vol. I, 107-08.

[74]*Supra*, 3-5.

[75]*Allen v. United States*, No. 05-6764.

[76]*Supra*.

to object to the indictment on the basis that it failed to charge a capital offense prejudiced Holder.

**12C(b), (c).**

**Holder was charged in a two count indictment with bank robbery by force or violence in which a killing occurs, and using or carrying a firearm during a crime of violence which resulted in a murder. Neither of said offenses required the government to prove that Holder deliberated on the killing in order to be convicted and eligible for a sentence of death. Was counsel constitutionally ineffective when he conceded in opening statement and closing argument that Holder participated in the armed robbery in which a killing occurred, and advised him to testify when his testimony conceded guilt on the capital charges?**

Holder was charged, along with Billie Allen, in a two count indictment with committing the crime of bank robbery by force or violence in which a killing occurs in violation of 18 U.S.C. §§ 2, 2113(a) & (e), and in Count II with carrying or using a firearm during a crime of violence which resulted in murder in violation of 18 U.S.C. §§ 924(c)(1) and (j)(1).  In order to find Holder guilty on Count I, the jury had to unanimously find the following elements beyond a reasonable doubt: "One, that defendant took money from the person in the presence of another while that money was in the care and custody of the Lindell Bank & Trust Company; Two, such taking was by force and violence or intimidation; Three, the deposits of Lindell Bank & Trust Company were then insured by the Federal Deposit Insurance Corporation; and Four, in committing this offense, the defendant, or a person aided and abetted by the defendant, killed Richard Heflin."[77]

---

[77]*United States v. Holder*, No. 4:97CR141 ERW, Instr. 15.

To return a guilty verdict on Count II, the jury had to find: "One, the defendant willfully and intentionally committed the crime of bank robbery as charged in Count I; Two, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm; Three, that in the course of committing the crime of bank robbery as charged in Count I, while knowingly using or carrying a firearm, the defendant, or a person aided or abetted by the defendant, killed Richard Heflin by the use of a firearm; and Four, the killing of Richard Heflin was murder in the perpetration of a robbery."[78]

In order to find that Holder aided and abetted the commission of either Count I or Count II, the jury had to find that Holder (1) must have known that either the bank robbery or the offense of using or carrying a firearm during and in relation to a bank robbery was being committed or going to be committed; (2) intentionally acted in some way for the purpose of causing, encouraging or aiding the commission of either offense and, in the course of either offense, Richard Heflin was killed; and (3) must have been aware of a serious risk of death attending his conduct.[79]

Charles Shaw entered his appearance on Holder's behalf in the district court on March 25, 1997. Sometime thereafter, Mr. Richard Burr of the Federal Death Penalty Resource Counsel, an organization which assists attorneys nationwide in the defense of federal capital cases, contacted counsel Shaw and offered his assistance. At Mr. Burr's recommendation, counsel Shaw retained Caryn Tatelli, a mitigation specialist, in December of 1997 to perform the mitigation investigation. Shortly thereafter, Ms. Tartelli met with counsel Shaw to discuss the penalty phase investigation. She determined that counsel Shaw was resistant to developing a mitigation case and ill-prepared to

[78]*Id.*, Instr. 19.

[79]*Id.*, Instrs. 16, 20.

handle the case.  Ms. Tatelli contacted Mr. Burr and asked him to intervene with counsel Shaw and convince him to accept her help, and get another lawyer on board to handle mitigation.  Mr. Burr subsequently was able to contact counsel Shaw and convince him to seek the appointment of a second lawyer to handle the penalty phase portion of the trial.[80]

In February of 1998, approximately thirty days before trial, counsel Herndon, f/k/a Brewer, was appointed pursuant to the Criminal Justice Act.  Shortly thereafter, counsel Herndon met with counsel Shaw to discuss trial strategy.  At that time, counsel Herndon learned that counsel Shaw's planned trial strategy was to argue that Holder was not guilty of the charged offenses because he neither fired his weapon nor intended for anyone to get hurt during the robbery.[81]  But, neither of the offenses with which Holder was charged required that Holder fired his weapon nor specifically intended beforehand that anyone was to get hurt in order to be convicted.  All that was required to find defendant guilty under either count was to show that he intentionally took part in an armed bank robbery, been aware of a serious risk of death attending his conduct, and that either he or a person whom he aided or abetted, killed a person during the perpetration of the robbery.

Counsel Shaw was unaware of the essential elements of the offenses charged in the indictment.  He was under the mistaken belief that the law required the government to prove that Holder specifically deliberated on the killing of the guard in order to be convicted of a capital offense.[82]  He believed that Holder was charged with two offenses, bank robbery in Count I and murder in Count II.  His trial strategy was centered around his belief that Count I was not a capital

---

[80]Hrg. Transcr. vol. II, 150-52, 157-61, 178, 212.

[81]Hrg. Transcr. vol. I, 112.

[82]*Id*. at 113-14; vol. II, 167.

offense, and that Holder could admit participating in the armed bank robbery as charged in Count I without making himself eligible for the death penalty.[83]

Mr. Burr and counsel Herndon met with counsel Shaw prior to trial in an attempt to convince him that his trial strategy was flawed, and that what he perceived as a defense, was really no defense at all.[84]  Counsel Herndon remembers Mr. Burr pulling out the applicable statute, and going over it with Mr. Shaw in an attempt to convince him that Count I was a capital offense.[85]  Mr. Burr and counsel Herndon were unable to convince counsel Shaw that his interpretation of the charges were incorrect.

As a result of his misunderstanding of the charges, Mr. Shaw assured Holder's convictions for the offenses charged.  Beginning with his opening statement, he conceded the government's case and "greased the skids" for Holder's conviction of a capital offense.

> Now, jurors, the evidence is going to show, and with candor you will hear that the defendant robbed that bank.[86] . . .
>
> .    .    .
>
> The judge will explain to you later on what malice aforethought means, but you've got to find that he intended the death of Heflin.  Now the evidence is going to show you that this Mr. Heflin was purposefully shot by this person known as Billy Allen.[87]
>
> .    .    .

---

[83]Hrg. Transcr. vol. I, 112; vol. II, 166-67; Holder's Depo., 49, 52-3, 55.

[84]Hrg. Transcr. vol. I, 113-14; vol. II, 167.

[85]*Id*.

[86]Tr. Transcr. vol. I, 64.

[87]*Id*. at 65.

The evidence is going to be that when he entered the bank, he thought no guns would be fired, and they were not to be fired. There will be no evidence that this defendant at any time fired the Russian-made weapon.[88]

.   .   .

Defendant fired no shots. Defendant's back was to the shooting when the shooting started…. from then on, of course, the defendant was caught. The defendant committed a robbery.[89]

.   .   .

We will at the end of this case ask that he be found not guilty of murder, as "murder" will be explained to you by the judge. As for the robbery, with candor and forthrightness, you will hear that he committed that robbery.[90]

In keeping with his trial strategy, counsel Shaw cross-examined the government's witnesses during the guilt phase in an attempt to convince the jury that Holder did not fire his weapon during the robbery, and that said fact rendered him not guilty of murder. Tragically, Mr. Shaw's misunderstanding of the charged offenses led him to convince Holder to take the stand, unknowingly admit each and every element of the offenses with which he was charged, and in the process, make himself eligible for the death penalty.[91]

Consistent with his misunderstanding of the charges, counsel Shaw stressed his theme in this closing argument that, while counsel was guilty of an armed bank robbery, he was not guilty of murder.

There is no doubt – we have never denied that since this trial started – that this defendant committed the extreme folly, the material act that seizes society by the

_____

[88]*Id*. at 67.

[89]*Id*. at 68.

[90]*Id*. at 169.

[91]Tr. Transcr. vol. VII, 69, 70, 81, 84-89, 104-06.

25

throat, committing a bank robbery, armed, which he was, to get himself out of his problems which was utterly wrong and for which he will pay.[92]

. . .

You have to leap frog.  In order to convict him of murder, you gave to leap frog over what these people have told us, the people in the bank, and just, convict him of murder because, tragically, manically and completely without justification, Billy Allen shot and killed Mr. Heflin.[93]

. . .

That is the reason he is here.  He has admitted to robbery, but the murder, any intention, even knowledge that he was shot when Heflin was shot, he wasn't in the bank.[94]

. . .

We admitted and I told you at the beginning that defendant was involved in this robbery; and that what he did was, of course, punishable, and what he did is inexcusable.  We offer no excuses for this part in this.  We are not asking to be excused for it.  But we reject totally the charge of murder.  Now , you can say what you want, but murder takes an intention for somebody to be killed.[95]

Trial counsel's performance in this regard was constitutionally deficient.  By conceding Holder's participation in the armed bank robbery in which killing occurred and by putting him on the witness stand to so testify, trial counsel assured Holder's convictions for the offenses charged and made Holder eligible for the death penalty.  Counsel's actions cannot be justified as any conceivable trial strategy.  His concessions of guilt in opening and closing statements, and his advice to his client to testify when his testimony would make him death eligible were unthinkable blunders - the result of counsel Shaw being totally unaware of the nature of the offenses with which his client was

---

[92]*Id*. at 77.

[93]*Id*.

[94]*Id*. at 80.

[95]*Id*. at 86-87.

charged.[96]  By admitting defendant's planning and participation in the Lindell Bank & Trust armed bank robbery, counsel Shaw assured Holder's conviction of a capital offense.

This case is governed by the standard set out in *United States v. Cronic*.[97]  Prejudice is presumed because, given counsel Shaw's misunderstanding of the charges, there was a complete breakdown in the adversarial process during the guilt phase of Holder's trial.  By conceding Holder's guilt in opening and closing statements and by putting him on the witness stand to admit that he participated in the bank robbery armed with military assault weapons, counsel Shaw failed to subject the government's case to meaningful adversarial testing.[98]  As a result, the *Cronic* standard is applicable and prejudice is presumed.[99]

Alternatively, Holder was unquestionably prejudiced by counsel's performance and can meet the *Strickland* prejudice standard.  The government took full advantage of counsel's deficient performance by outlining the elements of each offense in closing argument, and adeptly pointing out that Holder admitted each and every element during his testimony.[100]  Further compounding matters was the fact that Holder's testimony did not go well.  Besides being totally unprepared as a witness, Holder came across as combative, remorseless, indifferent, cold, and as someone looking to avoid

---

[96]*Regan v. Norris*, 365 F.3d 616, 621 (8th Cir. 2004) (trial counsel's failure to be aware of the elements of the offense falls below an objective standard of reasonableness).

[97]466 U.S. 648 (1984).

[98]*See State v. Harrington*, 708 A.2d 731, 737 (N.J. 1998) (a lawyer who concedes that his client committed the predicate offense to felony murder fails to subject the prosecutor's case to meaningful adversarial testing); *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991) (prejudice is presumed when counsel concedes in closing argument that his client robbed the bank).

[99]*See United States v. Cronic*, 466 U.S. at 656-59.

[100]Tr. Transcr. vol. VII, 38-42, 64.

responsibility by shifting the blame to the co-defendant.[101]  In addition, given the uncontraverted ballistics evidence which showed that there were a number of spent shells which could not have come from Allen's gun but could have been fired from Holder's gun, counsel Shaw set his client up to be branded as a liar by eliciting his testimony that he did not fire his weapon during the robbery.[102]  In fact, the government characterized Holder's testimony as aggravating evidence and used it to convince the jury to return sentences of death.[103]

Holder's testimony most likely convinced the jury to sentence him to death.  But for counsel's erroneous advice to Holder that he was charged with two offenses - non-capital bank robbery and murder - Holder would not have testified.[104]  Had he not, there would have been a reasonable likelihood that he would not have received the death penalty.

**12C(h).**

**Lead counsel Charles Shaw was generally inattentive and slept through parts of the sentencing phase proceedings.  Was Holder deprived of the effective assistance of counsel when, despite his lack of interest or knowledge of the sentencing phase strategy, counsel Shaw gave the penalty phase closing argument and, in the course thereof, failed to properly present the mitigation strategy developed by co-counsel Herndon and mitigation specialist Tatelli to the jury?**

---

[101]Hrg. Transcr. vol. I, 130, 135.

[102]Tr. Transcr. vol. VI, 166-67.

[103]Tr. Transcr. vol. XII, 178-79, 186-93, 215-18.

[104]Holder's Depo., 36-37.

28

Caryn Tatelli was hired by the defense team as a mitigation specialist. She worked closely and exclusively with Jennifer Herndon in developing the mitigation case for Holder.[105] Counsel Shaw, on the other hand, had nothing to do with preparation of the mitigation case.[106] While Caryn Tatelli prepared and tendered mitigation witness summaries to Shaw for his review, he told her to give them to Jennifer Herndon.[107] Shaw's reason for doing so stemmed from his belief that there wasn't going to be a penalty phase because Holder did not shoot the guard.[108]

Jennifer Herndon got into the case in February of 1998, approximately six weeks before trial. She and Caryn Tatelli worked around the clock to develop the mitigation case. During the course of developing the mitigation strategy, there never was a meeting with Charles Shaw in which a consistent guilt/penalty phase strategy was discussed.[109] Again, counsel Shaw's position was that there wasn't going to be a penalty phase, so why bother.[110]

Contrary to counsel Shaw's prediction, Holder was convicted of both counts of the indictment, warranting a penalty phase hearing. Counsel Herndon handled all the penalty phase witnesses. The mitigation strategy, as developed by her and Ms. Tatelli, was to give the jury a reason for the robbery. The mitigation theory revolved around the fact that Holder was, in effect, the man of the house. His father had left and his mother was on drugs. He had to provide for his family. But,

---

[105]Hrg. Transcr. vol. I, 15, 116, 125.

[106]*Id*. at 22, 118.

[107]*Id*. at 46, 119.

[108]*Id*. at 13, 22, 46, 79, 114-15.

[109]*Id*. at 17.

[110]*Infra*, n. 109.

when he lost his leg, it impacted his ability to do so. He needed money to obtain a new prosthetic leg so as to be more productive. His solution was to rob a bank in order to obtain the money to do so.[111]

Counsel Shaw was unaware of the mitigation strategy, having neither read the mitigation summaries nor shown any interest in that part of the trial.[112] During the penalty phase proceeding, Ms. Tatelli saw counsel Shaw's head bobbing with his eyes closed as if he were sleeping.[113] Shaw's apparent sleeping was consistent with the lack of interest he had previously shown in the mitigation case. It would not have mattered if Shaw would have stayed totally out of the mitigation case. But, unfortunately he did not.

Despite his lack of involved in the mitigation case, counsel Shaw told counsel Herndon that he was going to give the penalty phase closing argument.[114] Counsel Herndon was alarmed at this development and believed that it would be disastrous to the mitigation case.[115] Her reaction was to call Richard Burr and ask that he come to St. Louis to try to talk Shaw out of doing the penalty phase closing argument.[116]

The next day, Richard Burr flew to St. Louis and met with counsels Shaw and Herndon. During the course of that meeting, counsel Shaw's position became clear - that the penalty phase

---

[111]*Id*. at 116-17.

[112]*Id*. at 16, 118-19, 125.

[113]*Id*. at 28-30.

[114]*Id*. at 126.

[115]*Id*. at 126-27.

[116]*Id*.

evidence adduced by Ms. Herndon didn't make any difference. The only thing that mattered was that Norris didn't shoot the guard.[117]

Counsel Herndon disagreed. She believed that the penalty phase evidence needed to be linked together and that she was the proper person to do so, having worked explicitly on the mitigation case with Ms. Tatelli.[118] At the end of the meeting, counsel Herndon believed that she was going to do the closing argument.[119] But, the next day, counsel Shaw came to court and told her that he was going to do the closing argument.[120] He proceeded to do so, arguing the same thing that he did at the guilt phase - that Holder shouldn't be eligible for the death penalty because he didn't shoot the bank guard.[121]

A defendant is entitled to the effective assistance of counsel at critical stages of the proceeding. A penalty phase of a capital trial is clearly a most critical stage of the proceeding.[122] Holder was entitled to the effective assistance of counsel throughout the penalty phase. He was entitled to have a lawyer familiar with the mitigation case not only present the evidence to the jury, but also explain to the jury how said evidence tied together and why it would warrant a life sentence.[123] Holder was deprived of this right when counsel Shaw, someone totally unfamiliar with

---

[117]*Id.*

[118]*Id.* at 124.

[119]*Id.* at 128.

[120]*Id.*

[121]Tr. Transcr. vol. XII, 199-202, 208.

[122]*See, Wiggins v. Smith, supra*; *Williams v. Taylor, supra.*

[123]*See Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) (defense counsel must make a significant effort to focus the jury's attention on mitigating factors).

31

the mitigation strategy and someone who slept through portions of the mitigation trial, gave the closing argument in lieu of counsel Herndon, the lawyer who was instrumental in developing the mitigation case. Counsel Shaw's performance in this regard was constitutionally deficient .

Counsel Shaw's performance in giving the penalty phase closing argument after sleeping and being inattentive to the mitigation case clearly prejudiced Holder. The mitigation case needed to be tied up for the jury.[124] Counsel Shaw had no way of knowing how to do this because he was unfamiliar with the mitigation strategy. Counsel Shaw simply got up and argued to the jury in the mitigation case that Holder shouldn't get the death penalty because he didn't shoot the guard - a theory that the jury rejected during the course of the guilt phase. Had counsel Herndon done the closing argument, she would have pulled the mitigation evidence into a cohesive story explaining why Holder should receive a life sentence.[125]

The verdict director that the jury returned outlining the mitigation factors which they found to exist corroborates the fact that Holder was prejudiced by Shaw's failure to tie the mitigation case together. The jury found the existence of a number of mitigators that were part of counsel Herndon's and Ms. Tatelli's mitigation strategy.[126] Conversely, the jury did not find the existence of the factors argued by counsel Shaw - that Holder neither fired the shots which resulted in the guard's death, nor intended for any person to be killed during the robbery.[127] It was clear that the jury had no guidance as to how all the mitigation circumstances tied together. Had they been aware of the significance of

---

[124]Hrg. Transcr. vol. I, 77.

[125]*Id*. at 127-28.

[126]*See* Special Verdict Form, 9-12.

[127]*Id*., 8-9.

those factors, there is a reasonable likelihood that at least one of the jurors would have voted for a

life sentence.

Respectfully submitted,

/s/ Christopher E. McGraugh
CHRISTOPHER E. MCGRAUGH, #25278
Leritz, Plunkert & Bruning, P.C.
One City Center, Suite 2001
St. Louis, Missouri 63101
(314) 231-9600
(314) 231-9480 - Facsimile
E-mail: cmcgraugh@leritzlaw.com

/s/ Michael J. Gorla
MICHAEL J. GORLA, #3251
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com

*Counsel for Norris Holder*

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2005, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:  Mr. Steven Holtshauser and Mr. Joseph M. Landolt, Assistant United States Attorneys, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102.

/s/ Michael J. Gorla
Michael J. Gorla, #3251
Attorney for Norris Holder
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com