UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NORRIS HOLDER, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No.  4:03CV0923 ERW |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

GOVERNMENT'S RESPONSE TO MOVANT'S
POST-HEARING BRIEF

Comes now Respondent, United States of America, by and through Catherine L. Hanaway,

United States Attorney for the Eastern Judicial District of Missouri, and Steven E. Holtshouser and

Joseph M. Landolt, Assistant United States Attorneys for said District and hereby respond to

Movant's Post-Hearing Brief ("Movant's Brief") as follows:

**I. FACTUAL BACKGROUND**

In 1998, Movant Norris Holder ("Holder") and his co-defendant Billie Allen ("Allen")

were convicted after separate trials of killing security guard Richard Heflin during the

commission of the armed robbery of the Lindell Bank and Trust Company which occurred on

March 17, 1997.  Holder and Allen were each convicted of armed bank robbery in which a

killing occurred in violation of 18 U.S.C. §2113(a) and (e) (Count I) and using and carrying a

firearm during the commission of a crime of violence that resulted in the death of another person

under circumstances constituting first-degree murder, in violation of 18 U.S.C. §924 (j) (Count

II).  The jury recommended death as to each count and this Court sentenced Holder accordingly.

1

The Government presented overwhelming evidence of Holder's guilt at trial. A detailed summary of that evidence is contained on pages 3-36 of The Government's Response to Motion Under 28 U.S.C. §2255 To Vacate, Set Aside or Correct Convictions and Sentences by a Person in Federal Custody ("§2255 Response") filed with this Court on August 31, 2004 (document number 21). The voluminous evidence of Holder's guilt will not be recited again here, but references to the trial transcript will be made where appropriate.

On direct appeal, the Eighth Circuit affirmed the convictions of Holder and Allen, expressly rejecting Allen's contention that the indictment violated the Fifth Amendment because it failed to allege at least one aggravating factor and one mental intent factor that would make the defendant eligible for the death penalty. See United States v. Allen, 247 F.3d 741, 761-764 (8th Cir. 2001) ("Allen I"). Subsequent to Allen I, the Supreme Court decided Ring v. Arizona, 536 U.S. 584 (2002), holding that statutory aggravating factors that define eligibility for the death penalty are the functional equivalent of offense elements and must be found unanimously by the petit jury under a reasonable doubt standard. On the basis of Ring, the Supreme Court granted Allen's certiorari petition, vacated the Allen I decision, and remanded the case back to the Eighth Circuit for reconsideration in light of Ring. On reconsideration, a divided panel of the Eighth Circuit (R.S. Arnold and Melloy, JJ. ; Hansen, J., dissenting in part) held that "the indictment in Allen's case failed to charge a federal capital offense, and that given Allen's timely objections this failure cannot be dismissed as harmless." See United States v. Allen, 357 F.3d 745 (8th Cir. 2004)("Allen II"). The Allen II majority ordered that Allen's death penalty be vacated. On the Government's petition, the Court granted rehearing en banc. Upon rehearing, a unanimous Court held, inter alia that: (1) Ring requires capital aggravating factors to be found by

the grand jury and included in the indictment; (2) the defect in Allen's indictment was not structural error and was subject to harmless error review; and (3) the error was harmless beyond a reasonable doubt. See United States v. Allen, 406 F.3d 940, 942, 943-945, 945-949 (8th Cir. 2005) (en banc), cert. denied, 127 S.Ct. 826 (2006), rehearing denied, 127 S.Ct. 1361 (2007) ("Allen III"). The Allen III decision is now the controlling precedent within the Eighth Circuit regarding the Ring issue. Holder did not raise the Ring issue on appeal, and the Supreme Court denied his petition for certiorari. Holder v. United States, 539 U.S. 916 (2003).

This Court ordered an evidentiary hearing be held regarding the following claims raised by Holder in his §2255 Petition: (1) Issue 12A - Violation of the Fifth Amendment Indictment Clause; (2) Issue 12B - Jury's Improper Consideration of the Pecuniary Gain Statutory Aggravator; (3) Issue 12C(a) - Counsel's Unreasonable and Prejudicial Failure to Challenge the Indictment; (4) Issue 12C(b) - Trial Counsel's Unreasonable and Prejudicial Advice to Testify; (5) Issue 12C(c) - Trial Counsel's Unreasonable and Prejudicial Concession of Guilt During Opening Statement and Closing Argument; and (6) Issue 12C(h) - Trial Counsel's Prejudicial Sleeping During Critical Stages of the Proceeding. The hearing was held on July 18-20, 2005. Holder presented the testimony of Caryn Platt Tatelli, Jennifer Herdon and Richard Burr. Holder did not testify at the hearing, but his deposition taken on July 5, 2005 was admitted in lieu of his testimony.

## II. FAILURE OF INDICTMENT TO CHARGE STATUTORY AGGRAVATING FACTOR WAS HARMLESS BEYOND A REASONABLE DOUBT (CLAIM 12A)

The capital indictment in this case did not allege special findings to include at least one statutory aggravating factor. Although co-defendant Billie Allen raised a claim that the failure of the indictment to allege statutory aggravating factors violated his Fifth Amendment

Indictment Clause rights, Holder did not adopt Allen's motion.  On appeal, Holder did move to adopt the appellate claim made by Allen and seek review of the issue under a plain error standard.  The Eighth Circuit's opinion in Allen I is not clear on whether it granted Holder's request, but it clearly rejected Allen's claim of a Fifth Amendment violation.  Given the en banc decision in Allen III, together with the Supreme Court's denial of Allen's application of a writ of certiorari, Holder's claim in the pending motion must be denied.

It was undisputed in Allen III that the failure of the indictment to allege statutory aggravating factors violated the Fifth Amendment indictment right and the Supreme Court's holding in Ring v. Arizona, 536 U.S. 584 (2002).  The issue in Allen III was whether such an error was structural, and thus not subject to harmless error review, or non-structural, and thus capable of harmless error analysis.  The Court determined that it was not a structural error and evaluated the actual Grand Jury presentation in this case to conclude that any error was harmless beyond a reasonable doubt.

The same Grand Jury returned the same indictment jointly charging Allen and Holder with the same crimes.  Allen III determined beyond a reasonable doubt that any rational grand jury would have returned an indictment alleging the requisite mens rea and at least one statutory aggravating factor to satisfy Ring.  There is no principled basis for a different conclusion with respect to Holder.

Accordingly, the indictment error in Holder's indictment was harmless beyond a reasonable doubt and this argument in support of his petition should be rejected.

Alternatively, Holder is procedurally barred from litigating this issue in a motion under 28 U.S.C. §2255.  First, because there were extensive pretrial motions hearings, a trial and a

direct appeal in this case, there is the question whether Holder's substantive claims are cognizable at all in a motion under 28 U.S.C. §2255.  Claims that were raised and decided on direct appeal cannot be relitigated in a §2255 motion.  United States v. Davis, 406 F.3d 505 (8th Cir. 2005); United States v. Wiley, 245 F.3d 750, 752 (8th Cir. 2001).  The only exception to this rule is where the alleged error is a "fundamental defect[] that inherently result[s] in a complete miscarriage of justice."  United States v. Manko, 772 F.2d 481, 482 (8th Cir. 1985).

In addition, if a claim could have been raised on direct appeal, but was not, it cannot be raised in a §2255 motion unless the petitioner can show both (1) a "cause" that excuses the default, and (2) "actual prejudice" resulting from the errors of which he complains.  United States v. Frady, 456 U.S. 152, 168 1982); Matthews v. United States, 114 F.3d 112, 113 (8th Cir. 1997); Schneider v. United States, 981 F.2d 989, 990 (8th Cir. 1992).  If a petitioner is unable to show "cause" and "actual prejudice," he must make a "substantial claim that constitutional error has caused the conviction of an innocent person."  Schlup v. Delo, 513 U.S. 298, 324 (1995).  A claim of actual innocence must be based on "new evidence," and must convince the court that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  Id. at 327.  See, also, Embrey v. Hershberger, 131 F.3d 739 (8th Cir. 1997).

 Here, Holder did not raise a challenge to the indictment on Fifth Amendment grounds before the district court or in his initial appellate briefs or even in oral argument of his direct appeal.  If Allen I is viewed as having not permitted Holder to adopt this argument[1], then Holder

---

[1]It would seem unlikely that the Allen I Court did not allow Holder to adopt Allen's appellate argument on this issue, because it was the Court's suggestion during oral argument that Holder's counsel do so.  However, the Allen I opinion did not expressly state that is was granting Holder's subsequent written request and Holder did not seek a remand from the Supreme Court after Ring.

is procedurally barred, because he could have raised this issue in his direct appeal and did not

and has not established cause or actual prejudice from the alleged error.  If Allen I is viewed as

having permitted Holder to adopt this issue, then he is procedurally barred, because the issue was

raised and resolved on direct appeal and does not involve a fundamental defect that resulted in a

miscarriage of justice.

## III. SUBMISSION OF PECUNIARY GAIN STATUTORY AGGRAVATOR TO JURY WAS PROPER (CLAIM 12B)

Holder argues that it was prejudicial error for the District Court to submit the pecuniary

gain statutory aggravator, 18 U.S.C. §3592(b)(8), to the trial jury.  Section 3592(b)(8) contains

two (2) separate prongs.  United States v. Wicklund, 114 F.3d 151, 154 (10th Cir. 1997); United

States v. Cooper, 91 F.Supp.2d 90, 105 (D.D.C. 2000).  The first covers killings committed "as

consideration for the receipt" of anything of pecuniary value and the second covers killings

committed "in the expectation of the receipt" of anything of pecuniary value.  The first clause is

clearly limited to murder-for-hire situations, but the second prong "identifies a separate ground."

Wicklund, 114 F.3d at 154.  The phrase "as consideration for" derives from the language of

contract, is almost identical to the language in 18 U.S.C. §1958(a), and "means consideration in

the traditional sense of bargained for exchange."  Wicklund, 114 F.3d at 154.

The second prong "means something other than murder for hire."  Cooper, 91 F.Supp2d

at 105.  See also, Wicklund, 114 F.3d at 154; United States v. Matthews, 246 F.Supp.2d 137, 148

(N.D.N.Y. 2002); United States v. Cuff, 38 F.Supp2d 282, 288 (S.D.N.Y. 1999); United States v.

Spivey, 958 F.Supp. 1523, 1530 (D.N.M. 1997); United States v. Nguyen, 928 F.Supp. 1525,

1535-36 (D.Kan. 1996); United States v. Walker, 910 F.Supp. 837, 848-49 (N.D.N.Y. 1995).  As

the court stated in Nguyen, there is "no principled reason why the second prong" stops at

6

murders for hire and "reaches no further." Nguyen, 928 F.Supp. at 1536.[2]  To satisfy this prong, the Government must show that the defendant committed the murder in question in expectation of the receipt of pecuniary gain.  Although Congress chose not to include bank robbery among the list of offenses which by themselves give rise to a statutory aggravator, there is no reason to suggest that, in the context of a bank robbery, a murder cannot be committed in expectation of the receipt of anything of pecuniary value.

In United States v. Walker, 910 F.Supp 837, 848-849 (N.D.N.Y. 1995), the district court addressed analogous language in the death penalty scheme found at 21 U.S.C. § 848(n)(7), and stated that the clause has two prongs: (1) "the offense was committed 'as consideration for the receipt' or (2) 'in the expectation of the receipt' of something of pecuniary value."  Walker concluded that the first prong is intended to cover murder for hire situations, and the second prong is much wider in scope and includes any murder where the killer expects to receive anything of pecuniary value.  Id.  In rejecting arguments that the language applied only to murder for hire situations or where the killer would receive an inheritance or insurance proceeds, Walker concluded that nothing in the plain language of, "in expectation of the receipt, of anything of pecuniary value" supported such a restrictive construction of the statute.  Id.  To the contrary, the use of the phrase "*anything* of pecuniary value" contravenes a narrowing construction.  Id.  Accord, United States v. Cooper, 91 F.Supp.2d 90, 105-06 (D.D.C. 2000).

Several cases have denied motions to strike the aggravator where the underlying criminal episode involved a robbery.  Cooper, 91 F.Supp.2d at 105 (Starbuck's robbery);  Nguyen, *id.*

---

[2]However, Nguyen and United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000), discussed *infra,* arise from the same criminal episode.

(robbery of a restaurant); Matthews, 246 F.Supp.2d at 148 (drug-related robbery).[3]  The Ninth

Circuit, in the context of rejecting a collateral attack on an Arizona capital conviction based on a

nearly identical aggravator and a botched robbery attempt[4], held that a "rational sentencer could

have found the existence of the pecuniary gain aggravating factor."  LaGrand v. Stewart, 133

F.3d 1253, 1260 (9th Cir. 1998).   Moreover, the Government has not been able to find,  and

defendant fails to cite, any case which holds that the aggravator cannot be applied in the context

of a bank robbery.

     In United States v. Bernard, 299 F.3d 467, 483 (5th Cir. 2002), murders were committed

in connection with a carjacking and  an ATM robbery.  The evidence established that at the time

of the murders, the vehicle had already been stolen and the ATM had already been robbed.  The

motive for the murders was to prevent the victims from identifying the defendant.  The Court

found that the pecuniary gain aggravator was improperly submitted to the jury because the

instructions did not require the jury to find that the pecuniary gain was expected to follow as a

direct result of the murder as opposed to the robbery.  The court stated that "the application of

---

[3]Chief Judge Carol E. Jackson denied a motion to strike the pecuniary gain aggravator from the indictment in United States v. Bolden, No. S1-4:02CR557 CEJ (Memorandum and Order dated November 2, 2005).  In Bolden, a security guard was murdered when he refused to surrender his firearm to Bolden as Bolden was attempting to enter a bank to rob it.  In addition, the pecuniary gain aggravator was also submitted to the jury in Bolden and the jury found the aggravator proven beyond a reasonable doubt. This case is pending direct appeal.

[4]A robbery was attempted and the victim was murdered when he was unable to open a safe.  The Arizona Supreme Court gave the following rationale for upholding application of the aggravator there: ". . . the murder was neither accidental nor unexpected.  The reason defendant was there was his expectation of pecuniary gain and the reason he stabbed the victim was because the victim was unable to open the safe, frustrating defendant's continuing attempt for pecuniary gain.  The defendant's goal of pecuniary gain caused the murder and murder was in furtherance of his goal."  State v. LaGrand, 153 Ariz. 21, 36, 734 P.2d 563 (1987).

the 'pecuniary gain' aggravating factor is limited to situations where 'pecuniary gain' is expected 'to follow as a direct result of the (murder),'" quoting <u>United States v. Chanthadara</u>, 230 F.3d 1237, 1263 (10th Cir. 2000). The court held that the aggravating factor, pecuniary gain, "is only applicable where the jury finds beyond a reasonable doubt that the <u>murder itself</u> was committed 'as consideration for, or in the expectation of' pecuniary gain.'" <u>Bernard</u>, 299 F.3d. 467, 483. Thus, <u>Bernard</u> is a jury instruction case and requires that a finding based on the second clause of Section 3592(c)(8) be supported by an instruction and evidence that requires the pecuniary gain to "flow directly from the homicide." <i>Id.</i> at 483. Moreover, the facts of <u>Bernard</u> could not meet that standard, because of the <u>timing</u> of the murders, namely <u>after</u> the receipt of anything of pecuniary value.

Chanthadara, another case relied upon by Holder, likewise involved unique facts. There, a restaurant was robbed and the robbers attempted to get one of the owners to open a safe to obtain further money and when she was unable to open the safe she was shot and killed. On direct appeal, the defendant argued that the jury instruction on the pecuniary gain aggravator was erroneous because the jury was not permitted to find the expectation of gain from the underlying felony as opposed to the actual killing and that because all money had been taken before the killing, no "further monetary benefit [could] result [from] the homicide." Chanthadara, 230 F.3d at 1263. The court agreed that the gain must be expected "as a result of the victim's death." <i>Id.</i> It reasoned that "the offense" language of the aggravator, as applied to felony murder cases, had to refer to the homicide, rather than the robbery in which pecuniary gain is "implicit", because to rule otherwise would result in an automatic finding of the aggravator in robbery cases. Thus, the

error was the jury instruction's failure "to specify the 'offense' to which it referred was the homicide, not the underlying robbery". *Id.* at 1264.

Nothing in Bernard or Chanthadara requires a determination that the 2d clause of the pecuniary gain aggravator cannot apply in a bank robbery case.  What both cases mandate is that the jury be required to find that "the offense" which the defendant expects to receive pecuniary gain from is the homicide, not the robbery offense.  Here, that standard was met, because the jury was properly instructed and the guard, Richard Heflin, was killed before any money was taken.[5]

Holder also relies on the Eighth Circuit's opinion in Allen II.  The discussion of the pecuniary gain aggravator in Allen II was in the context of rejecting the Government's contention that the indictment was sufficient to allege the pecuniary gain aggravator by simply alleging that a bank robbery occurred in which a killing resulted.  While the Eighth Circuit noted the results in Chanthadara and Bernard with approval, it was not faced with the issue of the propriety of submitting the aggravator to the jury and, in any event,  the opinion was later vacated and eclipsed by the en banc decision in Allen III.  Thus, any discussion of the pecuniary gain aggravator in Allen II was *dicta* and is of no precedential value.

The facts in this case clearly supported an inference that pecuniary gain was expected to flow as a direct result of the murder as required by Bernard and Chanthadara.  In Bernard, the murder occurred hours after the robbery and in Chanthadara, the defect was the failure of the

---

[5]This Court need not decide whether the pecuniary gain aggravator can apply when the killing occurs after the robbery, although at least two courts have held that the sequence of events is not necessarily controlling.  United States v. Brown, 441 F.3d 1330, 1372 (11th Cir. 2006)("murder and robbery occurred nearly simultaneously" and pecuniary gain factor properly submitted); United States v. Roman, 371 F.Supp.2d 36, 45-46 (D.P.R. 2005)(same).

jury instructions to require the expected gain to flow from the homicide as opposed to the robbery.

United States v. Barnette, 390 F.3d 775 (4th Cir. 2004), is a post-Bernard application of the pecuniary gain aggravator to a case involving robbery. In Barnette, the defendant targeted a car stopped at an intersection, ordered the driver out of the car at gunpoint, ordered the driver into some nearby bushes, stole the driver's wallet, shot and killed the driver, and drove away in the stolen car. The Court affirmed the submission of the pecuniary gain aggravator, reasoning that the car "represented a pecuniary gain to Barnette at least insofar as it provided him with transportation to [the location of another murder] - transportation for which he would have otherwise have had to pay." *Id.* at 785.

Several District Courts have applied the pecuniary gain aggravator to capital robbery crimes. United States v. Roman, 371 F.Supp.2d 36, 45-46 (D.P.R. 2005)(murder in connection with scheme to rob armored trucks); United States v. Taylor, 316 F.Supp.2d 730, 737-38 (N.D.In. 2004)(murder during robbery of firearms store); United States v. Cooper, 91 F.Supp.2d 90 (D.D.C. 2000)(murder during robbery of coffee shop). In Roman, the victim, an armored car guard, was shot once before the money was taken and then shot again fatally as the robbers were fleeing with the money. The Court held that these facts could support a finding of the pecuniary gain aggravator, as follows:

> It may be that the pecuniary gain was already had at the time of the murder, but because the murder was practically simultaneous with the gain, and the murder clearly facilitated that gain, it can be said that the murder is part of the same transaction. Under these facts, a finding of pecuniary gain would not involve an extension of existing law. A jury could properly infer that the murder was committed for the express reason to effect the robbery, rather than being incident to, or as an afterthought to the robbery.

Roman, 371 F.Supp.2d at 46.  These authorities support the propriety of submitting the pecuniary gain aggravator in this case.

More recently, the Eleventh Circuit considered the pecuniary gain aggravator.  In United States v. Brown, 441 F.3d 1330, 1369-70 (11th Cir. 2006), the defendant robbed a Post Office and murdered a Postal employee.  The Court reviewed both Chanthadara and Bernard and concluded:

> "[n]either [case] . . . supports the argument that the pecuniary gain factor is somehow inapplicable in cases involving a robbery or that the factor is limited to cases of murder-for-hire.  Rather, they simply stand for the unremarkable proposition that the murder itself, and not the underlying robbery, must be committed in the expectation of something of pecuniary value."

*Id.* at 1370 (emphasis added).  The Court reviewed the evidence for sufficiency and the aggravator was properly submitted, because the jury "could reasonably have concluded that [the victim] was struggling and that [the defendant] had to kill her in order to successfully complete the robbery."  *Id.* at 1371.  Similarly, in United States v. Wilson, 2007 WL 81935 (E.D.N.Y. 2007), the District Court rejected a motion for acquittal based on a pecuniary gain factor argument where undercover narcotics officers were murdered in a drug robbery.  The District Court concluded that because the jury could reasonably infer that the murder was motivated, at least in part, by the hope of monetary gain, the aggravator could apply and the jury should be instructed accordingly.  *Id.* at 9-10.

The penalty phase jury instruction here, No. 4, stated:

> The second statutory aggravating factor alleged by the government is that Norris G. Holder committed the offenses in the expectation of the receipt of anything of pecuniary value.  To establish that a defendant committed an offense in the expectation of the receipt of anything of pecuniary value, the government must prove that the defendant committed the offense in the expectation of anything in the form of money, property, or anything else having economic value, benefit, or advantage.

(emphasis added)  Defendant may claim that the instruction did not require the pecuniary gain to flow from the killing, as opposed to the robbery.  However, the "offenses" and "offense" qualifiers must be read in the context of the evidence and the instructions as a whole.  The only "offenses" were Counts I and II, bank robbery in which a killing occurred and murder in connection with using a firearm to commit a crime of violence.  The verdict forms and the other portions of the instructions clearly focused the jury's attention on the two homicide offenses.  The Government's closing argument also did not take advantage of any potential ambiguity in the language of the instruction.[6]  Therefore, here, as in Brown:

> The district court could have stated more explicitly that the expectation of pecuniary gain must arise from the *murder* itself, and not from the robbery.  However, the trial judge plainly narrowed the field of consideration to the murder counts . . . and thus, adequately tied pecuniary gain to the murder.

441 F.3d at 1372 (emphasis in original).  The field of consideration was sufficiently limited in the case at bar.

Alternatively, Holder is procedurally barred from presenting this claim.  Holder's attack on the pecuniary gain aggravator could have been raised on direct appeal, but was not.  Therefore, it cannot be raised in a §2255 motion unless the petitioner can show both (1) a "cause" that excuses the default, and (2) "actual prejudice" resulting from the errors of which he complains.  United States v. Frady, 456 U.S. 152, 168 1982); Matthews v. United States, 114 F.3d 112, 113 (8th Cir. 1997); Schneider v. United States, 981 F.2d 989, 990 (8th Cir. 1992).  If a

---

[6]At one point, the Government argued that the aggravator was established, because Holder "trade[d] Richard Heflin's life so he could pay his lawyer and buy more gold and cars and whatever else he wanted to buy." (Tr. Trans. 3-26-98, pp.170-71).  At another point, the Government again referred to this aggravator, stating "this murder was for money." *Id.* at 184-85.

petitioner is unable to show "cause" and "actual prejudice," he must make a "substantial claim that constitutional error has caused the conviction of an innocent person." Schlup v. Delo, 513 U.S. 298, 324 (1995). A claim of actual innocence must be based on "new evidence," and must convince the court that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonablee doubt." *Id.* at 327. See also, Embrey v. Hershberger, 131 F.3d 739 (8th Cir. 1997). No such showing has been made here.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Holder presented testimony regarding four separate claims of ineffective assistance of counsel. (Claims 12C (a), (b), (c) and (h). Each of these claims will be addressed seriatim, but the over-arching constitutional standards of effective assistance of counsel apply equally to all of them. The Supreme Court established the current general test of effective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, for a criminal defendant to prove a Sixth Amendment claim of ineffective assistance of counsel, a two-pronged test must be satisfied. Id. at 688. First, defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Id. Second, the defendant must prove that the defense was prejudiced to the extent that there is a reasonable probability of a different result with effective assistance. Id. at 691. Under Strickland, the review of counsel's representation is highly deferential. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgement. Id. at 690. Strickland requires that the evaluation of counsel's performance reflect the attorney's perspective at the time, without the benefit of hindsight. Id.

at 689-90.  It further requires the defendant to prove specific acts or omissions which did not comport with the prevailing professional norms.  Id. at 690.

The Eighth Circuit has often applied the Strickland test to hold that, for purposes of a claim of ineffective assistance of counsel, tactical decisions by defense counsel made after investigation are virtually unchallengeable on appeal.  See, e.g.: Link v. Luebbers, 469 F.3d 1197, 1204 (8th Cir. 2006); Winfield v. Roper, 460 F.3d 1026, 1041 (8th Cir. 2006), petition for certiorari filed (March 3, 2007).  The Eighth Circuit has succinctly summarized the ineffectiveness prong of Strickland as follows:

> To establish ineffectiveness, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." [citations omitted]. "Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Every effort must be made to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [The] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." Id. Furthermore, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. The defendant must overcome the presumption that the challenged conduct "might be considered sound trial strategy." Id. at 689, (citation omitted).

Tunstall v. Hopkins 306 F.3d 601, 605 -606 (8th Cir. 2002), cert. denied, 538 U.S. 968 (2003).

That Court has been equally as vocal regarding the prejudice prong of the Strickland test. To establish prejudice, a defendant claiming ineffective assistance of counsel must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  Honeycutt v. Roper, 426 F.3d 957, 961 (8th Cir. 2005), cert. denied, 126 S.Ct. 2353 (2006).   Prejudice from counsel's deficient performance, for purposes of establishing ineffective assistance of counsel, is shown by demonstrating that counsel's errors

15

were so serious that they rendered the proceedings fundamentally unfair or the result unreliable. Bucklew v. Luebbers, 436 F.3d 1010, 1016 (8th Cir.), cert. denied, 127 S.Ct. 725 (2006). Defendant bears the burden of proving ineffective assistance of counsel. United States v. White, 341 F.3d. 673, 678 (8th Cir. 2003), cert. denied, 541 U.S. 955 (2004). Only if counsel's failure to test the prosecutions case is complete will defendant asserting ineffective assistance of counsel be relieved from establishing prejudice. Lamar v. Graves, 326 F.3d 983, 985 (8th Cir.), cert. denied, 540 U.S. 1040 (2003). A judgement as to prejudice under the Strickland test for ineffective assistance of counsel must be made in the context of a particular record, and only after carefully weighing the entire record. Jones v. Roper, 311 F. 3d 923, 926 (8th Cir.), cert. denied, 537 U.S. 1040 (2002). In evaluating the probability of a different result in a criminal trial for the purpose of determining whether a defendant was prejudiced by defense counsel's deficient performance, a reviewing court must consider the totality of the evidence. Hoon v. Iowa, 313 F.3d 1058, 1061 (8th Cir. 2002).

Applying these principles to the facts and circumstances of Holder's case, infra, it is clear that Holder fails to establish that his counsel performed in a constitutionally ineffective manner or that he was prejudiced by counsel's performance. This Court's deferential review of counsel's representation of Holder, based upon the totality of the evidence and viewed through the lens of counsel's perspective at the time of the representation, must necessarily consider the following: (1) counsel Charles M. Shaw ("Mr. Shaw") was faced with the overwhelming evidence presented by the Government of Holder's planning and execution of a remarkably brutal bank robbery which resulted in the death of Mr. Heflin; (2) the quantum of evidence presented to the jury regarding Holder's participation in the bank robbery left no reasonable

doubt as to his guilt of the offenses charged; (3) substantially identical evidence had already resulted in a verdict recommending death for Allen; (4) Mr. Shaw, based upon his professional appraisal of the strength of the Government's evidence and likelihood of conviction, embarked upon a reasonable strategy calculated to save Holder's life; (5) Holder was informed of and agreed to the strategy; (6) the Government adduced abundant evidence of each element of the charged offenses prior to Holder's guilt-phase testimony – Holder admitted nothing that had not already been proven; (7)

Mr. Shaw, an exceptionally experienced and respected advocate, presented in his closing arguments a cohesive and consistent defense calculated to spare Holder's life; (8) Mr. Shaw's penalty phase closing argument incorporated the mitigating evidence adduced by Holder during that portion of the trial; and (9) based upon his extensive jury trial experience, Mr. Shaw was eminently more qualified to present the guilt phase closing argument in an attempt to avoid the death penalty than co-counsel Herndon, who had never participated in a death penalty trial.

## A. COUNSEL'S ALLEGED FAILURE TO RAISE THE FIFTH AMENDMENT INDICTMENT RIGHT VIOLATION WAS NOT INEFFECTIVE ASSISTANCE OF COUNSEL (Claim 12C(a))

Holder's first claim of ineffective assistance of counsel concerns the failure of his trial counsel to object to the failure of the indictment to allege the requisite mental states or a statutory aggravator on the grounds that eventually became the Ring decision. In addition, trial counsel failed to adopt the pre-trial motions of co-defendant Billy Allen, one of which motions did raise the indictment right issue, and appellate counsel failed to adopt the issues raised by

Allen prior to oral argument.[7]  However, Holder cannot establish that he was prejudiced by any of these alleged deficiencies, because in Allen III, discussed *supra*, the Eighth Circuit sitting *en banc* determined that the Ring violation in this case was harmless beyond a reasonable doubt. Accordingly, this claim of ineffective assistance of counsel must fail.

### B. COUNSEL'S ADVICE THAT HOLDER TESTIFY (Claim 12C(b)) AND COUNSELS' TRIAL STRATEGY WERE NOT INEFFECTIVE (Claim 12C(c))

Holder argues that Mr .Shaw's representation was constitutionally deficient because, through his misunderstanding of the essential elements of the charged crimes, Mr. Shaw conceded Holder's participation in the bank robbery and encouraged his testimony.  Holder claims Mr. Shaw's conduct assured his conviction and made him eligible for the death penalty. Movant's Brief, p.26.  According to Holder, Mr. Shaw "was under the mistaken belief that the law required the government to prove that Holder specifically deliberated on the killing of the guard in order to be convicted of a capital offense." Id. p. 23.  Based on the guilt phase instructions, Mr. Shaw's belief was correct, not mistaken.  But, even if Mr. Shaw's assessment of the law was incorrect, Holder was not prejudiced thereby and merits no relief.

### 1. Mr. Shaw's Opening Statement Conceded Holder's Involvement in the Lesser Included offense of Bank Robbery, But Not A Capital Offense, And Was An Effective and Sound Strategy

---

[7]As discussed, *supra*, appellate counsel did attempt to adopt the indictment right issue at the suggestion of the Court following oral argument in Allen I, but it is not clear what, if any, action the Court took on said request.  Because it rejected the issue as to Allen, and the Court did not foresee Ring, the Court may not have viewed the request as material and simply chose to ignore it.  But it seems unlikely that the Court would solicit the request to adopt Allen's arguments and then deny the request.  This Court need not determine this question, because the end result in Allen III makes the question moot.

Holder incorrectly asserts in his Post-Hearing Brief that Mr. Shaw conceded Holder's guilt of a capital offense. In evaluating Holder's ineffective assistance of counsel claims, it is important to realize that Mr. Shaw did no such thing. First, in his opening statement, Mr. Shaw earned credibility with the jury by candidly acknowledging that the evidence would show that Holder participated in a bank robbery. He stated at the outset that "the evidence is going to show, and with candor you'll hear, that the defendant robbed that bank." (Tr.Trans. 3-18-98, p.64). As a seasoned and successful defense attorney, Mr. Shaw recognized the value of credibility and consistency[8] with a jury when attempting to persuade them of a particular point of view or theory. Mr. Shaw's opening statement also set the stage for facts that would later constitute mitigating factors. He advised the jury that Holder lost his leg at age 14 and that his motive for robbing the bank was to get money to buy a better prosthetic leg. (Tr.Trans. 3-18-98, p.64). Further, he emphasized to the jury that the evidence would not show, even though the law required it, some degree of intent to kill on the part of Holder: "he always said that nobody was going to get hurt"; Holder told Allen not to "act crazy" in the bank; Holder did not fire his weapon in the bank or at Richard Heflin; Holder did not intend to harm anyone and Allen was not supposed to fire his weapon; Holder did not aid and abet or intentionally have anything to do with the killing of Richard Heflin. (Tr.Trans. 3-18-98, pp.66-69).

These statements were no accident on the part of Mr. Shaw and reflected a statement of the themes that he would consistently adhere to through the end of the trial. Considering the evidence in this case, it would have been ineffective to seriously argue that Holder did not

---

[8]Even Ms. Herndon and Mr. Burr admitted the value of consistency. (Hrg. Trans. Vol. II, pp. 10, 202).

participate in the bank robbery.  There was no question of identity - Holder fell out of a burning van that had been followed from the crime scene and the weapons and equipment used in the robbery and the proceeds of the robbery were also present with Holder.  Holder was identified by a victim teller and Holder admitted his involvement in the bank robbery to the FBI.

Faced with overwhelming evidence of Holder's participation in the bank robbery, Mr. Shaw pursued the only viable guilt phase strategy: admit the obvious, namely Holder's participation in the robbery, but contest Holder's guilt of a capital offense based on his lack of the requisite mens rea, and set up a penalty phase defense to the death penalty by contesting Holder's role in and responsibility for the death of Richard Helfin.  Mr. Shaw's opening statement was far from a concession that Holder intended that anyone be harmed or killed or that Holder was aware of serious risk of death attending the conduct of the bank robbery.  On the contrary, in his opening statement, followed by his cross-examination of Government witnesses and direct examination of Holder, Mr. Shaw made a valiant and aggressive effort to establish the position that Holder did not intend or foresee that anyone would get hurt.  Based on the essential element of Counts I and II given to the jury, as discussed more fully *infra*, particularly the requirement that Holder was aware at the time of the robbery of a serious risk of death, Mr. Shaw never conceded Holder's guilt of a capital offense.

During the hearing, Ms. Herndon refused to admit the obvious: neither Mr. Shaw nor Holder's testimony conceded Holder's guilt of a capital offense.  (Hrg. Trans. Vol. II, pp. 10-25).  Ms. Herndon exposed her own confusion over the elements of the offenses by denying that there was a capital and a non-capital crime contained in the bank robbery count.  (Hrg. Trans. Vol. II, p. 22; Guilt Phase Instructions 15 and 17).  Ms. Herndon stubbornly refused to acknowledge that

20

by arguing that Holder was not in the bank when Richard Heflin was shot, that Holder did not

fire his weapon and that Holder did not believe anyone would be hurt, Mr. Shaw was disputing

the mens rea element of Counts I and II to establish a basis to ask the jury to find Holder guilty

of the non-capital offenses.  (Hrg. Trans. Vol II, pp. 17-25).  Even as late as the date of the

hearing on Holder's motion, over seven years after the trial, Ms. Herndon did not appreciate the

distinction between a capital and non-capital offense and eligibility for the death penalty in

federal court.  (Hrg. Trans. Vol. II, p. 13).  Fortunately for Holder's defense, Mr. Shaw

appreciated these differences.[9]

Because he consistently challenged the Government's proof concerning Holder's state of

mind and the extent of Holder's conduct in the bank, Mr. Shaw's strategy for an acquittal on the

capital counts was clear.  As discussed in the Government's Response to Holder's §2255 motion,

pages 52-62, pursuit of such a strategy was not ineffective assistance of counsel.   Notably absent

from any of Holder's attacks on the decisions of Mr. Shaw is any meaningful suggestion of a

viable alternative strategy that would have produced a reasonable chance of acquitting defendant

of the capital offenses.

Mr. Shaw's guilt phase strategy reflected in his opening statement was also sound

because it served a dual purpose - it was Holder's only viable chance for acquittal of capital

offenses and, at the same time, the most effective strategy for obtaining a life sentence for

---

[9]Mr. Shaw's letter to Joseph Landolt in 1997, Exhibit Q, also refutes any claim that Mr. Shaw was confused about the potential for Holder to be found guilty of a capital offense in federal court on a purely felony murder theory.  In his letter, Mr. Shaw pointed out his awareness that such a finding was possible in federal court even though it was not in state court.  Exhibit Q, ¶3.  This, of course, did not prevent a legal motion to require more mens rea than felony murder and, based on the instructions given at trial, said motion was successful.  (Exhibit T)

Holder's role in this most violent, take-over style bank robbery.  Mr. Shaw's opening statement strategy of conceding guilt of the bank robbery but denying guilt of the capital offenses on mens rea and role grounds served to earn Mr. Shaw credibility with the jury and allow him to be consistent when later asking to spare Holder's life.

### 2. Mr. Shaw's Advice To Holder Concerning Testifying In His Own Defense Was Consistent With His Trial Strategy and Not Ineffective

Holder now claims that trial counsel was ineffective because Holder's testimony "ma[d]e him death eligible" and that "Holder's testimony most likely convinced the jury to sentence him to death."  Movant's Brief pp.26, 28.  The massive quantum of evidence which the jury heard from Government witnesses  before Holder testified did more to assure his death eligibility than the jury's supposed rejection of Holder's testimony.  Rather than hurt his cause, Holder's testimony served to humanize him and offered hope of creating reasonable doubt as to his intent and role in the death of Richard Heflin.  Holder's testimony also helped to deliver what Mr. Shaw had promised the jury the evidence would show, while at the same time providing a temporal buffer, in the event the testimony did not go well, between testifying and penalty phase deliberations.  In other words, it was wiser for Holder to testify in the guilt phase rather than the penalty phase.   This strategic decision by Mr. Shaw was not the result of accident or poor planning.

The record amply demonstrates that Holder's testimony was a necessary part of a well-developed defense strategy aimed at alternatively acquitting Holder of capital charges and sparing Holder's life.  The record conclusively establishes that, prior to Holder's testimony, the Government had adduced overwhelming evidence of every element of each of the charged

crimes. Holder's testimony did not add any missing ingredient, and did not make him guilty of a capital offense or death eligible. In fact, it added powerful momentum to the cross-examination already conducted by Mr. Shaw concerning the lack of clarity in the evidence about Holder's role in the death of Richard Heflin and about whether Holder fired his weapon in the bank. It also added the only direct evidence concerning Holder's state of mind with respect to whether he was aware of a risk of death to anyone as a result of the robbery. Contrary to Ms. Herndon's continued denial of the obvious, Holder did not confess during his testimony to capital bank robbery or capital use of a firearm to commit murder, because he never admitted and always denied that he had any mental awareness that anyone would be hurt. (Hrg. Trans. Vol. II, p. 47).

A brief synopsis of just a portion of the evidence which the Government presented to prove Holder's guilt yields an appreciation of the challenges facing Mr. Shaw in defending this case. The jury heard that: Holder was a regular customer of the bank (Tr. Trans. 3-29-98, p. 107); Holder had been thinking about the robbery as early as New Year's Day of 1997 when he described to Terry Gear a plan he had to rob a bank (Tr. Trans. 3-18-98, pp. 151-155); Holder gathered a bullet proof vest, a Russian SKS assault rifle, a Chinese SKS assault rifle, a short-handled shotgun and walkie-talkies in preparation for the robbery. (Tr. Trans. 3-18-98 pp. 190-197, 205); Holder and Allen visited the bank together on March 13th (Tr. 3-19-98, pp. 114, 119-120); Holder was overheard talking about the robbery with Allen two days before the event and, the day before the robbery, disclosed to his friend Wayne Ross his plan to rob a bank (Tr. Trans. 3-18-98, pp. 187-189, 200-201); the night before the robbery he watched portions of the movie "Set It Off" with Allen (Tr. Trans. 3-18-98, p. 252); Holder stole two vehicles to use in the

getaway in addition to his own; one to get away from the bank, a second stationed in Forest Park for a switch, and finally his own car parked in the Barnes Hospital garage (Tr. Trans. 3-24-98 pp. 19, 267, 279); on the morning of the robbery, Holder pulled the getaway van up to the bank and, armed with a rifle, entered with Allen who was similarly armed (Tr. Trans. 3-18-98 pp. 300-303); the first robber in the bank came in shooting toward Mr. Hefflin (Tr. Trans. 3-20-98, pp. 17-18);  Mr. Hefflin was shot immediately (Tr. Trans. 3-18-98, pp. 92-93); Holder went over a gate and behind the tellers' area where he took money from the tellers' drawers and put it in a bag (Tr. Trans. 3-19-98, pp. 59-60; Tr. Trans. 3-23-98, pp. 109-111); Holder and Allen left the bank taking with them over $51,000 in cash as they drove east on Highway 40 (Tr. Trans. 3-20-98, p. 166, 175-176); Mr. Hefflin was taken to Barnes Hospital, where he was pronounced dead; he suffered at least eight discrete bullet wounds and numerous puncture wounds caused by bullet fragments; at least four of the wounds were potentially deadly (Tr. Trans. 3-19-98, pp. 170; Tr. Trans. 3-23-98, pp. 48, 50, 53); at least 16 shots were fired inside the bank; although Mr. Heflin was the only person physically injured, bullets passed through walls behind two occupied tellers' stations, one bullet hit a desk leg and was stopped short of potentially hitting a bank employee; another bullet struck the floor near the spot a bank employee jumped for cover (Tr. Trans. 3-20-98, pp 88-146);  the getaway van proceeded to Forest Park where it burst into flames (Tr. Trans. 3-20-98 pp. 175-176, 178-179); Allen ran from the burning van, but Holder was arrested at the van wearing a bullet proof vest (Tr. Trans. 3-20-98, pp. 196-205); burned money, two burned assault rifles and dozens of rounds of ammunition were recovered from the van and surrounding area (Tr. Trans. 3-20-98, pp.248, 251-269); Holder gave a statement to authorities after his arrest admitting that: he committed the robbery because he needed money; he and Allen chose the bank

24

because he had an account there, he knew the layout of the bank and it was near a highway; they stole two getaway vehicles, stationed one in Forest Park where they planned to switch and drive to the Barnes Hospital garage where Holder's own car was parked; he poured gasoline into the first getaway van before the robbery, and set it on fire by flicking his lighter after the robbery; he carried the Russian SKS and Allen carried the Chinese SKS; he jumped the tellers' counter, took money from the tellers' drawers and ran out of the bank; he wore a bullet proof vest and had ammunition in several clips; there was not supposed to be any shooting; and, he never fired his weapon (Tr. Trans. 3-24-98, pp. 17-56, 109-111, 117).

This abbreviated recitation of the Government's evidence provides an indication of the extensive and  compelling testimony which clearly demonstrated Holder's guilt.  Confronted by the volume of convincing evidence of Holder's guilt, Mr. Shaw chose to maintain his credibility with the jury by admitting the obvious – that Holder participated in the robbery.  He also seized upon the instructions provided to the jury, as well as portions of the Government's evidence, to plant the seed of doubt as a defense to the capital offenses and the death penalty - that because Holder was not aware there would be any shooting, he should not be put to death.  The Government submits this was an excellent strategy.  Holder's testimony at trial directly and effectively furthered that strategy.[10]

Government's witness Wayne Ross testified that although Holder planned to rob a bank, his plan was that nobody would get hurt. (Tr. Trans. 3-18-98, p. 201).  Holder also maintained in

---

[10]This Court observed Holder's testimony first-hand and should be guided by its recollection of the quality of said testimony, rather than the nearly a decade later self-serving characterizations of said testimony by Ms. Tatelli and Ms. Herndon.  In any event, the fact that a strategy did not work does not establish that it was a flawed strategy.

his post-arrest statement that he was "shocked and stunned" when he heard gunfire as there was not to be any shooting inside the bank. (Tr. Trans. 3-23- 98, p. 115; Tr. Trans. 3-24-98 pp. 20, 27, 46). Moreover, as discussed, *infra*, based upon defense counsel's Instruction Memo, this Court instructed the jury that in order to find defendant guilty of the crimes charged, they had to find, beyond a reasonable doubt, that Holder was "aware of a serious risk of death attending his conduct."

Instruction No.16 provided in applicable part:

. . . In order to have aided and abetted the commission of this crime, defendant must:
(1) have known the bank robbery was being committed or going to be committed; and
(2) have knowingly and intentionally acted in some way for the purpose of causing, encouraging, or aiding the commission of the bank robbery and in the course of the bank robbery, Richard Heflin was killed; and
(3) <u>have been aware of a serious risk of death attending his conduct</u>. . .

(emphasis added) Instruction No. 19 provided in applicable part

The crime of using or carrying a firearm during and in relation to a crime of violence which results in a murder, as charged in Count II of the indictment, has four essential elements, which are:
*One*, the defendant willfully and intentionally committed the crime of bank robbery as charged in Count I;
*Two*, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm;
*Three*, that in the course of willfully and intentionally committing the crime of bank robbery as charged in Count I, while knowingly using or carrying a firearm, the defendant, or a person aided or abetted by the defendant, killed Richard Heflin by the use of a firearm; and
*Four*, the killing of Richard Heflin was murder in the perpetration of a robbery.
Murder is the unlawful killing of a human being with malice aforethought. A killing

is unlawful if done without legal justification.  Killing is done with 'malice aforethought' if it results from the perpetration of a bank robbery <u>in which defendant was aware of a serious risk of death attending his conduct</u>.  'Malice aforethought' does not necessarily imply any ill will, spite or hatred towards the individual killed. . .

(emphasis added)  Instruction No. 20 provided in applicable part:

. . . In order to have aided and abetted in the commission of [Count II] the defendant must:
(1) have known the offense of using or carrying a firearm during and in relation to a bank robbery was being committed or going to be committed; and
(2) have intentionally acted in some way for the purpose of causing, encouraging, or aiding the commission of using or carrying a firearm during an in relation to a bank robbery and that Richard Heflin was murdered in the perpetration of that robbery; and
(3) <u>have been aware of a serious risk of death attending his conduct</u>. . .

(emphasis added).

The Eighth Circuit held in <u>Allen I</u> that the "aware of a serious risk of death attending his conduct" language included in the instructions was sufficient, as a matter of law, to require the jury to explicitly find specific intent.  <u>Allen I</u>, 247 F.3d at 784-785.   Despite Holder's current claim that his trial testimony assured his death eligibility, the plain fact is that in his trial testimony Holder repeatedly and consistently denied that he had the requisite specific intent.  On no fewer than 19 occasions, Holder stated in various ways that "nobody was to get hurt."  <u>See</u> Tr. Trans. 3-25-98, pp. 83-84, 88, 92, 98-99, 104-105, 106, 107, 109, 114, 120, 122, 130, 131, 132, 136, 139, 143, 144, 172.   In fact, at the evidentiary hearing in this matter, Ms. Herndon testified that Holder never conceded that by robbing the bank he "had been aware that there was a serious risk of death attending his conduct."  (Hrg. Trans. Vol. II, p 17).  Far from admitting to

27

guilt of capital offenses,[11] Holder's trial testimony refuted the specific intent required for the jury to make that finding.

Other legitimate concerns animated Holder's testimony.   It has been recognized that a defendant's testimony in a death penalty case may "humanize" the defendant before the jurors and make it more difficult for them to impose the death sentence:

> Skilled defense counsel realize, however, that putting the defendant on the stand sometimes can help to 'humanize' him in the eyes of the jury.  It may be more difficult for a jury to condemn to death a man who has sat in the stand a few feet from them, looked them in the eyes and talked to them.

Waters v.Thomas, 46 F.3d 1506, 1519 (11th Cir.), cert. denied, 516 U.S. 856 (1995).  Accord, Conklin v. Schofield, 366 F.3d 1191, 1204-05 (11th Cir. 2004), cert. denied, 545 U.S. 1111 (2005).  Not only did Mr. Shaw elicit multiple denials of an essential element of the offenses, through Holder's testimony he brought out "humanizing" information such as Holder's remorse for Mr. Heflin's death, that Holder had no way to buy a new leg because he was helping to support his mother, and that Holder had a good family whom he helped to support  (Tr. Trans. 3-25-98, pp. 138, 177-178).

Mr. Shaw explained his recommendation to Holder that he testify as follows:

> The defendant and I discussed this.  And I did suggest that he – – I thought he ought to testify.  I gave him my advice that because of the nature of the punishment that I thought

---

[11]Holder's arguments suggest that his testimony made him "death eligible."  To be accurate, he was not eligible to receive the death penalty until the jury not only found him guilty of capital offenses but also found one of the 4 requisite mental states and at least 1 statutory aggravator.  It is more accurate to characterize Holder's claim that Mr. Shaw conceded Holder's guilt of a capital offense, i.e., an offense which statutorily carries the possibility of the death penalty.

28

the best thing he could do would be to testify in his own behalf. And that if he was telling the truth that he should bring the truth out and let the jury hear it.

(Tr. Trans. 3-35-98, p. 65).

This Court took pains to insure that Holder's testimony was voluntary and that he was completely aware of what might happen should he testify. This Court informed Holder that he had a right to remain silent, that the Government had to prove his guilt beyond a reasonable doubt, that no one could force Holder to say anything which would connect him to the offenses, that Holder would be subject to cross examination on his criminal record, his planning and participation in the robbery and killing of Mr. Heflin. (Tr. Trans. 3-25-98, pp. 62-64). Under oath, Holder acknowledged that he was testifying because it was what he wanted to do and that no one had made any representations, promises or threats to get him to testify. (Tr. Trans. 3-25-98, p. 64). After receiving those assurances from Holder, this Court gave him an additional hour and a half to discuss the issue with his family and counsel. Holder remained resolute in his decision to testify. (Tr. Trans. 3-25-98, pp. 65-68).

Based on the record in this case and in light of the totality of the evidence and the deferential standard of review this Court must apply, it is clear that Mr. Shaw's advice that Holder testify was based upon legitimate and accepted trial strategies, and that absent these strategies a different result would not have resulted. Holder's claim of ineffective assistance of counsel as presented in Claim 12C(b) fails. Holder has failed to prove any acts or omissions by Mr. Shaw which did not comport with the prevailing norms of representation of capital defendants.

### 3. Mr. Shaw's Guilt Phase Closing Argument Was Effective and Reflected A Sound Strategy

A brief review of Mr. Shaw's closing argument after the guilt phase shows the sophistication of the three themes Mr. Shaw developed from the evidence: 1) Holder entered the bank after Allen had shot Richard Heflin (Tr. Trans. 3-26-98, p.69, lines 2-3); 2) Holder did not intend for anyone to get hurt and was not aware of a serious risk that anyone would get hurt (Tr. Trans. 3-26-98, p. 80, line 4); and 3) Holder did not fire his weapon and, at the least, did not shoot Richard Heflin (Tr.Trans. 3-26-98, pp. 67-69). Mr. Shaw carefully reviewed the testimony of the eyewitnesses and argued that none saw Holder fire his weapon, except one whose testimony conflicted with all the others. (Tr.Trans 3-26-98., p. 67). He argued that this was consistent with Holder's post-arrest statements and his trial testimony. (Tr. Trans. 3-26-98, p. 69, line 18). He also argued to the jury that Allen, not Holder, was the leader of this event. (Tr.Trans. 3-26-98, p. 67, lines 1-6). Mr. Shaw drew upon the testimony of Government Witness Wayne Ross, who testified that Holder was not the kind of person who would shoot anyone, (Tr.Trans. 3-26-98, p. 81), and that Holder did not intend for anyone to get hurt and had told Allen not to act crazy (Tr.Trans. 3-26-98, p. 85).   Mr. Shaw also strongly attacked the Government's evidence that Holder had fired his weapon in the bank, noting that all identified shells matched Allen's rifle and that the firearms' expert made no conclusive findings on the other shells. (Tr.Trans. 3-26-98, pp.82-83). He argued that the only evidence that any of the other shells came from the Holder's rifle (the Russian SKS) was the expert's finding that several shells were "consistent" with Holder's weapon. (Tr.Trans. 3-26-98, pp.83 and 90). Finally, Mr.

30

Shaw urged the jury to focus not on the end result of the event, but on Holder's personal role in it.  (Tr.Trans. 3-26-98, p.90).

The argument given by Mr. Shaw was not ineffective.  On the contrary, it was very aggressive and vigorously put the Government to the task of overcoming weaknesses in its evidence to convince the jury of Holder's guilt of capital offenses.  Mr. Shaw also focused on the issue that was most difficult for the Government to prove and the issue which Holder's testimony directly refuted - his awareness of a risk of death to Richard Heflin.  Mr. Shaw had an uphill battle, given the evidence, but Mr. Shaw's strategy was Holder's best and only chance for an acquittal of capital offenses, even though it was a slim chance.  More importantly, the jury could have convicted Holder of the capital offenses and accepted Mr. Shaw's argument that there was doubt about Holder's conduct in the bank and about the role he played in Mr. Heflin's death. Holder stood to benefit greatly from such doubt in the penalty phase, even if it was not a reasonable doubt and merely a doubt less than absolute certainty.[12]  Rather than being prejudiced by Mr. Shaw's argument at the end of the guilt phase, Mr. Shaw was laying the groundwork for Holder's best chance to avoid the death penalty.

Although Holder currently claims that "neither of the offenses with which Holder was charged required that Holder fired his weapon nor specifically intended beforehand that anyone was to get hurt in order to be convicted," that is not how the case was submitted to the jury at the time and the issue was not so clear at the time of trial.  Failure of counsel to anticipate a change in the law does not constitute ineffective assistance.  Parker v. Bowersox, 188 F.3d 923, 928-929 (8th Cir. 1999), cert. denied, 529 U.S. 1038 (2000).  At that time, the only available Eighth

---

[12]See the discussion of residual doubt, *infra*.

31

Circuit precedent regarding the mens rea requirement of bank robbery under §2113(e) was

United States v. Delay, 500 F.2d 1360 (8th Cir. 1974).   The Delay court treated §2113(e) as if the

killing involved in a bank robbery were a murder which required specific intent. Id. at 1363-64,

1367-68.  Mr. Shaw and Ms. Herndon raised this issue with this Court in a pleading,

Memorandum of Law in Support of Defendant's Proposed Instructions on Charged Offenses

("Instruction Memo").  See Government's Ex. T.   The Instruction Memo directed this Court to

other favorable precedent, including United States v. Jones, 678 F.2d 102 (9th Cir. 1982), which

supported the proposition that more than the intent to commit robbery is necessary to sustain a

§2113(e) conviction. Id. at 106.  As a result of the Instruction Memo, the Government amended

its proposed instructions to require the jury to find that Holder was "aware of a serious risk of

death attending his conduct"in order to find him guilty. See  Instructions 16, 19 and 20.

Neither did the Eighth Circuit dismiss Mr. Shaw's mens rea issue on Holder's direct

appeal as groundless. In Allen I, the Court carefully considered the claim that the elements

instructions for each count of conviction were defective due to their failure to require "a finding

by the jury that Holder had a specific intent, or mens rea, to kill. . ." Allen I, 247 F.3d at 782.

Although the Allen I Court eventually found Delay distinguishable, Id. at 783, it engaged in an

extended discourse of the mens rea required for each count of conviction.  Id. at 782-785.   The

Court even addressed the issue as if specific intent were required for conviction under either

count:

> Finally, assuming specific intent is required for conviction under either § 2113(e)  or §
> 924 (j), or both, we find that any error in the district court's instructions was
> harmless . . . We find any error to be harmless because the court's aiding and abetting
> instructions on each count of conviction [Instructions 16 and 20] supply the necessary
> specific intent as a matter of law, and in any case the instructions  require an explicit

finding of specific intent.

Allen I, 247 F.3d at 784 (emphasis supplied).

The Court based its conclusion that the instructions necessitated an explicit finding of specific intent upon the requirement that the jury find that "Holder was 'aware of a serious risk of death attending his conduct.'" Id. at 784 n. 19, 785.  It is ironic that Holder now claims Mr. Shaw was ineffective for espousing a position which the appellate court found persuasive enough to address as if he were correct.  Whether or not Mr. Shaw would accurately apprehend the elements of the charged offenses today, the jury was instructed then in accordance with his understanding of the law.  His representation of Holder in this regard was not ineffective and Holder cannot demonstrate prejudice.

### 4. The Decision That Mr. Shaw Give The Penalty Phase Closing Argument Was Sound

During the hearing, considerable attention was given to the fact that Mr. Shaw, not Ms. Herndon, gave the penalty phase closing argument.  It is clear that Mr. Burr, Ms. Tatelli and Ms. Herndon do not agree with Mr. Shaw's decision to give the closing argument in the penalty phase and felt that Ms. Herndon should have done so.  Respectfully, the weight to be given to their opinions should take into account their bias against capital punishment, their lack of knowledge of St. Louis juries, and the fact that Mr. Shaw is not here to refute their opinions.  Ms. Tatelli was impeached on numerous occasions during her testimony.  The hearing testimony of Holder's witnesses reflects a uniform view of how they think the death/life sentencing decision should have been made in this and every case.  Ms. Herndon testified that she would have mentioned the less culpable argument only briefly at the outset and devoted most of her limited time to the discussing Holder's coping mechanisms, difficult youth and why Holder decided to rob a bank to

solve his problems.  (Hrg. Trans. Vol. II, p. 55).  She would have done so in her first ever capital closing argument based on generic juror research, rather than anything particular that she knew about the jurors in this case.  (Hrg. Trans. Vol. II, pp. 60-62).  She would have done so, in part, because she felt that issues concerning the victim were not that relevant to the mitigation/aggravation balance.  (Hrg. Trans. Vol. II, p. 57).

Holder makes much of the fact that even though Mr. Shaw was not involved in front of the jury with the presentation of the mitigation evidence, he chose to give the final closing argument.[13]  Mr. Shaw is not here to explain why he made that choice, but the choice was not a flaw.  It is clear from the tenor of Ms. Herndon's testimony that she and Ms. Tatelli, with whom she maintains a close friendship and bond, were heavily invested in the investigation, preparation and presentation of the mitigation evidence.  Given that investment, it is understandable that the Ms. Tatelli and Ms. Herrndon would tend to place undue emphasis on the value and strength of said evidence to the jury in the weighing process in the context of the crime here.  The fact that Ms. Herndon did not agree with Mr. Shaw's evaluation of the case and the appropriate way to save Holder's life must have been as obvious to Mr. Shaw as it is to this Court.  It is also clear that Ms. Herndon would have made mitigation evidence the focus of any penalty phase closing argument given by her and may have ineffectively given insufficient weight to the theme of

---

[13]Government Exhibit Q admitted at the hearing refutes the claim by Ms. Tatelli and Ms. Herndon that Mr. Shaw did not understand the value of mitigation evidence or Holder's life story.  Exhibit Q demonstrates that Mr. Shaw was not only familiar with the details of Holder's life long before Ms. Tatelli became involved in the case, but he also understood the potential value of said evidence in the weighing process.  Holder's witnesses at the §2255 hearing were understandably surprised by the content of said letter, just as Mr. Burr and Ms. Tatelli were surprised by Ms. Herndon's lack of experience at the time of Holder's trial.

residual doubt.  (Hrg. Trans. Vol. II, pp. 31-32)(Ms. Herndon believed the power of residual doubt was limited to guilt issues).

Holder's post-hearing brief repeatedly refers to the failure of Mr. Shaw to "tie" the mitigation evidence together into a "story" that would give jurors a reason to spare Holder. However, notably absent from Holder's argument or Ms. Herndon's testimony, is any indication of how she would have done that (for the first time in her career) or why any argument given by her would have been more effective.  The mitigation evidence was not that complicated and it is was never explained by Ms. Herndon what tying it together meant.  She gave a very brief opening statement at the start of the mitigation evidence and there was nothing complicated about it that required "tying together" for the jury to understand.

Moreover, the jury completely understood the mitigation evidence, as shown by their overwhelming findings in favor of Holder concerning the mitigating factors.  Apparently having found the mitigating factors to be mitigating of punishment, the jury was unanimous in its belief that the mitigating factors did not sufficiently outweigh the aggravating factors, namely the circumstances of the crime, Holder's role in it and the extent of the victim impact.  Mr. Shaw's strategy and argument focused squarely on these issues and was a strong, yet unsuccessful, attempt to save Holder's life.

Mr. Shaw's decision to give the penalty phase closing argument himself perhaps reflected the fact that the mitigation evidence here not only was not that compelling, but actually may have undercut Mr. Shaw's residual doubt strategy.  For example, in addition to speaking positively about Holder as a friend, Cortez Harris testified that Holder had discussed the bank robbery plan and the need to deal with the guard.  (Tr. Trans. 4-2-98, pp. 28-30).   Holder told

Harris that his  initial plan was to neutralize the guard with a stun gun: "He said it would stun him for a minute, and all they needed was a minute or a minute-and-a-half to do what he had to do." (Tr.Trans. 4-2-98, p. 29).  That revelation, which came out on re-direct and re-cross-examination, served to deepen Holder's role in the planning of the robbery and the focus on the guard.  Because there was no evidence of a stun gun being brought to the bank or used, the jury was left to deduce that the stun gun plan had been abandoned for obvious risk reasons in favor of a more certain method for neutralizing the guard, namely murdering him.  The correctness of Mr. Shaw's choice to give the closing argument is reflected in the fact that Ms. Herndon believed, and still believes, that Cortez Harris' testimony did not seriously undercut Mr. Shaw's strategy. (Hrg. Trans. Vol. II, pp. 30-31).

Mr. Shaw also rightly considered Ms. Herndon's inexperience and her solitary focus on the mitigation evidence in deciding to give the penalty phase closing argument himself.  There is nothing in the record at trial to suggest a disagreement between counsel concerning this decision. However, it is not difficult to see that Mr. Shaw perceived as a flaw Ms. Herndon's preoccupation with what she believed to make a difference in the outcome.  Mr. Shaw clearly disagreed with the wisdom of that focus and attempted to keep the argument in line with the overall trial strategy without ignoring the mitigation evidence.

The Government is not well-positioned to contest the recollections of Richard Burr, Caryn Tatelli and Jennifer Herndon concerning what the deceased Mr. Shaw said to them.  Mr. Shaw may not have artfully or accurately articulated his strategy to them at any given point in time, but Mr. Shaw was not required to do so.  Mr. Shaw  had certainly faced more juries and obtained more favorable results for his clients over his long and famous career than these three

36

hearing witnesses combined. Mr. Burr was not Holder's attorney, even though it is clear that he did his best to insinuate himself into the case to the point of having Ms. Tatelli[14] essentially act as an informant for him about Mr. Shaw's actions.[15] Although she denied it, it is hard to believe that Ms. Tatelli's view of Mr. Shaw was not influenced by his disdain for social workers and women. (Hrg. Tr. Vol. I, p. 43).

It is also hard to believe that an attorney of Mr. Shaw's experience and talent did not understand what Ms. Tatelli and Ms. Herndon were doing with the mitigation evidence. (Hrg, Tr. Vol. I, p. 46). Mr. Shaw understood too well that Ms. Tatelli and Ms. Herndon believed that the "story to tell about Norris Holder's life" would spare his life. (Hrg. Tr. Vol. I, p. 47). Had Ms. Herndon given the closing argument, she would no doubt have focused more on the mitigation evidence, rather than lingering doubt as to culpability. (Hrg. Tr. Vol. I, p. 72). Her argument for a life sentence would have been that bank robbery was the only answer for Holder to get a new leg to be more productive and to continue to parent his siblings. (Hrg. Tr. Vol. I, p. 117).

Mr. Shaw saw the positions of Ms. Tatelli and Ms. Herndon as offering an excuse, and that is the way juries often perceive mitigation claims. (Hrg. Tr. Vol. I, 47-48). Ms. Herndon had to have viewed the mitigation evidence through rose-colored glasses to think that the story of Holder's life was compelling enough to result in a life sentence when weighed against the nature of the offense conduct and the strength of the victim impact evidence. Ms. Tatelli and

---

[14]In evaluating Ms. Tatelli's credibility, this Court should consider the numerous times that her recollection was impeached with prior inconsistent statements.

[15]It is very curious that Ms. Herndon was co-counsel with Mr. Shaw, but she viewed Mr. Burr as "directing things." (Hrg. Tr. Vol. I, p. 114).

Ms. Herndon's views were not informed by any knowledge about St. Louis juries in general or this jury in particular. (Hrg. Tr. Vol. I, pp. 48-49).

Another reason that Mr. Shaw may not have placed much confidence in the ability of Ms. Tatelli and Ms. Herndon[16] to present a persuasive case for life, was that they apparently did not understand what Mr. Shaw's strategy was and saw little value to minimizing Holder's culpability. (Hrg. Tr. Vol. I, pp. 50-55, 72). Mr. Shaw's view was that this jury would not give much weight to the mitigation evidence and would be more swayed by their view of Holder's culpability. The special verdict forms prove irrefutably that Mr. Shaw was right - they overwhelmingly found the mitigators, but rejected the view that Holder had not fired his weapon in the bank and found that the aggravating factors outweighed the mitigating factors sufficiently to justify a sentence of death.

Mr. Shaw had a wealth of experience before Missouri juries and St. Louis juries in particular. He had a better sense of how they would weigh the evidence in this case in making their ultimate penalty selection. Ms. Tatelli was new to the area of capital case mitigation,[17] having worked primarily in the post-conviction arena previously. Ms. Herndon had some

---

[16]Ms. Herndon testified that she read the statutes and came to the conclusion that Holder would be death "eligible" regardless of whether he shot his weapon. (Hrg. Tr. Vol. I, p. 113). Yet, Ms. Herndon later signed the legal memoranda, Government Exhibit T, that successfully argued that some element of mens rea was necessary to be guilty of a capital offense and made the failure to require a higher degree of mens rea an issue on appeal. Ms. Herndon's testimony confuses guilt of a capital offense with death eligibility, because the latter only exists if the former is found and in addition the jury finds one of the requisite mental states and at least one statutory aggravator. Similarly, even at this late date, Ms. Herndon thinks that Chanthadara stands for thee proposition that pecuniary gain is an invalid factor, whereas it clearly is simply a jury instruction case. (Hrg. Tr. Vol. I, p. 141).

[17]Ms. Tatelli testified that this was her second federal capital case and did not even know how "aggravators and mitigators worked exactly." (Hrg. Tr. Vol. I, p. 70)

criminal experience but prior to this case had never asked a single witness a single question in court in an actual capital case, federal or state. (Hrg. Tr. Vol. I, pp. 97, 149). She was so inexperienced[18] that she had never even heard of the Federal Death Penalty Resource Counsel Project prior to Holder's case. (Hrg. Tr. Vol. I, p. 99). She had certainly never given a closing argument in a capital case before.[19] Had she given the argument here, undoubtedly Holder would now be complaining that it was ineffective assistance to allow her to give her first such argument on behalf of Holder. Both Mr. Burr and Ms. Tatelli were uninformed about Ms. Brewer's actual experience level at the time of this trial.

Mr. Shaw understood well what types of defenses resonate with St. Louis jurors and what types do not. While Mr. Shaw may not have labeled it as such, he based his overarching strategy to save Mr. Holder's life on creating a residual doubt about Holder's role in the death of Richard Heflin. That strategy was pursued consistently by Mr. Shaw throughout every phase of the trial. The Government respectfully submits that such a strategy was the best strategy that offered Holder the best chance for a life sentence. Academia and the Courts have recognized the power of a residual or lingering doubt strategy in the context of capital case penalty decisions:

> Creating lingering doubt has been recognized as an effective strategy for avoiding the death penalty. We have written about it. *See, e.g., Stewart v. Dugger,* 877 F.2d 851, 855-56 (11th Cir.1989). In addition, a comprehensive study on the opinions of jurors in

---

[18]Ms. Herndon testified that she was unfamiliar with statutory mitigators and took direction from Ms. Tatelli. (Hrg. Tr. Vol. I, p. 118).

[19]It appears that Mr. Burr and Ms. Tatelli were confused about Ms. Herndon's experience level. Ms. Herndon's answers about her prior experience were also not that clear in her deposition or at the hearing and it took numerous questions to establish that she actually had never spoken a word in court in a capital trial before Holder's case. Even her prior trial experience is confusing: she tried over 50 jury trials but had given 75 closing arguments. (Hrg. Trans. Vol. II, p. 53).

capital cases concluded:

"Residual doubt" over the defendant's guilt is the most powerful "mitigating" fact.-[The study] suggests that the best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?,* 98 Colum. L. Rev. 1538, 1563 (1998) (footnotes omitted); *see* William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases,* 15 Am. J.Crim. L. 1, 28 (1988) ("[t]he existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor in the life recommendation cases studied."); *see also* Jennifer Treadway, Note, "Residual Doubt" in Capital Sentencing: No Doubt it is an Appropriate Mitigating Factor, 43 Case W. Res. L. Rev. 215 (1992). Furthermore, the American Law Institute, in a proposed model penal code, similarly recognized the importance of residual doubt in sentencing by including residual doubt as a mitigating circumstance. So, the efforts of Tarver's lawyer, during trial and sentencing, to create doubt about Tarver's guilt may not only have represented an adequate performance, but evidenced the most effective performance in defense to the death penalty.

Tarver v. Hopper, 169 F.3d 710, 715-16 (11th Cir. 1999).  Other courts and commentators have recognized the value of a residual or lingering doubt strategy.  Chandler v. United States, 218 F.3d 1305 (11th Cir. 2000); Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999);  United States v. Honken, 378 F.Supp.2d 1040 (N.D.Ia.2004); United States v. Foster, 2004 WL 868649 (D.Md. 2004); Uunited States v. Lentz, No. 01-150-A (E.D.Va. 2003); United States v. Davis, 132 F.Supp.2d 455 (E.D.La. 2001); Erik Lillquist, *Absolute Certainty and the Death Penalty*, 42 Am. Crim. L. Rev. 45(2005).

Accordingly, Mr. Shaw made the correct and effective decision in giving the penalty phase closing argument himself.  He, not Ms. Herndon, was Holder's best chance for a life sentence.

### 5. Mr. Shaw's Penalty Phase Closing Argument Was Not Ineffective

The content of Mr. Shaw's penalty phase closing argument fully reflects the residual doubt approach that he consistently took before the jury. He started by reminding them to consider all the evidence presented over three weeks, not just the mitigation evidence. (Tr. Trans. 4-3-98, p. 194). But he did not ignore the mitigation evidence, as Holder suggests. He noted the "mosaic" of Holder's life that Ms. Herndon had "painted." (Tr. Trans. 4-3-98, p. 195). Mr. Shaw discussed Mr. Holder's childhood, the fact that Holder had lived part of his life in public housing and the effects that such an experience had on Holder. (Tr. Trans. 4-3-98, pp. 195-196). Mr. Shaw described Holder as a gentle person who had no previous history of violence or danger to others. (Tr. Trans. 4-3-98, pp. 205-207). Mr. Shaw also attempted to explain that Holder's involvement in drugs and weapons was an inevitable result of his environment. (Tr.Trans. 4-3-98, pp. 195-197, 207). Mr. Shaw also emphasized Holder's lack of quality parenting and painted Holder's involvement in the death of Richard Heflin as simply choosing the wrong partner. (Tr. Trans. 4-3-98, p. 211)

More importantly, Mr. Shaw returned to the theme that he believed would most likely save Holder's life - residual doubt about Holder's intent and role in the death of Richard Heflin. In case any of the jurors missed it, Mr. Shaw took great pains to point out that at no time had the defense changed positions in the case: Allen did the shooting, Holder was outside when Richard Heflin was killed, Allen was the leader, Holder did not fire his weapon and the volume of shots was due to Allen reloading his weapon. (Tr. Trans. 4-3-98, p. 198). The main point of Mr. Shaw's argument was that Holder should not receive the death penalty for Allen's conduct that Holder did not foresee or could not control. (Tr. Trans. 4-3-98, p. 202). Mr. Shaw did not need

to convince the jury that his version was factual, but only needed to convince one juror that he/she had a residual doubt about whether the Government met its burden of proving beyond a reasonable doubt that Holder was not as culpable as Allen.  Considering what Mr. Shaw had to work with, the Government submits that this was not only constitutionally effective, it was an excellent strategy.  Mr. Shaw even reminded the jurors that it only took one of them to save a life, (Tr. Trans. 4-3-98, p. 214), and that the jury should not take Holder's life if he did not intend to kill Richard Heflin, or did not fire any shot that hurt Richard Heflin, or did not fire any shot in the bank.

### 6. Mr. Shaw's Strategy Was Effective And Holder Was Not Prejudiced

The Government has previously, and in great detail, discussed the propriety of trial counsel's strategy of conceding guilt of some conduct in the first phase of capital proceedings in order to maintain the credibility to avoid the death penalty in the subsequent phase. See, §2255 Response, pp. 50-78.  In the appropriate circumstances, this strategy continues to be recognized as a legitimate, indeed necessary, capital defense tactic.

In Florida v. Nixon, 543 U.S. 175 (2004), the Supreme Court held that an attorney who, in the guilt phase of a capital murder trial conceded his client's guilt of a capital offense[20] without the client's express consent, was not ineffective where the concession was a strategic decision aimed at sparing the client's life in the penalty phase. Id. at 182-183, 190-193.  Faced with overwhelming evidence of Nixon's guilt, including a graphically detailed description of the kidnaping and brutal murder of the victim Nixon gave to police, his trial counsel concluded that

---

[20]As discussed *supra*, Mr. Shaw did not at any time conceded Holder's guilt of a capital offense.  Mr. Shaw conceded Holder's conduct, but not the mental state required by the instructions to find Holder guilty of either capital offense.

the best strategy to avoid the death penalty was to concede guilt, thereby preserving his credibility in urging leniency in the penalty phase.  Id. at 181.  As Nixon was unresponsive to his counsel's attempts explain the strategy to him, counsel embarked upon the strategy without receiving Nixon's explicit approval.  The trial court lauded counsel's choice of tactic:

> '[T]he tactic employed by trial counsel . . . was an excellent analysis of [the] reality of the case' . . . The evidence of guilt 'would have persuaded any jury . . . beyond all doubt,' and '[f]or trial counsel to have inferred Mr. Nixon was not guilty . . . would have deprived [counsel] of any credibility during the penalty phase.'

Id. at 184.  The Supreme Court agreed that the strategy was appropriate:

> Although such a concession in a run-of-the-mine trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affects counsel's strategic calculus.  Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because defendant's guilt is often clear.  Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming . . . In such cases, 'avoiding execution may be the best and only realistic result possible." (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases §10.9.1, Commentary (rev'd ed. 2003), reprinted in 31 Hoffstra L.Rev. 913, 1040 (2003).

Id. at 190-191.  The Court recounted that Clarence Darrow was able to spare "youthful, cold blooded killers" Richard Loeb and Nathan Leopold from the death penalty by employing a similar stratagem, and concluded that "if counsel's strategy, given the evidence bearing on defendant's guilt, satisfies the Strickland standard, that is the end of the matter . . ." even absent the defendant's affirmative approval.  Id. at 192.

More than being an accepted practice in capital litigation, it has been suggested that the expedient of conceding a defendant's guilt in the situation presented by Nixon was ethically required. See, Andrew J. Epstein, Conceding the Guilt of an Unresponsive Client in a Capital Case: Constitutional and Ethical Requirements, 19 Geo. J. Legal Ethics 695 (2006).  Courts have

routinely affirmed the reasonableness of concessions of guilt in the first phase of capital murder trials where the strategy was intended to save the defendant's life.  See, e.g., Atwater v. Crosby, 451 F.3d. 799, 807-809 (11th Cir. 2006) cert. denied, ___ U.S. ___, 127 S.Ct. 951 (2007) (defense counsel performance not deficient where counsel argued in first phase closing that evidence supported finding of second degree murder and  experienced defense counsel testified he did not believe defendant had a chance of acquittal and strategy was to save defendant's life); Hightower v. Schofield, 365 F.3d 1008, 1038-39 (11th Cir. 2004), vacated on other grounds and remanded, 545 U.S. 1124 (2005)(defense counsel were not ineffective for failing to object to "guilty but mentally ill" instruction where counsel testified in state habeas hearing that strategy was to save defendant's life rather than seeking acquittal, which was a reasonable strategic choice given that defendant had confessed to murders on same day they occurred); Charm v. Mullin, 37 Fed. Appx. 475, 482 (10th Cir. 2002), cert. denied, 538 U.S. 927 (2003)(unpublished)(defense counsel's strategy to acknowledge, at beginning of trial, that State would present sufficient evidence for jury to convict defendant in order to maintain credibility for second stage, where defense counsel hoped to save defendant's life, was reasonable; State overwhelmingly established defendant's guilt); and, Trice v. Ward, 196 F.3d 1151, 1161-62 (10th Cir. 1999), cert. denied, 531 U.S. 835 (2000)(defense counsel's performance did not violate Strickland where counsel argued in guilt phase that defendant was "guilty of all counts in the information;" it was uncontroverted that defendant was responsible for beating victim and causing her death and all but conceded that he also raped her; it was entirely reasonable strategy for defense counsel to concede this point and focus on efforts at persuading jury that defendant

did not have intent to commit first degree murder and/or persuading the jury to spare defendant's life).

When faced – as Mr. Shaw was – with overwhelming evidence of a client's guilt, Nixon teaches that experienced counsel may make the reasoned strategic decision to concede first phase guilt to preserve the requisite second phase credibility needed to avoid a verdict of death, even without the client's specific approval.  Nixon, supra, at 190-193.  In contrast to the petitioner in Nixon, Holder was specifically advised of Mr. Shaw's similar strategy and approved it.  (Holder Deposition, pp.49-50, 53-57, 70-71, 76-77).  In fact, Holder understood this strategy would result in his conviction for the bank robbery.  (Holder Deposition, p. 105).   Holder, thus, has an even less compelling claim of ineffectiveness than that rejected in Nixon.

Equally unsuccessful is Holder's attempt to avail himself of the presumed prejudice provision of United States v. Cronic, 466 U.S. 648 (1984).  See Movant's Brief, p. 27.   Nixon neatly dispatches Holder's claim to Cronic relief:

> Cronic recognized a narrow exception to Strickland's holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but that the deficiency prejudiced the defense.  Cronic instructed that a presumption of prejudice would be in order in 'circumstances that are so likely to prejudice the accused that the cost of litigating their particular case is unjustified..' [Citation omitted.] The Court elaborated: "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.' [Citation omitted.] We illustrated just how infrequently the 'surrounding circumstances [will] justify a presumption of ineffectiveness' in Cronic itself.   In that case, we reversed a Court of Appeals ruling that ranked as prejudicially inadequate the performance of an inexperienced, under-prepared attorney in a complex mail fraud trial. . . On the record thus far developed, [defense counsel's] concession of Nixon's guilt does not rank as a 'fail[ure] to function in any meaningful sense as the Government's adversary.'
> Nixon, 543 U.S. at 190.

45

The same result should obtain here.  Mr. Shaw's performance, as reflected by the record of the lengthy trial in Holder's case, emphatically refutes any claim that <u>Cronic</u> applies.  Mr. Shaw, indeed, subjected the Government's case to "meaningful adversarial testing."  <u>See</u>, e.g., cross examination of Frank Stubits, Tr. Trans. 3-25-98, pp. 3-33, 39-42, 43-44.  Because <u>Cronic</u> does not apply and Holder has failed to establish actual prejudice, his claims must fail even if this Court finds that Mr. Shaw's performance was flawed.

### C. MR. SHAW WAS NOT SLEEPING DURING THE TRIAL (Claim 12C(h))

Holder claims variously that Mr. Shaw was "generally inattentive and slept through parts of the sentencing phase proceedings," and that he was ineffective in closing argument by failing to "properly present the mitigating strategy developed by co-counsel Herndon and mitigation specialist Tatelli to the jury."  Movant's Brief, p. 28.   Neither allegation merits relief.  The record does not support the allegation that Mr. Shaw slept during trial.  Mr. Shaw, an exceptionally  experienced trial attorney, gave a cogent penalty phase argument which acknowledged the mitigation information presented while maintaining cohesion with the guilt phase strategy.  By virtue of his experience, he was better equipped to argue issues he believed would resonate with the jury than Ms. Herndon, who was participating in her first capital case and had never given a penalty phase closing argument. (Hrg. Trans. Vol. II, p. 54).  Neither was Holder prejudiced by Mr. Shaw's argument.   The record reflects, by their findings on the mitigating circumstances submitted by Holder, that the jurors fully understood the mitigating information developed by Ms. Herndon and Ms. Tatelli.  However,  they chose not to weigh that information in the manner Holder would have preferred.

Holder bears the burden of "proving his lawyer's performance was unreasonable under prevailing professional standards." Thai v. Mapes, 412 F.3d 970, 978-979 (8th Cir. 2005). Under the Strickland standard, to obtain relief, he must further demonstrate that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 494. Thus, Holder bears the burden of proving that Mr. Shaw slept during trial, and that but for Mr. Shaw's slumber, a different outcome would have resulted. Holder fails to demonstrate either proposition.

Holder relies on the testimony of Caryn Tatelli in support of the sleeping claim. Movant's Brief, p. 30. Although Ms. Tatelli testified that Mr. Shaw was sleeping at counsel table during the penalty phase of trial, and that it concerned her, she was unable to say: (1) how many times this occurred; (2) what time of day it occurred; (3) how long it occurred; or even, (4) what witness was testifying at the time. (Hrg. Tr. Vol. I, pp. 28-32). At one point in her testimony, Ms. Tatelli claimed that she observed Mr. Shaw sleeping "[f]ive minutes, 10 minutes, 15 minutes, maybe longer, I don't really know" and that "I – – believe I saw it alt least twice." (Hrg. Tr. Vol I, p. 30). However only a moment later she recanted.

> [Mr. Holtshouser] And even though it gave you great concern, you can't tell us how long you observed it for or for how long a period of time it went on?
>
> [Ms. Tatelli] That's correct.
> (Id.)

Although she claimed to have brought the issue to the attention of Ms. Herndon and Mr. Burr (Id. at pp 31-32), the record does not reflect that she alerted this Court, or anyone else, to this shocking allegation. While Holder makes no reference to it in Movant's Brief, Ms. Herndon also

testified about the matter.  Ms. Herndon's testimony on this issue is confusing at best, and insufficient to carry Holder's burden.

Ms. Herndon's testimony does not indicate that Mr. Shaw actually slept, but only that it appeared so.   When first questioned on the matter, Ms. Herndon responded that she saw that Mr. Shaw <u>appeared</u> to be sleeping "early in the trial" and that it occurred "just that one day."  (<u>Id</u>. at p. 142). She later indicated that although she only saw him "appear[] to be sleeping" early in the guilt phase, she was informed that "he may have been sleeping during the penalty phase" but that "[she] never witnessed that."  (<u>Id</u>. at pp. 142, 145), and that she didn't know if he was actually sleeping or not.  (<u>Id</u>. at p. 148).   Although Ms. Herndon described a situation in which Mr. Shaw may have missed the opportunity to impeach "one of the tellers," she prefaced the description with the disclaimer, "I don't know whether he was sleeping when this happened or not."  (<u>Id</u>. at p. 143).  Incredibly, although she was involved in representing a client on trial for his life, Ms. Herndon <u>did nothing</u> with her alleged knowledge of Mr. Shaw's inattention.   Not only did she fail to bring the matter to the attention of this Court, she did not even raise it with Mr. Shaw. (<u>Id</u>. at pp. 144, 146-147).   Ms. Herndon may not have been experienced as a trial lawyer in capital cases, but by the time of Holder's trial she had been an attorney for approximately eight years, "was with the Capital Division of the Public Defender's Office for almost three years," and by her own reckoning, had "given 75 [non-capital] closing arguments before."   (<u>Id</u>. at pp.95-96; Vol. II, p. 54).  The Government finds it beyond belief that an attorney of Ms. Herndon's experience, charged with defending the life of her client, would not inform the Court that her co-counsel appeared to be sleeping, had that in fact been the case.  It is equally unbelievable that she would not bring the matter to co-counsel's attention.

In the first instance, Holder fails to establish that Mr. Shaw slept at all.  This Court may take judicial notice of matters occurring before it, and specifically may take judicial notice whether a trial participant was sleeping.  United States v. Bradley, 173 F.3d 225, 230 (3rd Cir.), cert. denied, 528 U.S. 963 (1999) (court could take judicial notice that juror was sleeping); United States v. Carter, 433 F.2d 874, 876 (10th Cir. 1970)(court could take judicial notice that juror was not sleeping); United States v. Curry, 471 F.2d 419, 422 (5th Cir. 1973)(same).  This Court presided over Holder's trial, and had the best vantage from which to view the conduct of all trial participants, counsel in particular.  At a status conference held in this matter on March 22, 2005, the Government requested this Court for its recollection of the issue:

> MR. HOLSTHOUSER: The other question may have been raised at the last meeting, but it had to do with your recollection as it relates to one of the issues that claim Mr. Shaw was sleeping during portions of the trial. It's obviously a bit of a  – –  no party intends to call you as a witness, or cross-examine you, but what I think we would ask you at some point, that both parties be notified as to whether you have a recollection on that issue, and what it would be so that that would be a fact in your findings of fact so that we know going into the hearing what that finding would be.  We're not asking for it now, but at some point.
>
> THE COURT: I think that's something that can be resolved sooner than later. We are on the record, and I will tell you I recall Mr. Shaw came to the hearings almost always before anyone.  He was frequently there before I arrived, and we passed the time of day, but nothing certainly about the case, and I have, because the issue arose, I have searched my memory and have no recollection whatsoever of ever seeing Mr. Shaw sleeping, or was there ever any, that I can recall, ever any time that I formed and impression that he was being less than attentive to the case, so that's my recollection about the case.
>
> There were times when Ms.[Herndon] was actively pursuing questioning and so forth, and during those times, I had my attention focused upon her, but I have searched my memory and that's the best recollection as I recall.
>
> (Hrg. Trans. 3-22-05, pp. 4-5). (Emphasis supplied).

The Court's recollection is clearly at odds with the testimony of Ms. Herndon.  Ms. Tatelli's inability to recall any details of this serious allegation, coupled with the failure to report the problem to the Court had it in fact occurred, lead to the inescapable conclusion that Holder has failed to carry his burden of establishing that Mr. Shaw slept.  It is just not possible that if Mr. Shaw slept "at least twice" for "[f]ive minutes, 10 minutes, 15 minutes, maybe longer" as Ms. Tatelli testified, that the Court  – who was facing Mr. Shaw – would not have noticed it and taken immediate prophylactic action.  This Court can deny Holder's claim based on its own observations.  United States v. Onaghise, 85 F.3d 638, 1996 WL 204544 at *2 (9th Cir. 1996)(Unpublished)(§2255 petitioner raised claim trial counsel, who slept during critical portions of trial was, ineffective; district court properly denied claim based on counsel's declaration and district court's own observations).

Moreover, had Mr. Shaw's misconduct of slumber in fact taken place, it was incumbent on Ms. Herndon to report it to the Court at once.  Carter, 433 F. 2d at 876.  One of his trial counsel having failed to apprise this Court of the alleged misconduct of his other trial counsel, Holder should not be allowed to have injected a defect in the trial to later claim the benefit. United States v. Hester, 489 F.2d 48, 50 (8th Cir. 1973)(claim of sleeping juror raised for first time in §2255 motion; trial court, who also presided over §2255 motion, indicated no memory of juror misconduct); Curry, 471 F.2d at 421-422 (counsel may not permit juror misconduct or inattentiveness to go unnoticed, thereby sewing a defect into the trial, and later claim its benefit).

Assuming, arguendo, that Holder has somehow established that Mr. Shaw slept, he is still not entitled to relief because he cannot establish prejudice.  Holder had the benefit of two trial counsel.   As there is no claim that co-counsel Herndon was ever unconscious or inattentive,

prejudice is not presumed as  Holder cannot show the Cronic-required complete failure to subject the Government's case to meaningful adversarial testing. See Nixon, 543 U.S. at 190 (for Cronic's presumed prejudice standard to apply, counsel's failure must be complete). Ordinarily, episodes of counsel's inattention or slumber are perfectly  amenable to the Strickland prejudice test. Tippins v. Walker, 77 F.3d 682, 686 (2nd Cir. 1996). See also: Muyet v. United States, 2004 WL 1746369 *3 (S.D.N.Y.) (unpublished ) (when defendant can only evince that counsel merely closed his eyes or slept a few times when defendant's interests not at stake courts should apply Strickland test).  The Walker court noted the dangers of presuming prejudice from lack of alertness.  Periods of sleep, preoccupation or otherwise during a long trial may be qualitatively substantial but without consequence, especially if they occurred during matters which were uncontested or peripheral to the defendant. Id.

To satisfy the Strickland standard on this claim, Holder must show that Mr. Shaw's conduct was so deficient that he was not functioning as the counsel guaranteed by the Sixth Amendment, and but for Mr. Shaw's deficient performance, there is a reasonable probability that the result of the proceeding would have been different.  United States v. Peterson, 777 F.2d 482, 484 (9th Cir, 1985), cert. denied, 479 U.S. 483 (1986).   In Peterson, the court denied defendant's claim of ineffectiveness based on the claim his attorney slept during trial.  The district court had found that counsel had not slept for a substantial portion of the trial, and because counsel was twenty feet from the district court, who did not notice counsel sleeping, doubted that counsel had slept at all. Id.

The court denied a similar claim in Prada-Cordero v. United States, 95 F.Supp.2d 76 (D. Puerto Rico, 2000).  The Prada-Cordero court noted that courts considering a sleeping counsel

claim should consider that during a long trial it may not be unusual for any attorney to become

drowsy or fall asleep.  The court further cautioned that courts reviewing these claims should be

cognizant that attorneys may use the appearance of sleep as a strategic tool to downplay the

importance of an adversary's presentation, and observed that unscrupulous practitioners may

apply the tactic to annul trials they feel they are at risk of losing.  Id. at 81-82.  The court  – who

had presided over petitioner's trial – based it's denial of the claim on the grounds that:

> First,   [I] did not observe Attorney Escalona sleeping either for a substantial
> portion of the trial or to the extent that [petitioner] alleges in his petition.  The
> defense table was within [my] direct line of sight and was only approximately
> twenty feet away.  If Escalona had been sleeping as often as petitioner claims,
> [I] would have noted such conduct. [I] did not.
>
> Second, a review of the trial transcript does not indicate that [petitioner] was
> constructively denied his right to counsel.  The record indicates Escalona was
> paying attention to the proceedings and actively participating in the trial. He
> made objections, some of which were successful.  He vigorously cross-examined
> the government's witnesses.  And he attempted to develop an alibis by portraying
> [petitioner] as a legitimate business person.  He was not absent from the courtroom
> and he did not fail to subject the government's case to meaningful adversarial testing.
> Id. at 82.
>
> United States v. Muyet, 994 F.Supp. 550 (S.D.N.Y. 1998) is apposite.  The Muyet court

applied the Strickland standard in denying defendants' ineffective assistance claims based on

allegations that counsel slept through significant portions of the trial.  The court rejected as

"patently false" defendants' claims that counsel slept every day of trial:

> [Counsel] sat at the front defense table . . . in direct line of sight of the Court
> for virtually the entire trial.  The Court never noticed [counsel] sleeping; if
> he had slept anywhere near the amount alleged by [defendants] it would have
> been impossible for the Court not to observe his sleeping.
> Id. at 560.

Several other defense attorneys provided affidavits alleging diversely that counsel's eyes had

been closed on "two or three occasions" or that "on several occasions" counsel appeared to be

52

sleeping. The court found that even if the attorneys' observations were accurate, counsel had not been ineffective:

> Based on the observations of [counsel] throughout the lengthy trial, the Court determines that his level of alertness and attentiveness to the proceedings in no way fell below prevailing professional norms and was not unprofessional error.
> Id. at 561.

See also: Fellman v. Poole, 33 F3d 58, 1994 WL 447275 *2 (9th Cir. 1994) (unpublished) (petitioner retains burden of showing prejudice resulting from counsel dozing off twice during four month trial; evidence supports trial court's finding that counsel was not asleep for any appreciable period of time and failed to show any prejudice).

The very testimony on which Holder relies to establish that Mr. Shaw slept equally demonstrates that even if the slumber occurred, Holder was not prejudiced. When asked specifically how Mr. Shaw's alleged sleeping during the penalty phase affected Holder's defense, Ms. Tatelli was unable to articulate an explanation:

> [Mr. Holtshouser] And so you can't – – since you don't remember what witness was on the stand, you can't give us any indication as to what impact it had on his awareness of what a particular mitigation witness was testifying to on direct or cross?
>
> [Ms. Tatelli] That's correct.
> (Hrg. Tr. Vol I p. 32).

Regarding the same allegation of sleeping during the penalty phase, Ms. Herndon was similarly challenged to describe what information Mr. Shaw's inattention deprived Holder of using to his advantage:

> [Mr. Holtshouser] All right. And, again with respect to [Mr. Shaw sleeping during the penalty phase], whatever sense you had of what he may have missed – – and again, you don't know whether he was actually sleeping or not, correct?

[Ms. Herndon] Correct.  That's right.

[Mr. Holtshouser] With respect to what he may have missed, what you surmised he missed, did you feel any need to bring it to his attention since he was going to do closing, "By the way, Mr. Shaw, you might want to know that this witness testified to this?"

[Ms. Herndon] Well again, I wouldn't have known what he missed, but, you know, it really wouldn't have mattered because Charlie – – by that point, when he decided he was going to do closing, he knew what he was going to say, and the reason he was going to do closing was because only he could say it and he didn't need me.

(Id. at pp. 147-148)(emphasis supplied).

The burden of proving Mr. Shaw actually slept and that the sleeping was prejudicial is Holder's, and he has failed to carry it.  This Court, just like the courts in Peterson, Prada-Cordero and Muyet, was in a superior position to evaluate Mr. Shaw's level of attention and professionalism, and should reach a similar conclusion.  Were Holder's claims true, they could not have gone unnoticed during trial.  This Court should rely on its own recollections and the record of Holder's trial, which abundantly demonstrate what the Court articulated in its own words:  "[N]or was there ever any, that I can recall, ever any time that I formed and impression that [Mr. Shaw] was being less than attentive to the case[.]"  This claim should be rejected.

**V. CONCLUSION**

This Court has the benefit of many years of experience in the arena of capital litigation at both the State and Federal levels.  Of equal import, this Court presided over the lengthy trials of both Holder and Allen.  Thus, this Court has more than just the cold record and briefs of the parties upon which to evaluate Holder's present claims.  The Government urges this Court to use both its own experience with capital litigation generally, and its intimate familiarity with the proceedings in this case specifically, to deny Holder's §2255 Motion.

It is undisputed that Mr. Shaw was renowned as an aggressive and highly successful criminal trial attorney, and had been for many years preceding the Holder trial. His conduct throughout his representation of Holder was consonant with his well-earned reputation. But for Mr. Shaw 's passing, he would have been able to articulate – much better than the Government has endeavored to do – his synchronized strategy over both phases of trial which was calculated to spare Holder's life. This Court bore witness to Mr. Shaw's attentiveness, his artful cross-examinations and his passionate arguments. This Court also witnessed the compelling and overwhelming quantum of evidence which convincingly proved Holder's planning of, and participation in, the brutally violent crimes that resulted in the death of Richard Heflin.

That Mr. Shaw was unsuccessful in his attempt to surmount this evidence assured that Holder would later level claims of ineffectiveness in a collateral attack on his sentence, as Holder does presently. That Mr. Shaw was unsuccessful in his attempt to surmount this evidence is no indication at all that he was in fact ineffective. To the contrary, a fair review of all of the facts and circumstances attendant to Mr. Shaw's representation of Holder yields the inescapable conclusion that Holder was well served by Mr. Shaw's professional representation.

In the rose-colored glow of hindsight, Holder now claims that Mr. Shaw pursued a flawed trial strategy, and that the Herndon/Burr/Tatelli model was a better path to pursue. However, Holder abjectly fails to detail in any meaningful way exactly what that path would have been. More importantly, he fails to demonstrate that it would have led to a different result. Had Ms. Herndon, Mr. Burr or Ms. Tatelli brought their concerns about Mr. Shaw to the attention of this Court before the verdict in this case, the claims would ring less hollow.

Even Holder does not claim his innocence in this matter. Overwhelming evidence of his guilt supports the jury's verdicts. Mr. Shaw's representation of Holder clearly surpassed any objective standard of reasonableness, especially considering Mr. Shaw's perspective at the time of the trial. There is no miscarriage of justice here; Holder received a fair trial while represented by competent and effective counsel. The jury reached a reliable result, and Holder's claims must fail.

Respectfully submitted,

CATHERINE L. HANAWAY
United States Attorney

*/s/ Steven E. Holtshouser*
STEVEN E. HOLTSHOUSER, #24277
JOSEPH M. LANDOLT, #6484
Assistant United States Attorneys
111 South 10th Street, 20th Floor
St. Louis, MO 63101
(314) 539-6894

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2007, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon:

Christopher E. McGraugh
Attorney at Law
1 City Centre, Suite 2001
St. Louis, MO 63102

Michael J. Gorla
Attorney at Law
720 Olive, Suite 1630
St. Louis, MO 63101

*/s/Steven E. Holtshouser*
Assistant United States Attorney

56