UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NORRIS HOLDER, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | No. 4:03CV0923 ERW |
| vs. | ) | |
| | ) | ***This is a Capital Case.*** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**MOVANT'S MOTION TO ALTER OR AMEND
JUDGMENT PURSUANT TO RULE 59(e)**

COMES NOW movant, Norris Holder, by and through counsel, and hereby moves the Court, pursuant to Fed. R. Civ. P. 59(e), to alter or amend its Judgment issued July 30, 2008, denying movant's motion for post-conviction relief pursuant to 28 U.S.C. § 2255. In support of this motion, movant states the following grounds:

**Introduction and Standard of Review**

A material mistake of law or fact allows a district court to alter or amend its judgment. *See, e.g., Deutsch v. Burlington Northern Railway Co.*, 983 F .2d 7 41, 744 (7th Cir. 1992); *Bannister v. Armontrout*, 807 F.Supp. 516, 556 (W.D. Mo. 1991). A district court's failure to notice or consider arguments or authorities that justify relief also constitutes an appropriate ground to grant a Rule 59(e) motion if these failures affected the correctness of the court's decision. *Hicks v. Town of Hudson*, 390 F.2d 84, 87-88 (10th Cir. 1967). Finally, 59(e) relief is appropriate to consider evidence that was not available to the court when it issued its decision or to prevent manifest

injustice.  *See, e.g., Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).  All of these settled grounds for granting Rule 59(e) relief exist in this case.

### Errors of Law and Fact

The issues meriting relief under Rule 59(e) will now be discussed.  For the convenience of the Court, petitioner will refer to the issues as they are identified in this Court's Memorandum and Order.

### 2.    Petitioner's Testimony at Trial and Counsel's Opening and Closing Statements (12(C)(b)&(c))

**Trial counsel's Shaw's trial strategy was based on a misunderstanding of the law.**

Defense counsel was constitutionally ineffective when, based on a mistaken belief in the law, he conceded that petitioner was guilty of a capital offense in his opening statement and closing argument, and advised petitioner to testify when his testimony confirmed his guilt on the capital charges.  In denying this claim, the Court, without the support of any facts, assumed that trial counsel's action was part of a sound trial strategy.  In doing so, the Court ignored all the evidence adduced at petitioner's hearing.

The evidence adduced at the evidentiary hearing creates an inescapable conclusion that Shaw's trial strategy was not sound as it was based on a misunderstanding of the law.  The Court assumes that the trial counsel's strategy was to focus the jury's attention on the petitioner's belief that no one would get hurt; thereby, attacking the existence of mental element that petitioner's action created a grave risk of death.  The Court fails to consider that Mr. Shaw never mentions the mental element "serious risk of death" in either his opening statement or his closing argument.  The evidence at hearing clearly sets out why - that Mr. Shaw was not only confused and harbored a

misbelief as to the charges and the requisite mens rea, but also showed an inability and a recalcitrance to form a sound trial strategy in accordance with the law. The notion that Mr. Shaw's trial strategy was to negate the mental element of "grave risk of death" strains logic because he actually assisted the government in introducing those facts which support this mental element. Further, the facts solicited by Mr. Shaw from petitioner regarding his actions prior, during and after the robbery were all used by the government to support the element of mens rea.  Trial Tr., Vol. 7 at 38-42, 64.

Tactical or strategic decisions based on a misunderstanding of the law are unreasonable. *Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003).  A trial counsel is ineffective when he makes strategic decisions based on an incomplete understanding of the law. *Landhorn v. Allen*, 590 F.3d 1272 (11th Cir. 2008).   The uncontroverted, uncontested evidence at hearing clearly demonstrates that Shaw formulated a trial strategy based on a misunderstanding of the law. Witnesses who testified at the hearing were unequivocal and consistent that Shaw's trial strategy was based on his belief that the bank robbery count was a non-capital offense, and petitioner could avoid the death penalty by admitting the robbery and denying that he intended for anyone to get hurt.  But, the evidence adduced at trial in support of this position was not addressed by the Court.

Caryn Platt Tatelli testified that she was recruited by Richard Burr, resource counsel for the Federal Death Penalty Resource, a project funded by the Administrative Office of the United States Courts, the Defender Services Division.  Evid. Hearing Tr., Vol. 1 at 9, Vol. 2 at 130, 140.  There was a concern that Mr. Shaw was treating it as a routine criminal matter and that petitioner was in trouble.  Evid. Hearing Tr., Vol. 2 at 138.  At Mr. Burr's urging, Ms. Tatelli was retained as a mitigation specialist to assist in the case.  Evid. Hearing Tr., Vol. 2 at 149.

Ms. Tatelli determined that no mitigation investigation had been undertaken. Evid. Hearing Tr., Vol. 1 at 11. It was not until Ms. Herndon was eventually appointed, only two months before trial, that a penalty phase strategy was even considered. Evid. Hearing Tr., Vol. 1 at 152, 116. Ms. Tatelli stated that Mr. Shaw was uninterested in developing a mitigation case as Mr. Shaw believed that it was not going to be a death penalty sentencing hearing because it was not a capital case. Ms. Tatelli's testimony stated in pertinent part:

Q:  Was there any discussion with Mr. Shaw as to what the guilt phase strategy would be in the case?

A:  I know that he didn't believe that Norris – that this would be a capital case. He didn't believe they would get to a death penalty sentencing hearing because he didn't think that the facts supported being a capital case.

Q:  Okay. Why do you say that?

A:  Because he would say things like, "We're not going to get to a death penalty sentencing hearing. This isn't a capital case. Norris isn't guilty of murder, first degree murder." I don't remember exactly, but that's the gist of the kinds things he was saying.

Evid. Hearing Tr., Vol. 1 at 12-13.

Ms. Herndon testified that she was appointed shortly before trial. She participated in meetings with Shaw to discuss trial strategy. Counsel Shaw believed that petitioner would be found not guilty of the murder charge. Evid. Hearing Tr., Vol. 1 at 115, Vol. 2 at 11. Ms. Herndon testified in direct contradiction of the Court's finding that there was no consistent mitigation and penalty phase trial strategy planned by Shaw. Evid. Hearing Tr., Vol. 2 at 107, Vol. 1 at 116. Ms. Herndon testified by way of direct evidence that Mr. Shaw did not understand the charges leveled against the petitioner. Particularly, Ms. Herndon describes a meeting between herself and Mr. Burr,

where defense strategy was discussed. Evid. Hearing Tr., Vol. 1 at 112. The testimony went as

follows:

> Q:    Okay, and did Mr. Shaw have a defense strategy at that point?
>
> A:    Yes. At that point, it was his strategy to argue that Norris wasn't guilty of the murder; he was only guilty of the robbery because he had not – not only had he not fired the shot that killed the victim, but he had not even fired his weapon at all.
>
> Q:    Okay, and did that give you concern?
>
> A:    Well, it did, yes. Once Dick got out the statute and you know, I was still brand new to this, but once Dick got out the statute and we all looked at it there at Charlie's office and then it was clear that that wasn't going to be a viable strategy.
>
> Q:    And why is that?
>
> A:    Well, because of the way the statute reads, it doesn't matter whether Norris pulled the trigger or whether he fired a shot or killed the victim, you know the fact that he participated in the robbery is sufficient to make him eligible for the death penalty, guilty of the crime that were charged.
>
> Q:    Was this expressed to Mr. Shaw?
>
> A:    Yes. At that time Dick Burr, you know, pulled out the statute and showed him and expressed to him that that wasn't going to work as a strategy for Charlie.
>
> Q:    What was his reaction once that was discussed?
>
> A:    Well, what was Charlie's reaction?
>
> Q:    Yes, ma'am.
>
> A:    He – he didn't seem too, I mean, he didn't agree with it. He didn't agree, and I'm not sure exactly how that was working because we were looking at the statute, but Charlie still seemed to think – you know, it got – it was sort of – I remember it being sort of an aggressive back and forth between Dick and Charlie because Charlie was pretty entrenched that his position was correct and Dick was equally entrenched that it was not correct.

Evid. Hearing Tr., Vol. 1 at 112-113.

Trial counsel Shaw's misunderstanding of the law continued past the pretrial stage and into the trial.  Motions for acquittal at the close of the government's case as well as at the close of all evidence demonstrate Shaw's mistaken belief of the law - that Count 1 did not charge a capital offense and that Count 2 required a specific intent to commit murder.  *See* Pet's Evid. Hearing Exh. 4 & 5.  Said motions for judgment of acquittal read as follows:

> 2.    As to Count II, the government failed to make a prima facie case as to Count II of the indictment in that there was no evidence to sustain the charge of malice of forethought which is the essential element which elevates the killing of an individual to an intentional status of murder under Count II of the indictment.

All legal arguments relating to the inclusion of a specific intent in the guilt phase instructions were prepared by Ms. Herndon and Mr. Burr.  Evid. Hearing Tr., Vol. 2 at 80.  In fact, Ms. Herndon testified that Mr. Shaw refused to read the memorandum regarding the petitioner's attack on the instructions as lacking in specific intent and that Mr. Shaw was surprised after the instruction conference that there was no murder charge.  Evid. Hearing Tr., Vol. 2 at 80.  Ms. Herndon testified as follows:

> Q:    Well let me see if I can phrase it for you this way.  Did he believe that there was – in the bank robbery charge, there was a capital count there and a non-capital count?
>
> A:    What he told me was there was a bank robbery charge and a murder charge.  During the instruction conference or at some point when we were talking outside of the instruction conference, he said, "What happened to the murder charge?"

Evid. Hearing Tr., Vol. 2 at 15.

Consistent with the testimony of Ms. Tatelli and Ms. Herndon, Mr. Burr testified that he was also concerned about the way Mr. Shaw was handling petitioner's case.  To that end, he took it upon himself to assist Mr. Shaw in hiring a mitigation specialist, and retaining co-counsel to handle the

penalty phase aspect of the case.  Mr. Burr also participated in trial strategy discussions with Mr. Shaw and Ms. Herndon.  He offered the following testimony regarding these meetings:

Q:  Was there any discussion as to what the guilty phase defense strategy would be?

A:  Yes.

Q:  Okay.  And who participated in discussion of the guilt phase strategy?

A:  Mr. Shaw, Ms. Herndon and me.

Q:  Okay, can you tell us was the substance of that conversation was?

A:  The substance – well, the thing that was the most striking was that Mr. Shaw misunderstood the charges against Mr. Holder.

Q:  How so?

A:  This case, obviously, everybody knows, involved a bank robbery in which a security officer was killed.  Mr. Shaw believed that he could defend in the guilt phase of this case against the capital charge by proving that Mr. Holder did not intend to kill anyone.  In other words, he – he thought that the capital aspect of the case required a specific intent murder, not simply a felony murder, and my reading of the statute and my understanding of the charge was to the contrary, and as was Ms. Herndon's, that the government did not have to prove – prove a specific homicidal mens rea.  It was certainly a mens rea as to the robbery but not a homicidal mens rea.

Q:  And what was the response by Mr. Shaw in relationship?

A:  I remember we got the statute out and read it together, and he still – notwithstanding what I thought was the plain meaning of the statute, he continued to take the view that – that he could defend against the capital charge by showing that there was no specific intent to kill.

Evid. Hearing Tr., Vol. 2 at 167.

This testimony and evidence is consistent with Mr. Shaw's comments during both his opening statement and his closing argument.  Beginning with his opening statement he conceded the government's case with the following comments:

- Now, jurors the evidence is going to show, and with candor you will hear the defendant rob the bank.  Trial Tr., Vol. 1 at.64.

- The judge will explain to you later on what malice aforethought means, but you are going to find that he intended the death of Heflin, now the evidence is going to show that Mr. Heflin was purposely shot by a person known as Billy Allen.  Trial Tr., Vol. 1 at 65.

- The evidence is going to be that when he entered the bank, he thought no guns would be fired and they were not to be fired.  There would be no evidence that this defendant at anytime fired his Russian made weapon.  Trial Tr., Vol. 1 at 67.

- Defendant fired no shots.  The defendant's back was to the shooting when the shooting started…from then on, of course, the defendant was caught.  The defendant committed a robbery.  Trial Tr., Vol. 1 at 68.

- We will at the end of this case ask that he be found not guilty of murder, as murder will be explained to you by the judge.  As for the robbery, with candor and forthrightness you will hear that he committed that robbery.  Trial Tr., Vol. 1 at 169.

Shaw stressed these very same things in his closing argument, that, while petitioner was guilty of armed bank robbery, he was not guilty of murder.

- There is no doubt – we have never denied that since this trial started – that this defendant committed the extreme folly, the material act that seizes society  by the throat, committing a bank robbery, armed, which he was, to get himself out of his problems, which was utterly wrong and for which he will pay.  Trial Tr., Vol. 7 at 77.

- You will have to leapfrog.  In order to convict him of murder, you have to leapfrog over what these people had told us, the people in the bank and just, convict him of murder, because tragically, manically and completely without justification, Billie Allen shot and killed Mr. Heflin.  Trial Tr., Vol. 7 at 77.

- That is the reason he is here.  He has admitted to robbery, but the murder, any intention even knowledge that he was shot when Heflin was shot, he wasn't in the bank.  Trial Tr., Vol. 7 at 80.

- We admitted and I told you at the beginning that defendant was involved in this robbery; and that what he did was, of course, punishable, and what he did was inexcusable.  We offer no excuses for his part in this.  We are not asking to be excused for it.  But we reject totally the charge of murder.  Now, you can say what

-8-

you want, but murder takes intention for somebody to be killed.  Trial Tr., Vol. 7 at 86-87.

**Trial counsel Shaw's trial strategy advising petitioner to testify was based on a misunderstanding of the law.**

Ms. Tatelli testified that she discussed with petitioner the possibility of him testifying in his own defense at his trial.  Evid. Hearing Tr., Vol. 1 at 49-50.  In those discussions, petitioner advised Ms. Tatelli that Mr. Shaw told him that if he told the jury what happened, he would get to go home.  Evid. Hearing Tr., Vol. 1 at 50-51.  Petitioner testified that he believed, as counsel Shaw explained, that he was charged with two different offenses:  bank robbery and murder.  Holder's Depo. Tr. at 52-55.  He testified that Mr. Shaw advised him that since he did not intend to hurt anyone and did not shoot the victim, that he may be found guilty of the bank robbery, but not the murder.  Holder's Depo. Tr. at  52-53.

Counsel Herndon, testified that she did not agree with Shaw's advice that petitioner testify.

A:   Well, several reasons.  Norris was not prepared to testify, first of all, and at the time that it first came up, that Charlie first mentioned it to me, there wasn't sufficient time to prepare him to testify.  I didn't think Norris would be a very sympathetic witness.  I think that as – as terrible as Norris feels about what happened, I never felt like he took responsibility for it, and I think that was because it was difficult for him.  This was not supposed to happen.  No one was supposed to die, and so the responsibility that he was able to – to live with was, "I didn't do this.  This isn't my fault," and that's a real problem, you know, when your client is on the witness stand because we know under the law it is his fault even though he didn't pull the trigger and so I thought that he was going to be a bad witness on the stand.  I thought he was unprepared.  I thought that it was a real problem that he was going to say he never fired his gun because the jury – you know, at that point they were believing that he fired his gun.  I was believing it based on the government's evidence, you know, because that's what the ballistics said.  So to put him up there to contradict unconverted government evidence was a bad idea, you know the jury was not going to give anything he said any credibility because of that one little piece of, "I didn't fire my weapon."  Evid. Hearing Tr., Vol. 1 at 130-131.

The right to counsel is a fundamental right of a criminal defendant; it assures the fairness and thus the legitimacy of our adversary process. *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). The essence of an ineffective assistance of counsel claim is that counsel's unprofessional errors so upset the adversarial balance between the defense and prosecution so as to render a defendant's trial unfair. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *United States v. Cronic*, 466 U.S. 648, 655-657 (1984). Access to counsel's skill and knowledge is necessary to accord defendant the ample opportunity to meet the government's case. *Strickland* at 685. Counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial process. *Id*. at 688. Counsel's competence, however, is presumed, and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms. *Id*. at 688-689. Because that testing process will generally not function properly unless defense counsel has done some investigation into the prosecution's case and explored various defense strategies, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. *Id.* at 691.

*Strickland's* reference to counsel's "thorough investigation of law," 466 U.S. 668, 690 (1984), indicates that reasonably competent defense counsel must be aware of applicable legal principles. Failure to be aware of the applicable legal principles constitutes ineffective assistance of counsel. See *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (trial counsel is ineffective for failing to "conduct an investigation that would have uncovered extensive records graphically describing petitioner's nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to records"); *Kimmelman v. Morris*, 477 U.S. 365, 385 (1986) (trial counsel's failure to make obvious and meritorious objections to tainted evidence

was ineffective and "betray[ed] a startling ignorance of the law"); *Reagan v. Norris*, 365 F.3d 616, 621-22 (8th Cir. 2004) (trial counsel unreasonably failed to object to jury instruction that omitted essential mens rea element of charged offense); *Blackburn v. Foltz*, 828 F.2d 1177, 1182-83 (6th Cir. 1987) (counsel's lack of knowledge as to the admissibility of defendant's prior convictions was unreasonable), cert denied, 485 U.S. 970 (1988); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989) (finding that defense counsel's failure to object to jury instructions that misstated applicable law was deficient performance under *Strickland*); *Goodwin v. Balkom*, 684 F.2d 794, 819-20 (11th Cir. 1982) (holding counsel was ineffective for not understanding the "fruit of the poisonous tree doctrine" and, as a result, not challenging the admissibility of defendant's confession), cert denied 460 U.S. 1098 (1983).

Petitioner believes this Court applied an improper standard, using that articulated in *Strickland*, in lieu of the standard established in *United States v. Cronic*, 466 U.S. 648 (1984). Prejudice should be presumed because given counsel Shaw's misunderstanding of the charges, there was a complete breakdown in the adversarial process during the guilt phase and penalty phase of petitioner's trial. By conceding petitioner's guilt in opening and closing statements and by putting him on the witness stand to admit that he participated in the bank robbery armed with military assault rifles, counsel Shaw failed to subject the government's case to a meaning adversarial testing. As a result, the *Cronic* standard is applicable and prejudice is presumed.

Alternatively, petitioner was unquestionably prejudiced by counsel's performed and can meet the *Strickland* prejudice standard. The government took advantage of counsel's deficient performance by outlining the elements of each offense in closing argument and adeptly pointing out that petitioner admitted to each and every element during his testimony. Further compounding

-11-

matters was the fact that petitioner was totally unprepared as a witness. He came across as combative, remorseless, indifferent, cold and somewhat looking to avoid responsibility by shifting the blame onto his co-defendant. Evid. Hearing Tr., Vol. 1 at 130-135. In addition, given the uncontroverted ballistic evidence which showed that there was a number of spent shells that could have come not have come from co-defendant's gun but may have been fired from petitioner's gun, counsel Shaw set his client up to be branded as a liar by eliciting his testimony that he did not fire his weapon in the bank. Evid. Hearing Tr., Vol. 6 at 166-167. In fact, the government characterized petitioner's testimony as aggravating evidence and used it to convince the jury to impose the death penalty. Trial Tr., Vol. 12 at 178-179, 186-193, 215-218.

**The Court's Judgment Order is based on supposition and is unsupported by the facts in the record below.**

This Court's Memorandum and Order, opining that counsel Shaw's trial strategy was an attempt to negate the mental element of "grave risk of death" and to merge that into a consistent penalty phase theme that his life should be spared, is based on supposition. The Court fails to cite any evidence adduced at the evidentiary hearing in support of this conclusion. On the contrary, petitioner introduced overwhelming and uncontradicted evidentiary that Shaw's trial strategy was founded on a misunderstanding and misbelief of the law. As such, this Court should grant alter, amend and set aside its judgment, granting petitioner relief on this issue.

### 3.   Failure to Obtain Ballistics Expert (12(C)(d))

Defense counsel's theory of the case was that, while petitioner was a willing participant in the bank robbery, he did not intend for anyone to be hurt, and that co-defendant Billie Allen acted

alone in shooting the guard.  The ballistics evidence was obviously an important aspect of the case, and needed to be investigated to make sure it fit within the defense theory.

Government witness, Frank Stubits, a firearms expert and tool mark examiner, obtained sixteen spent shell casings found inside the bank and compared them to other casings test fired from the weapons carried by petitioner and Allen during the robbery.  Stubits concluded that three of the sixteen spent shell casings were not fired from the rifle carried by Allen, but could have been fired from the rifle carried by petitioner.  Since there were only two armed robbers, the inference is that petitioner fired his weapon inside the bank. Reasonably competent defense counsel would have hired a ballistics expert to check Stubits' work before committing to a trial strategy which relied on the premise that petitioner did not fire his weapon inside the bank.  *See Adams v. Bertrand*, 453 F.3d 428, 436-37 (7th Cir. 2006) (defense counsel's commitment to a trial strategy without first investigating a pivotal witness was constitutionally deficient).  While defense counsel realized the importance of obtaining a ballistics expert to either confirm or challenge Stubits' work, such expert was never retained.  Evid. Hearing Tr., Vol. 1 at 123-24.

In analyzing this claim, the Court assumed that petitioner could have found a ballistics expert who would have disputed Stubits' conclusion that three of the spent shells could have been fired from the weapon carried by petitioner.  Even so, opines the Court, defense counsel's decision not to hire a ballistics expert was neither unreasonable nor prejudicial given the fact that there was other overwhelming evidence that petitioner fired his gun inside the bank.  Order at 65, 67-71.  But, the Court's analysis of this claim is incomplete because it failed to consider the scenario that a ballistics expert could have verified Stubits' conclusions, and analyze defense counsel's performance in that context.

Since defense counsel did not obtain a ballistics expert, they have no idea whether such an expert would have confirmed or challenged Stubits' conclusions. To fairly address his claim without an evidentiary hearing, this Court has to analyze the situation under the assumption that a ballistics expert would have verified Stubits' conclusion that three of the spent shell casings were fired, by process of elimination, from petitioner's gun. If that were the case, reasonably competent defense counsel would have realized the obvious danger of maintaining, as part of its theory, that petitioner did not fire his weapon inside the bank.

Unfortunately, defense counsel failed to appreciate the situation and committed to a predetermined strategy - that petitioner did not fire his weapon inside the bank - without first conducting a reasonable investigation into the ballistics evidence. Counsel's performance in this regard was objectively unreasonable and constituted a failure to use that degree of care and skill of a reasonably competent attorney in the same or similar circumstances. *See Draughton v. Dretke*, 427 F.3d 286, 294-97 (5th Cr. 2005) (counsel's decision not to pursue a forensics examination was unreasonable); *Driscoll v. Delo*, 71 F.3d 701, 707-09 (8th Cir. 1995) (counsel was constitutionally ineffective in handling serology evidence); *Wolfe v. Missouri*, 96 S.W.3d 90, 93-94 (Mo. banc 2003) (failure to test hair samples constituted deficient performance).

Petitioner was prejudiced by defense counsel's performance in this regard. From his opening statement, Trial Tr., Vol. 1 at 68, through defendant's testimony, *id*.,Vol. 6 at 85, 86, 102, and into the guilt and penalty phase closing arguments, *id*., Vol. 7 at 69, 75, 76, 92; Vol. 12 at 201, 202, 204, 208, 209, counsel Shaw continually harped on the fact that petitioner fired no shots from his weapon while he was inside the bank. In doing so, petitioner lost all credibility with the jury. If defense counsel's strategy was, as assumed by the Court, to have petitioner to gain credibility with the jury

by taking the stand and admitting to robbery, said strategy failed miserably.  It was doomed as soon as petitioner testified, contrary to the undisputed ballistics evidence, that he did not fire his weapon inside the bank.  In fact, not only did the jury believe that petitioner fired his weapon in the bank, they also found that he fired some of the shots that killed the guard. *See id.*, Vol. 12 at 251.  The jury reached this latter conclusion even though the two bullets found inside Heflin's body that could be compared with test fired bullets were both traced to Billie Allen's weapon.  *Id.*, Vol. 5 at 119-25.

The jury did not believe petitioner's version of the offense - that he did not attempt for anyone to be hurt and he did not shoot the guard - most likely because his testimony that he did not shoot his weapon inside the bank was directly contradicted by the ballistics evidence. Since the jury found that petitioner was lying with respect to that fact, it was a small step to find his entire story incredible.  Defense counsel could have prevented this situation by hiring a ballistics expert to determine whether Stubits' conclusions were accurate.  If Stubits' work was confirmed, defense counsel could have pursued the same strategy, and avoided the predicament of putting petitioner on the stand to testify that he did not fire his weapon.

As acknowledged by the Court, the evidence that petitioner shot the bank guard was weak at best. Order at 94.  But for counsel's performance in pursuing the theory that petitioner did not fire his weapon inside the bank, there is a reasonable likelihood that the jury may have found the first two mitigating circumstances: 1) that petitioner did not fire the shots which resulted in the victim's death; and 2) that he did not intend for any person to be killed during the course of the robbery.  Had one juror found the existence of either or both of these mitigators, there is a reasonable likelihood that the jury would have returned a sentence other than death.

This Court should alter and amend its Judgment to consider this claim from the opposite viewpoint, that a ballistics expert could have confirmed Stubits' work, and thereafter, for the reasons stated above, grant petitioner relief on this claim.

### 4.    Failure to Interview Mitigation Witnesses (12(C)(e))

Trial counsel was ineffective for failing to interview mitigation witnesses who could have testified on petitioner's behalf at the penalty phase proceedings.  For example, counsel failed to investigate and call an available witness with whom petitioner was placed in a holding cell at the federal courthouse in St. Louis.  A summary of this witness' potential testimony was included in a report prepared by FBI Special Agent Jan Hartman, which was available to counsel prior to counsel.[1] Specifically, the inmate witness could have been called to testify regarding petitioner's genuine expression of remorse regarding the death of Mr. Heflin.  Evidence of sincere remorse is a powerful mitigating factor.  There is a reasonable probability that if the jury had heard the testimony of a neutral witness who had no ties to petitioner, and who would not have received any benefit in exchange for his testimony, regarding petitioner's genuine expression of remorse, the outcome of the sentencing proceeding would have been different.  Trial counsel, however, made no attempt to locate and call this witness on behalf of petitioner.  It is respectfully submitted that this Court's resolution of this claim contains both factual and legal errors, and that the Court should therefore correct, vacate or set aside its memorandum and order denying relief on this claim, and allow an evidentiary hearing on this claim.

---

[1] Although the inmate was apparently not identified by name in the FBI report, petitioner identified the inmate at his July 7, 2005 deposition. *See* Holder's Depo. Tr. at 80. Petitioner stated that he provided this information to counsel Shaw and that counsel Shaw said that he would speak to these witnesses, but that Shaw ultimately did not do so. *Id*. at 79-84.

**A.      This Court Misapplied the *Strickland* Performance Prong in Excusing Counsel's Failure to Conduct Reasonable Investigations into the Inmate Witness Prior to Making a Decision About Whether to Call Him.**

The Court's conclusion that counsel's failure to locate and call the witness was a "reasonable strategic decision," Order at 75, constitutes legal error and is a misapplication of the *Strickland* standard regarding deficient performance.  It is undisputed that counsel never made any effort to locate or interview this witness prior to making the decision not to call him at trial.  Trial counsel was thus not in a position to make an informed strategic choice about whether to present this witness because he failed to undertake a reasonable investigation *before* making that choice.  *Strickland v. Washington*, 466 U.S. 668, 691 (1984) (counsel has a duty to make reasonable investigations that make particular investigations unnecessary).  Trial counsel could not have possibly assessed the witness' credibility or compared the quality of that witness' testimony regarding petitioner's remorse with that of the other penalty phase witnesses without first locating and interviewing the witness regarding his potential testimony.  Failure to undertake such preliminary investigations prior to making a decision not to use a witness constitutes deficient performance under *Strickland*.  *See Wiggins v. Smith*, 539 U.S. 510, 522 (2003) ("failure to uncover and present ... mitigating evidence ... could not be justified as a tactical decision because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation'") (quoting *Williams*, 529 U.S. at 396); *Kenley v. Armontrout*, 937 F.2d 1298, 1308 (8th Cir. 1991) ("it was not a reasonable strategy that led counsel not to investigate, but lack of thoroughness and preparation. Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made") (internal citation and quotation marks omitted); *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) ("[c]ounsel's 'strategy' not to use [certain witnesses] was not so

much trial strategy as it was an accommodation to his own inadequate trial preparation. ... although

it may have been a trial decision of counsel not to pursue [certain] testimony it was counsel's lack

of preparation which went a long way in inducing him to make it") (citation omitted); *Antwine v.*

*Delo*, 54 F.3d 1357, 1367 (8th Cir. 1995) ("[S]trategy resulting from lack of diligence in preparation

and investigation is not protected by the presumption in favor of counsel") (citation omitted).[2]

Additionally, the Court's conclusion that counsel's failure to adequately investigate the

witness is excusable because inmate testimony is "inherently limited," Order at 74, is erroneous and

has no factual support in the record.  Indeed, as the Court correctly noted earlier in its Order, "the

credibility of the witness is uniquely the function of the jury, and therefore the Court cannot decide

whether or not the jury would have credited the unknown witness's testimony." Order at 74-75.  In

---

[2] *See also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), Commentary to Guideline 11.4.1 (counsel may not "sit idly by, thinking that investigation would be futile.  The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each.  Without investigation, counsel's evaluation and advice amount to little more than a guess.") (internal quotation marks omitted); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003), Commentary to Guideline 10.7 (same).  In *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000), *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), the Supreme Court held that the ABA Guidelines are the appropriate guides for establishing what constitutes reasonably effective assistance in capital cases under the Sixth Amendment.  As the Court recognized in *Rompilla*, the 1989 and 2003 versions of the Guidelines "applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases." 545 U.S. at 387 n.7.  *See also Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) ("Although the instant case was tried before the 1989 ABA edition of the standards was published, the standards merely represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases. The ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland*.  They are the same type of longstanding norms referred to in *Strickland* in 1984 as 'guided' by American Bar Association standards and the like."); *Pickens v. Lockhart*, 714 F.2d 1455, 1460 (8th Cir. 1983) (relying on 1980 ABA Standards for Criminal Justice in finding that trial counsel rendered ineffective assistance in failing to fully investigate mitigating evidence).  *See also* attached Affidavit of Russell Stetler at ¶ 15 and note 1 (noting that the 2003 Guidelines are applicable to assess counsel's performance in capital trials conducted prior to 2003 because those Guidelines merely codified long-standing norms in existence significantly prior to 2003).

the absence of an evidentiary hearing, at which this Court would have an opportunity to observe the witness and make an independent credibility determination, the Court cannot simply credit the government's blanket assertion that the witness' status as an inmate would have "inherently limited" his testimony. *See*, *e.g.*, *Schlup v. Delo*, 513 U.S. 298, 309 n.19, 331-332 (1995) (reversing district court's denial of habeas petition, which focused primarily on the "suspect" nature of affidavits provided by inmate witnesses on the petitioner's behalf, and finding that the affidavits were sufficient to establish a threshold showing regarding "actual innocence" in order to entitle the petitioner to an evidentiary hearing on his claims). Moreover, the government's claim that such testimony is "inherently limiting" is belied by the fact that the government *routinely* relies on inmate witnesses in order to secure convictions.[3]

If anything, the inmate witness in this case would have been deemed *more* reliable than the other witnesses who testified about petitioner's remorse for his participation in the offense. As the Court will recall, those witnesses were all family members and friends of petitioner – in other words, persons whose testimony the jury might have discounted on account of their perceived bias for petitioner. The inmate witness, on the other hand, had absolutely no connection to petitioner, other

---

[3] Indeed, the reason why inmate witnesses are deemed unreliable is not because of their mere status as inmates, but because of the concern that they are attempting to curry favor with authorities in order to receive some benefit, such as a reduced sentence. *See*, *e.g.*, Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, Instruction 4.05A ("Credibility – Cooperating Witnesses") (noting that jury can properly consider inmate witness' interest in a reduced sentence in exchange for testifying in assessing inmate witness' credibility). In petitioner's case, however, that danger was not present; the inmate witness had absolutely nothing to gain in return for testifying on behalf of petitioner, and it is this *lack* of an improper or corrupting motive that would have been a powerful indicator of the credibility of the inmate witness' testimony. *See House v. Bell*, 547 U.S. 518, 552 (2006) (noting that exculpatory testimony from witnesses unconnected to the accused has "more probative value" than incriminating testimony from inmates because the neutral witnesses have "no evident motive to lie").

than incidental contact while being held in the same cell at the Federal Courthouse in St. Louis. At the time that petitioner briefly shared a cell with the inmate witness, petitioner had no reason to believe that he could potentially receive any benefit from expressing his remorse in the presence of this inmate, or that the inmate witness was in any position to help petitioner, so petitioner had no reason or incentive to express his anguish and regret about the offense other than because that is what he was genuinely feeling at the time. The inmate was simply a neutral observer of petitioner's sincere expressions of remorse over the death of Mr. Heflin. As such, his testimony would have had a level of credibility that petitioner's family and friends inherently lacked by virtue of their ties to petitioner and interest in the outcome of his sentencing. *See House v. Bell*, 547 U.S. 518, 552 (2006) (noting that the testimony at petitioner's habeas hearing "involve[d] an alleged spontaneous statement recounted by two eyewitnesses with no evident motive to lie. For this reason it has more probative value than, for example, incriminating testimony from inmates, suspects, or friends or relations of the accused"). Indeed, the inmate witness' inherent neutrality also suffices to dispute the Court's conclusion that his proposed testimony would have been "duplicative of other testimony presented." Order at 75. Testimony from an uninterested party that petitioner appeared to be genuinely remorseful about his crime is of much greater value than such statements coming from petitioner, or from his family and friends, and would thus have carried much more weight with the jury.

Although this Court described the proposed testimony from the inmate witness as "duplicative of other testimony presented," Order at 75, that analysis is incorrect. The fact that the *topic* of the testimony is similar does not automatically mean that the testimony of two witnesses is of equivalent value or interchangeable. *See, e.g., Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006)

(reversing death sentence and finding counsel ineffective for failing to put on additional evidence of childhood abuse, despite the fact that such evidence was presented at trial, because the trial testimony likely failed to give the jury a comprehensive understanding of the abuse given the discrepancy in depth and detail between the trial testimony and the habeas testimony).  Here, counsel simply had no way of *comparing* whether the inmate witness would have made a better or more compelling witness on the issue of Mr. Holder's remorse without first having interviewed him.  In other words, counsel had no foundation from which to compare the inmate witness with the other mitigation witnesses and make a reasonable decision as to who would be the best witness to call on the matter of petitioner's remorse.  Indeed, as Caryn Tatelli testified at the evidentiary hearing, the defense team "didn't put a lot of effort" into identifying such witnesses or offering evidence regarding petitioner's remorse as part of its mitigation presentation.  Evid. Hearing Tr., Vol. 1 at 52.  In light of that, counsel's failure to investigate and ascertain the necessary information regarding the inmate witness before choosing not to call him in favor of other witnesses constituted deficient performance under *Strickland*.  *See Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir. 1983) ("it is only after a full investigation of *all* the mitigating circumstances that counsel can make an informed, tactical decision about which information would be the most helpful to the client's case") (emphasis in original); *White v. Roper*, 416 F. 3d 728, 732 (8th Cir. 2005) (where "counsel's investigation was too superficial to reveal the comparative strength" of different approaches, "the presumption of sound trial strategy founders ... on the rocks of ignorance") (citing *Wiggins*).[4]

---

[4]  The Court's reliance on the fact that the "timing" of petitioner's expressions of remorse to the inmate witness makes "its truthfulness unreliable," Order at 74, is puzzling. Expressions of remorse can, by definition, only be made *after* the event for which the person feels remorse. Whether or not the expression of remorse itself is made soon after the crime or not has little, if any, bearing on the sincerity of the expression. Indeed, it is usually only with the benefit of time that one

B.        **Counsel's Deficient Performance was Prejudicial.**

There is a reasonable probability that outcome of the sentencing proceeding would have been different if the jury had received testimony regarding petitioner's remorse from a neutral, uninterested witness. As numerous studies of capital juries have shown, jurors' perceptions of the presence or absence of remorse plays a pivotal role in their decision to vote for life or death. *See, e.g.*, Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *Mitigation Means Having to Say You're Sorry: The Role of Remorse in Capital Sentencing,* 83 Cornell L.Rev. 1599, 1617 (1998) (finding that aside from the seriousness of the crime and the defendant's future dangerousness, no other factor plays a greater role in capital sentencing than remorse, and that if jurors believe the defendant is sorry for what he has done, they tend to sentence him to life imprisonment, not death; conversely, if jurors think the defendant has no remorse they are more apt to sentence him to death); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?* 98 Colum. L. Rev. 1538, 1560 (1998) (finding that almost 40% of jurors were more likely to vote for death if the defendant expressed no remorse for his offense, and that, in terms of aggravation, lack of remorse was second only to the defendant's prior history of violent crime and future dangerousness).[5] Given

---

is able to adequately reflect upon one's actions with sufficient care that one can genuinely feel such remorse. Moreover, the Court's reliance on *United States v. Bagley*, 537 F.2d 162 (5th Cir. 1976), is inapposite. That case deals with the elements necessary to establish a statement against penal interest under Federal Rule of Evidence 804(b)(3) for purposes of advancing a claim of third-party culpability. It does not stand for the proposition for which the Court cites it, i.e., that the timing of an expression of remorse make its truthfulness unreliable. *See* Order at 74.

[5] *See also* Scott Sundby, *The Jury and Absolution: Trial Tactics, Remorse and the Death Penalty*, 83 Cornell L. Rev. 1557 (1998) (in a study based on California juror interviews, finding that the defendant's degree of remorse was a significant factor for juries imposing the death penalty; that jurors identified the degree of the defendant's remorse as one of the most frequently discussed issues in the jury room at the penalty phase, and that, overall, 70% of the jurors raised lack of remorse as a reason they voted for the death penalty, often citing it as one of the most compelling reasons);

the importance that evidence of remorse plays in a capital jury's decision-making about whether to sentence someone to death, it was incumbent on counsel to present any such information to the jury in the most effective and credible way possible. Here, counsel failed to avail himself of an available witness whose testimony would have enhanced the penalty phase presentation because the witness had no motive to offer anything other than honest testimony about his observations of petitioner's genuine expressions of remorse. Trial counsel's unreasonable decision to forego the testimony of neutral witness on a matter of undisputed importance to the jury's sentencing determination resulted in prejudice to petitioner.[6]

Moreover, as the verdict form demonstrates, this was not a case in which the jury's findings indicate that the facts established an overwhelming case for death. The jury unanimously rejected one of the non-statutory mitigation factors (i.e., the "victim impact" aggravator), on which the government spent a considerable amount of time presenting evidence at the penalty phase. Additionally, numerous jurors found, in various combinations, twelve of the non-statutory mitigating factors that were presented. Given the central role that evidence of genuine remorse plays in the deliberations of capital juries, there is a reasonable probability that if this jury was presented with

---

Constanzo & Constanzo, *Life or Death Decisions: An analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 Law & Hum. Behav. 151, 161 (1994) (finding that a significant number of jurors considered the fact in sentencing the defendant to death that the defendant displayed no remorse for his crime); Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. Rev. 26, 59 (2000) (jurors were apt to respond to the remorseful defendant not only with good will, but also without fear or disgust, both of which tended to recede in the face of the defendant's remorse).

[6] Indeed, not a single juror found the "catch-all" statutory mitigating factor, i.e., that there were "other factors in Norris Holder's background, record or character or any other circumstances of the offenses that mitigate against imposition of the death sentence." *See* Verdict Form.

such evidence from a neutral witness, it would have altered the balance between mitigation and aggravation, and the outcome of the proceeding would have been different.

**C.     The Court Erred in Dismissing This Claim Without a Hearing.**

Petitioner's request for a hearing on this claim was denied. *See* Doc. #26. It is respectfully submitted that this court erred in denying this claim without a hearing, as it is evident from the Court's ruling that it relied on facts that are not in the record in deciding this claim. Additionally, this Court made credibility findings regarding the inmate witness without ever having heard from the witness himself, which is contrary to established law. For these reasons, an evidentiary hearing on this claim is warranted.

First, it should be noted that this Court's ruling relies on facts that are not in the record. Specifically, the Court stated that "Petitioner's trial counsel reviewed the testimony the unknown witness would provide, and determined, in the exercise of his professional judgment, that such evidence would not be beneficial to the Petitioner's defense." Order at 75. The Court's characterization of trial counsel's actions with respect to the inmate witness has no support in the record. This Court denied Petitioner's request for an evidentiary hearing with respect to this claim, so there is literally no evidence in the record as to whether counsel ever reviewed the testimony of the inmate witness, much less whether the decision not to locate the witness was the result of the exercise of professional judgment. The Court's findings with respect to counsel's performance in this regard is thus mere speculation. The Court's reliance on such unsupported "facts" to dispose of Petitioner's claim constitutes error. *See Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994) (holding that a § 2255 motion may not be dismissed without a hearing unless "the record *affirmatively* refutes the factual assertions upon which it is based," and remanding for an evidentiary

hearing so that a record could be made as to the reasons why counsel failed to offer certain evidence in defense of his client at trial) (emphasis added).

Additionally, this Court erred in passing on the credibility of the inmate witness based on inferences from the pleadings alone. As noted earlier, the Court's negative credibility assessment of the witness was not warranted in this case because the fact that the inmate witness' statements regarding petitioner's remorse were not made in exchange for, or in the hopes of, receiving some benefit neutralizes the suspicion commonly associated with relying on the testimony of inmates. More importantly, however, the Court's decision to make a credibility finding solely on the basis of the pleadings runs contrary to established precedent which states that a district court cannot make credibility determinations based on the pleadings alone. *See*, *e.g.*, *Koskela v. United States*, 235 F.3d 1148 (8th Cir. 2001) (district court abused its discretion in finding a hearing unnecessary and making credibility determinations about the witnesses based solely on competing affidavits); *Watson v. United States*, 493 F.3d 960, 964 (8th Cir. 2007) ("Although the district court was not required to credit [the movant's] assertion, it was required to hold a hearing before making factual determinations about [the movant's] credibility."); *Latorre v. United States*, 193 F.3d 1035, 1039 (8th Cir. 1999) (government's proffer of testimony by trial counsel and other witnesses to refute movant's allegations was an insufficient basis to deny an evidentiary hearing; "[T]hese witnesses were not heard at the § 2255 hearing in the District Court. Assertions by counsel cannot foreclose an evidentiary hearing, at which such testimony can be taken and subject to cross-examination."); *Smith v. United States*, 182 F.3d 1023, 1026 (8th Cir. 1999) (where movant and trial counsel filed conflicting affidavits regarding their out-of-court discussions, a hearing was necessary to resolve the facts that were in dispute). Thus, this Court erred in making a credibility finding with respect to the

inmate witness in the absence of a hearing, where the witnesses could have been called and questioned under oath.

Every inference must be drawn in petitioner's favor, particularly where, as here, petitioner has pled facts that if true would entitle him to relief, and yet, the district court has not granted an evidentiary hearing.  *See* 28 U.S.C. § 2255 ¶ 2; *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963) (requiring a hearing in federal habeas proceedings where the petitioner has alleged facts which, if proven, would entitle him to relief and where the district court has not resolved the merits of the factual dispute in a full and fair hearing); *Fontaine v. United States*, 411 U.S. 213, 215 (1973); *Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) ("The law is clear that, in order to be entitled to an evidentiary hearing, a petitioner need only allege–not prove– reasonably specific, non-conclusory facts that, if true, would entitle him to relief.") (emphasis in original); *See Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994) (remanding to the district court for evidentiary hearing on ineffective assistance of counsel claims); *Lawrence v. Armontrout*, 900 F.2d 127 (8th Cir. 1990); *Simmons v. Lockhart*, 856 F.2d 1144 (8th Cir. 1988); *Grigsby v. Mabry*, 637 F.2d 525 (8th Cir. 1980) (citing *Townsend v. Sain*).  It is respectfully submitted, therefore, that consistent with controlling precedent, the Court's order must be vacated, and the proceedings must be re-opened for an evidentiary hearing so that a factual record can be made on this claim.

### 5.    Failure to Investigate Petitioner's Mental Condition (12(C)(f))

This Court denied petitioner's claim that trial counsel was ineffective in failing to adequately investigate his mental condition and present readily available mitigation regarding his mental health. Notably, this Court denied the claim without conducting an evidentiary hearing.  It is respectfully

submitted that not only is this Court's denial of the claim erroneous, but also that a full evidentiary hearing on this claim is necessary in order to properly resolve the merits of this issue.

This Court's ruling on this issue essentially rests on two findings: (1) that the pre-trial mental health investigation conducted by trial counsel was reasonable, *see* Order at 78; and (2) that there is no evidence that any further mental examination of petitioner would have produced favorable information. Order at 79. In support of his claim that these findings are erroneous, petitioner respectfully submits the affidavits of Mr. Russell Stetler and Dr. Kathleen Wayland. Mr. Stetler is the National Mitigation Coordinator for the Federal Death Penalty Resource Counsel and Habeas Assistance and Training Counsel Projects. He is one of the nation's foremost experts on the issue of the standard of care in the investigation and presentation of mitigating evidence in capital cases, including the standard of care in capital mental health evaluations. Dr. Wayland is a clinical psychologist with extensive experience in conducting mental health evaluations of capital defendants.

As both Mr. Stetler and Dr. Wayland explain in detail in their respective affidavits, the pre-trial mental health investigation conducted by trial counsel was unreasonable and failed to meet the standard of care in capital cases. The mitigation investigation was belatedly and hastily conducted, and as a result, no meaningful inquiry into petitioner's mental health was ever conducted. *See* Evid. Hearing Tr., Vol I at 45 (testimony of Caryn Tatelli that pre-trial mitigation investigation of petitioner's head injuries and neurological issues was not thorough and complete). Indeed, the pre-trial mental health investigation was very narrowly focused on establishing a guilt-phase affirmative defense, and failed to encompass a broader investigation into mitigating evidence that would have been relevant in the penalty phase proceedings. It is well-settled that pre-trial consultation with a

mental health expert is no substitute for a thorough mental health investigation. *Rompilla v. Beard*, 545 U.S. 374, 392 (2005); *Kenley v. Armontrout*, 937 F.2d 1298, 1307 (8th Cir.), *cert. denied*, 502 U.S. 964 (1991) ("The fact that [the pre-trial psychiatric] report rules out a mental disease or defect and incompetency does not mean it rules out lesser but potentially mitigating conditions and disorders. We are aware of no legal authority strictly limiting mitigating medical, psychiatric and psychological evidence to that of legal insanity or incompetence. In fact, evidence of conditions, disorders and disturbances are precisely the kinds of facts which may be considered by a jury as mitigating evidence.") (citing *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982)).

As a result of trial counsel's deficient performance, crucial mitigation evidence regarding petitioner's mental health which was readily available to trial counsel went unexplored and was therefore never presented to the jury which decided whether petitioner should live or die. Given the constitutionally recognized importance of such mitigation evidence, *see, e.g., Brewer v. Quarterman*, __ U.S. __, 127 S. Ct. 1706, 1712-13 (2007) (rejecting Fifth Circuit's contention that only mental health impairments that are "chronic and/or immutable," such as mental retardation, qualify as mitigating, and holding that evidence that the petitioner was involuntarily committed for "major depression, single episode, without psychotic features, polysubstance abuse" was relevant mitigating evidence which the jury should have been permitted to consider), there is a reasonable probability that the outcome of the proceeding would have been different if the jury had been presented with mitigating evidence regarding petitioner's mental health issues.

Additionally, it is respectfully submitted that an evidentiary hearing on this claim is necessary in light of the wealth of information contained in the affidavits submitted by Dr. Wayland and Mr. Stetler, as well as that of Ms. Jennifer Merrigan, a lawyer and mitigation expert who has reviewed

records in petitioner's case and conducted interviews pertaining to his social history.  As these affidavits demonstrate, the conclusions previously made by Drs. Wetzel and Rothke regarding petitioner's mental health, on which this Court relied in its Order, are unreliable because they failed to take account of significant information regarding petitioner's social history, including a lifetime of exposure to various traumatic circumstances and events, that would have altered their findings. A more complete record must therefore be made in order to properly resolve petitioner's claim on this issue.

### 7.   Trial Counsel Slept During Portions of the Trial (12(C)(h))

On December 2, 2004, this Court granted petitioner's request for an evidentiary hearing on his claim that counsel Shaw slept during portions of his capital trial.  *See* Doc. #26.  The hearing took place on July 18, 19, and 20, 2005, at which time this Court heard testimony from two witnesses on this claim: Caryn Tatelli and Jennifer Herndon.  Despite credible testimony provided by these two witnesses, under oath, that they observed counsel Shaw sleeping during the trial, this Court denied the claim primarily because this Court did not itself recall seeing counsel Shaw sleeping during the trial.  Order at 84-85.  While it is true, as a general matter, that a court presiding over a § 2255 proceeding may rely on its own recollections of the prior criminal proceeding in adjudicating certain matters before it, it is respectfully submitted that this Court exceeded the scope of that principle in its resolution of this claim.

### A.   This Court's Reliance On Its Own Assessment of Its Capacity and Opportunity to Have Observed Counsel Shaw During the Trial Exceeded the Scope of the Rule Permitting the Court to Rely on its Recollection of the Trial.

As an initial matter, it should be noted that the observations that the Court volunteered regarding counsel Shaw's trial performance were not made as part of the § 2255 evidentiary hearing

in this case; the Order's citation to the "Evidentiary Hearing" for these remarks is mistaken. Rather, these remarks were made at a routine status conference held on March 22, 2005, approximately three months before the hearing on this claim was held.  Undersigned counsel did not know, and could not have known, at the time that the Court volunteered its recollection of the trial proceedings that it would later treat its recollection as dispositive of the claim of whether counsel Shaw slept through portions of petitioner's capital trial.  Indeed, the evidentiary hearing had yet to be conducted, and the Court gave no indication at the status conference that a hearing on this claim was no longer necessary given its recollection.  Rather, undersigned counsel understood the opposite to be the case, i.e., that further factual development at an evidentiary hearing was necessary in order to resolve this claim.

It is respectfully submitted that if undersigned counsel had known at the time of the status conference that the Court's remarks on the record were going to play such a central role in the Court's resolution of this claim, the undersigned would have inquired in an appropriate manner of the Court in order to make an adequate record regarding the Court's recollection.  For example, here, the claim alleged by petitioner in his § 2255 motion, and corroborated by the testimony of Ms. Tatelli and counsel Herndon, is that counsel Shaw was sleeping during witness testimony.  Typically, during such testimony, a trial judge's focus will largely be on the witness who is testifying, and the lawyer asking the questions – not only because that is where the "action" is in the courtroom, but because the trial judge must carefully follow the questions and answers in order to be ready to rule on any potential objections or prevent any impermissible testimony from being heard by the jury.  Indeed, that description appears to match this Court's recollection of how it presided over the penalty phase: "There were times when Ms. [Herndon] was actively pursuing questioning and so forth, and during those times, I had my attention focused upon her . . .".  *See* Order at 84-85 (citing Court's remarks

at 3/22/05 status conference).[7]  In light of the Court's own recognition that its duties at the trial necessitated that its energies and attention be focused on matters beyond keeping vigilant watch of counsel Shaw, it is respectfully submitted that the undersigned would have requested to inquire of the Court on this issue at the time of the evidentiary hearing in order to make a complete record of the facts on which the Court would base its ruling.

Such inquiry is especially important in light of the Court's statement in its Order that "had counsel Shaw been sleeping for substantial periods of time, or if at all, *it is likely that the Court would have noticed such behavior*."  Order at 87 (emphasis added).  That latter remark is significantly different than the Court's prior statement that it had no recollection of counsel Shaw sleeping during the trial.  Rather, it is a claim for which an adequate foundation has not yet been laid – namely, whether or not it was possible, given the Court's other important duties in presiding over the penalty phase proceedings, that the Court might not have noticed counsel Shaw sleeping during witness testimony.  In other words, it is one thing for the Court to state that it has no affirmative recollection of counsel Shaw sleeping.  It is quite another, however, to state that if it had happened, it is unlikely that it would have escaped the Court's attention.

---

[7] The Court also recollected that counsel Shaw "came to hearings almost before anyone" and "was frequently there before I arrived."  Order at 84.  Respectfully, those recollections are not probative of whether counsel Shaw was sleeping during penalty phase witness testimony because they concern counsel Shaw's activities at the start of the day's proceedings, not during the proceedings themselves.  Moreover, those were instances in which the Court and counsel Shaw were directly interacting with each other.  Order at 84 ("He was frequently there before I arrived, and we passed the time of day, but nothing certainly about the case . . ").  Petitioner's claim, however, concerns times when witnesses were giving testimony, i.e., times when it would be expected that the Court's attention would be directed not at counsel Shaw, but at the lawyer conducting the examination and the testimony being received as evidence.

The Court's reliance on that latter statement in denying petitioner's claim exceeds the scope of what it may properly rely upon in terms of its own recollections in adjudicating this claim. The underlying rationale behind that rule is that a § 2255 court is empowered to take judicial notice of events that that same court observed in the course of presiding over the original criminal trial. However, this Court's statement that it is "likely that the Court would have noticed such behavior" is not a statement about events that did or did not occur at *the trial*, but rather an observation that the Court is making about *itself* – i.e., the Court's ability and opportunity to have accurately and completely observed what was occurring at defense counsel table while the Court simultaneously presiding over the penalty phase proceedings of a federal capital trial, such that counsel Shaw's behavior would not have escaped its attention. That issue was never explored at the evidentiary hearing, nor could it have, because the first time that the Court attested to it was in its written Memorandum and Order.

It is respectfully submitted that given the central importance the Court placed on its appraisal of its capacity and opportunity to have observed counsel Shaw at trial in disposing of petitioner's claim, petitioner must be permitted to make appropriate inquiries of the Court so that this issue can be adequately developed on the record. Such inquiries would specifically be directed to issues including what this Court's duties were during the course of the trial; where the Court's attention was primarily focused during the receipt of witness testimony; how frequently and how carefully the Court observed counsel Shaw while he was seated at counsel table; where the Court's attention was directed while counsel Herndon conducted examination of the penalty phase witnesses; and whether the witnesses presented at the evidentiary hearing (Herndon, Tatelli, Holder) had a better opportunity, as well as more chances, to directly observe counsel Shaw during the trial than did the

Court.[8]  Such inquiries are necessary here given the fact that the Court's ruling on this issue relies not merely on its recollection of events at the trial, but on findings that the Court made about its own ability and opportunity to have accurately and completely observed counsel Shaw at trial.  It is thus respectfully submitted that the Court vacate its order and re-open the evidentiary hearing on this matter in order to permit petitioner to make a full record on this matter.

**B.      The Court Committed Legal Error By Requiring that Petitioner Establish that Counsel Shaw Slept Through "Substantial" Portions of the Trial.**

This Court committed legal error in that it applied the wrong legal standard for assessing petitioner's claim.  Specifically, the Order states: "Petitioner is unable to show that counsel Shaw slept through *substantial portions of the trial*, such that he was denied the presence of counsel." Order at 88 (emphasis added).  The Court's insistence that petitioner establish that counsel Shaw was asleep for "substantial" portions of the trial, however, misstates the applicable legal test and improperly requires a greater showing than is necessary in order to establish that relief is merited. In *Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001), the Fifth Circuit phrased the relevant legal standard as follows: "a defendant's Sixth Amendment right to counsel is violated when that defendant's counsel is repeatedly unconscious through *not insubstantial portions* of the defendant's

---

[8] Both counsel Herndon's and petitioner's observations of counsel Shaw were made while seated next to him at counsel table.  Additionally, Ms. Tatelli observed counsel Shaw sleeping during counsel Herndon's direct examination of mitigation witnesses, when this Court's attention, by its own statement, was properly focused counsel Herndon and the witness testimony, not counsel Shaw. Indeed, it is worth noting that all of the observations that these three witnesses made of counsel Shaw sleeping during the trial were made when someone other than counsel Shaw was examining a witness – that is, points of the trial when it would be expected that the Court's attention would be primarily focused on the testimony being received, and conversely, when it would be least likely that the Court's attention would be focused on an attorney who was merely sitting at counsel table.

capital murder trial.  Under such circumstances, *Cronic* requires that we presume that the Sixth Amendment violation prejudiced the defendant."  (Emphasis added.)

The difference in phrasing between this Court's and the Fifth Circuit's formulation of the test -- "substantial" versus "not insubstantial" – is not just a matter of semantics.  The *Burdine* test actually requires a much lower threshhold showing than that required by this Court.  Under *Burdine,* petitioner does not need to demonstrate that counsel Shaw slept during substantial portions of the trial.  Rather, he need only demonstrate that counsel Shaw slept through what amounts to something more than insubstantial portions of the trial.  As common usage implies, that amount need not itself be "substantial" in order to cross the threshold of being more than an insubstantial portion of the trial.

Indeed, the evidence adduced at the evidentiary hearing was sufficient to satisfy the *Burdine* threshold.  Petitioner presented the testimony of Caryn Tatelli, the defense mitigation investigator, as well as Jennifer Herndon, co-counsel with counsel Shaw.  Petitioner also submitted his own testimony on this issue by way of deposition.[9]  Ms. Tatelli testified that she observed counsel Shaw sleeping during the penalty phase.  Evid. Hearing Tr., Vol. 2 at 28.  Specifically, she observed counsel Shaw sleeping at counsel table while counsel Herndon was conducting direct examination of defense mitigation witnesses.  *Id.* at 28, 30.  Ms. Tatelli described her observation thusly:

> I saw that [counsel Shaw's] eyes were closed.  I saw his head sort of bobbling back and forth the way a sleeping person – somebody who is sort of fighting to stay awake – the head forward/head back jerking movement kind of thing.

---

[9] This Court did not refer to or cite petitioner's deposition testimony in its Order, despite the fact that it was received into evidence.  *See* Evid. Hearing Tr., Vol. 3 at 8.

*Id*. at 28.  As she further explained, "I truly believed he was sleeping, not just fighting off sleep." *Id*. at 29.  *See also*, *id*. at 30 ("I believed him to be sleeping, not fighting off sleep").  Ms. Tatelli observed counsel Shaw sleeping during the presentation of mitigation witness testimony at least twice.  *Id*. at 30.  She told counsel Herndon that she believed counsel Shaw was sleeping through the penalty phase testimony, to which counsel Herndon responded: "I know." *Id*. at 31.

Counsel Herndon also observed counsel Shaw sleeping during the trial.  She testified that she first observed him sleeping during the guilt phase proceedings.  Evid. Hearing Tr., Vol. 1 at 142.  It was initially petitioner who pointed it out to her.  *Id*.  Petitioner nudged her and motioned his head towards counsel Shaw, and when counsel Herndon looked over at him, she saw counsel Shaw with his face in his hands and his eyes closed.  *Id*.  She was convinced that counsel Shaw was not merely "resting his eyes" after she observed "him kind of do the like when you're asleep and you realize you're asleep and you kind of jerk your head up a little bit" and noticed "his head kind of bob up to attention a little bit, like you do when you're asleep and you don't want to be[.]" *Id*. at 143.  Counsel Herndon also confirmed that Ms. Tatelli told her during the trial that she had observed counsel Shaw sleeping during the penalty phase witness testimony.  *Id*. at 145.[10]

Petitioner also stated at his deposition that during the trial, he noticed counsel Shaw sleeping.  Holder's Depo. Tr. at 130.  Counsel Shaw had his head resting in his hand with his eyes closed and he appeared to be napping.  *Id*. at 129.  On about four or five occasions, petitioner also observed counsel Shaw's head "bobb[ing] heavily," as if he were nodding off.  *Id*. at 129-30.  Sometimes,

---

[10] Counsel Herndon did not state that she observed counsel Shaw sleeping during the penalty phase.  However, that is entirely consistent with the fact that counsel Herndon was conducting direct examinations of the penalty phase witnesses during the times that counsel Shaw slept during the penalty phase, and therefore her attention was focused on examining the witnesses, not observing counsel Shaw at counsel table.

petitioner would nudge counsel Shaw to wake him up out of his sleep. *Id*. at 130. Petitioner would also motion over to counsel Herndon to alert her to the fact that counsel Shaw was sleeping. *Id*. at 130.

All three of these witnesses offered their testimony regarding counsel Shaw under oath. Moreover, the points of consistency between their accounts establish the credibility and veracity of their testimony. For example, all three witnesses give consistent descriptions of seeing counsel Shaw bobbing his head while asleep, and both counsel Herndon and petitioner gave consistent descriptions regarding instances when counsel Shaw would rest his head in his hand and close his eyes. Additionally, counsel Herndon was able to corroborate both petitioner's and Ms. Tatelli's testimony that they had contemporaneously informed counsel Herndon about their concerns that counsel Shaw was sleeping during the trial.[11]

---

[11] The Court correctly faults counsel Herndon for failing to comply with her duty to contemporaneously notify the Court that counsel Shaw was sleeping during the trial. However, the fact that counsel Herndon failed to live up to her duty does not logically contradict or otherwise undermine the credibility of her testimony or the veracity of her observations of counsel Shaw. Indeed, it may be reasonably inferred from counsel Herndon's testimony at the evidentiary hearing that the reason she did not speak up at trial is because she felt like she lacked any authority relative to counsel Shaw. *See, e.g.,* Evid. Hearing Tr., Vol. 1 at 147 ("I was not much more than a nuisance to him. He was not rude or unfriendly to me, but he, obviously, knew what direction he was going in and expressed that he really didn't need my involvement in that").

Also, the Court's citation to *United States v. Hester*, 489 F.2d 48, 50 (8th Cir. 1973) for the proposition that counsel has an obligation to immediately appraise the trial court of any misconduct or risk forfeiting the claim is inapposite. *Hester* dealt with the issue of *juror* misconduct, not ineffective assistance of counsel. As even the Supreme Court has recognized, however, failure to raise an ineffective assistance of counsel claim on direct appeal does *not* bar a defendant from raising that claim in a § 2255 proceedings. *See Massaro v. United States*, 538 U.S. 500 (2003). Indeed, even prior to *Massaro*, the Eighth Circuit had held that "[c]laims of ineffective assistance of counsel are properly raised in a post-conviction motion under 28 U.S.C. § 2255, not on direct appeal." *United States v. Evans*, 272 F.3d 1069, 1093 (8th Cir. 2001).

Despite these points of consistency, this Court ruled that the testimony of Herndon and Tatelli was not credible because they did not identify precisely when or for how long counsel Shaw slept. That rationale, however, is contrary to the holding in *Burdine.* Indeed, the Fifth Circuit specifically rejected that same argument in its resolution of the case:

> The State next argues that because Burdine cannot demonstrate precisely when [counsel] slept during his trial, he cannot prove that [counsel] slept during critical stages of his criminal proceeding. In this regard, the State asks more of Burdine than the Supreme Court or this Court has ever asked of a defendant attempting to show the absence of counsel during a critical stage of a trial. To justify a particular stage as "critical," the Court has not required the defendant to explain how having counsel would have altered the outcome of his specific case. Rather, the Court has looked to whether the substantial rights of a defendant may be affected during that type of proceeding.

*See Burdine*, 262 F.3d at 347 (internal quotation marks and citations omitted).[12] Similarly here, the salient question is not whether petitioner can establish with precision when and how long counsel Shaw slept, but rather, "whether the substantial right of a defendant may be affected during that type of proceeding" during which counsel Shaw slept. As to that question, there is no doubt that a penalty phase proceeding in a capital case is the type of proceeding during which the right of a defendant

---

[12] A similar point was made in the concurring opinion written by Judge Higginbotham, who noted that attempts to identify with precision the times when counsel slept ignore the practical reality of how trials actually occur:

> The search for the precise evidence that came in as Burdine's counsel slept rests upon a view of trial dynamics and reality that confounds my forty years in the courtroom. With respect to my colleagues, that is not the way it works, and for the same reasons it is not the law. We presume prejudice because experience tells us that an occurrence presents both a high probability of prejudice and a difficulty of "proving it" in any finite sense. The law speaks of presumption not to supply a missing ingredient, but rather to recognize its inevitable presence. Right to counsel at critical stages is only an example of this principle. We simply will not put a person on trial for his life in the absence of counsel.

*Burdine*, 262 F.3d at 355 (Higginbotham, J., concurring).

may be affected.  Indeed, considering that the stakes of that proceeding were literally a matter of life or death to petitioner, it is inconceivable that one could identify a legal proceeding that could more substantially affect the right of a defendant than the penalty phase of a capital trial.  *Cf. Gregg v. Georgia*, 428 U.S. 153, 188 (1976) ("the penalty of death is different in kind from any other punishment imposed under our system of criminal punishment").

Given all the foregoing, it is respectfully submitted that this Court's resolution ran afoul of the legal standard established in *Burdine*.

### C.    This Court's Conclusion that Petitioner was not Prejudiced by Counsel Shaw Sleeping During the Trial was Erroneous.

This Court stated that petitioner could not establish that he was prejudiced because even if counsel Shaw was sleeping, he also had the assistance of counsel Herndon during the trial and therefore "was never without the representation of competent counsel."  Order at 88.  This conclusion overlooks important facts in the record regarding the division of labor between counsel Shaw and counsel Herndon at trial, as well as misapplies the prejudice standard articulated in *United States v. Cronic*, 466 U.S. 648 (1984).

First, it should be noted that counsel Herndon did not appear as counsel for petitioner until February 4, 1998 – approximately five weeks before trial.  Evid. Hearing Tr., Vol. 1 at 118.  As she testified during the evidentiary hearing, her representation of petitioner was limited to preparing the penalty phase case.  *Id*. at 115.  She did not participate in the preparation for the guilt phase proceedings, and testified at the hearing that even after the guilt-phase proceedings had already commenced,  she had not read all of the pre-trial discovery provided by the government.  *Id*. at 144. In short, counsel Herndon was not competently prepared to represent petitioner during the guilt phase

proceedings, so during those times when counsel Shaw slept through the guilt phase testimony, petitioner was effectively without the representation of competent counsel.[13]

With respect to the penalty phase, the Court's Order overlooks the fact that even though it was counsel Herndon who examined the mitigation witnesses, it was counsel Shaw that gave the closing argument. This fact begs the question of how counsel Shaw could have delivered an effective closing argument if he was sleeping through the penalty phase testimony. Apart from the obvious problem that being unconscious rendered counsel Shaw unable to hear the testimony of his witnesses as it came into evidence, there is also the issue that counsel Shaw was not paying attention to the jury, either, during the testimony, and therefore was not able to competently gauge how the jurors were reacting to the evidence.[14] Having neither heard portions of the testimony himself, nor observed the jurors during the receipt of that testimony, counsel Shaw was not in a position to make a reasoned judgment as to what themes and evidence would be the most effective to speak to the jury about in closing. Although counsel Shaw referenced certain mitigation themes in his closing

---

[13] It should be noted that in addition to the very little time that counsel Herndon had to prepare for trial, she also had to deal with the added burden that counsel Shaw expressed no interest in the preparation of the mitigation case, nor did he appear to understand the value or importance of preparing for the penalty phase proceedings. Evid. Hearing Tr., Vol. 1 at 14–16, 22, 46 (Tatelli); *id.* at 115-19, 124-5 (Herndon); Evid. Hearing Tr., Vol. 2 at 212 (Burr). Indeed, prior to Ms. Tatelli being retained in the case, counsel Shaw had not conducted any mitigation investigation in the case, nor had any of the mitigation witnesses been interviewed. Evid. Hearing Tr., Vol. 1 at 84-87 (Tatelli); *id.* at 103, 115 (Herndon).

[14] Additionally, if any of the jurors looked over at counsel table during the penalty phase testimony and saw counsel Shaw sleeping, the message that it communicated to the jury would have been unmistakable: none of this evidence is important. *Cf. Burdine*, 262 F.3d at 355 ("a lawyer asleep in the courtroom is more harmful than one who is physically absent. A message is sent to the jury when a defense counsel sleeps, sometimes as long as ten minutes, the prosecutor continues to present evidence, the judge does nothing (says he didn't see it) – all officers of the court pay it no mind. This is just a 'slow plea': going through the motions is the message.") (Higginbotham, J., concurring).

argument, the fact is that is all that they were – mere references.  Counsel Shaw's closing argument did not engage any of the testimony adduced at the penalty phase proceedings in the depth required to help the members of the jury understand what *weight* to accord those mitigating facts.[15]  Indeed, counsel Shaw did not mention even a single mitigation witness by name in the course of his closing argument.  Rather, he made only generic comments about "life in the ghetto," but did not draw on any specific examples from the witness testimony to talk about petitioner's social history and formative life experiences.

However, this Court need not engage in any searching examination of the closing argument, or identify the precise moments when counsel slept, in order to assess prejudice because, as the Court recognized in its Order at 87, the proper legal test for prejudice is not the one articulated in *Strickland*, but rather the "presumed prejudice" standard announced in *Cronic.  See Burdine*, 262 F.3d at 345-47.  *Cronic* recognized that because our system of justice deems essential the assistance of counsel, "a trial is unfair if the accused is denied counsel at a critical stage of his trial."  466 U.S. at 659.  In a footnote following this sentence, the Court explained that presumption of prejudice was appropriate "when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."  *Id*. at 659 n.25.  As the *Burdine* court noted, a sleeping lawyer is tantamount to having no lawyer at all: "The unconscious attorney is in fact no different from an attorney that is physically absent from trial since both are equally unable to exercise judgment on behalf of their clients.  Such absence of counsel at a critical stage of a proceeding makes the

---

[15] Indeed, this is why it is no answer to merely point to the verdict form and note that certain mitigators were found by some of the jurors.  Finding that a mitigating factor exists is not the same as assigning it weight, nor does that section of the verdict form reflect whether the jurors gave the factors any weight in the ultimate stage of deliberations.

adversary process unreliable, and thus a presumption of prejudice is warranted pursuant to *Cronic*." 262 F.3d at 349.

As noted in Section B, *supra*, this Court erred in stating that petitioner could not establish prejudice under *Cronic* unless he established that counsel Shaw slept through "substantial" portions of the trial. Under *Cronic* and *Burdine*, the relevant question is not a matter of *quantity*, but rather whether the *stage* of the proceedings during which counsel Shaw slept constituted a "critical stage" within the meaning of *Cronic*. That standard is easily satisfied here, as *Burdine* itself established that the receipt of testimony during a trial constitutes a "critical stage" of the proceedings. 262 F.3d at 347. Indeed, petitioner's claim is even stronger in that regard than the claim established in *Burdine*. There, the evidence of trial counsel sleeping was limited to portions of the guilt-phase proceedings only. Here, however, the testimony adduced at the evidentiary hearing established that counsel Shaw slept during portions of the guilt-phase *and* the penalty-phase proceedings, and that he insisted on giving the closing argument during *both* proceedings. Thus, petitioner adequately established under the prevailing legal test that he was prejudiced by counsel Shaw's sleeping during portions of his capital trial.

**10. Counsel Shaw's Decision to Give Penalty Phase Closing Argument (12(C)(k))**

Defense counsel Shaw made a conscious decision to have nothing to do with the preparation of the penalty phase case. He refused to read the witness summaries prepared by the mitigation expert, and took no part in planning the penalty phase strategy. Evid. Hearing Tr., Vol. 1 at 16, 22, 116, 118-19. The entire mitigation case was jointly put together by Caryn Tatelli and Jennifer Herndon, *id*. at 23, 74, and solely presented in court by counsel Herndon. *Id*. at 125. Despite his

lack of interest in and knowledge of the penalty phase strategy, counsel Shaw, to the utter shock and disbelief of Tatelli and Herndon, unilaterally decided to give the penalty phase closing argument. *Id*. at 23-25, 125-26. In doing so, he ignored the bulk of the mitigation evidence, and reverted to his unsuccessful guilt phase argument - that petitioner's life should be spared because he did not shoot Heflin. *Id*. at 25-26, 77, 129.

Given his complete unfamiliarity with the penalty phase strategy, counsel Shaw's performance in giving the penalty phase closing argument was unreasonably deficient. Petitioner was prejudiced because he lost his "final opportunity to marshal all of the mitigating evidence before the jury," and make a compelling case that his life be spared. *See Lawhorn v. Allen*, 519 F.3d 1272, 1295-97 (11th Cir. 2008).

In denying relief, the Court found that it was neither unreasonable nor prejudicial for counsel Shaw to give the penalty phase closing argument. The Court extrapolated from counsel Shaw's closing that his strategy was "to emphasize the weak evidence supporting the conclusion that petitioner actually shot Heflin, and to emphasize the remorse and lack of intent of petitioner." Order at 94. The Court held this to be a sound strategy given that counsel Shaw did reference some of the mitigating evidence in his closing argument. Order at 97. The Court found no prejudice, stating that it "cannot conclude that if counsel Herndon had given the closing argument, and focused less on residual doubt, and more on the mitigating factors developed through the evidence, the outcome would have been different." *Id*. These findings are based on a number of mistakes of law and fact.

Defense counsel has a constitutional duty to conduct a reasonable investigation of the relevant facts so as to be in a position to make reasonable strategic choices. *See Strickland v. Washington*, 466 U.S. 668, 691 (1984). In a capital case, this duty includes an obligation to conduct

an investigation into the background and personal characteristics of the defendant's life. *See Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000). While a mitigation investigation was conducted in this case, the Court ignores the fact that counsel Shaw had absolutely nothing to do with it.

A primary duty of defense counsel is "to prepare himself adequately prior to a legal proceeding." *See Magill v. Dugger*, 814 F.2d 879, 866 (11th Cir. 1987). Counsel Shaw was totally unprepared to give the penalty phase closing argument. He neither read the witness summaries not the sentencing hearing outlines prepared by Ms. Tatelli, Evid. Hearing. Tr., Vol.1 at 22, 46, nor discussed penalty phase strategy with either her or counsel Herndon. *Id*. at 78, 116. Counsel Shaw told Ms. Tatelli that the penalty phase was counsel Herndon's job, and to just work with her. *Id*. at 22. As a consequence, counsel Shaw had no idea about the mitigation case and/or the penalty phase strategy. *Id*. at 46-47. In fact, he was observed sleeping by Ms. Tatelli during the penalty phase presentation. Evid. Hearing Tr., Vol. 2 at 28. Although counsel Shaw briefly referred to the mitigation evidence in his penalty phase closing, said references paled in comparison to the volume of evidence presented by counsel Herndon.[16] Counsel Shaw's decision to give the penalty phase closing was constitutionally deficient given his lack of interest and involvement in the penalty phase case, and his ignorance of the penalty phase strategy. Contrary to the Court's findings, petitioner was prejudiced by counsel Shaw's performance.

In order to show prejudice, petitioner must that "there is a reasonable probability that . . . the result of the sentencing [proceeding] would have been different, *Strickland*, 466 U.S. at 694, had

---

[16]The Court diverted nineteen pages of its Memorandum and Order to summarizing the penalty phase testimony orchestrated by Ms. Tatelli and counsel Herndon. Order at 17-36.

-43-

counsel [Herndon] presented and explained the significance of all of the mitigating evidence." *See Wiggins*, 539 U.S. at 534-35; *Williams*, 529 U.S. 398-99. Defense counsel's closing argument at the penalty phase of a capital case is of paramount importance because it is counsel's last chance to make a case humanizing the defendant and showing his worthiness to live. *See Marshal v. Hendricks*, 307 F.3d 36, 99, 103 (3rd Cir. 2002). Petitioner lost this opportunity when counsel Shaw, despite his unfamiliarity with the mitigation case, stepped in and gave the penalty phase closing argument in lieu of counsel Herndon. Had counsel Herndon given the closing argument, she would have pulled the mitigation story together by focusing on why the mitigation evidence justified a life sentence, Evid. Hearing Tr., Vol. 2 at 56; something counsel Shaw was unable to do give his complete indifference to the penalty phase case.

Counsel Herndon only needed to convince one juror to alter the outcome of the proceedings. The Court noted that Herndon "did a masterful job" presenting a very thorough, credible and persuasive penalty phase case." Order at 94. Counsel Herndon was in position to marshal all of the mitigating evidence before the jury at the penalty phase closing and make a compelling case for petitioner's life. She and petitioner lost that chance when counsel Shaw gave the penalty phase closing despite his lack of preparation and unfamiliarity with the penalty phase strategy. There is a reasonable likelihood that, but for counsel Shaw's action in this regard, the result of the sentencing proceeding would have been different. Petitioner respectfully requests that this Court alter or amend its Judgment to grant relief on this issue.

### Conclusion

Because the Court's Judgment is based on mistakes of law and fact, relief under Fed. R. Civ. P. Rule 59(e) is appropriate. In particular, petitioner asks the Court to provide the following relief:

- alter, amend and set aside its Judgment on all the issues addressed herein;

- reopen the proceedings and grant petitioner an evidentiary hearing to further develop his claims pertaining to counsels' failure to interview mitigation witnesses (Claim 12(C)(e)), and failure to investigation petitioner's mental health (Claim 12(C)(f)); and his claim surrounding counsel Shaw's sleeping during portions of the trial (Claim 12(C)(h));

- alternatively, the Court should expand its previously issued certificate of appealability to include the claim pertaining to counsels' failure to interview mitigation witnesses (Claim 12(C)(e)); the claim that petitioner was deprived of effective assistance of counsel when Shaw slept during portions of the trial (Claim 12(C)(h)); and the claim pertaining to counsel Shaw's ineffectiveness in giving the penalty phase closing argument (Claim 12(C)(i)). These issues are debatable among jurors of reason and meet the standard for the granting of a certificate of appealability. *See, Miller el. v. Cockrell*, 537 U.S. 322, 336-37 (2003).

                                        Respectfully submitted,


/s/ Christopher E. McGraugh                      /s/ Michael J. Gorla
CHRISTOPHER E. MCGRAUGH, #25278                  MICHAEL J. GORLA, #3251
Leritz, Plunkert & Bruning, P.C.                 720 Olive Street, Suite 1630
One City Center, Suite 2001                      St. Louis, Missouri 63101
St. Louis, Missouri 63101                        (314) 621-1617
(314) 231-9600                                   (314) 621-7448 - Facsimile
(314) 231-9480 - Facsimile                       E-mail: mjgorla@msn.com
E-mail: cmcgraugh@leritzlaw.com

                                                 *Counsel for Norris Holder*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2008, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: Mr. Steven Holtshauser and Mr. Joseph M. Landolt, Assistant United States Attorneys, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102.

/s/ Michael J. Gorla
Michael J. Gorla, #3251
Attorney for Norris Holder
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com