**AFFIDAVIT OF RUSSELL STETLER**

I, RUSSELL STETLER, declare as follows:

*Background and Qualifications*

1. I am the National Mitigation Coordinator for the Federal Death Penalty Resource Counsel and Habeas Assistance and Training Counsel Projects. This national position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003). In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus.

2. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with investigators, mitigation specialists, lawyers, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

3. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project,

1

a nonprofit law office in San Francisco which coordinated appellate and post-conviction representation of all the prisoners under sentence of death in California.  In that capacity, I also supervised an in-house staff and consulted with investigators, mitigation specialists, lawyers, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

4.  I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices.  Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial and on appeal.  Most of these conferences were organized and attended by attorneys specializing in capital work.

5.  Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence.  I have lectured on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Wyoming.  I have given presentations at six different capital defense programs in Missouri and have been invited to another program in St. Louis later this summer.  I have also lectured on numerous occasions under the auspices of the Administrative Offices of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service.

6.  I have lectured on mitigation investigation at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie

conferences), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times in the past decade and a half, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA). I am co-chair of the planning committee for this seminar in 2009. I also teach regularly at the death penalty colleges sponsored by the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois.

7. Since 1993, I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This four-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the National Legal Aid and Defender Association. These and other articles of mine have been cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, rev. 2003 (31 HOFSTRA L. REV. 913 (Summer 2003), available at www.abanet.org/deathpenalty). At the request of HOFSTRA LAW REVIEW, I wrote an article for their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*. (31 HOFSTRA LAW REVIEW 1157 (Summer 2003)). At the request of HOFSTRA LAW REVIEW, I also wrote an article

for their symposium issue on the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases (36 HOFSTRA L. REV. 1067 (Spring 2008)).

8. I am the coauthor of chapters on psychiatric issues in death penalty cases in two books: *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., and Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and PUNISHMENT, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2nd ed. (Richard Rosner, M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press).

9. Over the years, I have been directly involved in hundreds of capital cases in California and New York, including dozens of trials and postconviction hearings. I have also been consulted in various capacities on capital cases in numerous other jurisdictions around the country. As an expert witness, I have provided evidence on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Georgia, Mississippi, Missouri, New York, Oklahoma, Pennsylvania, Tennessee, Texas, and Wyoming.

***Standard of Care in Capital Cases***

10. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar I have participated in since 1980, instructors have emphasized the importance of

4

conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases.

11. As early as 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." (Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-324 (1983).)

12. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors which may be disclosed beyond the fact of psychiatric disorder or organicity.

13. In three recent cases, the U.S. Supreme Court has found trial counsel ineffective for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005). In

5

*Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.)  In *Wiggins*, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation.  In *Rompilla*, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting mental health experts.

14.  In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves.  Moreover, even if lawyers had the skills, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence.  Thus, competent capital counsel retain a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes.  The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted that mitigation specialists "have extensive training and experience in the defense of capital cases.  They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review."  This report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer,

rather than an investigator or paralegal." (FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION, Federal Judicial Conference, May 1998, available at http://www.uscourts/gov/dpenalty/1COVER.htm.)

15. The Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter, 2003 Revised ABA Guidelines, available at www.abanet.org/deathpenalty) state unequivocally that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The previous Guidelines, adopted in 1989, similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." (1989 Guideline 11.4.1.) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation" (1989 Guideline 11.4.1.(7)) Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." The 1989 ABA Guidelines were recognized by the U.S. Supreme Court in *Wiggins* as "well-defined norms." (539 U.S. at 524). "The new ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989

Guidelines the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 at 487 (6th Cir. 2003).[1]

16. Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. *See* Richard G. Dudley, Jr., and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); and Douglas Liebert and David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994).

17. The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to

---

[1]The Supreme Court has consistently used the ABA's standards and guidelines in capital cases to assess the performance of trial counsel who prepared their cases before the relevant ABA publications had been issued. In *Strickland*, the Court cited standards published by the ABA in 1980 when assessing trial counsel's performance in 1976-77. In *Wiggins*, the Court cited the 1989 ABA Guidelines when assessing trial counsel's performance in 1988-89. In *Rompilla*, the Court used multiple ABA publications from 1980, 1989, and 2003, to assess deficiencies in a 1988 trial. Finally, in *Nixon v. Florida*, 543 U.S. 175 (2004), the Court used the 2003 Guidelines to assess performance in 1984-85.

remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Great diligence is required to ensure compliance. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

18. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

19. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. (One nationally recognized authority in mitigation investigation, Lee Norton, has stressed the cyclical nature of

the work and estimated that hundreds of hours will typically be required. *See* Lee Norton, *Capital Cases: Mitigation Investigation*, THE CHAMPION, 43-45 (May 1992).)

20. Mitigation investigation is particularly important when the client does not share the attorney's racial, ethnic, or cultural background. Cultural differences can include not only ethnicity and language, but all of the badges of social identity that define an individual's world and belief system, including politics, religion, and sexual orientation.

21. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute, mitigation need not involve a mental disease or defect. Nevertheless, in many, many cases, defendants do suffer mental impairments that may not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities which are given great weight when juries are charged with assessing individualized culpability.

22. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same setting turn out so differently. It is an objective scientific fact. It does not reflect a choice made by the client.

23. Over the years, I have been involved in hundreds of capital cases, including dozens of trials and postconviction hearings. My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-

making processes of actual jurors in death-penalty cases. *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness).

### *Standard of Care in Capital Mental Health Evaluations*

24. Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. (*See*, for example, Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997), finding that two-thirds of the witnesses jurors thought "backfired" were defense experts.) Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be learned through life-history investigation. However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of his life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities. Expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

25. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons). Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing. The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

26. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert. Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including neuropsychology, psychopharmacology, and the disciplines which study the effects of trauma on human development. The potential roles of experts include consultants; fact gatherers needed to elicit, or assess the credibility of, client disclosures; and testifying witnesses, to name but a few. To make informed decisions about the kind of experts who may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

*Review of the Norris Holder Case*

27.  I was asked by counsel for Norris Holder in his proceedings under 18 U.S.C. § 2255 to address the prevailing professional norms regarding the investigation and preparation of the penalty phase of capital cases at the time of Mr. Holder's trial and to assess trial counsel's investigation and presentation of mitigation evidence in that light.

28.  At the request of Mr. Holder's § 2255 counsel, I reviewed the statement of facts from *United States v. Allen and Holder*, 247 F.3d 741 (2001); volumes IX through XII of the reporter's transcript (*hereinafter*, "RT") of the sentencing phase of Mr. Holder's trial from March 31 through April 3, 1998; volumes I and II of the transcript of the evidentiary hearing in connection with Mr. Holder's § 2255 motion on July 18 and 19, 2005 (*hereinafter*, "EH"); the billing records of forensic social worker Caryn Platt Tatelli; and miscellaneous documents from the trial file, including Mr. Holder's medical records from St. John's Mercy Medical Center and St. Louis Children's Hospital; Mr. Holder's Student Permanent Record from the Rockwood School District of St. Louis County; and Mr. Holder's Application for Supplemental Security Income.  I have also been briefed orally by counsel about the procedural history of the case and other details.

29.  Based on the material I have reviewed and the information provided by counsel, it is my opinion that trial counsel's performance in both the investigation and presentation of mitigation evidence fell far below the prevailing professional norms at the time of Mr. Holder's trial in 1998.  The basis of my opinion begins with the unusual history of this case.  Mr. Holder was arrested for the capital offense on March 17, 1997.  According to the testimony of Federal Death Penalty Resource Counsel Richard Burr at the evidentiary hearing, lead trial counsel

Charles Shaw was hired by the family of Norris Holder, but the "retainer was relatively modest in terms of the funds that are needed for a capital defense." (EH vol. II, 139)  Although Mr. Shaw had received a letter from Federal Death Penalty Resource Counsel Project dated April 24, 1997 (with enclosures about the importance of mitigation evidence in capital cases),  there was no response from Mr. Shaw seeking additional assistance (EH vol. II, 136).  The Government filed a Notice of Intent to Seek the Death Penalty against Defendant Holder on August 8, 1997.  Five days later, Mr. Shaw notified Mr. Holder by letter that the Government was seeking Mr. Holder's execution.  In his letter of August 13, 1997, Mr. Shaw wrote to Mr. Holder, "This does not really surprise me and it does not in any way depress me.  It merely means that we must dig in our heels and work harder and harder until the truth comes out in open Court as to what actually happened."

30.  According to Mr. Burr's testimony at the evidentiary hearing, he was not consulted about the case until October 1997 – seven months after Mr. Holder's arrest, and two months after the Notice of Intent to Seek the Death Penalty: "The initial contact was, as I recall, about helping Mr. Shaw move from having been retained by the family, when the money had run out, to becoming appointed counsel."[2]  Mr. Burr urged Mr. Shaw to hire a mitigation specialist and to have a second attorney appointed who was experienced in capital cases (EH vol. II, 140-42, 149).  Caryn Tatelli was eventually hired as the mitigation specialist.  According to the testimony of Ms. Tatelli at the evidentiary hearing, she was first contacted about working on Mr. Holder's case in November or early December 1997 (EH vol. I, at 9), approximately four months after Mr.

---

[2]The trial file indicates that Mr. Shaw wrote Mr. Holder's mother on July 18, 1997, because she was delinquent in her payments, having made none since May 1997.

Shaw had received the Government's Notice of Intent to Seek the Death Penalty against Defendant Holder and nearly nine months after Mr. Holder's arrest for the capital offense. Trial counsel failed to engage Ms. Tatelli's services in a timely fashion. (ABA Guideline 10.4.C states that lead counsel should assemble the defense team, including "at least one mitigation specialist," "[a]s soon as possible after designation.")

31. According to Ms. Tatelli's testimony, nothing had been done in the mitigation investigation prior to her late involvement in the case (EH vol. I, 10-11), trial counsel Shaw showed no interest in mitigation because of his firm belief that they would not reach a sentencing proceeding (EH vol. I, 12-13), and Mr. Shaw never showed any interest in hiring experts to assist in preparation for the sentencing proceeding (EH vol. I, 14). Mr. Shaw apparently had no experience in capital defense or training in mitigation investigation, but he was also burdened by the conflict of having been retained by the very family whose dysfunction, substance abuse, and disabilities in Mr. Holder's formative years should have been the focus of immediate, probing life-history investigation, given that Mr. Holder had been born to unwed teenagers who were addicted to crack cocaine during a large portion of his childhood. Ms. Brewer, in turn, characterized Mr. Holder's family as "loving" and "supportive" in her opening statement (RT vol. X, 4) despite their utter failure to provide Mr. Holder with the most basic safety, nurturance and supervision at critical junctures of his childhood and adolescence. To offer just one example, according to her trial testimony, Mr. Holder's mother never once visited his high school (RT vol. X, 93),[3] and it was her failure to respond to a request for a parent conference that

---

[3]The questions on cross-examination read as follows:
  Q: Have you ever been to Eureka High School?
  A: No.

resulted in Mr. Holder's ultimate expulsion from high school, thereby ending his education. The school record of his termination cited "parental decision" and "lack of interest" (RT vol. X, 98).

32. At the time of Mr. Holder's case, it was well accepted that counsel in federal death penalty cases should engage the services of a mitigation specialist. (*See* the Report of the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, discussed *supra* at ¶ 14.) The importance of the mitigation specialist is also addressed at length in the Commentary to ABA Guideline 4.1:

> A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may never have disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.
>
> Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effects on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation. (Citations omitted; 31 HOFSTRA L. REV. at 959 (2003)).

---

Q: Had you ever been to the junior high school?
A. I have dropped him off. I have taken him out there before.

33. According to Ms. Tatelli's testimony, trial counsel did not provide her with any records or even summaries of witnesses who had been interviewed by the Government (so-called 302 summaries) (EH vol. I, 10). The Commentary to ABA Guideline 10.7 underscores the importance of obtaining all relevant records:

> Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information *pertaining to the client, his or her siblings and parents, and other family members,* including but not limited to:
> a.    school records
> b.    social service and welfare records
> c.    juvenile dependency or family court records
> d.    medical records
> e.    military records
> f.    employment records
> g.    criminal and correctional records
> h.    family birth, marriage, and death records
> i.    alcohol and drug abuse assessment or treatment records
> j.    INS records
> (31 HOFSTRA L. REV. at 1025, emphasis added).

Although Ms. Tatelli belatedly obtained some records pertaining to Mr. Holder, the records which I have reviewed (discussed *infra,* ¶ 39) reflect no effort on the part of trial counsel or their agents to obtain any records pertaining to his siblings, parents, or other family members. Reliable, objective records are critical to life-history investigation because they can reveal what the client and his family are reluctant to disclose because of shame and embarrassment, and what they simply can't disclose because they were too young or too impaired to record the events in memory. They are more credible to fact-finders because they have no inherent bias. Contemporaneous records are more credible than witnesses sharing previously undisclosed memories of past events, or experts offering opinions formed only after the client faces capital charges. They also enable the defense team to interview mitigation witnesses more effectively.

The authors of reports and documents are themselves potential mitigation witnesses, otherwise unknown to the client and his family. In a case such as Mr. Holder's, where both parents were self-described crack-cocaine addicts, records will be much more reliable than the addicts' memories. Siblings' records often reveal insights into family dynamics or help to explain the differences between their life trajectories and that of the capital client. Multigenerational records show inherited predispositions and vulnerabilities, as well as patterns of behavior that are repeated from one generation to the next. They are particularly important when, as in Mr. Holder's case, grandparents are significant caretakers at various points in the client's life. Records from multiple family members also provide a context for understanding key changes in the client's life -- for example, when changes in school attendance or behavior reflect the impact of what is occurring in the lives of the parents.

34. Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 677 (Spring 2008), explain in detail the duties of counsel to obtain the services of competent team members and to *supervise and direct* their work. (Supp. Guideline 4.1.A and B, 36 HOFSTRA L. REV. at 680.) According to Ms. Tatelli's testimony, Mr. Shaw didn't even look at her reports, but simply had his associate, Brad Dede, file them in his case file (EH vol. I, 16). At a meeting on February 24, 1998, shortly before trial, Mr. Shaw repeated that he had not read Ms. Tatelli's reports (EH vol. I, 22). A second lawyer, Jennifer Brewer, was appointed on February 4,1998, on the eve of trial, and she assumed responsibilities for supervising Ms. Tatelli and preparing the sentencing hearing (EH vol. I, 22-23), but absent a substantial continuance it was simply impossible for the mitigation investigation to be completed and the potential mitigation testimony to be effectively prepared. There is no entry in the case

docket reflecting a motion for continuance once Tatelli began working on the mitigation investigation.  On March 11, 1998, the second day of voir dire, trial counsel made an oral motion for a continuance, which was denied.  The trial began on March 18, and the sentencing phase began on March 31.  What was elicited from the witnesses who testified is precisely the sort of information one can expect to gather in *preliminary* interviews with family members, uninformed by thorough document collection and fatally compromised by the lack of time to build the trust and rapport that are necessary for full disclosure.

35.  The Supplementary Guidelines also provide clear guidance about the qualifications of mitigation specialists.  Supplementary Guideline 5.1.C elaborates on the necessary interviewing skills:

> Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They  must have the ability to advise counsel on appropriate mental health and other expert assistance.  (36 HOFSTRA L. REV. at 682)

Guideline 5.1.F discusses the necessary skills in record gathering:

> Mitigation specialists must possess the knowledge and skills to obtain all relevant records pertaining to the client and others. They must understand the various methods and mechanisms for requesting records and obtaining the necessary waivers and releases, and the commitment to pursue all means of obtaining records. (36 HOFSTRA L. REV. at 683)

Neither skill set is of much use without adequate time to gather all the necessary records and to conduct multiple interviews with the individuals who knew the client most intimately over the course of his life.  In Mr. Holder's case, Ms. Tatelli could collect only a small fraction of the

relevant records, and she simply did not have the time to conduct multiple, in-depth interviews with the key mitigation witnesses. It appears from my review that neither trial counsel nor Ms. Tatelli obtained signed releases from Mr. Holder's family members.

36. An analysis of Ms. Tatelli's billing records from the date of Ms. Brewer's appointment as second counsel through the jury's sentencing verdict is instructive. Although she spent many hours on the case in this period, she spent very little time interviewing anyone (22.4 hours) and only 1.3 hours with the client. In addition, over half of the interviewing time was spent either in group interviews (6.3 hours with the Holder family on March 7 and 2.6 hours with teachers in the presence of the FBI on March 16) or in telephone interviews (4 hours). In contrast, the appropriate approach – involving multiple one-on-one interviews – is succinctly summarized at Supplementary Guideline 10.11.C:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding. (36 HOFSTRA L. REV. at 689)

Even without direction from trial counsel, Tatelli was aware of major areas of potential mitigation that were simply unexplored because she had no time (e.g., the impact of the desegregation program which bused Mr. Holder from the inner city to the white suburbs and brain damage secondary to childhood events, EH vol. I, 45, 93-94).

37. Jennifer Brewer (now Herndon) testified at the evidentiary hearing that Mr. Holder's case was not only her first federal case but also her first trial work in a capital case (EH vol. I,

97). Although she was appointed as second counsel on February 4, 2008, she first met with Mr. Shaw nearly three weeks later, on February 24, along with Ms. Tatelli and Federal Death Penalty Resource Counsel Richard Burr (EH vol. I, 111). Ms. Brewer confirmed Ms. Tatelli's report that Mr. Shaw believed there was no need to prepare for a penalty phase because Mr. Holder would not be convicted of first-degree murder (EH vol. I, 114-115). According to Ms. Brewer's testimony, Mr. Shaw did not participate in any discussion of mitigation investigation or theme development (EH vol. I, 116-117). Ms. Brewer expected to do the penalty phase closing argument, but Mr. Shaw took it over, despite having no interest or involvement in the penalty phase evidence (EH vol. I, 125-127).

38. The need for a unified theory in the two phases of a capital trial has long been well accepted. ABA Guideline 10.10.1 on trial preparation states, "Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." Empirical research has shown that acceptance of responsibility is an important and highly mitigating consideration to capital jurors. (*See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUMB. L. REV. 1538 (1998).) One researcher found that a denial defense is more than twice as likely to result in a death sentence, compared to admission of responsibility cases. (*See* Scott Sundby, *The Jury and Absolution: Trial Tactics, Remorse and the Death Penalty,* 83 CORNELL L. REV. 1557 (1998). Professor Sundby also noted that without acceptance of responsibility, jurors become more cynical about, and less receptive to, testimony about child maltreatment or other mitigation.) As Federal Death Penalty Resource Counsel Richard Burr observed in his evidentiary hearing testimony, Mr.

Holder's trial counsel "presented a cramped mitigation case – in a trial that had no consistency between the guilt and penalty phase . . ." (EH vol. II, 220).

39.    The "cramped mitigation case" was a direct result of the failure to begin any mitigation investigation until Ms. Tatelli entered the case.  The life-history investigation was so limited that it touched on a few potential mitigation themes, but failed to explore multiple areas where there was an abundance of clues suggesting the need to probe more deeply.  Knowing that Mr. Holder's mother became pregnant at age sixteen, counsel should have investigated her prenatal care, nutrition, and exposure to alcohol and street drugs.  The possibility of Fetal Alcohol Spectrum Disorders should have been explored.  Knowing (from Mr. Holder's mother's account) that Mr. Holder was delivered by forceps, counsel should have obtained all birth records and explored potential anoxia and neurological effects.  Knowing (from St. Louis Children's Hospital Records) that Mr. Holder suffered a febrile seizure at age two, counsel should have investigated the neurological effects, as well as causes. Knowing (from the same hospital records) that Mr. Holder was again taken to the emergency room after an aspirin overdose at age two, counsel should have investigated the details of that episode.  Knowing (from school records) the point at which Mr. Holder's absence from school increased dramatically, counsel should have investigated the details of his home life at that time.  Knowing that both of Mr. Holder's parents were self-acknowledged crack-cocaine addicts, counsel should have obtained a detailed chronology of their substance abuse histories.  Knowing that Mr. Holder grew up in a notorious slum (the Blumeyer Housing Project), counsel should have investigated potential exposure to lead and other neurotoxins, as well as the everyday community violence in the war-zone atmosphere of his formative years.  Knowing that Mr. Holder's mother relied on public

assistance for much of his childhood, counsel should have obtained all records from the Department of Social Services as well as detailed earnings reports for both parents from the Social Security Administration. Knowing that Mr. Holder had been hospitalized for a depressed skull fracture after being attacked with a brick, counsel should have investigated the neurological consequences.

40. Trial counsel was also on notice that Mr. Holder had experienced extreme trauma (including his leg amputation following the train accident and a teenage classmate Rodney Carter's murder); numerous witnesses reported classic symptoms of avoidance, denial, and what mental health professionals might refer to as psychic or emotional numbing; and he received no treatment despite multiple psychological referrals at the time of his hospitalization for the amputation. Tynisha Jones, for example, testified at trial that there was no "mourning" about the amputation: "It was just like nothing happened." (RT vol. X, 222.) Cortez Harris likewise testified that Mr. Holder was "calm and cool" at the hospital. (RT vol. XI, 10.) Lonzetta Curry, Mr. Holder's maternal grandmother, testified, "He was just like he – just like it didn't even happen." "He tried to be strong. That's what he is." (RT vol. XI, 92.) Paternal aunt Mattie Cheers said it was "normal" for Mr. Holder "not to express things" (RT vol. XI, 97), and her daughter Tykita Jones said Mr. Holder "kept the accident to hisself" [sic] (RT vol. XI, 115). Applications for Supplemental Security Income completed on Mr. Holder's behalf by his mother likewise describe his untreated symptoms and behaviors: "My son leg is gone he sit and I [k]now he wishes that it was there and he hurt he can't get up and do things like he would like he still feel sore, itching a lot he won't sleep in his bed sleeps with me a lot more than in his own bed insecure, I think he feels." (November 10, 1991.) "He can't adjust to the fact mentally are [sic]

23

physically of the lost [sic] of his leg . . . He won't do anything won't talk to his friend won't go to school stay in house all the time alon[e] don't want to be bothered heads always bothering him don't want to wear his leg just sad." (Reconsideration for Disability Report, October 28, 2002.) Mr. Holder never saw a psychologist following his amputation despite seventeen or eighteen referrals from his hospital (RT vol. XII, 90).

41. While a number of witnesses testified during the sentencing proceeding, the brief investigation into Mr. Holder's social history had merely skimmed the surface. The witnesses had not been interviewed in sufficient depth to provide rich and persuasive testimony, and the document gathering likewise had merely plucked the low-hanging fruit. Counsel failed to provide the guidance and feedback needed by the mitigation specialist, and witnesses testified without adequate preparation. The witnesses were ill-prepared for cross-examination and often impeached with information from available records or Ms. Tatelli's own reports. Community education coordinator Lawrence Calvin Gwinn, for example, was impeached with "participant progress reports" showing a "decline in participant's willingness to work" and an unsatisfactory grade under capacity to "accept supervision, directions, advice, and constructive criticism." (RT vol. X, 117-118). Correctional Officer John Ruch was impeached with jail records about an assault on another officer (RT vol. X, 121). Cortez Harris was impeached with his own advance knowledge of Mr. Holder's planning of the bank robbery, including seeing the guns and ammunition under Mr. Holder's mattress, based on what Harris had disclosed to Tatelli and what she had memorialized in her report (RT vol. XI, 14-15).

42. There was no investigation of potential mitigation related to mental health issues, including neurological deficits and the long-term behavioral effects of both acute and chronic

exposure to trauma. The two psychologists who were consulted were neither provided with all the relevant social history data (because such data had not been collected) nor asked to address focused referral questions (because such questions could not be framed without understanding the social history). Dr. Thomas J. Reidy testified generically about the low likelihood of violent offenders to reoffend in the well-managed environment of a federal prison. His gratuitous comments that he found no evidence of brain damage (RT vol. X, 187) or mental illness (RT vol. X, 156) lacked any foundation beyond his brief interview of Mr. Holder. Dr. Steven E. Rothke's specialty is "secondary loss" – rehabilitation and adaptation to physical disability – not recovery from the multiple acute and chronic traumas that marked Mr. Holder's childhood and adolescence. He, too, lacked the social history data for a reliable assesssment, and he didn't review the records he had been provided about Mr. Holder's head injury (when hit with a brick in 1992) until *after* he had conducted his own cursory evaluation (RT XII, 79). His haphazard administration of a few tests cannot substitute for a well-normed neuropsychological battery. In any event, neither psychologist was provided with significant social history data, and both of them focused on narrow collateral issues in their evaluations and testimony.

43. Because the social history investigation had barely begun, there was no one to testify as to its meaning and significance. The lay witnesses offered bits and pieces of information, but there was no one to provide a narrative that would have given jurors some contextual understanding of Mr. Holder's life. Instead, jurors learned only isolated facts at best. In the absence of a testifying expert to connect all the evidentiary facts, the case needed a lawyer who could tell the story in closing argument. Because Mr. Shaw had been uninvolved in the presentation of mitigation witnesses and had been indifferent to the mitigation investigation, he

was wholly unprepared to explain to the jurors the significance of the evidence that had been presented. Mr. Shaw's catastrophic decision to do the penalty phase closing argument deprived jurors of any hope of appreciating the mitigating purpose for which the testimony had been offered. His stubborn insistence on rearguing whether Mr. Holder had shot anyone actually prevented jurors from understanding the mitigating purpose for which the defense had offered testimony in the sentencing proceeding.

44. The Special Verdict Form shows that the jurors were unable to give meaningful effect to the mitigating evidence that was presented. Although nine of the seventeen propounded nonstatutory mitigating factors were deemed proved by nine or more jurors (and three were found proved unanimously), *not a single juror* found that factors in Mr. Holder's background or character "mitigate against imposition of the death penalty." No one – lawyer or expert – explained to the jurors *why* any of the evidence was mitigating, in the sense of providing a reason for a sentence other than death. First on the list of nonstatutory mitigating factors was the one which was the entire focus of Mr. Shaw's summation: that Mr. Holder did not fire the fatal shots. Not a single juror agreed.

45. Supplementary Guideline 10.4.A delineates the responsibility of counsel in preparing mitigation evidence as follows:

> Counsel bears ultimate responsibility for the performance of the defense team and for decisions affecting the client and the case. It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy. (36 HOFSTRA L. REV. at 688)

In Mr. Holder's case, counsel fell far short of conducting an investigation of all reasonably available mitigation evidence, and Mr. Shaw was left to present a plea for mercy based on the one reason the jurors had already rejected – a claim of that he had not fired the fatal shots. In sum, the testimony offered by the defense in the sentencing proceeding was superficial and limited. There was no expert testimony to provide an overview of the social history and to interpret its significance. There was no attempt to address those critical questions in the closing argument. The multiple deficiencies in counsel's performance not only deprived Mr. Holder's of the effective representation to which he was entitled, but deprived jurors of the evidence and understanding they needed to make a reasoned moral decision about whether Mr. Holder should live or die.

I declare under penalty of perjury under the laws of the State of California, and the United States of America, that the foregoing is true and correct and was executed this ___11th___ day of August 2008 in Oakland, California.

RUSSELL STETLER