**Declaration of Kathleen Wayland, Ph.D.**

I, Kathleen Wayland, Ph.D., declare as follows:

**Background and Qualifications**

1.      I am a clinical psychologist licensed to practice in the states of North Carolina and California.  For the past fifteen years, I have worked as a Mitigation Specialist to assist court appointed counsel in capital cases in identifying, developing, and presenting mental health and mitigation evidence.  I am currently in private practice in Albuquerque, New Mexico, where I provide consultation on mental health and social history issues to attorneys working on capital and criminal cases.  From 2002 until 2008, I was employed as a Mitigation Specialist at the Habeas Corpus Resource Center (HCRC), an agency funded by the State of California to provide post-conviction representation to indigent defendants who have been sentenced to death. During my tenure at HCRC I provided training to attorneys, investigators, mitigation specialists, and paralegals on a variety of mental health and mitigation issues relevant to capital cases. From 1993 to 2002, I served as a Mitigation Specialist at the California Appellate Project (CAP), where I assisted counsel in developing and presenting mental health and mitigation evidence, and in reviewing prior mental health evaluations for professional competence and reliability.  In both of these positions, I have routinely consulted with investigators, mitigation specialists, lawyers, and mental health professionals who are retained to assist counsel in death penalty cases.

2.      For more than a decade, I have regularly attended seminars and conferences related to the defense of capital cases.  These conferences are organized and attended by attorneys specializing in capital work defense all over the country.

3.      I have served as a faculty member in numerous CLE-approved training seminars for capital litigation sponsored by state bar associations, state and federal capital defenders, professional associations, or colleges of law in numerous states and death penalty jurisdictions, including:  Arizona, Alabama, California, Colorado, Connecticut, the District of Columbia,

Georgia, Idaho, Illinois, Louisiana, Maryland, Missouri, New Mexico, New York, North Carolina, Oregon, Pennsylvania, and Texas.

4.    I have lectured at multiple national conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conferences), the National Association of Sentencing Advocates, the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life").  At various times, I have served on the planning committees for some of these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA).

5.    I received a B.A. degree from the State University of New York at Binghamton in 1977 and an M.A. in clinical psychology from Duke University in 1986.  In 1989, I was awarded a Ph.D. in clinical psychology, also from Duke University.  In 1989 and 1990, I completed a post-doctoral fellowship at Duke University Medical Center.

6.    From 1990 to 1995, I was an Associate with the Department of Psychiatry, Divisions of Child and Adolescent Psychiatry and Medical Psychology at Duke University Medical Center. In 1993, I took a two-year leave of absence from Duke Medical Center to serve as a consultant and Mitigation Specialist with CAP.  In 1995, I became a full time staff member at CAP.

7.    I have extensive research and clinical experience in the field of psychology and have published several articles in professional journals, including the Journal of Traumatic Stress and the Journal of Abnormal Child Psychology.  I have served as a consultant and expert witness in legal actions concerning family, juvenile and criminal matters, generally as an expert on the long-term effects of child abuse and trauma or as an expert on the development of mental health and mitigation evidence in capital cases.  At the request of *Hofstra Law Review* I wrote an article titled *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations*, 36 HOFSTRA L. REV. 923 (Spring 2008).

8.    I have extensive clinical experience conducting mental health evaluations and providing counseling and intensive therapy for both adults and children.  I have lectured and consulted nationally about the biological and psychosocial factors affecting human development, including physical and sexual abuse and traumatic stress syndromes, and have trained and supervised professionals in the social service, mental health, legal, and law enforcement fields.

9.    At the request of counsel representing Norris Holder in his 2255 proceedings, I have reviewed records related to Mr. Holder's federal conviction and death sentence and related postconviction proceedings.  All the information provided in this declaration is based on my review of relevant records and on my conversations with counsel.  I have consulted with Mr. Holder's attorneys entirely on a pro bono basis in order to help describe the evidence of trauma in Mr. Holder's life leading up to his involvement in the offense for which he has been sentenced to death and to outline the facts that warranted trial counsel's hiring a trauma expert to evaluate Mr. Holder and provide a report before his capital trial.

**Standard of Care in Capital Cases**

10.    Since the early 1980s, investigation of a client's background, character, life experiences and mental health has been recognized to be an integral part of basic professional norms in defending a capital case.  *See* Gary Goodpaster, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 New York University Law Review 299 (1983) at 323-324.

11.    I understand that in this case, Mr. Holder's lead trial lawyer, Charlie Shaw, did not hire a mitigation specialist until late December 1997, and did not bring a second attorney into the case until late January 1998. (Evidentiary Hearing, 10, 99).  Caryn Tatelli, the mitigation investigator on Mr. Holder's case, testified at the evidentiary hearing that she met with the defense team for the first time in January 1998.  Ms. Jennifer Brewer, who was brought on as co-counsel to Mr. Shaw and was put in charge of the penalty phase of Mr. Holder's case, did not join the defense team until the first week of February, 1998.  Trial began in the middle of March 1998.  I understand that Mr. Shaw did not conduct mitigation interviews or obtain social history documents and he was not interested in hiring experts. (Evidentiary Hearing 12).  As a result,

Ms. Brewer was exclusively in charge of working with Ms. Tatelli to prepare the mitigation case.  In my professional opinion, the less than three weeks that lapsed between Ms. Herndon's joining the case and the start of voir dire is completely inadequate to perform anywhere near an adequate life history investigation and certainly fell short of what was needed here to identify critical areas of mitigation characterizing Mr. Holder's life, including an evaluation of the sources and impact of traumatic events in his life.

12.    In addition to investigating a basic life history, since the 1980's, it has been standard practice for competent defense counsel to determine whether their capital client had suffered from organic brain injury, psychiatric disorders, or exposure to psychological trauma.  Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc.  In a capital case, such investigation is particularly important because of the additional mitigating factors which may be identified through an understanding of the interplay of the diverse effects of psychiatric disorders, trauma exposure, and brain dysfunction.

13.    Trauma is an almost universal feature of the lives of capitally charged and convicted defendants.  Therefore, assessing the role of trauma is an essential component of any competent mitigation investigation and any competent assessment of mental health issues in a capital case, particularly in a case involving a defendant such as Mr. Holder, with a history of seizure disorders, familial and environmental violence, poverty, and severe accidents.  Reliance on a client's own self-report about the impact of life events on him is insufficient and unjustifiable. In fact, the United States Supreme Court recognized this in *Rompilla v. Beard*, 545 U.S. 374 (2005) in finding that Rompilla's trial counsel were ineffective for failing to conduct a thorough life history investigation in preparation for Rompilla's penalty phase and instead relying "unjustifiably on Rompilla's own description of an unexceptional background." *Id.* at 379.  For defendants who suffer from brain injury or the effects of trauma, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions.  The literature on exposure to traumatic events helps to explain why individuals who are so exposed differ in the psychological consequences of

such exposure.  In general, there is a greater likelihood of profound psychological and emotional impairments when trauma exposure is severe, prolonged, occurs over several developmental stages, encompasses diverse forms of traumatic experiences, and is accompanied by additional psychiatric, familial, environmental, and social risk factors.  36 HOFSTRA L. REV. at 927.  From my review of records in Mr. Holder's case, he experienced all of the above.

14.    A reliable and comprehensive evaluation of the effects of exposure to traumatic events requires a careful exploration of all "criterion A" exposures, that is, an analysis of each and every event to which an individual was exposed.  In Mr. Holder's case, some traumatic exposures involved a single incident, acute and severe event, such as Mr. Holder's experience during a train accident and when he was hit in the head with the brick.  Other exposures were chronic and prolonged, such as Mr. Holder experienced growing up surrounded by the violence and poverty in the Blumeyer Housing Projects and in a home in which his parents were crack-addicted and frequently absent.  As I explain further below, in Mr. Holder's case, the only people who evaluated his mental health for his capital case are two neuropsychologists, Dr. Steven Rothke and Dr. Richard Wetzel, who relied almost exclusively on Mr. Holder's self-reports about the impact of certain life events, including his two life-threatening injuries which resulted in maiming and other permanent physical, psychological, and cognitive damage.  It is also critically important to note that Drs. Rothke and Wetzel evaluated Mr. Holder for brain injury and not for trauma, which again, is a crucial component of any competent investigation in a capital case, but particularly so when so much of the client's life is characterized by obvious traumatic events, as is the case with Mr. Holder.

15.    A thorough social history investigation is necessary to determine the existence of previous head injuries, childhood trauma, and a host of other life experiences that may impact a defendant's behavior and mindset before, during, and after a capital offense.  Defense counsel must conduct a social history to determine which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and exposure to trauma.  Mental health experts, in turn, require social history information to conduct a thorough and reliable evaluation.  A competent mitigation investigation must thoroughly explore all of a client's trauma exposures.  It is likely that the client will have suffered multiple and possibly repeated traumatic experiences,

very possibly in numerous contexts. 36 HOFSTRA L. REV. at 954.  That is certainly true of Mr. Holder.  A competent social history investigation also requires close examination of each event (or series of events), including the circumstances of each trauma, the sequelae, the interaction or overlap with other disorders and disabilities, and the factors that shaped the client's response and recovery (or disability).   36 HOFSTRA L. REV. at 954.  Limitations in Mr. Holder's defense team proved to be a barrier in developing his trauma history and presenting it to his capital jury.  As far as I know, no one on Mr. Holder's defense team was skilled in the investigation, preparation, and presentation of evidence of trauma, and there was certainly no comprehensive investigation, preparation, or presentation to the jury of all the traumatic exposures in Mr. Holder's life and how they impacted him psychiatrically and socially. Also as far as I can tell from my review of the records in Mr. Holder's case, his trial counsel never retained or consulted a trauma expert before he was tried for capital murder.

16.    Had a trauma specialist been retained in this case, the first task would have been to collect and analyze the complete documentary record relating to Mr. Holder, his biological relatives, and other individuals of significance to his life and development.  Based on these social history records, such as vital, medical, employment, academic, juvenile, correctional, and other records, in order to identify potential life events and environmental factors that could have led to extraordinary trauma that might have had a long-term impact on his thinking and behavior. The records would, in turn, have identified witnesses beyond those known to trial counsel, and would have better informed the interviews of even those witnesses who are known to counsel.

17.    In my opinion, as an expert in the identification of the sources and the effects of trauma on people, a number of factors in Mr. Holder's life pointed obviously to the need to consult a trauma expert in connection with this capital case.   In addition, at baseline, Mr. Holder comes from a population that is at particular risk for exposure to trauma: he is an African-American man, who grew up socio-economically disadvantaged in an urban area. 36 HOFSTRA L. REV. at 932-33.

a)    First, hospital records establish that Norris Holder suffered from seizures as a baby.  His mother and brother also suffered from seizures and were on medication.  These records suggest that Mr. Holder started life with some

neurological condition that manifested symptoms almost immediately, a red flag for potential neurodevelopmental problems affecting his development and functioning and increasing his risk for negative outcomes following exposure to subsequent stressors and traumatic events.

b)  Second, both of his parents have been addicted to crack, which is in itself a mental disorder, and which resulted in another source of abandonment, neglect and trauma for Mr. Holder. As a result of his parents' preoccupation with drugs and neglect of the family, Mr. Holder was left at a very young age to tend to the household and to his younger siblings. Mr. Holder's father also left the family around the same time Mr. Holder, Sr., and Mrs. Holder became addicted to crack. Aside from the loss that Mr. Holder experienced as a result of his father's abandonment, this event put additional pressure on him to be the "man of the family" and provide support to his mother and younger siblings. At the age of twelve, Mr. Holder's paternal grandfather, and his only remaining father figure, passed away. Accounts from Mr. Holder's family establish that Mr. Holder was very distressed by his grandfather's death, became more withdrawn, and would retreat during family occasions for some time afterward and cry. Such a profound loss of an important attachment figure, at a critical developmental stage, and subsequent to the early and repeated exposure to his parents' abdication of their most basic role as caregivers, can only have exacerbated Mr. Holder's psychological vulnerability.

c)  Third, Mr. Holder lived much of his life in housing projects in St. Louis that were riddled with abject poverty, violence, drugs, and crime. I have reviewed news articles on the Blumeyer Housing Projects in St. Louis where Norris Holder lived during much of his formative years. These articles describe the incessant stream of murders, burglaries, robberies, rapes, drug crimes, gun violence, arson, gang activity, and even a firebomb that characterized life in this apartment complex. Even supposed amenities such as elevators and swimming pools proved to be a source of injury and death. Bill Bryan, *Suspect in Double Murder Implicates Self, Police Say*, St. Louis Post-Dispatch, December 26, 1998, at 12 (reporting the killing of a woman and a ten-year-old girl who was raped and strangled); Norm

Parish and Carolyn Tuft, *Elevators at Complex Are Called Unsafe*, St. Louis Post-Dispatch, November 20, 1997, at A1 (describing a defective elevator trapping a four-year-old boy and his two-year-old cousin and the four-year-old's hand being caught in the elevator, which caused nerve damage to his wrist); *Woman Shot By Deputy At Blumeyer*, St. Louis Post-Dispatch, March 13, 1997, at 02B (reporting a police officer's shooting of a woman who came at him with a knife as he attempted to evict her from the Blumeyer apartment for the elderly); Bill Bryan, *Firebomb Injures Boy, 6, At Blumeyer Housing Complex*, St. Louis Post-Dispatch, October 20, 1994, at 18A (describing the boy's injury from a Molotov cocktail thrown through a second-floor window, and the shooting of a young man who ran to help the boy); *Woman, 94, Found Stabbed To Death At Home*, St. Louis Post-Dispatch November 8, 1994, at 2B ; *Man Found Slain In Home For Elderly*, St. Louis Post-Dispatch, May 21, 1995, at 5C (reporting killing of 78-year-old man); *Police/Courts*, St. Louis Post-Dispatch, July 2, 1996, at 3B (drowning of fifteen-year-old in community pool); Bill Bryan, *Woman, 70, Found Slain In Bathtub*, St. Louis Post-Dispatch, August 28, 1989, at 4A (reporting killing at Blumeyer); Joan Little, *30 Gang Members Rounded Up*, St. Louis Post-Dispatch, November 11, 1989, at 5A (reporting that after two innocent bystanders at Blumeyer were shot following a series of shootings, police rounded up gang members); *Crime Column*, St. Louis Post-Dispatch, February 14, 1990, at 4C (describing fifteen-year-old girl's nearly losing her left foot after a shotgun blast in what may have been an accidental shooting at Blumeyer); Bill Bryan and Bill Smith, *Fires Frighten Housing Complex . . . 124 Blazes Set at Blumeyer Apartments*, St. Louis Post-Dispatch, June 8, 1992, at 1A (describing series of arsons at Blumeyer); Margaret Gillerman and Stephen Casmier, *Son, Mother Save Family From Fire–Again*, St. Louis Post-Dispatch, December 27, 1992, at 1D (reporting that family of eight escaped arson fire at their home in the heart of Blumeyer complex); *Shooting At Housing Complex Kills Man, Injures 11-Year-Old*, St. Louis Post-Dispatch, March 29, 1993, at 7A (reporting killings at Blumeyer). This routine danger and the skills developed to survive it often serve as a traumatic foundation upon which later trauma builds. Exposure to

community violence is one of the most common traumatic events to which many capital defendants are exposed during their lives and developmental years. Mr. Holder's life in the Blumeyer projects was certainly characterized by routine exposure to community violence and was far from limited to isolated occurrences. People who experience multiple high magnitude exposures to trauma are at an increased risk of developing profound emotional and behavioral disturbances. 36 HOFSTRA L. REV. at 933. There is some evidence that Mr. Holder was suffering the symptoms of mental disorder before the two major injuries he later suffered. In 1990 and 1991, Norris was suspended from school for allegedly groping female students at his high school. On May 23, 1990, Mr. Holder was accused of grabbing a purse from a female student and, when she wouldn't give it to him, grabbing her breast; on March 4, 1991, Mr. Holder was suspended from school for allegedly grabbing a female student on her vaginal area and buttocks in the hallway; and on December 14, 1993 he allegedly grabbed the breast of a female student. Evidence of these disciplinary episodes came out during the penalty phase of Mr. Holder's trial but the defense offered the jury no evidence that this uncharacteristic behavior may have been the possible effect of a general deterioration in Mr. Holder's life circumstances, judgment, or coping skills, as a result of traumatic exposures or head injury. For example, in the year preceding and during the period of Mr. Holder's involvement in the incidents that led to his school suspension (two of which *preceded* his train accident), he was increasingly absent from school and his grades declined significantly. Such simultaneous negative change in Mr. Holder's school attendance, academic performance, and behavior, warranted an investigation by counsel into what social, physical, or psychological factors may have contributed to these changes in Mr. Holder's life and may have explained to his capital jury more about his life circumstances leading up to his participation in the crime. As far as I know, no such investigation took place, and certainly Mr. Holder's counsel made no presentation to the jury explaining Mr. Holder's school disciplinary problems as potentially mitigating.

d)    Fourth, Mr. Holder lost the lower part of his leg, including his left foot, and part of his right foot as the result of a train accident during which his legs were caught under a train and he was dragged for 100 feet until his leg was mutilated and he was able to break free. Terry Jett, a close friend of Mr. Holder's, was with Mr. Holder when he lost his leg under the train. I have reviewed a memorandum of an interview with Mr. Jett in which he describes the train accident in detail. Mr. Holder's trial attorneys never spoke with Mr. Jett or any of the people who witnessed the train accident. Mr. Jett recalled that Mr. Holder jumped up and tried to get on the same ladder as another friend, Anthony Brown. Mr. Jett was standing on the train behind Mr. Holder and saw the whole thing. Mr. Jett said that Mr. Holder did not catch his footing on the train and fell backwards and was subsequently trapped beneath the train. He was dragged for about 100 yards or the length of a football field. Mr. Jett said that Mr. Holder tumbled along sort of rolling over for the 100 yards. The train track also sucked Mr. Holder's right foot under so that he lost two toes on that foot in addition to losing his left leg below the knee. Mr. Jett watched Mr. Holder clutch to secure himself, but the only thing around was gravel. Finally his leg was actually disconnected from his body, the train amputated Mr. Holder's leg, and he was freed from being dragged by the train. Mr. Jett said that he could actually see white bone and the calf muscle, ligaments and tendons all separated. The other boys in the group jumped off the tracks far enough away that they did not get hit by the train and some of them ran off. Five of them stayed. Two of them went off ahead to flag down a car and get some help. Mr. Jett's account suggests that the remaining children were all in shock and unable to respond, so it took them several minutes simply to pick Mr. Holder up off the ground and another 20 minutes to carry him up a hill, where they propped him up under a bridge. Mr. Jett saw the meat came off from Mr. Holder's calf. His heel was cut completely off, but at that point the front part of his foot was still attached. As they carried Mr. Holder up the hill, the top of his foot fell off. One of the guys in the group, someone named Frank, picked up the foot. Mr. Jett recalled that it had no heel and no ankle. Mr. Holder's ankle had been amputated. Frank was carrying the foot which was just a few toes and the

front of the foot. Mr. Jett recalled that Frank or another guy in the group, Anthony Winn, took his shirt off and they all wrapped it around Mr. Holder's leg to stop the bleeding. They flagged down an older man on the highway who came down with a cell phone and called for an ambulance. Mr. Jett recalled that in total they waited for 30 to 45 minutes for the ambulance to arrive on the scene. Mr. Jett reported that initially when Mr. Holder was cut free from the train, he didn't even realize what had happened and he kept trying to get up and stand up but he couldn't. Mr. Jett said that while they were carrying him, none of them were physically strong enough to be holding him. Mr. Jett stated that for the first five years after this incident, he was very badly affected. After it happened, all the friends who witnessed Mr. Holder's accident blamed themselves. Following this accident, Mr. Jett had frequent nightmares. To this day, he has occasional nightmares about what he saw.

Also according to Mr. Jett, who remained close with Mr. Holder after the accident, the train incident affected Mr. Holder's life dramatically. Mr. Holder was affected in multiple ways, including limitations in the kind of jobs available to him and in his ability to participate in sports, previously significant areas of interest, self-esteem, and of esteem from others. Prior to suffering the amputation, Mr. Holder was physically active, and much of his social world and self esteem was organized around his physical and sports talents. He was a dancer and was in a musical group with his friends. They started singing and dancing since they were about 13 years old. The group participated in talent shows. The friends all blamed themselves and they all wish that they had never ridden the trains. Before the accident Mr. Holder and Mr. Jett were constant companions, playing sports and dancing together, among other activities. This horrific accident changes their lives dramatically and had a very adverse effect on their families, especially Mr. Holder's mother. According to Mr. Jett, "She was down a lot for years to come." Mr. Holder adapted a caretaking stance towards his mother. The boys visited her frequently, provided her flowers, and tried to console her. Before the accident, Mr. Holder was a superstar and Mr. Holder's mom behaved like the accident ended that for her. Mr. Holder's athletic ability

had been a source of pride to his mother and kept her spirits up.  She looked up to him, but after the accident, he was severely limited in what he could do.  Mr. Jett recalled that Mrs. Holder would say, "He [Mr. Holder] was the backbone of the family."  His mom would always say, "Why did that have to happen to my son of all people?"  It devastated her.  She grieved a lot and she cried and she spoke often about what had happened to him.  Mrs. Holder believed that before the accident, Mr. Holder was going to be a major league baseball player.  Mr. Jett recalled that it hurt him to see a mother crying.  For some time after the accident Mr. Holder did not have a prosthesis.   His lack of mobility wore on him, and he expressed desire to go out of his house and sit on the porch or go down to the store.  His life improved when he obtained a prosthesis, because he could at least walk.   Mr. Jett remembered that Mr. Holder would say "I wish I had both of my legs."  Mr. Jett would tell him, "at least you are living."  Mr. Jett would also remind Mrs. Holder that Norris was lucky to be alive, but his mom's response would be, he can't do normal things now, he can't do things like the normal kids.

My review of medical records related to this catastrophic accident, which resulted in mutilation, maiming, amputation and loss of function, reveal that Mr. Holder was referred seventeen or eighteen times for psychological evaluation or treatment.  Trial Tr., Vol. XII at 85.  The number and consistency of referrals for evaluation and treatment suggests that multiple providers recognized Mr. Holder's urgent need for care.  In my experience, having worked in a trauma center, the sheer number of referrals is unusual and signaled severe and chronic psychological distress.  Contemporaneous medical records and interviews with Mr. Holder's family members support this.  Records from St. Louis Medical Center describe Mr. Holder as experiencing "severe denial." Another medical record describes Mr. Holder as very quiet and difficult to converse with and as refusing meals, as having a flat affect and refusing to get out of bed.  One record identified the risk that Mr. Holder would develop post-traumatic stress disorder (PTSD) as a result of the injury.  Consistent with this observation were the indications of severe denial and flat affect, classic indicators of psychic numbing,

one of the core symptoms of PTSD.  Also Social Security records show reports by Mr. Holder's mother that his activity was largely limited to staying in bed because of insecurity stemming from his amputation.  These obvious signs of depression are common among victims of trauma and should have alerted competent trial counsel or their retained mental health experts that a trauma specialist needed to evaluate Mr. Holder before his capital trial. Given the violent, impoverished environment that Mr. Holder grew up in, and his early assumption of the role of protector of his family, particularly his mother and younger siblings, the impact of the loss of his leg likely had a profound effect on Mr. Holder's own sense of self-worth and safety.  A pervasive expectation of danger often follows exposure to traumatic events, particularly when such exposure results in dramatic changes in safety and functioning, such as occurred with Mr. Holder.  In such circumstances, trauma survivors often adapt survival strategies designed to ensure safety In addition, the records and family reports strongly suggest that Mr. Holder was, as is common to many trauma victims, experiencing a host of psychological difficulties.  36 HOFSTRA L. REV. at 935.

e)      Fifth, four months after Mr. Holder's train accident, he was riding in a car with friends, when someone threw a brick through an open window and hit him in his temple.  He was taken home, where he was lethargic, dazed, suffered periodic blackouts, vomited, and was later taken to the emergency room by his father.  He underwent a right frontal craniotomy for a right skull fracture and epidural hematoma and intercranial bleeding.   He was admitted to the Pediatric Intensive Care Unit (PICU).  When he was discharged, he was prescribed the anti-seizure medication, Dilantin.  Mr. Holder's family members felt that his personality changed after the brick incident and he became even more withdrawn and may have needed counseling that his family never pursued for him.  Although I understand that this information was in trial counsel's files, they failed to retain a trauma specialist who might have been able to make sense of this information and explain to the jury the impact of Mr. Holder's injuries on his later behavior.  The context in which this incident occurred cannot be ignored, as it was within mere

months of the severe accident resulting in loss of function; was itself a symptom of the chronically unsafe environment in which Mr. Holder lived; and resulted in even further changes to Mr. Holder's wellbeing and functioning.

18.     In addition to my review of these life circumstances of Mr. Holder's that in my opinion resulted in his experiencing the impact of trauma, I have also reviewed the reports and testimony of Dr. Steven Rothke and Dr. Richard Wetzel.  Neither of these witnesses purported to evaluate Mr. Holder for symptoms of trauma or opined in any respect about the traumatic impact of the circumstances I reviewed above on Mr. Holder.  A careful investigation of symptoms over time is essential when developing a comprehensive trauma history and evaluation of its mental health consequences.  36 HOFSTRA L. REV. at 943.  No such investigation was performed by the experts who evaluated Mr. Holder.  Mr. Holder's defense team's simplistic approach to a mental health evaluation led the defense to overlook significant psychiatric symptoms that may have been the subthreshold for one or more psychiatric disorders that Mr. Holder may have been suffering from before and during the offense for which he was capitally convicted.  Id. This limited approach by the defense team and by the experts who evaluated Mr. Holder certainly resulted in an incomplete and inaccurate picture of Mr. Holder's mental health status.  Id.

19.     Dr. Rothke, who was retained by Mr. Holder's counsel, testified during the penalty phase that he was specially qualified in two areas: rehabilitation psychology and clinical neuropsychology.  Trial Tr. Vol. XII at 74. He was certified by the Court as an expert in both these areas.  Trial Tr. Vol. XII at 75.  Nowhere in his description of his expertise, did he mention evaluation of a patient for the presence of symptoms of trauma.

20.     Dr. Rothke testified that he was retained to evaluate the impact of Mr. Holder's leg amputation "and to look at what if any relationship there was between that injury and the crime for which Mr. Holder is charged and being tried for today."   Trial Tr. Vol. XII at 76.  He also testified that he was asked to determine whether Mr. Holder suffered any lasting brain injury from the head injury he suffered in 1992.  Trial Tr. Vol. XII at 77.   Dr. Rothke based his evaluation on a three-hour clinical interview of Mr. Holder and review of medical records related to his amputation and head injuries as well as school and disciplinary records and records of

interviews with Mr. Holder's family and friends. He also reviewed the report of the prosecution expert, Dr. Richard Wetzel. Dr. Rothke also testified that he was asked to determine whether Mr. Holder suffered any lasting brain injury from the head injury he suffered in 1992. Thus, the record suggests that evaluations of Mr. Holder were very narrowly focused, and did not address the multiple forms of trauma to which he was exposed or the consequences of these exposures. Trial Tr. Vol. XII at 77.

21.    Dr. Rothke administered a number of tests: the Wechsler Memory Scale-Revised, a Stroop Color Word test, the Rey Complex Figure, the Trail Making Test, and the Wisconsin Card Sorting Test. He also testified that he was asked to determine whether Mr. Holder suffered any lasting brain injury from the head injury he suffered in 1992. Trial Tr. Vol. XII at 78. He also administered tests he described as "making up what is called a mental status examination." He also testified that he was asked to determine whether Mr. Holder suffered any lasting brain injury from the head injury he suffered in 1992. Trial Tr. Vol. XII at 78. He had not reviewed records pertaining to Mr. Holder's head injury before he met with Mr. Holder. He also testified that he was asked to determine whether Mr. Holder suffered any lasting brain injury from the head injury he suffered in 1992. Trial Tr. Vol. XII at 79, 80. Dr. Rothke concluded that Mr. Holder suffered no lasting effects from his head injury. Aside from reviewing medical records, Dr. Rothke relied exclusively on Mr. Holder's own account of the train accident to reach his conclusion concerning the psychological impact of the amputation on Mr. Holder. Trial Tr. Vol. XII at 81-82. Dr. Rothke recognized that the medical records indicated that Mr. Holder was experiencing denial. Trial Tr. Vol. XII at 83. He also testified that although Mr. Holder had been willing to see a psychologist following his train injury and the medical records reflected that it had been recommended seventeen or eighteen times that Mr. Holder be given a psychological consultation, one was never done. Trial Tr. Vol. XII at 84-85. Neither did Mr. Holder receive any outpatient psychological services. Trial Tr. Vol. XII at 85.

22.    Dr. Rothke testified that he interviewed Mr. Holder about what his life was like at the time of the train accident in order to have a sense of what coping skills he had to deal with the trauma, whether he'd dealt with trauma before that might have made him more vulnerable to the effects of the injury and what resources he might have had to cope with the event. Trial Tr. Vol.

XII at 86.  Yet, in order to gather this crucial information, Dr. Rothke relied exclusively on Mr. Holder's self-report from a limited clinical interview, despite evidence of numbing and denial. Moreover, his access to information from family members was limited—and the information that trial counsel had gathered from Mr. Holder's family was limited to begin with--and though he referred to Mr. Holder's being referred for psychological consultation after his train accident, Dr. Rothke's conclusions did not take into account information from medical records suggesting concerns of hospital personnel. Dr. Rothke concluded that Mr. Holder was largely the same after the injury as he was before, and that there was only a minor indication that he was depressed. Trial Tr. Vol. XII at 87.  He described the impact of Mr. Holder's denial as helping him cope with the accident and as characterized by his attempt "very hard to identify himself as an able-bodied individual."  Trial Tr. Vol. XII at 90-91; Rothke Report at 4 ("He displays a long standing pattern or emotional denial in response to stress and trauma.  He has worked very hard at maintaining an able-bodied and independent status and not identifying himself as disabled."). Dr. Rothke recognized that someone with a physical disability might feel less secure and vulnerable but exhibited no recognition that Mr. Holder may have been experiencing such feelings and never attempted to explain how they might have influenced his participation in the robbery for which he was being tried.  Trial Tr. Vol. XII at 103. Although Dr. Rothke recognized that a person in Mr. Holder's position might feel vulnerable, he did not—nor did Mr. Holder's lawyers ask him to—opine as to whether *Mr. Holder* was actually experiencing such feelings and how his feeling vulnerable and insecure might have led him to arm himself, particularly in the wake of the attack with the brick, and to the events that led to his capital conviction.

23.    Dr. Rothke's report noted that Mr. Holder received school grades of As and Bs until the Sixth Grade, and then thereafter got Ds and lower grades.  Changes in academic functioning, such as noted in Mr. Holder's school records, often signal the presence of cognitive or emotional impairments. Yet, Dr. Rothke apparently attributed no significance to it, and neither he nor anyone on Mr. Holder's defense team noted this as a red flag warranting further investigation into what kinds of social or psychological difficulties Mr. Holder may have been experiencing even before his injuries.   Rothke Report at 2.

24.     Dr. Richard Wetzel evaluated Mr. Holder for the trial prosecution in preparation for Mr. Holder's penalty phase.  He spent ten and a quarter hours with Mr. Holder for his evaluation.  During part of this time, he supervised the administration of neuropsychological tests to Mr. Holder.  Wetzel Report at 1, 24.  He also reviewed Dr. Rothke's report and Dr. Thomas J. Reidy's report and article authored by Dr. Reidy, as well as records of interviews with Mr. Holder's family and friends, and school, prison, and medical records.  In addition, he reviewed the federal death penalty statute and the DSM IV.  I have reviewed Dr. Wetzel's report.

25.     Dr. Wetzel's timeline of Mr. Holder's social history identified a number of significant events that should have prompted the defense team to undertake a comprehensive trauma investigation.  He identified the seizures Mr. Holder suffered as an infant.  Wetzel Report at 3.  He identified that Mr. Holder's school records reflected a steady decline in his attendance and his grades, even before the train and brick accidents.  Id. at 4.  He noted, as did Dr. Rothke, that the medical records from the train accident identified that Mr. Holder was experiencing denial.  Id. at 5.  He identified that at one point in the records pertaining to the train accident, "it was noted" that Mr. Holder was "very unhappy and angry" but the "cause was not stated" and that "Mr. Holder, when interviewed, had no recollection about this."  Id. at 6.

26.     Dr. Wetzel's review of the impact of Mr. Holder's head injury (the brick incident) was limited to Mr. Holder's self-report that the injury had little lasting effect on his personality other than that it made him more "paranoid" and he stays on the "lookout" and is more watchful for danger, symptoms that are themselves suggestive of a post-traumatic response.  Wetzel Report at 7.  Dr. Wetzel noted that Mr. Holder's grades after the brick incident ranged from D- to D+, which in his view was a "significant **improvement** from the semester before the train injury and the head injury."  Id. at 7 (emphasis in report).  Dr. Wetzel's report also included reference to incidents not contained in other reports I have reviewed: Mr. Holder was arrested and adjudicated in juvenile court for cocaine possession in December 1992, and he was carjacked in January 1993, after which he obtained a gun.  Id. at 8.  At the same time this was going on, Mr. Holder was receiving failing grades in school.   Wetzel Report at 8.  These are all additional red flags that should have prompted Mr. Holder's defense team to "connect the dots" by performing a comprehensive evaluation of all the traumatic events in his life and present a picture to his

sentencer of what impact these events had on Mr. Holder's life and behavior. Dr. Wetzel further noted Mr. Holder's aforementioned disciplinary problems in school, including the incident in December 1993 when he was suspended for allegedly groping another student's breast while wearing a ski mask.  Id. at 9.  As discussed above, when viewed with Mr. Holder's declining school attendance and academic performance, such facts warranted comprehensive investigation into Mr. Holder's home life and psychological functioning for potentially mitigating information.  Yet, Mr. Holder's counsel failed to conduct such an investigation.  Dr. Wetzel also noted that Mr. Holder reported that he sold drugs for six or eight years during which he was earning good money.  At one point in 1994, he was put on probation for possession of a controlled substance.  Id. at 10.      These were all incidents that could have and should have shed light on Mr. Holder's life circumstances leading up to the events that led to his conviction for capital murder.  In fact, Dr. Wetzel reported that Mr. Holder became emotional when describing his interest in getting away from drug dealing and finding a way to earn a living to help his family.   Id. at 11.  Yet, trial counsel did nothing to elicit these facts or present them in any meaningful way to Mr. Holder's capital jury.

27.    Dr. Wetzel's report accepted at face value Mr. Holder's statement that he did not suffer from a post traumatic reaction, however it noted that Mr. Holder reported being "paranoid" about people who might assault him, suggesting the heightened sense of danger often experienced by people exposed to traumatic events.  Wetzel Report at 13. He also accepted at face value Mr. Holder's denial that he suffered from any depression at any time after the accidents. Id. at 14.  Dr. Wetzel's investigation into Mr. Holder's family history of psychiatric and neurologic disease appears limited to Mr. Holder's reports about this.  Id. at 17.

28.    Dr. Wetzel concluded that Mr. Holder exhibited "detectable brain dysfunction" caused by the injury from the flying brick and that that dysfunction was limited to motor speed in Mr. Holder's left hand and that he suffered from no other cognitive dysfunction or other brain disease or injury resulting from this accident.  Wetzel Report at 18.  He also concluded that Mr. Holder did not suffer from PTSD or any psychosis or disturbance of mood, that Mr. Holder had a history of febrile seizure without neurological or cognitive sequelae, traumatic amputation of his lower left leg below the knee and amputation of his fifth toe on his right foot; he further

concluded that Mr. Holder did not suffer from any mental disease or defect under the law.  Id. at 18-19.  Dr.  Wetzel went on to conclude that there was no psychological or neuropsychological connection or causal relationship between the febrile seizures, traumatic amputation and the head injury and the crimes with which Mr. Holder was charged.  Id. at 19.  He also went on to opine, based on his interrogation interview of Mr. Holder, that Mr. Holder did not meet the federal statutory mitigating factors of impaired capacity or emotional disturbance.  Id. at 19 and 22.

29.      Dr. Wetzel's interview with Mr. Holder reads very much like a law enforcement interrogation.    Wetzel Report at 12-13; 19-21.  This interview technique is utterly ineffectual at eliciting any useful information about a defendant's trauma history and its impact on that defendant.  Eliciting information about the trauma capital defendants have experienced requires skilled interviewing of the defendants, their family members, and others on a variety of subjects that are highly sensitive, may be cognitively or emotionally difficult to recall, and the telling or retelling of which may be accompanied by overwhelming affect.  36 HOFSTRA L. REV. at 959.  Given the nature of traumatic experience and barriers to disclosure, there is a need for multiple, repeated interviews over time.  36 HOFSTRA L. REV. at 960.   Dr. Wetzel interviewed Mr. Holder over two days and spent a total of 10.25 hours with him.  Wetzel Report at 1.  His interview technique, as documented in his report, featured Dr. Wetzel's posing mainly yes-or-no questions related to the crime, the motive, the co-defendant, and its planning. It really comes as no surprise that subsequent to that line and mode of questioning, Mr. Holder denied any psychological problems or impact resulting from his injuries from the accident and the assault with the brick.  Dr. Wetzel's report does not reflect inquiry as to effects of other traumatic events and circumstances in Mr. Holder's life.) As previously noted, Dr. Wetzel conducted no collateral interviews with Mr. Holder's family members or others; rather, he relied exclusively on Mr. Holder's self-reports.

30.      My review of records pertaining to Mr. Holder's social history and his capital case and my conversations with counsel have led me to conclude that Mr. Holder experienced a number of traumatic events and exposures, and psychological vulnerabilities, including suffering seizures when he was an infant, growing up with parents who were addicted to crack during much of his childhood and often absent, living in housing project rife with poverty and routine

community violence, experiencing the death of his grandfather—his principal father figure—at a tender age, and then the loss of his leg and part of his other foot in the train accident, followed closely by the head and brain injuries he sustained after being assaulted with a brick.  Evidence exists that Mr. Holder was suffering some serious psychological effects of all this trauma, possibly Post-Traumatic Stress Disorder (PTSD) or symptoms of a post-traumatic stress response, and depression, as evinced by references in medical records, family reports and the incomplete expert reports to Mr. Holder's exhibiting signs of avoidance, denial, and a heightened sensitivity to potential cues of danger.

31.    In my professional opinion, Mr. Holder's trial counsel failed to identify obvious red flags warranting investigation into traumatic events and circumstances in his life and therefore failed to investigate or develop a cohesive mitigation presentation to his capital jury that would have described the critical impact these factors had on Mr. Holder's development, behavior, motivation, and neurological and psychological health.   Without a comprehensive trauma assessment, Mr. Holder's sentencing profile was woefully inadequate, and his jury was left without information that was critical to determining Mr. Holder's moral culpability and whether he should live or die.

I declare under penalty of perjury under the laws of the State of New Mexico and the United States of America that the foregoing is true and correct.  Executed this 11th day of August, 2008.

/s/ Kathleen Wayland, Ph.D.
Kathleen Wayland, Ph.D.