**Declaration of Jennifer Merrigan**

I, Jennifer Merrigan, am an attorney licensed to practice in the state of Missouri. My training and background are in mitigation investigation in capital cases. Since May, 2000, I have been a Court Appointed Special Advocate in family courts in Cook County, Illinois and Kansas City, Missouri, advocating for children in abuse and neglect cases. I have worked on mitigation issues in capital cases since May, 2003, through the Public Interest Litigation Clinic, a non-profit law firm in Kansas City, Missouri, that has specialized in the representation of persons in capital trial, appeal and post-conviction cases since 1989. PILC also develops support and training materials for court-appointed capital defense attorneys throughout the United States. I started working on mitigation in capital cases as a legal intern for PILC in 2003. When I was admitted to the Missouri Bar in 2004, I joined the staff of PILC as a staff attorney and mitigation specialist.

As a staff attorney at PILC, I have been primarily responsible for a grant-funded project to research and articulate prevailing standards of performance for the mitigation function of capital defense teams. I have worked under the supervision of Sean O'Brien, an attorney who has represented indigent persons in capital cases since 1983, and Russ Stetler, who is the Mitigation Coordinator for the Federal Public Defender System. With the cooperation of the ABA Death Penalty Representation Project, I have interviewed mitigation specialists and capital defense attorneys in every jurisdiction in the United States that authorizes capital punishment, and conducted substantial legal and social science research into performance of counsel issues in capital cases. The project produced the *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677 (Spring 2008), which "are a natural and complementary extension of the ABA Guidelines [on the Appointment and Performance of Defense Counsel in Death Penalty Cases]." Robin Maher, *The ABA and Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases,* 36 Hofstra L. Rev. at 770.

While working on the Supplementary Guidelines Project, I was also trained as a mitigation specialist to provide direct representation in death penalty cases. Since 2005, I have worked as a mitigation specialist under the supervision of Mr. O'Brien, and I currently work as a mitigation investigator and consultant and co-counsel in trial and post-conviction proceedings in cases pending in both state and federal courts. In addition to Mr. O'Brien's training and supervision, I have attended the following national death penalty defense mitigation conferences:

NAACP Legal Defense Fund Annual Capital Punishment Training Conference; 2008, 2006 (Warrenton, Virginia);

Life in the Balance, National Legal Aid and Defender Association;  2008, 2006; (Atlanta, GA, New Orleans, LA);

Federal Capital Defense Strategy Session, Administrative Office of the United States Court, 2008, 2007; (San Antonio, TX, Baltimore, MD);

Persuasion Institute, Administrative Office of the United States Courts; 2008 (Cornell University School of Law, Ithaca, NY);

Annual National Federal Habeas Corpus Seminar, Administrative Office of the United States Courts, 2007 (Nashville, TN); 2006, 2005 (Pittsburgh, PA);

National Seminar on the Development and Integration of Mitigation Evidence, Administrative Office of the United States Courts, 2008 (Baltimore, MD); 2007, 2006 (Washington, DC);

Spotlight on Team Defense, National Alliance of Sentencing Advocates and Mitigation Specialists; 2006 (Baltimore, MD);

The Habeas Institute, National Institute for Trial Advocacy, Habeas Assistance Training Counsel, and the Administrative Office of the Courts; 2006 (Kansas City, MO);

Making the Case for Life, National Association of Criminal Defense Lawyers; 2005 (Oklahoma City, OK);

Investigation and Mitigation Training, A Fighting Chance; 2005 (New Orleans, LA);

National Capital Defense and Mitigation Skills Conference:  Building the Mitigation Case; 2004-2005 (Topeka, KS).

I was contacted by attorneys for Norris Holder and asked to provide mitigation investigation assistance in Norris Holder's case.  Pursuant to this request, I first reviewed the trial transcript in Norris' case as well as the 2255 evidentiary hearing transcript and related pleadings.  I also reviewed extensively nine large binders of documents which I believe to have been in trial counsel's file.  Those include records from:

Hospitals:
> Cardinal Glennon, Forest Park, St. Louis University, St. John's, St. Louis Children's Hospital (pertaining to Norris Holder)

School records (pertaining to Norris, Norell, and Normeka Holder)
> Rockwood South Junior High, Eureka Senior High School, Vashon High School, Marshal Elementary, and Bowles Elementary

Department of Revenue (pertaining to Norris Holder and Kimberly Holder)

Department of Social Security Administration (pertaining to Norris Holder)

St. Louis County Juvenile Court (pertaining to Norris Holder)

St. Louis Metropolitan Police Department  (pertaining to Norris Holder)

Missouri Probation and Parole (pertaining to Norris Holder)

Noticeably absent from the records I was provided, which I understand to be all the records

trial counsel gathered in this case, were records pertaining to Norris' family members.  There is absolutely no information in these records about the family history of physical or mental illness, family history of substance abuse or incarceration, or any other information about Norris' family and family history key to developing a life history for any capital client.  Likewise, there are no birth records from Norris Holder's birth, or hospital records for any other family member.  Again, these are records that are basic to any life history investigation in a capital case.

During my review of the above listed documents, a number of significant events in Norris Holder's life appeared to me obvious areas of investigation in preparation for his representation at any stage of his capital case, but particularly at his trial.  As a result, I met and interviewed family members and friends of Norris Holder, including his mother, Kimberly Holder, his maternal grandmother, Lonzetta Curry, his maternal aunt, Mattie Jones, and his childhood friend, Terry Jett to gather more information about those key occurrences.

From Norris' records obtained by trial counsel I learned that Norris was hospitalized as an infant for seizures.  I asked Norris' mother about this and learned that she also had seizures from the time she was eight years old until about the time she was approximately thirteen.  As a child, she was hospitalized for approximately one month.  Norrim, Norris' brother, also had seizures.  He was on medication for years, possibly Dilantin.  This information points to a family history of neurological problems that should have been investigated thoroughly in preparation for Norris' capital trial.  It was not.

When Norris was approximately six years old, the family moved to the Blumeyer housing projects, which were at that time rife with violence and illegal activity.  Norris' mother is very upset that she ever moved her family to the to the Blumeyers.  They lived at the projects for 10 years and left when Norris was approximately 16, according to Kimberly.  At first, her husband, Norris Sr., was with her, and the family lived there together.  They lived in an apartment on the 12th floor.  Over the years that they lived there, the conditions in the Blumeyers deteriorated.  The family moved to a townhouse after Norell, Norris' youngest brother, was born.  They moved because there was a rule in the high-rises that residents there couldn't have more than two children.  Kimberly said that things got a lot worse when they were in the townhouses because they were right there on the ground and they could see everything and they couldn't escape it.  She said that you would see drug deals going down everyday all the time and that people would hide drugs in their barbeque pits.  Norris' grandmother stressed that in the Blumeyers it was very dangerous; you could not go outside at night.  When she came to see the family, she would have to leave before it got dark.  Even the police would not come in to the Blumeyers at night because it was considered too dangerous.  During the day you would see the police beating and chasing the kids.  But at night, the neighborhood belonged to its inhabitants, and law enforcement did not dare tread into that territory.  When they moved to the townhouse, Norris' grandmother said that the family's exposure to the violence in the projects increased exponentially. Norris' mother, his grandmother, and his aunt all called the neighborhood a war zone.  Several of "little Norris'" friends were shot at and several of them were killed.   To make matters worse for the kids, during the day, Kimberly and her husband were not present.

Terry Jett lived near Norris in the Blumeyer housing projects beginning in approximately 1987. Terry remembers that when he was hanging out at Norris' house, Norris Sr. was gone altogether and Kim was gone a lot during the day. The Blumeyers were so deteriorated that they were knocked down five years ago in order to disperse the people living there.

Terry Jett was also present at the time that Norris lost his leg while jumping onto a moving train. Terry was standing on the train car behind Norris and saw the whole accident. Norris jumped up and tried to get on the same ladder as another friend, Anthony Brown. Norris was able to get one of his hands onto the ladder, but his other hand grabbed Anthony's shirt. Norris was not able to get his footing on the train and he fell backwards. He didn't fall far enough from the train to clear it, and he was trapped underneath it. Norris was dragged for about 100 yards, or the length of a football field. Terry watched Norris tumble along sort of rolling over the 100 yards, trying to grab onto anything. But the only thing around was gravel, so Norris could not grip onto anything. Finally Norris' leg actually disconnected from his body. The train amputated Norris' leg, and so Norris came free from underneath the train. When Norris was finally let free of the train, Terry could actually see white bone and the calf muscle, the ligaments and tendons all separated, and visible. Initially when Norris was cut free from the train, he didn't even realize what had happened and he kept trying to get up and stand up but he couldn't. Norris' friends jumped off the train far enough away that they did not get hit by the train.

Terry recalled that although some of the boys ran off, five of them stayed: Terry Jett, Anthony Brown, Anthony Winn, Frank Wright, and Damon Johnson. The road was quite a ways, so two of the kids went off ahead to flag down a car and get some help. The remaining kids carried Norris up and propped him underneath the bridge that was there. Terry stated they were all really drained; it was as if they had no strength, and so it took them about five minutes to even pick Norris up in the first place and another twenty minutes to carry him up a hill. The meat had been ripped from Norris' calf. His heel was cut completely off and, initially, the front part of his foot was still on. As they carried him up the hill, the top of his foot fell off. One of the other boy's took their shirt off and they all wrapped it around Norris' leg to stop the bleeding. Frank picked up the foot that had fallen off of Norris as he was being carried; it had no heel and no ankle. Norris' ankle had been amputated by the train. Frank carried the foot, which was actually just a few toes and the front of the foot. The boys were able to flag someone on the highway, an older man who came down with a cell phone and called for an ambulance. Norris waited for approximately forty minutes for the ambulance to get there.

According to Norrim, Norris' brother, another kid living in the Blumeyers taught Norris and his friends how to jump the trains. (Lorenzo Matthews was one of their many friends who was shot and killed in the Blumeyers.) Norrim was home with the younger siblings when Norris' friends came and knocked on the door. His friend was crying and he said that there had been an accident and Norris got run over by a train.

Norris' grandmother was one of the first family members to arrive at the hospital. They took her into the room where Norris was lying; Norris was shaking. They were trying to sedate him but

4

she said that he wouldn't fall asleep.  She could see his leg was wrapped up in something and that it was shredded.  His shoe was in a bucket, and his foot was still in the shoe.  There was blood everywhere.  She couldn't really look because she knew that Norris' eyes were trained on her and that if she looked that she would be shocked or faint and he would be able to see it and it would scare him.  So she told him that it would be ok and then he went to sleep.  The doctors told Norris' grandmother that they were going to cut Norris' leg off above the knee, however, she would not consent to it and told them to cut it below the knee and sew up the parts of the knee that were injured.

Terry Jett has had a lot of nightmares throughout his life about what he saw.  He said that time has helped, but it was bad for the first five years; he was very badly affected.  In the beginning he had nightmares very frequently and that he still occasionally has nightmares about what happened that night.  All of Norris friends, and Norris, blamed themselves.  Before the accident they had done everything together, played a lot of sports, danced.  It changed things and it hurt their families especially Norris' mother.  She was down a lot for years after the accident.  The boys, including Terry, would visit and give her flowers.  They would go see her a lot and try to console her.  Before the accident she was upbeat.  After the accident, it was her trying to take care of Norris.  Norris was a superstar and Norris' mom behaved like the accident ended that for her.  Norris' athletic ability had kept his mother upbeat.  She looked up to him, but now he could only do so much.  "He was the backbone of the family."  His mom would always say, "Why did that have to happen to my son of all people?"  It devastated her.  She grieved a lot; she cried, and she spoke about what had happened to him.  His mother thought he was going to be a major league baseball player.

Terry said that Norris would not grieve but he would say "I wish I had both of my legs."  Terry would tell him, "at least you are living."  I asked if Terry ever told Norris' mom that, and he said he had but that Norris' mom's response would be, "he can't do normal things now; he can't do things like the normal kids."  Norris would say to his mother, "I'm ok; you have to be strong."  Terry said that Norris chose to be strong.

After Norris came home from the hospital after the train accident, most of the time he was in his room.  Terry came over every day and would sit with him.  When Norris went back to school, it was like everyone had to get to know him all over again.  Even when he first had his prosthesis, he had to use crutches.  To go to school every day they took a bus, which they caught usually either in front of their houses or at the end of the block.  One driver would stop by the houses but other drivers would not. Different drivers wouldn't know to stop there.  This was very difficult for Norris, who had to run to catch the bus, though he was on crutches and wearing a prosthetic leg.  Even with the prosthesis, it was difficult for Norris to catch the school bus.  Terry remembered that he and Norris had to be at the bus stop at 4:55 a.m.  They arrived at school between 7 and 7:30.  Once on the highway, Terry said that you could fall asleep for about 40 minutes.  The first period was the hardest because they were so sleepy.  I asked what happened if you missed the bus and he laughed.  "If you miss the bus, you miss school.  Every once in awhile, your mom might drive you if you really, really had to be there."

After the train accident, it took a while before Norris could go back to school.  Terry remembered that Norris had to repeat the 9th grade.  Norris did not like being in class behind all of his friends and behind everyone he knew.  Norris did not have as many friends after the train accident.  There were people that stayed away from them.  Norris had a lack of confidence afterwards. Even once Norris got his prosthesis–about a year after the accident--it was very painful.

Norris' family members recalled that after Norris was moved back home, he lay in his bed a lot.  When they fitted him with a prosthetic leg he would have to duct tape it on his leg to keep it on.  They tried to get disability but Norris was denied.

Norrim said that after the accident, Norris changed completely.  Norrim said that there was a lot of friction between Norris and Norrim, who had previously been close, and Norrim said that Norris' leg was always bleeding.  He remembers afterwards that Norris was unable to get around or leave the house.  Norrim said that it was like Norris withdrew.  He thought it was because Norris' leg wasn't healing.  Norris' uncle MC said that after the accident, it was like Norris' state of mind changed.  Like he was always on the defensive.  MC said that Norris tried to keep up a good front but he could see a difference in his personality.  Norris' leg was bleeding all the time.  Before this, Norris was both very athletic and he also loved to dance.

Terry Jett was also present when Norris was hit in the head with a brick.  Norris was riding in the passenger seat of Andrew Bell's car.  Terry was following behind them in his own car.  Some guys started throwing rocks and then one of them threw a brick.  The brick hit Norris in the head; the window was down, so the brick hit him in the temple directly.  Terry said that when the brick hit Norris there was just a little bit of blood.  When they took him home, Norris was in and out of consciousness.  Norris' mom took it really bad.  When he first got hit, Norris was upset and angry wondering who would throw a brick at his head but then he kept getting more and more dizzy.  Terry remembered Norris saying that his head just didn't feel right.  Norris was very nauseous and he couldn't actually walk himself inside.  Terry did not recall the police showing up.  Terry said that Norris' mom was frantic.  "What happened to him."  She was really mad.  "Why does this keep happening to my son?"  Terry said that Norris' mom was melting down and Norris was just sitting on the couch.  He said he seemed like he was drifting in and out.

Norris' mother also recalled when Norris got hit in the head with a brick.  She said that he came home one night and he had said that he had gotten hit in the head with a brick but that there really wasn't any visible bleeding.  There was just a small wound.  She said that a while later, he started throwing up and he couldn't see straight.  They took him to the hospital and the doctor said that Norris had fluid on his brain and they performed emergency surgery.

For a long time, Terry recalled that after the brick incident, Norris got really bad migraines. He used to talk about them and how he would have to sit back and relax.  Terry said that Norris got migraines every other day or every two to three days.  Terry also said that he noticed a change in Norris; he was still somewhat vibrant and strong after the train incident.  But after the brick, Norris wasn't as social; he wasn't happy all the time.  Norris was down.  He seemed worse off and more

quiet. Norris' grandma said that after this it seemed like Norris pulled back even more and that he kept even more to himself and that he had just changed a lot.

When I asked Norris' family if they knew why a brick was thrown at his head they all said that is how it was in the Blumeyers, that you just couldn't be out in the evening because all kinds of dangerous stuff happened. His grandmother and aunt could not believe that Norris had never had any follow-up counseling after he was hit in the head with the brick.

Everyone who I spoke with emphasized that Norris was not one to talk about what he was going through. Even after his amputation, he never received psychiatric assistance or counseling, and he never opened up to anyone. After he was hit in the head with the and the brick, Norris seemed to wall himself off completely. They all noted that Norris had been the rock of the family and was upbeat and positive until the accidents changed all that.

Through my investigation into Norris Holder's life history, I've gathered facts that demonstrate that he was subjected to a number of major stressors: a family history of neurological problems; impoverished living in a neighborhood rife with incessant violence; absent parents; and two serious injuries that resulted in significant physical trauma and symptoms of serious psychological distress. My review of trial counsel's file shows that counsel had in their possession a number of the records that documented Norris' traumatic life history. Many of these documents reflected information which I do not believe trial counsel followed up on. For example, records and interviews indicated that Norris Holder, his brother, Norrim, and his mother all suffered from seizures. In addition, records from Norris' hospitalization after his leg was amputated show that he had been referred for psychiatric services. However, he never received those services. Similarly, after the amputation, fifteen-year-old Norris applied for disability. However, records indicate that his mother waited six months before filing a necessary form, and the application was dismissed. In my professional opinion, these records were not properly followed up on by trial counsel. Trial counsel argued that Norris' motivation for committing the robbery was his desire for a new prosthetic leg. Imperative to that is information about other attempts that Norris made after his accident to obtain resources, such as Social Security. The Social Security records also should have prompted trial counsel to follow up to find out why Norris' mother was unwilling or unable to complete the process that would have given Norris and his family financial support in the wake of his debilitating injury.

The social history investigation also fell short of accomplishing detailed, thorough witness interviews, even about major events in Norris' life–as far as I know, trial counsel never interviewed any witness to Norris' train or brick accidents, for example. I easily located Terry Jett , and he was more than willing to talk to me when I found him. He has been incarcerated in the Missouri Department of Corrections system since the time of trial, so trial counsel could have easily located him. His recollection of the accident was very detailed, and still haunts him to this day. Terry was surprised that no one from Norris' defense team had ever contacted him before. In my professional opinion, I don't believe that any mental health expert could give a professional assessment about the effect of the train incident and amputation on Norris without talking to at least one witness who saw

7

the horrible event.  This is especially true when considering that trauma patients tend to minimize the effects of the trauma they have experienced.  Many trauma patients experience outright denial. Hospital records, in fact, indicate that doctors at the time were concerned that Norris was in denial and was at risk of experiencing Post Traumatic Stress Disorder.  In my professional opinion, the performance of Norris' trial attorneys fell well below the accepted standard of care when they failed to interview Norris' childhood friends who witnesses his being leg being mutilated and amputated by a moving train, particularly when this event so clearly impacted his decision to get involved in the events that led to his conviction for capital murder.

In many ways, such as this, trial counsel did not perform on par with the American Bar Association's Guidelines of Appointment and Performance in Capital Cases, which requires that two capital attorneys and a mitigation specialist be appointed early in every capital case.  In this case, a second capital defense attorney was not appointed until February 1998, approximately one month before voir dire in the case began.  A mitigation specialist, Caryn Tatelli, was not appointed until December 1998.  Though Ms. Tatelli was able to obtain a number of records in this case, I do not believe that the defense team was able to give meaningful review to those records and then share them effectively with trial experts.  Judging from my experience, it is impossible to request, obtain, review, and effectively utilize hundreds of pages of life history documents in the time this trial team had before Norris' trial commenced.  Each request must be made separately, to each individual agency or organization, which usually has its own rules and regulations for releasing documents and information.  The organizations must then search for the records, photo copy them, and return them to the requestor.  In my personal experience, this process alone can take well over three months. Once the records have been received, they must be reviewed carefully by a person with the training and skills to notice significant details.  The flagged records must then be shared with various experts, who can explain the meaning of complicated medical records, school records, and other life history documents.  Record review also reveals new and important witnesses in the client's life, as well as new questions for witnesses with whom the team has already established contact.  It is an arduous process, one that I do not believe could have been done or was done in the time frame under which Norris Holder's defense team was operating.

This compressed time period for preparing for Norris' penalty phase also accounted for the disjointed presentation at the penalty phase.  The defense team did not have adequate time to properly interview and prepare the witnesses or to thoroughly review the records and utilize the information therein. As Caryn Tatelli and Jennifer Herndon testified at the evidentiary hearing, lead trial counsel Charlie Shaw precluded them from hiring the experts they needed.  In addition, it seems very clear to me that without adequate time, they were unable to arm the experts that they did have with the relevant social history information that counsel had gathered, though even that was incomplete.  Such social history would have been critical to any expert's evaluation, assessment, or diagnosis of Norris in connection with his capital case.  This inability to collect adequate records combined with Charlie Shaw's refusal to permit Jennifer Herndon to make her closing argument, deprived the jury of the necessary guidance in how to weigh and evaluate the mitigating evidence. Without either an expert or a relevant argument to the jury summing up the evidence that was presented, the defense could not present a coherent penalty phase mitigation  theory to the jury, nor

8

could they explain how Norris Holder's life history and family history combined to create the circumstances that gave rise to the crime.  No matter the reason, Norris Holder was not afforded representation in line with the prevailing professional standards and norms.

I declare under penalty of perjury under the laws of the State of Missouri and the United States of America that the foregoing is true and correct.

Executed this 12th day of August, 2008.

/s/ Jennifer A. Merrigan

Jennifer A. Merrigan, MO 56733

9