UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NORRIS HOLDER,                      )
                                    )
              Movant,               )
                                    )       No. 4:03CV0923 ERW
vs.                                 )
                                    )       *This is a Capital Case.*
UNITED STATES OF AMERICA,           )
                                    )
              Respondent.           )

### MOVANT'S REPLY TO GOVERNMENT'S RESPONSE TO MOVANT'S MOTION TO ALTER OR AMEND JUDGMENT PURSUANT TO RULE 59(e)

COMES NOW movant, Norris Holder, by and through counsel, and for his reply to the government's response to his Fed. R. Civ. Pro. 59(e) motion to alter or amend the judgment of this Court issued on July 30, 2008, states as follows:

**Introduction**

Mr. Holder reasserts and incorporates by reference the arguments set forth in his Rule 59(e) motion to alter or amend judgment which fully address and refute the points set forth in the government's response. Mr. Holder believes, however, that supplementation and clarification of the following points is warranted.

**1. Standard of Review in a Rule 59(e) Motion**

The government argues that Mr. Holder's Rule 59(e) motion "essentially re-argues his prior [§ 2255] motion and this [Rule 59(e)] motion should be denied on that basis alone." Gov't Resp. at 2. As the government itself concedes, however, the purpose of Rule 59(e) motions is to seek reconsideration of a judgment on precisely those grounds which form the basis for Mr. Holder's

-1-

motion – namely, because the judgment relied on "manifest errors of law or fact."  Gov't Resp. at 1.  Mr. Holder's Rule 59(e) motion did not, as the government asserts, simply "re-argue the case," but rather challenged significant errors of law and fact in the Order dismissing Mr. Holder's § 2255 motion, such as the Court's failure to grant an evidentiary hearing on certain claims, its misapplication of the legal tests articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), and *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001), its reliance on facts that were not in the record, and its omission of facts that were in the record.  These are all appropriate bases on which to seek reconsideration of a judgment on the merits pursuant to Rule 59(e), and the government's suggestion to the contrary lacks merit.

Additionally, in light of the fact that this is a capital case and that "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice," *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), it is imperative that the manifest errors of law and fact raised in Mr. Holder's Rule 59(e) motion be reviewed and corrected.  This is particularly true with respect to Mr. Holder's request that this Court reconsider the denial of an evidentiary hearing on certain of his ineffective assistance of counsel claims.  Unlike a habeas petition brought in § 2254 proceedings, where there is a prior opportunity to develop the record at a state court evidentiary hearing, the present proceeding before this Court is the only opportunity available to Mr. Holder to conduct an evidentiary hearing and develop a record on his § 2255 claims.

The Eighth Circuit has a longstanding practice of providing capital habeas litigants a full and adequate opportunity to develop a record on claims of ineffective assistance of counsel.  As the Court recently re-affirmed in *Nelson v. United States*, 2008 U.S. App. LEXIS 22338, *2 (8th Cir. Oct. 27, 2008) (*per curiam*), "[o]ur cases teach that issues regarding ineffective assistance of counsel

often require a hearing to consider evidence not disclosed on the face of the trial court record."[1] Evidence regarding trial counsel's preparations, or lack thereof, is almost never apparent from the face of the trial record, and that is certainly the case here.  Moreover, the trial record also fails to disclose – as is pertinent to several of Mr. Holder's ineffective assistance claims – the available mental health and mitigation evidence which trial counsel unreasonably failed to present.  All Mr. Holder requests at this stage is a fair opportunity to present his evidence on his ineffective assistance of counsel claims so that a ruling on his § 2255 motion can be made on the basis of a complete record, and after a comparison of what *was* presented at trial versus what *could have been* presented at trial, rather than on mere speculation.

### 2. Conceding Mr. Holder's Guilt During Opening and Closing Statements (12(C)(b))

### Advising Mr. Holder to Testify When His Testimony Confirmed His Guilt on a Capital Offense (12(C)(c))

The government claims that Mr. Holder "fails to identify evidence which this Court did not consider" in its resolution of these claims.  Gov't Resp. at 2.  But, nothing could be further from the truth.  Mr. Holder set out in his Rule 59(e) motion a plethora of evidence adduced at the evidentiary hearing that was neither mentioned nor addressed by the Court in its ruling on these issues.  *See* Rule 59(e) mot. at 3-9.  Instead of addressing this fact, the government simply speculates, without any

---

[1] It should be noted that in *Nelson*, a capital § 2255 case, the Eighth Circuit remanded the case to the district court for an evidentiary hearing on Mr. Nelson's ineffective assistance claims on the basis of the application for a Certificate of Appealability alone.  In other words, the Eighth Circuit did not even wait for merits briefing to remand the case, as it was apparent to the Court that the ineffective assistance of counsel claims, by their nature, required that an evidentiary hearing be conducted in order to receive evidence regarding trial counsel's actions *outside* the courtroom in preparing the case for trial.  As in Mr. Holder's case, those claims included trial counsel's failure to adequately investigate the petitioner's mental health, and trial counsel's failure to present available mitigation witnesses.

evidentiary support, that Mr. Shaw's trial strategy was based on a sound understanding of the law and facts. The government's position is directly contrary to the evidence adduced at the § 2255 hearing which clearly established that Mr. Shaw's trial strategy was based on his mistaken belief that a conviction on the robbery charge would not subject Mr. Holder to the death penalty. *See* Rule 59(e) mot. 3-7.

### 3.  Failure to Obtain Ballistics Expert (12(C)(d))

Mr. Holder asserts that the Court's analysis of this claim is incomplete because it overlooked the possibility that an independent ballistics expert could have verified government expert Stubits' conclusion that three of the spent shells recovered in the bank could have been fired from Holder's gun. The government's response to this assertion is two-fold: 1) that the Rule 59(e) motion is the first time that Mr. Holder claimed to be prejudiced by trial counsel's failure to confirm Mr. Stubits' opinion; and 2) that, even if counsel was deficient in not confirming Stubits' opinion, it would not have changed the outcome of the case because there was no alternative strategy available to the defense. Gov't Resp. at 4-5. Both contentions are incorrect.

### A.    Holder raised the issue of prejudice stemming from trial counsel's failure to confirm ballistics evidence at the evidentiary hearing.

Although the Court did not grant an evidentiary hearing on this issue, the range of possible prejudice stemming from trial counsel's failure to obtain a ballistics expert was explained by § 2255 motion counsel during the following exchange at the evidentiary hearing:

Q  (Mr. McGraugh):  I believe you've answered this question, but was there any meeting with Mr. Shaw where you would strategize what was going to be presented in the guilt phase and what would be presented in the penalty phase?

A  (Ms. Herndon):   No.  The only meetings that - - that I had with Charlie - - and there weren't very many, but the only meeting I had with him, the only things we talked about were guilt phase issues.

Q   And as it relates to guilt phase issues, what kind of discussions would you have had with him?

A   Well, you know what I remember - - and, like I say, there weren't very many, and I mean like maybe two or three, and what I remember is the ballistics issue.  That was the biggest one that I was involved in and that I could recall.

Q   Let me ask you about that.  When first was there a real discussion about ballistics, and what was the discussion?

A   During the meeting with Dick, we talked about the need for a ballistics expert, and that was - - it had to be Dick's idea because Charlie - - it wasn't Charlie's idea and it wouldn't have been mine at that point.  So it had to be Dick's idea.  He suggested a ballistics expert, and Charlie said that he knew someone.  You know, he had been a lawyer for a long time obviously.  He had a contact.  So we left that meeting with Charlie was going to make contact with that ballistics expert.

Q   What was the significance or the importance of obtaining a ballistics expert?

MR. HOLTSHOUSER:   Judge, I'm going to object to the relevance of this line of questioning to the issues that have been narrowed for this area.

MR. MCGRAUGH:   Well, Judge, it goes to the prejudice issue as to the case and particularly as to what prejudice - - again, we would - - we would - - we would take the position that this is a chronic [Cronic] issue as it applies to the testimony and the concession of guilt, but also, the Court could look at it on a Strickland issue and then would have to examine the prejudice of putting Mr. Holder on and conceding guilt and advising the Jury that his weapon had not been fired in the bank.  This line of testimony, which I think where it's going to go is this, Judge, is to - - is to discuss what Mr. Shaw knew about the ballistics expert or the ballistics issue in the case as to whether it was advisable to put this - - put his client on the witness stand to say that he didn't fire his weapon in the bank as well as to state in both opening and closing argument that he did not shoot his weapon in the bank, I believe what Mr. - - what Ms. Herndon is going to testify to is that Mr. Shaw was aware that this was an issue and it wasn't followed up on, and as a consequence, it goes to the prejudice issue, Judge, as to what effect, if any, would Mr. Holder's testimony have or what error in putting Mr. Holder on the stand would have as well as his concessions both in opening and closing statement.

-5-

THE COURT:          All right.

MR. HOLTSHOUSER:          Well, Judge, I think the problems with that is that it's - - we're lumping - - we're trying to paint with a broader brush her than is the focus of the Court's order.  The ballistics have nothing to do with Norris Holder's decision to testify or the prejudice from that without some evidence being brought forward that a ballistics expert should have or would have been found that would have changed the outcome of the case or somehow changed the evidence that came in.  The ballistics evidence came primarily from Officer Stubits.  The question that's being asked here has to do with Mr. Shaw's pursuit or nonpursuit of a ballistics expert, and somehow there has to be some linkage up with prejudice from the failure to get a ballistics expert. There's been no evidence produced to us in the course of discovery in this civil matter regarding that there exists such a ballistics expert or that we're going to hear evidence that has a ballistics expert been pursued, he would have told Mr. Shaw this and then he would have known not to call Mr. Holder.  So I think this is bootstrapping somewhat into another area that's really not relevant to the issues that the Court has narrowed.

MR. MCGRAUGH:          You Honor, could I just briefly respond to that, Judge?

THE COURT:          Sure.

Mr. MCGRAUGH:          The Court may, if focused on a <u>Strickland</u> analysis, have to examine prejudice in this case.  Judge, it's going to be our position that it's a "damned if you do and damned if you don't" proposition, that had he got an expert, an expert would have agreed with Mr. Stubits, then the Court has to examine the merits of putting his client on the stand to say, "I didn't fire the gun: when there was no evidence to contradict that.

However, on the other hand, if he was to get an expert, an expert who could contradict that, then the question is why would he put his client on the stand and concede these things without putting this expert on.  So, you know, Judge, I don't - - it doesn't matter really what the expert would say.  It's the recognition that there was an issue here, an issue that had to be followed up on, and then that has to be examined in the totality of his decision to put his client on and to concede guilt in both the opening and closing arguments.

THE COURT:          Okay.  I'll overrule it and allow it. Overruled. (Evid. Hrg. Tr., Vol. 1 at 119-124).

The government's assertion that the Rule 59(e) motion was the first time that Mr. Holder claimed to be prejudiced because of trial counsel's failure to confirm Stubits' opinion is simply not true.

**B.      An alternative remedy was available to the defense had trial counsel confirmed Stubits' opinion.**

Contrary to the government's claim, there was an alternative strategy available to trial counsel had he taken the time to confirm Stubits' opinion. That strategy would have been to advise Mr. Holder not to take the witness stand. There would have been no downside to this strategy because the ballistics evidence was consistent with the premise that Mr. Holder did not fire the shots that actually killed the bank guard. Advising Mr. Holder not to take the witness stand would have still allowed trial counsel to maintain this position and, at the same time, insulate Mr. Holder from a government attack based on Stubits' opinion that, of the two guns carried by the participants, three of the spent shells could only have come from Mr. Holder's gun.

Finally, the government claims that relief on this claim should be denied because Mr. Holder would be unable to show that the outcome of the proceeding would have been different. But, in order to succeed on this claim, Mr. Holder only has to show a reasonable probability of a different result, a standard that is "less than a preponderance of the evidence," *See Strickland v. Washington*, 466 U.S. 668, 693 (1984), a standard that Mr. Holder can meet. *See* Rule 59(e) mot. at 14-15.

This Court should alter and amend its judgment to consider this claim from the viewpoint that trial counsel was ineffective for failing to hire a ballistics expert to confirm Stubits' opinion, and thereafter grant relief, or alternatively, grant Mr. Holder an evidentiary hearing on this claim.

### 4.  Failure to Interview Mitigation Witness (12(C)(e))

As stated in Mr. Holder's Rule 59 motion, trial counsel was ineffective in failing to interview and call an inmate witness who could have provided critical mitigation evidence regarding Mr. Holder's genuine remorse over the death of Mr. Heflin.[2]  In responding to Mr. Holder's claim, the government essentially focuses only on the second prong of *Strickland* (the "prejudice prong") and makes the following assertions:  (1) the witness's credibility was "questionable"; (2) the testimony would have been cumulative; (3) the witness's description of Mr. Holder's remorse was "ambiguous at best"; and (4) testimony may not have been admissible.

With respect to the witness's credibility, the government ignores, as the Court properly stated in its Order, that "the credibility of the witness is uniquely the function of the jury, and therefore the Court cannot decide whether or not the jury would have credited the unknown witness's testimony." Order at 74-75.  Moreover, the government ignores clear case law which establishes that a witness's status as an inmate is not in and of itself sufficient to make an adverse credibility determination and deny a hearing on claim that is based on testimony from such a witness.  *See*, *e.g.*, *Schlup v. Delo*, 513 U.S. 298, 309 n.19, 331-332 (1995) (reversing district court's denial of habeas petition, which focused primarily on the "suspect" nature of affidavits provided by inmate witnesses on the petitioner's behalf, and finding that the affidavits were sufficient to establish a threshold showing regarding "actual innocence" in order to entitle the petitioner to an evidentiary hearing on his

---

[2] The government states that "Holder now limits his argument to the issue of remorse only." Gov't Resp. at 6.  Mr. Holder's Rule 59 motion does not – and need not – ask this Court to reconsider every single issue presented in his § 2255 motion in order to constitute a proper Rule 59 motion.  The fact that the Rule 59 motion seeks re-consideration on certain issues adjudicated by this Court in its Order cannot and should not be construed by the government as "abandonment" of any remaining issues raised in Mr. Holder's § 2255 motion.

claims).  Additionally, the government completely ignores the argument that given that the inmate witness had absolutely nothing to gain in return for testifying on behalf of Mr. Holder, this *lack* of an improper or corrupting motive that would have been a powerful indicator of the credibility of the inmate witness's testimony.  *See House v. Bell*, 547 U.S. 518, 552 (2006) (noting that exculpatory testimony from witnesses unconnected to the accused has "more probative value" than incriminating testimony from inmates because the neutral witnesses have "no evident motive to lie").[3]

With respect to the issue of cumulativeness, the government makes no attempt to respond to relevant case law which establishes that the mere fact that the *topic* of the testimony of the proffered witness is similar to the previously-presented testimony of a trial witness does not automatically mean that the testimony of two witnesses is of equivalent weight or interchangeable. *See*, *e.g., Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006).  As was argued in Mr. Holder's Rule 59 motion, a significant fact about the inmate witness that distinguishes him from the trial witnesses is precisely the fact that he was *not* a family member or friend of Mr. Holder's, and therefore, did not have the kind of pre-existing relationship with Mr. Holder that might raise suspicions of bias. The inmate witness was a detached, neutral observer of Mr. Holder's expression of remorse over the death of Mr. Heflin.  This was not a person to whom Mr. Holder had any reason or incentive to express his anguish and regret about the offense other than because that is what he was genuinely feeling.  Nor did the inmate witness hope to have gained anything in exchange for relating to the FBI

---

[3] The government is also conspicuously silent in responding to Mr. Holder's observation that the government itself *routinely* relies on the testimony of inmate witnesses in order to secure convictions, deeming such testimony credible despite the obvious incentives present for those witnesses to curry favor with authorities and shape their testimony in a manner that will allow them to receive a benefit in exchange for their testimony.  By contrast, the inmate witness here had nothing to gain by relating his observation that Mr. Holder was genuinely remorseful regarding the death of Mr. Heflin.

his observation of Mr. Holder's genuine expression of remorse. As such, the inmate witness's testimony cannot be deemed "cumulative" to the other witness testimony when it was singularly compelling on account of the fact that the inmate witness's lack of interest in the outcome of Mr. Holder's sentencing functioned as an independent indicator of the authenticity and credibility of the testimony.

With respect to the government's argument that the witness's testimony was "ambiguous at best," this claim is belied by the FBI 302 report, in which the witness unequivocally stated: "Holder appeared remorseful." Moreover, to the extent that the government claims that such a statement can be construed as "ambiguous," it is all the more reason that this Court should permit an evidentiary hearing on the matter so that such "ambiguity" can be probed, and this issue can be resolved on the basis of a full, factual record, rather than mere conjecture as to what the witness's statement to the FBI meant.

With respect to the government's assertion that such testimony "may not have been admissible," Gov't Resp. at 6, the government cites no authority in support of this claim. Indeed, as the government is well aware, such remorse evidence is routinely admitted as relevant mitigating evidence in capital sentencing proceedings, and there is no reason why it would have been deemed inadmissible at Mr. Holder's trial merely because the witness was an inmate at the time that he observed Mr. Holder's expression of remorse.

In order to demonstrate *Strickland* prejudice, Mr. Holder need only establish "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 536. As explained in *Strickland* itself, a "'reasonable probability of a different result' is thus *less than a preponderance of the evidence*." *Strickland*, 466 U.S. at 693 (emphasis added). In light of the

-10-

extensive authority cited in Mr. Holder's Rule 59 motion which establishes the central role that evidence of genuine remorse plays in the sentencing deliberations of capital juries, as well as the findings on the special verdict form which demonstrate that the government did not make an overwhelming case for death, there exists here a reasonable probability that Mr. Holder was prejudiced by counsel's failure to present a neutral, unbiased witness on the issue of Mr. Holder's genuine remorse over the death of Mr. Heflin.  Both case law and social science research have spoken about the powerful role that evidence of genuine remorse plays in a capital juror's decision to spare a capital defendant's life.  *See*, *e.g.*, *Williams v. Taylor*, 529 U.S. 362, 398 (2000) (noting that state court's *Strickland* prejudice analysis was unreasonable in part because it failed to take into account mitigating evidence of petitioner's remorse which, coupled with other mitigation trial counsel failed to present, "might well have influenced the jury's appraisal of his moral culpability"); Rule 59 motion at 22-24 (collecting social science research demonstrating that jurors' perceptions of the presence or absence of remorse plays a decisive role in their decision to vote for life or death). Coupled with the additional mental health evidence which trial counsel unreasonably failed to investigate and present, discussed *infra*, evidence of Mr. Holder's genuine remorse for the death of Mr. Heflin "might well have influenced the jury's appraisal of his moral culpability" such that there is a reasonable probability that at least one juror would have struck a different balance.

### 5.  Failure to Investigation Petitioner's Mental Condition (12(C)(f))

The government's allegation that Mr. Holder "seeks to expand his claim to include the reasonableness of the entire mitigation investigation," Gov't Resp. at 8, is patently untrue.  Mr. Holder has always alleged that trial counsel were ineffective for failing to fully investigate Mr. Holder's mental health and to perform a full neuropsychological examination of Mr. Holder that

would have uncovered significant and powerful mitigating evidence regarding Mr. Holder's impaired brain functioning and brain damage. As both the case law and the declarations make clear, an adequate mental health investigation must necessarily include an investigation into a capital defendant's social history and background, as such information is crucial to having a complete picture of who the defendant is and to understanding what formative events in his life shaped his psyche and impacted his mental health. *See Wiggins v. Smith*, 539 U.S. 510 (2003) (trial counsel ineffective, even though they had their client examined by a mental health expert, because they failed to conduct a complete social history investigation); Stetler Declaration at ¶ 16 ("[W]ithout a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation.").

A mental health examination that omits such information – such as the ones performed by Dr. Wetzel and Dr. Rothke – will necessarily be deficient and inadequate. This is particularly true here, where the information that trial counsel failed to investigate, and of which the trial experts where therefore unaware, involved Mr. Holder's repeated exposure to severe trauma. This trauma included suffering seizures when he was an infant; growing up with parents who were addicted to crack cocaine and often absent during much of his childhood; living in housing project rife with poverty, open drug use and drug sales, and routine and extreme community violence; experiencing the death of his grandfather—his principal father figure—at a tender age; and then the amputation of his left leg and part of his right foot after it was caught and he was dragged for 100 yards by a train when he was 14 years old, followed closely by the head and brain injuries he sustained after being

-12-

assaulted with a brick.[4]  As is well-documented, repeated exposure to such forms of stress and

trauma not only impairs brain functioning, but it also has a physiological impact on the brain itself.

*See*, *e.g.*, J. Douglas Bremner, *Does Stress Damage the Brain?*, SOCIETY OF BIOLOGICAL

PSYCHIATRY, 1999 at 797-99 (noting that exposure to stress and trauma causes damage to the

hippocampus of the brain); J. Douglas Bremner & Eric Vermetten, *Stress and Development:*

*Behavioral and Biological Consequences*, DEVELOPMENT AND PSYCHOPATHOLOGY, 2001 at 473-74

(noting that early stressors have long-term effects on the brain structures and systems, and that there

is "ample evidence that stress results in long-term changes in neurobiology, and emerging evidence

supports the idea that these effects underlie the symptoms of PTSD and other stress-related

disorders").[5]  Contrary to the government's blanket assertions, the evidence of Mr. Holder's repeated

---

[4] Although the trial experts were aware of the physical trauma that Mr. Holder experienced, both Dr. Rothke and Dr. Wetzel relied exclusively on Mr. Holder's self-reporting to conclude that he suffered no lasting psychological effects as a result of these traumas.  As Dr. Wayland noted in her declaration, however, the evidence available to both experts at the time strongly suggested that Mr. Holder was engaged in a not uncommon denial about the effect these traumas had on him, and there were sufficient "red flags" in both the contemporaneous medical records and Mr. Holder's own affect that should have alerted the trial experts that further investigation and a full trauma assessment were warranted.  *See* Wayland Declaration at ¶¶ 18-31.  Doctors who examined Mr. Holder after the accident reported multiple times that Mr. Holder was experiencing denial.  Persistent and extreme denial, such as the type experienced by Mr. Holder is well established as a symptom of extreme exposure to trauma and is not, as defense expert Dr. Rothke characterized at trial, merely "a coping mechanism."  (Tr. Vol. 12, 83; 90-91).

[5] *See also* M. Michele Murburg, *The Psychobiology of Posttraumatic Stress Disorder: An Overview*, Annals New york Academy of Sciences, 1997 at 352 ("it is now quite clear that stress . . . alters neurobiological systems.  Stress-induced alterations may range from molecular changes that have an impact on learning and memory to disruption of complex functions such as sleep, information processing, and emotions"); *id.* at 353 ("Stress exposure in the generic sense, then, can be viewed broadly as causing a series of cellular changes that modify neuronal and other cellular biology, ultimately contributing to altered systemic and organismic responses to subsequent stimuli"); Robert S. Pynoos et al., *Issues in the Development Neurobiology of Traumatic Stress*, ANNALS NEW YORK ACADEMY OF SCIENCES, June 1997 at 178 (stating that traumatic stress in childhood can result in "significantly reduced left hippocampal volume" and "regression to an earlier

exposure to trauma throughout his life is squarely within the scope of his claim that trial counsel failed to adequately investigate and present evidence that would have established powerful mitigation evidence of Mr. Holder's impaired brain function and brain damage.

The government's contention that Mr. Holder "asks this Court to imagine what the evidence [that trial counsel failed to investigate and present] was and speculate as to its impact," Gov't Resp. at 9, is flatly incorrect. Mr. Holder requested an evidentiary hearing on his mental health claim, precisely so that his claim could be ruled upon based on a fully developed record, rather than on the basis of imagination and speculation. However, Mr. Holder's request for a hearing on his mental health claim was denied. Mr. Holder, therefore, did not have an opportunity to examine witnesses and present evidence regarding either the deficiencies in trial counsel's mental health investigation, or the mitigating mental health evidence which could have been presented if trial counsel had conducted a proper mental health investigation. The government's criticism, therefore, that "a clear identification of what evidence was not explored, what evidence was not presented, and how it presentation to the jury would have impacted the outcome" is "woefully absent," Gov't Resp. at 9, seems misplaced because it appears to blame Mr. Holder for the fact that a hearing was not held on his claim.

Consistent with the function and purpose of Rule 59, Mr. Holder respectfully asks the Court to reconsider its decision denying an evidentiary hearing on his claim. The government's argument that such a request is improper and that the declarations attached to Mr. Holder's Rule 59 motion

---

stage of neural structure and function"); Robert F. Anda et al., *The Enduring Effects of Abuse ad Related Adverse Experiences in Childhood: A Convergence of Evidence From Neurobiology and Epidemiology*, European Archives of Psychiatry and Clinical Neuroscience, 2005 at 175 (noting that "early stressors cause long-term changes in multiple brain circuits and systems").

from Ms. Jennifer Merrigan, Dr. Kathleen Wayland and Mr. Russell Stetler "should not be considered part of the record in this case," Gov't Resp. at 9, is puzzling, to say the least. Not only is the government's claim unsupported by any authority, it is directly contradicted by the text of Rule 59 itself, which specifically contemplates that a litigant may attach affidavits in support of his Rule 59 motion. *See* Fed. R. Civ. P. 59(c) ("Time to Serve Affidavits").[6] Indeed, the Eighth Circuit has a longstanding practice, based on fundamental fairness, of allowing such fact development where

---

[6] To the extent that the government is implying that Mr. Holder should have submitted the declarations earlier, the government fails to explain what pleading vehicle Mr. Holder could have used, consistent with the Federal Rules, to do so. In its motion seeking an extension of time in which to file its response to Mr. Holder's Rule 59 motion, the government suggested that Mr. Holder should have submitted the declarations as part of a motion to reopen the evidentiary hearing. *See* Government's Motion for Extension of Time, dated August 21, 2008, at 1. The government ignores, however, that a) this is precisely what is asked for in the Rule 59 motion; b) a Rule 59 motion is the appropriate pleading vehicle for making such a request; and c) Rule 59 expressly provides for the submission of affidavits in connection with any claims raised as part of a motion filed pursuant to Rule 59.

It should be noted that the undersigned filed a motion requesting an evidentiary hearing on Mr. Holder's § 2255 claims after filing his § 2255 motion. Following the government's response – in which it objected to an evidentiary hearing – and Mr. Holder's reply to the government response, the Court timely issued a ruling on the evidentiary hearing motion, limiting the hearing to six claims, and denying a hearing on the remaining claims, including Mr. Holder's mental health claim. The government, therefore, early on successfully fought Mr. Holder's attempts to develop the record on his claim at the stage of the proceedings where such record development ordinarily occurs, i.e., at an evidentiary hearing. Having precluded both testimony and the receipt of evidence on Mr. Holder's mental health claim, the government now faults Mr. Holder for the fact that no evidence was submitted on Mr. Holder's mental health claim at the evidentiary hearing.

In challenging the Court's denial of the evidentiary hearing, the undersigned submitted the declarations of Ms. Merrigan, Mr. Stetler and Dr. Wayland, which provide in sufficient detail precisely the evidence of psychological trauma to which Mr. Holder was exposed, as well as its likely impact on his mental health, including his brain functioning, which the government claims is still "woefully absent." In the interest of completeness, the undersigned also attach the signed declarations of the various witnesses with whom Ms. Merrigan spoke regarding the traumatic events which Mr. Holder experienced, and which Dr. Wayland's and Mr. Stetler's declarations reference. *See* attached Exhs. 2-8. The government, however, cannot continue to have it both ways – on the one hand fighting Mr. Holder's efforts to develop the record on his claims, and on the other claiming that Mr. Holder has not made sufficient efforts to develop the record on his claims.

it is necessary or appropriate to do so. *See*, *e.g.*, *Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994) (in capital § 2554 case, where petitioner alleged that trial counsel failed to adequately investigate petitioner's mental health, remanding for a hearing on the basis of facts alleged in affidavits and declarations submitted along with petitioner's Rule 59 motion).

Rather than address the substance of the declarations themselves, the government throws out a red herring in the form of a claim that the expert declarations seek to "supplant" the *Strickland* standard with a "self-serving" standard instead. Specifically, it appears that the government is directing its criticism at Mr. Stetler's declaration, but even a cursory examination of Mr. Stetler's declaration is sufficient to refute the government's claim. Mr. Stetler's declaration regarding what constitutes a constitutionally adequate mental health investigation explicitly relies on principles articulated in the Supreme Court's decisions in *Wiggins v. Smith*, 539 U.S. 510 (2003), *Williams v. Taylor*, 529 U.S. 362 (2000), and *Rompilla v. Beard*, 545 U.S. 347 (2005), as well as the American Bar Association's (ABA) Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, which the Supreme Court has consistently recognized as codifying "well defined norms," *Wiggins*, 539 U.S. at 524, and that these Guidelines are appropriate for assessing the performance of counsel in capital cases. *See* Stetler Declaration at ¶ 15.[7] Indeed, the government

---

[7] Moreover, contrary to the government's remark that "fortunately" the ABA does not determine the standard of ineffective assistance of counsel claims, it should be noted that the Supreme Court initially relied upon the ABA Guidelines as an appropriate guide for assessing attorney competence in capital cases in *Strickland v. Washington*, 466 U.S. at 688 (approvingly citing ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980)\ ("The Defense Function")). In *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000), *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (referring to the ABA Guidelines as "well defined norms"), and *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), the Supreme Court held that these standards are the appropriate guides for establishing what constitutes reasonably effective assistance under the Sixth Amendment. As the Court recognized in *Rompilla*, the 1989 and 2003 versions of the Guidelines "applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases." 545 U.S. at

fails to cite a single statement made by Mr. Stetler in his declaration which is inconsistent with the definition of "effective assistance" as defined in *Strickland*.

Contrary to the government's assertion, trial counsel's failure to conduct a thorough and adequate mental health investigation was not the product of "strategy," but rather a function of how hastily and belatedly that investigation was conducted. The government asserts that trial counsel's failure to present the additional mental health evidence was a tactical decision that counsel made after "choos[ing] between the benefit that Dr. Rothke brought to the mitigation case and the internal inconsistency that Dr. Semone would have brought to Holder's case together with the rebuttal of Dr. Wetzel." Gov't Resp. at 8 n.3. The government's assertion, however, is mere speculation, as the issue of why counsel did not present the mental health evidence in question was *never explored* at the evidentiary hearing because the Court did not grant Mr. Holder an evidentiary hearing on his mental health claim.[8] Moreover, there is simply no support in the record for either the claim that trial counsel were aware of all the evidence of psychological trauma which Mr. Holder suffered, or that counsel "strategically" chose to keep that information of psychological trauma from the trial experts

---

387 n.7. *See also Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) ("Although the instant case was tried before the 1989 ABA edition of the standards was published, the standards merely represent a codification of longstanding, commonsense principles of representation understood by diligent, competent counsel in death penalty cases. The ABA standards are not aspirational in the sense that they represent norms newly discovered after Strickland. They are the same type of longstanding norms referred to in Strickland in 1984 as 'guided' by American Bar Association standards and the like."); *Pickens v. Lockhart*, 714 F.2d 1455, 1460 (8th Cir. 1983) (relying on 1980 ABA Standards for Criminal Justice in finding that trial counsel rendered ineffective assistance in failing to fully investigate mitigating evidence).

[8] Indeed, to the extent that any evidence was adduced at the evidentiary hearing on this issue, it was that trial counsel made no meaningful inquiry into Mr. Holder's mental health as part of its mitigation case. *See* Evid. Hearing Tr. Vol I at 45 (testimony of Caryn Tatelli that pre-trial mitigation investigation of Mr. Holder's head injuries and neurological issues was not thorough and complete).

as part of their evaluation.  Indeed, given that there is no evidence that counsel's "decisions" were made after conducting reasonable investigations into the matter, counsel's decision cannot be deemed strategic as a matter of law.  *See Kenley v. Armontrout*, 937 F.2d 1298, 1308 (8th Cir.), *cert. denied*, 502 U.S. 964 (1991)  ("it was not a reasonable strategy that led counsel not to investigate, but lack of thoroughness and preparation. Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made") (internal citation and quotation marks omitted); *Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir. 1983) ("it is only after a full investigation of *all* the mitigating circumstances that counsel can make an informed, tactical decision about which information would be the most helpful to the client's case" (emphasis in original).

Simply put, the existing record is not adequately developed to permit the Court to find that trial counsel's failure to present the available mental health evidence was a product of strategy, rather than a "lack of thoroughness and preparation." *Kenley*, 937 F.2d at 1308.  As the Eighth Circuit recently noted in a capital § 2255 case that alleged, *inter alia*, trial counsel's failure to adequately investigate the movant's mental health, "[o]ur cases teach that issues regarding ineffective assistance of counsel often require a hearing to consider evidence not disclosed on the face of the trial court record." *Nelson v. United States*, 2008 U.S. App. LEXIS 22338, *2 (8th Cir. Oct. 27, 2008) (*per curiam*) (remanding for an evidentiary hearing).  Similarly, an evidentiary hearing is warranted on Mr. Holder's claim, as trial counsel's "decisions" with respect to the mental health investigation are not matters which are disclosed on the face of the trial record, but rather concern aspects of counsel's performance that occurred outside the courtroom.  Under such circumstances, the government cannot

simply invoke the word "strategy" to explain away counsel's performance and avoid the need for a hearing to develop the facts which are otherwise not disclosed in the trial record.[9]

Finally, with respect to the government's claim that additional mental health evidence would not have affected the outcome of the proceedings, it is important to first note that the government has mischaracterized the *Strickland* prejudice prong. Mr. Holder need not establish that the mental health evidence "would have impacted the outcome" of the trial, but rather only that there exists "a *reasonable probability* that *at least one juror* would have struck a different balance," *Wiggins*, 539 U.S. at 536 (emphasis added). The government's apparent contention that there is no reasonable probability that at least one juror would have struck a different balance in light of evidence of the psychological trauma to which Mr. Holder was exposed and its impact on the functioning and physiology of his brain is simply at odds with established Supreme Court precedent. *See, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004) (evidence of "impaired intellectual functioning is inherently mitigating"); *Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005) (counsel ineffective for failing to present evidence of petitioner's mental health problems). *See also Frazier v. Huffman*, 343 F.3d 780, 794 (6th Cir. 2003), *supplemented*, 348 F.3d 174 (6th Cir. 2003), *cert. denied*, 541 U.S. 1095 (2004) (trial counsel was ineffective in failing to "investigate and present evidence of [petitioner's] brain impairment."; "We can conceive of no rational trial strategy that would justify

---

[9] Similarly, the government's contention that Dr. Rothke "conducted a full mental examination of Holder and had access to all pertinent facts," Gov't Resp. at 7, has no factual support, and certainly cannot be concluded on the basis of the trial record. Indeed, as the declarations from Ms. Merrigan, Mr. Stetler and Dr. Wayland establish, Dr. Rothke's mental examination of Mr. Holder was incomplete precisely because he did *not* have access to significant and probative facts regarding Mr. Holder's social history and repeated exposure to trauma. This only underscores the need for a hearing, so that findings regarding the adequacy or inadequacy of Dr. Rothke's evaluation can be made on the basis of an adequate factual record, rather than on the basis of an incomplete trial record which is silent as to the material facts upon which a resolution of this claim depends.

the failure . . . to investigate and present evidence of [petitioner's] brain impairment"); *Coleman v. Mitchell*, 268 F.3d 417, 450-51 (6th Cir. 2001), *cert. denied sub nom. Coleman v. Bagley*, 535 U.S. 1031 (2002) (counsel ineffective for "fail[ing] to [develop and] present . . . any aspects of petitioner's personal history," which included evidence of head injuries and possible psychological and organic brain disorders); *Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) (counsel ineffective in failing to present mitigating evidence of petitioner's brain damage and troubled background).

Additionally, as the verdict form demonstrates, this was not a case in which the jury's findings indicate that the facts established an overwhelming case for death. The jury unanimously rejected one of the non-statutory mitigation factors (i.e., the "victim impact" aggravator), on which the government spent a considerable amount of time presenting evidence at the penalty phase, and numerous jurors found, in various combinations, twelve of the non-statutory mitigating factors that were presented. In light of these facts, the government cannot seriously contend that there is no reasonable probability that at least one juror would have struck a different balance if presented with non-cumulative mitigation evidence regarding Mr. Holder's mental health.

Mr. Holder was exposed to severe and repeated traumas throughout his life. (*See* Exhibit 1, Declaration of Dr. Leslie Lebowitz). "Researchers and clinicians recognize that the psychological consequences of trauma affect multiple domains of functioning: emotional, cognitive, physiological. In each area traumatic experience disrupts and dysregulates the delicate balance that allows each system to respond optimally to incoming information." Leslie Lebowitz, Understanding Severe Traumatization, 6th Mental Health and Experts Manual, 8th Edition (2005) (available at http://dpa.state.ky.us/library/manuals/mental/Ch27.html)(last visited Nov. 20, 2008). "The repeated and severe traumas to which Mr. Holder has been subjected are without question a risk factor for the

-20-

development of behavioral and social problems. Moreover, the combination of these events is sufficiently catastrophic that we can assume that any child subjected to such an array of traumatic experiences would show signs of harm." (Exh. 1, Declaration of Dr. Leslie Lebowitz at ¶22). The effects of trauma are not uniform; "while some events are inherently traumatic, events also become more or less psychologically toxic in relations to their meaning, the kind and level of social support that is available, the resources of the individual, and prior traumas." (*Id*. at ¶ 16). After the train accident, a 14 year old Mr. Holder lacked the kind of support that he needed to deal with the trauma of losing his leg. Medical records from St. Louis University Hospital as well as St. John's Medical Center and the testimony of Dr. Stephen Rothke indicate that despite 17 referrals for psychiatric assistance or therapy, Mr. Holder's parents took him to none. Social security records show that Mr. Holder did not receive social security and assistance because his parents failed to take him to a required appointment. This lack of support for a child without the means or resources to deal with severe exposure to trauma increased Mr. Holder's risk of experiencing "devastating long-term psychological consequences." Exh. 1, Declaration of Dr. Leslie Lebowitz at ¶ 15). Because Mr. Holder was denied an evidentiary hearing on this claim, he was not permitted to explore these consequences fully.[10]

---

[10] An emerging body of research shows that chronic traumatic exposure is also linked with changes in the brain's chemistry, structure, and function. "Traumatic experience produces such a strong and overwhelming fight or flight response, that it compromises our brain's regulatory functions, with negative long-term consequence." Leslie Lebowitz, Understanding Severe Traumatization, 6th Mental Health and Experts Manual, 8th Edition (2005) (available at http://dpa.state.ky.us/library/manuals/mental/Ch27.html)(last visited Nov. 20, 2008). "Chronic danger produces chronic activation of what was likely intended as a rapid response systems and the long term consequences of these reactions can be damaging. Research has shown that chronic exposure to traumatic stress- to the hormones and neurochemicals that are released within us in reaction to it impacts the brain's chemistry and physiology. Individuals with a history of chronic traumatic experiences exhibit increased levels of catecholomines (e.g., adrenaline), dysregulation

The government alleges that Mr. Holder "seeks to expand his claim to include the reasonableness of the entire mitigation investigation," Gov't Resp. at 8, but this allegation is patently untrue. Mr. Holder has always alleged that trial counsel were ineffective for failing to fully investigate Mr. Holder's mental health and to perform a full neuropsychological examination of Mr. Holder that would have uncovered significant and powerful mitigating evidence regarding Mr. Holder's impaired brain functioning and brain damage. As both the case law and the declarations make clear, an adequate mental health investigation must necessarily include an investigation into a capital defendant's social history and background, as such information is crucial to having a complete picture of who the defendant is and to understanding what formative events in his life shaped his psyche and impacted on his mental health. *See Wiggins v. Smith*, 539 U.S. 510 (2003) (trial counsel ineffective, even though they had their client examined by a mental health expert,

### 7. Trial Counsel Slept During Portions of the Trial (12(C)(h))

The government's contention that Mr. Holder's argument "amounts to re-arguing this aspect of the § 2255 motion," Gov't Resp. at 10, is flatly incorrect. Mr. Holder's Rule 59 motion argued that the Court's resolution of this claim must be reconsidered in light of significant legal and factual errors in the Court's Order – which is precisely the purpose of a Rule 59 motion.

---

of regulator neurotransmitters, and increased levels of neurochemicals (endogenous opiods) which may be associated with emotional numbing." *Id*. Over exposure to trauma can cause an actual physical change in the chemistry of the brain. *Id*. *See also,* Robert F. Anda et al., *The Enduring Effects of Abuse and Related Adverse Experiences in Childhood: A Convergence of Evidence From Neurobiology and Epidemiology*, EUROPEAN ARCHIVES OF PSYCHIATRY AND CLINICAL NEUROSCIENCE, 2005, at 175; and J. Douglas Bremner, *Does Stress Damage the Brain?*, SOCIETY OF BIOLOGICAL PSYCHIATRY, 1999, at 797. "After chronic exposure to overwhelming, terrifying experiences, an individual's physiology may be altered so that they remain in a state of readiness to perceive threat and act immediately…This may compromise an individual's ability to control their reactions; it is through cortical activity that we reason, weight options, and deliberate." (6th Mental Health and Expert Manual, Ch. 27, Understanding Severe Traumatization).

With respect to the legal error, Mr. Holder correctly noted that this Court applied the wrong legal standard to his claim, and in doing so, improperly imposed a more onerous burden than the one contemplated in *Burdine*. Specifically, the Court's Order states: "Petitioner is unable to show that counsel Shaw slept through *substantial portions of the trial*, such that he was denied the presence of counsel." Order at 88 (emphasis added). The relevant legal standard, however, is that "a defendant's Sixth Amendment right to counsel is violated when that defendant's counsel is repeatedly unconscious through *not insubstantial portions* of the defendant's capital murder trial. Under such circumstances, *Cronic* requires that we presume that the Sixth Amendment violation prejudiced the defendant." (Emphasis added.) *Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001). The government's attempt to dismiss the distinction between these two formulations as a mere "matter of semantics," Gov't Resp. at 11, is not responsive. With due respect, the "semantics" here have significant legal meaning. As even ordinary usage demonstrates, the phrase "not insubstantial" does not mean the same thing as "substantial."[11] The *Burdine* test, therefore, actually requires a much lower threshold showing than that required by this Court. Indeed, if the *Burdine* court had intended that the applicable legal test require that a litigant establish that counsel was asleep for "substantial portions of the trial" before being entitled to relief, it would have stated so, rather than use the unique double negative phrasing of "not insubstantial portions of the trial." Thus,

---

[11] For example, the sentence, "I received a substantial raise in my salary," does not mean the same thing as "I received a not insubstantial raise in my salary." The latter sentence indicates that the raise was more than a negligible amount – i.e., not insubstantial – but not necessarily of sufficient amount to cross the threshold of being considered a "substantial" raise.

it is respectfully submitted that the Court's misstatement of the *Burdine* test resulted in legal error, and that reconsideration and relief is warranted pursuant to Mr. Holder's Rule 59 motion.[12]

As noted in the Rule 59 motion, the Court also committed legal error in that its ruling on this issue relied not merely on its recollection of events at the trial, but on findings that the Court made about its own ability and opportunity to have accurately and completely observed counsel Shaw at trial. The government is simply incorrect in its claim that the Court solely relied on the record adduced at the evidentiary hearing to resolve the underlying factual disputes of this claim. In its ruling, the Court treated as dispositive the claim that "had counsel Shaw been sleeping for substantial periods of time, or if at all, *it is likely that the Court would have noticed such behavior.*" Order at 87 (emphasis added).[13] As previously argued by Mr. Holder, this is not a statement about events that did or did not occur at *the trial*, but rather an observation that the Court made about *itself* – i.e., the Court's ability and opportunity to have accurately and completely observed what was occurring at defense counsel table while simultaneously presiding over the penalty phase proceedings of a federal capital trial, such that counsel Shaw's behavior would not have escaped its attention. The Court's reliance on its own assessment of its capacity and opportunity to have observed counsel Shaw during

---

[12] The government also argues that the *Cronic* standard of prejudice does not apply here. However, given that the government does not contest that the *Burdine* standard is the applicable legal test for ineffective assistance of counsel claims which allege that trial counsel slept during the trial, the government's argument is wrong as a matter of law. As the *Burdine* court made clear, the *Cronic* standard of presumed prejudice applies upon a showing that trial counsel slept through "not insubstantial potions of the defendant's capital murder trial." *Burdine*, 262 F.3d at 341. Regardless, Mr. Holder's claim would still succeed even under the *Strickland* standard, as it is objectively unreasonable and prejudicial for trial counsel to sleep through the very testimony which he must rely on in his closing argument to persuade the jury to spare the life of his client.

[13] Indeed, the government even refers to the Court's recollections as part of its "findings of fact." Gov't Resp. at 10.

the trial exceeded the scope of the rule permitting the Court to rely on its recollection of the trial, and therefore it constituted legal error. It is respectfully submitted that the Court vacate its order and re-open the evidentiary hearing to permit Mr. Holder to make a full record on this matter, as discussed in the Rule 59 motion. *See* Rule 59 mot. at 29-33.

With respect to the factual errors in the Court's Order, Mr. Holder pointed out those aspects of the record which it appears that the Court did not take into consideration in its ruling, including the points of consistency between the evidentiary hearing testimony of counsel Herndon and Ms. Tatelli on this matter, as well as the fact that the Court's Order omits all mention of the evidence received by way of Mr. Holder's sworn deposition testimony on this issue. The government responds merely by characterizing counsel Herndon's and Ms. Tatelli's recollection of counsel Shaw sleeping at counsel table as "sketchy," Gov't Resp. at 10. The government, however, is conspicuously silent about the fact that both Herndon and Tatelli, as well as Mr. Holder in his sworn deposition testimony, provided accounts of counsel Shaw's sleeping that were consistent on crucial details – for example, that counsel Shaw's head would bob up and down as his eyes closed and he struggled to stay awake during witness testimony. As the record of the evidentiary hearing reflects, none of the witnesses wavered in their testimony that they observed counsel Shaw sleeping during the trial.

The government also argues that counsel Herndon's and Ms. Tatelli's testimony is not credible because they failed to either "jostle Mr. Shaw awake," Gov't Resp. at 10, or bring counsel Shaw's sleeping to the attention of the Court and "ask for a break so Mr. Shaw could get a

refreshment." Id.  The fact that counsel Herndon and Ms. Tatelli did not "jostle" counsel Shaw[14] or ask the Court for a break does not refute Herndon's and Tatelli's sworn testimony at the hearing that they observed counsel Shaw sleeping during the trial.  At best, their inaction establishes that they failed to live up to their professional obligations; it does not, however, establish that Herndon and Tatelli lied to this Court at the evidentiary hearing about what they observed.  The accuracy of Herndon's and Tatelli's recollection that they saw counsel Shaw sleeping during the trial does not hinge on whether they contemporaneously jostled Mr. Shaw or asked the Court for a break.[15]  Simply put, the fact that Herndon and Tatelli *should have* done something when they witnessed counsel Shaw sleeping is entirely independent of the question of whether they did, in fact, witness counsel Shaw sleeping.

Finally, the government argues that prejudice cannot be demonstrated because the penalty phase was handled primarily by counsel Herndon, and because the portions during which counsel Shaw slept could not be identified with enough specificity.  These arguments, however, were extensively refuted in Mr. Holder's Rule 59 motion, *see* Rule 59(e) mot. at 38-41, and the government fails to address any of the arguments previously presented.  As noted in the motion, counsel Herndon's efforts in the penalty phase were effectively rendered moot by the fact that counsel Shaw insisted on giving the closing argument.  In the course of that argument, counsel Shaw

---

[14] It should be noted that Mr. Holder testified at his sworn deposition that he did indeed jostle Mr. Shaw awake during the course of the trial, as well as nudge counsel Herndon and motion to her when Mr. Shaw was sleeping at counsel table.  Holder Deposition at 130.

[15] Indeed, in *Burdine*, one of the witnesses who saw trial counsel sleeping was the deputy clerk assigned to the trial court of the defendant's trial, yet neither the district court nor the Fifth Circuit questioned her credibility for failing to alert the trial judge to the fact that trial counsel was sleeping.

did not mention a single mitigation witness by name or discuss any of the mitigation evidence which was received into evidence in anything other than the most generic manner possible. Having neither heard portions of the testimony himself, nor observed the jurors during the receipt of that testimony, counsel Shaw was not in a position to make a reasoned judgment as to what themes and evidence would be the most effective to speak to the jury about in closing. Consequently, counsel Shaw's closing argument did not engage any of the testimony adduced at the penalty phase proceedings in the depth required to help the members of the jury understand what *weight* to accord those mitigating facts.

With respect to the issue of specificity, this, too, was addressed in Mr. Holder's motion. *See* mot. at 40-41. As noted there, under *Cronic* and *Burdine*, the relevant question is not a matter of identifying discrete moments in the trial and quantitatively measuring them to determine whether they collectively constitute a "not insubstantial portion" of the trial, but rather whether the *stage* of the proceedings during which counsel Shaw slept constituted a "critical stage" within the meaning of *Cronic*. That standard is easily satisfied here, as *Burdine* itself established that the receipt of testimony during a trial constitutes a "critical stage" of the proceedings. 262 F.3d at 347.

**Conclusion**

**WHEREFORE**, for each and all of the reasons set out herein and in his Rule 59(e) motion, Mr. Holder prays that this Court alter, amend, or set aside its judgment issued on July 30, 2008, denying Mr. Holder's § 2255 motion, and thereafter reopen the proceedings, and grant petitioner an evidentiary hearing to develop the claims addressed in his Rule 59(e) motion, and for such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Christopher E. McGraugh
CHRISTOPHER E. MCGRAUGH, #25278
Leritz, Plunkert & Bruning, P.C.
One City Center, Suite 2001
St. Louis, Missouri 63101
(314) 231-9600
(314) 231-9480 - Facsimile
E-mail: cmcgraugh@leritzlaw.com

/s/ Michael J. Gorla
MICHAEL J. GORLA, #3251
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com

*Counsel for Norris Holder*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2008, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:  Mr. Steven Holtshauser and Mr. Joseph M. Landolt, Assistant United States Attorneys, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102.

/s/ Michael J. Gorla
Michael J. Gorla, #3251
Attorney for Norris Holder
720 Olive Street, Suite 1630
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
E-mail: mjgorla@msn.com