**Declaration of Dr. Leslie Lebowitz**

**Background and Qualifications**

1.    I am a licensed clinical psychologist in the state of Massachusetts.  For more than two decades, my clinical and research focus has been the assessment and treatment of the long-term effects of traumatic life experiences.  I received a B.A. degree from Oberlin College in 1979 and an M.A. in psychology from Duke University in 1985.  In 1990, I received a Ph.D. in clinical psychology, also from Duke University.  In 1990, after completing my clinical internship at Beth Israel Medical Center in NYC, I became an assistant professor at the University of Massachusetts /Boston. There I taught general psychology classes to undergraduate and graduate students as well as developed courses in psychological trauma and supervised original research in the area of interpersonal violence.

2.    Following this, I worked at the National Center for Posttraumatic Stress Disorders where I helped develop the Women's Health Sciences Division at the Veterans Administration Medical Center (VAMC) in Boston, Massachusetts where I supervised research, evaluated combat veterans and trained interns and post-doctoral fellows. Following this I was employed as a clinical and research psychologist in the Behavioral Sciences Division at the same institution where I conducted research, psychological assessments and individual psychotherapy with war veterans, most of whom had served in World War II or Vietnam.  My duties also included the training and supervision of psychology interns. Throughout this period my research focused on the assessment and treatment of the long term effects of exposure to trauma. My findings have been published in the *Journal of Traumatic Stress, Psychotherapy, Journal of Interpersonal Violence,* and *Journal of Training and Practice in Professional Psychology among others.* I have been a frequent presenter and panelist at professional conferences, including annual meetings of the International Society for Traumatic Stress Studies and the American Psychological Association.  I also conduct trainings and workshops for a range of groups, including the US Air Force, assisting them in identifying and treating the effects of psychological trauma.

3.    I have practiced psychotherapy since 1984. In 1996 I began to work full time in private practice, providing psychotherapy to people who had suffered adverse experiences as children or young adults. During this time I also consulted to the Victims of Violence Program about the development of research protocols with which to evaluate their treatment interventions,

1

**EXHIBIT 1**

taught graduate courses in trauma at Simmons School of Social Work and lectured locally to colleges and universities in the Boston and New York area. I also worked with the Department of Health and Human Services, developing curricula and training for mental health professionals treating war-related trauma suffered by refugees from Bosnia-Herzegovina.

4.     More recently I wrote the psychological portion of the curriculum used by the US Air Force to educate their Sexual Assault Response Coordinators and I continue to do training for the military on this issue. I am also currently working with researchers and clinicians and the National Center for PTSD to develop and implement a treatment protocol for re-deploying US Marines. I am also a senior supervisor at The Trauma Center at the Justice Research Institute. Finally, since 1993 I have functioned as an expert witness on several forensic cases in which trauma was suspected to play a role.  I am a member in good standing of the American Psychological Association and The International Society for Traumatic Stress Studies.

**Introduction**

5.     At the request of current counsel for Norris Holder, Jr., I have reviewed records, reports, and other documents concerning Mr. Holder.  The documents I received include educational, medical and social security records of Mr. Holder; declarations from friends and family members of Mr. Holder; and trial testimony and reports from Dr. Rothke as well as a report from Dr. Wetzel.  Current counsel for Mr. Holder has asked that I review these records and discuss my preliminary impressions and observations with respect to four specific issues: (1) What is psychological trauma and what are the variables involved in doing an accurate assessment of the impact of potentially traumatic events; (2) The nature and severity of the events suffered by Mr. Holder due to the train accident which resulted in the amputation of his leg, and the assault with a brick resulting in an emergency craniotomy; (3) The nature and the severity of the events suffered by Mr. Holder due to the violent and unpredictable environment in which he lived, both in terms of his family of origin as well as his neighborhood at the Blumeyers; and (4) Whether there are likely to be significant neurobiological and behavioral effects from these events.

There are several issues that make a sensitive and precise evaluation for traumatic impact critical for understanding how a traumatized individual ends up behaving in mal-adaptive ways, and there are also a number of aspects of how people respond to trauma which make this evaluation difficult.

2

Trauma is defined as something that induces overwhelming feelings of horror, fear or helplessness. These feelings are understood to be at a level of intensity that precludes our normal, everyday way of coping with stress. Moreover, it is understood that experiences of this intensity have the capacity to disrupt and alter the basic systems of the self (emotion, cognition, memory and biology). More specifically, traumatic experiences have, by virtue of their intensity the capacity to disrupt and alter how we contain and process our emotions. Traumatic experiences, by definition, have the capacity to shatter our more positive schemas of ourselves and the world and to shape the schemas and beliefs we use to interpret, predict and respond to everyday experience. Traumatic memories are different than regular memories. They are more fragmented, more indelible, more sensory and far more readily activated than normal memories, hence whatever we must do to endure them must be maintained over time, often without our conscious awareness. Finally, traumatic experiences are so profoundly arousing that they have the capacity to permanently alter the biology of our bodies. Research has increasingly demonstrated that unresolved trauma alters not only how we feel and think and remember but that it also alters us at the level of our brain functioning and physiology. These effects are different from the kinds of damage typically assessed by standardized neurological testing. In laboratory research, when trauma is activated, changes in the brain are observed that suggest profound and enduring damage emanating from the lingering effects of traumatic exposure.

Based on the standard definition of what constitutes a traumatic event, Mr. Holder's experiences before the age of 16 (namely, exposure to drug abusing parents and childhood neglect, chronic gun violence, the horrific train accident, and the assault with a brick), all qualify as psychologically traumatic events. While many people successfully resolve traumatic experiences, in that they go on to lead successful lives, serious trauma leaves people "at risk" for psychological, behavioral and medical problems. *See*, Robert F. Anda et al., *The Enduring Effects of Abuse and Related Adverse Experiences in Childhood: A Convergence of Evidence From Neurobiology and Epidemiology*, EUROPEAN ARCHIVES OF PSYCHIATRY AND CLINICAL NEUROSCIENCE, 2005, at 175. Whether this "risk" results in a negative outcome or not, depends heavily on what else has already happened to the individual and what continues to occur (i.e., is the trauma a single event or repeated, where in development did it occur, what are the resources of the individual and does life continue to hammer this individual with adverse events or does it provide safety and reparative opportunities).

3

The negative potential of trauma is cumulative – more is worse -- one does not get "used" to trauma. The toxicity of trauma is not only related to the intensity of a particular event, but it is also cumulative and synergistic – traumas take on additional meaning and a probability of negative impact in relation to each other. They also accrue toxicity in relation to the particular vulnerabilities of the individual (for example, youth is a risk factor, as is poverty).

Finally, while adults often cope successfully with a single adverse experience, there are different types of traumas, and some are more harmful than others. Traumas involving interpersonal violence or exposure to grotesque and horrifying imagery, any trauma that is chronic, or that involves entrapment and repetition, adverse experiences occurring in childhood (particularly those that are not mediated by a loving and supportive family), trauma or neglect occurring at the hands of people children need to trust, are all understood to be more harmful than other types of stressful events.

In addition, some people are more resilient than others. Resiliency is comprised of many factors, (such as constitution) but prime among the factors that contribute to resiliency are, for children, the ability to achieve a post-trauma reality-based sense of safety and the presence of a supportive and attentive family. The absence of these factors is, especially for children, traumatic in and of themselves, but they also render children far less resilient to whatever other adverse experiences may come their way. Thus, when thinking about trauma and its impact, it is important not only to catalogue the traumatic experiences that may have occurred, but it is equally imperative to look at the broader social, familial and developmental context within which a particular individual has been traumatized.

Another factor burdening the accurate assessment of traumatic impact is that the effects of trauma are not necessarily obvious. Unlike physical injury, in instances of psychological trauma, the victim cannot be expected to know or accurately report their injuries in a straightforward way. While some people do have a sense of some of the ways in which they have been injured by traumatic events, many do not, and nearly no one is able to perceive from inside themselves the far reaching and pervasive effects of having been traumatized. Even researchers have been surprised at the pervasive and far reaching effects of trauma, particularly childhood trauma. *See,* Robert F. Anda et al., *The Enduring Effects of Abuse and Related Adverse Experiences in Childhood: A Convergence of Evidence From Neurobiology and Epidemiology,* EUROPEAN ARCHIVES OF PSYCHIATRY AND CLINICAL NEUROSCIENCE, 2005, at 175.

4

The pervasive effects of trauma exist both inside and outside of the awareness of the effected individual. Avoidance, both conscious and unconscious (of feelings, meanings, and behaviors related to the trauma) is one of the hallmarks of the posttraumatic response.  Severe trauma, childhood trauma and chronic trauma are all more likely (independently as well as cumulatively) to lead to pernicious forms of avoidance. If feelings and meanings are aggressively ignored, denied, and avoided, a kind of 'not knowing' takes place. In these all too common cases, the victim is literally unable to approach their feelings and understandings of the impact of the trauma, and because they are unable to approach it directly, they are not able to report it easily nor to develop more adaptive ways of coping. As a result of this and other psychological processes, trauma effects tend to become less and less obvious over time, and more, rather than less, harmful.

Coping with trauma affects all the major systems of the self: memory, cognition, emotion, biology. Moreover, severe trauma tends to effect and alter an individual's life both within and outside of their awareness and to do so in ways that are not obvious. Thus an individual may, after a trauma, avoid people, or pleasure, or take undue risks, or begin to take drugs, but not link these behaviors to their traumatic experiences. As a result, while people can give you clues as to the effects of trauma upon them, they often cannot report on it directly or comprehensively. Fortunately, by looking across traumatic events and the effects they have on large groups of people (combat veterans, survivors of child abuse and neglect, natural disasters, etc.) researchers have gleaned a substantial body of knowledge that can be used, by a trauma-knowledgeable individual, to ascertain if there are effects and if so, what they are likely to be.

Another important and surprising feature of the posttraumatic process is that the rules of normal memory no longer apply. Traumatic experiences are encoded differently than normal memories, they tend to be fragmented, sensory (rather than narrative) they are often relatively less accessible to language, and most importantly, they do not fade with the passage of time as do normal memories. As such, the unbearable and harmful intensity of the initial injury, whatever it might be, in the absence of resolution, endures internally, in memory. As a result, whatever defenses and coping mechanisms the individual employs (such as avoidance, dissociation) endure, further altering and distorting a life.

Anytime trauma is chronic, when the stress cannot be successfully resolved, the necessity of relying on costly and distorting psychological coping mechanisms is increased. If one cannot

5

obtain safety in the external world then one must strive for it internally. Of course, this influence from the past and from the trauma leads to distortions in how the present moment is experienced – how options are perceived and interpreted. Traumatic experience and its corollary feelings of fear and helplessness and related meanings (the expectation of harm, the perception of limited options, negative outcome) can readily become the lens through which present experience is perceived and mis-interpreted.

6.     Norris Holder's life has been defined by exposure to multiple forms of trauma. Each of the traumas to which he has been exposed has been severe.  Collectively these traumas would be expected to constitute a crushing and overwhelming psychological and biological assault. According to all that we have gleaned from the last three decades of research, we can assume that no child would be unaffected by this collection of profoundly adverse events. Moreover, it is reasonable to assume that trauma this severe would have some consequences within each of the major systems of the self (emotions and emotional regulation, cognitions and characteristic ways of interpreting experience, biology, including but not limited to physiological reactivity and alterations in the brain).  In reaching this opinion, I have relied on the records and documents provided by counsel, as well as my own knowledge of the field of traumatic stress. **Mr. Holder's life was permeated with violence, neglect and traumatic injuries.**

7.     Each of the incidents discussed below are red flags that signal the need for a trauma assessment.  It is important to look not only at what happened (and did not happen) to Mr. Holder, i.e., to examine the catalogue of adverse events defining Mr. Holder's life and the striking absence of effective help, safety or reparative opportunities, but it is equally important to put each of those events in the context of his overall circumstances and resources, since these shape the impact of any single traumatic event.

8.     Norris Holder was born to a 16 year old mother.  His parents were not married until they were 18, at which point, Mr. Holder's father joined the army.  As an infant, Mr. Holder experienced seizures on several different occasions.  His family moved frequently, due to evictions and there is some indication that his parents' relationship was volatile.  Mr. Holder's father eventually left the family and started another family, severing ties with Mr. Holder at a young age.

9.     When Mr. Holder was 9 years old his family moved into the Blumeyers Housing Projects, a low income, Section 8 housing, marked by extreme and pervasive violence, gangs,

6

and drugs. The neighborhood and its effect on Mr. Holder are discussed in declarations obtained by current counsel for Mr. Holder and together they paint a portrait of a terrifying environment in which everyone was prey and could be victimized at any time. Gun violence was an every day event and children lived in fear of being shot or hurt. Mr. Holder personally knew people who were shot, and at 16 a close friend of his was killed. It is important to understand that the violence and lack of safety to which Mr. Holder was exposed was chronic. It is one thing to be frightened and then have the opportunity to achieve safety. It is far more damaging to be constantly frightened, at risk for serious injury or death, and to live in circumstances in which genuine safety is unobtainable.

10.    In addition to living in a traumatic social and community environment, Mr. Holder's own parents began using crack-cocaine after their move to the Blumeyers Housing Project. Parental drug use is, in and of itself, a traumatic event for a child. It constitutes a profound abandonment of the child and invariably initiates a cascade of other adverse events, including but not limited to neglect and exposure to corrupting and dangerous influences. Counsel were aware of this fact, as Norris' mother and father testified about their own drug use. In addition, even after the devastating accident, Mr. Holder's parents were so neglectful that they prevented Mr. Holder from receiving disability funds and did not follow up with mental health referrals – despite repeated recommendations to do so.

11.    The poverty of Mr. Holder's family, the drug usage and neglect by his parents, and the vulnerability inherent in being a child all insured that he not only was forced to live within a traumatic environment but that he was trapped by it. These types of ongoing traumatic conditions in which safety and security are not possible to achieve, require ongoing defensive operations which are highly damaging to the developing self, yet less recognizable as connected to trauma (they often appear to be features of the personality).

12.    School records provide further evidence that something was wrong early on in Mr. Holder's life. Whenever a dramatic change in school attendance, behavior or grades is observed it warrants close investigation. At the age of 13, when Mr. Holder was in 8th Grade, he missed over 40 days of school, approximately one day per week of school. This number represents an extreme jump in the number of days that Mr. Holder missed from the year before, when he was absent for approximately 5 days. Such a dramatic drop in attendance and participation always indicates something is amiss. At the very least it represents a lack of

7

positive parental involvement. More typically, it also signifies that something is seriously wrong. It is notable that this period of decline coincides with the time period of drug use by Mr. Holder's parents and drug sales by Mr. Holder. During this time Mr. Holder gave other evidence of increasingly disturbed behavior in that he was suspended several times for groping female students.

13.    In 1991, at the age of 14, Norris Holder lost his left leg and part of his right foot in a horrifying train accident. I reviewed a declaration by Terry Jett, a friend who witnessed the accident. In his declaration, Mr. Jett describes the amputation of Mr. Holder's leg by the train. Mr. Holder slipped while trying to get on board a train. Eye witness accounts describe him being dragged helplessly for nearly 100 feet and only coming free because the train had ripped off half of one leg and part of his other foot. Mr. Jett reported that the event was so horrible that he still has nightmares about it. Mr. Jett also describes the devastating effects of the accident on Mr. Holder, stating that Mr. Holder could no longer engage in sports or other positive activities that had once tied him to a peer group and to the hope of escaping poverty. In his declaration, Mr. Jett also discussed Mr. Holder's mother's severe reaction to the accident, her depression, and outward expression that her son was "not normal."

14.    Mr. Jett's vivid recollection of the incident and its subsequent effects on Mr. Holder conflict with the opinions offered by trial experts that the incident had no apparent effect on Mr. Holder. It would be extremely unlikely for an accident such as this not to have a negative effect on nearly any child. It is even more difficult to imagine how it would not be especially devastating for a child in Mr. Holder's position. Mr. Holder's parents were neglectful and impaired. There is little evidence that they supported him or cared for him adequately. Even after the devastating accident they were unable to follow through with recommendations for care. Before the accident Mr. Holder had managed his life by developing a close group of friends with whom he danced and played sports. He was, by report, good at competitive sports, played on several school teams, and had the hope of attending college on a sports scholarship. Further, the extreme dangerousness of where he lived made being physically adept a core need. The grotesque train accident intersected with a life that was singularly unprotected and unparented, and in doing so, took from him his only hope of achieving safety or of escaping his conditions. In addition to the profound loss of limb, autonomy and the sense of an intact self, the accident

8

separated him from his friends and his positive pursuits and opportunities for mastery and pleasure and it must have devastated his hope of finding a way out of his circumstances.

15. Medical records reinforce the interpretation that his parents were neglectful and that he was in distress. Records from St. Louis Medical Center report that Mr. Holder was experiencing "severe denial" and warn of the possibility of post-traumatic stress disorder. Records from St. John's Mercy document symptoms of denial and depression after the accident. Mr. Holder was repeatedly referred for psychiatric care after his amputation. However, neither of his parents ever followed up on these. Mr. Holder was never seen by a psychiatrist or mental health professional. Social Security records also show reports by Mr. Holder's mother that Mr. Holder was depressed and "staying in the house all the time." Mr. Holder was refused financial assistance for his disability because his mother failed to take her 15 year old son to the requisite appointment. This level of medical and emotional neglect would be expected to greatly compound the psychological impact of the trauma itself.

16. It is important to highlight that while some events are inherently traumatic, events also become more or less psychologically toxic in relation to their meaning, the kind and level of social support that is available, the resources of the individual, and prior traumas. Thus, exposure to violence in a war situation, while certainly highly stressful for everyone and traumatic for some soldiers, has the possibility of being moderated (by the positive meaning of defending one's country, being a part of a valued social cohort, social support, etc.) in ways that exposure to community violence does not. Similarly, while many people lose limbs, and while this is always inherently stressful, the fact that Mr. Holder was already a neglected and traumatized child, continuing to live in great danger, heavily dependent on his physical prowess to provide an illusion of safety and the hope of escape, all radically increase the probability that this terrible accident would have devastating long-term psychological consequences.

17. Four months later, when Mr. Holder was age 16, while riding in a car, he was hit in the temple with a brick, and seriously injured, requiring surgery. Again, any possibility of attaining a sense of safety is precluded. I reviewed declarations from two friends, Terry Jett and Andrew Bell, who were with Mr. Holder at the time of the injury. Both discuss the fact that they witnessed a brick hit Mr. Holder directly in the temple. Mr. Jett said that Mr. Holder became "more and more dizzy," was nauseous and could not walk by the time that he arrived at home. It appears as though a significant amount of time elapsed between the time that 16 year old Mr.

9

Holder was hit in the head with the brick and the time that he was taken to the hospital, whereupon he required emergency surgery. I also reviewed medical records from Cardinal Glennon Hospital which denote that Mr. Holder experienced a skull fracture and underwent a craniotomy. The records indicate that Mr. Holder was again referred for therapy, suggesting professionals were observing something they felt warranted treatment.

**Conclusions**

18. Norris Holder experienced multiple severe traumatic events before the age of 17. These traumatic events raise serious red flags, which should have prompted trial counsel for Mr. Holder to hire and consult with a trauma expert.

19. Although both Dr. Wetzel and Dr. Rothke made an effort to enquire about his traumas, and Dr. Wetzel examined him for PTSD, PTSD is only one of the many possible sequalae of trauma. It is important to remember that when trauma occurs early in development and when it is chronic, the effects tend to be more pervasive and far less obvious than when an acute trauma afflicts an adult. The diagnosis of PTSD, while extremely valid and robust in relation to acute trauma in adulthood, has often been a source of controversy when applied to victims of chronic trauma and childhood trauma.

20. Moreover, when the traumas or reminders of the trauma are ongoing in some way (i.e., if the individual remains in danger or believes they are in danger – as Mr. Holder would likely have felt throughout his life as well as in jail) there is a great likelihood of a disguised presentation. In these instances, the individual is heavily invested in appearing normal and unaffected and the overt symptoms of PTSD are less likely to be manifest. Instead, victims of chronic trauma may appear numb, in denial, and seem unresponsive to material that should be painful. In most cases, this type of presentation is a part of the posttraumatic picture.

Further, one of the more toxic aspects of the traumatic experiences is the feeling of helplessness. This is the feeling that many defenses are organized to cope with. Helplessness not only makes people feel a need to protect and defend themselves, but it may also be experienced as humiliating or as a feeling which undermines one's sense of masculinity. As a result, trying to assess the after-effects of trauma in a young man can be daunting, since acknowledging their vulnerability, admitting to the presence of symptoms and the loss of certain capacities may well feel as though it takes from them their remaining dignity and selfhood, as well as puts them at risk if they continue to feel in danger.

10

21.     It does not appear that either Dr. Wetzel or Dr. Rothke engaged in the type of broad based enquiry and examination necessary to explore for the possible after-effects of chronic and severe trauma  In general, because of the nature of traumatic memory and the often disguised presentation of the aftermath of chronic trauma, these types of assessments utilize open ended and discursive questioning. As best as can be ascertained, this was not done. The Drs. did however, note that Mr. Holder was experiencing significant denial after the amputation of his leg, and that one record indicated he was upset and angry, though he did not know why.  In addition, Dr. Wetzel reported that Mr. Holder reporting experiencing "paranoia" after the accident and resulting amputation.  In addition to identifying in Mr. Holder significant symptoms of trauma exposure, both doctors also note that Mr. Holder received multiple referrals for psychological services after his amputation.  Specifically, Dr. Rothke testified that Mr. Holder received 17 such referrals.  Nonetheless, even with all of these red flags, a focused examination of the role of traumatic stress was not done.

22.     I have reviewed the foregoing records and found evidence of a multiple traumatic events including but not limited to: neglect, exposure to chronic violence, drug abusing parents, the horrifying accident that severed Mr. Holder's leg and the subsequent assault with a brick. The repeated and severe traumas to which Mr. Holder has been subjected are without question a risk factor for the development of behavioral and social problems. Moreover, the combination of these events is sufficiently catastrophic that we can assume that any child subjected to such an array of traumatic experiences would show signs of harm. However, the only way to understand the particular nature of this harm, and how it may or may not have affected the trajectory of Mr. Holder's life, is to do a careful assessment of traumatic impact.

I declare, under penalty of perjury, that the foregoing declaration is true and correct to the best of my knowledge.

Dr. Leslie Lebowitz

11