# United States Court of Appeals
## For the Eighth Circuit

_____

No. 10-1304

_____

Norris G. Holder

*Plaintiff - Appellant*

v.

United States of America

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri – St. Louis

_____

Submitted: November 15, 2012
Filed: July 31, 2013

_____

Before RILEY, Chief Judge, WOLLMAN and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

A jury convicted Norris Holder and sentenced him to death for robbing a bank and killing a bank security guard in St. Louis, Missouri. Following an unsuccessful appeal before this Court, Holder filed a motion pursuant to 28 U.S.C. § 2255 to

vacate, set aside, or correct his sentence, which the district court[1] denied.  Holder then moved pursuant to Federal Rule of Civil Procedure 59(e) to alter or amend the district court's judgment, and the district court denied that motion as well.  Before us now is Holder's appeal of the district court's denial of his Rule 59(e) motion.  For the reasons set forth below, we affirm in all respects.

## I.  Background

### A.  Facts

#### 1.  Bank Robbery

On the morning of March 17, 1997, Holder and Billie Jerome Allen robbed the Lindell Bank and Trust Company ("the Bank") in St. Louis, Missouri.  The two men arrived at the Bank shortly after 10:30 AM in a stolen van that they had doused with gasoline and planned to burn after fleeing to a second getaway vehicle.  Both men wore dark clothes and ski masks, and Holder also wore a bullet-proof vest.  The men were heavily armed with SKS semiautomatic rifles with bayonets and several magazines of hollow-point ammunition capable of penetrating vehicles.

Evidence presented at trial showed that Allen was the first man to enter the Bank and that he began shooting his rifle immediately, killing security guard Richard Heflin.  Holder followed closely behind Allen and proceeded to jump over the bank counter and retrieve money from the teller drawers.  The two men then exited the Bank and drove away in the van, taking with them $51,949.00.  While en route to a second getaway vehicle, the van caught fire and Holder and Allen were forced to abandon it in a large urban park in St. Louis.  Allen escaped on foot, but Holder, who

---

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

wears a prosthesis as a result of a train accident in 1991 that severed one of his legs, was captured by law enforcement and arrested.

An FBI agent interviewed Holder the night of the bank robbery, at which time Holder confessed that he planned and committed the robbery with Allen. Holder fashioned the robbery after the movies *Heat* and *Set It Off*, both of which Holder had watched within ten days prior to the robbery and feature forceful, takeover-style bank robberies by heavily armed robbers. Holder and Allen chose the Bank because Holder had been a customer there since January 1996 and was familiar with its layout, and because it is near a highway. The two men visited the Bank four days before the robbery, during which time Holder made a withdrawal and Allen sat in the lobby. Holder stated during his interview that he and Allen had agreed that they would not fire their rifles and that he did not intend for anyone to get hurt.

A grand jury indicted Holder for robbery by force or violence resulting in death in violation of 18 U.S.C. § 2113(a) and (e) ("Count I") and carrying a firearm during a crime of violence and murder resulting from a crime of violence in violation 18 U.S.C. §§ 924(c)(1)(A) and (j)(1) ("Count II").

### 2. Guilt Phase of Trial

The guilt phase of Holder's trial began on March 10, 1998.[2] Holder was represented primarily by attorneys Charles Shaw[3] and Jennifer Herndon. Shaw had entered an appearance on Holder's behalf on March 25, 1997, but Herndon did not join the defense effort until February 1998, approximately thirty days before the trial began. Shaw served as lead counsel while Herndon dealt primarily with the penalty phase of the trial.

---

[2]Holder and Allen were each indicted for the same offenses but tried separately.

[3]Attorney Shaw is now deceased.

-3-

Because of the strong evidence against Holder, Shaw decided that it would be best to admit to Holder's participation in the robbery and to argue that Holder lacked the mens rea for imposition of the death penalty, i.e., that Holder was unaware of any serious risk of death attending his actions and lacked the specific intent to kill.  In support of this strategy and pursuant to Shaw's advice, Holder testified in his own defense.  Holder maintained at trial, as he had when he was interviewed the night of the robbery, that he and Allen agreed that there would be no shooting and that he did not intend for anyone to be injured.  On cross-examination, however, Holder admitted that he loaded his rifle the night before the robbery and placed a bullet in the firing chamber so that he could fire the rifle by simply squeezing the trigger.  Additionally, notwithstanding Holder's claim that Allen was the instigator of the robbery, Holder also admitted that he supplied both of the rifles used in the robbery, as well as other weapons and ammunition that were placed in secondary getaway vehicles that Holder and Allen intended to use after they burned and deserted the van.

A government ballistics expert testified that there were sixteen shell casings found in the Bank.  Of the sixteen casings, eight were positively identified as having been fired from Allen's rife; three were consistent with having been fired by Allen's rifle; three could *not* have been fired by Allen's rifle; and two could have been fired by either Holder or Allen's rifles.  The bullets recovered from the wounds to Heflin's abdomen and kidney were positively identified as being fired by Allen's rifle, though it could not be determined whether the bullets and bullet fragments in Heflin's liver, thighs, and knee originated from Allen's rifle or Holder's rifle.  There is no suggestion that anyone other than Holder or Allen fired a shot in the Bank.  Holder did not call his own ballistics expert to refute the government's testimony, but he denied ever firing his rifle inside the Bank.

Appellate Case: 10-1304   Page: 4   Date Filed: 07/31/2013 Entry ID: 4060230

At the conclusion of the guilt phase of the trial, the jury convicted Holder of Count I and Count II.[4]

### 3.  Penalty Phase of Trial

At the penalty phase, the government submitted two statutory aggravating factors (including a pecuniary-gain aggravating factor relating to Heflin's murder) and four nonstatutory aggravating factors.  The jury unanimously found  both statutory aggravating factors and three of the four nonstatutory aggravating factors to be present; the jury did not unanimously reach a conclusion regarding the fourth nonstatutory aggravating factor, which pertained to Heflin's personal characteristics and the impact of his death upon his family.

Holder submitted two statutory mitigating factors and seventeen nonstatutory mitigating factors (including a claim that he did not fire the shots that resulted in Heflin's death).  Among the mitigating evidence that Holder relied upon was testimony regarding his difficult upbringing, including being raised by an absent father and drug-addicted mother; the 1991 train accident that severed one of his legs and the effect that it had on him; and a 1992 assault during which he was struck in the head with a brick.  Herndon retained Dr. Steven Rothke, a psychologist who specializes in neuropsychology and rehabilitation psychology, to assess the impact on Holder of the train accident and assault.  Dr. Rothke testified that Holder was "cognitively intact" and found "no significant neurobehavioral signs of head injury or reduced capacity to control his actions and responses."  Herndon also retained forensic psychologist Dr. Thomas Reidy to opine regarding Holder's future dangerousness. Dr. Reidy's written report concluded that Holder's "estimated risk of violence in prison does not exceed the known relevant base rates."

---

[4]Allen was also convicted of Count I and Count II in his separate trial.

-5-

The government also obtained a mental-health expert, Dr. Richard Wetzel, to examine Holder. Dr. Wetzel did not testify at trial, but submitted a written report that contained substantially the same material findings as Dr. Rothke, i.e., that Holder did not exhibit any cognitive dysfunction from brain injury or any psychiatric disorders. Herndon obtained permission to have a third psychologist, Dr. Anthony Semone, evaluate Holder and review Dr. Wetzel's findings. However, Dr. Semone did not perform either of these tasks until after Holder was sentenced.

Ultimately, no juror found either statutory mitigating factor to be present, and the jurors split on the nonstatutory mitigating factors—no juror found five of the factors to be present; twelve jurors found three of the factors to be present; and as few as two and as many as eleven found the various other nine nonstatutory mitigating factors. The jury returned death sentences for Holder on both counts.[5]

### 4. Direct Appeal and Post-Conviction Proceedings

Holder appealed the verdict, arguing, inter alia, that his convictions were invalid due to flawed jury instructions, that certain aggravating factors were unconstitutionally vague, and that the district court erred in admitting four graphic autopsy photographs. In a consolidated case with Allen's appeal from his separate convictions, see supra notes 2, 4, and 5, we rejected each of Holder's arguments and affirmed the jury's verdict. United States v. Allen, 247 F.3d 741, 795 (8th Cir. 2001) ("Allen I"). Holder then petitioned the U.S. Supreme Court for certiorari, and his petition was denied.[6] Holder v. United States, 539 U.S. 916 (2003).

---

[5]Allen was sentenced to life in prison for Count I and received a death sentence for Count II.

[6]Allen also petitioned the Supreme Court for certiorari. The Court granted Allen's petition, vacated this Court's opinion in the consolidated appeal (Allen I), and remanded Allen's case in view of Ring v. Arizona, 536 U.S. 584 (2002). Allen v. United States, 536 U.S. 953 (2002). Ring held that the statutory aggravating factors

-6-

Holder subsequently moved pursuant to 28 U.S.C. § 2255 for the district court to vacate, set aside, or correct his sentence. Holder raised three grounds for relief: (1) the indictment failed to include a single statutory aggravating factor in violation of his Fifth Amendment Indictment Clause right; (2) the jury improperly considered the pecuniary-gain statutory aggravating factor; and (3) his counsel was ineffective in multiple respects, including a claim that counsel failed to adequately investigate his mental health. The district court held a three-day evidentiary hearing on Holder's motion, but refused to hear any evidence on the mental-health issue.[7]

The district court denied Holder's § 2255 motion on all claims. Holder subsequently moved pursuant to Federal Rule of Civil Procedure 59(e) for the district court to alter or amend its judgment on his § 2255 motion, and the district court denied that motion as well. Holder then filed this appeal.

## B. Standard of Review

"Rule 59(e) motions serve the limited function of correcting 'manifest errors of law or fact or to present newly discovered evidence.'" United States v. Metro. Saint Louis Sewer Dist., 440 F.3d 930, 933 (8th Cir. 2006) (quoting Innovative Home

---

that make a defendant eligible for the death penalty must be found by a jury, not by a judge, in accordance with the Sixth Amendment. 536 U.S. at 609. Holder's constitutional claim relating to the issue in Ring is discussed infra at Part IV.

[7]The evidentiary hearing was limited to the following issues: (1) "Violation of the Fifth Amendment Indictment Clause;" (2) "Jury's Improper Consideration of the Pecuniary Gain Statutory Aggravator;" (3) "Counsel's Unreasonable and Prejudicial Failure to Challenge the Indictment;" (4) "Trial Counsel's Unreasonable and Prejudicial Advice to Testify;" (5) "Trial Counsel's Unreasonable and Prejudicial Concession of Guilt During Opening Statement and Closing Argument;" and (6) "Trial Counsel's Prejudicial Sleeping During Critical Stages of the Proceedings." Holder v. United States, No. 4:03CV00923, slip op. at 1 (E.D. Mo. Dec. 2, 2004) ("Order Limiting the Scope of the § 2255 Evidentiary Hearing").

Health Care v. P.T.–O.T. Assoc. of the Black Hills, 141 F.3d 1284, 1286 (8th Cir. 1998)).  "Such motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment."  Innovative Home Health Care, 141 F.3d at 1286.  "[A]ppeal from the denial of a Rule 59(e) motion allows challenge of the underlying ruling that produced the judgment[,]"  Prince v. Kids Ark Learning Ctr., LLC, 622 F.3d 992, 994 (8th Cir. 2010), which in this case is the district court's denial of Holder's § 2255 motion. Accordingly, our review is de novo.  Ortiz v. United States, 664 F.3d 1151, 1164 (8th Cir. 2011) (standard of review for § 2255 motion).

Holder raises five issues on appeal.  Three issues pertain to the alleged ineffective assistance of his trial counsel.  The fourth issue pertains to the district court's refusal to grant an evidentiary hearing regarding defense counsel's investigation of Holder's mental health.  The fifth issue pertains to whether a constitutional violation of the Fifth Amendment Indictment Clause was structural error or prejudicial error.  We address each issue in turn below.

## II.  Ineffective Assistance of Counsel

Holder alleges that his trial counsel was constitutionally ineffective in three ways.  Specifically, Holder claims that his counsel (1) "failed to assure adversarial testing of the government's case by conceding that Mr. Holder participated in an armed robbery resulting in a killing, and prejudicially advising [Holder] to testify in support of counsel's non-defense to the charges"; (2) "failed to consult an independent ballistics expert before choosing a doomed theory that [Holder] fired no shots" in the Bank; and (3) "fail[ed] to object to the court's submission of the pecuniary gain aggravator where the submitted instruction failed to specify that the money-generating 'offense' referred to the murder and not the underlying robbery."

-8-

Ineffective assistance of counsel claims are governed by the two-pronged test in Strickland v. Washington, 466 U.S. 668 (1984). "For a claim to be cognizable, [1] counsel's performance must rise to a level of constitutional deficiency, and [2] the defendant must show a reasonable probability that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different[,]'" Eastin v. Hobbs, 688 F.3d 911, 915 (8th Cir. 2012) (quoting Strickland, 466 U.S. 668 at 695)), i.e., that the defendant was prejudiced by the deficiency, Alaniz v. United States, 351 F.3d 365, 367–68 (8th Cir. 2003). An attorney's performance is "deficient" when he makes errors "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687. "In weighing whether trial counsel's performance was constitutionally deficient, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Close v. United States, 679 F.3d 714, 716 (8th Cir. 2012) (quoting Strickland, 466 U.S. at 689).

"A deficiency is prejudicial when there is a reasonable probability, that is, one 'sufficient to undermine confidence in the outcome,' that the result of the trial would have been different but for the deficiency." Id. (quoting Strickland, 466 U.S. at 694)). As a reviewing court, our job is not to "consider the attorney error in isolation, but instead [to] assess how the error fits into the big picture of what happened at trial." Marcrum v. Luebbers, 509 F.3d 489, 503 (8th Cir. 2007) (citing Strickland, 466 U.S. at 696). A finding that no prejudice exists is sufficient to conclude that counsel was not constitutionally ineffective—we need not first make a determination regarding deficiency. See DeRoo v. United States, 223 F.3d 919, 925 (8th Cir. 2000).

With this framework in mind, we turn to Holder's specific claims of ineffective assistance.

## A.  Conceding the Robbery

Holder's first claim is that counsel Shaw was ineffective for admitting that Holder participated in the armed bank robbery.  Specifically, Holder claims that Shaw did not understand that the charges against him were capital-eligible offenses and that by conceding Holder's participation in a robbery that resulted in death, Shaw sealed his fate.  Holder claims that Shaw was deficient for pursuing a strategy of concession and that he suffered prejudice as a result.

### 1.  Proper Standard for Ineffectiveness

Holder first argues that Shaw was ineffective under United States v. Cronic, 466 U.S. 648 (1984), and that we need not analyze Shaw's trial conduct under the Strickland standard.  Cronic set forth three situations in which counsel was so plainly deficient that prejudice can be presumed.  Id. at 659–60 (noting that in certain circumstances "a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial"); United States v. White, 341 F.3d 673, 677 (8th Cir. 2003) ("There are instances when counsel's errors are so great or the denial of counsel is so complete as to create a presumption of prejudice, eliminating the need to prove Strickland prejudice." (citing Cronic, 466 U.S. at 659)).  One scenario is when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."  Cronic, 466 U.S. at 659.  Here, Holder claims that Shaw misunderstood the nature of the charges against him and that Shaw's concession of the robbery resulted in "a complete breakdown in the adversarial process."

Contrary to Holder's claim, however, the record demonstrates that Shaw did understand that the charges were capital-eligible offenses.  When the district court inquired at trial as to whether Holder wanted to testify in his own defense, Shaw stated: "I gave [Holder] my advice that because of the nature of the punishment that I thought the best thing he could to do [sic] would be testify on his own behalf."

-10-

Holder v. United States, No. 4:03CV00923, 2008 WL 2909648, at *32 (E.D. Mo. July 22, 2008) ("Order Denying § 2255 Relief").  Accordingly, rather than engaging in the "useless charade" of attempting to prove Holder not guilty of a crime for which he had "no bona fide defense to the charge," Cronic, 466 U.S. at 656 n.19, Shaw's trial strategy was to argue that Holder lacked the requisite mental state for imposition of the death penalty.[8]  See Order Denying § 2255 Relief, 2008 WL 2909648, at *30 ("[Shaw] chose a strategy that focused on [Holder's] mental state, under the instruction, that required him to be aware of a serious risk of death.").

In Florida v. Nixon, the Supreme Court held that defense counsel's admission of his client's guilt in a capital case was properly analyzed under Strickland, not Cronic.  543 U.S. 175, 178 (2004).  The Court recognized that capital cases involve specialized circumstances:

> Although [a concession of guilt] in a run-of-the-mine trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus. Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. . . . In such cases, avoiding execution [may be] the best and only realistic result possible.

Id. at 190–91 (second alteration in original) (citation and internal quotation marks omitted).

Here, the district court found that Shaw based his decision to admit that Holder robbed the Bank on the strong evidence against Holder and on the theory that honesty

---

[8]To be convicted of Count I and Count II, the government had to prove that Holder had been "aware of a serious risk of death attending his conduct."

and candor with the jury was the best approach to saving Holder's life.  Order Denying § 2255 Relief, 2008 WL 2909648, at *31.  In denying Holder's § 2255 motion, the district court noted the following:

> The defense team faced a daunting task in preparing and presenting a defense for [Holder].  Independent credible witnesses were available to testify that [Holder], over a period of several months, planned to rob a bank.  Witnesses saw [Holder] plan to purchase or have purchased for him a shotgun and an assault rifle with an attached bayonet and banana clip, described as used in the robbery by a person in the location of the Bank where the robber took money from the teller drawers. . . . The two robbers fled in a van followed by a lawyer to the location where the van exploded in flames and [Holder] was observed as being on fire.  [Holder] confessed to the robbery, identified the other robber who was arrested, and always consistently stated he planned for no one to get hurt and he was sorry for the death of the guard. These facts, known going into the trial, limited the options in defending [Holder].

Id. at *29.

The district court also found that, despite conceding the fact of Holder's participation in the robbery, Shaw "challenged the government's case by cross-examining witnesses, presenting defense witnesses, and de-emphasizing [Holder's] role in planning the robbery, and emphasizing that [Holder] was not the one who fired the fatal shots at Heflin."  Id. at *35; see id. at *29 ("[Shaw] skillfully and consistently presented evidence and cross-examined witnesses, to show . . . that the evidence was weak that [Holder] fired shots at Heflin and [Shaw] continuously focused the jury's attention on the undisputed evidence that [Holder] believed no one would be injured."); id. at *31 ("[C]ounsel Shaw disputed any malice on the part of

-12-

[Holder] . . . ."); id. at *30 (noting that Shaw "always argued" that Holder believed "that there was no risk of death").

Based on the district court's findings, we reject Holders' contention that Cronic's presumption applies simply because Shaw conceded the all-but-undisputable fact of his participation in the robbery.  See Haynes v. Cain, 298 F.3d 375, 381–82 (5th Cir. 2002) (Cronic standard does not apply where defense counsel conceded the underlying rape and robbery in view of "nearly conclusive proof" that the defendant committed the crimes, but "remained active at trial, probing weaknesses in the prosecution's case on the issue of intent"); see also Bell v. Cone, 535 U.S. 685, 696–98 (2002) (stating that Cronic's *per se* rule applies only when "counsel fail[s] to oppose the prosecution throughout [a] . . . proceeding *as a whole*," not merely "at specific points" (emphasis added)); White, 341 F.3d at 678 ("The failure to oppose the prosecution's case must involve the entire proceeding, not just isolated portions.").

## 2.  Application of Strickland Standard

Shaw was also not constitutionally ineffective as counsel under the Strickland standard.  In Lingar v. Bowersox, we held that defense counsel's decision to concede the physical elements of second-degree murder and to argue that his client lacked the mens rea necessary for a capital-murder conviction was not constitutionally deficient. 176 F.3d 453, 458–59 (8th Cir. 1999).  In determining that "counsel's concession was a  reasonable trial strategy," id. at 459, we stated the following:

> [T]he decision to concede guilt of the lesser charge of second-degree murder was a reasonable tactical retreat rather than a complete surrender. The tactic did not preclude [defendant] from maintaining his innocence on the first-degree murder charge, and if successful, would have permitted Lingar to avoid the death penalty.  Further, counsel could retain some credibility and gain an advantage

-13-

by winning the jury's trust.  Even if the jury convicted [defendant] of first-degree murder, the jury might then be more sympathetic to defense witnesses testifying in the penalty phase that [defendant] deserved mercy. Given the overwhelming evidence, [defendant] could not credibly deny involvement in [the victim's] killing, and denying all involvement could inflame the jury and incite it to render a death sentence. Defense counsel had no viable option.

Id. (citations omitted).

Here, the district court found that the evidence of Holder's involvement in the robbery was "overwhelming," Order Denying § 2255 Relief, 2008 WL 2909648, at *34, and that "Shaw presented [Holder's] case in the only reasonable manner possible," id. at *30.  Specifically, the district court found that Shaw "employed a sound trial strategy of admitting [Holder's] involvement in the crime in order to gain credibility in arguing [Holder's] lack of intent and his belief that no one would be harmed, to increase the chance of leniency during the penalty phase." Id. at *35.  In according great deference to trial counsel's decisions, we cannot say that Shaw was constitutionally deficient for employing a reasonable trial strategy aimed at sparing Holder's life.

Notably, despite claiming that Shaw was ineffective as counsel, Holder has not offered any alternative theory of the case under which he would have been found not guilty based on the evidence introduced at trial and his admissible confession given the night of the robbery.  Thus, even if Shaw was unaware of the possible consequences to Holder of conceding the robbery charges against him, as alleged—a conclusion that is contradicted by the record, see id. at *30 (noting that Shaw's defense strategy was premised on avoiding the death penalty)—Holder has not shown that he suffered any prejudice, and "[s]heer outcome determination . . . [is] not sufficient to make out a claim under the Sixth Amendment." Lockhart v. Fretwell, 506 U.S. 364, 370 (1993).

-14-

For the reasons set forth above, we reject Holder's claim that Shaw was constitutionally ineffective for conceding his participation in the robbery.

## B.  Ballistics Expert

Holder's second ineffective-assistance claim is that Shaw failed to obtain an independent ballistics expert to testify at trial.  The precise nature of this claim has evolved throughout Holder's pursuit of post-conviction relief.  In his § 2255 motion, Holder asserted a failure-to-dispute theory, i.e., that "[t]rial counsel's failure to properly investigate, consult or offer testimony of a ballistic expert to *contest* the government's expert's opinion led the jury to believe that petitioner fired his weapon inside the bank based on opinions of the government's expert." (Emphasis added.)  In denying relief, the district court characterized the claim as follows: "[Holder's] . . . argument is that his trial counsel was ineffective for failing to obtain a ballistic expert to *dispute* the Government's evidence that some of the rounds fired during the bank robbery could have come from the [his] weapon." Order Denying § 2255 Relief, 2008 WL 2909648, at *36 (emphasis added).   The district court issued a certificate of appealability on this issue that stated simply that Holder could appeal his claim that "counsel failed to obtain a ballistics expert." Id. at *55.

In his subsequent Rule 59(e) motion, however, Holder set forth a failure-to-confirm theory, i.e., that "the court failed to consider the scenario that a ballistics expert could have *verified* [the government expert's] conclusions, and analyze defense counsel's performance in that context." (Emphasis added.)  Holder maintains this failure-to-confirm theory on appeal, arguing that "[i]f an independent expert had *confirmed* the government's ballistics analysis, a reasonable attorney would not argue that Mr. Holder's weapon was never fired, and would not present the defendant's credibility-destroying testimony to that effect." (Emphasis added.)

-15-

Holder's diametrically opposed positions indicate that attorney Shaw faced a difficult decision regarding how to deal with the government's ballistics expert at trial. In such situations, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, and "[o]ur scrutiny of counsel's performance must be 'highly deferential[,]'" New v. United States, 652 F.3d 949, 952 (8th Cir. 2011) (quoting Strickland, 466 U.S. at 690)). Here, rather than subjecting a defensive ballistics expert to the prosecution's scrutiny, Shaw elected to discredit the government's expert through what the district court described as "skillful[] cross-examin[ation]." Order Denying § 2255 Relief, 2008 WL 2909648, at *37. For example, Shaw was able to get the government's expert to make admissions such as, "I did not come up with any positive result on a bullet or a shell with [Holder's rifle]," and "[T]here were not sufficient markings [on the shell casings] that I could definitely say [that the casings came from Holder's rifle]." Id. at *38 (internal quotation marks omitted). We find nothing in the record to suggest that Shaw's strategy falls outside the wide range of reasonable trial strategy afforded to counsel.

Nevertheless, even if counsel was deficient for failing to call a ballistics expert, Holder cannot show that he suffered any prejudice. With respect to Holder's originally pleaded failure-to-dispute theory, the government presented evidence at trial that Holder's rifle was found with empty ammunition cartridges, as well as testimony from a bank teller that Holder fired at least one shot in the Bank. As the district court recognized, the best possible testimony that Holder could have elicited from a defensive ballistics expert would have been that the three bullets that the government's expert identified as not originating from Allen rifle, see supra Part I.A.2, were not fired from Holder's rifle. See Order Denying § 2255 Relief, 2008 WL 2909648, at *37. Given the circumstantial evidence to the contrary, however, there is nothing in the record to indicate that the jury would have reached a different result than it did after weighing the competing testimonies. See Kennedy v. Kemna, 666 F.3d 472, 477–78 (8th Cir. 2012) (no prejudice from failure to present ballistics evidence where

-16-

"the state's case against [the defendant] was strong" and "the ballistics evidence is, at best, minimally probative").

With respect to the more recently asserted failure-to-confirm theory, Holder cannot show that his defense would have been in any different position had a defensive ballistics expert testified substantially the same as the government's expert than it was without its own expert.  See Wainwright v. Lockhart, 80 F.3d 1226, 1230 (8th Cir. 1996) (no prejudice from failure to have defensive ballistics expert testify at trial where testimony would have been "consistent" with that of the government's ballistics expert).

Accordingly, Holder's claim that counsel was constitutionally ineffective for failing to obtain an independent ballistic expert fails.

### C.  Pecuniary Gain Factor

Holder's final ineffective-assistance claim is that Shaw failed to object to the district court's instruction on the pecuniary-gain factor.  18 U.S.C. § 3592 lists several aggravating factors for a homicide that, if found, render the defendant eligible for the death penalty.  One of these factors is that "[t]he defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value."  18 U.S.C. § 3592(c)(8).  In United States v. Bolden, we stated that "the pecuniary gain factor applies to a killing during the course of a bank robbery only where pecuniary gain is expected to follow as a direct result of the *murder*." 545 F.3d 609, 615 (8th Cir. 2008) (emphasis added) (citation and internal quotation marks omitted).

The district court instructed Holder's jury on the pecuniary-gain factor as follows:

-17-

> To establish that a defendant committed an *offense* in the expectation of the receipt of anything of pecuniary value, the government must prove that the defendant committed the *offense* in the expectation of anything in the form of money, property, or anything else having some economic value, benefit, or advantage.

(Emphases added.)  This Court previously found no error in a jury instruction that was identical to the one in this case, except that it substituted "killing or murder" for "offense."  Bolden, 545 F.3d at 616 (stating that "[t]his instruction accurately stated the law[]" and that "by substituting 'the killing or murder' for the reference to 'the offense' in § 3592(c)(8), the instruction made clear that the jury could not find this aggravating factor based solely on [the defendant's] attempt to rob the bank for pecuniary gain").

Holder claims that his counsel was ineffective for failing to object to the district court's jury instruction because, unlike the instruction in Bolden, the instruction in this case did not specify what "offense" had to be motivated by pecuniary gain.  Holder argues that the jury "should have been instructed that, in order to find the existence of the pecuniary gain aggravator, the government must prove that [Mr.] Holder committed 'the offense *of murder*' in expectation of pecuniary gain."  (Emphasis added.)  The government concedes that it is now known that this limitation would have been appropriate, but that counsel was not deficient because the law was unsettled at the time of Holder's trial in 1998.  Holder, on the other hand, contends that "[w]hile the Bolden opinion was issued well after Mr. Holder's case was decided, the legal basis for this claim existed at the time of Mr. Holder's trial," and that "counsel was on notice that the jury should have been specifically instructed that the offense listed in the pecuniary gain instruction was the 'killing or murder.'"[9]

---

[9]Holder appears to be concerned with the jury having mistakenly linked pecuniary gain to only the underlying bank-robbery offense of 18 U.S.C. § 2113 in Count I.  Specifically, Holder argues that "[t]he instruction is defective because it

-18-

We need not decide the state of law in 1998[10] or whether counsel was deficient for failing to object to the jury instruction, however, because Holder cannot show prejudice. Even if the district court adopted Holder's modification, thus substituting "killing or murder" for "offense," Holder still cannot show that the jury would have failed to find that the pecuniary-gain factor applied. The Ninth Circuit's opinion in LaGrand v. Stewart, 133 F.3d 1253 (9th Cir. 1998) ("LaGrand III"), is instructive.

LaGrand III came to the Ninth Circuit on appeal from the district court's denial of a habeas petition, in which the petitioner argued that the state court applied an overly broad standard for applying the pecuniary-gain factor. See LaGrand v. Lewis, 883 F. Supp. 451, 465–66 (D. Ariz. 1995) ("LaGrand II"). In the underlying state case, the Arizona Supreme Court found that "the reason [the petitioner] stabbed the victim [during a bank robbery] was because the victim was unable to open the safe, frustrating the defendant's continuing attempt for pecuniary gain. The defendant's goal of pecuniary gain caused the murder and the murder was in furtherance of his goal." State v. LaGrand, 734 P.2d 563, 578 (Ariz. 1987) ("LaGrand I"). In denying the petitioner's habeas petition, the district court held that it was neither irrational nor

---

allowed the jury to find the existence of the pecuniary gain statutory aggravating factor based solely on Mr. Holder's motive for the *underlying bank robbery*." (Emphasis added.) However, both Counts of the indictment included capital-eligible offenses, see 18 U.S.C. § 924(j)(1), and Holder has not argued that "offense" could have been mistaken for "uses or carries a firearm," as found in 18 U.S.C. § 924(c)(1)(A) and charged in Count II of the indictment. Thus, our analysis of the pecuniary-gain jury instruction is limited to the alleged conflation of "offense" with the underlying bank robbery.

[10]At least one of our sister circuits has since determined that an instruction regarding the pecuniary-gain factor is erroneous if "offense" is not plainly defined. United States v. Chanthadara, 230 F.3d 1237, 1264 (10th Cir. 2000) ("The instruction failed to specify the 'offense' to which it referred was the homicide, not the underlying robbery, and thereby failed to impose a necessary limitation. Therefore, the instruction was erroneous.").

-19-

arbitrary of the Arizona Supreme Court to determine that "Petitioner's goal of robbing the bank so permeated [his] conduct that the murder can be deemed to have been committed in furtherance of that goal." LaGrand II, 883 F. Supp. at 465.  The Ninth Circuit, in affirming the district court, stated that "[t]he LaGrands threatened the victims with death in order to obtain entry to the vault. . . . A rational sentencer could have found the existence of the pecuniary gain aggravating factor." LaGrand III, 133 F.3d at 1260.

This case has facts to support applying the pecuniary-gain factor that are stronger than the facts of LaGrand.  Here, the district court made a finding that Heflin "was shot by either Allen or [Holder], or both, upon entering the bank, *due to Heflin reaching for his firearm*." Order Denying § 2255 Relief, 2008 WL 2909648, at *49 (emphasis added).  This finding is not clearly erroneous and, presumably, Holder and Allen would have not been successful in robbing the bank had they not disarmed Heflin.  Just as in LaGrand, Holder and Allen's "sole purpose of the journey to the bank was to rob it." LaGrand III, 133 F.3d at 1260.  And, like in Bolden, Holder and Allen "brought . . . loaded []gun[s] to the bank planning to confront the bank guard before robbing the bank."  545 F.3d at 615–16.  Thus, even if the instruction on the pecuniary-gain factor defined "offense" to be "killing or murder," a reasonable jury would have still determined that Heflin was killed "to remove an obstacle to completing the robbery," id. at 616, and that "the killing was committed in the expectation of receiving pecuniary gain," id.

Accordingly, we reject Holder's claim of ineffective assistance for failing to object to the district court's jury instruction on the pecuniary-gain factor.

### III.  Evidentiary Hearing on Mental Health

Holder also argues that the district court erred in denying his request for an evidentiary hearing regarding whether his counsel was ineffective for allegedly failing

to adequately investigate his mental-health condition. Specifically, Holder claims that attorney Herndon employed an unreasonable mitigation strategy by not consulting with a third psychologist to determine whether the reports of Drs. Rothke and Wetzel were deficient, and that "[a] reliable and fully-informed trauma diagnosis could have cast reasonable doubt upon the guilt-phase proposition . . . that Mr. Holder was 'aware of a serious risk of death attending his conduct.'"

## A.  Standard of Review

"A petitioner is entitled to an evidentiary hearing on a section 2255 motion unless 'the motion and the files and the records of the case conclusively show that [he] is entitled to no relief.'" Anjulo-Lopez v. United States, 541 F.3d 814, 817 (8th Cir. 2008) (alteration in original) (quoting 28 U.S.C. § 2255). "No hearing is required, however, where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." Id. (citation and internal quotation marks omitted).

This Court reviews the district court's decision to deny an evidentiary hearing for an abuse of discretion. Saunders v. United States, 236 F.3d 950, 952 (8th Cir. 2001). "That standard is somewhat misleading, however, because review of the determination that no hearing was required obligates us to look behind that discretionary decision to the [district] court's rejection of the claim on its merits, which is a legal conclusion that we review de novo." Id. Accordingly, we must "consider the validity of [a petitioner's] allegation of ineffective assistance of counsel in order to decide if he is entitled to remand for an evidentiary hearing." Id. (citation and internal quotation marks omitted).

"The failure of counsel to adequately investigate a petitioner's mental health history and background can necessitate an evidentiary hearing." Parkus v. Delo, 33

-21-

F.3d 933, 939 n.6 (8th Cir. 1994).  Strickland sets forth the framework for evaluating counsel's actions in a failure-to-investigate claim:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690–91.  "[F]ailing to present mitigating evidence may be ineffective assistance if, due to inadequate trial preparation and investigation, 'counsel has through neglect failed to discover such evidence.'" Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir. 1991) (quoting Laws v. Armontrout, 863 F.2d 1377, 1385 (8th Cir. 1988)).  "[S]trategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." Id.

## B.  Holder's Claims

Holder's defense team obtained two mental-health experts, Dr. Steven Rothke, a clinical neuropsychologist, and Dr. Thomas Reidy, a forensic psychologist.  See supra Part I.A.3.  Dr. Rothke examined Holder, reviewed the findings of the government's expert, Dr. Richard Wetzel (also a neuropsychologist), and testified regarding Holder's mental state at the time of the bank robbery.  Dr. Rothke was aware of the accident that severed one of Holder's legs when he was fifteen years old, as well as the incident in which Holder was struck in the head with a brick and Holder's troubled upbringing.  Dr. Rothke opined that Holder's amputation and desire for money to purchase a new prosthesis was a motivating factor for committing the

-22-

robbery, but that Holder "did not display 'any psychiatric diagnosis, nor is he in need of any psychological treatment relating to his injury.'" <u>Order Denying § 2255 Relief</u>, 2008 WL 2909648, at *42. Dr. Reidy was tasked primarily with assessing Holder's future dangerousness as an inmate, but also reviewed the reports of Drs. Rothke and Wetzel.[11]

Holder's ineffective-assistance claim is two-fold. First, Holder alleges that Dr. Rothke "performed something less than a full neuropscyhological examination," that Herndon sought a third psychological evaluation by Dr. Anthony Semone, but that the third evaluation did not occur prior to sentencing even though the district court authorized it.[12] Dr. Semone reviewed Dr. Wetzel's report after Holder was sentenced and opined that Holder's brain damage, <u>see</u> <u>supra</u> note 11, could affect his judgment and ability to assess danger. Holder argues that he is entitled to an evidentiary hearing to determine why Herndon forwent Dr. Semone's evaluation prior to sentencing and whether that decision was professionally reasonable.

---

[11]Among Dr. Wetzel's findings was that Holder had a detectable brain condition as a result of a skull fracture caused by the brick incident. Dr. Wetzel opined that the condition affected only the motor functions in Holder's left hand—not Holder's judgment.

[12]The parties dispute when and for what purpose the court authorized the third psychological evaluation by Dr. Semone. Holder claims that his counsel contacted Dr. Semone "to review Dr. Wetzel's findings[] and [to] determine the need for further neuropsychological testing." The government, on the other hand, claims that Dr. Semone could not possibly be viewed as a responsive expert based on the timeline of events—the court granted Herndon's request for the evaluation on March 12, 1998, but Dr. Wetzel did not evaluate Holder until March 21 and did not release his written report until March 23. We need not resolve the purpose and timing issues surrounding counsel's request to have Dr. Semone evaluate Holder, however, because even under Holder's view of the facts, we would reach the same conclusion.

-23-

Second, Holder alleges that counsel was deficient for failing to have him separately evaluated by a trauma expert, as distinguishable from a neuropsychologist. Specifically, Holder claims that "[e]ven if [he] received 'a full and complete *neuropsychological exam*' as between Drs. Rothke and Wetzel, that exam is distinct from a trauma assessment, which is not limited to the physical or organic brain damage that a neuropsychological exam detects." Holder argues that he was prejudiced because a third expert opinion or a trauma assessment, or both, would have cast reasonable doubt regarding his ability to appreciate the dangerousness of his conduct, thus enabling him to avoid the death penalty.

### 1.  Failure to Present Testimony of Dr. Semone

Regarding his claim involving Dr. Semone, Holder relies principally on two cases: Wiggins v. Smith, 539 U.S. 510 (2003), and Sinisterra v. United States, 600 F.3d 900 (8th Cir. 2010). In Wiggins, a judge convicted the petitioner of first-degree murder, robbery, and two counts of theft. 539 U.S. at 514–15. At the start of the sentencing proceedings, the petitioner's counsel told the jury that they would hear evidence that the petitioner "has had a difficult life" and that "[i]t has not been easy for him[,]" but that "he's worked," "tried to be a productive citizen, and [has] reached the age of 27 with no convictions for prior crimes of violence and no convictions, period." Id. at 515 (internal quotation marks omitted). No such evidence was presented, however, and counsel instead chose to focus the entirety of the defense efforts in the penalty phase on disputing petitioner's direct involvement in the murder.[13] See id. at 515. That decision was made despite the existence of "psychological reports and expert testimony demonstrating [the petitioner's] limited intellectual capacities and childlike emotional state on the one hand, and the absence

---

[13]Petitioner's counsel in Wiggins had moved to bifurcate the sentencing proceedings between (1) "prov[ing] that [petitioner] did not act as a principal in the first degree" and (2) presenting mitigating evidence, if necessary. 539 U.S. at 515. That motion was denied.

-24-

aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other." Id. at 516. The Supreme Court held that petitioner's counsel was deficient for "fail[ing] to investigate thoroughly" and "never follow[ing] up . . . with details of [petitioner's] history," id. at 526, and that such deficiency prejudiced petitioner, see id. at 534–38 (describing "[t]he mitigating evidence counsel failed to discover and present" as "powerful").

In Sinisterra, the petitioner was sentenced to death after being convicted of four charges, including knowingly traveling in interstate commerce with the intent that a murder for hire be committed. 600 F.3d at 903–04. At the penalty phase, the only mitigation evidence presented by petitioner's counsel was redacted videotaped interviews with petitioner's family members, friends, former employer, and corrections and probations officers. Id. at 904. Notably, "[n]o evidence of [petitioner's] mental health or capacity was presented." Id. Petitioner sought an evidentiary hearing as to whether his attorneys were ineffective for failing to investigate his background further, which he alleged included, inter alia, being the victim of rape, physical and sexual abuse, and head injuries. Id. at 907. This Court determined that petitioner's failure-to-investigate claim warranted further review and remanded the case for an evidentiary hearing. Id. at 912.

Both Wiggins and Sinisterra are distinguishable from this case, however, and thus Holder's reliance on them is misplaced. Each of those cases involved counsel's complete, or near-complete, failure to investigate and present mitigation evidence relating to the petitioners' backgrounds and mental capacities. See Wiggins, 539 U.S. at 523–525, 537 (concluding that counsel's investigation into petitioner's social background was limited to a single page contained in the presentence report and city-kept records of petitioner's foster-care placements, and determining that "[petitioner's] sentencing jury heard only one significant mitigating factor—that [petitioner] had no prior convictions"); Sinisterra, 600 F.3d at 908 (stating that "*[n]o* evidence of [petitioner's] mental health or capacity was presented during the penalty phase of his

-25-

trial[,]" and noting that petitioner's trial counsel "fore[went] *any* penalty-phase presentation of his mental health and capacity" (emphases added)). Here, by contrast, Holder's counsel investigated and presented a substantial amount of evidence relating to Holder's background and mental capacity. See Order Denying § 2255 Relief, 2008 WL 2909648, at *9 (noting the "broad scope of mitigation evidence presented to the jury for their consideration"). At Holder's sentencing, his counsel presented testimony from, among others, the following individuals: Holder's family, including his father, mother, brother, sister, maternal grandmother, aunt, and several cousins; two of Holder's high-school teachers; law-enforcement officers that had previously interacted with Holder; long-time friends of Holder; and a prosthetist–orthotist that had previously examined Holder. See id. at *9–20. This nonexpert testimony was in addition to the expert testimony and written reports submitted by Drs. Rothke and Reidy. Accordingly, unlike in Wiggins and Sinisterra, where certain aspects of the petitioners' social and medical histories were not fully investigated or altogether ignored, the sum of the mitigating evidence and testimony in this case shed light on Holder's troubled background, need for money, personal characteristics, and mental capabilities. In short, Holder's counsel left no stone unturned. See id. at *21 ("The penalty phase evidence was masterfully presented."). Wiggins and Sinisterra are thus not factually analogous and are of little applicability.

Instead, we find Cole v. Roper, 623 F.3d 1183 (8th Cir. 2010), to be instructive. In Cole, the habeas petitioner "had undergone two pretrial psychiatric evaluations by mental health experts," but "agrue[d] that counsel [was ineffective for not] hav[ing] had him evaluated by a third expert to develop mitigation evidence for the penalty phase." Id. at 1189–90. This Court rejected that argument and determined that two expert opinions "[were] enough of an investigation to clear Strickland's performance prong." Id. at 1190. The same is true in this case. Here, like in Cole, two defense experts already concluded that Holder did not suffer from any psychiatric disorders or cognitive deficiencies. Compare id. ("[B]oth pretrial experts who examined [petitioner] concluded that he was not suffering from any mental disease or defect at

-26-

the time of the crime. . . . His thought processes were found to be logical and sequential, and he was determined to be capable of knowing and appreciating the nature, quality and wrongfulness of his conduct."), with Order Denying § 2255 Relief, 2008 WL 2909648, at *13 ("Dr. Reidy . . . . reviewed the report of Dr. Rothke, neuropsychologist and 'secondary loss expert,' and the report of Dr. Wetzel, the Government's neuropsychologist.  He concluded that there was nothing in their 'very similar' reports to indicate that [Holder] might have a mental illness.'"); see also Order Denying § 2255 Relief, 2008 WL 2909648, at *42 ("Dr. Rothke concluded that [Holder] did not display 'any psychiatric diagnosis, nor is he in need of any psychological treatment relating to his injury.' . . . Dr. Rothke's report was corroborated by the report of the Government's expert, Dr. Wetzel.").  "Trial counsel is not required by the Sixth Amendment to continue shopping for a[n] [expert] until a favorable opinion is obtained."  Forsyth v. Ault, 537 F.3d 887, 892 (8th Cir. 2008); see also Marcrum, 509 F.3d at 511 ("Where counsel has obtained the assistance of a qualified expert . . . and nothing has happened that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion.").

Accordingly, Herndon was not ineffective for failing to consult Dr. Semone prior to sentencing.

2.  Failure to Present a Trauma Expert

Holder's claim that counsel was deficient for not having him evaluated by a trauma expert also fails.  Holder claims that the reports of Drs. Rothke and Reidy "do not reflect an awareness of the specific and vivid details [of his upbringing] that are necessary for a reliable trauma assessment," and that "a trauma expert could have swayed the jury with professional insights more relevant to [his] case, and beyond the subjective 'brain damage' that is typically assessed by neuropsychologists."  But Holder has not shown, as he alleges, that either Dr. Rothke or Dr. Reidy lacked the

-27-

"relevant skills, credentials, and professional experience" to conduct an adequate evaluation of the events that shaped his life.

Dr. Rothke is board certified in "Rehabilitation Psychology" and is characterized as a "secondary loss expert." Dr. Rothke conducted a three-hour examination of Holder "for the purpose of evaluating [Holder] concerning the impact of Mr. Holder's amputation injury in 1991 and to look at what if any relationship there was between that injury and the crime for which Mr. Holder [was] charged and being tried." Order Denying § 2255 Relief, 2008 WL 2909648, at *20 (internal quotation marks omitted). Dr. Rothke concluded that "[Holder] displayed very little outward signs of any type of *emotional* reaction to his injury." Id. (emphasis added) (citation and internal quotation marks omitted).

Dr. Reidy is one of only about 175 board-certified forensic psychologists in the United States. In forming his opinion regarding Holder's future dangerousness, Dr. Reidy "reviewed F.B.I. and police reports, medical records, school records, jail records, interviewed family members, friends, acquaintances, school personnel, and correctional officers." Id. at *13. He also reviewed Dr. Rothke's report and had "no complaint" and "no disagreement" as to its findings. Id. (internal quotation marks omitted).

"In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527. Given Dr. Rothke and Dr. Reidy's credentials and the breadth of their evaluations of Holder, nothing in the record supports Holder's argument that a trauma expert would have reached different conclusions regarding Holder's ability to appreciate the dangerousness of his conduct. Contrast with id. at 525 (noting that "counsel uncovered no evidence in their investigation to suggest that . . . further investigation would have been fruitless"). Accordingly, counsel was

-28-

not deficient for not obtaining a separate trauma expert.

### 3.  Prejudice

Holder was also not prejudiced by Herndon's failure to have Dr. Semone or a trauma expert separately examine him prior to sentencing.  As previously explained, the essence of Holder's claim is that testimony from either a third psychologist or trauma expert would have cast doubt on his ability to appreciate the dangerousness of his conduct, thus negating the mens rea necessary for capital punishment.  But a reasonable jury considering at least, inter alia, Holder's preparations for the bank robbery—e.g., wearing a bullet-proof vest, using semiautomatic rifles and bullets that can penetrate police cars, and dousing the getaway van in gasoline—would still have found that Holder was aware of a serious risk of death attending his actions, even having heard additional expert testimony.  This conclusion is made plain by the jury's unanimous negative findings on both of the statutory mitigating factors that Holder submitted—(1) that Holder did not fire the shots that resulted in Heflin's death and (2) that Holder did not intend for any person to be killed.  Given these findings, as well as the testimony and circumstantial evidence that Holder fired shots inside the bank, Holder cannot maintain that, had his counsel consulted with a third psychologist or trauma expert, "the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

Because Holder's counsel was not constitutionally deficient for not obtaining the opinion of a third psychologist or trauma expert, nor did Holder suffer any prejudice, the district court did not abuse its discretion in denying Holder an evidentiary hearing regarding counsel's alleged failure to adequately investigate his mental health.

## IV.  Constitutionally Defective Indictment

Holder's final argument on appeal is that the indictment against him failed to allege a single 18 U.S.C. § 3592(c) statutory aggravating factor and the requisite mental state required for imposition of the death penalty.  The Fifth Amendment states in relevant part that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. amend. V.  The Supreme Court has interpreted this to mean that "the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted."  United States v. Reese, 92 U.S. 214, 232 (1875). For capital cases, this includes statutory aggravating factors.  United States v. Allen, 406 F.3d 940, 943 (8th Cir. 2005) (en banc) ("Allen II") ("[T]he Fifth Amendment requires at least one statutory aggravating factor and the mens rea requirement to be found by the grand jury and charged in the indictment."), *vacating* 357 F.3d 745 (8th Cir. 2004); see also Ring, 536 U.S. at 589 ("Capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."); Jones v. United States, 526 U.S. 227, 243 n.6 (1999) ("[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.").

In Allen II, this Court determined that it is error to not charge the aggravating factors for capital punishment in the indictment, 406 F.3d at 943, but that the error is not structural and is thus subject to harmless-error analysis, id. at 945.[14]  A harmless

---

[14]Holder argues, as did Allen, that Stirone v. United States, 361 U.S. 212 (1960), requires us to treat the defective indictment as structural error.  For the same reasons that we rejected this claim in Allen II, we also reject it now.  See 406 F.3d at 943–45.  Holder is correct that after this Court decided Allen II, the Supreme Court in United States v. Resendiz-Ponce, 549 U.S. 102 (2007), took up the precise question

error is "[a]ny error, defect, irregularity, or variance that does not affect substantial rights." Fed. R. Crim. P. 52(a). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Allen II, 406 F.3d at 945 (alteration in original) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)) (internal quotation marks omitted). "When the error at issue is the failure to have a jury make a necessary finding, . . . we review the relevant evidence in the record to determine what 'any rational jury' would have done if asked to make the necessary finding." Id. at 945 (citation omitted); see id. at 946 (employing the "narrowest method of conducting harmless-error review").

Here, just as in Allen's appeal, "[o]ur inquiry . . . is whether any rational grand jury—and we presume that [Holder's] grand jury was rational—would have found the existence of the requisite mental state and one or more of the statutory aggravating factors found by the petit jury if the grand jury had been asked to do so." Id. at 945. For at least the reason that the same grand jury that returned Allen's indictment also returned Holder's indictment based on the same evidence and for the same charges, "we see no realistic possibility that [Holder's] grand jury would have declined to charge a statutory aggravating factor or the mens rea requirement in order to avoid exposing [Holder] to the death penalty." Allen II, 406 F.3d at 949; see id. at 947 ("Th[e] grand jury testimony persuades us beyond a reasonable doubt that, if the grand jury had been asked to charge the grave-risk-of-death-to-others statutory aggravating factor, it would have done so.").

---

of whether the omission of an element of a criminal offense in a federal indictment constitutes harmless error. The Resendiz-Ponce Court did not reach that question, however, because it found no error in the indictment. Id. at 111. In dissent, one Justice stated that he would have found such an error to be structural, but recognized that "the full Court will undoubtedly have to speak to the point on another day." Id. at 116–17 (Scalia, J., dissenting). That day has yet to come, and until it does, this panel is bound by its en banc decision in Allen II.

Accordingly, we reject Holder's Fifth Amendment Indictment Clause claim.

## V.  Conclusion

For the reasons set forth above, we affirm the district court's denial of Holder's Rule 59(e) motion in all respects.

———————————————

Appellate Case: 10-1304    Page: 32    Date Filed: 07/31/2013 Entry ID: 4060230